1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5              v.                    )  No. 19 CR 00567-1
                                      )
 6   ROBERT SYLVESTER KELLY,          )  Chicago, Illinois
                                      )  July 16, 2019
 7              Defendant.            )  1:02 p.m.

 8                   TRANSCRIPT OF PROCEEDINGS

 9          BEFORE THE HONORABLE HARRY D. LEINENWEBER

10   APPEARANCES:

11   For the Plaintiff:       HON. JOHN R. LAUSCH, JR.
                              United States Attorney
12                            BY:  MS. ANGEL KRULL
                                   MS. ABIGAIL L. PELUSO
13                                 MS. JEANNICE W. APPENTENG
                              Assistant United States Attorneys
14                            219 South Dearborn Street, Suite 500
                              Chicago, Illinois 60604
15                            (312) 353-5300

16   For the Defendant:       STEVEN A. GREENBERG, LTD.
                              BY:  MR. STEVEN A. GREENBERG
17                            53 West Jackson Boulevard
                              Suite 1260
18                            Chicago, Illinois 60604
                              (312) 879-9500
19
                              LEONARD MEYER, LLP
20                            BY:  MR. MICHAEL I. LEONARD
                              120 North LaSalle Street, Suite 2000
21                            Chicago, Illinois 60602
                              (312) 380-6559
22

23

24

25
```

```
 1                              DUANE MORRIS, LLP
                                BY:  MR. CHRISTOPHER T. GROHMAN
 2                              190 South LaSalle Street
                                Suite 3700
 3                              Chicago, Illinois 60603

 4    ALSO PRESENT              MR. JEFFREY ARIAS,
                                United States Pretrial Services
 5

 6    Court Reporter:          Judith A. Walsh, CSR, RDR, F/CRR
                                Official Court Reporter
 7                              219 South Dearborn Street, Room 1944
                                Chicago, Illinois 60604
 8                              (312) 702-8865
                                judith_walsh@ilnd.uscourts.gov
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2                THE COURT:  Good afternoon.

3                THE CLERK:  Good afternoon, Judge.

4                19 CR 567, United States versus Kelly.

5                THE COURT:  Good afternoon.

6                MS. KRULL:  Good afternoon, your Honor.  Angel Krull,

7     Abigail Peluso, and Jeannice Appenteng on behalf of the United

8     States.

9                MR. GREENBERG:  Good morning, your Honor.  Steve

10    Greenberg, Mike Leonard, and Chris Grohman -- who promises

11    he's going to electronically file his appearance today --

12                THE COURT:  All right.

13                MR. GREENBERG:  -- on behalf of Mr. Kelly who's

14    present.

15                PRETRIAL SERVICES OFFICER:  Good afternoon, your

16    Honor.  Jeffrey Arias on behalf of Pretrial Services.

17                THE COURT:  Okay.  This is the defendant's petition

18    for bond.

19                MR. GREENBERG:  Yes.

20                THE COURT:  Okay.  The government has -- I've

21    received the pretrial services report.  I think I have two of

22    them, one for the New York case and one for this case.  And

23    it's my understanding, we've consolidated the matter for

24    hearing today.  Is that correct?

25                MS. KRULL:  Yes, your Honor.

1          MR. GREENBERG:  Yes, your Honor.

2          THE COURT:  And it's my understanding that -- further

3    that the government contends that some of the counts require

4    the presumption of -- there are no conditions, which would

5    then make the burden on the defendant.

6          Do you agree with that, Mr. Greenberg?

7          MR. GREENBERG:  I agree that some of the counts do,

8    yes.

9          THE COURT:  And how do you wish to proceed?  If

10   you -- let me ask this.  Does the government intend to call

11   live witnesses, or are you going to proffer, or what?

12         MS. KRULL:  We do not intend to call live witnesses.

13   We intend to proceed by proffer and a joint presentation on

14   both cases.

15         THE COURT:  All right.  And do defendants intend to

16   provide -- call any witnesses?

17         MR. GREENBERG:  No, your Honor.  We're going to rely

18   on the recommendations of the pretrial services report and

19   argument.

20         THE COURT:  Okay.  And so the government then would

21   proceed then.

22         MS. KRULL:  Thank you, your Honor.

23         MR. GREENBERG:  Your Honor, do you want us to stay

24   here or --

25         THE COURT:  Well, probably seat --

1          MR. GREENBERG:  Thank you.

2          THE COURT:  A proffer is not quite the same as

3    testimony.

4          MR. GREENBERG:  Right.  But I'm guessing it will be

5    lengthy.

6          THE COURT:  So there won't be cross-examination.  Let

7    me ask this.  How long do you think the proceeding will take?

8          MS. KRULL:  Your Honor, my argument is less than a

9    half an hour long.

10          THE COURT:  All right.

11          MR. GREENBERG:  I'll be seated.

12          THE COURT:  Very good.

13          MR. GREENBERG:  Thank you.

14          MS. KRULL:  Thank you, your Honor.

15          THE COURT:  Ms. Krull, you may proceed.

16          MS. KRULL:  The defendant, Robert Sylvester Kelly,

17    should be detained pending his trial because, first, he is an

18    extreme danger to the community, especially to minor girls.

19    Second, he poses a serious risk of obstruction of justice in

20    his current case which also makes him a danger to the

21    community.  And third, he poses a serious risk of flight now

22    that he's facing more serious charges with mandatory prison

23    time.

24          In this case, as you noted, your Honor, detention is

25    presumed under the Bail Reform Act because the defendant is

1    charged with producing child pornography, among other things.

2    So detention, your Honor, is our starting point, and it's the

3    defendant's burden to rebut that presumption of detention,

4    which it simply cannot do.

5            The defendant here is charged with incredibly serious

6    crimes involving the sexual abuse of young teen girls, some as

7    young as being in middle school at the time.  Middle school.

8    We're talking seventh and eighth-grade girls.  And it didn't

9    happen once or twice.  He sexually abused them hundreds of

10   times before they turned 18.

