UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 19 CR 567-1 |
| v. | ) | |
| | ) | |
| ROBERT KELLY, | ) | |
| | ) | Hon. Harry D. Leinenweber |
| Defendant. | ) | |

**DEFENDANT ROBERT KELLY'S MOTION FOR IMMEDIATE
RELEASE FROM SOLITARY CONFINEMENT**

**NOW COMES** DEFENDANT, **ROBERT KELLY**, through counsel, and
respectfully requests that this Court Order the Federal Bureau of Prisons
("BOP") to immediately release him from confinement in the "Special Housing
Unit" ("SHU"), which is designed for and used to punish. In support, Mr. Kelly
states as follows:

## I.    Introduction

Despite being compliant with all forms of previous pretrial release, since
his arrest on July 11, 2019, Mr. Kelly has been housed in the SHU at the
Metropolitan Correctional Center ("MCC"). Initially, this was purportedly
done for Mr. Kelly's own safety, but subsequently, Mr. Kelly, through counsel,
requested that he be released into the MCC's general population. The BOP
refused, stating, "[T]he issue is that although he may be ready to go to general
population, for safety and security reasons, he may not be appropriate for

general population at this time because of his alleged offense and notoriety. . .

. Nonetheless, his housing status will continue to be monitored and reviewed

on a weekly basis." *See* Exhibit A, attached hereto (email from BOP).

Instead of placing the Mr. Kelly one of several other floors available as

an alternative to general population, the BOP has placed Mr. Kelly where

inmates go to be punished, on the facility's most restrictive floor, with zero

privileges. In essence, even though he has not violated a single BOP rule, Mr.

Kelly is being unconstitutionally punished and segregated from the rest of the

prison population. Additionally, the BOP's promise to continue to check Mr.

Kelly's status to see if anything changes as to his solitary segregation is utterly

nonsensical – the conduct he is charged with will remain unchanged, as will

his celebrity status.

Housing in the SHU unit entails, among other things:

- No meaningful interaction with other humans;

- No time outside getting sunlight;

- No  privileges in terms of use of media/recreation activities;

- All visits, except for those with attorneys, are conducted via video and recorded. Normally inmates have unrecorded face-to-face visitation that takes place in a common visiting room;

- A single civilian visitor for each 90-day period.  This means that the same one civilian can visit for 90 days, and only at that point may a new

civilian visitor be designated. . Normally inmates are allowed to place 10 civilian visitors on their visitation list;

- Allowance of only the purchase of soap and other toiletries, and batteries for a small radio, from the commissary. Normally inmates are allowed to buy those items as well as snacks and candy;

- Highly limited interaction other inmates;

- No television. Normally inmates are free to watch television in the dayroom where they can socialize with other inmates;

- Access to showers for basic hygiene only three days per week, on Monday, Wednesday and Friday. Normally inmates are allowed to shower every day;

- No recreation or fresh air. Normally inmates are allowed to exercise and play basketball on the roof of the facility;

- Only one telephone call, lasting 15 minutes, per month. Normally inmates are allowed at least 300 minutes of phone privileges per month;

- No email access. Normally inmates have unfettered access to email family, friends, and their attorneys;

Further, Mr. Kelly's segregation in the SHU (and in custody) gives rise to issues that make it very difficult to prepare for any trial, including the following;

- Anytime Mr. Kelly is removed from his cell he has to be handcuffed and remain handcuffed, and does not have use of his hands when meeting with counsel, as opposed to general population inmates, who are not cuffed when meeting with counsel.

- SHU inmates must meet with counsel are in a small room, far smaller than the ones on the 11th floor where counsel meets with inmates that are not in the SHU. In the 11th floor meeting rooms there is a table, and the client typically will sit on one side, with counsel on the other. The table provides a working space. In the SHU there is no table, only a very small counter against one wall. That limited counter space is encumbered by a box utilized for the video visitation and a desktop computer terminal and screen. There is not enough space to put a piece of paper and have it lie flat;

- Mr. Kelly has extremely limited literacy, which means that every piece of discovery is going to have to be read to him, and order to review. When meeting with Mr. Kelly anything and everything the Council wishes to review with him must be kept on counsel's lap or the floor, because there is no table. Given that Mr. Kelly is cuffed during these visits, and there is no table, it is impossible for counsel to review documents with him and write notes.

Given that Mr. Kelly is a pretrial detainee not yet convicted of any crime, his current conditions not only violate the cruel and unusual punishment standards of the 8th Amendment, his procedural due process rights, and further inhibits his right to effective counsel under the 6th Amendment.

