IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 19 CR 567 |
| v. | ) | |
| | ) | Judge Leinenweber |
| ROBERT KELLY | ) | |

### DEFENDANT ROBERT KELLY'S MOTION FOR BOND[1]

We are respectfully moving for a bail hearing and order granting release. Robert Kelly, a pretrial defendant currently detained at the Chicago MCC, is within the group of people the Centers for Disease Control and Prevention ("CDC") has categorized as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world. In making this request Mr. Kelly is mindful of the fact that on the last status date he withdrew his motion asking that the court reconsider his detention. That motion was Dkt. 54. He withdrew his request because he is also being detained on an order out of the Eastern District of New York. A request is contemporaneously being filed before that court. *Mr. Kelly request that this Court defer any ruling until after the New York court has acted on his request*, less this Court were to grant his request and that court were not he would simply and up in the same unhealthy conditions, just in New York.

The risk is real; BOP has requested that self-reporting be curtailed, and those

---

[1] Kelly acknowledges that much of this motion is from a template circulated by the federal defender program.

1

who do report are quarantined. Those now detained cannot be protected from the coming jail epidemic, and if infected will without question suffer from inferior health care.

Mr. Kelly is also requesting that this court consider all the arguments made in his previously filed request for reconsideration of detention, in addition to the additional arguments made herein. Dkt. 54.

If Mr. Kelly were to be released, he would live at "the Roosevelt Collection Lofts", a large apartment complex just west of Clark Street on Roosevelt Road. He would reside with Joycelyn Savage. He would submit to any conditions that this court saw fit, including home incarceration.

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The health risk to Mr. Kelly, because of his age and existing health issues, especially considering the conditions at the MCC, necessitates his release on bail.

For health reasons people are supposed to remain at a "social distance" which the experts have defined as at least six feet. They are supposed to avoid interaction. These are the basic steps to try and not become infected. These basic steps are simply impossible in a jail setting. No matter what steps they take the sanitation will be substandard, the risk of an internal pandemic at the MCC is great, and if one does get sick jail healthcare is notoriously substandard. Imagine how poor it

2

will be given the overall lack of resources at even the best hospitals. And make no mistake about it, this is a deadly disease. They are predicting that millions could die, in this country alone. Requiring people to reside in a custodial jail setting is tantamount to making them drink poison. Regardless of any allegations, the fact is Mr. Kelly is a pretrial detainee.

## Factual Background

### *Changed Circumstances: COVID-19 Outbreak*

As of March 15, 2020, the new strain of coronavirus which causes COVID-19, has infected over 225,000 people, leading to at least 10,000 deaths worldwide.[2] The World Health Organization has officially classified COVID-19 as a pandemic.[3] President Trump declared a national emergency on March 13, 2020.[4] Governor Pritzker has ordered a complete lockdown of the state of Illinois.

https://www2.illinois.gov/sites/coronavirus/Pages/default.aspx

The CDC has issued guidance that individuals take preventative actions, including avoiding crowded areas and staying home as much as possible. while at age 53 Mr. Kelly is not within the highest risk age group, the more that is learned about this horrific virus the broader the precautions become. Initially it was believed that

---

[2] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[4] Live updates: President Trump declares a national emergency in response to coronavirus, Washington Post (March 13, 2020) https://www.washingtonpost.com/world/2020/03/13/coronavirus-latest-news/

only those who were over 80 were at serious risk, then it became those over 70, now they are suggesting over 60. More to the point, initially they thought younger individuals would have an experience similar to the common cold but horrific stories have started to bubble to the surface and the experts know longer make that claim. Equal to the point, it is not just whether Mr. Kelly has a condition that makes him high risk or is of the age, it is also those around him. Plainly, there are inmates with various health conditions that make them high risk. Once they get the disease the odds of them spreading it to others, within that Cancún of confinement, is great.

