UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SYLVESTER KELLY, aka "R.Kelly" | Case No. 19 CR 567-1<br><br>Honorable Harry D. Leinenweber |

**GOVERNMENT'S RESPONSE TO DEFENDANT
KELLY'S MOTION FOR DISCLOSURE AND PROTECTIVE ORDER**

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant Robert Kelly's motion to require the disclosure of grand jury subpoenas, production of all grand jury materials, and for a protective order. Dkt. #133. In the motion, Kelly alleges that the Government acted improperly in issuing grand jury subpoenas that resulted in the collection of bank records of Kelly's current and former counsel, specifically Attorney A and Law Firm A. *Id*. For the reasons identified below, the Government respectfully requests that the Court deny the motion.

**I.    Introduction**

The Superseding Indictment alleges that, over the course of 20 years, Kelly paid money to others, including Minor 1, Minor 1's family, McDavid, and Individuals B, C, and D, in exchange for them to lie about Kelly's sexual abuse of minors or their efforts to collect and conceal child pornography involving Kelly's abuse of minors. Kelly made many of these payments through an attorney. During the course of its

investigation, the Government issued subpoenas to banks for accounts from which these payments were made and for accounts that received these payments, collecting evidence proving who was paid and that Kelly or his businesses were the source of the payments.

In addition, in the course of its investigation, the Government identified a bank account that Kelly appeared to control through a nominee third-party. In part because of Kelly's history of bribing victims and witnesses, the Government investigated this account to determine whether Kelly controlled it and whether he was using a nominee to conceal its activity. To that end, the Government issued bank subpoenas relating to various payees from that third-party account whose identities were not known to the Government. When the banks produced records in response to the subpoenas, the Government learned that two of those payees were attorneys, including Attorney A.[1] The Government produced to all counsel the records that it received in response to these subpoenas, pursuant to the strict terms of the protective order in this case. Dkt #53.

Kelly now asserts that in issuing these subpoenas, the Government "went on an unreasonable, intimidating, and harassing fishing expedition" relating to Kelly's current and former counsel, specifically Attorney A and Law Firm A.[2] Dkt. #133 at 2. Not so. As explained below, the Government had legitimate, law-enforcement reasons for subpoenaing the bank records at issue. The bank records prove that defendant

---

[1] The other was Attorney B, who is not mentioned in Kelly's motion.

[2] The indictment does not allege that Attorney A, Law Firm A, or any attorney at Law Firm A engaged in wrongdoing.

2

paid $125,000 to Individual B for recovering and returning videotapes showing Kelly sexually abusing a minor. These records also help prove that defendant controls a nominee bank account that received at least $1.2 million last year despite claiming to this Court that he "has no money." Dkt. #54-1 at 21. This account was established in early 2019, shortly after Kelly was charged with sexual exploitation crimes in the Circuit Court of Cook County. By directing substantial income to a nominee bank account, it appears Kelly was attempting to avoid financial consequences associated with the pending criminal charges in this and other cases, including fines and victim restitution. Moreover, given Kelly's past conduct, there is a risk he would use these funds to continue his pattern of paying off witnesses and victims to lie or remain silent about his crimes. All of these facts made it reasonable to subpoena records related to the accounts at issue.

Lacking standing to quash the subpoenas at issue (and because such a motion would be moot at this stage anyway), Kelly instead requests that this Court order the Government to disclose all grand jury subpoenas and materials not previously disclosed. The requested relief is not appropriate. Out of an abundance of caution, the Government already sought and received from counsel for McDavid and Brown the return of records related to Attorney A.[3] The Government agrees to do the same for bank records related to Law Firm A; it has already asked for the return of those records from all counsel, will destroy copies of non-relevant materials included in that production, and will reproduce to counsel only those records it intends to use at trial.

---

[3] The same is true regarding Attorney B, though Kelly does not appear to take issue with the records relating to Attorney B.

3

These reasonable measures are sufficient to address counsel's concerns. Accordingly, Kelly's motion should be denied.

