UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 CR 567 |
| | ) | |
| -vs- | ) | |
| | ) | Hon. Harry D. Leinenweber |
| | ) | |
| ROBERT SYLVESTER KELLY, also known | ) | |
| As "R.Kelly," DERREL MCDAVID, and | ) | |
| MILTON BROWN, also known as "June | ) | |
| Brown." | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT KELLY'S MOTION TO SEVER HIS TRIAL FROM CO-DEFENDANT MCDAVID'S AND FURTHER TO SEVER COUNTS 10 THROUGH 13 FROM THE <u>REMAINDER OF THE INDICTMENT</u>**

NOW COMES, Defendant, ROBERT S. KELLY, by and through his counsel, Jennifer Bonjean, and moves this Court to sever his trial from that of his co-defendant Derrel McDavid where a serious risk exists that a joint trial would compromise the rights of either, or both defendants, or prevent a jury from making a reliable judgment about guilt or innocence as to counts five through eight of the indictment. Defendant moves to sever on the grounds that one of McDavid's attorneys, Vadim Glozman, is laboring under a potential conflict of interest that may prejudice Defendant at trial. Separately, Defendant moves to sever counts 10 through 13 of the indictment from the remaining counts where Defendant will suffer substantial prejudice if those counts are tried with the remaining counts in the indictment.

**A.     Motion to Sever Trial From McDavid's Trial**

1.     Defendant Kelly and McDavid are charged with conspiracy to knowingly alter, destroy, mutilate, conceal, cover up, falsity and make a false entry in any record, document, and

tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of the United States in violation of 18 U.S.C. 1519. ("the obstruction of justice count")

2. The government identifies a number of overt acts in furtherance of this conspiracy, including but not limited to: (1) Kelly caused a Bass Productions, Ltd. check signed by McDavid to be issued to Minor One's father, in the amount of $30,000; (2) Kelly and McDavid caused a wire to be made from a Bass Productions, LTD. bank account to pay to Individual B to settle lawsuit that Individual B had filed for payment for recovering and returning videotapes that depicted Kelly engaged in sexual contact with Minor One that had been stolen from him by Individual D; (3) Kelly caused a wire transfer in the amount of $80,000 to be paid to MCDAVID through his firm, Winkler & McDavid, Ltd. In September 2014; (4) Kelly caused a RSK enterprise LLC check to be issued to Minor One in the amount $1150.00 in October 2014; and (5) Kelly caused a wire payment in the amount of $100,000 to be made from RSK enterprises LLC to agent of McDavid on McDavid's behalf.

3. Separately, Defendant Kelly and McDavid are charged with conspiring to receive child pornography, namely Video 2, Video 3, and Video 4 (Count Six) and the completed offenses of receiving child pornography (Counts Seven and Eight).

4. Because many of the overt acts identified by the government involve McDavid's conduct and not Defendant's, Defendant's defense, as to counts five through eight, will turn, at least in part, on whether he possessed knowledge about certain acts that McDavid took. Although McDavid has declined to discuss his defense with undersigned counsel, it seems obvious that Defendant and McDavid's defenses are necessarily antagonistic. Indeed, several of the overt acts that the government contends were committed in furtherance of a conspiracy are evidence of

McDavid stealing from Defendant (which he did for over a decade) – not conspiring to obstruct justice.

5. Federal Rule of Criminal Procedure 8(b) provides that an indictment "may charge two or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The rule further provides that "[t]he defendants may be charged in one or more counts together or separated" and that "[a]ll defendants need not be charged in each count." *Id.*

6. Defendant does not allege that the defendants were improperly joined but argues that severance is justified pursuant to Rule 14(a), which provides that if the joinder of offenses or defendants "appear to prejudice a defendant or the government," the court "may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

7. The court should grant severance to properly joined defendants "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent a jury from making a reliable judgment about guilt or innocence." *Zafiro v United States,* 506 U.S. 534, 539 (1993).

8. A serious risk is present, the Supreme Court has explained if: (1) highly prejudicial evidence that is probative of the defendant's guilt is admitted solely against a co-defendant, (2) many defendants are tried together in a complicated case where the defendants have markedly different degrees of culpability, or (3) "essential exculpatory evidence" for one defendant would be admissible in a solo trial but unavailable in a joint trial. *Id.* at 540.

