UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SYLVESTER KELLY, aka "R. Kelly,"<br>DERREL McDAVID, and<br>MILTON BROWN, aka "June Brown" | Case No. 19 CR 567<br><br>Honorable Harry D. Leinenweber |

**GOVERNMENT'S MOTION
TO EMPANEL A CONFIDENTIAL JURY**

Due to the tremendous attention in this case from the media and other online platforms, the United States requests that a confidential jury be empaneled for trial. As set forth below, a confidential jury is necessary in this case to protect the jurors' privacy and integrity, and to shield them from harassment by defendant Robert Kelly's supporters. The government requests that the following information about the jurors remain out of the public record until further order of the Court: (1) juror's name; (2) spouse's name; (3) juror's city of residence; and (4) juror's place of employment.[1]

**I.   APPLICABLE LAW**

The public does not have an absolute right of access to jurors' names during a high-profile trial. *United States v. Blagojevich*, 612 F.3d 558, 561 (7th Cir. 2010). As the Seventh Circuit has explained, "[t]he right question is not *whether* names may be

---

[1] Prior to filing this motion, the government conferred with defendants' attorneys. Defendants Kelly and McDavid oppose this motion. Defendant Brown takes no position.

kept secret, or disclosure deferred, but *what justifies* such a decision." *Id.* (emphasis in original). *See also* Northern District of Illinois Plan For Random Selection of Jurors, adopted by the Northern District of Illinois pursuant to 28 U.S.C. § 1863(b)(7), at ¶ 10a (expressly permitting district courts to maintain the confidentiality of juror names "in the interest of justice.").[2]

Because "[c]onfidential' . . . juries infringe on the public nature of trials, [they should] only be used sparingly and after sound consideration that is articulated by the district court on the record." *United States v. Harris*, 763 F.3d 881, 886 (7th Cir. 2014). Accordingly, "a judge must find some unusual risk to justify keeping jurors' names confidential . . . [and] great public interest in this prosecution may indeed create exceptional risks." *Blagojevich*, 612 F.3d at 565.

Confidential juries have been used in multiple high-profile trials in this district. *See United States v. Blagojevich*, 743 F. Supp. 2d 794 (N.D. Ill. 2010); *United States v. Black*, 483 F. Supp. 2d 618 (N.D. Ill. 2007). In *Blagojevich*, for example, the district court explained that the case featured intense media scrutiny and unusual public statements by the defendant, and that the court had received several unsolicited communications from jurors regarding the trial. The court concluded that the presumption of disclosure was overcome because these circumstances made releasing jurors' names during trial uniquely risky. *Blagojevich*, 743 F. Supp. 2d at 808-09.

---

[2] The plan is available at the Northern District of Illinois website. *See* https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_press/ILNDJuryPlan.pdf (last accessed Aug. 2, 2022).

In *Black*, Judge St. Eve concluded that similar factors supported her decision to prohibit access to juror names during trial.

> [T] to disclose the jurors' names in a high-profile trial such as this would create the unnecessary risk that, during the course of the trial, jurors will be subjected to improper and presumptively prejudicial contact. Such contact creates the risk that the jurors' verdict could rest on something other than the evidence admitted in this case. As recent history in this courthouse indicates, public disclosure of juror names during the pendency of a high-profile trial will increase the risk that external influences will be brought to bear on the jurors. Common sense further reveals that external influences will not be shouldered by the jurors alone, but will also be borne by their families, friends, co-workers and employers. These costs should not unnecessarily accompany the fulfillment of civic duty, especially where, like here, they create a real and substantial risk of compromising Defendants' right to a fair trial.
>
> Second, to transform jurors' personal lives into public news—especially where several jurors have already indicated sensitivity to this issue—could unnecessarily interfere with the jurors' ability or willingness to perform their sworn duties.

*Black*, 483 F. Supp. 2d at 630 (citations omitted).

