# Exhibit 1



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| Elizabeth R. Pozolo | Dirksen Federal Courthouse | Direct Line: (312) 469-6131 |
| Assistant United States Attorney | 219 South Dearborn Street, Fifth Floor | E-mail: elizabeth.pozolo@usdoj.gov |
| | Chicago, IL 60604 | |

July 1, 2022

<u>*Via Email and U.S. Mail (Enclosures)*</u>

Jennifer Bonjean                          Mary Judge
Bonjean Law Group, PLLC        Federal Defender Program
750 Lexington Avenue, 9th Floor   55 East Monroe, Suite 2800
New York, New York 10022        Chicago, Illinois 60603
*Counsel for Robert Kelly*             *Counsel for Milton Brown*


Vadim A. Glozman                      Beau B. Brindley
Law Offices of Vadim A. Glozman    Law Offices of Beau B. Brindley
53 West Jackson Boulevard          53 West Jackson Boulevard
Suite 1410                                Suite 1410
Chicago, Illinois 60604               Chicago, Illinois 60604
*Counsel for Derrel McDavid*         *Counsel for Derrel McDavid*

Re:    ***United States v. Robert Sylvester Kelly, et al., No. 19 CR 567***

Dear Counsel:

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, the government hereby notifies you that, at trial, the government intends to present expert testimony, as detailed below:

**1.    <u>Dr. Darrel Turner</u>**

The government expects that Dr. Turner will be qualified to testify as an expert on issues related to child sexual abuse, including but not limited to:

  a)    Typical means abusers use to target, recruit, manipulate, and groom minor victims;

  b)    Contributing factors that can make children more susceptible to grooming and influence by abusers;

  c)    Certain victim/abuser dynamics, including why victims may experience conflicting feelings and/or emotions toward their

abusers, including ongoing love, affection, dependence, and the need for connection with their perpetrator;

d) Contributing factors that can cause victims to delay disclosure of sexual abuse, recant, or outright deny the abuse;

e) Common victim reactions, including physical, emotional, and mental responses to incidents of sexual abuse or exploitation.

Dr. Turner's CV is enclosed. The government has copies of some transcripts of Dr. Turner's testimony in other child exploitation cases: (1) *United States v. Telles*, 16 CR 424 (N.D. Ca.) (*see* TRANSCRIPT_005-000078 – 128);[1] and (2) *United States v. Numann*, Case No, 16 CR 65 (D. Alaska) (*see* TRANSCRIPT_005-000001 – 77). These transcripts are just provided as examples of Dr. Turner's testimony and not as a comprehensive review of all prior testimony.

**2. George R. Skaluba (FBI)**

The government expects that Mr. Skaluba will be qualified to testify about the physical and electronic examinations that he conducted of certain VHS videocassette tapes (referred to as "Video 1," "Video 2," and "Video 3" in the superseding indictment). As set forth in Mr. Skaluba's reports that were already produced to you, Mr. Skaluba is expected to testify about the processes that he used to analyze the VHS videocassette tapes and his determinations about the content of the recordings on the tapes. *See* CCSAO_001-000225 – 226 (Video 1); HSI_001-000891 – 896 (Video 2 and Video 3). In 2008, Mr. Skaluba testified about Video 1 in defendant Robert Kelly's Cook County criminal trial, and his testimony was produced to you. *See* CCSAO_001-006679 – 6756.

Mr. Skaluba's CV is enclosed.

Please advise at your earliest convenience if you anticipate objecting to any of these witness' qualifications as an expert in their identified field, or the substance of their anticipated testimony, so that we can attempt to resolve any disputes prior to trial.

We recognize our obligation for continuing disclosure pursuant to Rule 16. Should we receive any additional information relating to the aforementioned experts, we will supplement these disclosures accordingly. In addition, if you believe these disclosures are not sufficient pursuant to Federal Rule of Criminal Procedure 16, please advise us so that we may further discuss this matter. The government reserves its right to provide notice prior to trial of any additional experts it intends to call at trial.

---

[1] On appeal, the Ninth Circuit affirmed the inclusion of Dr. Turner's expert testimony at trial. *See United States v. Telles*, 18 F.4th 290, 302-03 (9th Cir. 2021).

Further, pursuant to Rule 16(b)(1)(B) and (C), please provide us with the name, qualifications, summary of anticipated testimony, and any reports or analysis generated by your expert(s) as soon as possible.

Finally, the government renews its request for all discovery to which it is entitled pursuant to Federal Rules of Criminal Procedure 12.1, 12.2, 12.3, and 16, and Local Criminal Rule 16.1, including but not limited to:

1) The opportunity to inspect and copy any tangible item or document that may be offered as an exhibit at trial, pursuant to Rule 16(b)(1)(A);

2) The results of any examination or test that may be introduced by the defendant at trial, pursuant to Rule 16(b)(1)(B);

3) A written summary of any expert testimony that the defendant intends to use, including the expert's opinions, the bases and reasons for those opinions, and the expert's qualifications, pursuant to Rule 16(b)(1)(C);

4) Notice of any alibi or similar defense the defendant intends to raise, including any defense asserting the defendant's unavailability on or near the dates, times, and places named in the indictment, pursuant to Rule 12.1;

5) Notice of any defense, or of an intent to offer expert testimony, concerning a mental defect or condition inconsistent with the state of mind required for the offense charged, pursuant to Rule 12.2; and

6) Notice of a defense of public authority, pursuant to Rule 12.3.

Please do not hesitate to contact me if you have any questions or concerns.

Very truly yours,

JOHN R. LAUSCH, JR.
United States Attorney

By: *Elizabeth R. Pozolo*
Elizabeth R. Pozolo
Jeannice W. Appenteng
Jason Julien
Assistant United States Attorneys

3

**2022 CURRICULUM
VITAE**

Darrel B. Turner, PhD

<u>PERSONAL</u>:

|  |  |
|---|---|
| Telephone: | (337) 842-6339 |
| Fax: | (337) 419-0490 |
| E-mail: | dbt@turnerforensicpsychology.com |
| Mailing address: | P.O. Box 3245 |
|  | Lake Charles, LA 70602 |
| Primary Office: | 748 Bayou Pines East, Suite D |
|  | Lake Charles, LA 70601 |
| Website: | www.turnerforensicpsychology.com |

<u>EDUCATION</u>:

McNeese State University, Lake Charles, LA
        B.S. in Psychology, May 2002
        M.A. in Counseling Psychology, May 2006

Sam Houston State University, Huntsville, TX
        Ph.D. in Clinical Psychology, September 2011

Louisiana Licensed Clinical Psychologist – License #1219

Texas Licensed Clinical Psychologist – License #36453

<u>PROFESSIONAL EXPERIENCE</u>:

<u>Clinical</u>:

Private Clinical Practice and Forensic Practice (Competency and Sanity for Adults and
        Juveniles, Risk Assessment of Sex Offenders both Adult and Juvenile, Child
        Custody Evaluations, Fitness for Duty Evaluations, General Diagnostic
        Evaluations, etc.). Testimony as an expert witness in clinical psychology and
        forensic psychology in district, state, and federal court for prosecution and
        defense on the above matters.

Psychological Consultant to Oceans Behavioral Health Inpatient Psychiatric Center in
        Lake Charles, LA, November, 2021 to Present

Member of Advisory Council for Shannon Cox Family and Youth Community
        Counseling Center, January 2020, to present

Invited Peer Reviewer for Publications in the Journal of Child Abuse and Neglect

Federally Contracted Sex Offender Risk Assessment and Treatment Provider for Federal Inmates on Probation or Parole – Western District of Louisiana, Lake Charles Division. 2021-present

Member of the Louisiana Registry of Sex Offender Treatment Providers (2013 to present).

Substance Abuse Program (SAP) certified evaluator (2016 to present).

Appointed to U.S. Department of Justice National Strategy SME Child Exploitation & Human Trafficking Council to U.S. Congress as an Expert in Offender Psychology (1 of 15 Worldwide), March 2020.

Expert and Consulting Expert in Criminal and Civil Litigation Regarding Impact of Sexual Abuse (to include production of child pornography) on Victims (both as Children and Adults). Cases have included individual (offender) liability as well Institutional Liability (State Institutions, Mental Health Care Inpatient Facilities, Foster Care Networks, etc.).

Invited to Speak Nationally and Internationally on Various Topics Related to Forensic Psychology at a Variety of Mental Health, Legal, and Law Enforcement Trainings and Conferences

Designated as an Expert Witness in Clinical Psychology with a Specialty in Forensic Psychology and Sex Offending in United States Federal Court, Multiple Districts, Multiple State Jurisdictions, and Multiple Local Courts.

Consultant to the FBI, NCIS, Department of Homeland Security, and Various State, Local, and Federal Attorneys and Law Enforcement Agencies re: Risk Assessment of Sexual Offenders and Behaviors of both Offenders and Victims of Childhood Sexual Assault

Consultant to Various Media Sources related to True Crime Coverage for Newspapers, Television, and Documentary Films

(August 2011 to February 2013) Staff Psychologist at Federal Correctional Complex, Pollock, LA.

(August 2010 to August 2011) Pre-doctoral Internship with the United States Federal Bureau of Prisons at the Federal Correctional Institution in Fort Worth, Texas. Rotations include Forensic Psychology, General Psychology and Correctional Psychology.

(August 2009 to May 2010) Practicum placement at Ben Taub General Hospital Neuropsychiatric Clinic at the Houston Medical Center in Houston, Texas.

(June 2008 to August 2008) Practicum placement at Harris County Juvenile Detention Center in Houston, TX, through MHMRA.

(November 2007 to December 2009) Conducted forensic evaluations and trial consultation for adults and juveniles under the supervision of Dr. Mary Alice Conroy across several counties in Texas. Evaluations included: Competency to Stand Trial, Sanity at the Time of the Offense, and Competency for Execution.

(August 2008 to August 2009) One of two doctoral students assigned to a new 20hr/week Assessment Practicum placement at the Psychological Services Center in Huntsville, TX. Duties include adult and child psychological assessments for a variety of learning, personality, and forensic issues.

(August 2007 to May 2008) Practicum placement at MCDCSC in Willis, Texas.

(Summer 2005 to Summer 2006) Head Counselor and Assistant to Coordinator at the Kay Dore Counseling Clinic. Children as Primary Client Population.

PUBLICATIONS:

ODAG (2021) (Office of Deputy Attorney General) Invited Collaborator and Expert Consultant on National Strategy on Child Exploitation: Offender Psychology; Section Prepared by United States Military Service Behavioral Analysis Unit (BAU) and the FBI BAU from the National Coordinator for Child Exploitation & Human Trafficking, the U.S. Department of Justice.

*McCallum, K., E., Boccaccini, M. T., Varela, J. G., & Turner, D. B (2021). Psychopathy profiles and Personality Assessment inventory Scores in a sex offender risk assessment field setting. *Assessment*. https://doi.org/10.1177/10731911211015312

*Trupp, G., Preszler, J., Boccaccini, M. T., Marcus, D. M., Varela, J. G., & Turner, D. B. (2021). Generalizability of psychopathy network findings to scores assigned to individuals convicted of a sex offense. *Criminal Justice and Behavior, 48*(5), 671-689. doi: 10.1177/0093854821989375

Turner, D. B., Blanch, J., Sparks, C., & Hanks, M. (2015). The Sentencing Battleground: Understanding the current psychology research and refuting defense psychology and risk assessment reports at sentencing. United States Attorneys' Bulletin. U.S. Department of Justice, July, 2015.

Turner, D. B., Boccaccini, M. T., Murrie, D. C., & Harris, P. B. (2015). Jurors report that risk scores matter in SVP trials, but that other factors matter more. *Behavioral Sciences and the Law*. doi: 10.1002/bsl.2154

Boccaccini, M. T., Murrie, D. C., & Turner, D. B. (2014). Jurors' views on the value and objectivity of mental health expert witnesses. *Behavioral Sciences and the Law, 32*, 483- 495. doi: 10.1002/bsl.2129

Knighton, J. C., Murrie, D. C., Boccaccini, M. T., & *Turner, D. B. (2014). How likely is "likely to reoffend" in sex offender civil commitment trials? *Law and Human Behavior, 38*, 294- 304. doi: 10.1037/lhb0000079

Boccaccini, M.T., Turner, D. B., Murrie, D.C., Henderson, C.E., & Chevalier, C., (2013). Do scores from risk measures matter to jurors? *Psychology, Public Policy, and Law, 19*, 259-269. doi: 10.1037/a0031354

Boccaccini, M.T., Turner, D., Murrie, D. C., & Rufino, K. A. (2012). Do PCL-R scores from state or defense experts best predict future misconduct among civilly committed sex offenders? *Law and Human Behavior, 36*, 159-169. doi: 10.1037/h0093949

Clark, J., Boccaccini, M.T., & Turner, D. (2010). Attitudes toward coerced confessions: Psychometric properties of new and existing measures. Southwest Journal of Criminal Justice, 6,  185-203.

Murrie, D.C., Boccaccini, M.T., & Turner, D.T. (2010). Ethical challenges in sex-offender civil commitment evaluations: Applying imperfect science in adversarial settings. In A. Schlank (Ed.). *The Sexual Predator (Vol 4).* Kingston, NJ: Civic Research Institute.

Turner, D. (2011). *Juror perceptions of the influence of expert witness testimony in Texas sexually violent predator civil commitment hearings.* Ph.D. Dissertation, Sam Houston State University, Huntsville, Texas.

Murrie, D.C., Boccaccini, M.T., Turner, D., Meeks, M., Woods, C. & Tussey, C. (2009). Rater (dis)agreement on risk assessment measures in sexually violent predator proceedings: Evidence of adversarial allegiance in forensic evaluation? Psychology, Public Policy, and Law, 15, 19-53.

Boccaccini, M.T., Turner., & Murrie, D.C. (2008). Do some evaluators report consistently higher or lower scores on the PCL-R?: Findings from a statewide sample of sexually violent predator evaluations. *Psychology, Public Policy, and Law, 14*, 262-283. Turner, D. B., & Marceaux, J. C. (2005, July). Cell assignment among violent and non-violent offenders and its effect on recidivism. American Journal of Psychological Research, http://www.mcneese.edu/colleges/ed/deptpsy/ajpr/ajpr12.pdf

State of Louisiana Department of Social Services Office of Family Support. (2005). *Best Practices of the access and visitation program for the 14th judicial District family and juvenile court.* Baton Rouge, LA: Disney, J.M., & Turner, D.B.

INVITED PROFESSIONAL PRESENTATIONS/CONSULTATIONS:

Hamilton, P., Thorne, S., Turner, D., Latham, J.  (2022).  Civil Commitment and Behavioral Abnormality Assessment and Placement.  *Council on Sex Offender Treatment.*  Denton, Texas.

Keynote Speaker at the British Psychological Society's Student Member Group – "Beyond The Lecture" Theatre, September 30, 2021 – Webinar

Presented for the Texas Psychological Association with Dr. Paul Hamilton on Conducting Behavioral Abnormality Evaluations at the Multidisciplinary Team Level for Purposes of the Civil Commitment Process of Sexually Violent Predators in the State of Texas, November, 2021.

One of three Clinical Psychologists Invited to Present in a Live "Ask the Expert" Session at the 2021 Dallas Crimes Against Children Conference. "Ask the Expert: Grooming, Featuring Expert Dr. Darrel B. Turner," August, 2021

Keynote Speaker at the Southwestern Indiana Child Advocacy Center Coalition, Crisis Connection Conference, September, 2019

Keynote Speaker and Presenter at the 2019 Utah Children's Justice Symposium, Salt Lake City, Utah, May 14, 2019 – "Grooming Behaviors of Child Molesters and Impact on Behavior and Disclosure of Victims."

Invited Presenter at the annual TAASA Conference on "Online Solicitation of Minors for Sexual Purposes," South Padre Island, Texas, April 30, 2018.

Invited Workshop Presenter at the International Child Protection Congress in Coventry, England on "Grooming Behaviors of Child Molesters and the Impact on Behavior of Child Victims." March 9, 2018.

Keynote Speaker and Presenter at the Connections Count Conference in Lake Charles, LA, on February 21, 2018

Invited Presenter at the 9th annual Champions of Children Conference in Chicago, IL

Invited Guest Speaker at the 3rd annual Louisiana Defense Attorney's Conference in Natchitoches, LA

Invited Guest Speaker at the Quarterly Region D Texas TAASA Conference and Webinar, The Woodlands, TX, on July 25, 2016

Invited Presenter at the National Association Against Sexual Abuse Annual Conference in Corpus Christi, TX, on March 8, 2016

Invited Instructor at the San Antonio, TX, Police Department Sex Crimes Unit on Effective Interview Techniques of Suspects of Child Sexual Abusers with various Personality Constructs and Disorders, San Antonio, TX, in March, 2016

Invited Speaker at the Connections Count Conference in Lake Charles, LA on the areas Ethical Considerations in Child Custody Evaluations, February 12, 2016

Invited Instructor for Project Safe Childhood Webinar Series – Topic: "Risk Assessment of Child Pornography Offenders" at the United States Attorney's Office in Lafayette, LA, on December 16, 2015

Invited Presenter at the Lake Charles Area Family Law Organization Monthly Meeting On Best Practices in Child Custody Evaluations

Instructor Trainer in Interviewing and Interrogating of Child Molesters at the Advanced Child Abuse Investigation Instructor Training at the Texas Municipal Policeman's Association Training Facility in Austin, TX, December 9-11, 2015

Invited speaker at the International Child Protection Congress in Edinburgh, Scotland, 2015, Topic: "Grooming Behaviors of Child Molesters and the Effect on Behavior of Child Victims."

Invited Instructor at the Annual Project Safe Childhood Online Exploitation Seminar for the Office of Legal Education, U.S. Department of Justice in Columbia, South Carolina, August 3-7, 2015

Invited speaker at the Austin Center for Child Protective Services October, 2015 Meeting Of the Travis County Child Protection Team

Invited speaker at the 2013, 2015, 2016, 2019, 2021 Protect Our Children Conference in Omaha, Nebraska. Topic: "Understanding Counter-Intuitive Behaviors of Victims of Childhood Sexual Assault and Grooming Behaviors of Offenders."

Invited speaker to the Calcasieu Parish District Attorney's Office in May, 2015. Topic: "Grooming Behaviors of Child Molesters and the Effect on Behavior of Child Victims."

Invited Speaker to the Special Prosecution Unit in Huntsville, Texas in March, 2015. Topic: "Understanding the Statistics Behind Risk Assessment of Sexually Violent Predators."

Invited speaker at the 2012, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022 International Crimes Against Children Conference in Dallas, TX. Topics: "Risk Assessment of Sexually Violent Predators", "Risk Assessment of Child Pornography Offenders," "Civil Commitment of Sexually Violent Predators in Texas," "Grooming Behaviors of Child Molesters and the Impact on Victims," "Denial Patterns and Deception of Detection among Sex Offenders," "Collaboration Between Attorneys and Mental Health Experts in the Communication of Expert Testimony in Court," "Paraphilias among Sex Offenders," and "Maintaining Mental Health in the Field of Sexual Offenses."

Invited speaker at quarterly meeting of Project Safe Childhood at the Assistant United States Attorneys' Office in Dallas Texas on several occasions.

Invited to present on numerous occasions to discuss research findings on expert testimony impact on jurors and field reliability of psychological tests used in risk assessments. Also discussed were implications findings may have on practice. Special Prosecution Unit/Civil Division in Huntsville, Texas

Invited to present research findings on expert testimony impact on jurors and field reliability of psychological tests used in risk assessments and to discuss implications on practice in Sexually Violent Predator Civil Commitment hearings with State Counsel for Offenders Office in Conroe, Texas.

Invited to present research findings on current status of outpatient civil commitment program in Texas, field reliability of psychological tests used in risk assessments in Sexually Violent Predator Civil Commitment hearings with Counsel on Sex Offender Treatment (governing body of Texas SVP Civil Commitment Program) in Austin, Texas. Also discussed were effectiveness of PCL-R, Static-99, MnSost-R, and PAI in predicting compliance of offenders with parameters of Texas Civil Commitment Program.

Invited to present research findings on field reliability of psychological tests used in risk assessments and an overview of functioning of Texas SVP Civil Commitment Program to Texas Department of Criminal Justice (TDCJ) in Huntsville, Texas.

Invited speaker at the 2010 annual Texas Criminal Defense Lawyers' Association Conference in Dallas, Texas. Topics included risk assessment of sexually violent predators and preliminary findings of my Dissertation, "Juror Perceptions of Expert Witness Testimony in Texas Sexually Violent Predator Civil Commitment Hearings."

Member of a focus group consisting of federal and local law enforcement, prosecutors, mental health professionals, and community service providers on Investigation Human Trafficking.

Consultant to Lake Charles, Louisiana Police Department Cold Case Homicide Unit.

Undercover Operative in Sting Operation of Illegal Sex Activity and Illegal Drug Activity in Lake Charles, Louisiana

MANUSCRIPTS UNDER REVIEW:

Turner, D.T., Harris, P., Strauss, J., Zachary, S., Robinson, L.(2021) Introducing the APOD: Analysis of Patterns of Denial among Sex Offenders, In Press

RESEARCH EXPERIENCE:

(November 2015 to Present) Invited to Collaborate with the FBI's Behavioral Analysis Unit on Risk Factors of Child Pornography Offenders to Reoffend as Compared To Risk Factors of Contact Offenders.

(November 2008 to August 2010) Assistant Researcher examining recidivism rates of the entire population of capital murderers in the Texas Department of Criminal Justice from 1994 to present. The study also examines the recidivism rates of those offenders convicted of Solicitation (or "Murder-for-Hire") crimes. Results examine rates of recidivism, types of reoffenses, and demographic characteristics of the population: Sam Houston State University.
Supervisor: Mary Alice Conroy, Ph.D.

(Spring 2007) Research Assistant, 10 hours per week, Witness Preparation Testimony Study, Department of Psychology, Sam Houston State University. Supervisor: Marc Boccaccini, Ph.D.

(Fall 2006 to February 2015) Establishing and leading a research program in conjunction With Texas State Sexually Violent Predator Civil Commitment Court examining Details of expert witness testimony and effects of expert witness testimony on jurors in Texas Sexually Violent Predator Civil Commitment Hearings. Sam Houston State University. Supervisor: Marc Boccaccini, Ph.D.

(Summer 2005 to Spring 2006) Psychology Department, McNeese State University. Completed a thesis examining the relationship between early "big wins" and pathological gambling behaviors among social and problematic gamblers. Department of Psychology, McNeese State University. Supervisor: Cameron L. Melville, Ph.D.

(Summer 2005 to Spring 2006) Independent research examining the effect of incarceration on the mentally ill as well as arresting officer judgment concerning mental health of inmates and its correlation to inmate performance on several tests measuring mental health. Department of Psychology, McNeese State University. Supervisor: Lawrence S. Dilks, Ph.D.

(Summer 2005 to Spring 2006) Independent research examining the relationship between inmate performance on the Millon Clinical Multiaxal Inventory and severity of Criminal Behavior. Department of Psychology, McNeese State University. Supervisor: Lawrence S. Dilks, Ph.D.

(Fall 2004 to Spring 2005) Hired under Janelle M. Disney, Ph.D. to assist in the writing of the Best Practices Manual of the Access and Visitation Program for the Louisiana State Department.

(Spring 2004 to Summer 2005) Lead researcher studying inmates at Calcasieu Correctional Center and the effect of cell assignment on recidivism among violent and non-violent inmates. Department of Psychology, McNeese State University. Supervisor: Diana Odom Gunn, Ph.D.

PRESENTATIONS AT PROFESSIONAL MEETINGS:

Concannon, A. B., Ruchensky, J. R., Varela, J. G., Holdren, S. M., Kurus, S. J., Harris, P. B., & Turner, D. B. (2022, March). *Estimating scores for the alternative model for personality disorders in sexually violent predator evaluations: Associations with the Psychopathy-Checklist—Revised*. Paper presented as part of the symposium "*Using the Personality Assessment Inventory to Assess the Alternative Model for Personality Disorders*" at the 2022 Annual Conference of the Society for Personality Assessment, Chicago, IL.

Kurus, S., K., Holdren, S., Rubenstein, L., Varela, J. G., Boccaccini, M. T., Harris, P. B., Turner, D. T., & Hamilton, P. M. (2020, March). *Evaluator differences in PCL-R scoring and risk level determination in sexually violent predator civil commitment evaluations.* Poster presented at the annual convention of the American Psychology-Law Society, New Orleans, LA.

Trupp, G.F., Preszler, J., Boccaccini, M.T., Marcus, D.J., Varela, J.G., & Turner, D.B. (2019, March). *Network Analysis of Psychopathy as Defined by the PCL-R Within the Field.* Poster presented to the Annual Meeting of the American Psychology-Law Society, Portland, OR.

Turner, D., Chevalier, C., Boccaccini, M. T., & Murrie, D. C. (2012, March). Do SVP jurors believe that offenders with higher risk measure scores are more likely to reoffend? Poster presentation at the meeting of the American Psychology-Law Society, San Juan, PR.

Boccaccini, M.T., Rufino, K., Turner, D., & Murrie, D.C. (2011, March). Do some evaluators assign consistently higher PCL-R facet scores than others?: Yes and No. In D.C. Murrie (Chair), Field reliability and field validity of forensic Psychology-Law Society, Miami, FL.

Boccaccini, M.T., Turner, D., & Murrie, D.C. (2009, March). Do some evaluators report consistently higher or lower PCL-R scores than others? Paper presented at the meeting of the American Psychology-Law Society, San Antonio, Texas.

Turner, D.B., Wevodau, A., Boccaccini, M.T., & Murrie, D.C. (2011, March). SVP jurors' beliefs about the recidivism rate that indicates an offender is "likely" to reoffend. Poster presented at the meeting of the American Psychology-Law Society, Miami, FL.

Turner, D., Boccaccini, M.T., & Murrie, D. C. (2010, March). Are PCL-R scores from state or defense experts more predictive of future offending? In I. Packer (Chair), Issues in Psychopathy Assessment. Symposium presented at the meeting of the American Psychology-Law Society, Vancouver, Canada.

Turner, D., Boccaccini, M.T., Meeks, M., & Murrie, D.C. (2009, March). Real SVP jurors' beliefs about what influences their decisions. In D. Krauss (Chair), Expert witness testimony in sexually violent predator trials. Symposium presented at the meeting of the American Psychology-Law Society, San Antonio, Texas.

Meeks, M., Boccaccini, M.T., & Turner, D. (2009, March). Evidence or experts?: SVP jurors beliefs about influences in their trial decisions. In D. Krauss (Chair), Expert witness testimony in sexually violent predator trials. Symposium presented at the meeting of the American Psychology-Law Society, San Antonio, Texas.

Murrie, D.C., Boccaccini, M.T., & Turner, C. (2009, March). How research on SVP juries should-and should not-inform expert testimony in SVP trials. In D. Krauss (Chair), Expert witness testimony in sexually violent predator trials. Symposium presented at the meeting of the American Psychology-Law Society, San Antonio, Texas.

Meeks, M., Turner, D., Woods, C., Boccaccini, M.T., & Murrie, D.C. (2009, March). Which diagnoses do experts identify as "behavioral abnormalities" for SVP offenders? Poster presented at the meeting of the American Psychology-Law Society, San Antonio, Texas.

Clark, J., Boccaccini, M.T., & Turner, D. (2008, March). Attitudes toward confessions: Psychometric properties of new and existing measures. Poster presented at the meeting of the American Psychology Association, Jacksonville, FL.

Turner, D., Boccaccini, M.T., & Murrie, D.C. (2008, March). Jurors' perceptions of expert witness testimony in SVP hearings. Poster presented at the meeting of the American Psychology-Law Society, Jacksonville, Florida.

Murrie, D.C., Boccaccini, M.T., Turner, D., & Meeks, M. (2008, March). Interrater (dis)agreement on actuarial risk measure scores completed by opposing evaluators in sexually violent predator trials. Paper presented at the meeting of the American Psychology Association, Jacksonville, FL.

Whiteman, J.L., & Turner, D.B. (Spring 2006). Life Actualization Therapy. Presentation at Fall 2005 (postponed to Spring 2006) Louisiana Counselors Association Conference, Baton Rouge, LA.