11           And that's just two of the victims.  Between the

12   Illinois state court charges, the case in the Eastern District

13   of New York, and the case right here in the Northern District

14   of Illinois, there are 12 unique victims identified in those

15   cases, and the vast majority of them are minors.

16           And that's just the tip of the iceberg.  Our

17   investigation has identified many more girls who were sexually

18   abused by the defendant, and our investigation is far from

19   over.  The evidence against the defendant is overwhelming.  It

20   includes hard evidence, direct evidence in the form of three

21   videos showing this man, Robert Kelly, sexually abusing a

22   young girl who was only 14 years old at the time.

23           These videos are extremely disturbing to watch, and

24   they show defendant's sadomasochistic abuse of a 14-year-old

25   girl.  These videos also show defendant's particular sexual

1  interest in young girls because he repeatedly tells the girl

2  to refer to her body parts, specifically her genitalia, as

3  being only 14 years old.  And he does so in such a way that

4  shows his sexual interest to girls that particular age.  The

5  girls' age is repeated at least 15 times on this video, these

6  videos, including by the defendant's own mouth.  Also on these

7  videos, the defendant makes the girl call him "daddy" over and

8  over again.

9        And there is no question that it is the defendant on

10  these videos.  There are extreme close-ups of the defendant's

11  face on these videos.  Two of the videos are filmed in very

12  distinctive rooms at his former home.  And the victim in all

13  three of these videos, she herself has testified under oath

14  that it was Robert Kelly in all three videos sexually abusing

15  her when she was 14 years old.  There are at least five

16  witnesses who will corroborate that victim.

17        That evidence is overwhelming, your Honor.  The

18  defendant repeatedly sexually abused a 14-year-old girl.  He

19  filmed it, and we have the videos to prove it.  That weighs in

20  favor of detention.

21        But that's not all, your Honor.  In addition to the

22  sexual abuse of at least five minors, several victims reported

23  defendant's physical abuse in addition to the sexual abuse:

24  Hitting, slapping, punching, and spanking.  And beyond the

25  physical harm, there's the psychological harm that also must

1    be considered in determining whether the defendant is a danger

2    to the community.

3            Both the Illinois and the New York indictments list

4    examples of the defendant's manipulative and controlling

5    behaviors that impose lasting harm to the victims in cases

6    like this.  And that's particularly so when the defendant is

7    not in custody, because these victims fear him.  All of this

8    makes the defendant a further danger to the community.

9            But what sets this case apart from so many others and

10   what makes the defendant even more of a danger to the

11   community is the defendant's extensive history of obstruction

12   of justice -- the threats, the intimidation, the witness

13   tampering, the hush money payments -- all outlined in Count 5

14   of the indictment.

15           And these just -- these aren't just mere arguments

16   from a prosecutor.  This is what the defendant is actually

17   charged with.  A grand jury found probable cause that the

18   defendant obstructed justice in all of those ways.  This risk

19   of obstruction is real.  This risk is ongoing.  And this risk

20   of obstruction is heightened by the defendant's fame and power

21   which emboldens him to give a -- and gives him a unique

22   ability to influence and intimidate witnesses and victims, and

23   that continues to this day.

24           Now, I expect the defense will argue that the

25   defendant should be released because this conduct is old and

1    dates back to the 1990s.  First, that's factually just not

2    true.   Count 5 of the indictment, the conspiracy to obstruct

3    justice, that count alleges conduct right up to the present

4    day.   And the New York indictment includes conduct in 2015

5    against a minor and in 2018 against an adult victim.  So it's

6    just wrong to say that these cases deal only with old conduct.

7            But second, and perhaps more importantly, so what?

8    There is no statute of limitations for producing child

9    pornography and enticing a minor to engage in sexual activity.

10   If the defendant was sexually attracted to middle-school

11   girls, to eighth-grade girls in 1999, then he is still

12   attracted to middle-school girls and eighth-grade girls right

13   here in the present.  He sexually assaulted those girls

14   hundreds of times.

15           Being sexually attracted to young girls is not

16   something that you can just turn on and turn off like a light

17   switch.  It hasn't just magically gone away.  It's who the

18   defendant is.  It's what he's been doing for most of his adult

19   life and that, your Honor, makes him a danger today.

20           The defendant's team has also argued that these new

21   federal charges in Illinois and in New York are just for the

22   same conduct that the defendant was acquitted of in 2008.

23   Again, not true.  There are 13 counts in the Illinois

24   indictment and five counts in the New York indictment.  That's

25   18 total counts.  Only one of those 18 total counts is the

1    same as his state court trial in 2008. That means that the

2    defendant is facing 17 new criminal counts that he has never

3    faced before.

4           And what about that one count that does overlap with

5    the old state case? That's Count 1 of the Illinois

6    indictment. The United States Department of Justice very

7    deliberately charged Count 1 of the indictment even though the

8    defendant was acquitted of state charges based on the same

9    conduct, and that's because the defendant obstructed justice

10    and he ensured that the state trial was not a fair trial. He

11    threatened and he intimidated Minor One's family and other

12    witnesses. He provided hush money payments, and he

13    manipulated and controlled minor victims into lying about

14    their abuse.

15           Charging this conduct in the Illinois indictment

16    sends a message that no one is above the law, not even a

17    famous musician with lots of money and power.

18           Now, the defendant will say that he's not a flight

19    risk because he has showed up to all of his court hearings in

20    the past, but the stakes have significantly changed. He is

21    now for the very first time facing a mandatory minimum of 10

22    years' imprisonment and up to a maximum of 195 years on the

23    Illinois indictment alone. On top of that, New York has a

24    possible sentence of up to 80 years. And that changes

25    everything.

1       And before last Thursday, the defendant faced only

2  the same court system at the same courthouse where he

3  illegally obtained an acquittal by obstructing justice, and he

4  likely thought that he would do it again.  Now he has federal

5  charges.  He had little incentive to flee then.  Now he does.

6  The very obstruction of justice that saved him last time is

7  charged in this new indictment.  And so he knows it won't work

8  this time because this time, his victims are cooperating with

9  law enforcement.  And that, your Honor, is his incentive to

10  flee.