## II. Solitary Segregation Unconstitutionally Deprives Mr. Kelly of his Constitutional Rights

In evaluating the conditions a pre-trial detainee is held in, the Supreme Court indicated in *Bell v. Wolfish* that the "proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish* 441 U.S. 520 (1979). Absent a showing of express intent to punish on the part of detention facility officials, the determination turns on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* at 530. The Court reasoned that, "pretrial detainees, who have not been convicted of any crimes, retain *at least* those constitutional rights that we have held are enjoyed by convicted prisoners." *Id.* at 544 (emphasis added). The Court further observed that "loading a detainee with chains and shackles and throwing him in a dungeon" would violate due process because many alternatives short of those measures would suffice to "ensure presence at trial and security of the institution." *Id.* at 539.

Similarly, in *Rapier v. Harris*, the Seventh Circuit noted that "due process entitles a pretrial detainee to be free from punishment prior to an adjudication of guilt." *Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999). The Seventh Circuit recognized the "fundamental principle that a person held in confinement as a pretrial detainee may not be subjected to any form of punishment for the crime for which he is charged." *Id.* Any other rule "would render nugatory the basic proposition that a person is innocent until there is a judicial determination of guilt." *Id.* Thus, while the "government may have legitimate interests that stem from the need to manage the facility in which the individual is detained," the measures taken to effectuate these interests must be "reasonable." *Id.* at 1004.

In *Rapier*, a pretrial detainee was placed in solitary confinement for a prolonged period of time because of misconduct that occurred while he was detained, namely numerous incidents of violent and disruptive behavior, including throwing food trays and urine at other inmates and guards, stabbing a prisoner-trustee with a broken broomstick multiple times, and purposely flooding his cell by blocking the toilet. *Id.* at 1001.

The *Rapier* court observed that, "unlike sentenced prisoners for whom much institutional punishment can be considered to be within the parameters of the imposed sentence of confinement …pretrial detainees, serving no sentence and being held only to answer an accusation at trial, have no

6

expectation that, simply by virtue of their status as pretrial detainees, they will be subjected to punishment." *Id.* at 1003. The *Rapier* court additionally noted that, before pretrial detainees are subjected to punishments for infractions committed while awaiting trial, these detainees are entitled to procedural protection before the imposition of any punishment. *Id.* at 1004. This due process "hearing helps to ensure that disciplinary punishment is what it purports to be, rather than punishment in advance of conviction for the crime that led to detention," which has been decried by the Supreme Court. *Id.*

This view was echoed in *Love v. Sheahan,* where the Northern District of Illinois found that the plaintiff pretrial detainee had sufficiently stated a claim for procedural due process when he was placed in solitary segregation without a procedural hearing either before or during his stay. *Love v. Sheahan*, 156 F. Supp. 2d 749, 756 (N.D. Ill. 2001). In *Love,* the court recognized the fundamental difference between inmates and pretrial detainees, noting that - as a pretrial detainee – plaintiff "need not allege that defendants' actions imposed atypical and significant hardship in relation to the ordinary incidents of prison life." *Id.* at 756. Notably, the plaintiff in *Love* was in segregation in connection with the stabbing to death of another pre-trial detainee in a rival gang. *Id.* at 752.

Here, Mr. Kelly's circumstances in the present case stand in stark contrast to those of the pretrial detainees in either *Love* or *Rapier*. Not only

has Mr. Kelly been deprived of due process by not being afforded a hearing by the BOP, the BOP has not done anything to even consider less restrictive alternatives to placing Mr. Kelly in solitary segregation. In addition, Mr. Kelly's solitary segregation bears no relationship to any of his conduct since his detention. In fact, Mr. Kelly has done nothing to violate any rule being detained.

In fact, based on the words of the BOP alone, it is clear that Mr. Kelly is being punished because of the crime of which he is charged and because of his celebrity status. He is being held in solitary confinement despite the fact that he has not violated a single BOP rule or regulation. This arbitrary and capricious placement of Mr. Kelly in solitary segregation based solely on how detainees in the general population may purportedly react is equivalent to "loading him with chains and shackles and throwing him in a dungeon." *Wolfish* 441 U.S. at 552. The BOP's continuing violation of his due process must be rejected by this Court.

Further, this Court should consider the toll that solitary confinement continues to take on Mr. Kelly's physical and mental health. Common sense counsels that anyone who is denied regular human contact and access to the outside will suffer severe consequences. The leading literature suggests exactly the same. For example, in his 2006 article in the Washington University Journal of Law and Policy, former Harvard Medical School faculty

member Dr. Stuart Grassian noted that "…deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment…even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." Stuart Grassian, *The Psychological Effects of Solitary Confinement*, Washington University Journal of Law and Policy Vol. 22, January 2006, at 330-331. In cases of solitary confinement, Dr. Grassian noted that "incarceration in solitary caused either severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness." *Id*. at 334.