### Conditions of Confinement and Spread of Coronavirus

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[5] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[6] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. *Id*. Additionally, older individuals are at increased risk for coronavirus; in 2016, 11% of the 1.45 million people in state and federal prisons were over the age of 55.[7] According to public health experts, incarcerated individuals "are

---

[5] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[6] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[7] *Aging Prison Populations Drive Up Costs*, Pew Charitable Trust, (February 18, 2018)

4

at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[8] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[9] Recent outbreaks of mumps in facilities in Texas and New Jersey have demonstrated how quickly institutions can be overrun with disease, especially when the viruses have long incubation times, because inmates and guards cannot maintain sufficient space to practice social distancing, and may have contact with high numbers of other people in the facilities.[10]

In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[11] Recognizing the threat to the institutions and the public at large, courts and officials have begun taking measures to reduce the risk. Secretary of State Mike Pompeo has called for Iran to release Americans

---

https://www.pewtrusts.org/en/research-and-analysis/articles/2018/02/20/aging-prison-populations-drive-up-costs

[8] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[9] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY; *Health Care Behind Bars Is Already Abysmal. Are Prison Officials Prepared for the Coronavirus?,* Mother Jones (March 4, 2020) https://www.motherjones.com/crime-justice/2020/03/health-care-behind-bars-is-already-abysmal-are-prison-officials-prepared-for-the-coronavirus/

[10] *300 inmates in Texas' Harris County jail are quarantined over a mumps outbreak*, CNN Health (June 13, 2019) https://www.cnn.com/2019/06/13/health/mumps-texas-harris-county-jail/index.html; *6 inmates at a New Jersey jail came down with the mumps. The entire facility is now quarantined*, CNN Health, (June 13, 2019) https://www.cnn.com/2019/06/12/us/mumps-jersey-bergen-county-jail-trnd/index.html

[11] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

5

detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[12] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[13] In Brooklyn, District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[14] Officials in Cuyahoga County, Ohio have released hundreds of inmates out of concern they might contract the coronavirus if it spread throughout the jail.[15] The Kent County Jail in Michigan has begun working with judges to review cases to determine which inmates might be eligible for release, either by having their bonds changed or having sentences reduced.[16] A Sacramento County judge entered an order authorizing the Sherriff's Office to release inmates with 30 days or less remaining on their sentences.

Facilities in the U.S. have already begun to show signs of COVID-19 infections. On March 13, 2020, the Harris County Juvenile Court in Houston announced that

---

[12] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.

[13] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[14] Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) *at* https://theappeal.org/sentenced-to-covid-19/.

[15] *Ohio jail releases hundreds of inmates due to coronavirus concerns*, Nexstar Media Wire (March 16, 2020) https://kfor.com/health/coronavirus/ohio-jail-releases-hundreds-of-inmates-due-to-coronavirus-concerns/

[16] *Jail inmates get stepped-up screenings, possible early release, as pandemic grows*, ABC 13 (March 13, 2020) https://www.wzzm13.com/article/news/health/coronavirus/kent-county-jail-staff-prepares-for-coronavirus/69-03136848-bef8-4ddf-819f-788d7bf6eb3a

the court wing will be fully closed to all until further notice, after officials reported that a person who had been in the court may test positive for coronavirus.[17] On March 14, 2020, an employee at a correctional facility in Pennsylvania also tested positive for Covid-19. Thirty-four inmates and staffers there are now in quarantine.[18] On March 12, 2020, a staffer at the Monroe Correctional Complex in Washington state tested positive for coronavirus.[19] A New York Department of Corrections investigator died of the coronavirus on Sunday, March 15th; it is unclear how many individuals the investigator was in contact with, and the Department will not release the name of the facility the individual worked in.[20] The former chief medical officer of the New York City jail system put the threat in stark terms: "We should recall that we have 5,000 jails and prisons full of people with high rates of health problems, and where health services are often inadequate and disconnected from the community systems directing the coronavirus response….Coronavirus in these settings will dramatically increase the epidemic curve, not flatten it, and disproportionately for people of color."[21]

---

[17] *Harris County Juvenile Justice Center closed until further notice, officials say*, Click 2 Houston (march 13, 2020) https://www.click2houston.com/news/local/2020/03/13/harris-county-juvenile-justice-center-closed-until-further-notice-officials-say/

[18] *Coronavirus Update: 34 George W. Hill Correctional Facility Employees, Inmates Being Self-Quarantined After Employee Tests Positive For COVID-19*, CBS Philly (March 14, 2020) https://philadelphia.cbslocal.com/2020/03/14/george-w-hill-correctional-facility-employee-tests-positive-for-covid-19/