## II. The Government Reasonably Subpoenaed Records Related to Payments to Individual B.

The Supreme Court has long recognized that the "grand jury's investigative power must be broad if its public responsibility is adequately to be discharged." *Branzburg v. Hayes*. 408 U.S. 665, 700 (1972). Indeed, "a grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" *Id.* (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970)); *see also United States v. R. Entrs., Inc.*, 498 U.S. 292, 297 (1991) (same); *Blair v. United States*, 250 U.S. 273, 282 (1919) (same). Accordingly, the grand jury "may compel the production of evidence or the testimony of witnesses as it considers appropriate," so long as compliance with the subpoena would not be "unreasonable or oppressive"—which, unlike a trial subpoena, need not be tailored to evidence that would be relevant and admissible at trial. *R. Entrs., Inc.*, 498 U.S. at 299-300 ("In the grand jury context, the decision as to what offense will be charged is routinely not made until after the grand jury has concluded its investigation. One simply cannot know in advance whether information sought during the investigation will be relevant and admissible in a prosecution for a particular offense.").

Consistent with this authority, the Government used grand jury subpoenas to investigate payments made by and on behalf of Kelly to pay-off witnesses and to compensate persons for their efforts to conceal evidence of Kelly's child exploitation.

4

The Government's investigation revealed that some payments were made by Kelly through attorneys to settle lawsuits filed by individuals who threatened to release information regarding Kelly's child exploitation (including lawsuits filed by Individual B and co-defendant McDavid). Specifically, as the Superseding Indictment alleges, Kelly made multiple payments to Individual B:

> Between approximately 2001 and approximately 2009, KELLY, MCDAVID, Individual A, and others caused Individual B to be paid hundreds of thousands of dollars for obtaining and returning multiple videos that they knew depicted KELLY engaged in sexual contact and sexual acts with minors.

Superseding Indictment at ¶ 6(a). At least one of these payments to Individual B occurred on or about June 30, 2009, when:

> On or about June 30, 2009, KELLY and MCDAVID caused a wire payment to be made from a Bass Production, Ltd. Bank account to pay Individual B to settle a lawsuit that Individual B had filed for payment for recovering and returning videotapes that depicted KELLY engaged in sexual contact and sexual acts with a minor.

*Id.* at ¶ 11(d).

The Government's investigation revealed that this June 30, 2009 payment was for $125,000 and was facilitated through Kelly's former attorney at Law Firm A. One of the grand jury subpoenas at issue requested records for the relevant timeframe[4] associated with the bank account (held by Law Firm A) used to make the $125,000 payment, as well as for bank records for the payments to Individual B from Individual B's attorney. These records, together with the bank records of Kelly's business Bass

---

[4] The Superseding Indictment alleges that Kelly met Minor 1 in 1996 or 1997, and Kelly and McDavid actively obstructed justice from 2000 to the date of the Superseding Indictment. Accordingly, the timeframe of 1996 to 2019 is relevant to the allegation that Kelly and McDavid actively sought to pay off witnesses and victims, and compensate witnesses for their efforts to retrieve and conceal videotapes that document Kelly's sexual exploitation of minors.

5

Productions, revealed that Bass Productions wired $125,000 to Law Firm A, which then wired $125,000 to Individual B's attorney, who ultimately made two payments to Individual B.

Contrary to Kelly's claims, this was not a "fishing expedition." The grand jury was investigating the source of payments made to Individual B, which were part of Kelly's obstruction of justice. After it was determined that at least one of these payments were made via an account held by Law Firm A, it was reasonable for a grand jury subpoena to be issued to a bank seeking records for that account. Bank records received in response to the subpoena have been produced by the Government only to counsel of record, pursuant to a strict protective order that restricts defense counsel from further dissemination.

Kelly cites section 9-13.410 of the U.S. Attorney's Manual, now known as the Justice Manual, for the alleged proposition that the Government should have provided notice of the subpoena to Law Firm A (and Attorney A, discussed below). The Justice Manual provides no such thing. The section cited by Kelly refers to subpoenas sent *to an attorney*, not to a bank. Indeed, the section expressly excludes a "subpoena to a bank for records of an attorney's trust account, because trust accounts tend to hold the pooled funds of numerous clients, and records related to such accounts ordinarily do not relate to individual clients, and do not contain or reflect privileged or confidential attorney-client communications." Justice Manual, Section 9-13.410.[5]

---

[5] The Justice Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or

Kelly also incorrectly contends that the bank records may be protected by the attorney-client privilege. Simply put, "in order for the attorney-client privilege to attach, the communication in question must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). Here, the bank records sought by the grand jury were transaction records held by third-party financial institutions. Thus, the records are not confidential communications between an attorney and client, and they are not cloaked in the attorney-client privilege. *See, e.g., United States v. Miller*, 425 U.S. 435, 442 (1976) (there is no legitimate expectation of privacy in the contents of bank records maintained by financial institutions).