9. Defendant and McDavid have mutually antagonistic defenses such that "the acceptance of one defendant's defense will preclude acquittal of the other defendant." *United States v. Carrillo,* 435 F. 3d 767, 778 (7th Cir. 2006). Furthermore, because Kelly has every intention of presenting evidence that McDavid embezzled and defrauded Kelly, along with a host of other employees, McDavid's right not to be tried on crimes other than those charged in the indictment may be compromised. This evidence constitutes essential exculpatory evidence for the Defendant but may not be available to him at a joint trial if McDavid moves to bar it.

10. Furthermore, there has been no assurances that McDavid will not be used as witness against Defendant in connection with the other charged offenses if he takes the stand. In fact, it seems likely that the government will attempt to use McDavid as its witness if he takes the stand to present evidence against Defendant as to other counts of the indictment. This might also be true as to co-defendant Brown since several of the government's witnesses seem to suggest that Brown was involved in facilitating Defendant's sexual exploitation of minors, a claim that Defendant denies.

11. It is well known and supported by both witness testimony and financial records that Defendant was largely ignorant of his finances and relied entirely on his surrogates, including McDavid, to make decisions about how monies were paid and who monies were paid to.

12. It is also well known that Kelly is functionally illiterate and relied entirely on third parties to run almost every aspect of his life that related to business and legal matters. Kelly did not monitor his business accounts and did not write checks from his accounts unless directed to do so by McDavid. Indeed, McDavid created business accounts and secured credit cards that

Kelly did not even know existed. Kelly rarely, if ever, used credit cards or debit cards and would make purchases in cash that was provided to him by McDavid.

13. Until McDavid left Kelly's employ, he controlled Kelly's finances in every respect. McDavid used Kelly's business accounts as a personal piggy bank.

14. McDavid routinely wired/wrote checks to himself and his own company, Winkler and McDavid, from Kelly's business accounts without Kelly's knowledge. McDavid paid his personal credits cards from Kelly's business accounts and used his company credit card, an American Express Centurion Card (a.k.a. "Black Card") for personal travel and personal expenses.

15. McDavid induced Kelly to pay him hundreds of thousands of dollars on the false promise that the money would be invested in a popular Chicago restaurant. McDavid embezzled the money instead, using it to invest *himself* in the restaurant while cutting Defendant out. McDavid knew Defendant was powerless to expose this criminal conduct due to his intellectual and educational limitations.

16. McDavid contends that payments made to him by Defendant in 2014 and 2015 were wholly unrelated to any alleged conspiracy; Kelly agrees on this point. Rather, Kelly contends that McDavid sued Kelly for breach of contract, a contract Kelly was tricked and manipulated into signing by McDavid.

17. Defendant denies that he carried out any "overt acts" in furtherance of any conspiracy and that to the extent the government shows that any monies flowed to third parties from his accounts, it was largely without his knowledge and carried out by McDavid. Kelly will also show that McDavid had a strong interest in ensuring that Kelly, his work horse, kept performing so that his personal piggy bank remained full.

18. Defendant does not merely intend to engage in blame-shifting, he fully intends to show that McDavid had an independent interest in ensuring that Defendant continued to work uninterrupted by bad press because McDavid supported his own lavish lifestyle stealing from Kelly.

19. Equally problematic, one of McDavid's lawyers, Vadim Glozman may have a potential conflict of interest that would serve to prejudice Kelly at a joint trial.

20. According to the government's indictment, Kelly and McDavid along with Individual A conspired, *inter alia,* to obstruct justice in connection with the Cook County State's Attorney office prosecution of Defendant in 2008 relating to Defendant's alleged creation of child pornography involving Minor 1.

21. According to the government, Kelly, McDavid, and Individual A – a private investigator used by Kelly's prior attorney Ed Genson, agreed to collect video tapes that allegedly depicted Kelly having sexual contact with Minor 1.

22. According to the government, Individual A – who worked with Kelly's legal team – allegedly agreed to pay money to victims and witnesses and others to ensure that they did not cooperate with law enforcement. Individual A also allegedly arranged for Individual B to be paid hundreds of thousands of dollars for obtaining and returning video tapes that depicted Kelly having sexual contact with a minor.