## II.  ARGUMENT

The national and international news coverage of this case has been extensive. Media outlets, bloggers, and video bloggers ("vloggers") monitor the case docket closely and often re-post the parties' filings and the Court's orders within hours of appearing on the docket.[3] Defendant Kelly is an international celebrity in the music

---

[3] *See, e.g.*, "As Trial Looms, R. Kelly's Attorney Challenges Chicago Charges," available at https://www.nbcchicago.com/local/as-trial-looms-r-kellys-attorney-challenges-chicago-charges/2822266/ (May 2, 2022, reporting on the motion to dismiss filed by Kelly that day); "R. Kelly's Chicago trial remains set for Aug. 1 as judge rejects delay," available at https://www.fox32chicago.com/news/r-kellys-chicago-trial-remains-set-for-aug-1-as-judge-rejects-delay (May 10, 2022, reporting on the Court's denial of Kelly's motion to continue the trial entered that day); "Federal Judge Won't Toss Charges or Sever Cases in R. Kelly's Upcoming Chicago Trial," available at https://news.wttw.com/2022/06/30/federal-judge-won-t-toss-charges-or-sever-cases-r-kelly-s-upcoming-chicago-trial (June 30, 2022, reporting on the Court's denial of Kelly's motions to continue and sever entered that day); "R. Kelly Kept

3

industry. Between 1996 and 2015, Kelly was nominated for over 250 music awards, including 26 Grammy Awards. Kelly has a fervent fanbase, including many individuals who actively use various social media platforms to share their opinions about Kelly and his ongoing criminal cases. The popularity of the docuseries "Surviving R. Kelly," currently available on Netflix, has also contributed to the widespread coverage of, and public interest in, Kelly's criminal prosecutions.

Defendant Kelly's jury trial in the Eastern District of New York ("EDNY"), conducted in 2021, also generated intense media attention.[4] In the EDNY trial, the judge ordered the empaneling of an *anonymous* jury, a more restrictive remedy than a confidential jury, due to "the seriousness of the charges, the defendant's history of obstructing the judicial process, the potential for juror intimidation and the intensity of media attention given to this case." *United States v. Kelly*, Case No. 19 CR 286, R. 79 (E.D.N.Y. Oct. 8, 2020). As a result, the identities of all jurors, including their names, addresses, and places of employment, were withheld from the parties and the public in the EDNY case.

---

a Gym Bag Filled With Explicit Videos of Kids Every Where He Went," available at https://allhiphop.com/news/r-kelly-gym-bag/ (July 17, 2022, re-posting portions of the government's *Santiago* proffer filed that day).

[4] Multiple major news outlets, including The New York Times, The Chicago Tribune, and The Chicago Sun-Times, posted daily articles about the EDNY case during the trial and the subsequent sentencing hearing. *See* https://www.nytimes.com/topic/person/r-kelly; https://www.chicagotribune.com/tags/r-kelly/; https://chicago.suntimes.com/r-kelly. Kelly's cases are covered by international news outlets as well. *See, e.g.*, "R. Kelly: The history of allegations against him," available at https://bbc.com/news/entertainment-arts-40635526 (June 29, 2022).

4

Since this case was charged in 2019, employees of the United States Attorney's Office have received numerous unsolicited emails and phone calls from individuals having no involvement in the case, wanting to share their views about Kelly's prosecution. Indeed, defendant Kelly included one such email chain in his recent discovery motion. *See* R. 242 at 4. Many of these unsolicited communications have come from zealous Kelly supporters who wanted, not only to express their views, but also to share social media content, such as blog posts. As Judge Zagel noted in *Blagojevich*, "[d]uring the time leading up to trial, as well as during the trial, [Judge Zagel] received several communications from opinionated members of the public," including emails, letters, and phone calls, which were "clearly an attempt to somehow influence the decision maker in this case. . . . While some may be quick to discount a theorist and a forger, it is highly likely that a juror would be disturbed that such people have been able to obtain their personal contact information. It is easy to see how contact like this could interfere with a jurors' ability to perform his sworn duties." 743 F. Supp. 2d at 798, 802.

As in *Blagojevich*, there have also been instances where individuals having no relation to this case have attempted to insert themselves into the proceedings by filing motions and letters on the docket, claiming to be defendant Kelly. *See* R. 151, 152, 156, 157. For example, "Defendant's Expedited Motion to Dismiss Criminal Cause of Action" is a five-page document contending that the indictment was not properly returned in this case and the U.S. Attorney was corrupt and "acting out of fraud to deceive Mr. Kelly." R. 152. Kelly's counsel at the time immediately filed a

5

motion to strike the filings stating that "[n]one of these documents were prepared by Mr. Kelly, they were not filed with his approval, nor were they filed with the approval of his attorneys. They [are] plainly legally incorrect, frivolous, and full of errors." R. 153. *See Blagojevich*, 743 F. Supp. 2d at 799 (noting the filing of an "uninvited amicus brief asserting a mass government conspiracy," and commenting that "the extraordinary attention being paid to this case leads not only to the expression of opinions, but also to the view that the trial is an opportunity to be noticed.").