Symposium: Whiteman, J.L., Dilks, L.S., Marceaux, J.C., Turner, D.B., White, R., Mayeaux, B.D. (Spring 2006). Hurricane Rita: Personality Variables and Coping Mechanisms. Southwestern Psychological Association annual conference, Austin, TX.

Turner, D.B., Dilks, L.S., Boyd, S.L., Marceaux, J.C. (Spring 2006). The Relationship between Inmate Performance on the Millon Clinical Multiaxal Inventory and Severity of Criminal Behavior. Paper presentation at the Southwestern Psychological Association annual conference, Austin, TX.

Marceaux. J.C., Melville, C.L., Turner, D.B. (Spring 2006). Early Wins and Losses in Pathological Gambling. Paper presentation at the Southwestern Psychological Association annual conference, Austin, TX.

Boyd, S.L., Dilks, L.S., Marceaux, J.C., & Turner, D.B. (Spring 2006). Psychological and Behavioral Attributes of the Incarcerated Individual. Paper presentation at the Southwestern Psychological Association annual conference, Austin, TX.

TEACHING EXPERIENCE:

(Fall 2011 to Summer 2019) Online Faculty Member through the University of Phoenix (Summer 2013 to Summer 2015)

Online Faculty Member through Argosy University (Fall 2012 to Fall 2014)

Adjunct Professor at McNeese State University

(Spring 2006) Teaching Graduate Assistant: Introduction to Psychology 101, McNeese State University

(Fall 2005) Teaching Graduate Assistant: Introduction to Psychology 101 and a web-based course I designed in Educational Psychology 211, McNeese State University

(Spring 2005) Teaching Graduate Assistant: Introduction to Psychology 101 and Educational Psychology 211, McNeese State University

(Fall 2004) Teaching Graduate Assistant: Introduction to Psychology 101 and a Satellite Video course in Introduction to Psychology 101, McNeese State University

PROFESSIONAL ASSOCIATIONS:

American Psychological Association

American Psychology Law Society

Southwestern Psychological Association

Psi Chi, the National Honors Society in Psychology

Member of Louisiana Registry of Sex Offender Treatment Providers

Texas Psychological Association

Louisiana Psychological Association

HONORS:

2011 Honor Graduate at Federal Law Enforcement Training Center, Glynco, Georgia

2009 Outstanding Research by a Doctoral Student in Psychology Department at Sam Houston State University

2008 James P. Weber Outstanding Second Year Psychology Graduate Student Scholarship

McNeese State University Foundation 2005-2006 Dore Graduate School Fellowship (one of two recipients)

The Dore Fellowship for Graduate Assistants, Spring 2005

The Dore Fellowship for Graduate Assistants, Fall 2004

VOL. 1

PAGES 1 - 269

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE JEFFREY S. WHITE, JUDGE**

```
UNITED STATES OF AMERICA,      )
                               )
              PLAINTIFF,       )   NO. CR-16-0424 JSW
                               )
  VS.                          )   WEDNESDAY, OCTOBER 17, 2018
                               )
DAVID JOHN TELLES, JR.,        )   OAKLAND, CALIFORNIA
                               )
                               )   JURY TRIAL REDACTED
              DEFENDANT.       )
_____)
```

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

FOR PLAINTIFF:          ALEX G. TSE, ESQUIRE
                        UNITED STATES ATTORNEY
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA  94612
                    BY: CHRISTINA MCCALL,
                        VANESSA BAEHR-JONES,
                        ASSISTANT UNITED STATES ATTORNEYS




FOR DEFENDANT:          MICHAEL STEPANIAN, ESQUIRE
                        JENNIFER L. NAEGELE, ESQUIRE
                        819 EDDY STREET
                        SAN FRANCISCO, CALIFORNIA 94109




REPORTED BY:            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                        OFFICIAL COURT REPORTER

TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1   FIRST PART OF THIS?

2               **THE COURT:**  ALL RIGHT.  IT IS BLANK NOW.

3               **MS. BAEHR-JONES:**  WONDERFUL.  THANK YOU.

4                       <u>**DIRECT EXAMINATION**</u>

5   BY MS. BAEHR-JONES:

6   **Q.**  GOOD AFTERNOON, DR. TURNER.

7   **A.**  GOOD AFTERNOON.

8   **Q.**  WHAT IS YOUR CURRENT POSITION?

9   **A.**  I AM A CLINICAL PSYCHOLOGIST AND I SPECIALIZE IN FORENSIC

10  PSYCHOLOGY.

11  **Q.**  I WANT TO TALK TO YOU FIRST ABOUT YOUR BACKGROUND, YOUR

12  EDUCATION, AND SOME OF YOUR EXPERIENCE.  LET ME START WITH

13  YOUR EDUCATION.

14      CAN YOU GO BACK AND DESCRIBE WHAT SCHOOLS, WHAT PROGRAMS

15  YOU'VE ATTENDED AS PART OF BEING A CLINICAL AND FORENSIC

16  PSYCHOLOGIST?

17  **A.**  SURE.

18      SO I OBTAINED MY BACHELOR'S DEGREE IN PSYCHOLOGY FROM

19  MCNEESE STATE UNIVERSITY IN LOUISIANA AND A COUNSELING

20  PSYCHOLOGY MASTER'S DEGREE FROM THE SAME INSTITUTION.

21      AND THEN I GOT MY DOCTORATE OR PH.D. FROM SAM HOUSTON

22  STATE UNIVERSITY IN HUNTSVILLE, TEXAS AND COMPLETED MY

23  PREDOCTORAL INTERNSHIP AT THE FEDERAL BUREAU OF PRISONS IN

24  FORT WORTH, TEXAS.

25  **Q.**  AND AFTER YOU COMPLETED YOUR DOCTORATE, YOU MENTIONED THAT

1    YOU WORKED FOR THE BUREAU OF PRISONS.  WHAT WAS YOUR FIRST
2    EXPERIENCE AS A PSYCHOLOGIST?
3    **A.**  WELL, YOU ARE REQUIRED TO COMPLETE A YEAR INTERNSHIP
4    BEFORE YOU RECEIVE YOUR DOCTORATE.  AND SO MY YEAR INTERNSHIP
5    WAS AT THE FEDERAL CORRECTIONAL INSTITUTION IN FORT WORTH,
6    TEXAS.
7        HALF OF MY YEAR THERE WAS SPENT AS A CORRECTIONAL
8    PSYCHOLOGIST AND HALF OF MY YEAR THERE WAS SPENT AS A FORENSIC
9    PSYCHOLOGIST DOING FORENSIC EVALUATIONS FOR THE FEDERAL
10   GOVERNMENT.
11       AND THEN ONCE I RECEIVED MY DIPLOMA, I STATED ON AND
12   WORKED AT THE FEDERAL BUREAU OF PRISONS FOR A COUPLE OF YEARS
13   AT A FEW DIFFERENT PRISONS IN LOUISIANA, PRIMARILY AT UNITED
14   STATES PENITENTIARY AT POLLOCK, IN POLLOCK, LOUISIANA.
15   **Q.**  YOU MENTIONED FORENSIC PSYCHOLOGY.  CAN YOU EXPLAIN WHAT
16   FORENSIC PSYCHOLOGY IS VERSUS JUST REGULAR PSYCHOLOGY?
17   **A.**  SURE.
18       IT'S UNFORTUNATELY NOT AS GLAMOROUS AS IT APPEARS ON ALL
19   OF THE TRUE CRIME SHOWS AND EVERYTHING.  FORENSIC PSYCHOLOGY
20   JUST MEANS THE APPLICATION OF FORENSIC -- I'M SORRY, THE
21   APPLICATION OF PSYCHOLOGICAL PRINCIPLES IN A COURT SETTING,
22   WHETHER IT'S CIVIL OR CRIMINAL.  AND YOU CAN HAVE FORENSIC
23   DENTISTRY OR FORENSIC JUST ABOUT ANYTHING YOU WANT.  IF THE
24   PERSON IS AN EXPERT AND IS TESTIFYING IN COURT IN SOME
25   CAPACITY, THEN THAT'S CONSIDERED FORENSIC WORK.  SO THAT'S

1    WHAT FORENSIC PSYCHOLOGY IS IN A NUTSHELL.

2    **Q.**  CAN YOU -- SINCE YOU STARTED PRACTICING, DO YOU HAVE

3    SEVERAL DIFFERENT SORT OF FACETS OF WHAT YOU PRACTICE?

4    **A.**  YES, MA'AM, I DO.

5    **Q.**  CAN YOU BREAK THOSE DOWN?

6    **A.**  SURE.

7        SO MY PRACTICE IS ABOUT HALF CLINICAL PSYCHOLOGY AND ABOUT

8    HALF FORENSIC PSYCHOLOGY.  SO HALF OF THE WORK I DO WOULD

9    QUALIFY AS FORENSIC PSYCHOLOGY LIKE THIS WORK HERE TODAY SINCE

10   WE ARE IN A COURTROOM, AND HALF OF THE WORK I DO WOULD SIMPLY

11   BE CLINICAL PSYCHOLOGY.

12   **Q.**  WHEN YOU SAY "CLINICAL", CAN YOU EXPLAIN WHAT CLINICAL

13   MEANS?

14   **A.**  SURE.

15       CLINICAL PSYCHOLOGY IS TESTING, DIAGNOSING, TREATING,

16   MAKING TREATMENT RECOMMENDATIONS, CONSULTING WITH OTHER

17   PROFESSIONALS REGARDING BEST TREATMENT FOR AN INDIVIDUAL.

18       SO ABOUT HALF OF MY PRACTICE I SPEND DOING TESTING,

19   EVALUATING PERSONS WITH DISABILITIES.  FOR ABOUT FIVE YEARS, I

20   DID A LOT OF WORK THROUGH THE DEPARTMENT OF DEFENSE EVALUATING

21   SERVICEMEN AND WOMEN WHO WERE RETURNING FROM COMBAT WITH PTSD

22   ISSUES, DEPRESSION, AND THINGS LIKE THAT, AS WELL AS OLDER

23   VETERANS FROM PREVIOUS WARS WHO WERE TRYING TO GET

24   SERVICE-CONNECTED BENEFITS AND TREATMENT.

25       ALSO, IN THE CLINICAL CAPACITY, I TEACH, I TEACH TWO

1    CLASSES ONLINE.  AN ETHICS CLASS IN FORENSIC EVALUATIONS AND A

2    STATISTICS CLASS, WHICH WILL PUT YOU TO SLEEP IN ABOUT THREE

3    SECONDS.  JUST GENERAL TESTING, INTELLIGENCE TESTING, THINGS

4    OF THAT NATURE.

5        SO THAT'S THE CLINICAL ASPECT OF MY PRACTICE.

6    **Q.**  AND AS PART OF YOUR CLINICAL WORK, I WANT TO SPECIFICALLY

7    ASK ABOUT CLINICAL WORK YOU'VE DONE RELATING TO SEX OFFENDERS

8    AND CHILD VICTIMS.

9    **A.**  OKAY.

10   **Q.**  HAVE YOU INTERVIEWED SEX OFFENDERS AND CHILD VICTIMS AS

11   PART OF YOUR CLINICAL WORK?

12   **A.**  AS PART OF MY CLINICAL WORK, YES.  I USED TO TREAT SEX

13   OFFENDERS IN MY PRIVATE PRACTICE.  I'M CERTIFIED IN THE STATE

14   OF LOUISIANA AS A SEX OFFENDER TREATMENT PROVIDER.  I NO

15   LONGER DO -- I NO LONGER TREAT SEX OFFENDERS, BUT I HAVE

16   TREATED VICTIMS ESPECIALLY CHILD VICTIMS OF SEXUAL ABUSE AS

17   WELL AS OFFENDERS THEMSELVES IN MY CLINICAL PRACTICE.  YES,

18   MA'AM.

19   **Q.**  IN YOUR CLINICAL EXPERIENCE, CAN YOU GIVE AN ESTIMATE OF

20   HOW MANY SEX OFFENDERS AND CHILD VICTIMS YOU'VE INTERVIEWED?

21   **A.**  YOU KNOW, IN THE ENTIRETY OF MY PRACTICE, WITH SEX

22   OFFENDING BEING MY PRIMARY AREA OF SPECIALTY UNDER FORENSIC

23   PSYCHOLOGY, I'VE EASILY SPOKEN WITH OVER A THOUSAND OFFENDERS

24   AND VICTIMS.

25   **Q.**  DO YOU ALSO PARTICIPATE IN RESEARCH PROJECTS?

TURNER - DIRECT / BAEHR-JONES

1   **A.**  I DO, YES, MA'AM.

2   **Q.**  AND CAN YOU TALK ABOUT SOME OF THE RESEARCH -- CURRENT

3   RESEARCH PROJECTS THAT YOU ARE WORKING ON?

4   **A.**  SURE.

5       WE'VE GOT SOME PRETTY EXCITING -- EXCITING TO ME BECAUSE

6   I'M A RESEARCH NERD, BUT EXCITING PROJECTS RELATED TO

7   GROOMING.  WE'VE ACTUALLY -- A LOT OF THE RESEARCH ON

8   GROOMING, IT'S KIND OF WHAT PEOPLE THAT WORK AT UNIVERSITIES

9   THINK GROOMING MIGHT BE, AND THEY PUT OUT STUDIES LIKE THAT.

10      WHAT MY TEAM HAS DONE IS GONE OUT AND INTERVIEWED SEX

11  OFFENDERS WHO ARE IN AFTERCARE PROGRAMS, AND ASKED THEM TO

12  TELL US WHAT GROOMING TECHNIQUES THEY'VE USED OR THEY WOULD

13  THINK OTHER SEX OFFENDERS, CHILD MOLESTERS SPECIFICALLY WOULD

14  USE.  SO THAT'S AN EXCITING STUDY.

15      WE ALSO HAVE A STUDY THAT IS CURRENTLY BEING PUBLISHED ON

16  ONLINE SOLICITATION WHICH IS WHERE ADULTS SEEK OUT MINORS

17  ONLINE FOR SEXUAL PURPOSES, AND THEN TRAVEL TO MEET THEM FOR

18  SEXUAL PURPOSES.

19      WE HAVE INCORPORATED SOME POLYGRAPH TESTING IN THAT STUDY,

20  SO THAT'S VERY EXCITING.

21      WE HAVE A STUDY -- I'M ACTUALLY DESIGNING AN INSTRUMENT

22  FOR USE BY LAW ENFORCEMENT WHICH DIFFERENTIATES BETWEEN

23  FALSELY ACCUSED INDIVIDUALS AND INDIVIDUALS WHO ARE LATER

24  CONVICTED.  AND THE WAY THAT THEY GO ABOUT DENYING DURING

25  POLICE INTERVIEWS THEIR SEX OFFENSES AGAINST ADULTS AND

1    CHILDREN.  SO IT'S SOME COMMON DENIAL TECHNIQUES THAT ARE

2    USED.

3        WE HAVE A BUNCH IN THE HOPPER.  THOSE ARE THE MAIN ONES

4    THAT POP IN MY HEAD.

5    **Q.**  AND THEN ARE YOU LICENSED -- DO YOU HAVE CERTAIN LICENSES

6    AND CERTIFICATIONS AS A PSYCHOLOGIST AND FORENSIC

7    PSYCHOLOGIST?

8    **A.**  YES, MA'AM.  I'M LICENSED IN THE STATE OF TEXAS AS A

9    PSYCHOLOGIST AND I'M LICENSED IN THE STATE OF LOUISIANA AS A

10   PSYCHOLOGIST.  I'M A CERTIFIED SUBSTANCE ABUSE PROGRAM

11   PROVIDER, WHICH IS ANOTHER ASPECT OF MY CLINICAL PRACTICE.  I

12   WORK WITH PEOPLE WHO HAVE HAD SUBSTANCE ABUSE PROBLEMS ON THE

13   JOB.  WE HAVE A LOT OF OIL INDUSTRY WORK WHERE I LIVE, SO

14   PEOPLE OPERATING HEAVY MACHINERY THAT HAVE FAILED DRUG TESTS.

15   ALSO WORK WITH JLAB, WHICH IS JUDGE AND LAWYERS ASSISTANCE

16   PROGRAM FOR JUDGES, LAWYERS, AND THEIR FAMILIES.  SO THINGS OF

17   THAT NATURE.

18   **Q.**  AND THEN FINALLY I WOULD LIKE TO ASK YOU ABOUT YOUR

19   EXPERIENCE TESTIFYING.

20       HAVE YOU PREVIOUSLY TESTIFIED AS AN EXPERT WITNESS?

21   **A.**  YES, MA'AM.

22   **Q.**  AND CAN YOU BRIEFLY DESCRIBE THE DIFFERENT TYPES OF COURTS

23   THAT YOU'VE TESTIFIED IN?

24   **A.**  SURE.

25       SO I'VE TESTIFIED IN NUMEROUS STATE COURTS, LOCAL COURTS,

1    DISTRICT ATTORNEY'S OFFICES ESSENTIALLY IN TEXAS AND

2    LOUISIANA, ALL OVER TEXAS AND LOUISIANA.

3        AND THEN I'VE ALSO DONE QUITE A BIT OF FEDERAL WORK.  AND

4    I'VE TESTIFIED -- MOST OF THE CASES THAT I GET DON'T END UP

5    WITH TESTIMONY.  I END UP DOING AN EVALUATION OR WRITING A

6    REPORT, OR SOMETHING OF THAT NATURE.

7        SO I'VE WORKED CASES FOR PROSECUTION AND DEFENSE ALL OVER

8    THE COUNTRY.  I'VE ACTUALLY TESTIFIED FEDERALLY IN FLORIDA, IN

9    PENNSYLVANIA, OKLAHOMA, NEVADA, NEW MEXICO, AND THEN FEDERALLY

10   ALSO IN TEXAS AS WELL.  THOSE ARE THE ONES -- THOSE ARE THE

11   ONES, AGAIN, THAT COME TO MIND.

12   **Q.**  AND YOU MENTIONED THAT YOU'VE WORKED FOR BOTH THE

13   GOVERNMENT AND DEFENSE.  HAVE YOU TESTIFIED AS WELL FOR BOTH

14   THE GOVERNMENT AND THE DEFENSE?

15   **A.**  YES, MA'AM.

16       AT THIS POINT I'VE TESTIFIED FOR THE STATE AND FOR DEFENSE

17   IN THE STATE.  I'VE DONE WORK FOR FEDERAL PUBLIC DEFENDER'S

18   EVALUATIONS, RISK ASSESSMENTS, AND THINGS LIKE THAT, BUT I

19   HAVE NOT TESTIFIED FOR THE DEFENSE IN A FEDERAL CASE YET.

20   **Q.**  AND THEN FINALLY, HAVE YOU SPECIFICALLY TESTIFIED

21   PREVIOUSLY AS AN EXPERT ON GROOMING PRACTICES AND VICTIM

22   BEHAVIORS?

23   **A.**  YES, MA'AM.  THAT'S THE PRIMARY FOCUS OF MY WORK AND

24   RESEARCH.

25       AND SO I'VE BEEN ASKED MANY TIMES TO TESTIFY IN MANY

1   DIFFERENT JURISDICTIONS ABOUT GROOMING BEHAVIORS THAT ADULT

2   SEX OFFENDERS ENGAGE IN WHEN THEY ARE ATTEMPTING TO ENGAGE IN

3   SEX WITH CHILDREN.  AS WELL AS THE IMPACT THAT THAT HAS ON THE

4   CHILD VICTIMS IN TERMS OF HOW LONG THEY MAY WAIT TO TELL AS A

5   RESULT, OR THINGS LIKE THAT.

6       SO, IN ADDITION TO TESTIFYING, I'VE PRESENTED IN THAT

7   CAPACITY INTERNATIONALLY AND ACROSS THE NATION TO ATTORNEYS,

8   JUDGES, LAW ENFORCEMENT AGENCIES, DEFENSE ATTORNEY GROUPS.  SO

9   IT'S A LOT OF WHAT I DO.

10          **MS. BAEHR-JONES:**  YOUR HONOR, AT THIS TIME I WOULD

11  LIKE TO MOVE THIS EXPERT IN AS AN EXPERT IN CLINICAL

12  PSYCHOLOGY WITH AN EMPHASIS IN FORENSIC PSYCHOLOGY AND SEX

13  OFFENDER BEHAVIOR.

14          **THE COURT:**  DO YOU HAVE AN OBJECTION TO THE

15  QUALIFICATIONS OR DO YOU WISH TO VOIR DIRE THE WITNESS BEFORE

16  I DECIDE?

17          **MS. NAEGELE:**  I WOULD LIKE TO VOIR DIRE THE WITNESS.

18          **THE COURT:**  ALL RIGHT.  PLEASE STEP BACK, COUNSEL.

19      LADIES AND GENTLEMEN, VOIR DIRE, YOU HEARD THAT USED WHEN

20  WE SELECTED YOU.  IT'S ALSO USED IN THE PROCESS OF ALLOWING

21  LAWYERS TO TEST THE QUALIFICATIONS OF A PARTICULAR PERSON

22  OFFERED AS AN EXPERT, AND THE OPPOSING LAWYER HAS THE

23  OPPORTUNITY TO QUESTION THE WITNESS IN AN EFFORT TO DETERMINE

24  WHETHER HE OR SHE SHOULD BE QUALIFIED AS AN EXPERT.  THAT'S

25  WHAT WE ARE GOING TO DO NOW, HAVE A LIMITED VOIR DIRE

TURNER – VOIR DIRE / NAEGELE

```
 1    ADDRESSING THAT PARTICULAR ISSUE.

 2         YOU MAY PROCEED.

 3                  VOIR DIRE EXAMINATION

 4    BY MS. NAEGELE:

 5    Q.  GOOD AFTERNOON, DR. TURNER.

 6    A.  GOOD AFTERNOON, MA'AM.

 7    Q.  I'M JEN NAEGELE, AND MYSELF AND MICHAEL STEPANIAN ARE

 8    REPRESENTING THE DEFENDANT IN THIS CASE.

 9    A.  PLEASURE TO MEET YOU.

10    Q.  SO YOU SAID THAT YOU EARNED YOUR PH.D. IN CLINICAL

11    PSYCHOLOGY IN 2011 FROM SAM HOUSTON STATE UNIVERSITY; IS THAT

12    RIGHT?

13    A.  YES, MA'AM.

14    Q.  AND SINCE THAT TIME YOU'VE DONE QUITE A BIT OF WORK FOR

15    GOVERNMENT AGENCIES?

16    A.  YES, MA'AM.

17    Q.  IN FACT, IN YOUR ROUGHLY TEN-YEAR CAREER YOU'VE WORKED

18    MAINLY WITH LAW ENFORCEMENT AGENCIES; IS THAT RIGHT?

19    A.  I'VE DONE A LOT OF WORK WITH LAW ENFORCEMENT AGENCIES,

20    YES, MA'AM.

21    Q.  YOU'VE BEEN HIRED BY THE UNITED STATES ATTORNEY'S OFFICE

22    BEFORE TO TESTIFY IN OTHER CRIMINAL PROSECUTIONS LIKE THIS

23    ONE?

24    A.  YES, MA'AM.

25    Q.  AND YOU'VE BEEN A CONSULTANT FOR THE FBI?
```

1    **A.**   YES, MA'AM.

2    **Q.**   AND NCIS?

3    **A.**   YES, MA'AM.

4    **Q.**   DEPARTMENT OF HOMELAND SECURITY?

5    **A.**   YES, MA'AM.

6    **Q.**   VARIOUS STATE, LOCAL, AND FEDERAL ATTORNEYS?

7    **A.**   YES, MA'AM.

8    **Q.**   AND THE LAW ENFORCEMENT AGENCIES?

9    **A.**   YES, MA'AM.

10   **Q.**   YOU ALSO SERVED AS A STAFF PSYCHOLOGIST IN A FEDERAL

11   CORRECTIONAL COMPLEX IN LOUISIANA?

12   **A.**   YES, MA'AM.

13   **Q.**   AND YOU COMPLETED AN INTERNSHIP WITH THE FEDERAL BUREAU OF

14   PRISONS?

15   **A.**   YES, MA'AM.

16   **Q.**   YOU'VE -- OVER THE LAST SEVERAL YEARS, YOU'VE ALSO BEEN

17   INVITED TO SPEAK AT VARIOUS LAW ENFORCEMENT SEMINARS, MOSTLY

18   IN LOUISIANA AND TEXAS, FOR DIFFERENT POLICE DEPARTMENTS AND

19   OTHER LAW ENFORCEMENT?

20   **A.**   YES, MA'AM.

21   **Q.**   AND PRIOR TO GRAD SCHOOL, YOU WORKED IN AN UNDERCOVER

22   CAPACITY ON SEX OFFENSE AND NARCOTICS INVESTIGATIONS WITH

23   LOCAL LAW ENFORCEMENT IN LOUISIANA?

24   **A.**   CORRECT.

25   **Q.**   THE MOST RECENT PUBLICATION THAT YOU AUTHORED WAS, IT

```
 1    APPEARS TO BE IN JULY 2015; IS THAT CORRECT?
 2    A.  YES, MA'AM.
 3    Q.  I'M JUST HOLDING UP A COPY HERE.
 4        IT'S ENTITLED "THE SENTENCING BATTLEGROUND, UNDERSTANDING
 5    THE CURRENT PSYCHOLOGY RESEARCH AND REFUTING DEFENSE
 6    PSYCHOLOGY AND RISK ASSESSMENT REPORTS AT SENTENCING".
 7    A.  THAT'S CORRECT.
 8    Q.  AND THIS WAS PUBLISHED IN THE UNITED STATES ATTORNEY'S
 9    BULLETIN?
10    A.  YES, MA'AM.
11    Q.  AND IS THAT -- THAT'S A PUBLICATION THAT'S GEARED TOWARDS
12    PROSECUTORS, CORRECT?
13    A.  YES, MA'AM.
14    Q.  AND IN THIS ARTICLE YOU -- IT'S BASICALLY A PRIMER FOR
15    PROSECUTORS TO REFUTE ARGUMENTS THE DEFENSE ATTORNEYS MAKE
16    ABOUT RISK ASSESSMENT AT SENTENCING; IS THAT RIGHT?
17    A.  YES, MA'AM.
18    Q.  YOU ALSO AUTHORED ANOTHER PAPER CALLED "ETHICAL CHALLENGES
19    IN SEX OFFENDER CIVIL COMMITMENT EVALUATIONS APPLYING
20    IMPERFECT SCIENCE IN ADVERSARIAL PROCEEDINGS"?
21    A.  YES, MA'AM.
22    Q.  AND THIS WAS PUBLISHED -- I ACTUALLY CAN'T TELL FROM THIS
23    WHEN THIS WAS PUBLISHED.  DO YOU KNOW?
24    A.  I DON'T REMEMBER THE YEAR.  I WANT TO SAY IT WAS AROUND
25    2010 OR 2011.  IT WAS A CHAPTER IN A TEXTBOOK.
```

```
 1    Q.   I SEE.

 2         AND IN IT YOU WRITE:

 3              "THE IMPERFECT CORRESPONDENCE BETWEEN STATUTORY

 4              LANGUAGE, I.E., THE LEGAL AND THE SCIENCE OF SEX

 5              OFFENDER DIAGNOSIS AND RISK ASSESSMENT, I.E., THE

 6              CLINICAL, CREATES NUMEROUS AMBIGUITIES AND ROOM FOR

 7              REASONABLE PROFESSIONALS TO DISAGREE."

 8         IS THAT RIGHT?

 9    A.   YES, MA'AM.

10    Q.   YOU FURTHER WRITE:

11              "MANY ETHICAL CHALLENGES ARISE AS EVALUATORS ATTEMPT

12              TO BRIDGE THE GAP BETWEEN CLINICAL AND LEGAL.

13              EVALUATORS ENGAGE IN UNETHICAL PRACTICE WHEN THEY

14              KNOWINGLY MISREPRESENT THE SCIENTIFIC KNOWLEDGE

15              RELEVANT TO THE LEGAL ISSUE PERHAPS BY EXAGGERATING

16              OR MINIMIZING THE IMPLICATIONS OF THE UNDERLYING

17              LIMITATIONS OF SCIENTIFIC KNOWLEDGE.  THE EVALUATORS

18              ALSO ENGAGE IN UNETHICAL PRACTICE WHEN THEY

19              UNKNOWINGLY MISREPRESENT THE SCIENTIFIC KNOWLEDGE

20              RELEVANT TO THE LEGAL ISSUE PERHAPS BY FAILING TO

21              KEEP INFORMED ABOUT RELEVANT RESEARCH, SCIENTIFIC

22              DEBATE, OR BEST PRACTICES."

23         IS THAT CORRECT?

24    A.   YES, MA'AM.  AND THAT'S REALLY WHAT LED -- SO THAT

25    TEXTBOOK ARTICLE IS WHAT LED TO ME BEING INVITED TO
```

1    PARTICIPATE IN THE U.S. BULLETIN ARTICLE WAS BECAUSE OF THE
2    FACT THAT THERE WAS JUST KIND OF THIS RAMPANT PATTERN OF
3    MISREPRESENTATION OF DATA AND RESEARCH, PARTICULARLY ON THE
4    PART OF DEFENSE EXPERTS AND RISK ASSESSMENT.
5        SO THOSE ARE KIND OF TIED TOGETHER, YES, MA'AM.
6    Q.  YOU DON'T THINK THE GOVERNMENT EXPERTS MISREPRESENT THINGS
7    SOMETIMES TOO?
8    A.  ABSOLUTELY I DO, YES, MA'AM.
9    Q.  IN THIS ARTICLE, YOU ACTUALLY DON'T SPECIFY, YOU DON'T
10   DISTINGUISH BETWEEN DEFENSE OR PROSECUTION, YOU DO THAT IN THE
11   UNITED STATES ATTORNEY'S BULLETIN ARTICLE, BUT NOT IN THIS
12   ARTICLE?
13   A.  CORRECT.
14   Q.  IN FACT, IN THIS ARTICLE YOU SAY:
15           "THE PULL OF ADVERSARIAL PROCEEDINGS COMPOUNDS THE
16           ETHICAL CHALLENGES RELATED TO IMPERFECT SCIENCE."
17       CORRECT?
18   A.  YES, MA'AM.  WE ARE TRYING TO BRING ATTENTION TO THE FACT
19   THAT THIS IS SOMETHING THAT EXISTS AND THIS IS SOMETHING THAT
20   AS EXPERTS WE NEED TO BE AWARE OF AND KEEP OURSELVES IN CHECK
21   ON.
22   Q.  AND THIS IDEA OF WHAT CONSTITUTES GROOMING IS NOT AN EXACT
23   SCIENCE, IS IT?
24   A.  NO, MA'AM, IT'S NOT AN EXACT SCIENCE.  WE STUDY IT AS BEST
25   WE CAN.