11       There are no release conditions that can mitigate

12  these dangers.  Electronic monitoring and home incarceration

13  are just insufficient here.  Electronic monitoring does

14  nothing about the obstruction of justice.  It does nothing to

15  prevent witness tampering.  Defendant could easily obstruct

16  justice from the comfort of his own home even if he has an

17  ankle bracelet, but not so from the MCC where his

18  communications will be monitored.

19       And on top of that, the defendant can entice girls to

20  his own doorstep.  He doesn't have to leave his home to do

21  that, especially when he has assistants and other workers who

22  enable him as alleged in the New York racketeering charge.  So

23  electronic monitoring and home incarceration are insufficient

24  to protect the public, to protect the victims, and to protect

25  witnesses from defendant's obstruction of justice.

1      Finally, your Honor, the defendant has already shown
2  his intention to disrespect this court by not being fully
3  upfront with Pretrial Services.  When Pretrial Services asked
4  him about his prior marriages, defendant conveniently left out
5  his very first marriage in 1994, and that's because that
6  marriage was to a minor girl who was only 15 years old at the
7  time and the defendant was 27 years old.  That marriage
8  happened right here in the Northern District of Illinois, and
9  the defendant knew that the girl was only 15 years old when he
10 married her.
11     Defendant was not upfront and truthful with Pretrial
12 Services during his interview.  Defendant mentioned only his
13 second marriage, and he conveniently left out that first
14 marriage because it incriminates him.  He could have simply --
15 he could have simply declined to answer that question if he
16 didn't want to disclose it but instead, he chose to lie and
17 only talk about his second marriage.
18     MR. GREENBERG:  Judge, I'm sorry.  I don't mean to
19 interrupt, but I'm going to object to that.  And maybe I'll be
20 a witness.  He did decline to answer the question.  I was
21 there.
22     THE COURT:  That, I don't know.  The record will
23 be --
24     MR. GREENBERG:  I --
25     THE COURT:  Okay.  You've established the record.

1    Whether that's true or not, I don't know.

2              MS. KRULL:  All I know, your Honor, is that's not

3    reported in the pretrial services report that the government

4    received that it was a declination to talk about his first

5    marriage.

6              Your Honor, the defendant is a danger to the

7    community.  He is a risk of flight.  And he poses a serious

8    risk of obstruction of justice.  For all of the reasons that

9    I've just laid out, the government respectfully requests that

10   this Court detain the defendant pending his trial here in the

11   Northern District of Illinois and then also for any transport

12   to New York to face the charges there.  Thank you.

13             THE COURT:  Is New York going to make a presentation

14   of its own?

15             MS. KRULL:  No, your Honor.  They are not.

16             THE COURT:  Okay.  So your presentation covers both

17   so --

18             MS. KRULL:  Correct.

19             THE COURT:  Mr. Greenberg?

20             MR. GREENBERG:  Thank you, your Honor.  Your Honor,

21   first of all, I just do want to address the pretrial services

22   report.  I sat in on the interview the other day, which is not

23   something that we typically, I guess, do.  But as I indicated,

24   in response when they asked about marriage, he declined to

25   answer certain questions at my suggestion.

14

1          Beyond that, Judge, Mr. Kelly is 52 years old.  He's

2     been a lifelong resident essentially of Illinois except for

3     brief stints in other jurisdictions.  He lived in Miami when

4     he was recording an album for a time.  He lived in Atlanta for

5     a couple of years.

6          He lives here with two young ladies.  In the media,

7     they've referred to these ladies as -- somehow as hostages or

8     slaves or whatever.  They move freely about.  They live their

9     lives.  It may not be how -- you or I or some other people may

10    not choose to live with two girlfriends at the same time.

11    That's how they choose to live.  And, in fact, they're here in

12    court today to support him.  They're back here in the first

13    row, your Honor.  So they're certainly not hostages.  They're

14    certainly not being held kidnapped.

15         And that's sort of how this started.  Late last year

16    when the father of one of them was claiming that he couldn't

17    see his daughter, we set up numerous meetings since I've been

18    involved with Mr. Kelly, and they've never shown up for those

19    meetings.

20         He has children.  He's estranged from his children,

21    his children who live here.  Even though he's estranged from

22    his children, he pays child support every month.  At one

23    point, Judge, he's -- he fell behind on child support.  He got

24    jailed until he came up with the money.  He came up with the

25    money.  He paid the child support.  His child support is

1   current and being paid.  Even though he doesn't see his kids,

2   even though his career is not what it was, he's still paying

3   that.

4          He doesn't travel.  In connection with the Illinois

5   proceedings, I turned in his passport.  I looked at the

6   passport before I turned it in.  It was seven or eight years

7   old.  It didn't have a single stamp in it.  He hadn't been

8   anywhere, hadn't been anywhere, hasn't traveled around the

9   United States for the last years.

10         Every once in a while, he goes to play a concert

11  somewhere, and he'll travel to the concert.  And unlike -- and

12  I've said this before.  Unlike the song, his most famous song

13  which is, "I Believe I Can Fly," Mr. Kelly doesn't fly.  He

14  doesn't like to fly.  He drives to concerts unless it's

15  somewhere he can't fly to.

16         So, for instance, if he has a concert in California,

17  he may have to take a plane.  He gets medicated.  He goes on

18  the flight.  That's one of the reasons he never travels to do

19  concerts internationally because he doesn't like to fly.  He's

20  got a van.  He travels in his van.  So he's not a risk to go

21  to the airport and take off.  And frankly, he would be

22  recognized anyway.  He's not going anywhere.

23         He has no family or friends that reside outside the

24  United States.  He has no contact with people under 18.  No

25  one under 18 lives with him.  No one under 18 lives around

1    him.

2           And they had to ask questions about internet and so

3    forth.  He has internet.  He records on a computer.  And he

4    records -- obviously, you have to use the internet to do

5    anything with the computer.  And right now, your Honor, he

6    lives in a small -- it's essentially a one-bedroom, I think

7    they call it, plus den unit in Trump Tower on the 48th floor;

8    a secure building, obviously.