Similarly, in his 2012 testimony before the Senate Judiciary Committee on Civil Rights during a hearing on solitary confinement, Psychology Professor Craig Haney discussed the conditions prisoners face in solitary confinement. Professor Haney testified that all solitary prisoners are confined for, on average, 23 hours per day in cells that commonly range from 60-80 feet in dimension. United States Cong. Senate Judiciary Subcommittee on the Constitution, Civil and Human Rights. *Hearing on Solitary Confinement, June 19, 2012. 112th Cong. 2nd sess. Washington: GPO 2012* (statement of Craig Haney, PhD) at p. 4.

9

Professor Haney further testified that serious mental illness can result as a result of this confinement, and that many inmates become "so desperate and despondent that they engage in self-mutilation...and...a disturbingly high number resort to suicide." *Id.* at p. 9. According to Professor Haney, it is "not uncommon in these units to encounter prisoners who have smeared themselves with feces, sit catatonic in puddles of their own urine on the floors of their cells, or shriek wildly and bang their fists or their heads against the walls that contain them." *Id.* Professor Haney also referred to a 2003 study he conducted of inmates in solitary confinement where three quarters of those interviewed exhibited a prevalence of the following symptoms "...significantly increased negative attitudes and affect, irritability, anger, aggression and even rage; chronic insomnia, free floating anxiety, fear of impending emotional breakdowns, a loss of control, and panic attacks; severe and even paralyzing discomfort around other people, extreme paranoia; as well as various kinds of cognitive dysfunction, such as an inability to concentrate or remember, and ruminations in which they fixate on trivial things intensely and over long periods of time; a sense of hopelessness and deep depression are widespread; and many prisoners report signs and symptoms of psychosis, including visual and auditory hallucinations." *Id.* at 11; C. Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124-156 (2003); C. Haney, *The Social Psychology of Isolation: Why Solitary*

10

*Confinement is Psychologically Harmful*, Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20 (2009).

Moreover, courts have also historically recognized the serious nature of issues that may befall those inmates in solitary confinement. In the 1890 case of *In Re Medley*, the United States Supreme Court noted that, with regard to inmates in solitary confinement, "A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." *In re Medley,* 134 U.S. 160 (1890).

Over a century later, this view remained consistent, with the Northern District of California recognizing that the severe conditions "may press the outer-bounds of what most humans can psychologically tolerate." *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995). This view was echoed by the Middle District of Louisiana, which recognized social interaction and environmental stimulation as basic human needs, the deprivation of which constitute cruel and unusual punishment under the Eighth Amendment, noting "…in light of the maturation of our society's understanding of the very real psychological needs of human beings, courts have recognized the inhumanity of

11

institutionally-imposed psychological pain and suffering. Furthermore, as the Third Circuit stated, "[t]he touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007).

The Eastern District of Virginia recently affirmed the view in *Medley*, recognizing that the appropriateness of incarcerating inmates in solitary confinement must adhere to the analysis of the evolving standards of common decency. *See Porter v. Clarke*, 290 F. Supp. 3d 518 (E.D. Va. 2018). The court in *Porter* noted that "there is a large and growing body of literature—both academic and legal—discussing the potentially devastating effects of prolonged periods of isolation. As one District Court put it nearly two decades ago: "A conclusion ... that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science." *Id*. at 9 (internal citations omitted.) The *Porter* court then held that years' long isolation created a significant risk of substantial psychological and emotional harm, and that the inmates involved in the case suffered irreparable harm by virtue of their incarcerated conditions in solitary confinement on death row. *Id*. Accordingly, the court granted the plaintiff inmates' motion for summary judgment, and issued an injunction against the Mr. Kelly warden. *Id*. at 17.

### III. Conclusion

Mr. Kelly is a pretrial detainee who has not committed a single violation while in jail, yet he is being housed in a solitary confinement situation due to his celebrity status. This violates the 6th, 8th, and 14th Amendments. This Court should therefore enter an Order requiring the BOP to either immediately release Mr. Kelly from his current conditions of confinement, and for such other and further relief as is appropriate under the circumstances.

Respectfully submitted,
*/s/ Steven Greenberg*

Attorneys for Defendant:
STEVEN A. GREENBERG
Greenberg Trial Lawyers
Attorney at Law
53 W. Jackson Blvd., Suite 1260
Chicago, IL 60604
(312) 879-9500
Steve@GreenbergCD.com

LEONARDMEYER, LLP
Michael I. Leonard
120 North LaSalle – 20th Floor
Chicago, Illinois 60602
(312)380-6659 (direct)
(312)264-0671 (fax)
mleonard@leonardmeyerllp.com

Christopher T. Grohman

## <u>CERTIFICATE OF SERVICE</u>

Christopher T. Grohman, Attorney at Law, hereby certifies that the foregoing brief was served on August 29, 2019, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.


/s/ Christopher T. Grohman