[19] *Staffer at Monroe state prison tests positive for coronavirus, DOC says*, Seattle Times (March 13, 2020) https://www.seattletimes.com/seattle-news/staffer-at-monroe-state-prison-tests-positive-for-coronavirus-doc-says/

[20] Kira Lerner, *New York Department Of Corrections Investigator Dies From Covid-19*, The Appeal (March 16, 2020) https://theappeal.org/covid-19-coronavirus-new-york-department-of-corrections-death/

[21] Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, NY Times (March 16, 2020)

*Specific Conditions at the MCC*

The MCC is a large pretrial detention facility, housing approximately 700 people. The majority of the people detained are housed in small two-man cells with a shared toilet and sink, with dayrooms where the inmates spend the majority of their time. As the BOP itself has recognized, "the population density of prisons creates a risk of infection and transmission for inmates and staff."[22] Although the BOP has indicated that it will "implement nationwide modified operations to maximize social distancing and limit group gatherings in our facilities," the small physical footprint of the MCC makes it unclear whether such distancing efforts will be effective.

The risk posed by the logistics is further complicated by the BOP's lack of direction in the early weeks of the coronavirus outbreak. The MCC did not appear to have met some of the most basic recommendations of the CDC for preventing the spread of the coronavirus. Up until Friday, March 13, 2020, visitors were still allowed into the facility.[23] Prior to that date, the facility had no protocol for screening visitors. In the last week, the MCC posted basic signage advising people who are not feeling well or who were knowingly exposed to the virus not to enter, and it is so unobtrusive that multiple staff attorneys from the Federal Defender Program failed to even notice it. No questions were asked of individuals attempting to visit inmates; there is no

---

https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html
[22] *AP Exclusive: Visits to Federal Inmates Halted Over Virus*, Associated Press, https://www.nytimes.com/aponline/2020/03/13/us/politics/ap-us-virus-outbreak-federal-prisons.html
[23] *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons (March 13, 2020) https://www.bop.gov/resources/news/20200313_covid-19.jsp

inquiry into whether a person has travelled recently or is experiencing any symptoms consistent with the virus. Give the incubation period for the virus, it is unclear what the effect of those lax procedures will be in the future.

With regard to current conditions inside the facility, per the observation of multiple staff attorneys prior to the cessation of visits, MCC staff are not wearing face masks, and only a few officers are wearing gloves. The BOP's overview of the COVID-19 response concedes that it conducted an assessment of Personal Protective Equipment (PPE) stores and is in the process of obtaining bulk purchases and exploring alternate supply chain options, which is indicative of a current lack of sufficient PPE. While the facility does have hand sanitizer available on the visiting floor, the single large bottle has a sign that says "STAFF ONLY" on it. The single dispenser next to the restroom appears to be non-alcohol-based sanitizer, as it is the same dispenser that was in place prior to the coronavirus outbreak, and detention facilities consider alcohol-based sanitizer to be contraband.[24] The CDC has indicated non-alcohol-based sanitizer may not be effective in stopping the spread of the virus.[25] Additionally, the visitor's bathroom on the entry level floor of the MCC frequently has no soap or paper towels available, which makes it difficult for individuals entering the facility to adequately clean their hands before visiting.

It is also unclear the extent to which inmates will have access to the same basic

---

[24] *How can prisons contain coronavirus when Purell is a contraband?*, ABA Journal (March 13, 2020) https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus
[25] https://www.cdc.gov/handwashing/show-me-the-science-hand-sanitizer.html

preventative measures being taken by the public today. For instance, it is unclear whether the BOP will allow inmates access to the type of hand sanitizer recommended by the CDC, free of charge. Nor is it clear whether inmates will have access to sufficient quantities of soap, free of charge. Per the public commissary list, inmates must buy bars of soap.[26] Only those inmates who have money for commissary will be able to purchase antibacterial soap. Emails from the Executive Director of the Federal Defender Program inquiring about protocols related to any enhanced sanitization within the facility, availability of personal hygiene products, or more frequent laundry have not been answered, other than to refer attorneys to the BOP website for updates.