In short, the issuance of the subpoena was not an abuse of the grand jury's powers, and there is no cause to grant the broad relief Kelly now requests.

Kelly demands that this Court permit his attorneys to review all grand jury subpoenas (not just the subpoenas allegedly issued in error) and materials produced to the Government in response to all grand jury subpoenas. While some grand jury material has been disclosed to the defense in the ordinary course of discovery, the defense is requesting all grand jury material amassed in the course of the investigation, even if the government otherwise would not be required to disclose

---

criminal." Justice Manual, Section 1-1.200; *see also United States v. Fletcher*, 634 F.3d 395, 405 (7th Cir. 2011) (policy in the U.S. Attorney's Manual does not create substantive rights); *United States v. Lopez-Matias*, 522 F.3d 150, 155-56 (1st Cir. 2008) (same and collecting cases).

those materials in discovery. Such relief would be extraordinary and is unnecessary under the circumstances.

A defendant seeking grand jury materials bears the burden of making "a strong showing of particularized need for grand jury materials" before disclosure will be allowed. *United States v. Sells Eng'g, Inc.,* 463 U.S. 418, 443 (1983). Because grand jury proceedings are secret and their disclosure limited by Federal Rule of Criminal Procedure 6(e), a party seeking grand jury material under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [the] request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 US 211, 222 (1979).

Kelly has not made that showing. As discussed above, the subpoena for the account held by Law Firm A was reasonably issued in the course of the grand jury's investigation. And to the extent the subpoena resulted in the production of records unrelated to the $125,000 payment from Kelly to Individual B, the Government has asked counsel of record to return the records, and the Government will destroy them, as well as all copies in the Government's possession. At trial, the Government will seek a stipulation related to the $125,000 payment. To the extent a stipulation is not possible, the Government will seek only to introduce records from Law Firm A's bank accounts that are related to the $125,000 payment to Individual B described above. And the Government does not intend to publicly disclose the identity of Law Firm A. The fact that the subpoena was a proper use of the grand jury, the Government's

limited use of bank records related to Law Firm A, together with its efforts to ensure that unrelated bank records are returned and destroyed, moots the need for any further remedy.

### III. The Government Reasonably Subpoenaed Records Related to Kelly's Assets.

The second subpoena at issue, as explained above, relates to Kelly's assignment of royalties to Individual E, which resulted in the Government obtaining certain bank records of Attorney A, who represents Kelly in the federal criminal case in New York. This subpoena, too, was proper and reasonably related to the grand jury's investigation.

As background, as alleged in the Superseding Indictment, Kelly has a long history of bribing and attempting to bribe victims and witnesses to lie about and conceal his sexual abuse of minors. Wealth Kelly earned from his music career allowed him to pay large amounts of money for this purpose. In part to identify these payments, the Government subpoenaed records for bank accounts associated with Kelly and his businesses. The subpoenaed records indeed contained evidence of numerous such payments.

In 2019, Kelly opened a new bank account in the name of a nominee, Individual E, shortly after he was charged with crimes involving sexual exploitation in the Circuit Court of Cook County, Illinois. A few weeks after being charged, in March 2019, Individual E incorporated SomeBrotherLuv, LLC. Nine days after that, on April 2, 2019, Kelly assigned some of his music royalties to SomeBrotherLuv, and

9

shortly thereafter, royalty payments for Kelly's recordings began to be sent to a bank account in the name of SomeBrotherLuv.

The assignment of Kelly's royalties to SomeBrotherLuv and Individual E does not appear to have been an arms-length transaction. It does not appear that Kelly received consideration in return for assigning his rights to the royalty payments. In addition, in recorded jail calls, Kelly appears to have directed people to contact Individual E to receive payments indirectly from Kelly.