23. According to investigative reports, the conspiracies charged in counts 5 and 6 of the indictment occurred, in part, *in* the law offices of Ed Genson and that the completed crime of receiving child pornography as alleged in counts 7 and 8 of the indictment took place in Genson's office.

24. Represented by Ed Genson, Kelly was acquitted on all child pornography charges on June 13, 2008.

25. For at least the next 10 years (probably much longer), Genson and Kelly maintained an attorney-client relationship. Indeed, in a Sun Times report published shortly before Genson's death, Genson publicly claimed "I kept him out of trouble for 10 years." Genson stated that he "vetted [Kelly's ] records." He stated, "I listened to them, which ones would make a judge mad." https://chicago.suntimes.com/2019/3/7/18392521/r-kelly-was-guilty-as-hell-singer-s-prominent-lawyer-from-first-trial-says

26. Genson further claimed that he kept Kelly out of trouble because "he convinced Kelly to take medication to suppress his sexual urges.[1]" *Id.*

27. In the years following Kelly's acquittal, Kelly and Genson maintained an attorney client relationship. Also, during that time, Vadim Glozman, McDavid's attorney, worked for Genson as an associate. An attorney client relationship between Kelly and Genson was imputed to Glozman who was Genson's associate.

28. According to Mr. Glozman's LinkedIn page, he worked as an associate for Genson between February 2012 and September 2018. Glozman states on his website that he "began his legal career working hand-in-hand with Edward Genson, the dean of Chicago criminal defense. Ed Genson taught Mr. Glozman his in-depth knowledge of trial procedure and how to craft a defense focused on the specific dynamics of the jury and judges involved."

---

[1] Sadly, prior to his death, Genson engaged in egregious violations of the Rules of Professional Responsibility, announcing to the world privileged communications with Mr. Kelly and betraying his duty of loyalty to Kelly in a bizarre interview with the Sun Times. Much like the government's indifference to investigating a BOP officer's egregious conduct of stealing and selling Kelly's email communications, the ARDC did not seem to have any appetite for addressing an outrageous ethical violation of the storied Chicago defense attorney, Ed Genson, who, if alive, would have much to explain about his own conduct in connection with Counts Five through Eight of this indictment. https://chicago.suntimes.com/2019/3/7/18392521/r-kelly-was-guilty-as-hell-singer-s-prominent-lawyer-from-first-trial-says

7

29. Based on the foregoing, any privileged information conveyed by Kelly to his prior attorney, Ed Genson, was also received by Genson's associate Mr. Glozman, either actually or constructively.

30. Because Glozman arguably owes a duty of loyalty to Kelly because he was a member of the firm that represented Kelly, he is in a conflicted position. This potential conflict may be an actual conflict if Glozman possesses privileged information that he may or can use to the benefit of his client or to the detriment of Mr. Kelly at a joint trial.

**B.  Motion to Sever Counts Ten through Thirteen**

31. In addition to the child pornography counts involving Minor 1, conspiracy to obstruct justice (related to Minor 1), the receiving child pornography counts (also related to Minor 1), and one count of sexual exploitation of Minor 1, Kelly is charged with four additional counts of child exploitation related to Minors 3 through 6 charged in counts 10 through 13 of the indictment.

32. Counts 10 through 13 which do not involve Minor 1 should be severed from the remainder of the indictment because Kelly will suffer substantial prejudice if those counts are tried with the remaining counts in the indictment.

33. Fed. R. of Crim. Pro. 8 allows for joinder of counts where offenses are, "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." However, Rule 14 "Relief of Prejudicial Joinder," provides for severance in cases of "substantial prejudice." *See United States v. Werner* (2d Cir. 1980) 620 F.2d 922, 928. Rule 14 states:

> **(a) Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

34. Courts have recognized that substantial prejudice results from joining charges that are supported by relatively strong evidence with charges supported by much weaker evidence. *United States v. Alverado,* 1994 U.S. Dist. LEXIS 17062, *12 *See, e.g., United States v. Foutz,* 540 F.2d 733, 738 (4th Cir. 1976) (where difference in the strength of two cases was great, "we cannot presume that the jury adhered to limiting instructions and properly 'segregate[d] [the] evidence into separate intellectual boxes'" (citation omitted)); *United States v. Ragghianti,* 527 F.2d 586 (9th Cir. 1975) (reversing trial court's determination that severance was not required where there was strong evidence of one robbery and weak evidence of another); *Gregory v. United States,* 125 U.S. App. D.C. 140, 369 F.2d 185, 189 (D.C. Cir. 1966) (similar), *cert. denied,* 396 U.S. 865, 24 L. Ed. 2d 119, 90 S. Ct. 143 (1969)."