The extreme degree of public interest, and actions of persons interested in interjecting themselves into the proceedings, is also illustrated by telephonic court proceedings, including routine status hearings, conducted by Court. Hundreds of individuals regularly phone in to observe these proceedings, and in some instances, members of the public have become unruly and yelled expletives at one another as court proceedings were being conducted. For example, during a telephonic status hearing on May 10, 2022, R. 194, after the Court denied Kelly's motion to continue the trial date, multiple members of the public openly criticized the Court's decision. The government was later informed that one of the attendees on the call recorded the proceedings and posted the audio recording on the internet.

Moreover, federal prosecutions of Kelly have given rise to threats of violence directed at prosecutors and witnesses. For example, on July 12, 2022, a federal grand jury returned an indictment charging Christopher Gunn with threatening the lives of three individuals involved in the prosecution of Kelly in EDNY. *See United States v. Gunn*, Case No. 22 CR 314, R. 6 (E.D.N.Y. July 12, 2022). As alleged in the

6

complaint, Gunn is active on various social media platforms and regularly posted about Kelly's cases, including Gunn's desire to "storm" the U.S. Attorney's Office in Brooklyn, New York. *See* Case No. 22 CR 314, R. 1 (Complaint), attached hereto as Government Exhibit 1.

As another example, one of Kelly's supporters, Donnell Russell, recently pleaded guilty to interstate stalking for his participation in a scheme to harass, intimidate, and cause substantial emotional distress to one of the victim-witnesses in the EDNY prosecution. *See United States v. Russell*, Case No. 20 CR 427 (E.D.N.Y. July 26, 2022).

In sum, this case has generated extraordinary media attention, and such attention is likely to lead to third-party attempts to contact and influence jurors—and the anticipation of such contacts—making it difficult for jurors to follow the Court's instructions (particularly instructions barring outside research and discussion of the case), and to evaluate the evidence impartially. Such actions would no doubt also impede efforts to find people willing to serve on juries in highly publicized cases. The risk of outside influence is neither hypothetical nor speculative here; it has already come to fruition during pretrial proceedings.

Indeed, the circumstances of this case arguably weigh in favor of empaneling an anonymous, rather than a confidential, jury. *See United States v. Mansoori*, 304 F.3d 635, 650-51 (7th Cir. 2012) (finding anonymous jury warranted based on previous attempts "to interfere with the judicial process; the severity of the punishment that the defendant would face if convicted; and whether publicity

7

regarding the case presents the prospect that the jurors' names could become public and expose them to intimidation and harassment."). However, because the chief concern in this case is the likelihood that jurors would be subjected to extra-judicial contacts by members of the media and the public, in the government's view, empaneling a confidential jury is the appropriate—and least restrictive—means of ensuring that the defendants receive a fair trial by an impartial jury, free from outside influences.

Moreover, there are no alternative means, such as courtroom security or cautionary instructions, capable of achieving satisfactory protection. Here, potential extra-judicial contacts and influences may be delivered in secret or over the internet, and may emanate from places far beyond the district Court's jurisdiction. Accordingly, given the enormous and extraordinary national and international media interest in this case and the extraordinary risk of external contacts and influences that interest creates, empanelment of a confidential jury is required in the interest of justice.

### III. CONCLUSION

For all of the reasons set forth above, the Court should grant the government's motion to empanel a confidential jury in this case.

          Respectfully submitted,

          JOHN R. LAUSCH, JR.
          United States Attorney

By:   */s/ Elizabeth R. Pozolo*
          JEANNICE APPENTENG
          ELIZABETH R. POZOLO
          JASON A. JULIEN
          BRIAN WILLIAMSON
          Assistant U.S. Attorneys
          219 South Dearborn St., Rm. 500
          Chicago, Illinois 60604
          (312) 353-5300

Dated: August 2, 2022