1   **Q.**  AND IT OFTEN DEPENDS VERY MUCH ON THE FACTS OF A GIVEN

2   CASE?

3   **A.**  YES, MA'AM.

4       BUT THIS IS -- WE DON'T STUDY ONE CASE AND PUT OUT

5   RESEARCH ON THAT.  WE STUDY NUMEROUS CASES AND MULTIPLE CASES,

6   AND WE COMPARE RESEARCH FINDINGS ACROSS STUDIES.  THAT'S WHY

7   WE ARE ABLE TO TESTIFY IN AN EXPERT CAPACITY.  WE WOULDN'T

8   JUST TAKE ONE CASE AND APPLY THAT TO ALL CASES.

9   **Q.**  UNDERSTOOD.  BUT THE -- BUT YOU -- YOU WOULD AGREE THAT

10  IT'S IMPORTANT TO ANALYZE EACH INDIVIDUAL CASE ON ITS MERITS?

11  **A.**  ABSOLUTELY, YES.

12  **Q.**  AND THAT SORT OF GENERALIZED CONCLUSIONS ABOUT BEHAVIOR IN

13  A GIVEN CASE CAN BE DANGEROUS?

14  **A.**  THEY CAN BE, BUT THIS IS ALSO THE BASIS OF WHY PSYCHOLOGY

15  IS A SCIENCE BECAUSE OF THE RESEARCH AND BECAUSE WE DON'T --

16  I'M NOT HERE TALKING ABOUT JUST WHAT I THINK OR WHAT I'VE SEEN

17  IN WORKING CASED.  WE ARE TALKING ABOUT RESEARCH THAT'S BEEN

18  REPLICATED TIME AND TIME AND TIME AGAIN.

19          **THE COURT:**  COUNSEL, WE'RE GETTING -- WE HAVEN'T YET,

20  BUT WE ARE GETTING CLOSE TO THE LINE WITH RESPECT TO VOIR

21  DIRE.  AND ALL THE QUESTIONS YOU ARE ASKING, I THINK, MAY BE

22  VERY APPROPRIATE ON PLENARY CROSS, BUT NOT NECESSARILY NOW.

23      BUT I WILL LET YOU CONTINUE IF YOU HAVE OTHER QUESTIONS

24  RELATING SPECIFICALLY TO THE OFFER OF THIS WITNESS AS AN

25  EXPERT.

```
 1          MS. NAEGELE:  THEY ARE RELATED, SO I -- MAYBE I'LL
 2   ASK A COUPLE OF MORE QUESTIONS ON VOIR DIRE.
 3          THE COURT:  GO AHEAD.  I'M NOT GOING TO LIMIT YOU.
 4   BY MS. NAEGELE:
 5   Q.  GOING BACK TO THAT SAME ARTICLE ABOUT THE ETHICAL
 6   CHALLENGES, I JUST WANTED TO MENTION A COUPLE MORE POINTS YOU
 7   MADE IN THAT ARTICLE THAT... YOU SAY:
 8          "ALTHOUGH THERE ARE MANY SCIENTIFIC ISSUES ON WHICH
 9           REASONABLE EVALUATORS MAY DISAGREE, THE ADVERSARIAL
10           PROCESS MAY PULL EVALUATORS TO CONSIDER ONLY ONE SIDE
11           OF THE SCIENCE TOO QUICKLY TO DISCUSS FINDINGS OR TOO
12           QUICKLY EMBRACE EQUIVOCAL FINDINGS."
13   A.  THAT'S RIGHT.
14   Q.  SO A LOT OF TIMES IT DEPENDS ON WHICH SIDE IS PAYING YOU
15   AS TO WHAT YOUR CONCLUSIONS ARE?
16          MS. BAEHR-JONES:  OBJECTION, YOUR HONOR.
17          THE COURT:  SUSTAINED.  THAT'S ARGUMENTATIVE.
18          MS. NAEGELE:  OKAY.  THAT'S ALL ON VOIR DIRE, YOUR
19   HONOR.
20          THE COURT:  DO YOU HAVE ANY OBJECTION?
21          MS. NAEGELE:  I DO HAVE AN OBJECTION TO -- SHALL I
22   STATE IT NOW?
23          THE COURT:  IS THIS WHAT WE CONSIDERED BEFORE?  YOU
24   WANT TO REITERATE THAT OBJECTION?
25          MS. NAEGELE:  I WOULD LIKE REITERATE THAT OBJECTION.
```

1            **THE COURT:**  YOUR OBJECTION IS NOTED AND OVERRULED.

2            **MS. NAEGELE:**  THANK YOU.

3            **THE COURT:**  SO, LADIES AND GENTLEMEN, I'M GOING TO

4    GIVE YOU ANOTHER INSTRUCTION.  YOU WILL HEAR MANY, NOT MANY,

5    BUT SOME THROUGHOUT THE TRIAL THAT ARE SPECIFIC TO PARTICULAR

6    WITNESSES OR SITUATIONS.

7        SO YOU'RE ABOUT TO HEAR THE TESTIMONY OF DR. TURNER WHO

8    WILL TESTIFY, THE COURT EXPECTS, TO HIS OPINIONS AND THE

9    REASONS FOR HIS OPINIONS.  THIS OPINION TESTIMONY IS ALLOWED

10   BECAUSE OF THE EDUCATION OR EXPERIENCE OF THIS WITNESS.  SUCH

11   OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER TESTIMONY.

12   YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH WEIGHT AS

13   YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND

14   EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL OF THE

15   OTHER EVIDENCE IN THE CASE.

16       PROCEED.

17           **MS. BAEHR-JONES:**  THANK YOU, YOUR HONOR.

18                   **DIRECT EXAMINATION RESUMED**

19   BY MS. BAEHR-JONES:

20   **Q.**  SO, DR. TURNER, I WANT TO START BY ASKING YOU, HAVE YOU

21   REVIEWED THE EVIDENCE IN THIS CASE?

22   **A.**  NO, MA'AM.

23   **Q.**  AND HAVE I SENT YOU REPORTS OR EVIDENCE OR ANYTHING ELSE

24   TO SORT OF REVIEW THAT IS EVIDENCE IN THIS CASE?

25   **A.**  NO, MA'AM.

TURNER - DIRECT / BAEHR-JONES

1    **Q.**  NOW, IT'S CORRECT, I'VE TOLD YOU THE AGES OF THE VICTIM

2    AND THE DEFENDANT IN THIS CASE; IS THAT RIGHT?

3    **A.**  YES, MA'AM.  THE AGES OF THE DEFENDANT AND THE VICTIM, AS

4    WELL AS THE CHARGES.

5    **Q.**  OKAY.

6        OTHER THAN THAT, HAVE I TOLD YOU ANYTHING ABOUT THE

7    EVIDENCE OR THE FACTS OF THE OFFENSES THAT ARE CHARGED?

8    **A.**  NO, MA'AM.

9    **Q.**  SO ARE YOU TESTIFYING THEN AS WHAT'S CALLED A BLIND

10   EXPERT?

11   **A.**  YES, MA'AM.

12   **Q.**  CAN YOU EXPLAIN BRIEFLY JUST WHAT THAT MEANS?

13   **A.**  SURE.

14       SO I'M NOT HERE TO SPEAK DIRECTLY ABOUT EVENTS THAT

15   OCCURRED IN THIS CASE.  WHEN THE OTHER COUNSEL WAS HERE, WE

16   TALKED A LITTLE BIT ABOUT GENERALIZING DATA TO ONE CASE OR

17   VICE VERSA.

18       SO WHAT I'LL BE DOING IS REPORTING ON RESEARCH, MY

19   RESEARCH, RESEARCH IN THE FIELD, WHAT WE KNOW IN GENERAL ABOUT

20   SEX OFFENDERS WHO ARE ADULTS WHO OFFEND AGAINST CHILDREN, WHAT

21   WE KNOW IN GENERAL ABOUT WHAT THAT GROOMING BEHAVIOR DOES TO

22   THOSE VICTIMS AS WELL AS SOME OTHER THINGS THAT I'M SURE YOU

23   WILL ASK ME, BUT IT WON'T BE... IT WON'T BE DIRECTLY RELATED

24   TO THIS CASE.

25       FRANKLY, I DON'T KNOW WHAT HAPPENED AND I COULDN'T EVEN

```
 1    TELL YOU THE DEFENDANT'S LAST NAME IF I HAD TO.

 2              MS. BAEHR-JONES:  YOUR HONOR, JUST TO CLARIFY, DID

 3    THE COURT QUALIFY DR. TURNER AS AN EXPERT?

 4              THE COURT:  I DID.  I OVERRULED THE OBJECTION AND,

 5    THEREFORE, YOU MAY PROCEED AS SUCH.

 6              MS. BAEHR-JONES:  THANK YOU.

 7         YOUR HONOR, THE GOVERNMENT WOULD ASK PERMISSION TO PUBLISH

 8    BUT NOT TO ADMIT WHAT'S BEEN MARKED AS EXHIBIT 197.

 9              THE COURT:  IS THIS A DEMONSTRATIVE AID?

10              MS. BAEHR-JONES:  IT IS A DEMONSTRATIVE AID.

11              THE COURT:  ARE YOU FAMILIAR WITH THIS COUNSEL AND DO

12    YOU HAVE ANY OBJECTION TO IT?

13              MS. NAEGELE:  I AM, AND NO OBJECTION.

14              THE COURT:  ALL RIGHT.  YOU MAY PUBLISH THIS TO THE

15    JURY.

16              MS. BAEHR-JONES:  IF WE CAN GO INTO SLIDE SHOW MODE.

17    THANK YOU.

18         TURNING TO SLIDE 1.

19                        (DISPLAYED ON SCREEN.)

20         TO THE NEXT SLIDE PLEASE.

21                        (DISPLAYED ON SCREEN.)

22    BY MS. BAEHR-JONES:

23    Q.  SO JUST FOR A BRIEF OVERVIEW, CAN YOU EXPLAIN TO THE JURY

24    SORT OF THE TWO TOPICS THAT YOU ARE HERE TO TALK ABOUT TODAY?

25    A.  SURE.
```

1    WHEN WE TALK ABOUT SEXUAL OFFENDING, WHEN WE TALK ABOUT,

2    FOR EXAMPLE, AN ADULT FEMALE WHO IS SEXUALLY ASSAULTED IN A

3    PARKING GARAGE BY A STRANGER, WE ARE TALKING ABOUT SOMETHING

4    VERY, VERY DIFFERENT THAN THE DYNAMICS OF WHAT OCCURS WHEN A

5    CHILD IS SEXUALLY ASSAULTED BY AN ADULT.

6    CHILDREN THINK DIFFERENTLY.  THEIR EMOTIONS ARE DIFFERENT.

7    THEIR VIEWS ON SEX ARE DIFFERENT.  AND SO WHAT WE FIND WHEN WE

8    LOOK AT SEXUAL ABUSE OF CHILDREN IS THAT IT IS A VERY, VERY

9    DISTINCT AND SEPARATE CRIME FROM SEXUAL ABUSE OF AN ADULT.

10   AND IN THE MAJORITY OF CASES WHERE THERE IS ANY KIND OF

11   COMMUNICATION BETWEEN THE OFFENDER AND THE INTENDED VICTIM

12   PRIOR TO THE ABUSE, THERE IS EVIDENCE OF GROOMING.  AND

13   GROOMING IS ONE OF THE MAJOR THINGS THAT WE WILL TALK ABOUT

14   TODAY.

15   SECONDLY, BECAUSE OF THE FACT THAT CHILDREN ARE DIFFERENT

16   BECAUSE OF THE FACT CHILDREN HAVE BEEN GROOMED

17   PSYCHOLOGICALLY, EMOTIONALLY BY THEIR OFFENDER, WHAT DOES THAT

18   DO TO THAT VICTIM IN TERMS OF AT THAT TIME, DOWN THE ROAD?

19   WHAT DOES THAT DO TO THE LIKELIHOOD THAT THEY WILL DISCLOSE?

20   HOW THEY WILL DISCLOSE THE ABUSE, IF THEY DO, TO WHOM.  AND SO

21   THAT WOULD BE THE SECOND MAJOR AREA THAT WE WILL BE

22   DISCUSSING.

23        **MS. BAEHR-JONES:**  MS. QUANT, CAN I HAVE THE NEXT

24   SLIDE, PLEASE.

25                    (DISPLAYED ON SCREEN.)

TURNER - DIRECT / BAEHR-JONES

1   BY MS. BAEHR-JONES:

2   **Q.**  SO TO TALK ABOUT THE FIRST AREA, CAN YOU PROVIDE SORT OF A

3   BRIEF EXPLANATION, DEFINITION OF GROOMING BEHAVIOR?

4   **A.**  SURE.

5       THE DEFINITION I USE IS AN EFFORT TO BE AS SIMPLE AS

6   POSSIBLE.  IT IS ESSENTIALLY BEHAVIOR THAT IS ENGAGED IN BY AN

7   OFFENDER IN ORDER TO GAIN ACCESS TO A CHILD VICTIM, TO

8   MAINTAIN ACCESS, AND TO PREVENT THAT CHILD FROM DISCLOSING THE

9   ABUSE TO OTHERS.

10  **Q.**  CAN YOU TALK ABOUT JUST TYPES OF GROOMING?

11  **A.**  SURE.

12      ONE OF THE INTERESTING THINGS IN RESEARCH THAT WE'RE

13  SEEING NOW BECAUSE THERE'S MORE RESEARCH BEING CONDUCTED ON

14  GROOMING NOW THAN THERE HAS BEEN IN THE PAST, IS GROOMING IS

15  TRADITIONALLY THOUGHT OF TO BE GIVING FIREWORKS, GIVING MONEY,

16  GIVING CANDY TO GET CHILDREN TO ACQUIESCE TO DOING CERTAIN

17  THINGS.

18      BUT WHAT WE ARE DISCOVERING IS THAT GROOMING IS MUCH, MUCH

19  MORE OF AN EMOTIONAL CONSTRUCT.  IT'S MORE ABOUT ESTABLISHING

20  SOME TYPE OF RELATIONSHIP WITH THE CHILD, GAINING THE CHILD'S

21  TRUST, BECOMING SOMEONE THAT'S VERY IMPORTANT IN THE LIFE OF

22  THAT CHILD.

23      SO WHILE THERE IS GROOMING AS WE THINK OF IT

24  TRADITIONALLY, WHILE THERE ARE SOME GIFTS GIVEN AND THINGS OF

25  THAT NATURE, THEY'RE USUALLY GIVEN WITH THE INTENT TO

1    ESTABLISH OR DEEPEN THIS EMOTIONAL CONNECTION.

2    **Q.**  AND --

3              **MS. BAEHR-JONES:**  CAN I HAVE THE NEXT SLIDE, PLEASE?

4                        (DISPLAYED ON SCREEN.)

5    **BY MS. BAEHR-JONES:**

6    **Q.**  CAN I ASK YOU ABOUT THE STAGES OF GROOMING AND WHAT THE

7    GOALS ARE.

8    **A.**  RIGHT.

9        SO EACH CASE IS DIFFERENT, AND IT WAS A GOOD POINT THAT

10   OPPOSING COUNSEL MADE.  EACH CASE STANDS ON ITS OWN MERITS BUT

11   THERE ARE SOME PATTERNS THAT WE SEE ACROSS CASES.

12       ONE OF THOSE PATTERNS THAT WE SEE IS THAT THERE IS

13   ISOLATION OF THE INTENDED VICTIM.  THERE IS A NORMALIZATION OF

14   SEX, SEXUAL ACTIVITY, SEXUAL TALKING, SEXUAL THEMES, SEXUAL

15   PICTURES, NUDITY, AND THAT THIS NORMALIZATION IS GRADUATED,

16   WHICH MEANS IT OCCURS OVER TIME.

17       THE VAST MAJORITY OF SEXUAL ASSAULTS ARE NOT INSTANT

18   ASSAULTS WHERE THE SEXUAL ASSAULT TAKES PLACE.  THEY ARE

19   GRADUATED.  IT'S KIND OF GETTING THEIR FOOT IN THE DOOR,

20   TESTING THE WATERS, AND IT OCCURS OVER TIME.

21       SO THOSE ARE THE -- THAT'S KIND OF THE THREE MAIN THEMES

22   WE SEE, AND WE CAN TALK ABOUT EACH ONE.

23   **Q.**  I GUESS STARTING WITH ISOLATION, CAN YOU TALK ABOUT HOW

24   THAT WORKS IN ONLINE CONTACTS VERSUS IN-PERSON CONTACTS?

25   **A.**  SURE.

1        SO WHAT WE SEE WHEN WE STUDY ONLINE GROOMING, IS THAT IT'S

2   ESSENTIALLY VERY MUCH THE SAME AS GROOMING IN PERSON EXCEPT IT

3   TENDS TO OCCUR A BIT FASTER TO WHEREAS GROOMING OF A CONTACT

4   VICTIM, GROOMING IN PERSON CAN LAST MONTHS OR EVEN YEARS.

5   ONLINE GROOMING TENDS TO HAPPEN FASTER.

6        SO THE FIRST THING THAT WE SEE IS THAT THE INTENDED VICTIM

7   IS ISOLATED AND THE OFFENDER SPENDS AS MUCH TIME ALONE WITH

8   THE INTENDED VICTIM AS POSSIBLE.

9        THE PRIMARY REASON FOR THAT IS TO DESTROY THE VICTIM'S

10  FRAME OF REFERENCE.  AND WHEN I SAY THAT, I'M REFERRING TO

11  THINGS THAT THE VICTIM -- THE CHILD HAS BEEN TAUGHT ABOUT SEX,

12  GOOD TOUCHES, BAD TOUCHES, SAFE TOUCHES, PRIVATE PARTS, THINGS

13  OF THAT NATURE THAT WE HOPE THEY HAVE BEEN TAUGHT BY THEIR

14  PARENTS AND OTHER CAREGIVERS.

15       IT'S IMPORTANT FOR THE OFFENDER TO ISOLATE THE VICTIM AND

16  GET THEM AWAY FROM THAT FRAME OF REFERENCE SO THAT THERE ARE

17  LESS PEOPLE SAYING, WHAT'S GOING ON WITH YOU AND UNCLE JIMMY?

18  WHY ARE YOU SPENDING SO MUCH TIME TOGETHER?  IT'S A BIT WEIRD

19  YOU ARE SITTING ON HIS LAP.  WHAT'S HAPPENING?

20       THE MORE THEY ARE ISOLATED AND AWAY FROM THAT, THE MORE

21  EASY IT IS FOR THE OFFENDER TO INTRODUCE THESE SEXUAL THEMES

22  AND DO THAT OVER TIME.

23       AND WE DON'T SUGGEST THE ISOLATION IN THE CONTEXT OF CHILD

24  SEXUAL ABUSE, WE SEE IT IN OTHER CASES OF, QUOTE, UNQUOTE

25  "BRAIN WASHING" AS WELL.

TURNER - DIRECT / BAEHR-JONES

1 **Q.**  HOW DOES THAT OCCUR IN THE ONLINE CONTEXT?

2 **A.**  WELL, INTERESTINGLY, WHAT WE FIND IS THAT WHEN AN OFFENDER

3 MEETS A VICTIM ONLINE, THEY DO TEND TO, THE MAJORITY OF TIMES,

4 TRY TO MOVE THAT CONVERSATION TO A MORE PRIVATE ONLINE AREA.

5 SO THEY WOULD WANT TO TAKE THE CONVERSATION FROM INSTAGRAM, OR

6 SOMETHING LIKE THAT, TO SOMETHING THAT'S A BIT MORE PRIVATE,

7 PRIVATE MESSAGING.

8    SO THEY ARE GETTING IT AWAY SO THAT OTHER PEOPLE AREN'T

9 SEEING IT, THEY ARE NOT AWARE OF WHAT'S GOING ON, AND THEY

10 HAVE THE VICTIM IN AN ISOLATED ENVIRONMENT WHERE THEY CAN THEN

11 CARRY ON WITH THE GROOMING PROCESS.

12 **Q.**  THEN YOU STARTED TO TALK ABOUT NORMALIZING, AND THEN

13 THAT'S ALL PART OF THE PROCESS OF GRADUATION.  CAN YOU SORT OF

14 CONTINUE ALONG THOSE LINES AND EXPLAIN HOW THAT HAPPENS?

15 **A.**  YES, MA'AM.

16    SO SEX IS NOT A NORMAL THEME IN THE LIFE OF MOST CHILDREN,

17 ESPECIALLY IF WE ARE TALKING ABOUT PREPUBESCENT CHILDREN.  AND

18 SEX WITH ADULTS IS GENERALLY NOT A COMMON PART OF THE THINKING

19 AND MOTIVATION OF POSTPUBESCENT CHILDREN, SO 13, 14, 15.  SEX

20 WITH ADULTS WOULD BE CONSIDERED ABNORMAL TO WHEREAS FOR A

21 PREPUBESCENT CHILD, SEX, IN GENERAL, IS JUST NOT A MOTIVATING

22 FACTOR.

23    SO THE IDEA BEHIND NORMALIZING IS THAT INSTEAD OF THIS

24 NOTION THAT SEX IS BAD, AND THAT SEX IS ABNORMAL, AND THAT SEX

25 IS SEX BETWEEN ADULTS AND CHILDREN IS JUST SOMETHING THAT'S

1    NOT DONE, IT'S REFRAMED TO BE SOMETHING THAT IS NORMAL,

2    SOMETHING THAT A LOT OF PEOPLE ARE DOING, A LOT OF CHILDREN

3    ARE DOING, SOMETHING THAT'S NOT BAD, SOMETHING THAT'S NOT

4    PAINFUL, SOMETHING THAT'S ENJOYABLE, SOMETHING THAT'S

5    UNIVERSAL.

6        AND THAT'S ACCOMPLISHED BY -- AGAIN, THE NORMALIZATION AND

7    GRADUATION GO HAND IN HAND BECAUSE IT'S NOT INSTANTLY, HEY,

8    LET'S TAKE OUR CLOTHES OFF AND HAVE SEX.  IT'S GENERALLY...

9    STARTS WITH COMPLIMENTS, MAYBE JOKES ABOUT SEX, QUESTIONS

10   ABOUT, HAVE YOU EVER HAD A BOYFRIEND?  ARE YOU A VIRGIN?

11   THINGS OF THAT NATURE.

12       IN CONTACT CASES WE SEE -- MEANING NOT ONLINE CASES, WE

13   SEE A LOT OF GRADUATED TOUCHING, PATTING THEIR BOTTOMS,

14   SQUEEZING, HUGGING, CUDDLING, GIVING COMPLIMENTS, YOU LOOK

15   BEAUTIFUL, YOU LOOK LIKE YOUR MOTHER, THAT BECOMES YOU LOOK

16   SEXY.  SO OVER TIME IT BECOMES... IT BECOMES MORE AND MORE

17   SEXUAL, SEXUALIZED AND CAN BECOME MORE AND MORE GRAPHIC.

18       SOMETIMES WE SEE THE USE OF PORNOGRAPHY, SENDING PICTURES,

19   ASKING FOR PICTURES, OR EVEN SHOWING PORNOGRAPHY, INCLUDING

20   CHILD PORNOGRAPHY TO INTENDED VICTIMS.

21           **MS. BAEHR-JONES:**  AND THEN I WANT TO TURN TO THE NEXT

22   SLIDE, PLEASE.

23                   (DISPLAYED ON SCREEN.)

24   **BY MS. BAEHR-JONES:**

25   **Q.**  I WANT TO ASK YOU ABOUT SOME SPECIFIC STUDIES.

```
 1            MS. BAEHR-JONES:  SO IF YOU COULD KEEP GOING AND HAVE
 2     THE TEXT COME UP HERE.
 3     BY MS. BAEHR-JONES:
 4     Q.  I WANT TO ASK YOU FIRST ABOUT -- THIS IS AN OLDER STUDY
 5     FROM 1995 --
 6     A.  RIGHT.
 7     Q.  -- AND WHAT THAT STUDY SHOWS.
 8     A.  SO IT IS AN OLDER STUDY, IT IS FROM '95, BUT IT'S A VERY
 9     FAMOUS STUDY.  I LIKE THIS STUDY BECAUSE IT'S KIND OF -- IT'S
10     GROOMING WITHOUT KIND OF PRIOR TO THE EXPLOSION OF THE
11     INTERNET.
12            AND SO WE LOOK AND WE SEE THAT, AGAIN, IT'S NOT A LOT OF
13     GIFT GIVING -- I BELIEVE THERE'S ONE MORE -- THERE WE GO.
14            SO IT'S NOT A LOT OF GIFT GIVING AND THREATENING, AND, YOU
15     KNOW, I'M GOING TO HURT YOUR PARENTS, OR I'M GOING TO HURT
16     YOU, OR YOUR BROTHERS AND SISTERS IF YOU DO THIS.  IT'S
17     PORTRAYED AS A GAME.  IT'S PORTRAYED AS I'M TEACHING YOU
18     SOMETHING SO THAT SOMEONE WON'T TEACH IT TO YOU INCORRECTLY.
19            AND THEN THE MOST INTERESTING THING ABOUT THIS STUDY THAT
20     I'VE REPLICATED IN MY RECENT GROOMING STUDY IS THAT ONE-FIFTH
21     OF THE CHILD MOLESTERS IN THE ELLIOTT STUDY WERE ABLE TO
22     PREVENT THE VICTIM FROM DISCLOSING BY EXPLAINING TO THE
23     VICTIM, IF YOU TELL ANYONE THAT WE'RE DOING THIS, THEN YOU
24     WON'T BE ABLE TO SEE ME ANYMORE.
25            AND THAT'S AN ESPECIALLY POWERFUL STATISTIC BECAUSE WE
```

1    THINK OF A CHILD BEING SEXUALLY INAPPROPRIATELY TOUCHED AND

2    RUNNING OUT AND FINDING THE FIRST ADULT THEY CAN AND TELLING

3    THEM THE WHOLE STORY, THE WHOLE STORY THE FIRST TIME, BUT

4    THAT'S NOT WHAT OCCURS.

5         THESE CHILDREN HAVE OFTEN BEEN SO GROOMED AND BECOME SO

6    RELIANT AND DEPENDENT ON THE RELATIONSHIP WITH THEIR ABUSER

7    THAT JUST SAYING -- ESSENTIALLY SAYING IF YOU TELL PEOPLE THAT

8    I'VE BEEN RAPING YOU, THEN I WON'T BE ABLE TO RAPE YOU

9    ANYMORE.  AND IN 20 PERCENT OF CASES IN THIS STUDY AND IN, I

10   BELIEVE 17 IN MY STUDY, THAT WAS ENOUGH TO PREVENT THE VICTIM

11   FROM SAYING ANYTHING.

12   **Q.**  I WANT TO ASK ABOUT --

13            **MS. BAEHR-JONES:**  IF YOU GO TO THE NEXT SLIDE.