9           He lives there, and he records there.  He's taken the

10   den.  He's got some computer equipment in there, and with

11   today's technology you can make a guitar and he can make

12   keyboards and all of that, and that's what he does.  And he

13   basically stays in that unit unless he's walking his dog or

14   going outside as he likes to do from time to time and smoking

15   a cigar.  He has no criminal record.  And I'll get into the

16   earlier case in a minute.  But he has no criminal record.

17          These are the third and fourth cases that Mr. Kelly

18   has been charged with of real substance.  Actually, they're

19   the fourth and fifth.  He got charged with a case in Florida

20   that was dismissed back when the other charges were pending

21   here in Illinois back in 2002-2003.

22          He had a case from 2002 to 2008.  It was pending in

23   state court here in Illinois.  There were dozens of court

24   dates, dozens upon dozens of court dates.  He was required to

25   appear, the best I've been able to determine, at each of those

1   court dates.  He appeared each of those court dates.  He was

2   facing extraordinarily serious charges at that time, your

3   Honor.

4           The prosecutors maybe want to look down on the state

5   court or the integrity of the state court proceedings.  Those

6   were extraordinarily serious.  They were child pornography

7   charges.  He was facing, by my reading of the charges,

8   possible consecutive time.  And he went to trial on over 10

9   charges.  He was looking at significant, significant jail

10  time.  And he went to trial.  He had to go to trial.

11          I keep hearing this, you know, from the prosecution,

12  and I see what they've done in their indictment.  Obviously,

13  I'm not privy to the evidence at this point, but they say that

14  the case was somehow rigged.  He went to trial.  He wasn't, if

15  it was -- he didn't take a bench trial.  He had a jury.  He

16  didn't -- no one says he paid off the jurors or anything.  He

17  had 12 people.  Those 12 people watched the video in that

18  case.  The video in that case got played, the same video

19  they're talking about here.

20          The witness in that case that they've got here

21  testified before the grand jury, her parents testified before

22  the grand jury back then that that wasn't her.  The jury heard

23  all the evidence.  The jury heard from other people.  And the

24  jury watched the video.  And the jury acquitted Mr. Kelly.  If

25  the fix was in, he went through an awful lot because the fix

1   was in.  He was definitely at jeopardy in that case.

2         Now, I don't know what their evidence is.  I don't

3   know what people who maybe knew Mr. Kelly was.  He had fine

4   attorneys.  He had the Sam Adam, Junior and Senior.  He had

5   Mr. Genson on the case.  I don't know what they're saying was

6   going on with that case because I haven't seen it.  But

7   Mr. Kelly had to go to trial.  He had to face those jurors.

8   He had to sit through a closing argument and a rebuttal

9   closing argument where someone pointed their finger at him and

10  said, "Based on the evidence here, we think you're guilty."

11        They thought that they had presented enough evidence.

12  If they had such problems with their evidence on that case,

13  they wouldn't have gone to trial, the prosecutors.  And I've

14  talked to those prosecutors about that case.  They certainly

15  never suspected that anything was untoward in that case.  He

16  never missed a court date, never was late for a court date.

17        Charged again here in Illinois this year.  And again,

18  they pooh-poohed those charges.  He's charged with Class X

19  felonies here in Illinois and, again, facing potential

20  consecutive time on Class X felonies.  He showed up for court.

21  The State indicted him.  The State called me up, they said,

22  "We're going to add charges on the case.  When do you want to

23  come to court and be arraigned?"

24        We picked a date.  He showed up.  He showed up on

25  time.  He pled not guilty to those charges, and the State

1    didn't even ask the judge to raise the bond on the case

2    because there's no reason to believe that he is not going to

3    show up.

4          On the state case, Judge, he posted $100,000.  They

5    had 25,000 he had to post, a $250,000 D bond on each of the

6    four cases.  So it's $100,000 total that's posted on that

7    case.  He's being monitored by pretrial services in the state

8    court.  They've never had a problem.  They check on him.  He

9    does what he's supposed to do.  They tell him to call, he

10   calls when he's supposed to call.  They tell him where to be,

11   he's where he has to be.  There's not any problem there.

12         The fact that Mr. Kelly was getting charged in state

13   court was no surprise to anyone.  It was -- there was this, as

14   they like to call it, documentary.  I don't really think it

15   was a documentary, but they call it that.  And he gets

16   charged.  He turns himself in.  They called me up.  They said,

17   "Hey, we charged" -- this is original, not on the increased

18   charges, the original charges.  They called me up.  "We

19   charged him with felonies.  We'll give him 24 hours to turn

20   himself in."

21         We made arrangements, went to the police station,

22   went to the police station, turned himself in, cooperated with

23   them.  They wanted to take a DNA sample.  Sure, take the DNA

24   sample, all that.

25         He did that knowing that when I talked to the

1    prosecutors about bond, they would not agree to a bond with

2    me.  So he did that full well knowing that he could be held

3    without bond on the state charges.  And had they called me on

4    this -- and they knew I was representing him.  Had they called

5    me on this, they wouldn't have had to pull up and arrest him

6    walking his dog outside of Trump Tower.  If they would have

7    said, "Bring him in," we would have brought him in just like

8    before.

9              They argue that he's a flight risk when every single

10   time, every single time, he has voluntarily appeared.  He

11   hasn't fled.  He hasn't missed court.  He hasn't been late for

12   court.

13             It was no secret he was under investigation here,

14   Judge.  It's been common knowledge he's under investigation

15   here.  He's under investigation in the Eastern District of New

16   York.  There may even be a second investigation in the

17   Southern District of New York that I've heard about.  It's a

18   well-known fact.

19             If Mr. Kelly was going to flee, he would have left

20   then.  He would have already left.  He's not a flight risk at

21   all.  And I'm shocked that they even argue that, that they

22   would even argue that.  When they pulled up to arrest him on

23   Wabash, he didn't try and run.  He texted me shortly before.

24   He saw the cars out there.  I can show the government the text

25   message.  He saw the cars out -- that were out there, your

1    Honor.  He didn't go back into Trump Tower.  He didn't go lock

2    himself -- he stood there smoking a cigar and walking his dog.