It is unclear whether testing has actually been done at facilities in Illinois, whether of inmates or staff. It is not clear whether the MCC has any testing for COVID-19 available, or when, if ever, it will have tests. Further, the medical ward at the MCC is limited. Studies have estimated that 15-20% of individuals who test positive for the virus require hospitalization.[27] In the case of an outbreak in the facility, the medical ward could be quickly overwhelmed. The protocol for transporting infected individuals to area hospitals is also not clear. The lack of transparency from the BOP is alarming, and should not inure to its benefit. Until the BOP provides information otherwise, the courts should not assume that appropriate

---

[26] *MCC Commissary List*, https://www.bop.gov/locations/institutions/ccc/CCC_commlists040318.pdf

[27] Wu Z, McGoogan JM. *Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72 314 Cases From the Chinese Center for Disease Control and Prevention. JAMA.* Published online February 24, 2020. https://jamanetwork.com/journals/jama/fullarticle/2762130

measures are in place.

Furthermore, despite the ban on visits, members of the community will still be introduced into the facility as new prisoners will continue to be admitted to the MCC. As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into the MCC, and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. The BOP's action plan states only that individuals will be screened for "risk factors" and symptoms; only those who are both symptomatic and have exposure risk factors will be tested for the virus. Those who are asymptomatic but assessed to have risk factors will be quarantined, although it is not clear where or how the inmates will be quarantined given the limited space constraints.[28] On March 12, 2020, Magistrate Judge Orenstein in the Eastern District of New York denied a remand application for an individual alleged to have violated the terms of pretrial release, holding that increasing the population of the MDC could present a "danger to the community"—the staff and inmates inside the jail—by potentially bringing the virus into the facility. *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020). Such action recognizes that individuals who are out in the larger community and susceptible to community spread may not immediate show symptoms, but may still carry the virus. Under the BOP's plan, those individuals would enter the MCC undetected.

Even post the BOP announcement that visits are suspended, it is not clear that

---

[28] The MCC reports that it already has some number of inmates showing flu symptoms "quarantined."

11

the MCC is taking enhanced steps to ensure that guards do not bring the virus to the facility. The BOP directive issued on March 13th indicates that the protocol for "enhanced health screening of staff" will be implemented in areas with "sustained community transmission."[29] Such "sustained community transmission" is determined by the CDC website; where the state is rated "yes" for community transmission, the enhanced protocols will be applied. To date, Illinois is rated "undetermined."[30] The enhanced protocols consist of asking for self-reports and temperature checks, and individuals with symptoms will be "encouraged" to stay home. Only those with symptoms and "risk factors" will be not allowed to return to work for the quarantine period. Given the nationwide shortage of tests, it does not appear that guards with symptoms, or even risk factors, will be tested.[31] However, the CDC has acknowledged that transmission of the virus can occur before an individual becomes symptomatic.[32] Therefore, guards who show symptoms may transmit the virus from the community to the MCC even before they become sick.

If staff do get sick and are not able to report to work, their absences may further affect the functioning of the facility. The sequestration measures taken in 2013 resulted in cuts to staffing levels, and the MCC has never fully restored its staff

---

[29] *Id.* at "Screening for Staff."
[30] *Coronavirus Disease 2019 (COVID-19) in the U.S.* (March 13, 2020, updating regularly) https://www.cdc.gov/coronavirus/2019-ncov/cases-in-us.html#reporting-cases
[31] *A BOP COVID-19 Overview*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/overview.jsp#bop_emergency_response (stating that an employee at FMC Lexington, a medical center that necessarily houses inmates with health conditions, was exposed to an individual who tested positive for COVID-19 and was self-quarantined).
[32] *How COVID-19 Spreads*, Centers for Disease Control and Prevention, https://www.cdc.gov/ coronavirus/2019-ncov/prepare/transmission.html

capacity to pre-sequestration levels.[33] Staff attorneys are routinely told by staff that they are pulling overtime shifts in order to maintain the appropriate staffing levels. In the past year, educators and counsellors have been recruited to fill in at the MCC front desk and accompany attorneys up to the visiting room. When sufficient staff are not available to run the institution, the building is put on lockdown. Should staff members show symptoms and be forced to stay home from work, their absences will also negatively affect the MCC's ability to function properly.

### The Bail Reform Act Requires Mr. Kelly's Release

A "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The circumstances that existed when detention was ordered detained have now changed.