Accordingly, in the course of its investigation, the Government subpoenaed bank records for the aforementioned SomeBrotherLuv account into which royalties for Kelly's recordings were being deposited. The bank records would demonstrate how those payments were being disbursed from the SomeBrotherLuv account and whether they were being disbursed to further Kelly's interests, including possibly as bribes. It also was reasonable to investigate the assignment as a potential attempt by Kelly to avoid financial consequences associated with criminal charges, including fines and victim restitution.

The subpoenaed records reveal that the SomeBrotherLuv account received deposits of at least approximately $1.2 million in royalty payments for Kelly's recordings in 2019.[6] The bank records also show outgoing payments in various forms, with some (but not all) of the payees identified. To identify the unidentified payees, the Government used grand jury subpoenas to trace the payments, including by requesting records for accounts that received bank transfers from the

---

[6] Additional royalty payments have been paid into this account since the Government's initial subpoena.

SomeBrotherLuv account during the relevant timeframe. The Government did not know who held those accounts when it issued the subpoenas. One of the unidentified payees turned out to be Attorney A, an attorney for Kelly.

There was nothing improper about the issuance of grand jury subpoenas for bank accounts that received payments from the SomeBrotherLuv account. Contrary to Kelly's argument that the subpoena resulting in the production of Attorney A's bank records to the Government was somehow meant to intimidate and harass his attorneys, the Government did not know at the time the subpoenas were sent who the account holders were. They were unidentified payees. It was only when the Government received the records from the bank that it learned that one of the unidentified payees was one of Kelly's defense attorneys. Indeed, the use of these funds for Kelly's expenses, and Kelly's recorded conversations directing people to contact Individual E for funds from Kelly, refute assertions in his multiple motions for pre-trial release that he has no money.[7]

In any event, when defense counsel asked that Attorney A's records be reclaimed from the co-defendants, to whom they were produced in the ordinary course

---

[7] For example, defense counsel argued at the detention hearing that Kelly is not a risk of flight because "he has no money":

> How could he flee? He has no money. Mr. Kelly filed bankruptcy four, five years ago. He doesn't, to the best of what I've been able to determine, own the royalties to his songs. They were stolen from him.

Dkt. #54-1, at 21. Counsel then identified some "small checks" Kelly had recently received, including $400,000 Kelly received "right around the time of the state charges," which counsel stated Kelly had "put in a bank account in his own name." *Id*. at 21-22. But even that money, counsel claimed, defendant used to pay various bills and "there was nothing left." *Id*. at 22

of discovery pursuant to a protective order that prohibited their further dissemination, the Government promptly did so. Thus, the only parties who currently have those records are Kelly and the Government. The Government has already sought the return of Attorney A's records from Kelly and will destroy all records that do not show Kelly's control of the money in the SomeBrotherLuv account. It will do the same with all copies of those records in the Government's possession.[8]

The Government will not use any of Attorney A's bank records at trial. To the extent the Government needs to admit evidence to prove that Kelly maintained control of the money in the SomeBrotherLuv account, either at trial or sentencing, the Government will seek stipulations to avoid having to reference payments to Attorney A. If any filings need to attach such records as exhibits, the Government will do so under seal.

## IV. Conclusion

The bank subpoenas here were issued for legitimate, law enforcement reasons, in the course of a broad investigation into Kelly's acts of obstruction over many years and potential use of a nominee bank account to conceal assets, and not to harass or intimidate anyone. Kelly's wild accusations and inaccurate speculation as to the Government's motives are unfounded, and in any event, would not support the broad disclosure of all grand jury subpoenas and materials, not otherwise discoverable in the criminal case, to the defense. In addition, the Government's transparency in producing the records and efforts to limit the use and dissemination of unrelated

---

[8] The Government will do the same with respect to Attorney B, despite Kelly not complaining about Attorney B's records.

records moots the need for any additional remedy. Kelly's motion therefore should be denied.

          Respectfully submitted,

          JOHN R. LAUSCH, JR.
          United States Attorney

By:   /s/ *Angel M. Krull*
      ANGEL M. KRULL
      ABIGAIL L. PELUSO
      JEANNICE APPENTENG
      Assistant U.S. Attorneys
      219 South Dearborn St., Rm. 500
      Chicago, Illinois 60604
      (312) 353-5300

Dated: August 11, 2020