35. In this case, Counts 1 through 3 of the indictment are allegedly supported by video-recorded evidence while Counts 10 through 13 are not. Assuming the integrity of that video evidence (which is only an assumption for the purposes of this motion), such evidence would be significantly stronger than 25-year-old testimonial evidence of questionable veracity. It is simply undeniable that the government's evidence as to counts 1 through 3 of the indictment is dramatically stronger than is its evidence as to counts 10 through 13 of the indictment.

36. Similarly, substantial prejudice can result where a Defendant has important testimony to give on one case and a strong need to refrain from testifying on the other. *Cross v. United States,* 335 F. 2d 987 (D.C. Cir. 1964). *United States v. Archer,* 843 F.2d 1019, 1022 (7th Cir. 1988); *Baker v. United States,* 401 F.2d 958, 977 (D.C. Cir. 1968); *United States v. Ely,* 910 F.2d 455, 457 (7th Cir. 1990).

37. In *Baker,* the D.C. Circuit observed:

> Prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence. His decision whether to testify will reflect a balancing of several factors with respect to each count: the evidence against him, the availability of defense evidence other than his testimony, the plausibility and substantiality of his testimony, the possible effects of demeanor, impeachment, and cross-examination. But if the two charges are joined for trial, it is not possible for him to weigh these factors separately as to each count. If he testifies on one count, he runs the risk that any adverse effects will influence the jury's consideration of the other count. Thus he bears the risk on both counts, although he may benefit on only one. Moreover, a defendant's silence on one count would be damaging in the face of his express denial of the other. Thus, he may be coerced into testifying on the count upon which he wished to remain silent. It is not necessary to decide whether this invades his constitutional right to remain silent, since we think it constitutes prejudice within the meaning of Rule 14." *Baker v. United States*, 401 F. 2d 958, 976 (D.C. Cir. 1968). *See also, Archer*, 843 F. 2d at 1022 (recognizing that sometimes circumstances can coerce a defendant into testifying on a count upon which he wishes to remain silent.).

38. In light of the foregoing, this Court should sever counts 10 through 13 of the indictment where Defendant has critical testimony to offer in defense as to those counts but may seek to maintain his Fifth Amendment rights in connection with Counts 1 through 3 of the indictment for which there is substantially more evidence. Indeed, this is precisely the scenario that justifies severance because Defendant has important testimony to give concerning counts 10 through 13 and a need to refrain from testifying as to counts 1 through 3.

39. Severance is particularly justified here where the only similarity between counts 10 through 13 and the remaining counts of the indictment are that they are of the same or similar character. *United States v. Coleman*, 22 F. 3d 126, 134 (7th Cir. 1994) *overruled on other grounds*.

40. Counts 10 through 13 are of a similar character to the counts involving Minor 1 but they involve different victims, different acts, and largely different evidence. But because of the similar nature to the counts involving Minor 1, the risk of prejudice is acute.

41. It is inevitable that if the jury concludes that Defendant is guilty of Counts 1 through 3 for which there arguably stronger evidence, it will not bother to consider whether the government satisfied its burden in connection with counts 10 through 13, counts that each carry a maximum sentence of life imprisonment.

42. Because of the serious risk of prejudice to Defendant, this Court should grant severance of counts 10 through 13.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully asks this Court to sever his trial from co-defendant McDavid's trial and further to sever counts 10 through 13 from the remainder of the indictment.

Respectfully Submitted,

/s/JENNIFER BONJEAN

Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl
New York, NY 10022
715-875-1850

## **CERTIFICATE OF SERVICE**

      I, JENNIFER BONJEAN, certify that filed this Motion for Severance on May 16, 2022 via ECF. All parties to this action were serve via ECF.

                                                              /s/JENNIFER BONJEAN