14                     (DISPLAYED ON SCREEN.)

15   **BY MS. BAEHR-JONES:**

16   **Q.**  -- SOME ADDITIONAL RESEARCH, AND I THINK THIS IS MORE,

17   SORT OF MORE CURRENT, SO AFTER THE ERA OF THE ONLINE WORLD.

18   **A.**  RIGHT.

19   **Q.**  AND I WANT TO ASK YOU WHAT THE MORE RECENT RESEARCH SHOWS

20   ABOUT WHAT GROOMING CONSISTS OF.

21   **A.**  WELL, THE MAIN TAKEAWAY FROM THE NEWER RESEARCH -- AND

22   THESE ARE FINDINGS FROM MY STUDY, IS THAT THERE ISN'T THAT

23   MUCH DIFFERENCE.  EVEN WITH THE ADVENT OF THE INTERNET, EVEN

24   WHEN THE INTERNET IS USED AS A MEANS OF GROOMING, OR FOR THE

25   PURPOSE OF GROOMING, WE ARE STILL SEEING THE SAME THING.

TURNER - DIRECT / BAEHR-JONES

1   SO GIFTS IN AND OF THEMSELVES, 18 PERCENT ABOUT ONE-FIFTH

2   OF THE TIME, PLAYING GAMES, LESS THAN THAT, BUT WHAT WE SEE

3   OVER HALF THE TIME IS THAT THE TECHNIQUES ENGAGED IN BY AN

4   ADULT OFFENDER WHO IS GROOMING A CHILD FOR SEX INVOLVE

5   EMOTIONAL CONTENT.  THEY INVOLVE ESTABLISHING TRUST.

6   OFFENDERS WILL SAY, I PUT MYSELF IN THE VICTIM'S SHOES, I TELL

7   THEM I'VE BEEN THROUGH WHAT THEY HAVE BEEN THROUGH, GIVING

8   THEM A COMMON GROUND.  AND THAT LEAVES... THAT LEAVES THE

9   CHILD FEELING THIS IS SOMEONE THAT UNDERSTANDS ME, THIS IS

10  SOMEONE THAT LISTENS, THIS IS SOMEONE THAT BELIEVES ME, THIS

11  IS SOMEONE THAT MAKES ME FEEL SPECIAL AND UNIQUE.

12  SO WE SEE THINGS LIKE SPECIAL TREATMENT, FAVORITISM,

13  ESTABLISHING TRUST IS A HUGE ONE, CONSOLING, LESS RESTRICTIVE

14  PARENTING WHEN THAT'S THE CONTEXT OF THE ABUSE.  BUT THAT'S

15  THE MAIN TAKEAWAYS, OVER HALF THE TIME.

16  AND EVEN WHEN GIFTS ARE GIVEN, IT'S PRIMARILY FOR THE

17  PURPOSE OF FURTHERING THIS EMOTIONAL RELATIONSHIP.

18  **Q.**  SINCE THE EMOTIONAL CONNECTION AND SOME OF THE THINGS YOU

19  TALK ABOUT IS SUCH AN IMPORTANT PART OF THE GROOMING PROCESS,

20  WHAT KIND OF MINORS ARE OFFENDERS LOOKING FOR?

21  **A.**  WELL, OFFENDERS ARE VERY GOOD AT DETERMINING WHICH

22  CHILDREN WILL BE MOST SUSCEPTIBLE TO GROOMING AND WILL BE MOST

23  SUSCEPTIBLE ULTIMATELY TO ABUSE.

24  CHILDREN THAT ARE DISTANCED FROM THEIR FAMILY, CHILDREN

25  THAT ARE DISENFRANCHISED IN SOME WAY, CHILDREN THAT DO NOT

```
 1   FEEL A CONNECTION WITH THOSE CLOSEST IN THEIR LIVES.

 2        AND, YOU KNOW, I'VE HAD OFFENDERS TALK TO ME ABOUT GOING

 3   THROUGH FACEBOOK PAGES AND THINGS LIKE THAT OF CHILDREN AND

 4   TEENS, AND BEING ABLE TO SPOT IMMEDIATELY THIS IS -- THIS IS

 5   SOMEONE THAT I SHOULD FOCUS ON JUST SIMPLY BASED ON WHAT IS

 6   AND WHAT IS NOT POSTED ON THAT CHILD'S SOCIAL MEDIA.  AND

 7   THAT'S THE PREDATORY AND MANIPULATIVE NATURE OF THE OFFENDER.

 8        SO, AGAIN, NOT TO BE REPETITIVE, DISENFRANCHISED,

 9   DISTANCED FROM THEIR FAMILIES, CHILDREN WITH ANY KIND OF

10   BEHAVIORAL PROBLEMS, CHILDREN WHO SEEM TO BE LACKING SOMETHING

11   IN THEIR LIVES.

12   Q.  I WANT TO ASK ABOUT THE NEXT SLIDE.

13                   (DISPLAYED ON SCREEN.)

14        YOU'VE TALKED ABOUT THIS IN THE CONTEXT OF THESE TWO

15   CONCEPTS BEING INTERTWINED, GROOMING BEHAVIOR AND VICTIM

16   BEHAVIOR BEING AN INTERTWINED NATURE OR CONCEPT.  I WANT TO

17   MOVE ON AND ASK YOU ABOUT THE SECOND PART OF THAT, AND THAT IS

18   VICTIM BEHAVIORS, AND SPECIFICALLY WHAT MAY BE

19   COUNTERINTUITIVE ABOUT HOW VICTIMS, MINOR VICTIMS RESPOND TO

20   GROOMING ON THE PART OF THE OFFENDERS.

21            THE COURT:  COUNSEL?

22            MS. NAEGELE:  YOUR HONOR, I WOULD LIKE TO OBJECT TO

23   THIS LINE OF QUESTIONING ON FOUNDATION.

24            THE COURT:  OVERRULED.

25            THE WITNESS:  SEX OFFENDING AGAINST CHILDREN IS NOT
```

1    LIKE BANK ROBBERY, IT'S NOT LIKE MURDER.  IT'S NOT EVEN LIKE

2    SEX OFFENDING AGAINST ADULTS.  THESE CRIMES ARE REPORTED, IN

3    SOME CASES ONE HUNDRED PERCENT OF THE TIME, AND IN SOME

4    CASES -- MOST CASES THE MAJORITY OF THE TIME.

5        AS WE'LL LOOK AT IN A MINUTE, CHILDREN ACTUALLY REPORT

6    THEIR ABUSE VERY SELDOMLY WHEN THEY DO REPORT.  THE REASON FOR

7    THAT IS DIRECTLY RELATED TO THE FACT THAT THEY HAVE BEEN

8    GROOMED.  THEY HAVE BEEN GROOMED TO BE MADE TO FEEL THAT THE

9    OFFENDER IS SOMEONE THAT CARES FOR THEM, THAT THE SEXUAL

10   CONTACT IS INCIDENTAL TO THE EMOTIONAL CONNECTION WITH THE

11   OFFENDER.

12       SO THE OFFENDER IS SOMEONE THAT FINALLY TRUSTS THEM, THAT

13   THEY CAN TRUST, THAT SEES THEM FOR THE VALUE THAT THEY

14   REPRESENT, THAT HAS -- UNDERSTANDS THEM AND HAS BEEN THROUGH

15   WHAT THEY HAVE BEEN THROUGH.  THAT'S A VERY HARD TIE TO BREAK

16   FOR SOME VICTIMS WHO DON'T GET THAT ANYWHERE ELSE IN THEIR

17   LIFE EVEN WHEN SEX HAS BECOME PART OF THAT.

18       SO VICTIMS WILL NOT REPORT OR WILL DELAY REPORTING OR WILL

19   RECANT THEIR DISCLOSURES OR CHANGE THEIR STORIES BECAUSE THEY

20   FEEL A CONNECTION TO THE OFFENDER.  WE SEE CASES WHERE

21   CHILDREN, WILL EVEN AFTER BEING ABUSED, WILL STILL ASK TO GO

22   BACK AND SEE THE OFFENDER AGAIN.

23       SO -- AND THIS DIRECTLY RELAYS THE AGE OF THE VICTIM, THE

24   TYPE OF GROOMING THAT WAS USED.  IF THE CHILD FEELS THAT THEY

25   DID ANYTHING WRONG, THEY ARE OFTEN MADE TO FEEL COMPLICIT, BUT

```
 1    WE'RE IN THIS TOGETHER.  IF I -- YOU KNOW, YOU'RE JUST AS
 2    RESPONSIBLE AS I AM.  IF YOU GO DOWN, I GO DOWN, WHICH, OF
 3    COURSE, ISN'T TRUE BUT THE CHILD DOESN'T KNOW THAT AT THE
 4    TIME.
 5        SO GROOMING DIRECTLY --
 6            THE COURT:  JUST A MOMENT.
 7            MS. NAEGELE:  YOUR HONOR, I JUST WANT TO OBJECT TO
 8    THE NARRATIVE FORM OF THE QUESTION.
 9            THE COURT:  SUSTAINED.  ASK ANOTHER QUESTION, PLEASE.
10            MS. BAEHR-JONES:  THANK YOU, YOUR HONOR.
11    BY MS. BAEHR-JONES:
12    Q.  LET'S MOVE ON TO THE NEXT SLIDE.
13                    (DISPLAYED ON SCREEN.)
14        I WANT TO ASK YOU ABOUT SOME OF THE SPECIFIC STUDIES THAT
15    SORT OF GIVE NUMBERS TO WHAT YOU'VE BEEN TALKING ABOUT.
16    A.  SURE.
17    Q.  STARTING WITH THE FIRST STUDIES THAT ARE UP THERE.
18        CAN YOU TALK ABOUT -- LOOKS LIKE THERE'S THREE STUDIES.
19    CAN YOU TALK ABOUT THE FINDINGS OF THOSE THREE DIFFERENT
20    STUDIES?
21    A.  THESE ARE THREE OF THE MAIN STUDIES.  IN LOUISIANA WE
22    WOULD CALL HIM HEBERT.  I GUESS WE CALL HIM HERBERT EVERYWHERE
23    ELSE.
24        HANSON AND JONES, THOSE ARE VERY FAMOUS STUDIES.  WHAT
25    THEY FIND IS THAT CHILDREN THAT ARE SEXUALLY ABUSED WILL NOT
```

1    REPORT THIS SEXUAL ABUSE 60 TO 80 PERCENT OF THE TIME UNTIL

2    THEY ARE ADULTS.  SO THAT'S 60 UP TO 80 PERCENT OF THE TIME

3    THAT CHILDREN ARE NOT REPORTING ANYTHING AT THE TIME THAT THEY

4    ARE BEING ABUSED OR EVEN IN SUBSEQUENT YEARS.

5    **Q.**  MOVING ON TO THE SECOND STUDY, THIS SAYS HEBERT IN 2009,

6    THIS GIVES SOME MORE GRANULARITY TO THE STATISTICS.  CAN YOU

7    TALK ABOUT THE TWO STATISTICS?

8    **A.**  SURE.

9        IF YOU LOOK AT THE SECOND BULLET, ABOUT 60 PERCENT OF

10   VICTIMS DON'T DISCLOSE FOR AT LEAST FIVE YEARS, THAT'S GOING

11   TO PUT A LOT OF THE CHILD VICTIMS FROM THE TOP FEW STUDIES

12   INTO ADULTHOOD, RIGHT?  SO ANYONE THAT'S OFFENDED AGAIN FROM

13   13 AND UP WHO WAITS FIVE YEARS, IS, BY JUST MATH, GOING TO BE

14   REPORTING AS AN ADULT.

15       AND THEN WE KNOW FROM STUDIES THAT UP TO ONE-FIFTH OF

16   CHILDREN WHO ARE SEXUALLY ABUSED NEVER DISCLOSE IN ANY

17   CAPACITY.

18   **Q.**  FINALLY, THE THIRD SORT OF SET OF STUDIES HERE, AND THIS

19   DEALS WITH STUDIES IN 2006 AND 2008 ABOUT LEVELS OF DETECTION

20   AND REPORTING.

21       CAN YOU SUMMARIZE THOSE STUDIES?

22   **A.**  SURE.

23       AND SO IN THE U.S. BULLETIN ARTICLE WHERE WE WERE LOOKING

24   AT DEFENSE EXPERTS RISK ASSESSMENTS, THIS IS ONE OF THE MAIN

25   THINGS THAT WE WANTED TO ADDRESS.  ONLY 5 PERCENT -- ACROSS

1    STUDIES, ONLY ABOUT 5 PERCENT OF INSTANCES OF CHILDHOOD SEXUAL

2    ABUSE ARE REPORTED TO AUTHORITIES.

3        NOW, SOMETIMES THEY MAY REPORT IT TO A FRIEND OR SOMETIMES

4    THEY MAY REPORT IT TO A RELATIVE WHO DOESN'T GO ON AND REPORT

5    IT TO AUTHORITIES.  SO OF ALL THE CHILD SEXUAL ABUSE THAT IS

6    OCCURRING, ONLY 5 PERCENT IS KNOWN ABOUT BY AUTHORITIES.

7        NOW, IT'S EVEN MORE ALARMING IS, OF THAT 5 PERCENT, ONLY

8    5 PERCENT OF THAT 5 PERCENT END IN A CONVICTION.

9        SO WHEN WE LOOK AT THINGS LIKE RE-OFFENSE RATES --

10            **THE COURT:**  I'M GOING TO ASK YOU TO MOVE ON TO

11    SOMETHING ELSE.

12            **MS. BAEHR-JONES:**  THANK YOU, YOUR HONOR.

13            **THE COURT:**  THE JURY WILL DISREGARD THE LAST PART OF

14    THE WITNESS'S ANSWER.

15    **BY MS. BAEHR-JONES:**

16    **Q.**  JUST TO BE CLEAR, THE STUDY ITSELF JUST TALKS ABOUT

17    DETECTION AND REPORTING RATES, CORRECT?

18    **A.**  CORRECT.

19    **Q.**  OKAY.

20            **MS. BAEHR-JONES:**  AND LET'S MOVE ON TO THE FINAL

21    SLIDE.

22                    (DISPLAYED ON SCREEN.)

23    **BY MS. BAEHR-JONES:**

24    **Q.**  I WANT TO ASK YOU ABOUT THIS STUDY DEALING WITH ADOLESCENT

25    VICTIMS AND WHAT THEIR SORT OF RELATIONSHIP WITH OFFENDERS

TURNER - DIRECT / BAEHR-JONES

1  LOOKS LIKE.

2      AND THIS IS -- THIS TALKS ABOUT STATISTICS OF HOW VICTIMS

3  PERCEIVE THEIR RELATIONSHIP.  CAN YOU EXPLAIN THIS?

4  **A.**  SURE.

5      SO AT THE TIME THAT THE VICTIMS IN THIS STUDY DISCLOSED TO

6  LAW ENFORCEMENT OFFICERS AND SPOKE TO LAW ENFORCEMENT

7  OFFICERS, AND THESE WERE ADOLESCENT VICTIMS, SO 13 AND UP,

8  46 PERCENT ABOUT HALF OF THE TIME, THE LAW ENFORCEMENT

9  OFFICERS FELT THAT THIS ADOLESCENT WAS ACTUALLY IN LOVE WITH

10  THE PERSON THAT WAS OFFENDING AGAINST THEM.

11      SO THE FINDING IS PRETTY SIMPLE, BUT IT'S A PRETTY

12  POWERFUL FINDING IN TERMS OF HOW EFFECTIVE AND POWERFUL

13  GROOMING CAN BE.

14  **Q.**  WHEN YOU LOOK AT THE INTERPLAY OF GROOMING AND VICTIM

15  BEHAVIOR FOR, SO ADOLESCENCE, SORT OF POSTPUBESCENT MINORS,

16  HOW DOES THAT DIFFER, IF AT ALL, FROM HOW THOSE TWO THINGS

17  INTERPLAY WITH CHILDREN UNDER PUBESCENCE?

18  **A.**  PEOPLE THAT ARE POSTPUBESCENT, SO TEENAGE CHILDREN ARE

19  GOING TO BE MORE LIKELY TO BE THE KIND OF VICTIMS THAT DO SEE

20  THIS AS A RELATIONSHIP, DO FEEL THAT MAYBE THEY ARE IN LOVE

21  WITH THIS PERSON AS OPPOSED TO PREPUBESCENT CHILDREN WHO ARE

22  MORE LIKELY TO FEEL THAT THIS IS JUST SOMEONE FUN IN THEIR

23  LIFE, SOMEONE THAT THEY HAVE A GOOD TIME WITH AND THEY GET

24  SPECIAL ATTENTION FROM.

25          **MS. BAEHR-JONES:**  I THINK THAT'S THE LAST SLIDE.  AND

TURNER - CROSS / NAEGELE

```
 1    THE GOVERNMENT HAS NOTHING FURTHER.

 2           THE COURT:  THANK YOU, COUNSEL.

 3       YOU MAY CROSS.

 4           THE COURT:  LET'S TAKE A STRETCH BREAK.  WE HAVE BEEN

 5    GOING ABOUT AN HOUR.  YOU CAN STAND UP, TOO, DOCTOR.

 6           THE WITNESS:  THANKS.

 7              (PAUSE IN THE PROCEEDINGS.)

 8           THE COURT:  PLEASE BE SEATED.  WHENEVER YOU ARE

 9    READY, LADIES AND GENTLEMEN, AND EVERYONE ELSE.

10       YOU MAY PROCEED, COUNSEL.

11           MS. NAEGELE:  THANK YOU.

12                   CROSS-EXAMINATION

13    BY MS. NAEGELE:

14    Q.  HELLO AGAIN, DR. TURNER.

15    A.  HELLO, MA'AM.

16    Q.  SO YOU JUST TESTIFIED TO SOME TYPICAL BEHAVIORS THAT YOU

17    SEE IN WHAT YOU CALL GROOMING?

18    A.  YES, MA'AM.

19    Q.  AND I'VE GOT ANOTHER DRAFT ARTICLE THAT YOU WROTE OR THAT

20    YOU ARE IN THE PROCESS OF WRITING.  I DON'T KNOW IF THIS HAS

21    BEEN PUBLISHED.  IT'S CALLED "GROOMING AND OTHER RELATED" --

22    SORRY.  "GROOMING AND OTHER OFFENSE-RELATED BEHAVIORS IN CHILD

23    MOLESTATION CASES, AN ANALYSIS OF OFFENDER SELF-REPORTED

24    BEHAVIORS AND BELIEFS".

25    A.  OKAY.
```

1    IT'S GONE THROUGH -- THEY GO THROUGH A LOT OF NAME

2    CHANGES.  SO I AM NOT SURE WHAT WE ARE CURRENTLY CALLING IT,

3    BUT I KNOW THE STUDY YOU'RE TALKING ABOUT.

4    **Q.**  GOOD.  I THINK THAT'S ALL THAT IS IMPORTANT.

5       AND IN THIS DRAFT THAT I HAVE THAT APPEARS TO BE UNDATED,

6    IT SAYS, AND I QUOTE:

7           "ALTHOUGH SOME HAVE POSTULATED DEFINITIONS AND

8           MECHANISMS, NO TRUE CONSENSUS EXISTS IN THE CLINICAL

9           RESEARCH OR FORENSIC FIELDS AS TO WHAT GROOMING

10          ACTUALLY ENTAILS MAKING DESCRIPTION AND ADEQUATE

11          MEASUREMENT NEARLY IMPOSSIBLE."

12   **A.**  CORRECT.

13   **Q.**  AND YOU CITE A STUDY THERE BENNETT AND O'DONOHUE FROM

14   2014.

15   **A.**  RIGHT.  AND THAT'S --

16       **THE COURT:**  WAIT A MINUTE.  IS THERE A QUESTION?  I

17   THINK HE'S ANTICIPATING THE QUESTION.

18   **BY MS. NAEGELE:**

19   **Q.**  THE QUESTION IS, DID YOU CITE THE BENNETT AND O'DONOHUE --

20       **THE COURT:**  THAT'S ALL SHE'S ASKING, YES OR NO, DID

21   YOU CITE THAT?

22       **THE WITNESS:**  YES.

23       **THE COURT:**  NEXT QUESTION, PLEASE.

24   **BY MS. NAEGELE:**

25   **Q.**  THE -- WE ALREADY TALKED ABOUT GROOMING NOT BEING A

TURNER - CROSS / NAEGELE

1   PERFECT SCIENCE AND THAT SEEMS TO SUPPORT THAT; IS THAT RIGHT?

2   **A.**   YES.

3   **Q.**   IN FACT, IT'S A HIGHLY SUBJECTIVE ANALYSIS AND IT DEPENDS

4   ON ENTIRELY WHAT THE OFFENDER IS INTENDING TO DO; IS THAT

5   RIGHT?

6   **A.**   YES.

7   **Q.**   AND AN OFFENDER CAN'T ACCIDENTALLY GROOM SOMEONE, THEY

8   HAVE TO INTEND IT?

9   **A.**   I THINK THAT'S FAIR, YES.

10  **Q.**   NOW, I WANT TO GO BACK FOR A SECOND TO YOUR -- HOW YOU

11  BECAME RETAINED IN THIS CASE.

12       YOU WERE RETAINED BY THE GOVERNMENT TO TESTIFY IN THIS

13  CASE TODAY?

14  **A.**   YES, MA'AM.

15  **Q.**   AND HOW MUCH IS THE GOVERNMENT PAYING YOU TO DO SO?

16  **A.**   $300 AN HOUR.

17  **Q.**   AND THEY ALSO FLEW YOU HERE FROM LOUISIANA?

18  **A.**   YES, MA'AM.

19  **Q.**   SO HOW MUCH DO YOU EXPECT TO MAKE OUT OF YOUR WORK IN THIS

20  CASE?

21          **THE COURT:**  WHEN YOU SAY "MAKE", DO YOU MEAN GROSS?

22  OR HE MAY HAVE EXPENSES.

23          **MS. NAEGELE:**  I MEAN GROSS.

24          **THE COURT:**  THANK YOU.

25          **MS. NAEGELE:**  I'M SORRY, I MEAN NET.

```
 1    BY MS. NAEGELE:
 2    Q.   HOW MUCH WILL YOU PROFIT FROM THIS WORK?
 3    A.   I WOULD SAY BETWEEN 3 AND 4,000.
 4    Q.   AND HOW MUCH IN TOTAL, IF YOU KNOW, AN ESTIMATE IS FINE,
 5    WOULD YOU SAY THAT YOU'VE MADE FROM YOUR CONSULTATIONS AND
 6    PARTNERSHIPS WITH THE FEDERAL GOVERNMENT IN OTHER CASES
 7    INCLUDING THIS ONE?
 8              MS. BAEHR-JONES:  OBJECTION, YOUR HONOR.
 9              THE COURT:  OVERRULED.
10              THE WITNESS:  MY WORK WITH THE GOVERNMENT OR MY WORK
11    WITH THE PUBLIC FEDERAL DEFENDER'S AS WELL AS PROSECUTION?
12              MS. NAEGELE:  NO, JUST WITH THE FEDERAL GOVERNMENT --
13              THE COURT:  IN THEORY, THE PUBLIC DEFENDER -- YOU
14    MEAN THE EXECUTIVE BRANCH?  YOU MEAN THE PROSECUTION SIDE
15    VERSUS THE DEFENSE SIDE?
16              MS. NAEGELE:  THE PROSECUTION SIDE.
17              THE COURT:  THANK YOU.
18              THE WITNESS:  OKAY.  I'VE NEVER SAT DOWN AND TRIED TO
19    CALCULATE THAT.
20    BY MS. NAEGELE:
21    Q.   WOULD YOU SAY IT'S A SIGNIFICANT PORTION OF YOUR INCOME?
22    A.   NO, MA'AM.
23    Q.   WOULD YOU SAY IT'S IN THE TENS OF THOUSANDS AT LEAST?
24    A.   YES, MA'AM.
25    Q.   NOW YOUR PRIOR TESTIMONY IN OTHER CASES, YOU'VE STATED
```

1  THAT YOU'VE BEEN QUALIFIED AS AN EXPERT IN FORENSIC PSYCHOLOGY

2  SEVERAL TIMES IN FEDERAL COURT, AND YOU TALKED ABOUT THAT WITH

3  THE PROSECUTOR, CORRECT?

4  **A.**  CORRECT.

5  **Q.**  AND OUT OF THOSE -- OUT OF THOSE CASES, HOW MANY OF THEM

6  WERE ACTUAL TESTIMONY AS OPPOSED TO PROVIDING CONSULTATION OR

7  REPORT?

8  **A.**  MAY I CLARIFY?

9     DO YOU MEAN -- SO BLIND TESTIMONY LIKE I'M DOING TODAY

10  VERSUS HAVING DONE AN EVALUATION AND SUBMITTED A REPORT?

11  **Q.**  WE WILL GET TO THAT.

12    RIGHT NOW I'M ASKING IN HOW MANY CASES HAVE YOU ACTUALLY

13  TESTIFIED VERSUS DOING THINGS OUT OF COURT -- OUT OF THE -- AN

14  IN-PERSON COURT TESTIMONY.

15  **A.**  OKAY.  HOW MANY TIMES HAVE I TESTIFIED IN COURT?

16  **Q.**  CORRECT.

17  **A.**  IN GENERAL?

18  **Q.**  IN FEDERAL COURT.

19  **A.**  IN FEDERAL COURT.  MAYBE SEVEN OR EIGHT.  THAT'S AN

20  ESTIMATE.

21  **Q.**  THAT SOUNDS RIGHT TO ME.

22    IS THAT --

23       **THE COURT:**  COUNSEL, PLEASE DON'T --

24       **MS. NAEGELE:**  I' SORRY.  I'M SORRY.

25       **THE COURT:**  THANK YOU VERY MUCH.