3    He was polite.  He was cooperative.  There was absolutely no

4    reason to believe that he would flee.

5         How could he flee?  He has no money.  Mr. Kelly filed

6    for bankruptcy four, five years ago.  He doesn't, to the best

7    of what I've been able to determine, own the royalties to his

8    songs.  Those were stolen from him.  He would get small checks

9    from time to time because, my understanding -- I've learned a

10   little about the business now in this case -- they don't make

11   money from selling the music anymore because you can go on a

12   streaming service, and the streaming service charges a small

13   monthly fee.  So the money's in concerts.  And he doesn't play

14   any concerts these days.  He hasn't played any concerts for a

15   while.

16        So every once in a while, he'll get a check.  It

17   might be 30,000, 40,000.  I think he got one that was a little

18   bit bigger than that for royalty payments.  He got a check

19   when Sony, I think it was Sony canceled his contract.  There

20   was an agreement as to how much it was.  That money is gone.

21        What did he do with that money?  He didn't put the

22   money when he got it -- he got almost $400,000 right around

23   the time of the state charges, I think right after the state

24   charges.  He didn't put that money in a safe in his house or

25   in a hidden box somewhere.  He put that money in a bank

1   account under his own name.  And what happened?  He had gotten

2   evicted from his recording studio, and the people who evicted

3   him seized the money in his bank account.  And a big chunk of

4   it went to pay because he owed back child support, so he paid

5   it to back child support.  And some of it went to pay his

6   state court bond.  And then there was nothing left.

7          He prepaid his apartment.  I believe it's paid for

8   close to either until December or to January 1st in Trump

9   Tower.  He's prepaid that.  And he has no other money to live

10  on.  He's got no money to flee on.  He'll get a little check

11  here and a little check there, and maybe some friends will

12  help him.

13         They say that he lives a lavish lifestyle, but he

14  doesn't live a lavish lifestyle.  They say that he faces a

15  mandatory minimum sentence of ten years now so he's in some

16  grave danger.  He was facing a mandatory minimum sentence of

17  six years before, and he was showing up.  I don't see that as

18  a sea change in what he's facing.

19         They claim, your Honor, that Mr. Kelly is a danger to

20  minors.  The way the indictment is written is very typical.

21  It's vague as to what things are.  And I understand why they

22  write the indictments that way, but the dates are in there.

23  So except for one allegation which I can't figure out what

24  they're really saying in it, the allegations date back to the

25  '90s, to the '90s.

1          Now, I understand statutes of limitations and all of

2     that, but they date back to the '90s.  They've been

3     investigating him, state.  They've been investigating him,

4     federal.  They've gone on TV and said, "Call us if you've had

5     a problem with R. Kelly."

6          They've gone on TV, other people, not the law

7     enforcement, have said, you know, "We'll pay you for your

8     story if something has happened with R. Kelly," yet we're

9     still dating back two decades on allegations regarding minors

10    except for one very vague thing that they've put in one of the

11    indictments.

12         There's no evidence that he's a risk to minors at all

13    at this point.  And they talk about the psychological risk or

14    something like that.  I don't -- I don't know what that is,

15    but whatever it is, detaining Mr. Kelly isn't going to fix

16    someone if someone's got some kind of psychological issues

17    because of something happening to them.  Those aren't

18    connected at all.  In fact, the only proof here is that he

19    isn't a danger to minors.  The fact that it's been two decades

20    since there were these allegations shows that he isn't.

21         They say that he's a danger because he's going to

22    obstruct justice in this case just like he did before.  And I

23    don't have whatever their evidence is, but I can tell you a

24    little bit.  And these are not secrets.  This is well known

25    about Mr. Kelly and Mr. Kelly's business.  Mr. Kelly had a

24

1    business manager.  He had a lawyer.  He had an accountant.  He

2    had people who worked for him, other people working for him,

3    all of whom have a lot of money now.  All of them have a lot

4    of money now, but Mr. Kelly doesn't.  He doesn't have any

5    money.

6          It's not a secret that Mr. Kelly doesn't read.  He

7    doesn't write.  Now, if other people did something when he was

8    facing trial before because they wanted to protect, you know,

9    the money tree, I don't know about that, and I haven't seen

10   the evidence on that, but he wasn't doing it.  He wasn't doing

11   it.  And let me tell you why, even if the government says he's

12   a danger because of the obstruction charges, why their

13   argument impeaches itself.

14         He's charged in that count with two other people:

15   Derrel McDavid -- and everyone has always told me Derrel

16   McDavid was the guy who ran it, he was the business guy; he

17   was the accountant, but he was the business guy, he was the

18   guy who handled all Mr. Kelly's affairs -- and a guy named

19   June Brown.

20         The government agreed to recognizance bonds for

21   Derrel McDavid and June Brown.  June Brown, I think, turned

22   himself in in Las Vegas.  My understanding is, he got a

23   recognizance bond.  Derrel McDavid turned himself in here and

24   got a recognizance bond, but he's charged with obstruction.

25   If obstruction is such a danger and such a risk to everybody,

1       then why did the government agree to a recognizance bond for

2       Derrel McDavid?  And I'm sure they've got -- they've got their

3       reasons, but it certainly shows that that charge doesn't imply

4       that anyone's a danger.

5              Frankly, Mr. Kelly -- well, there's no evidence, your

6       Honor, at this point and there's no evidence because it hasn't

7       happened that since Mr. Kelly has heard these rumors swirling

8       around which have been around now for probably a year and a

9       half, two years about criminal charges and so forth, that he's

10      done anything to any witness, to anyone he thinks might be a

11      witness, taken any action at all.

12             There's no suggestion that since the state court

13      charges were filed that Mr. Kelly has done anything wrong at

14      all, anything.  Hasn't talked to a witness.  Hasn't interfered

15      with a witness.  And I don't even think that was a condition

16      of his state court bond.  I might be -- was that a condition,

17      Steve, that he not have contact with anyone?  Was it a

18      condition?