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984 U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial

---

[33] *Memorandum: Sequestration and Safety Actions Regarding the Bureau of Prisons Institutions*, Dept. of Justice (March 22, 2013) https://www.justice.gov/sites/default/files/oip/legacy/2014/ 07/23/sequestration-safety-actions.pdf

13

or without trial is the carefully limited exception" to liberty before trial). One charged with a crime is, after all, presumed innocent. *Stack v. Boyle*, 342 U.S. 1, 4 (1951). A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo*, 495 U.S. 711, 723–24 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

The courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these fundamental characteristics of our democracy." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). *See also United States v. Adams*, No. 6:19-mj-00087-MK, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart

14

conditions and open sores released on home detention because of his medical conditions); *United States v. Johnston*, No. 17-00046 (RMM) 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the Mann Act and in need of colon surgery released to custody of his wife for 21 days); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives).

This Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Kelly will yield, relative to the heightened health risks posed to Mr. Kelly during this rapidly encroaching pandemic. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

In addition, continued detention is not necessary to ensure the primary goals of pretrial detention—appearance in court and community safety. Statistics demonstrate that nearly everyone on pretrial release in the federal system appears in court and does not reoffend. In 2019, fully 99% of released federal defendants

nationwide appeared for court, and over 98% did not commit new offenses while on bond.[34]



Moreover, this near-perfect compliance rate is seen equally in federal districts with very high release rates (~70%) and those with very low release rates (~24%).[35] The below chart reflects this data:

---

[34] *See* AO Table H-15, http://jnet.ao.dcn/sites/default/files/pdf/H15_Ending12312019.pdf (showing a nationwide failure to appear rate of 1.1% and a rearrest rate of 1.8% in 2019).
[35] The six federal districts with the lowest release rates (average 24.37%) have an average failure to appear rate of 1.78%, while the six districts with the highest release rates (average 69.08%) have an even lower failure to appear rate of 0.42%. *See* AO Table H-15; Table H-14A, https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf. The six districts with the lowest release rates have an average re-arrest rate of 1.10%, while the six districts with the highest release rates have an average re-arrest rate of 0.91%. *See* Table H-15. (The districts with the lowest release rates are D. Utah, E.D. Oklahoma, W.D. Arkansas, S.D. Texas, E.D. Tennessee, and S.D. California; the districts with the highest release rates are D. Guam, D. Northern Mariana Islands, W.D. Washington, D. Connecticut, D. Maine, and D. Hawaii. *See* Table H-14A.)



### Conditions of Release Are Available That Allow Mr. Kelly To Be Treated Humanely While Also Ameliorating Any Danger To The Community

From Mr. Kelly's perspective his life—not only his liberty—is on the line, creating a powerful incentive to abide by any release conditions the Court may impose and changing the calculus that initially led to the denial of bail in this case. He would be foolish to leave his home. Indeed, there is an order that requires people to stay in their homes. Electronic monitoring could ensure that he stays in his home.

Critically, during this temporary release, Mr. Kelly could be supported and monitored by Pretrial Services. Since 2009, Pretrial Services' data has found that only 2.9% of defendants in the highest risk category were re-arrested for a violent crime while on release.[36] In the Northern District of Illinois, the Office of Pretrial Services reports that in Fiscal Year 2019, the failure to appear rate was only 0.4%,

---

[36] Thomas H. Cohen, Christopher T. Lowenkamp, and William E. Hicks, *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary* (September 2018) *at* https://www.uscourts.gov/sites/default/files/82_2_3_0.pdf.

17

and only 3.2% of supervisees reoffended. Mr. Kelly poses a lower risk of violating supervision, particularly during a global pandemic during which even leaving the house will endanger their lives.

                                      Respectfully submitted,

                                      /s/ Steven Greenberg

Attorneys for Defendant:

STEVEN A. GREENBERG
Greenberg Trial Lawyers
Attorney at Law
53 W. Jackson Blvd., Suite 1260
Chicago, IL 60604
(312) 879-9500

Steve@GreenbergCD.com

LEONARDMEYER, LLP
Michael I. Leonard
120 North LaSalle – 20th Floor
Chicago, Illinois 60602
(312)380-6659 (direct)
(312)264-0671 (fax)

mleonard@leonardmeyerllp.com