1    BY MS. NAEGELE:

2    Q.   THAT -- THOSE WERE ALL FOR THE PROSECUTION, CORRECT?

3    A.   CORRECT.

4    Q.   AND OUT OF THOSE CASES, HOW MANY TIMES HAS YOUR TESTIMONY

5    BEEN RESTRICTED TO PRESENTING TO A JUDGE AS OPPOSED TO A JURY

6    ON HOW MUCH RISK A PARTICULAR DEFENDANT MIGHT PRESENT TO

7    REOFFENDING AND FOR A DEFENDANT WHO HAS ALREADY BEEN CONVICTED

8    AT SENTENCING?

9    A.   I THINK... I THINK MOST OF THEM -- I WANT TO SAY THE

10   MAJORITY HAVE BEEN AT THE SENTENCING PHASE.  BUT, AGAIN, I'VE

11   NOT SAT DOWN AND CALCULATED THAT.  BUT I THINK THAT'S MOSTLY,

12   OR AT LEAST HALF AND HALF.

13   Q.   WOULD YOU AGREE THAT ONLY TWO OUT OF THE EIGHT CASES IN

14   WHICH YOU'VE TESTIFIED WERE ON THE GUILT PHASE, SUCH AS THIS?

15        MS. BAEHR-JONES:  OBJECTION, YOUR HONOR.

16        THE COURT:  OVERRULED.

17        THE WITNESS:  IF YOU'VE GOT IT THERE IN FRONT OF YOU,

18   THEN I'LL TRUST THAT YOU ARE NOT MAKING IT UP.  THAT SOUNDS

19   RIGHT.  I DON'T KNOW.  I'M SORRY.

20   BY MS. NAEGELE:

21   Q.   AND IN HOW MANY CASES HAVE YOU TESTIFIED AS A BLIND

22   EXPERT, MEANING YOU HAVEN'T REVIEWED ANY OF THE FACTS OF THE

23   CASE OR THE CHARGES, AND YOU'RE NOT OFFERING AN OPINION ON A

24   SPECIFIC PERSON?

25   A.   MAYBE THREE OR FOUR.  I HAVE A FEELING YOU COULD TELL ME.

1    **Q.**  OUT OF THOSE EIGHT?

2       NOW YOU GAVE US SOME EXAMPLES OF TYPICAL GROOMING

3  BEHAVIORS THAT YOU ARE FAMILIAR WITH AND YOU SEE FREQUENTLY,

4  CORRECT?

5    **A.**  YES, MA'AM.

6    **Q.**  THOSE WERE ISOLATION, NORMALIZING, AND WHAT WAS THE THIRD

7  ONE?

8    **A.**  GRADUATION.

9    **Q.**  GRADUATION.

10   **A.**  YES, MA'AM.

11   **Q.**  WOULD YOU AGREE THAT THERE ARE OTHER BEHAVIORS THAT YOU DO

12  NOT INCLUDE IN THIS LIST?

13   **A.**  YES, MA'AM.  THAT'S JUST AN OVERVIEW.  YES, MA'AM.

14   **Q.**  FOR INSTANCE, A VERY COMMON TECHNIQUE IS THE USE OF

15  ALCOHOL?

16   **A.**  YES, MA'AM.

17   **Q.**  AND YOU DID NOT INCLUDE THAT ON YOUR SLIDES HERE OR IN

18  YOUR TESTIMONY TODAY.

19   **A.**  NO, MA'AM.

20   **Q.**  AND IS THERE A REASON THAT YOU DIDN'T INCLUDE THAT?

21   **A.**  NO, MA'AM.  THE SLIDES THAT I PRESENTED HERE TODAY ARE THE

22  SLIDES THAT I USE WHEN I'M PRESENTING.  THEY ARE JUST THE

23  BASIC STEPS.

24     SO THE USE OF ALCOHOL OR DRUGS OR GIFTS WASN'T ON THERE

25  EITHER.  IT WOULD OCCUR THROUGHOUT THE PROCESS.  I DON'T LIST

TURNER - CROSS / NAEGELE

1    ALL OF THEM, JUST THE MAJOR....

2    **Q.** BUT YOU DID IN ONE OF THE OTHER CASES IN WHICH YOU

3    TESTIFIED ON THE -- AT THE GUILT PHASE AT TRIAL, YOU DID

4    MENTION ALCOHOL, CORRECT? THAT'S *UNITED STATES VERSUS DISNEY*?

5    **A.** I'M SURE I DID. YES, MA'AM.

6    **Q.** WAS THAT ALSO A BLIND?

7    **A.** I BELIEVE SO. I CAN'T REMEMBER. THAT WAS THE FIRST TIME

8    I TESTIFIED SO IT'S BEEN A WHILE.

9    **Q.** AND THAT WAS IN 2013?

10   **A.** YES, MA'AM.

11   **Q.** SO THE REASON THAT ALCOHOL IS OFTEN INVOLVED IS IT LOWERS

12   INHIBITIONS, CORRECT?

13   **A.** YES, MA'AM. I WOULD SAY IT LOWERS INHIBITIONS, BUT IT

14   ALSO IS USED -- IT CAN BE USED TO MAKE THE VICTIM FEEL

15   COMPLICIT. SO THAT'S SOMETHING THAT THEY ARE AFRAID THEY WILL

16   GET IN TROUBLE FOR. SO THAT KIND OF TIES THEM IN EVEN

17   FURTHER.

18   **Q.** UNDERSTOOD. IT ALSO MAKES PEOPLE WILLING TO DO THINGS

19   THEY WOULDN'T NORMALLY DO?

20   **A.** YES, MA'AM.

21   **Q.** AND ANOTHER COMMON BEHAVIOR THAT YOU TESTIFIED TO IN THE

22   PAST IS USING THREATS. I'M QUOTING HERE, "SOMETIMES DIRECT

23   PHYSICAL THREATS, SOMETIMES MORE INDIRECT COVERT THREATS."

24   **A.** RIGHT, AS WE SAW IN THE RESEARCH SLIDES. YES, MA'AM.

25   **Q.** AND YOU ALSO TESTIFIED THAT GROOMERS OFTEN ATTEMPT TO

```
1    ALIENATE A MINOR FROM HIS OR HER PARENTS, CORRECT?

2    A.   YES, MA'AM.  THE ISOLATION PHASE.

3    Q.   AND THAT ONLINE GROOMERS OFTEN PICK UP ON INSECURITIES AND

4    VULNERABILITIES, AND THEN USE THOSE TO DEVELOP TRUST?

5    A.   YES, MA'AM.

6    Q.   DO -- HAVE YOU EVER SEEN AN ONLINE GROOMER TELL LIES OR

7    MAKE UP STORIES TO ELICIT SYMPATHIES AND REEL THEM IN?

8    A.   YES, MA'AM.

9    Q.   AND WHAT IF THE OFFENDER IS SOMEONE WHO'S ESPECIALLY

10   GULLIBLE AND NAIVE AND POSSIBLY SUFFERING FROM A MENTAL DEFECT

11   LIKE AUTISM OR SOME OTHER MENTAL DEFECT.

12           THE COURT:  WHAT IS THE QUESTION THOUGH?  YOU SAID

13   "WHAT IF".  THERE MUST BE AN END TO THAT QUESTION.  WOULD YOU

14   FINISH THE QUESTION?

15   BY MS. NAEGELE:

16   Q.   WHAT IMPACT WOULD THAT HAVE ON WHETHER OR NOT YOU CONCLUDE

17   THAT THE BEHAVIOR IS GROOMING?

18   A.   SO YOU MENTIONED AUTISM.  I THINK IT'S IMPORTANT, IT WOULD

19   BE IMPORTANT TO NOTE THAT THAT'S A SPECTRUM.  AND THEN ON ONE

20   END OF THE SPECTRUM IS VERY SEVERE AUTISM WHERE SOME PEOPLE

21   ARE LITERALLY NOT ABLE TO FUNCTION OR CARE FOR THEMSELVES.

22   AND ON THE OTHER END OF THE SPECTRUM IS HIGH FUNCTIONING

23   AUTISM.  AND WITH HIGH FUNCTIONING AUTISM, IT USED TO BE

24   REFERRED TO AS ASPERGERS, BUT WE NO LONGER CALL IT THAT.

25   THESE PEOPLE CAN LEAD FRUITFUL LIVES AND ENGAGE IN ANY
```

1    BEHAVIORS THAT -- I HATE TO USE THE WORD NORMAL, BUT MOST

2    NORMAL PEOPLE WHO AREN'T ON THE AUTISM SPECTRUM CAN ENGAGE IN.

3         SO THAT'S -- I DON'T KNOW IF I'M COMFORTABLE COMMENTING ON

4    THAT BECAUSE I'M NOT, YOU KNOW, I'M NOT SURE WHAT WE ARE

5    TALKING ABOUT.

6    **Q.**  BUT THAT WOULD IMPACT YOUR EVALUATION OF AN OFFENDER ON

7    WHETHER IT WAS GROOMING, INTENTIONAL GROOMING?

8    **A.**  NOT NECESSARILY.  IF THE INDIVIDUAL WAS VERY HIGH

9    FUNCTIONING, A PERSON WITH HIGH FUNCTIONING AUTISM COULD

10   ABSOLUTELY ENGAGE IN GROOMING BEHAVIOR.

11   **Q.**  IT WOULD BE PART OF THE STORY?

12   **A.**  SURE.

13   **Q.**  PART OF THE CONSIDERATION?

14   **A.**  YES, MA'AM.

15   **Q.**  AND WHAT ABOUT THE -- A CASE WHERE YOU HAVE THE VICTIM

16   TELLING A LOT OF LIES ABOUT THE PERSON'S AGE OR -- AND TELLING

17   THE OFFENDER THAT SHE'S OLDER?

18   **A.**  WHAT DO YOU MEAN?

19         **THE COURT:**  IS THE QUESTION WHAT IMPACT, IF ANY, ON

20   THE WITNESS'S OPINION ABOUT GROOMING?

21         **MS. NAEGELE:**  CORRECT.

22         **THE COURT:**  IF IN A PARTICULAR CASE THE VICTIM WAS

23   TELLING LIES ABOUT HER PERSONAL SITUATION; IS THAT THE

24   QUESTION?

25         **MS. NAEGELE:**  CORRECT.

1      **THE COURT:**  DO YOU HAVE THAT IN MIND?

2      **THE WITNESS:**  I'M THINKING ABOUT IT RIGHT NOW.

3      **THE COURT:**  OKAY.  TAKE YOUR TIME.

4      **THE WITNESS:**  ANY -- ANYTHING LIKE THAT WOULD IMPACT

5   AN EVALUATION IN A CASE LIKE THIS.

6   **BY MS. NAEGELE:**

7   **Q.**  AND YOU ALSO SAID THAT OFTEN PORNOGRAPHIC PHOTOS ARE

8   EXCHANGED.  WOULD YOU SAY THAT IS MOST OF THE TIME?

9   **A.**  I DON'T KNOW IF THAT'S MOST OF THE TIME OR NOT.

10  **Q.**  SO YOU ALSO TESTIFIED THAT YOU USED TO TREAT SEX

11  OFFENDERS, CORRECT?

12  **A.**  CORRECT.

13  **Q.**  AND IN YOUR ONLINE BIO, YOU SAY THAT YOU HAVE PERFORMED

14  COURT ORDERED EVALUATIONS SUCH AS COMPETENCY TO STAND TRIAL,

15  COMPETENCY TO PROCEED TO TRIAL, SANITY AT THE TIME OF THE

16  OFFENSE, AND OTHER SIMILAR EVALUATIONS TO DETERMINE MITIGATING

17  MENTAL HEALTH FACTORS AND OFFENDERS.

18      CAN YOU TELL US A LITTLE BIT ABOUT WHAT KINDS OF MENTAL

19  HEALTH FACTORS YOU'VE CONSIDERED IN YOUR CAREER?

20  **A.**  SURE.

21      ONE OF THE MAJOR ONES WOULD BE SCHIZOPHRENIA OR A

22  PSYCHOTIC DISORDER WHERE THE PERSON HAS A BREAK FROM REALITY,

23  THEY ARE HEARING VOICES, THEY HAVE DELUSIONAL BELIEFS.

24      ANOTHER COMES TO MIND WAS A CASE INVOLVING A VETERAN WITH

25  PTSD WHO WAS INVOLVED IN A SHOOTOUT.  AND I TESTIFIED IN THAT

1    CASE ABOUT PTSD IN GENERAL AND WHAT THAT CAN DO TO SOMEONE'S

2    HYPERVIGILANCE AND SENSE OF ANXIETY.

3        BUT PREDOMINANTLY IT'S PSYCHOTIC, THE MORE SEVERE

4    DISORDERS, PSYCHOTIC DISORDERS, AND THINGS OF THAT NATURE.

5    **Q.**  SO IF IT WAS AN ESPECIALLY VULNERABLE ADULT, COULD

6    ESPECIALLY VULNERABLE ADULTS IN FACT BE GROOMED HIM OR

7    HERSELF?

8        IF THE -- OF ALL OF THE OTHER TYPICAL FACTORS ARE THERE,

9    AN EFFORT TO DISTANCE FROM FAMILY, DISENFRANCHISE -- I'M

10   SORRY, STRIKE THAT.

11       AN INDIVIDUAL WHO IS DISENFRANCHISED, DOESN'T FEEL

12   CONNECTIONS, IS... IS VULNERABLE TO MANIPULATION, HAS BEHAVIOR

13   ISSUES, LACKING SOMETHING, DISTANCED FROM OTHERS, COULD --

14   COULD THAT ADULT POTENTIALLY BE A VICTIM OF GROOMING?

15   **A.**  I WOULD SAY YES BY ANOTHER ADULT.  I'M NOT COMFORTABLE NOR

16   WOULD I FEEL THAT A CHILD COULD ENGAGE IN GROOMING BEHAVIORS

17   BY DEFINITION.  BUT YES.

18   **Q.**  OKAY.  DR. TURNER, THANK YOU.  AND I JUST WANT TO ASK YOU

19   A COUPLE MORE QUESTIONS.

20       YOU DON'T KNOW ANYTHING ABOUT MY CLIENT'S CASE, DO YOU?

21   **A.**  NO, MA'AM.

22   **Q.**  YOU HAVEN'T INTERVIEWED HIM?

23   **A.**  NO, MA'AM.

24   **Q.**  AND YOU DON'T HAVE ANY OPINION ON WHAT WAS IN HIS ACTUAL

25   MIND DURING THE ALLEGED INCIDENTS IN THIS CASE?

1    **A.**   NO, MA'AM.

2            **MS. NAEGELE:**  THANK YOU.

3            **THE WITNESS:**  YES, MA'AM.

4            **THE COURT:**  ANYTHING FURTHER, COUNSEL?

5            **MS. BAEHR-JONES:**  JUST A FEW THINGS ON REDIRECT.

6            **THE COURT:**  SURE.  BRIEFLY, PLEASE.  I'M NOT A GREAT

7    LOVER OF REDIRECT, BUT GO AHEAD.

8                   **REDIRECT EXAMINATION**

9    BY MS. BAEHR-JONES:

10   **Q.**   YOU WERE ASKED ABOUT GETTING PAID.  DO YOU GET PAID WHEN

11   YOU WORK FOR THE DEFENSE SIDE AS WELL?

12   **A.**   YES, MA'AM.

13   **Q.**   I WANTED TO GO BACK TO ONE OF THE QUESTIONS -- SORT OF

14   QUESTIONS THE DEFENSE COUNSEL ASKED YOU ABOUT VICTIM'S LIVES,

15   TELLING SHE'S OLDER, AND I WANT TO JUST ASK YOU A FEW MORE

16   THINGS ABOUT THAT -- EXCUSE ME, SORRY.  I'M GOING TO GO BACK

17   TO MY NOTES.

18       I WANT TO ASK YOU, HAVE YOU WORKED ON CASES WITH MINORS

19   WHO HAVE OTHER PERSONAS ONLINE, OR WHO MAKE THINGS UP, OR WHO

20   THEMSELVES HAVE SEXUALIZED CONVERSATIONS THAT ARE -- THAT

21   APPEAR TO BE OLDER?

22   **A.**   YES, I HAVE.  IT HAPPENS QUITE FREQUENTLY.

23           **MS. NAEGELE:**  OBJECTION, YOUR HONOR.

24           **THE COURT:**  OVERRULED.  YOU OPENED THE DOOR ON THIS.

25   OVERRULED.

TURNER - REDIRECT / BAEHR-JONES

 1   BY MS. BAEHR-JONES:

 2   Q.  IN THAT CONTEXT, HOW DO YOU EVALUATE WHETHER THE ADULT IS

 3   GROOMING THAT MINOR FOR SEXUAL ACT OR JUST EXPANDING AND

 4   RESPONDING ON WHAT THE MINOR IS DOING?

 5   A.  I THINK THERE ARE TWO MAIN THINGS TO CONSIDER THERE.  ONE

 6   IS WE'RE TALKING ABOUT AN ADULT AND A CHILD, AND THE

 7   DIFFERENTIAL THERE IS GREAT.  SO AN ADULT SHOULD NOT BE

 8   RESPONDING TO SEXUAL DISCUSSIONS WITH A CHILD.

 9       AND NUMBER TWO, I THINK YOU WOULD HAVE TO LOOK AT THE

10   BEHAVIORS THAT OCCUR TO DETERMINE IF GROOMING FOR SEXUAL

11   INTERACTION WAS THE INTENTION.  IN OTHER WORDS, IF THE ADULT

12   SAID, THIS IS CRAZY, STOP THIS, WE SHOULDN'T BE IN TOUCH ANY

13   MORE, THAT'S ONE THING.  IF THE ADULT TAKES STEPS TO SEEK OUT

14   AND ACTUALLY ENGAGE IN SEXUAL PHYSICAL INTERACTION WITH THE

15   CHILD, THEN I THINK IT'S PRETTY CLEAR THAT THE BEHAVIORS THEY

16   WERE ENGAGING IN WOULD HAVE BEEN FOR THE PURPOSE OF GROOMING.

17            THE COURT:  I THINK WE SHOULD MOVE ON TO SOMETHING

18   ELSE, IF YOU HAVE SOMETHING ELSE.

19            MS. BAEHR-JONES:  YES.  I WANTED TO MOVE ON TO AUTISM

20   VERY BRIEFLY BECAUSE THE DEFENSE RAISED ON THAT.

21            THE COURT:  YES.

22   BY MS. BAEHR-JONES:

23   Q.  WHAT DO STUDIES SHOW, IF ANYTHING, ABOUT THE CONNECTION

24   BETWEEN AUTISM SPECTRUM DISORDER AND SEX OFFENDERS WHO TARGET

25   MINORS?

TURNER - REDIRECT / BAEHR-JONES

1    **A.**  THERE'S NO CONNECTION BETWEEN AUTISM SPECTRUM DISORDER AND

2    SEXUALLY ASSAULTING MINORS, WHICH IS GOOD NEWS FOR EVERYONE

3    WITH AUTISM THAT DOESN'T HAVE TO WONDER IF TODAY IS THE DAY I

4    WAKE UP AND I'M SEXUALLY ATTRACTED TO CHILDREN.

5          **MS. NAEGELE:**  OBJECTION, YOUR HONOR.

6          **THE COURT:**  SUSTAINED.  I WILL STRIKE THAT.  THE JURY

7    SHOULD DISREGARD THE LAST COMMENT.

8    **BY MS. BAEHR-JONES:**

9    **Q.**  JUST SPECIFICALLY, DO STUDIES SHOW A CONNECTION BETWEEN

10   THOSE TWO, SO IF YOU ARE THINKING ABOUT DISORDERS THAT RELATE

11   TO SEX OFFENDERS, PEDOPHILIA, DIFFERENT TYPES OF PARAPHILIAS,

12   ARE THERE ANY STUDIES THAT SHOW CONNECTIONS BETWEEN THAT AND

13   THE DISORDER OF AUTISM SPECTRUM --

14         **THE COURT:**  THAT'S SUSTAINED.  I'M NOT GOING TO LET

15   HIM ANSWER THAT.  THAT'S IT.  WE'RE DONE.

16         **MS. BAEHR-JONES:**  OKAY.

17   **BY MS. BAEHR-JONES:**

18   **Q.**  I WANT TO ASK YOU ONE, DO YOU HAVE EXPERIENCE TREATING

19   HIGH FUNCTIONING AUTISM SPECTRUM DISORDER CLIENTS?

20   **A.**  YES, MA'AM.

21   **Q.**  AND CAN, IN YOUR EXPERIENCE, THIS IS BASED ON YOUR

22   CLINICAL EXPERIENCE, CAN HIGH FUNCTIONING AUTISM PEOPLE

23   EXHIBIT AND MANIFEST MANIPULATION AND MANIPULATION OF

24   RELATIONSHIPS?

25         **MS. NAEGELE:**  OBJECTION, YOUR HONOR.

```
 1            THE COURT:  SUSTAINED.

 2   BY MS. BAEHR-JONES:

 3   Q.  I JUST WANT TO ASK ABOUT ONE BENNETT STUDY THAT DEFENSE

 4   COUNSEL ASKED YOU ABOUT BUT I DON'T THINK YOU HAD A CHANCE TO

 5   EXPLAIN THE STUDY ITSELF.

 6   A.  OKAY.

 7   Q.  THIS WAS IN THE CONTEXT OF TALKING -- I BELIEVE IT WAS IN

 8   THE CONTEXT OF TALKING ABOUT HOW GROOMING CAN BE A DIFFICULT

 9   THING TO DEFINE?

10   A.  RIGHT.

11   Q.  CAN YOU BRIEFLY EXPLAIN, SINCE YOU WERE ASKED ABOUT IT,

12   THE BENNETT STUDY?

13   A.  THIS WAS JUST A STUDY THAT I CITED IN THE OPENING SECTION

14   OF MY STUDY AS A REASON WHY WE NEED STUDIES LIKE MY STUDY

15   BECAUSE PREVIOUS RESEARCH HAS BEEN CONFUSING.  AND SO IT'S

16   EXCITING THAT THERE'S NEW RESEARCH NOW THAT'S SORT OF HONING

17   IN AND NARROWING DOWN.

18            MS. BAEHR-JONES:  NOTHING FURTHER, YOUR HONOR.

19            THE COURT:  ANYTHING FURTHER?

20            MS. NAEGELE:  NO, YOUR HONOR.

21            THE COURT:  THANK YOU, DOCTOR.  YOU'RE EXCUSED.  NEXT

22   WITNESS, PLEASE.

23            MS. MCCALL:  THE GOVERNMENT'S NEXT WITNESS IS

24   DETECTIVE CONSTABLE ANGELA THOMAS.

25            THE COURT:  ALL RIGHT.  PLEASE STAND OVER HERE TO THE
```

```
 1    WITNESS STAND AND BE SWORN, DETECTIVE.

 2             THE CLERK:  RAISE YOUR RIGHT HAND, PLEASE.

 3          (ANGELA THOMAS, CALLED AS A WITNESS FOR THE GOVERNMENT,

 4    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

 5             THE WITNESS:  I DO.

 6             THE CLERK:  THANK YOU.  PLEASE BE SEATED.  STATE AND

 7    SPELL YOUR FULL NAME FOR THE RECORD.

 8             THE WITNESS:  OKAY.  MY NAME IS ANGELA THOMAS.

 9    THAT'S A-N-G-E-L-A, T-H-O-M-A-S.

10             THE CLERK:  THANK YOU.

11                       DIRECT EXAMINATION

12    BY MS. MCCALL:

13    Q.   GOOD AFTERNOON.

14    A.   GOOD AFTERNOON.

15    Q.   CAN YOU PLEASE TELL US YOUR JOB TITLE?

16    A.   I'M A DETECTIVE CONSTABLE.

17    Q.   AND HOW LONG HAVE YOU SERVED AS A DETECTIVE CONSTABLE?

18    A.   I HAVE BEEN IN THE POLICE FORCE FOR 15 YEARS AS A

19    DETECTIVE FOR JUST OVER 12.

20    Q.   WHICH POLICE FORCE DO YOU WORK FOR?

21    A.   I WORK FOR DEVON AND CORNWALL CONSTABULARY, WHICH IS IN

22    ENGLAND.

23    Q.   HAVE YOU BEEN WITH DEVON AND CORNWALL YOUR WHOLE CAREER?

24    A.   I HAVE.

25    Q.   AND WHICH TEAM ARE YOU CURRENTLY ASSIGNED TO?
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )
    )
        Plaintiff,    )
    )
    vs.    )    CASE NO. 3:16-cr-00065-TMB
    )
GREGORY TODD NUMANN,    )
    )
        Defendant.    )
_____)

TRANSCRIPT OF EVIDENTIARY HEARING RE IMPOSITION OF SENTENCE
BEFORE THE HONORABLE TIMOTHY M. BURGESS, DISTRICT JUDGE
February 26, 2018; 10:02 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
    Office of the United States Attorney
    BY: KYLE FREDERICK REARDON
    222 West 7th Avenue, #9
    Anchorage, Alaska  99513
    907-271-5071

**FOR THE DEFENDANT:**
    Law Office of Steven M. Wells, PC
    BY:  STEVEN M. WELLS
    431 West 7th Avenue, Suite 107
    Anchorage, Alaska  99501
    907-279-3557

R. JOY STANCEL, RMR-CRR
Federal Official Realtime Reporter
222 West 7th Avenue, #4
Anchorage, Alaska  99513
Proceedings Recorded by Mechanical Stenography
Transcript Produced by Computer

I N D E X

February 26, 2018

| Government's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Darrel Turner | 8 | 63 | 68 | 69 |

- - - - -

E X H I B I T   I N D E X

| Exhibit | Page |
|---|---|

(No Exhibits Identified)

```
1              (Call to Order of the Court)

2              DEPUTY CLERK:  All rise.  His Honor, the Court, the

3   United States District Court for the District of Alaska is now

4   in session with the Honorable Timothy M. Burgess presiding.

5              Please be seated.

6              Your Honor, we're on record in United States of

7   America versus Gregory Todd Numann, Case Number

8   3:16-Criminal-65.  Starting with the Government, please,

9   counsel please state your names for the record.

10             MR. REARDON:  Good morning, Your Honor, Kyle Reardon

11  for the United States.

12             MR. WELLS:  Steve Wells for Mr. Numann.

13             THE COURT:  Good morning.  This is the time set for

14  imposition of sentence.  Based on the filings of the parties, I

15  take it that what we're going to do today is have an

16  evidentiary hearing, and then we need to set a date to finish

17  the sentencing in this case, this is just the evidentiary

18  portion of the sentencing.

19             MR. WELLS:  Yes.  And I apologize, Judge.  I'm trying

20  to get a report from an expert, and it's just taken longer than

21  I had anticipated.

22             THE COURT:  So you anticipate that you're going to

23  have the report on March 2nd?