19             Okay.  It's a condition of his bond, that he's

20      complied with that.  But he complied with it before it was a

21      condition of his bond.  He didn't do anything.

22             Now, they say that all of this is different and all

23      of it is different charges, different victims and all that.

24      We respectfully disagree, your Honor.  We think that there is

25      great overlap.  And we think that some of the case is, in

1   fact, overreaching.  For instance, where they've got predicate

2   acts in a RICO prosecution because you could have transmitted

3   a sexually transmitted disease in violation of state law,

4   they're making it into a RICO case.  I know they've got other

5   allegations, but they've got things like that in their case.

6          We think that it's terrible overreaching.  We think

7   that they're trying to criticize how consenting adults,

8   consenting adults who never complained for years and years all

9   of a sudden say, "Oh, no, I didn't want to be in that kind of

10  a relationship.  There was something about that relationship."

11         These people who are their witnesses have been on a

12  greatest hits tour since this first hit.  They've been on TV.

13  They went to the awards in Las Vegas, the MTV awards, and got

14  an award for the documentary.  They went to some other award

15  show and they -- we've got this, they Tweet and they video and

16  they, "Oh, this is great.  My mom has never been" -- the one

17  girl who is charged, she's one of the people in the state

18  case.  "My mommy's never been to anything like this.  I'm so

19  happy I got to bring my mother to this."  I mean, give me a

20  break.  That's what this has turned into.

21          They've got in here that he was forcing people to do

22  labor.  I have no idea what they're talking about.  Was he

23  forcing a girl to collect tickets?  Was he forcing her to

24  record?  What is it?  It's so vague, we can't -- we can't

25  respond, we can't attack it, but we're going to attack it.

1          Mr. Kelly's conditions, Judge, another factor I think

2     the Court can take into consideration, he is in the SHU, which

3     is the special housing unit.  He's in the SHU because,

4     frankly, for the MCC or any other institution, Mr. Kelly is a

5     difficult prisoner to have there because of other prisoners;

6     not because of anything Mr. Kelly is going to do but because

7     of his notoriety.

8          Mr. Kelly -- there's going to be an enormous amount

9     of discovery in this case.  He can't read and he can't write.

10    Someone's going to have to sit down with him hour after hour

11    after hour, day after day, and go through the discovery.

12    That's virtually impossible to do if he's in custody.

13         In the SHU, he gets 15 minutes a week to speak on the

14    phone, not like other inmates.  There's no dayroom.  There's

15    no television because that's normally the hole.  That's where

16    they take people who are in trouble.  There's no television

17    there.  And he can't read, so there's no books to read.

18    There's no anything.  So he literally sits there in isolation

19    all day long.

20         And if we go to meet with him, the attorneys on the

21    case, we went over there yesterday.  What would you guys say?

22    The room is six by eight?

23         Probably a six-foot by eight-foot room, and we'll all

24    crammed in there.  That's the room that we have to meet with

25    him, and they have to shut everything else down while we do

1   it.  They have to shut everything else down while we do it.

2   Now, whatever you may think of the charges, whatever the

3   government may think or the public may think of the charges,

4   the man's going to have to prepare for trial, and the man's

5   entitled to be held in a humane situation.

6           We have reviewed all of the conditions listed in the

7   pretrial services report.  He doesn't have a passport.  That's

8   been taken by the State.  We have no objection to any of the

9   conditions that are listed in the report.  And we believe that

10  it's perfectly appropriate in this case that he should be

11  allowed to return home, whether it's on electronic monitoring

12  or home detention or whatever the -- I know there's various

13  levels of federal detention when you're kept at home, but that

14  that is, in fact, appropriate, commensurate with the

15  presumption of innocence and the proper bail that should be

16  set in this case.

17          May I have one moment, Judge?

18          THE COURT:  Yes, sir.

19      (Pause.)

20          MR. GREENBERG:  And Mr. Grohman has pointed out to me

21  also that they executed a search warrant on Mr. Kelly's

22  residence after he was arrested.  I believe that I read

23  somewhere they found two bullets, I think, which were in a cup

24  with change.  He had weapons.  Those were all turned in to the

25  State when he was arrested on the state charges.  Those were

1    probably buried under the change.  But they found nothing that
2    I'm aware of during that search.
3              THE COURT:  Thank you.
4              MR. GREENBERG:  Thank you.
5              THE COURT:  Ms. Krull?
6              MS. KRULL:  Thank you, your Honor.  I just briefly
7    want to address a couple of the things raised by
8    Mr. Greenberg.  First of all, Mr. Greenberg raised the fact
9    that Mr. Kelly's co-defendants were released on bond.  And
10   yes, that is true, and here's why.
11             There are zero allegations against Mr. McDavid and
12   Mr. Brown that they have ever sexually abused a minor.  They
13   are not charged in the most serious counts in this indictment,
14   and they are not charged with counts that carry that
15   presumption of detention.
16             And second of all, with respect to the charges
17   relating to the obstruction of justice, Mr. Kelly was the
18   leader of that conspiracy to obstruct justice.  And whatever
19   his co-defendants did in furtherance of that obstruction of
20   justice they did at his behalf.
21             And I want to make clear, with respect to the count
22   of receiving child pornography, that conspiracy to receive
23   child pornography that both McDavid and Mr. Brown is charged
24   in, their role in receiving that child pornography was not
25   because they enjoyed viewing child pornography.  It was

1  because the defendant instructed them to obtain these sex

2  tapes with minors that the defendant was on.  And so it's not

3  like they had an interest in minors.  They were doing what the

4  defendant told them to do.  That's why they're charged in that

5  count.  And so we did not seek detention for those individuals

6  because we did not see them as the extreme danger to minors

7  that the defendant is.

8          The other thing I'd like to mention, your Honor, is

9  that throughout Mr. Greenberg's presentation here, he never

10  once mentioned Minor One.  He never once mentioned the

11  strength of our evidence regarding Mr. Kelly's sexual interest

12  in middle-school kids.  He never once mentioned that she has

13  now gone on record that, yes, that is her on three videos.