24             MR. WELLS:  That is when my expert told me.

25  Mr. Reardon and I spoke.  It's not clear if I have to be in
```

1    Seattle for the following week.  If I do, it would be a couple

2    of days.  What I would propose is have the sentencing memo

3    filed by March 9th, and we proposed, depending on the Court's

4    calendar, March 20th or 21st for a -- 19th or 20th for a -- for

5    the continued imposition of sentence.

6              THE COURT:  Well, I have a seven-day civil trial that

7    is going to go if the four criminal trials I have for that week

8    don't go.  So I guess what I'm trying to tell you, in a

9    roundabout way, is I don't think that's going to work.

10             I think the week of April 2nd looks more realistic.

11             MR. WELLS:  If we do April 2nd, I would ask if we

12   could do it the end of that week.  At this point, there's a

13   case that I have in front of Judge Gleason and my co-counsel

14   and I, we've spoken with Mr. Russo and it appears that

15   April 2nd, 2nd or 3rd, we would probably be in D.C. for that,

16   that case.

17             THE COURT:  So the latter part of the week?  First of

18   all, do you both anticipate that if we take evidence today

19   we're going to need to take evidence at the follow-up hearing?

20             MR. WELLS:  Evidence, no.  My expert was not going to

21   testify.  I was only going to submit a report that I was going

22   to file under seal, because it dealt with -- but I imagine that

23   there would be victims, and certainly Mr. Numann would make a

24   statement, but I don't think that there would be evidence

25   taken.

1    THE COURT:  So an hour to hour and a half would be a

2  sufficient amount of time?

3    MR. REARDON:  I believe so, Your Honor, yes.

4    THE COURT:  What about 9:00 on April 6th, Friday,

5  April 6th; how does that work?

6    MR. REARDON:  That's fine for the United States, Your

7  Honor.

8    MR. WELLS:  That should work, Your Honor.

9    THE COURT:  Let's do that.  I have a two-hour block

10  then.  I have another sentencing at 11.  So if for some reason,

11  as things develop, you think you're going to need more than two

12  hours, if you would just let me know and I can move it to later

13  that afternoon, because right now, that afternoon is wide open.

14    One more question.  I know Mr. Wells has retained an

15  expert and anticipates having a report by March 2nd, and

16  frankly, this gives us a little breathing room in case that

17  date doesn't pan out, which sometimes happens.  Do you

18  anticipate retaining your own expert or having an expert

19  respond to whatever his expert files?

20    MR. REARDON:  I don't anticipate, Your Honor.  What

21  I've asked Dr. Turner, who's going to be our witness today, to

22  do is potentially be available by phone.  He's from Louisiana.

23  He's traveled up.  He's got his own private practice.  So to

24  the extent that there would be a response or rebuttal, that we

25  couldn't put in writing, I would ask the Court grant us leave

1     to have him testify via phone.

2             THE COURT:  So you anticipate, then, he would be

3     participating telephonically listening to Mr. Wells's expert

4     testify, and if something develops in the course of that

5     testimony, you would have him --

6             MR. REARDON:  Yes, Your Honor.  I think Mr. Wells's

7     statement was he did not anticipate his expert would testify.

8     So it would only be --

9             THE COURT:  I see what you're saying.

10            MR. REARDON:  I expect we'll see the report, we'll be

11    able to respond in writing and get what we need to in writing,

12    but if there is a need for testimony we would like to have our

13    expert available on the phone.

14            THE COURT:  Okay.  So I guess what I would suggest,

15    then, is while we're just talking about planning, so how about

16    this, if either side is going to file any supplemental

17    sentencing memoranda, if you would do that by Friday,

18    March 23rd, and then you can each respond to what the other

19    side has filed by Friday, March 30th, which then gives me a

20    week with your materials and arguments, you know, before the

21    sentencing, so that I can be ready and have reviewed your

22    material before sentencing.  Okay?

23            MR. REARDON:  Yes, Your Honor.

24            MR. WELLS:  Okay.

25            THE COURT:  So I think that should take care of all

1    the scheduling matters.  And I'm assuming you will let the

2    victims know the new date and time?

3            MR. REARDON:  Yes, Your Honor.

4            THE COURT:  So are you both calling witnesses today?

5            MR. REARDON:  No, Your Honor.  I believe it's just

6    the United States, and we just have one witness.

7            THE COURT:  Just one witness?

8            MR. REARDON:  Yes, Your Honor.

9            THE COURT:  Okay.  Well, let's have that person come

10   forward.

11           MR. REARDON:  United calls Dr. Darrel Turner.

12           THE COURT:  And while Dr. Turner is coming up, I do

13   have a question.  There was information contained in the PSR

14   that refers to -- let me find the paragraph.  It refers to --

15   I'm looking at Paragraph 40, to which I know there was

16   objection, and the conduct that's listed in Paragraph 40, and I

17   know it's referred to later, and if I remember my facts

18   correctly, there was a recording made.

19           MR. REARDON:  Yes, Your Honor.

20           THE COURT:  Am I correct?

21           MR. REARDON:  Yes, Your Honor.  That was submitted as

22   part of the Government's sentencing memo.

23           THE COURT:  Okay.  So is that person going to be

24   testifying?

25           MR. REARDON:  That person will not be testifying.

TURNER - DIRECT

1   That person will be providing a victim impact statement, but in

2   terms of the facts that the Government will submit on this

3   particular enhancement, it is the -- it is the recording.

4           THE COURT:  Okay.  I just wanted to be clear on that.

5   It was one question I had when I was reviewing the material

6   yesterday.

7           If you could, please administer the oath.

8           DEPUTY CLERK:  Yes, Your Honor.  Please raise your

9   right hand.

10          (Oath administered to the witness)

11          DEPUTY CLERK:  Thank you.  Please have a seat.  Speak

12  into the microphone at all times.  Please state and spell your

13  full name.

14          THE WITNESS:  My name is Darrel Turner, D-A-R-R-E-L,

15  Turner, T-U-R-N-E-R.

16          DEPUTY CLERK:  Thank you.

17          MR. REARDON:  Thank you, Your Honor.

18              DARREL TURNER, GOVERNMENT WITNESS, SWORN

19                      DIRECT EXAMINATION

20  BY MR. REARDON:

21  Q    Dr. Turner, what do you do for a living?

22  A    I'm a clinical psychologist with a specialty in forensics.

23  Q    Can you explain what those terms mean?  What is a clinical

24  psychologist, and what is a specialty in forensics?

25  A    Sure.  So a clinical psychologist means that I have a

TURNER - DIRECT

1   Ph.D., or a doctorate in clinical psychology as opposed to

2   school psychology or counseling psychology, or something like

3   that.  And then a specialty in forensics means that my

4   training, my internship, practical placement, and things like

5   that, focused on the area of the use of clinical psychology as

6   it applies to the courtroom, whether it's criminal or civil

7   matters.  So that's what forensic psychology is, and that's a

8   bit of what clinical psychology is.

9   Q    Do you have your own practice?

10  A    Yes, sir, I do.

11  Q    And within your own practice, is there a specialty that

12  you've developed?

13  A    Yes, sir, there is.

14  Q    What is that specialty?

15  A    I specialize in the area of sexual offending, specifically

16  sexual offending against children, and online, non-contact

17  offending.

18  Q    Let's define some of those terms for the Court.  Sexual

19  offending means what?

20  A    Sexual offending meaning victimization of someone for

21  sexual reasons.

22  Q    And then online would obviously refer to anything that

23  happens on the Internet?

24  A    Yes, sir.

25  Q    And then you used the term "non-contact".  What do you

TURNER - DIRECT

1   mean by the term "non-contact"?

2   A    Well, in clinical terms and in doing evaluations and

3   whatnot, we sort of divide up sex offenses into contact

4   offenses, where someone actually has physical contact with the

5   victim, versus non-contact, where there is no actual physical

6   contact, but there is victimization otherwise.

7   Q    Just by way of example, a contact offense would be a

8   hands-on molestation?

9   A    Yes, sir.  A rape or a molestation, yes, sir.

10  Q    And a non-contact offense would be the viewing of child

11  pornography online?

12  A    Yes, sir, that's correct.

13  Q    Now, as it relates to your practice and the work that you

14  do, how does that work or manifest itself?  What, specifically,

15  do you do in your practice when it comes to sex offenders?

16  A    In the past, I've treated sex offenders.  I don't do that

17  anymore.  Primarily, I conduct risk assessments, which is the

18  likelihood that someone will re-offend after release or while

19  on probation, or something to that effect.  So that's primarily

20  how I operate in that function in my career, and that's either

21  court-appointed, or I could be retained by defense counsel or

22  prosecution.

23  Q    In the course of your career, how many sex offenders have

24  you -- let's start first with how many cases have you been

25  involved in?

TURNER - DIRECT

1   A    Oh, I don't have that exact number.  I would say easily

2   over a thousand.

3   Q    Okay.  And within that thousand or more, how many

4   individuals accused of a sex crime, sex offenders, have you

5   interviewed?

6   A    I think a thousand would be a good estimate.  That's a big

7   ballpark.  I apologize.

8   Q    Okay.  And again, within this population, this includes

9   both contact and non-contact offenders?

10  A    Yes, sir.

11  Q    Now, you're being paid for your time here today; correct?

12  A    Yes, sir.

13  Q    You've been retained by the United States to testify?

14  A    Yes, sir, I have.

15  Q    And can you tell the Court what your rate is?

16  A    Yes.  My rate is $250 an hour, and that's for all clinical

17  work, record review, testimony, and then $150 an hour for

18  travel.  And that's only flight or driving time.  I don't count

19  sitting in airports and things like that.

20  Q    Are you a licensed clinical psychologist?

21  A    Yes, I am, in two states.

22  Q    Which states are those?

23  A    In Louisiana and in Texas.

24  Q    We're going to talk about your work on this case in just a

25  minute, but before we do that, I just want to go briefly into

TURNER - DIRECT

1  your background and how you got into this field.  You have a

2  doctorate?

3  A     I do, yes, sir.

4  Q     What is that doctorate in?

5  A     That doctorate is in clinical psychology.

6  Q     What university?

7  A     That's Sam Houston State University in Huntsville, Texas.

8  Q     You obviously had to complete a dissertation to receive

9  that doctorate.  What was your field of study for your

10 dissertation?

11 A     Was expert witness testimony in sexually violent predator

12 civil commitment trials or hearings, technically, in the state

13 of Texas, how the juries respond to expert testimony, what they

14 think about statistical risk measure instruments versus facts

15 of the actual offense, and things of that nature.

16 Q     Now, since completing that research, have you continued to

17 engage in research activities in this area?

18 A     Yes, sir.

19 Q     And was either your dissertation or any of the following

20 research you've done, has any of that led to publications in

21 any peer reviewed journals?

22 A     Yes, sir.

23 Q     And any idea how many, and can you give us a general sense

24 of what types of publications have been published in peer

25 reviewed journals?

TURNER - DIRECT

1   A    Sure.  So the dissertation was a massive undertaking, and

2   so we split that up into about maybe five or six different

3   publications, and that looked at things -- so the statute is

4   very specific in its language, and things like that, regarding

5   civil commitment of sexually violent predators.  So we kind of

6   broke it down and looked at some of that, what does this phrase

7   actually mean to a juror, or so on, so forth.

8          And then I've also published in the area of risk

9   assessment, and I have manuscripts that are under review for

10  publication in -- that are looking at online solicitation of

11  minors for sex, as well as grooming behaviors engaged in by

12  adult males to facilitate sex with children.

13  Q    And before we continue on down this line of inquiry, I

14  think it's important just to, again, define these terms as we

15  use them.  You've used the term "risk assessment" several

16  times.

17  A    Yes, sir.

18  Q    What is the risk assessment, in layman's terms?

19  A    Well, in the field of psychology, there's quite a bit of

20  research that looks at what factors, if they're present,

21  increase a sex offender's likelihood of re-offending.  So a

22  risk assessment is -- should be and is a very complicated

23  procedure which involves a lot of review of records,

24  interviews, testing, using psychological instruments to

25  determine to what degree these factors are present and increase

TURNER - DIRECT

1    a person's risk, or to what degree they're not present.  And

2    then there are -- there have been some protective factors that

3    have been found that we know can actually lower a person's risk

4    of re-offending.  So it's looking at everything and it's coming

5    up with a research-supported report on where this person fits

6    in terms of risk of re-offending as compared with other sex

7    offenders.

8    Q    So your area of familiarity and the area that your work

9    involves risk assessment for sex offenders?

10   A    That's correct.

11   Q    There's nothing inherent about risk assessment when it

12   comes to sex offenders; it could be applied to any behavior?

13   A    That's correct.  I do risk assessment for repeat violent

14   behavior; murderers, things like that.  It's different.  You

15   tailor it differently when you hook at sex offenders because

16   you're looking at different factors from the research, but

17   there are certainly different types of risk assessments, yes,

18   sir.

19   Q    Getting back to your publications, on any of the

20   publications that you've described, have you been the lead

21   author?

22   A    Yes, sir.

23   Q    And are there others in which you've been a co-author or

24   second or third author?

25   A    Yes, sir.

TURNER - DIRECT

1  Q    Have you lectured on any of the topics that we're going to

2  discuss here today, specifically risk assessments and

3  recidivism?

4  A    Yes, sir, I have.

5  Q    And to what groups have you lectured?

6  A    I've been invited to present -- it's usually kind of a

7  multidisciplinary group.  It will be other mental health

8  workers, attorneys, defense attorneys, prosecutors, civil

9  attorneys, law enforcement, again, treatment providers.  And

10 I've presented across the United States and internationally on

11 my research findings in these areas.

12 Q    Are you a member of any professional organizations?

13 A    Yes, sir.

14 Q    And what organizations are you a member of?

15 A    The American Psychology and Law Society and the American

16 Psychological Association.

17 Q    Now, you have testified as an expert in court before;

18 correct?

19 A    Yes, sir.

20 Q    Was that in a civil or criminal case?

21 A    Both.

22 Q    How many times have you testified, exactly?

23 A    I would say somewhere around 50, 50 times.

24 Q    Were those in state or federal court?

25 A    Both.

TURNER - DIRECT

1   Q    To the best of your knowledge, have you ever not been

2   qualified as an expert witness?

3   A    No, sir, I have not.

4   Q    In terms of the civil cases in which you testified, again,

5   generally speaking, what types of cases are those?

6   A    So I testify fairly often in civil commitment cases of

7   sexually violent predators.  Texas has civil commitment laws

8   for repeat sexually violent offenders who are deemed to be

9   especially high risk.  So I've testified both for the defense

10  as well as for the prosecution in those cases.  And then I've

11  also testified in other civil matters that aren't necessarily

12  criminally oriented, like child custody and things like that.

13  Q    Do you do a fair bit of work with the military, as well?

14  A    I do, yes.

15  Q    Again, testifying and providing opinions?

16  A    Not a lot of -- not a lot of testimony in that work.

17  That's more clinical work, as opposed to forensic work.

18  Q    Now, focusing on your experience in criminal court what

19  sorts of cases have you testified in in either state or federal

20  criminal proceedings?

21  A    Obviously, a lot of cases involving sexual offenses,

22  whether they're against adults or children, and whether they're

23  contact or non-contact.  A lot of -- obviously, a lot of child

24  pornography cases, and then, I mean, any range of crimes.

25        Sometimes the Court will ask me to answer a very

TURNER - DIRECT

1    specific question, and so my evaluation will focus on that.

2    Sometimes it's something more common, such as the competency to

3    stand trial, competency to waive counsel, sanity at the time of

4    the offense, and then general risk of re-offending for

5    non-sexual offenses.  And that's just a -- that's just what

6    comes to mind.  I've done quite a bit of court testimony.

7    Q    And you mentioned it before, but I just want to get this

8    point and make sure we're clear.  You've testified as an expert

9    for both defendants in criminal cases as well as the Government

10   or the prosecution in criminal cases?

11   A    Yes, sir, that's right.

12   Q    And have you done work for either the Government or

13   defendants that did not lead to your having to testify in

14   court?

15   A    Yes, sir.  In fact, most of the time that I'm retained, it

16   does not end up requiring testimony.  Usually, it's just a

17   report or consultation, or something of that nature.  But

18   sometimes it does require testimony.

19   Q    And a report or consultations that you described, what are

20   you being asked to report on or consult on?

21   A    Sometimes I'm being asked to conduct a full risk

22   assessment on an offender, so to review records, to interview

23   the defendant, to write a report.  And sometimes I'm --

24   sometimes I'm asked to consult regarding another -- some other

25   psychological work that's been done on that case.  So it really

TURNER - DIRECT

1    depends from case to case and -- but obviously, if I'm asked to

2    do a risk assessment, there's much more work involved.  It's a

3    very -- it's a very lengthy process.  There's a lot to it.  I

4    don't know how much you want me to get into.

5            MR. REARDON:  Well, I think at this time I'd like to

6    move to qualify Dr. Turner as an expert in the area of clinical

7    psychology with a specialty in forensic psychology and sex

8    offender assessment and recidivism.

9            THE COURT:  Any objection?

10           MR. WELLS:  No objection.

11           THE COURT:  He's so qualified.  Go ahead.

12           MR. REARDON:  Thank you, Your Honor.

13   BY MR. REARDON:

14   Q    Now, Dr. Turner, you and I have spoken about your

15   testimony here today; is that correct?

16   A    Yes, sir.

17   Q    In preparing to testify, have you been provided any

18   information or details about Mr. Numann?

19   A    No, sir.

20   Q    Are you aware --

21           THE COURT:  Excuse me, was that a no?

22           THE WITNESS:  No, sir, I have not.

23   BY MR. REARDON:

24   Q    Are you aware of any particular facts about Mr. Numann as

25   it relates to this case or any case?

TURNER - DIRECT

1  A    No, sir.  I have no knowledge of any facts of this case or

2  any other cases you have ongoing right now.

3  Q    Are you aware even of what he's pled guilty to?

4  A    No, sir, I'm not.

5  Q    Have you read the presentence report in this case?

6  A    No, sir, I have not.

7  Q    Have you read the United States' sentencing memo?

8  A    No, sir, I have not.

9  Q    Did you review any of the discovery?

10 A    No, sir.

11 Q    So your testimony here and what I'm going to ask about is

12 generalized, about sex offenders and their assessment and the

13 recidivism of sex offenders; correct?

14 A    That's correct, yes, sir.

15 Q    Now, let's talk about the science and those two areas.

16 Now, in the course of your research and your work in this area,

17 have you had the opportunity to examine federal sex crimes,

18 specifically the volume of federal sex crimes within the last

19 two decades?

20 A    Yes, sir.

21 Q    And what has your research shown you about the growth in

22 federal sex crimes in the last two decades?

23 A    It's been enormous, the growth.  It's -- it's, as the

24 Internet came into existence and pornography became available

25 readily on the Internet, including child pornography, you know,

TURNER - DIRECT

1  we've just seen an exponential spike in the number of sex

2  offenses, especially sex offenses related to child pornography.

3  Q   And when it comes to evaluating those federal cases,

4  particularly federal child pornography cases, have you had the

5  opportunity to review arguments that have been made both by

6  government attorneys as well as defense counsel when it comes

7  to some of the various risk factors to consider in those types

8  of cases?

9  A   Yes, sir, I have.

10 Q   I want to go through a few things in particular with you,

11 and I'll frame them in the context of arguments that have been

12 made, and then we'll discuss a little more detail of each of

13 those arguments.

14       The first involves arguments that studies focused on

15 child pornography defendants have empirically demonstrated that

16 many child pornographers are less dangerous than previously

17 believed or less dangerous than the general population.  Do you

18 have an opinion about the accuracy of that statement?

19 A   Yes, sir, I do.

20 Q   What is your opinion when it comes to the accuracy of the

21 statement that child pornography defendants have been

22 empirically demonstrated to be less dangerous than others?

23 A   I think that that finding, in and of itself, is dangerous,

24 and I think that it's misrepresented and misused.  I don't

25 think -- I think we're in the dawn of studying Internet child

TURNER - DIRECT

1   pornography and we're very much in the infant stages, and as --

2   as research progresses and we begin to look at things a little

3   bit differently, we're finding -- we're finding that that

4   general statement that all child pornography offenders are at a

5   very low risk to re-offend is not true.  Many of them are.

6   There certainly are child pornography offenders that are at a

7   low risk, but to say that all of them are because research has

8   shown that to be the case is -- it's very concerning.

9   Q   Can I ask you if you know where a statement like that

10  comes from?  Are there any studies out there which seem to

11  support that conclusion that there is some empirical evidence

12  of a lower rate of recidivism among child pornography

13  offenders?

14  A   Yes, sir.  There's -- most of the work done by Dr. Michael

15  Seto -- I'm not denigrating another professional.  He's a smart

16  man; does very good work.  I just have a problem with some of

17  the methodology of his studies.  He's a psychologist out of

18  Canada, and his research has shown low general recidivism rates

19  among child pornography offenders.

20  Q   And in fact, his research has shown a recidivism rate of

21  less than five percent, at least in a 2011 paper he authored;

22  correct?

23  A   Yes, sir, that's correct.

24  Q   Let's talk about what some of your concerns are with that

25  five percent -- actually, the number is 4.6 percent.  What --

TURNER - DIRECT

1   have you read that paper?

2   A    Yes, I have.

3   Q    And have you read other papers which reached similar

4   conclusions?

5   A    Yes, sir.

6   Q    Based on your review of that research, what are some of

7   the weaknesses that you see in Dr. Seto's conclusions?

8   A    I will say Dr. Seto is the first to cite the weaknesses in

9   his own work, which are lack of follow-up times.  Again, this

10  is relatively -- relatively a new type of crime that we're

11  dealing with, so for it to have been committed, detected, a

12  sentence served and then a release occurring and follow-up time

13  in the community, some of the follow-up studies are following

14  these offenders for a year, 18 months.  That's -- that's a bit

15  silly in terms of a recidivism study.  I mean, when we look at

16  murder or rape of adult victims, we look at 10-, 20-, 30-year

17  recidivism markers.  So follow-up time is a problem.

18          One of the main problems is the fact that these

19  offenses are among the most undetected offenses that there are.

20  This is not like bank robbery or murder, where it's generally

21  assumed and expected that it's going to be detected and

22  reported.  We know from research that about only about five

23  percent of sexual offenses against children are ever reported.

24  Of those, of that five percent, about another five percent

25  result in a conviction.  So we're talking about an

1    exponentially small number of offenses that are reported and

2    accounted for.

3          So it's sort of akin to saying there were only four

4    drunk people in New Orleans in Mardi Gras this year because

5    there were only four arrests for public intoxication, and it's

6    not a good representation of what's actually going on out

7    there.  So to say it without the qualifier that, hey, this is a

8    gross underestimate, but you know, so far, this is what we've

9    been able to find, I think, is misleading and very, very

10   dangerous.

11   Q    So let's -- let's unpack some of what you said.  You

12   started initially by talking about -- well, you concluded,

13   actually, by talking about some qualifiers.  And in fact,

14   Dr. Seto, in the study, highlights one of the largest

15   qualifiers, which is in any assessment of recidivism, it's

16   important to analyze each individual case on its own merits;

17   correct?

18   A    Yes, sir, absolutely.

19   Q    And so drawing a general conclusion about a rate of

20   recidivism can be dangerous because each case is different; is

21   that a fair statement?

22   A    Absolutely.  And we see that in things like risk of

23   suicide and other -- other areas.

24   Q    And explain what you mean by you see this in risk

25   assessments of suicide.  How is that relevant to this inquiry?

TURNER - DIRECT

1   A      Well, for example, the risk that -- suicide, death by

2   suicide only occurs in less than one percent of the population,

3   but we know when dealing with this population that there are

4   certain factors that can double or even triple someone's risk

5   of committing suicide, such as prior military service,

6   questioning sexual identity, previous attempts.

7          So when someone like that comes before a court, for

8   example, for consideration for involuntary commitment, we don't

9   just throw out, well, less than one percent of people commit

10  suicide so the risk is pretty low.  We look at an individual

11  case, we look at the risk factors and whatnot, and that's not

12  necessarily done in cases involving child pornography

13  offenders.  In fact, it's rarely done, but it can be done

14  through a thorough -- through a thorough risk assessment, using

15  empirically supported means and research-supported risk

16  factors, and et cetera.

17  Q   We're going to talk about some of those risk factors in a

18  bit, but I wanted to touch on a second point you raised in

19  response to my question about Dr. Seto's study.  You described

20  offenses being undetected.  This is known as the underreporting

21  problem; correct?

22  A    Yes, sir.

23  Q   And your testimony was that five percent of sex offenses

24  are reported and only five percent of those are -- lead to a

25  conviction?

TURNER - DIRECT

1   A    I'm sorry, I don't mean to interrupt.  Sex offenses among

2   children -- sex offenses against children, yes, sir.

3   Q    Thank you for that clarification.  So five percent of

4   offenses among children are reported and only five percent of

5   those lead to conviction.  Why is that a problem in Dr. Seto's

6   study and the 4.6 number we've been talking about in terms of

7   recidivism?

8   A    I think Dr. Seto was responsible in publishing his

9   information, and he says look, this is an underrepresentation

10  because so many of these offenses are undisclosed.  So when you

11  do a recidivism study, you rely on convictions, primarily.

12  Sometimes arrests, sometimes charges, but it would be a charge

13  that the offense has to be disclosed, and you know, we know

14  that 60 to 80 percent of children don't disclose any sexual

15  abuse until adulthood.  We know that about 30 percent never

16  disclose.  We know that a little over half, about 60 percent

17  wait at least five years, and then you know, the studies are

18  also showing that this is true among child pornography,

19  offending online as well, that it's vastly undetected.  And so

20  it's not a good representation of re-offending rates for the

21  same reasons.

22  Q    So this underreporting or this undetected reporting issue,

23  again, when we're tying it back to the conclusions about

24  recidivism, this -- how does that relate to rates of recidivism

25  when we consider a longer time period, a longer period of

1    follow-up of a sex offender?

2    A    Well, we're seeing them go up, as you would expect.  And

3    Dr. Seto's also published a follow-up study, and there has been

4    some increases.  It's small, but there has been increase as the

5    time goes on.

6              There was also a study commissioned by the United

7    States Congress in about 2012.  It was very similar to the

8    study that we've been talking about, where they did a

9    follow-up, period of follow-up study of child pornography

10   offenders, and the numbers, again, were about 7-point-something

11   percent of committing another sexual offense.  Fairly small,

12   but again, they provided the caveat.  We're looking at this

13   like we've looked at every other recidivism study because we

14   don't know really how else to do it, and here's what we're

15   finding, but we are aware that you shouldn't hang your hat on

16   these numbers, because this is a very different type of offense

17   than something, as I said earlier, like bank robbery or murder.

18   Q    So is it fair to say that the underreporting problem

19   manifests itself in two ways; one there's a large number of

20   crimes which simply go unreported, and therefore, someone may

21   have recidivated but simply not been caught for it, and also it

22   takes a long time for some people to report, and therefore, if

23   the follow-up study is only two years or five years or ten

24   years, you may not capture future offending behavior?

25   A    Yes, sir, especially when you consider that, generally,

TURNER - DIRECT

1    for the first several years, usually, that individual is going

2    to be under some fairly strict supervision a lot of the time,

3    even if it's -- even if it's just simply registering or limited

4    access to Internet, or whatever the case may be.  So these

5    studies that are following people for 18 months are following

6    people that are being very, very closely watched and monitored

7    and have limited access to the means with which to re-offend,

8    anyway.  So that's another problem.

9    Q    And closely watched and monitored because they're under

10   some court-ordered supervision, parole, probation?

11   A    Exactly, yes, sir.

12   Q    Now, are you aware of any studies which have attempted to

13   get past this issue of underreporting; that is, to capture the

14   actual offenses that are occurring as opposed to just simply

15   those in which there was conviction?

16   A    Yes, sir.

17   Q    And can you explain for the Court and explain for us here

18   what those studies have tended to show when it comes to actual

19   conduct versus conduct in which there's been a conviction?

20   A    Sure.  So a lot of this work is coming out of the United

21   States Marshals Service by a Dr. Bourke, and what he's doing is

22   the use of anonymous tactical polygraphs with child pornography

23   offenders.  And what he's doing is he's interviewing child

24   pornography offenders, and asking them -- and these are

25   offenders that have -- their only known offense is a child

TURNER - DIRECT

1    pornography offense, and he's asking them, you know, do you

2    have any contact victims that we're unaware of, that were not

3    detected.  And in his most recent study, I think about four

4    percent initially admitted yes.  And then once subjected to a

5    polygraph, it ended up at over 50 percent.  I want to say about

6    54 percent had previous undetected contact victims in the past,

7    prior to the instant offense of child pornography that they

8    were -- that they were convicted for at that time.

9            So this is kind of another -- it's called

10   precidivism, and this is kind of a newer way that researchers

11   are looking at prevalence of offending and risk among this

12   population in a crime that is so habitually underreported.

13   Q    Do you know if those numbers that Dr. Bourke has found,

14   the 4.7 percent who initially admitted and then the 54 percent

15   who were -- who later admitted after tactical polygraph, do you

16   know if those are consistent with other studies of other sex

17   offenders?

18   A    Yes, sir, they are.  There's -- there's quite a few

19   studies where the -- where child molesters or child pornography

20   offenders are subject to this sort of anonymous ability to

21   report, and some of the findings have been pretty phenomenal in

22   terms of we knew about 159 victims from this group of

23   offenders, based on their criminal history, but after the

24   tactical polygraph, we're aware of, you know, 600, 800

25   incidences with other minors that have come to light.  So we're

TURNER - DIRECT

1   starting to see -- as research goes in this area, we're seeing

2   pretty consistent findings.

3   Q    And Dr. Bourke's study has been the subject of some

4   criticism; is that correct?

5   A    That's correct.

6   Q    That criticism was strongest when the study first came

7   out; is that a fair statement?

8   A    Yes.  And I would say his initial -- the initial Butner

9   study, as it's known, was greatly criticized for the means in

10  which he chose to sample.  But the more recent tactical

11  polygraph studies have been not subject to nearly the criticism

12  that first study was.

13  Q    That was what I wanted to ask you.  The subsequent studies

14  have validated in large measure the original findings of the

15  Butner study and subsequent study by Dr. Bourke?

16  A    Yes, sir, that's right.

17  Q    So that's the issue of the empirical data as it concerns

18  recidivism.  I next want to ask you about contact offenses, and

19  the statement that is often made that there is empirical

20  testing to disprove the fear that the typical child pornography

21  defendant will go on to molest children.  We talked about

22  precidivism, you mentioned, and sort of the rates of potential

23  future contact offenses.  I want to get into a little bit more

24  detail, a little bit more in the weeds in that.

25          So empirical testing to disprove that someone will go

TURNER - DIRECT

1    on to commit another crime, what does the literature show that

2    are some of the risk factors or some of the things that this

3    testing should look for in assessing whether or not someone

4    will go on to commit a crime?

5    A     Well, the --

6    Q     And I should have -- to clarify, a crime involving the

7    sexual exploitation of a child.

8    A     Yes, sir.  So there are a lot of risk factors that have

9    been shown empirically to increase someone's risk of

10   re-offending.  The two primary, I guess, umbrellas of risk that

11   need to be addressed in a good risk assessment and one that's

12   up to the standard of practice are the degree of

13   antisocialiality present in the offender.  So I say "offender"

14   because we're talking about re-offending, as well as a degree

15   of sexual deviance that is also present in that offender.  And

16   there are others, but those are the two primary risk domains

17   that need to be closely examined.

18   Q     Okay.  So I'm going to talk about those in just a moment,

19   but -- I'm sorry, I want to talk about the two primary

20   umbrellas in just a moment, but let's just touch on the others

21   just briefly.  One risk factor is access to children; is that

22   correct?

23   A     Yes, sir.

24   Q     How or why is that a risk factor when it comes to future

25   contact?

TURNER - DIRECT

1  A    Well, there have been several studies that have shown that

2  among groups of child pornography offenders, those that are

3  most likely to go on and commit a follow-up contact offense are

4  the individuals that are in a position where they have access

5  to children, whether it's in the home, whether they're putting

6  themselves in a position through work to have access to

7  children, you know, working at a carnival, working at a Game

8  Stop, working at a bowling alley or something like -- something

9  like that.

10      You know, we think about -- we think about sex and

11  the sexual drive and sexual attraction is a very, very powerful

12  motivating force in all of our lives.  It affects a lot of

13  decisions that we make.  So when we see someone putting

14  themselves in a position to have access to children then their

15  risk of re-offending or progressing to a contact offense

16  increase.

17  Q    Another risk factor is criminal history or lifestyle?

18  A    Yes, sir.

19  Q    And again, how is that relevant to assessing a defendant's

20  future conduct?

21  A    Well, criminal history, antisocialiality really acts as a

22  sort of fuel by which an offender is able to act on the

23  sexually deviant urges.  So when we talk about

24  antisocialiality, it's a clinical term and it refers to the

25  degree to which someone is entitled, the degree to which

TURNER - DIRECT

1  someone is unable to empathize with others or feel remorse, the
2  degree to which a person's emotional presentation is flat or
3  shallow, the degree of pathological lying.  Any kind of
4  criminal history is going to speak directly to someone's level
5  of antisocialiality.
6          So there's on and on, substance abuse, lots of other
7  examples, unstable work history.  These are signs of
8  antisocialiality.  So if an individual has high degree of
9  antisocialiality, essentially what happens is they're able to
10 victimize more easily.  They're able to put their hands on an
11 actual child or go to and download pornography with less
12 remorse.  They can sleep at night, they can live with
13 themselves, they can, you know, see the -- see a child's face
14 and continue to do that.  So when those two co-exist, when you
15 have sexually deviant interests that would require victimizing
16 someone to satisfy them and you have a high degree of
17 antisocialiality, which means you're okay with victimizing
18 someone else, that's why those two, especially in tandem, are
19 quite dangerous.
20 Q    So let's talk a little bit about the sexual desire or the
21 urge that's at issue here.  Can you just provide the Court with
22 some information about what we're dealing with when we're
23 talking about an individual's sexual interest in children?
24 Where does that desire come from; how does it manifest itself?
25 I mean, for a lot of us, it's difficult to understand.  So can

1  you attempt to explain where that urge comes from?

2  A    You know, the best -- the best way, in my opinion, to

3  explain that is to just say whatever -- to think about yourself

4  and whatever it is you're most sexually attracted to whether,

5  you know, if you're heterosexual, then it's essentially

6  somewhere around the same age, opposite sex peer.  If you're

7  home sexual, it's same sex, generally same age peer.  That

8  degree of attraction is what is present in a pedophile in terms

9  of their sexual attraction to children.  It's equally as

10  powerful and it's -- it is a biological urge.  We're not

11  talking about snatching purses.  We're talking about something

12  like hunger, sleep.  We're talking about need for love.

13        If you go back and think about all the decisions

14  you've made as a human being that are related to your sexual

15  interests from the time you hit puberty to the time you got

16  married, or whatever, it's a big factor in our life.  So we're

17  talking about something that is a biological urge, and that's

18  what makes it very different from other types of offenses.  I

19  may have gotten off subject --

20  Q    No, that leads me right into my follow-up question, which

21  is I want to then carry that inquiry into what you just talked

22  about with antisocial behavior and the role that the

23  antisocialiality factors that you described play in regulating

24  this urge.  And I think that the best way to frame my question

25  is to put it in the context of a non-sex offense crime.

TURNER - DIRECT

1    There's a hundred dollar bill sitting out on the

2  counter.  It doesn't belong to us.  Any of us would like to

3  have an extra hundred dollars; pay for our parking, pay for

4  coffee, pay for dinner for our wife.  What is it that would

5  keep us from taking that hundred dollar bill, and then when we

6  talk about sex offender, what is it that would keep them or

7  cause them to then commit their crime?  So in the context of a

8  non-sex offense, maybe it's easier to explain.

9  A    Sure.  So what's going to prevent me from grabbing a

10  hundred dollar bill, hopefully, is that I recognize it as

11  wrong, based on some moral code.  It belongs to someone else,

12  so someone's going to be out a hundred dollars.  It's not mine.

13  I would be stealing, I would be breaking the law, and I

14  don't -- ideally, I don't want to have anything to do with

15  that.

16    Someone who's more antisocial doesn't think in those

17  terms.  Someone who's more antisocial thinks a hundred dollar

18  bill, great, let's do it, and there's no second thought because

19  there really isn't any sense of empathy or remorse.  It's very

20  much about the individual and what they want and what they can

21  get and other -- other people are kind of be damned, so to

22  speak.

23    So in terms of a sex offense, there are certainly

24  people that have deviant sexual interests, but who are not --

25  I'm sorry, are not antisocial enough to ever be comfortable

TURNER - DIRECT

1  acting on them.  There may be people that are interested in