14          And I want to emphasize, it's not just the same video

15  from 2008.  We have three videos showing the defendant

16  sexually abusing Minor One.  And the other two videos were not

17  part of that 2008 trial.  So these charges are much more

18  severe than what he was facing before.

19          And the other thing I'd like to say, Mr. --

20  Mr. Greenberg liked to focus on a lot of the adult victims in

21  the case, and he was not focusing on the minors.  And I'd like

22  to make clear that the eighth-graders that I mentioned

23  including Minor One, never have they appeared before a TV

24  camera.  Never have they been seeking fame and fortune.  They

25  have cooperated with the United States government because we

1    reached out to them.  They are not on TV seeking money from

2    the defendant.

3         That's all, your Honor.

4         THE COURT:  Anything further?

5         MR. GREENBERG:  No, your Honor.

6         THE COURT:  All right.  Under the law, the charge,

7    the specific charge of child pornography, creating and

8    possessing child pornography, does require a presumption of

9    detention that there are no conditions that would be

10   sufficient.  And it would be up to the defendant to

11   demonstrate that there -- to get away from this presumption.

12        And I do not believe based on the allegations that

13   have -- of the indictment which bear the imprimatur of the

14   grand jury, which means that the grand jury, after hearing

15   evidence certainly produced by the government, found probable

16   cause for guilt of all of the specific counts in both the

17   indictment here in Chicago and the indictment in -- from New

18   York, in the Eastern District of New York.

19        The charges are extraordinarily serious.  The one

20   specific one, Count 1, 2, and 3, carry a mandatory ten-year

21   penalty which is a very, very -- which indicates how serious

22   those specific charges are and, in addition, they carry the

23   detention presumption.

24        The -- as far as the obstruction of justice,

25   according to the specific count in the indictment that the

1   acquittal was at least in some part obtained because of

2   obstruction of justice which involved allegedly paying off of

3   witnesses and threatening witnesses and buying back certain

4   evidence in the forms of the videos that even though

5   apparently there was one that was played, there were several

6   other videos.  And if all three videos or four videos, one of

7   which apparently has not surfaced yet but must be out there

8   somewhere, had all three of them, who knows how the case could

9   have come out.

10          Supposedly, according to the indictment -- again, I

11  go by the fact that a grand jury found that there's probable

12  cause -- that witnesses were paid and witnesses were

13  threatened in order to either change testimony or not appear

14  at all.

15          So it appears to me that the defendant has failed to

16  overcome the presumption of requiring detention in both the

17  case here in Chicago and the case in New York.

18          Although, does the presumption apply in the New York

19  case?

20          MS. KRULL:  Yes, it does, your Honor.

21          THE COURT:  All right.  So the presumption in both

22  cases, that there are no conditions that will assure the

23  defendant's attendance at trial and no conditions that will

24  protect the public and certain individuals, accordingly, the

25  Court denies the motion for bond.  Thank you.

1    MS. KRULL:  Your Honor, I believe that we also have

2  to take care of the defendant's arraignment.  He was unable to

3  be arraigned the very first day that he was arrested.

4    THE COURT:  All right.  Mr. Greenberg, has the

5  defendant received a copy of the indictment?

6    MR. GREENBERG:  He has, your Honor.

7    THE COURT:  Have -- you've advised that he can't read

8  it, but have you read it to him?

9    MR. GREENBERG:  We've gone over the charges with him,

10  yes.  We'll enter pleas of not guilty, and we'll waive formal

11  reading.

12    THE COURT:  All right.  Would the government put on

13  the record the maximum penalties?

14    MS. KRULL:  Yes, your Honor.  For Counts 1 through 4

15  of the indictment, the maximum possible penalties are 20

16  years' imprisonment with a mandatory minimum of ten years;

17  supervised release of not more than five years; a fine of up

18  to $250,000; and a special assessment of $100 along with

19  restitution.

20    With respect to Count 5, the conspiracy to obstruct

21  justice, the maximum term of imprisonment is five years;

22  supervised release of not more than three years; a fine of up

23  to $250,000; and a special assessment of $100.

24    With respect to Count 6, conspiracy to receive child

25  pornography, and also Counts 7 and 8, the actual receipt of

1    child pornography, there's a mandatory minimum of five years'

2    imprisonment on each of those counts; a statutory maximum

3    sentence of 20 years on each count; supervised release of at

4    least five years and up to lifetime supervised release; a fine

5    of up to $250,000; and a special assessment of $100.

6         And finally, with respect to Counts 9 through 13,

7    enticement of minors to engage in criminal sexual activity,

8    there's a statutory maximum of ten years' imprisonment on each

9    count; up to five years of supervised release; a fine of up to

10   $250,000; a special assessment of $100; and also restitution.

11        THE COURT:  He's been arraigned on the New York

12   charges already?

13        MS. KRULL:  Yes, he has.

14        THE COURT:  All right.  Mr. Kelly, your attorney -- I

15   understand that he tells me that you cannot read.  And so do

16   you feel that you understand the nature of the charges of the

17   indictment?

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  Okay.  All right.  The Court accepts

20   the -- let the record show that the defendant is in court in

21   person through his counsels.  The government's present through

22   its counsel.  The defendant acknowledges that he has received

23   a copy of the indictment, that it has been read to him, that

24   he is familiar with the contents of the indictment, and he

25   waives the -- excuse me.  He pleads to all of the counts not

1    guilty.

2          The rule -- as far as discovery is concerned, the

3    government will proceed immediately to furnish discovery; is

4    that correct?

5          MS. KRULL:  Your Honor, we were going to ask for some

6    time to be able to work out a protective order with all three

7    defendants because a lot of the materials that we'll be

8    producing involve minors.  And we are working on a protective

9    order before we produce anything.  So we would like maybe an

10   extension of a week to your normal schedule for the Rule 16

11   conference.

12         THE COURT:  Is that acceptable?

13         MR. GREENBERG:  I don't know what -- what a week

14   means.  Give me a day that they're talking about.

15         THE COURT:  Are you talking about two weeks for the

16   production?