2  sadistic sex, causing pain in a partner, who either simply
3  don't act on it or they join the community and have a safe
4  word, or whatever the case may be.  There are persons with
5  pedophile interests in children who could not bring themselves
6  to victimize a child, could not bring themselves to download
7  child pornography and feed that because their level of
8  antisocialiality is so low.  So again, it's when they exist in
9  tandem, research shows that not only does a person's risk of
10 re-offending increase, but it exponentially does so.
11 Q    When what exists in tandem?
12 A    When antisocialiality and sexually deviant interest exist
13 in tandem.
14 Q    And is it fair to say that the problem is compounded when
15 we talk about sex offenders because of what you discussed
16 earlier, this biological or sex drive component as opposed to
17 simply taking the hundred dollar bill, which doesn't have any
18 sort of biological imperative attached to it?
19 A    Yes, sir.  So again, when we're talking about sexual
20 interests, we're talking about something that is a very
21 powerful force in anyone's life.  It is a -- it is a base brain
22 activity and so it's very different from other offenses.
23          THE COURT:  So can I ask a question?  So the sexually
24 deviant interest is sort of operating at the hidden level?
25          THE WITNESS:  Yes, sir.

TURNER - DIRECT

1              THE COURT:  It's not something you think about, it's

2    just --

3              THE WITNESS:  You think about it in a sense about --

4              THE COURT:  But it derives from the hidden; it's not

5    a conscious decision?

6              THE WITNESS:  That's correct.

7    BY MR. REARDON:

8    Q    So discussing some of the antisocial levels -- you

9    described several of them -- unstable work, unstable

10   relationships, pathological lying.  Other antisocial behaviors

11   can include substance abuse?

12   A    Yes, sir.

13   Q    Impulsivity?

14   A    Yes, sir.

15   Q    Irresponsibility in financial matters?

16   A    Yes.

17   Q    Parasitic lifestyle; what is that.

18   A    Parasitic lifestyle is living off of other people's

19   graces, not really establishing for yourself source of income

20   and a means of financial support.  But you know, kind of living

21   off this person for a while, living off this person for a

22   while, living off this person for a while.  We see that a lot

23   in antisocial persons because the level of irresponsibility is

24   such that they aren't really interested in or capable of

25   holding serious work together, and it's this manipulation, it's

TURNER - DIRECT

1   this conning, and it's this lack of empathizing with the person

2   that they're -- that they're mooching off of, so to speak,

3   because again, it's all about that individual.

4   Q    Is mooching a clinical term?

5   A    It's not, unfortunately.  Sorry.

6   Q    Sexual promiscuity is an antisocial behavior?

7   A    Yes, it is.

8   Q    What about a pattern of blaming others, how is that an

9   antisocial behavior?

10  A     Well, it -- it's not accepting responsibility for your own

11  actions.  So there's always -- it's always someone else's fault

12  or someone else's fault.  It's never, look, I did this and I

13  was wrong for it.  And there it is.  We see a pattern of that,

14  of deflecting the blame.  Specifically, when we're talking

15  about sexual offenders, we'll see a lot of times blaming the

16  victim, denigrating a victim, saying that the victim was the

17  one that initiated, or something like that.

18  Q    And then finally, another antisocial behavior would be

19  obviously unreported sexual contacts with minors or contacts

20  that did not lead to criminal prosecutions; is that fair to

21  say?

22  A    Yes, sir.

23  Q    Can these antisocialiality factors be measured

24  empirically?

25  A    Yes, sir, it can.

TURNER - DIRECT

1  Q    How is that done?

2  A    A good thorough psychological evaluation is going to start

3  from birth and go all the way through every aspect of life,

4  because we can see aspects of antisocialiality in childhood, we

5  can see it in school, we can see it in family relationships,

6  work history, as we said.  So there are also instruments that

7  can be used, one being the PCL-R, which is the Psychopathy

8  Checklist Revised.  It was not intended to be a risk assessment

9  instrument.  It was created by Dr. Robert Hare to measure the

10 degree to which a person has psychopathic characteristics,

11 which is sort of an extreme version of antisocialiality, but as

12 it turns out, because antisocialiality is such a good predictor

13 of re-offending, it is used.  And sometimes -- so in the state

14 of Texas, for example, in civil commitment hearings, it's

15 required as part of the risk assessment.

16 Q    When we talk about the PCL-R is there a particular

17 component or portion that is more relevant than others?

18 A    Well, among -- among pedophiles, it's been shown that

19 the -- what are called Factor 1, which are the personality

20 items that we've mentioned already, those are related, can be

21 specifically related to re-offending, sexually.  But the part

22 of the PCL-R that's most predictive of re-offending is what's

23 known as Facet 4, and it looks at actual historic behaviors.  I

24 don't have it in front of me, but it's any kind of juvenile

25 criminal history, any critical versatility, so lots of

1    different types of crimes committed, any kind of revocation of

2    release, the person has been on supervision and does not

3    comply.  And there are two other items, not -- don't have it in

4    front of me, so they escape me.  But they're all -- I'm sorry,

5    early behavioral problems is one.  So evidence of

6    antisocialiality in childhood and poor behavioral control,

7    which is kind of proneness to lashing out, easily angered,

8    physical violence, that sort of thing.

9    Q    You used the term "pedophilia" or "pedophile" at several

10   points in some answers that you've given.  That is a term

11   that's relevant in assessing sexual deviance; is that true?

12   A    Yes, sir.

13   Q    Let's talk about sexual deviance.  What do you mean when

14   you use the term "sexual deviance"?

15   A    In a clinical context, we're talking about anything -- one

16   way of putting it is anything that would require breaking the

17   law or victimizing someone in order to satisfy that urge.  But

18   generally, more broadly, it's sexual attraction to anyone or

19   anything other than -- than a consenting, basically same-age

20   peer.

21   Q    So is it fair to say that sexual deviance would include a

22   non-consensual encounter with an adult, rape?

23   A    Yes, sir.

24   Q    And sexual deviance is also sexual contact with an

25   individual incapable of consenting, a mentally impaired adult?

1    A    Yes, sir.

2    Q    And then a child, as well?

3    A    Yes, sir.

4         THE COURT:  And I'm sorry, I need to interject

5    because if I follow your definition correctly, then a sexual

6    relationship between a 50-year-old man and a 30-year-old woman

7    would fall in the same category, because you said similar age

8    group.  So where do you draw the line?

9         THE WITNESS:  That's what I said, basically a

10   same-age peer, because the -- where you draw the line is if a

11   person is 18 or 19 and in a relationship with a 16-year or

12   17-year-old --

13        THE COURT:  I know those are obviously maybe more

14   difficult calls, but you know, I'm presenting you with a

15   hypothetical where you have two consenting adults, one is 30

16   and one is 60 or 70.

17        THE WITNESS:  That's not considered sexually deviant.

18   They're both adults.

19        THE COURT:  But your definition included the concept

20   that they should be close in age.

21        THE WITNESS:  I was just referring to not --

22        THE COURT:  You mean adult, consenting adults?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  That's a different definition than I

25   think the one you gave before.

1    THE WITNESS: Yes, sir.

2    THE COURT: Go ahead.

3  BY MR. REARDON:

4  Q   So I want to focus on the issue of sexual deviance as it

5  relates to contact with children. When we talk about contact,

6  what are we speaking of as it relates to kids?

7  A   We're talking about any touching that is for the purpose

8  of sexual arousal of the perpetrator. So it's very broad. It

9  could be a lot of different things.

10 Q   And does it matter what kind of touching? Does it matter

11 if it's just a touch over the clothing versus under the

12 clothing? Does it matter if it's the offender putting their

13 hands on the child or the child putting their hands on the

14 offender? Does it matter if it's sexual penetration of some

15 sort with an object? Does it matter if it's sexual penetration

16 with the male penis? Is there some quality or scale when it

17 comes to this issue of sexual deviance as it concerns contact

18 with children?

19 A   Well, any of the -- any of the contact that you mentioned

20 would indicate sexual deviance. That would be sexually deviant

21 acts. When we look at sexual deviance, there are some things

22 that will increase a person's risk, based on how sexually

23 deviant it is, so the more violent offenses, in the context of

24 pedophilia, much younger children as opposed to, you know, a

25 15- or 16-year-old child, which is still considered deviant

TURNER - DIRECT

1    because it's against the law, but -- so younger children, more

2    violence, different kinds of sexual acts all occurring in one

3    offense.  So these would be indication of an elevation in

4    sexual deviance.  However, everything that you said would also

5    be evidence of sexual deviance.

6    Q    You've used the term "pedophilia" and introduced this sort

7    of line of inquiry with that term.  What is the clinical

8    definition of pedophilia?

9    A    Pedophilia is defined as an adult who has sexually --

10   sexual attraction to prepubescent children.  Generally, we use

11   the age of 13 as kind of a starting point, but everyone reaches

12   puberty at a different time.  So it's based -- it needs to be

13   based on secondary sexual characteristics; presence of pubic

14   hair, breasts, stuff like that.  But sexual attraction to

15   prepubescent children that occurs over a period.  Generally, we

16   use six months.  If we were at five months three weeks, we

17   wouldn't say, oh, no problem here.  But just as a guideline,

18   and it's something that causes problems, causes legal problems,

19   cause distress, anxiety, so to speak.

20   Q    And are there various types of pedophilia?  Are there

21   scales or degrees of pedophilia that a clinician like yourself

22   might diagnose?

23   A    Yes, sir.  There are specific qualifiers that we have to

24   give when we make a diagnosis of pedophilic disorder to do just

25   that, what you're talking about now.

TURNER - DIRECT

1  Q    What are the qualifiers?

2  A    We want to address whether or not the individual is

3  attracted to females only, so female prepubescent children

4  only, or male children only, or both, and we also want to

5  differentiate whether or not the individual is a pure

6  pedophile, and by that I mean they are only sexually attracted

7  to children, or if the person is sexually attracted to

8  prepubescent children as well as adults.  So all of those would

9  be taken into consideration and rendered when making a

10 diagnosis of pedophilia.

11 Q    Is an individual's viewing of and collecting child

12 pornography a valid means of diagnosing pedophilia?

13 A    Yes, sir.

14 Q    How so, or why, or what does it reveal?

15 A    Well, it reveals, as long as it is -- you know, it is

16 something that has occurred over a certain period.  If someone

17 downloaded two pictures of naked children and never did it

18 again, it wouldn't necessarily meet criteria as being diagnosed

19 as a pedophile.  If it goes on for a period of time, if it

20 characterizes who the individual is, as I said, at least a

21 six-month period, give or take, and we see that as a pattern of

22 behavior, then what we're seeing is in downloading of child

23 pornography, we're seeing them interacting and engaging with

24 these images of children that are of a sexual nature, illicit

25 images of children.  And during the course of the

TURNER - DIRECT

1   investigation, we want to look at things such as masturbatory

2   behavior, masturbation.  And there have been several articles,

3   a lot of which suggests it is a valid means of diagnosing

4   pedophilia.

5   Q     You talked about how long someone had been downloading,

6   viewing.  In making the diagnosis that relies in part on an

7   individual's viewing or downloading child pornography, is it

8   also relevant to look at the amount of time they spend in this

9   activity?

10  A     Absolutely, yes, sir.

11  Q     And that would include both the download activity as well

12  as the viewing of it; correct?

13  A     Yes, sir.

14  Q     Is it relevant to look at the number and the size of the

15  collection?

16  A     Yes, sir, it is.

17  Q     And what about the organization of a collection, is that a

18  factor that should be considered in terms of a diagnosis of

19  pedophilia?

20  A     It is.  There's some research that suggests that the more

21  time a person spends with their collection, sorting it, filing

22  it, lot of times what we see is they'll just kind of restart.

23  So they'll put everything in a very organized way and then just

24  kind of start over.  So the more time someone is spending in

25  that regard with their collection, that's going to speak to an

TURNER - DIRECT

1   increase in sexual deviance, which will speak to an increase in

2   risk of re-offending.

3   Q    Is it fair to say that much of the work that you do when

4   it comes to assessing individuals who are accused of child

5   pornography crimes involves individuals who are doing this

6   activity online?  Is that all of your work these days?

7   A    No, sir.

8   Q    Okay.  But I mean, in terms of individuals accused of

9   child pornography crimes, what is the percentage of online

10  versus hard copy offenders that you see?

11  A    Okay.  Well, it's -- the vast proportion, the majority is

12  online as opposed to, you know, as opposed to taking Polaroids,

13  or something like that.  I do work cases where that's the case,

14  but vast majority, we're talking about online.

15  Q    And what about the retention of collections across various

16  platforms?  And I think about computers or hard drives or other

17  digital storage media.  Is it a relevant consideration to you

18  when you're assessing whether or not someone is a pedophile

19  that they have retained a collection, even though they've

20  gotten rid of -- even though they've moved on to a new

21  computer, or they've kept an old hard drive, even though

22  they're now operating in the cloud.  Is that something that's

23  of interest to you?

24  A    Yes, sir, it is.

25  Q    And why so?

TURNER - DIRECT

1    A    Well, it's -- they're obviously very invested and

2    interested in this collection to the point that they're going

3    to keep it even when changing devices.  If they have images on

4    multiple devices, if they have -- you know, it's not uncommon

5    for a child pornography offender to download a bunch at a time

6    and then -- and then delete all of it and go back and download

7    it again.  We see that quite often as well.  So you know, when

8    they're hanging onto it and they're making sure that they --

9    even as they're switching instruments or getting new devices,

10   that they're not without it, then we're seeing how important it

11   is to them.

12   Q    And can I ask you about the hiding of a collection, the

13   use of encryption to hide a collection from others?  What role

14   or what impact would that have on your assessment or diagnosis

15   of an individual?

16   A    Well, we're seeing a lot -- a lot more of that, and with

17   the advent of the dark web, as law enforcement makes an effort

18   to catch child pornography offenders, child pornography

19   offenders are getting better at hiding their actions.  So I

20   think if someone is -- if I were doing a risk assessment,

21   especially more so in these days -- five, even ten years ago,

22   the encryption would be less significant to me.  Now, just

23   because we tend to see so much, so much more of it and similar

24   types of behaviors as technology increases, but it does point

25   to the fact that, again, it's important to them, they're trying

1  to hang onto it.

2  Q    And you used the term "dark web".  The TORa network or

3  some of the encrypted online programs to access child

4  pornography material?

5  A    Yes, sir.

6  Q    And this use of encryption, would you consider that to be

7  relevant in the categorization or the classification of sexual

8  deviance or antisocial behavior?

9  A    I think -- I think any efforts to hang onto a collection

10 that would indicate that that collection is important to the

11 individual would speak more to sexual deviance than it would to

12 antisocialiality.

13 Q    One other thing you mentioned, terms of sexual deviance,

14 you talked about masturbatory behavior.  What is that and why

15 is it important?

16 A    Well, masturbatory behavior is the frequency at which an

17 individual who's downloading -- downloading child pornography

18 and viewing child pornography masturbates to it, but not only

19 frequency, but which images specifically that individual

20 prefers, which types of images does that individual most

21 frequently masturbate to.  These are going to speak directly to

22 their sexual deviance and sexually deviant interests, and are

23 going to help in our risk assessment as well.  So that's

24 something that absolutely has to be assessed in great detail in

25 an evaluation.

TURNER - DIRECT

1  Q    So let's try and put all this together.  We talked about

2  key factors in a risk assessment.  When you are performing a

3  risk assessment of a child pornography offender, what is the

4  absolute minimum in terms of the work you need to do on that

5  case?

6  A    You know, these are not easy cases to work, and I need

7  every record possible.  I need previous interviews, whether by

8  police or anyone else, with the defendant.  I need criminal

9  history.  I need offense reports.  I need police details.  I

10 need to view the actual collection.  I need to look for things

11 like ratio of images of boys to girls.  And there's certain

12 things that law enforcement looks for and the description of a

13 record that's different than what a psychologist would look

14 for.  I'm looking for things that would indicate an emotional

15 identification with children.

16         And then a thorough evaluation, after all that is

17 done, I'm familiar with the case, I've sort of created a

18 profile of the offender and how I'm going to approach him or

19 her, an assessment for antisocialiality, assessment for sexual

20 deviance, use of the PCL-R.  There are some sexual deviance

21 instruments that are good, not bad, but I think that it's the

22 kind of thing that it's better -- it's better assessed through

23 an interview.  And really, there's not much -- there's not much

24 in terms of testing that's involved.  There's some risk

25 assessment instruments you can use, like a Static-99 if there's

TURNER - DIRECT

1    a contact offense.  If it's a child porn, pornography-only

2    offender, that limits what we have to work with in terms of

3    risk assessment instruments.  So we kind of fall back on

4    research and what we know to be risk factors; antisocialiality,

5    sexual deviance, age, things like that.

6    Q    So the first step you talked about, sort of developing a

7    background, how far back would you go in assessing an

8    individual's history?

9    A    All the way.  I mean, one of my questions is, what's your

10   first memory.  I start with where were you born and then we go

11   from there.  It's a very -- it's a very long and in-depth

12   interview.  Your antisocialiality is evidenced -- can be

13   evidenced in childhood; running away, skipping school, using

14   drugs at an early age, shoplifting.  We look for things like

15   playing with fire, hurting animals, torturing animals.  So we

16   want to go all the way back.  There's no part of a

17   defendant's -- at that point, of a defendant's life that I

18   don't want to cover.

19   Q    Is it one interview, several interviews?

20   A    Ideally, it's several, but it can be done in one rather

21   long session.

22   Q    And in terms of reviewing the images that are possessed by

23   a defendant, why, again, is that important?

24   A    It's important because there are certain aspects of a

25   collection that if they are present increase a person's risk

1    and there are -- an attorney versus a law enforcement agent

2    versus a psychologist are going to look at -- are going to look

3    at very different aspects of things and are going to -- are

4    going to skip through, because they're looking for something

5    that has a lot of skin, or something like that.  But I'm going

6    to need to see other things, like is there any kind of bondage

7    in the picture, is there -- you know, is it a male versus a

8    female, things like that.

9            Also, I know that I'm going to be speaking with this

10   individual and so I'm going to be asking them about their

11   masturbatory behavior with these images, and so I'm going to

12   want to be able to cite specific images, specific videos, and

13   other things.  I need a baseline from which to work.  So if I

14   know that they've looked at these images and I'm familiar with

15   them and I can ask them, and they say, "No all I did was look

16   at A, B, C," then I know they're not being honest, not taking

17   responsibility, and I can confront them with that.  There's a

18   lot of reasons why.  It's certainly unpleasant, but I mean,

19   these are important evaluations, and to do them correctly, I

20   think, is important.

21   Q    You ever use a polygraph in performing an assessment?

22   A    Yes, sir.

23   Q    And in what way can a polygraph be useful in performing a

24   risk assessment?

25   A    Well, a polygraph can be useful because when you do an

TURNER - DIRECT

1   evaluation of -- so this would be something that would occur

2   over at least two evaluations, usually three.  When you are

3   asking the person about their history, when you're asking a

4   person about current desires, current attraction to children,

5   current masturbatory fantasy, even without access to their

6   collection, and then you follow that up with a polygraph

7   interview, and if they -- if they fail certain items, that they

8   told sort of -- they tell me, "I don't masturbate on thoughts

9   of children," or, "I don't have any desire to physically touch

10  a child in a sexual manner," something like that, then we would

11  incorporate those into the tactical polygraph, and if they

12  failed those, then they need to explain to me why they failed

13  those because I need to be able to assess all of that out in

14  the report that I'm going to write.  So they're very, very

15  helpful.

16  Q    You had mentioned earlier that there are some tests which

17  are, I think your language was "good, not bad" that can be used

18  to assess a child pornography defendant.  What are some of

19  those tests that are good not bad?

20  A    Well, there's a new test by Dr. Seto that's out.  I think

21  it's good in that it's an effort to have something for

22  clinicians to use.  I think it's not great in the sense that

23  the sample size is quite small.  It's only between two and

24  three hundred people, so that the amount of re-offenders in the

25  group is as small as nine or three in some groups.  And also,

TURNER - DIRECT

1    when you look at the items on the test -- as Dr. Seto, himself,

2    says, it shouldn't be used in isolation, it's just a tool.

3    These items essentially measure things like antisocialiaity

4    and sexual deviance, which you can get through a good

5    interview.

6             And then there are other tests that have no business

7    in a sex offender risk assessment evaluation, but --

8    Q    Let's talk about some of those.  You mentioned Static-99?

9    A    Right.

10   Q    Is that one of the tests that has no business being in a

11   sex offender's evaluation?

12   A    It has no business being in a child pornography

13   non-contact sex offender evaluation.

14   Q    Why is that?

15   A    Well, the Static-99R is a good instrument, a robust

16   instrument.  It has a big sample size, but the sample was not

17   made up of child pornography offenders.  And so the authors

18   say, you know, this is not appropriate for use with anyone that

19   doesn't have a contact sexual offense.  So sometimes you'll see

20   experts using it, and they shouldn't be because it's not

21   designed to be used for child pornography offenders.

22   Q    There are other tests; SONAR, Rapid Risk Assessment,

23   SPR 20, SoRAD.  Are these all tests you see frequently used in

24   cases that don't have any business in a sex offender

25   assessment?

1    A    Yes, sir.

2    Q    Why is that?

3    A    Actually, the majority of those instruments were made by

4    the same people.  So the sample size -- or I'm sorry, the

5    sample group that was used, child pornography offenders are not

6    represented in that group.  So you can't then -- it's like

7    giving an IQ test to a dog.  It's two different groups.  It's

8    not designed to be given to them.  And so we can't -- we can't

9    use something like a Static-99 for -- or the -- you know, the

10   ERASOR, any of the others, STABLE.  We can't use those for

11   non-contact offenders or child pornography offenders.

12   Q    If you were to prioritize or list the most important

13   considerations for you in conducting a sex offender assessment,

14   what would your top three be?

15   A    My top three would be the PCL-R, first and foremost.  I

16   want to -- I want a measure of the person's degree of

17   antisocialiality, and the PCL-R, you have to go all the way

18   back through childhood and everything in order to properly

19   score it.  I don't -- I can't really see -- unless a person is

20   very -- unless a clinician is very confident in their ability

21   to assess antisocialiality without it, I can't see a sex

22   offender risk assessment of any kind, whether it's child

23   pornography or contact, that doesn't need a PCL-R score.

24          And then a thorough assessment of sexual deviance.

25   You know, there's the -- I believe it's the -- there's the

1   STAASI.  There's a couple other instruments that can be used,

2   but the problems is some of them, a like the Abel are reliable

3   self report and are very easy to fake, so to speak.  So I think

4   it's better to -- for me, it's better to really, really address

5   in great detail their sexual history, their, you know,

6   masturbatory behavior, and things like that.

7          I guess a third one, it's pretty simple, but I'm

8   going to want to look at age.  Age is a big factor in terms of

9   risk.  The younger the defendant, the more risk -- at risk they

10  are to re-offend.

11  Q    And why is that?

12  A    It's generally believed to be because of hormones and

13  brain functioning.  As we age out, whatever our -- whatever our

14  sexual interests are tend to -- not in everyone, but tend to

15  wane over time in older age.  And that's just due to -- to

16  hormones and, you know, our bodies changing, our brains

17  changing.  But a younger individual is still -- still very,

18  very active, sexually, and has a lot of the hormones still

19  raging that they had, you know, at that time.  So the

20  general -- the general finding is that when a person is

21  younger, 35 or below, at the time that they're going to be

22  released, they're at a higher risk to re-offend, but there are

23  a couple of mitigating factors with that.

24  Q    And what are those mitigating factors?

25  A    The first and most important is, obviously, not everyone

1    ages out the same way in terms of their sexual drive or sexual

2    interests.  So if I'm doing an evaluation on someone that

3    committed a sex offense when they were 25 and they're going to

4    be getting out of prison at 50, then they would get full credit

5    for that protective factor of their age.  We use a cut-off in

6    research of 35.  But, if the individual is committing offenses

7    at 55 and I'm doing the assessment of that individual at 55,

8    then I'm not going to put as much weight on their age, because

9    obviously, this is -- this is an individual that, you know, 70,

10   75, it doesn't matter.  This is an individual who's still

11   willing to act out on these sexual urges at that age.

12   Q    So both the age of the defendant at the time of the

13   evaluation, but also the age at the time of the offense is a

14   relevant consideration?

15   A    Yes, sir.

16            THE COURT:  I thought he mentioned there were three

17   factors.  He listed two, by my count.

18            MR. REARDON:  PCL-R.

19            THE COURT:  PCL-R and age.

20   BY MR. REARDON:

21   Q    Thorough assessment of sexual deviance.  Is there another

22   one?

23   A    No.

24   Q    Is it fair to say that any risk assessment is both a

25   combination of art and science?

TURNER - DIRECT

1    A    I think so, yes.

2    Q    And have you, in the course of your work, had the

3    opportunity to review assessments that have been done on other

4    defendants by licensed clinicians?

5    A    Yes, sir.

6    Q    Generally speaking, are there some consistent themes

7    within those assessments that cause you concern, as a licensed

8    clinician?

9    A    Yes, there are.

10   Q    And what are those concerns?

11   A    Well, it's on both sides.  I see experts that work for --

12   work for a prosecution and in their report, they'll use a lot

13   of flowery language, talk about the heinous nature of the

14   images, things like that.  And there's not really much place

15   for that in what's supposed to be a scientific and objective

16   risk assessment.  We're not trying to scare a jury or a trier

17   of fact.  We're trying to present them with scientific risk

18   assessments.

19           And then on -- on the converse, people that tend to

20   work primarily for the defense will avoid asking questions

21   about masturbatory behaviors.  I've -- I've seen countless

22   evaluations where it's not even addressed, that they spend less

23   time with records.  They address things like -- you know,

24   they'll give an intelligence test or some of these things that

25   have -- have no correlation to risk of re-offending, and

TURNER - DIRECT

1    sometimes I -- sometimes I think it's kind of they either don't

2    know what they're doing or it's to kind of -- let's throw as

3    much out there as possible and just kind of look like we did a

4    really thorough assessment, but kind of avoid the question at

5    hand.

6              So you know, the use of superfluous instruments and

7    then the avoiding and non-reporting of things like history of

8    antisocialiality and a really in-depth assessment of the

9    person's sexual deviance.

10   Q    And I think you raised a good point, I want to be

11   absolutely clear for the record.  Your criticism is not solely

12   of defense experts.  You have worked as a defense expert,

13   yourself; correct?

14   A    Yes, sir, that's correct.

15   Q    Your criticism is of reports, in general, that you've

16   seen, whether they've been offered by a prosecution witness or

17   a defense witness?

18   A    Yes, sir, that's correct.

19   Q    And some of these issues that you've described, you've

20   seen, to varying degrees, in reports from either side?

21   A    Yes, sir.

22   Q    Have you also seen, in these reports, the use of

23   non-empirically supported mitigation factors --

24   A    Yes, sir.

25   Q    -- to justify or explain behavior?

TURNER - DIRECT

1  A    Yes, sir.

2  Q    And what is a non-empirically supported mitigation factor?

3  A    Well, one of the bigger ones -- and this was a study that

4  I did in 2016, or '15, I believe.  One of the biggest ones is

5  the use of other mental health issues to sort of explain away

6  the use of child pornography.  So we see, you know, this

7  individual was looking at child pornography because they are

8  depressed, or this individual was looking at child pornography

9  because they just got back from Afghanistan and have PTSD.  I

10  mean, it goes across the border; alcoholism, et cetera, you

11  name it.

12       So the problem with that is, we tend to -- we tend to

13  feel for people with mental illness, and PTSD is one of the

14  more common ones that I've seen.  And so certainly there's an

15  emotional content that comes up when we talk about combat

16  veterans or police officers that have PTSD.  But there's no

17  indication anywhere in all of psychological research that any

18  mental disorder will cause someone to become sexually attracted

19  to children, and that's what we're saying when we attribute

20  another mental illness as a mitigating factor.

21       And that's really good news to know, because for

22  every Veteran that's come back from combat, they don't have to

23  wonder if today's the day I'm going to wake up and be sexually

24  attracted to children because there's this link.  There is no

25  link.  Is this the beer that I drink that's going to make me

1  sexually attracted to children?  There is no link.  So if we

2  see a report and we see, you know, this focus on these other

3  things and they're not really asking them about which images

4  are you most attracted to, when did you first think about

5  downloading, when did these sort of things that we need to be

6  looking at, then those are mitigating factors that, you know,

7  if someone is -- if someone is sexually attracted to children

8  and they're depressed, then sure, they may tend to view more

9  when they're depressed, but you know, it's when it's used as an

10  excuse.  It's when it's used as an excuse for the behavior and

11  as an explanation for the behavior existing, that's when it's

12  problematic.

13  Q    Have you seen instances in which an individual's prior

14  sexual abuse is used as a mitigating factor?

15  A    Yes, sir.

16  Q    And is that an issue that you have some concern with?

17  A    Yes, sir.

18  Q    And how so?

19  A    Well, very much like mental illness, if someone is

20  sexually abused as a child, there is no correlation that exists

21  between that person going on to sexually abuse other children.

22  There is no correlation, also, between being sexually abused as

23  a child and whether someone is likely to re-offend.  So what we

24  see in the research is that most sex offenders will say that

25  they were sexually abused as a child.  Even if we -- even if

TURNER - DIRECT

1  all of that is true, then what we see is it tends to exist more

2  in the population of sex offenders, but there are far, far, far

3  more people that are sexually abused and don't go on to offend

4  sexually when they are adults.

5          Again, it's just like the PTSD thing.  It's good news

6  for people that have experienced sexual abuse as a child.  They

7  don't have to be concerned that research shows they are likely

8  to go on and do the same things, themselves.  Most do not.

9  Q    Are you aware of any studies that attempt to capture or

10  calculate the rate of sexual offending among the general

11  population?

12  A    It's quite low.  It's going to be -- you know, when we --

13  I don't know an exact number of general population, but I would

14  say it's going to be a very small number.

15  Q    And is that small number consistent with the rate among

16  sex abuse survivors or victims of sexual assault?

17  A    Yes, it is.

18  Q    What I'm asking, I think I'm paraphrasing what you said

19  earlier, there's no statistically significant difference

20  between the general population and victims of sexual assault

21  when it comes to committing a sexual offense?

22  A    That's correct.

23  Q    Are there any other non-empirically based or supported

24  mitigation factors that you see in reports that you review?

25  We've talked about PTSD.  We talked about mental illness.  We

1    talked about being a victim of prior sexual abuse.  Any others

2    that you have seen in your work?

3    A    Um --

4    Q    What about compulsive behavior or obsessive compulsive

5    behavior?

6    A    Correct.  So an anxiety disorder like that, like a need to

7    collect because of some kind of obsessive compulsive disorder

8    or anxiety disorder -- so I was a hoarder, I couldn't help

9    myself -- that, again, doesn't explain away the sexual

10   attraction to children.  Or, you know, choosing child

11   pornography to collect.  There's no research to support that.

12   And that's used -- along with PTSD, depression, all these other

13   things, that's used fairly commonly.

14   Q    So let's talk about treatment, then.  So all of these

15   factors that you've outlined -- depression, PTSD -- are they

16   relevant in devising a treatment plan for sex offenders?

17   A    Well, I think certainly.  I think you want to look at the

18   person as a whole and I think if you're planning treatment for

19   an individual, then you're going to want to address any issues

20   that they have.  But I will say that a person's sex offender

21   treatment is going to be very much its own thing, and so if a

22   person has PTSD or major depression, or something like that,

23   that is going to be needed to be addressed separately.  The

24   kind of treatment that he receives in sex offender treatment is

25   very different, and it's not going to address those sort of

TURNER - DIRECT

1  things.  It's less about feeling and things like that and more

2  so about your thoughts, your behaviors, how to stop certain

3  thoughts and things like that.  So yes, I think that, of

4  course, anyone with a sexual offense that has any other

5  coexisting mental illnesses, those need to be addressed, just

6  for the betterment of that person and society in general, but

7  it's not going to be done in the context of their sex offender

8  treatment.

9  Q    What are the current best practices when it comes to

10 treating a sex offender?

11 A    We don't send someone to sex offender treatment with the

12 notion we're going the cure them of sexually deviant interest.

13 We send them to sex offender treatment with the hope that that

14 person can learn enough about themselves, their own sources of

15 sexual arousal, things that they tell themselves to justify or

16 rationalize the illegal behavior that they've been engaging in,

17 high risk situations, whether it be, you know, using substances

18 or anything that lowers inhibitions to act on impulses that are

19 already there.  We teach them about their offense cycle.  We

20 teach them about triggers and thinking errors, and we try to

21 teach them about empathy and the impact it has on victims and

22 families, and so on and so forth, so that that person can be --

23 have tools to use with which to not re-offend.

24 Q    In your opinion, and based on all the experience that you

25 have in this area, what is the best outcome for someone who is

1    a sex offender?

2    A    I think the best outcome for someone that is a sex

3    offender is to find someone that hopefully does not want to

4    re-offend, someone that will engage in treatment, and someone

5    that will be honest with themselves and usually -- usually,

6    it's in a group setting and with the treatment providers, and

7    will do the work and will admit to their offenses, take

8    responsibility, and then put what they learned into practice.

9    The techniques and tools that they learn in treatment, that

10    they'll actually use them and they'll actually put them -- put

11    them into play.

12            MR. REARDON:  Your Honor, I have no further questions

13    for Dr. Turner.

14            THE COURT:  Thank you.

15            MR. WELLS:  Just one moment.

16            (Discussion off record)

17                    CROSS EXAMINATION

18    BY MR. WELLS:

19    Q    Just real quickly, to reiterate, you don't know anything

20    about Mr. Numann or his history; right?

21    A    Yes, sir, that's correct.

22    Q    And you've not written a report taking what you've

23    testified to today and applying it to Mr. Numann?

24    A    No, sir, not at all.

25    Q    You don't have any opinion as to Mr. Numann's history; do

1    you?

2    A    No, sir, I don't.

3    Q    You have no opinion as to Mr. Numann's potential

4    amenability to rehabilitation?

5    A    No, sir, I don't.

6    Q    Or his -- or his particular risk of re-offending?

7    A    No, sir.

8         MR. WELLS:  I don't have any further questions,

9    Judge.

10        THE COURT:  Okay.  Thank you.  I've got a few.

11        What's the impact of the likeliness of someone to

12   recidivism if they don't consider their proclivities to be a

13   sexual deviance?

14        THE WITNESS:  It's going to be higher.  This is one

15   of the main tenets of treatment, is recognizing the deviant

16   nature.  So a good treatment program is going to address

17   antisocialiality and sexual deviance together, and so someone

18   that doesn't see it as sexual deviance will have a hard time

19   developing any empathy or seeing any damage that they're

20   causing to a victim.

21        THE COURT:  As far as viewing child pornography,

22   there certainly have been studies that I've seen in the past,

23   and I just want your opinion, that the more one views this

24   material, the more it has a tendency to rewire your brain's

25   pleasure center, sort of like a drug addiction.  Is that your

1    understanding, from your studies?

2         THE WITNESS:  Yes, sir.

3         THE COURT:  You ended your direct testimony moments

4    ago by talking about how it's important for defendants to --

5    individuals engaged in this type of behavior, I guess I should

6    say, to acknowledge their misconduct and take responsibility

7    for it.  That's an important part of coming to terms with it?

8         THE WITNESS:  Yes, Your Honor.

9         THE COURT:  And you said you weren't familiar with

10   the facts of this case; is that right?

11        THE WITNESS:  Yes, Your Honor.

12        THE COURT:  Let me touch upon some questions that

13   were asked of you.  You said, in your testimony -- I'm

14   generalizing now because I don't have your exact words, but you

15   correct me if I'm wrong -- the more one immerses him or herself

16   in viewing this type of material, the more concern you have as

17   to whether or not they're going to be likely or amenable to

18   rehabilitation.

19        THE WITNESS:  Yes, sir, that's correct.

20        THE COURT:  On the topic of evaluating the risk of

21   recidivism, would it be important to have as much information

22   as possible as to what they were doing online?

23        THE WITNESS:  Absolutely.  For several reasons, yes,

24   sir.

25        THE COURT:  And what are those reasons?