17         MS. KRULL:  Right.  Normally, we get two weeks to

18   produce the Rule 16 materials.  We're asking for an extra week

19   because Mr. Brown's not even in town yet.  We're not sure of

20   his attorney situation, and we'd like to produce -- to work

21   out this protective order with all three defendants in the

22   case before we produce anything.

23         THE COURT:  So you want three weeks to produce?

24         MS. KRULL:  Correct.

25         MR. GREENBERG:  Judge, given that Mr. Kelly is going

1    to be in custody, we -- you know, we can look over whatever

2    they propose as a protective order, and it will be binding on

3    us.  And if they want to work out another protective order --

4    I mean, what happens if Mr. Brown gets here and says he needs

5    time to find counsel.  I don't want to be at Mr. Brown, who is

6    out, his leisure.

7         THE COURT:  Well, we're talking about three weeks

8    max.  Now, if they can't work out a protective order, he

9    doesn't get counsel in time, they will proceed with

10   discovery --

11        MS. KRULL:  Correct.

12        THE COURT:  -- within -- after three weeks even

13   though they have not.  So they would have to do it piecemeal,

14   I guess, to -- is that acceptable, I guess the question is?

15        MR. GREENBERG:  I'm not trying to be difficult --

16        THE COURT:  No, I --

17        MR. GREENBERG:  -- but how difficult is it to do a

18   protective order?  The protective order is going to say, don't

19   show it to anyone other than the lawyers --

20        THE COURT:  I don't know.

21        MR. GREENBERG:  -- and people working on the case.

22        THE COURT:  I don't know.

23        MR. GREENBERG:  It seems pretty simple.  I would

24   think they've got one on their word processor.

25        THE COURT:  Normally, you'd think it might be simple,

1   but then I've been here long enough to know that it isn't --
2   that isn't always the case, that people come up with
3   objections.
4        I guess I repeat the question:  You object to three
5   weeks?
6        MR. GREENBERG:  I do.
7        THE COURT:  All right.  I'll make it two weeks.
8        Let's see.  What else do we need to do?  Discovery in
9   two weeks.  Do you wish to file pretrial motions?
10       MR. GREENBERG:  I'm sure we will.
11       THE COURT:  How much time?  Would you like to do it
12  now, or do you want to look at them and then we can have a --
13       MR. GREENBERG:  I'd like to look at the discovery.
14       THE COURT:  All right.  Why don't we do this.  We'll
15  come back in 30 days, and we'll set a schedule for motions.
16       And is there objection to excluding time?
17       MR. GREENBERG:  No, your Honor.
18       THE COURT:  All right.  To the next status, will be
19  30 days after you get the discovery.
20       THE CLERK:  September 4th at 10:00 o'clock a.m.
21       THE COURT:  September 4th.  The time will be excluded
22  without objection to September 4th for the purpose of the
23  interest of justice and for the -- in the interest of justice
24  and for pretrial motions which counsel advises that there
25  definitely will be.  So okay, without objection, time will be

1     so excluded.

2             MS. KRULL:  Thank you.

3             THE COURT:  September 4th at 9:00 o'clock.

4             MR. GREENBERG:  Thank you.

5             THE COURT:  Anything --

6             MR. GREENBERG:  What about --

7             MS. KRULL:  Your Honor, I imagine that New York is

8     going to want to have an arraignment in New York on their

9     charges.

10            THE COURT:  Hasn't he been arraigned?  I thought you

11    said he --

12            MS. KRULL:  I misspoke earlier.  He had his initial

13    appearance on the removal proceedings, but he needs to be

14    arraigned before --

15            THE COURT:  Oh.

16            MS. KRULL:  -- the district judge there.

17            And so I do believe, though, September 4th should

18    give us enough time for him to have his appearance there and

19    be brought back to Chicago for your September 4th date.  I'll

20    work with the marshals on that to make sure that that's okay.

21            THE COURT:  All right.

22            MS. KRULL:  But it sounds like it should be enough

23    time to get him to New York and back.

24            MR. GREENBERG:  Which is a whole another

25    complication, Judge.

1      THE COURT:  Are you representing him in the New York

2   case?

3      MR. GREENBERG:  We very well may be, but he does --

4   he has a lawyer there.

5      THE COURT:  Does he have one there?

6      MR. GREENBERG:  Right.  Because we're not -- I'm not

7   licensed --

8      THE COURT:  All right.  Well --

9      MS. KRULL:  We can also talk about videoconferencing

10  with New York to see if that is a possibility.

11     THE COURT:  All right.  Work that out.

12     MR. GREENBERG:  Can we -- we can't arraign him here

13  now?  We've reviewed those charges with him, also, but --

14     THE COURT:  I don't know.

15     MS. KRULL:  He's entitled to appear before the

16  district judge there.

17     THE COURT:  Well, is that a waiveable?

18     MS. KRULL:  I can work on that to see if that's

19  acceptable to the judge in New York and the prosecutors in New

20  York.

21     THE COURT:  All right.  If you want to do -- arraign

22  him in front of me on the New York charges, then just schedule

23  it with the clerk, and we can do that.

24     MS. KRULL:  Thank you, Judge.  I'll work on that.

25     MR. GREENBERG:  Thank you.

1          THE COURT:  Anything further?

2          MR. GREENBERG:  No, your Honor.

3          MS. KRULL:  No, your Honor.

4          THE COURT:  All right.  We'll stand adjourned.

5          THE CLERK:  All rise.

6       (Proceedings adjourned at 1:56 p.m.)

7                    * * * * * * *

8                 C E R T I F I C A T E

9       I, Judith A. Walsh, do hereby certify that the

10   foregoing is a complete, true, and accurate transcript of the

11   proceedings had in the above-entitled case before the

12   Honorable HARRY D. LEINENWEBER, one of the judges of said

13   Court, at Chicago, Illinois, on July 16, 2019.

14

15   */s/ Judith A. Walsh, CSR, RDR, CRR*_____    July 20, 2019

16   Official Court Reporter

17   United States District Court

18   Northern District of Illinois

19   Eastern Division

20

21

22

23

24

25