```
 1              THE WITNESS:  Well, one of the big things that we
 2    look at in terms of risk is if someone is also -- so not only
 3    accessing child pornography, but is -- two main things that we
 4    look for; if they're visiting any sites where they might have
 5    direct access to children, any other social media or anything
 6    like that.
 7              THE COURT:  Chat rooms?
 8              THE WITNESS:  Yes, sir.  That's concerning.  And
 9    secondly, any communication that that individual is having with
10    other child pornography offenders and pedophiles.  That serves
11    as a -- that serves as a reinforcement of their behaviors.  It
12    kind of shatters the frame of reference that this is wrong
13    and -- and you know, society sees this as a bad thing, but it
14    shows, well, there's other people doing it, this guy seems
15    nice.  So any interaction with other like-minded individuals
16    online is going to increase risk, and that's been shown in
17    studies.
18              THE COURT:  So let me present you with a
19    hypothetical, then.  You have an individual who has admitted to
20    downloading and viewing this type of information.  This
21    individual has multiple devices.  And you were able to evaluate
22    the breadth and depth of their activity on all but one of those
23    devices.  What would that tell you, or what concern would you
24    have if there is a particular device which you can't have
25    access to evaluating their long-term risk?
```

```
 1              THE WITNESS:  May I ask a question?  May I ask a
 2    clarifying question?
 3              THE COURT:  Yes.
 4              THE WITNESS:  Is this limited access because of
 5    something that was imposed by the offender?
 6              THE COURT:  Correct, his password.  In this
 7    hypothetical, it's a computer that's password protected.  You
 8    know, there may be other reasons.  For instance, there may be
 9    other crimes or personal information in there that this
10    hypothetical defendant doesn't want the authority or the Court
11    to see, but it may also have direct, you know, information that
12    is directly related to the offense at issue.  So in that
13    hypothetical, would that present some concerns to you?
14              THE WITNESS:  Yes, sir, it would present several.
15              THE COURT:  Could you enumerate those for me?
16              THE WITNESS:  Yes, sir.  First of all, we're not
17    seeing someone that is willing to admit the full degree of
18    their wrongdoing; and therefore, we're seeing someone that is
19    exhibiting a higher degree of antisocialiality because they're
20    still hiding.  This is going to -- this is going to be a
21    negative prognosticator for success in treatment.  And if I
22    were doing an evaluation on it and that were the case, my go-to
23    would be that that's where the heart of the matter lies, is in
24    that -- in that -- is in that one that we're not being given
25    access to.  So in my report, I would say that while it's
```

TURNER - REDIRECT

1    possible that there is absolutely nothing on this and it
2    couldn't affect anything at all, it does raise those concerns.
3            THE COURT:  Finally, and I think you've touched upon
4    this in your direct testimony but I want to make sure I
5    understand.  You do think that there is a greater concern in
6    situations in which an individual has done more than simply
7    view child pornography, but has, in fact, acted out on those
8    sexual interests associated with child pornography by having
9    contact with underage individuals?
10           THE WITNESS:  Yes, sir.  That individual would
11   certainly be at a higher risk to re-offend based on sexual
12   deviance, based on antisocialiality.  That would be very
13   concerning.
14           THE COURT:  Okay.  Those are the questions I had.
15   Thank you.  You can step down --
16           MR. REARDON:  Your Honor, may I follow up, based on
17   your questions?
18           THE COURT:  Yes, and I'll give Mr. Wells an
19   opportunity to follow up as well.
20                        REDIRECT EXAMINATION
21   BY MR. REARDON:
22   Q    I just wanted to build on the question the Court had, just
23   the last question involving a situation in which there was
24   acting out or contact.  You said that this person would be at a
25   higher risk to re-offend; is that correct?

TURNER - RECROSS

1   A    That's correct.

2   Q    In assessing that risk, does it matter who the victim is?

3   And I speak, is it a nuclear family member, extended family

4   member, member of a social club, random member of the

5   community?

6   A    Well, what we know from research is that individuals

7   who -- whose contact offenses against a child only constitute

8   incestual offending are at less of a risk, when compared to

9   persons who act out against children outside of their family.

10  And then the highest level of risk, in terms of victim type,

11  would be -- would be a stranger victim, acting out on a victim

12  that the person did not know over 24 hours.

13           MR. REARDON:  No further questions, Your Honor.

14           THE COURT:  Mr. Wells?

15                    RECROSS EXAMINATION

16  BY MR. WELLS:

17  Q    Just a couple of follow-up questions.  Would it make --

18  following up on the questions that Mr. Reardon had discussed,

19  would it make a difference to you if the -- if any hands-on

20  offenses had occurred, say, 10-plus years ago?

21  A    If I had knowledge of hands-on offending, it would be very

22  pertinent to risk and it wouldn't matter if it was 10 years

23  ago.

24  Q    Would it matter if the offender voluntarily ceased the

25  conduct on his own?

1   A    I suppose it could.  It's a lot of hypotheticals being

2   thrown at me.

3   Q    Right.

4   A    I suppose it could.  That's going to be my answer.  I'm

5   sorry.  I suppose it could.

6   Q    Okay.  I want to follow up just on one question that the

7   Court asked about if there was one device that's inaccessible.

8   Are you familiar with how these investigations start?

9   Essentially, there's a search warrant and computers are seized

10  and they're examined for some time?

11  A    Yes, sir.

12  Q    Okay.  Would it make a difference to you if it was just by

13  the time that -- that charges were filed, eight, ten months

14  later, the individual couldn't remember the password?

15  A    You know, I think if that -- if there was some way to

16  verify that were true, I think that that would be less

17  concerning, other than he just simply wouldn't give it up.

18          MR. WELLS:  All right.  I don't have any further

19  questions.

20          THE COURT:  Thank you.  And just to follow up on one

21  of Mr. Wells's questions, as far as timing, would it make a

22  difference if the refusal was close in time to when the

23  computer was received or some time later?

24          THE WITNESS:  Yes, sir, because I think -- I think

25  that if we're talking about a memory issue, I think it's less

1  likely that the password will have been forgotten if it was

2  closer to the seizing of it.

3          THE COURT:  Thank you.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  You may step down.

6          (Witness excused)

7          THE COURT:  Let me share a couple things with the

8  parties I'd like to make sure you are prepared to address in

9  your briefings.

10          Number one, in regard to the PSR, if you will look at

11  Docket 54, the objections by the defendant to Paragraphs 39 and

12  51, I would like the names -- apparently, Mr. Wells referred to

13  the names of his daughters by their names.  I would like those

14  removed and only initials used, please.

15          MR. WELLS:  Sorry about that, Judge.  That was just

16  in an email.  I was not anticipating that would have been

17  filed.

18          THE COURT:  No, I just want to clean that up now.

19          MR. WELLS:  Okay.  That's fine.  It just occurred to

20  me.  I didn't even think about that.

21          THE COURT:  No, that fine.  We'll just get that -- if

22  you can make that change, I would appreciate that.  I'm

23  assuming there are no objections to that change.

24          MR. WELLS:  No, there's no objection to that change.

25          MR. REARDON:  No.

```
 1              THE COURT:  All right.  Couple things.  Let's talk
 2   about, obviously, the hypothetical we've all been dancing
 3   around here today, which has to do with the computer at issue.
 4   Has the Government taken every step available to it to access
 5   the information on that computer?  And if you need to run out
 6   and grab your agents before they leave --
 7              MR. REARDON:  Could I ask -- Special Agent Darrel
 8   Allison is here.  I'm happy to bring him up and we can put him
 9   on the stand.
10              THE COURT:  You don't have to put him on the stand.
11   You can just tell me.
12              MR. REARDON:  If I could have just a moment?
13              (Discussion off record)
14              MR. REARDON:  Your Honor, the computer was seized.
15   It was examined here locally.  They were unable to get into it.
16   Sent it to Quantico for further examination.  The experts at
17   FBI headquarters in Quantico have been unable to get into it.
18   I don't know, and if I did, I wouldn't be able to tell you the
19   specific methods that were used, but at this point, it's been
20   sent to the highest level of computer forensic examination
21   available within the FBI, and breaking that encryption has not
22   been possible.
23              THE COURT:  Thank you.  So I would like, in your
24   briefing, both of you to address the issue that the locked
25   computer presents to the Court in deciding what is an
```

1   appropriate sentence in this case.  Obviously, it has

2   implications to public safety, as we have heard from this

3   expert today, because it makes it difficult for me to

4   understand the breadth and depth of the defendant's conduct in

5   this case.

6          The Government has certainly -- I mean, Mr. Wells has

7   certainly indicated that he's been cooperative and he's tried

8   to be helpful, and he's under no obligation to provide

9   information against himself in the form of the computer.  It

10   may all be well and true, but the Government has taken the

11   opposite position, which is they are concerned there's more

12   nefarious information on that computer that is now being kept

13   out of the discussion here, and that counsels the Court to be

14   more concerned about the dangers as presented by the defendant.

15          So you all better be prepared to address that,

16   because that's going to be one of the factors I'm taking into

17   consideration when deciding how much time this gentleman's

18   going to spend in jail.  I will tell you he's looking at a

19   remarkably long period of time as a possible sentence in this

20   case and some of that is going to obviously depend upon my

21   evaluation of the 3553(a) factors, which implicates not only

22   the information referred to here today and what you all are

23   going to file, but my assessment of how dangerous he, in fact,

24   is.

25          I think it also may have some implications as to

1  whether or not he's actually accepted responsibility for his

2  conduct.  So I think you all need to be prepared to address

3  that.

4          As a separate matter, I'd like you to also, in your

5  briefing, be prepared to address acceptance of responsibility

6  as it pertains to the obstructive behavior that the Probation

7  Office has found in this case, and I haven't had a chance to

8  take a look at 3C1.1 and the cases that address that issue, but

9  clearly, it's an important issue for him in this case as to

10  whether or not he should get -- right now, the report finds a

11  two-level enhancement for obstruction of justice, but it also

12  finds a three-level departure for acceptance of responsibility

13  and that needs to be addressed.  And I am concerned about

14  making sure that I give both of you a sufficient opportunity to

15  address those issues.

16          So again, I've given you a briefing schedule.  I'd

17  like to make sure that if you are going to be referring to case

18  law that you give me pinpoint citations that support your

19  respective positions on some of the issues I've raised and the

20  other sentencing issues that are out there in your supplemental

21  sentencing memoranda.  I would also like pinpoint citations to

22  any testimony that has been elicited here today, or that will

23  be submitted in the form of -- is it an affidavit or report?

24  I'm not sure which it's going to be.

25          MR. WELLS:  It would be an -- a report, Your Honor.

1    THE COURT:  Okay.  Again, pinpoint citations to that

2  report, because I'm sure that's going to be submitted as a

3  countervailing report to the information we've heard here

4  today.  And those were the matters I wanted to mention to you.

5    Is there anything else either one of you want to talk

6  about today?

7    MR. REARDON:  Your Honor, I know when I got here four

8  years ago, the Court did this, and we've stopped doing it.

9  Does it assist the Court to have hyperlinks embedded into the

10  filings.

11    THE COURT:  Absolutely.  It absolutely is beneficial.

12    MR. REARDON:  Then I will try and do that.  And I

13  want to state for the record, Your Honor, I think our argument

14  is clear, we'll certainly reiterate it in whatever supplemental

15  filings we have.  We recognize the defendant's Fifth Amendment

16  right.  We're not in front of a jury, so those concerns are a

17  little bit mitigated, but our argument as concerns the

18  encryption and our ability to access that is not a comment on

19  his right to remain silent, but simply directed to, as the

20  Court said, his acceptance of responsibility and all of the

21  things we don't know about his risk factors.

22    THE COURT:  I understand what you're saying, and

23  again, I wanted to make clear, he may have very valid reasons,

24  and as I think I articulated in the hypothetical I presented to

25  our last witness, there may be a myriad of other reasons that

1    have nothing to do with this case that one would not want to

2    expose by providing access to the computer.  But it does

3    implicate the Court's ability to understand the depth and

4    breadth of the conduct and use that in order to make a fair

5    assessment as to the risk he presents going forward.  And so,

6    you know, it is what it is.

7            I am a little confused by Mr. Wells's comment that

8    this is somehow a matter of him simply forgetting his access

9    code.  That's the first time I've heard that.  In the materials

10   I've read, all I saw was, at the time it was seized, he

11   provided information and agreed to be interviewed, but at that

12   time, refused to provide the access code.  So I don't know if

13   there was some other correspondence or communications between

14   the parties in which he's now taken the position that oh, I

15   just can't remember now, I don't remember the password.  I

16   guess that would be a different matter, but that's not before

17   me.

18           MR. REARDON:  Yes, Your Honor.

19           THE COURT:  Other than what I heard here today.

20           MR. REARDON:  Understood.

21           THE COURT:  Okay.  Any other questions?

22           MR. REARDON:  No.  Just to reiterate, the briefing

23   schedule is supplemental memos March 23rd with responses a week

24   later March 30th.

25           THE COURT:  Correct.

1          MR. REARDON:  Hearing on April 6th at 9 a.m.

2          THE COURT:  And I would appreciate the hyperlinks.

3    Thank you very much.  We'll be in recess.

4          DEPUTY CLERK:  All rise.  This matter is now

5    adjourned.  This court stands in recess until 1 p.m.

6          (Proceedings concluded at 12:00 noon)

7

8                         CERTIFICATE

9          I, R. Joy Stancel, Federal Official Realtime Court
     Reporter in and for the United States District Court for the
10   District of Alaska, do hereby certify that the foregoing
     transcript is a true and accurate transcript from the original
11   stenographic record in the above-entitled matter and that the
     transcript page format is in conformance with the regulations
12   of the Judicial Conference of the United States.

13      Dated this 30th day of March, 2018.

14
                              /s/ R. Joy Stancel
15                   _____
                          R. JOY STANCEL, RMR-CRR
16                   FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25