# Exhibit 2



**U.S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| *Elizabeth R. Pozolo*<br>*Assistant United States Attorney* | *Dirksen Federal Courthouse*<br>*219 South Dearborn Street, Fifth Floor*<br>*Chicago, IL 60604* | *Direct Line: (312) 469-6131*<br>*E-mail: elizabeth.pozolo@usdoj.gov* |

August 8, 2022

<u>***Via Email and U.S. Mail (Enclosures)***</u>

Jennifer Bonjean
Bonjean Law Group, PLLC
750 Lexington Avenue, 9th Floor
New York, New York 10022
*Counsel for Robert Kelly*

Mary Judge
Federal Defender Program
55 East Monroe, Suite 2800
Chicago, Illinois 60603
*Counsel for Milton Brown*

Vadim A. Glozman
Law Offices of Vadim A. Glozman
53 West Jackson Boulevard
Suite 1410
Chicago, Illinois 60604
*Counsel for Derrel McDavid*

Beau B. Brindley
Law Offices of Beau B. Brindley
53 West Jackson Boulevard
Suite 1410
Chicago, Illinois 60604
*Counsel for Derrel McDavid*

Re:    ***United States v. Robert Sylvester Kelly, et al.,* No. 19 CR 567**

Dear Counsel:

The government submits this supplemental expert disclosure for Dr. Darrel Turner, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G).

<u>Background and Qualifications</u>

Dr. Darrel Turner has spent approximately 18 years in the field of clinical psychology. As described in his curriculum vitae, Dr. Turner has extensive experience conducting forensic and trial evaluations of adults and juveniles. In his private clinical practice, Dr. Turner has treated hundreds of victims of sexual abuse. Dr. Turner is one of fifteen Experts in Offender Psychology appointed to the U.S. Department of Justice National Strategy SME Child Exploitation and Human Trafficking Council to U.S. Congress. Dr. Turner regularly presents on topics related to child exploitation, including the grooming process. For example, Dr. Turner is scheduled to present at the internationally recognized Crimes Against Children Conference in Dallas, Texas, during the week of August 8, 2022. Specifically, Dr. Turner will be giving presentations about grooming and detecting deception among

child molesters. Dr. Turner has also presented on his peer-reviewed publication, "Grooming and Other Offense-Related Behaviors in Child Molestation Cases: An Analysis of Offender Self-Reported Behaviors and Beliefs." *See* Exhibit A.

Dr. Turner has been qualified as a clinical and forensic psychology expert in numerous court cases, including over a dozen federal criminal cases. *See* Case List, attached as Exhibit B. For example, a transcript of Dr. Turner's testimony in *United States v. Telles*, Case No. 16 CR 424 (N.D. Cal. 2019), an online enticement and international child sex traveler case, was provided to you with the government's expert disclosure dated July 1, 2022. The Ninth Circuit affirmed the conviction in that case and upheld Dr. Turner's testimony on the topics of grooming and victims' delayed disclosure of abuse. *See United States v. Telles*, 18 F.4th 290, 302-03 (9th Cir. 2021). Additional transcripts of Dr. Turner's testimony in child exploitation cases are enclosed with this supplemental disclosure, including:

- *United States v. Ebert*, Case No. 19 CR 244 (W.D.N.C. 2020) (Exhibit C)
- *United States v. Disney*, Case No. 12 CR 287 (E.D. Pa. 2013) (Exhibit D)
- *United States. v. Gillis*, Case No. 15 CR 226 (M.D. Fla. 2016) (offender risk assessment) (Exhibit E)

Expected Testimony

Dr. Turner will present general expert testimony on the topics listed in the government's disclosure dated July 1, 2022. These topics fall into two main categories: (1) the grooming behavior of sex offenders against children; and (2) delayed/partial disclosures by victims. Dr. Turner's opinions are based on his training, experience, and research, as detailed in his curriculum vitae. Dr. Turner has not reviewed any case-specific materials for this case and has not been provided with any facts specific to the offender or victims in this case, other than the names of the defendants.

Specifically, Dr. Turner is expected to testify about the following:

*The process of grooming*

Grooming in the context of child molestation by adults is the process by which offenders isolate intended victims, gradually introduce sexual themes and behaviors to systematically desensitize victims to the introduction of sex into the relationship, and prevent victims from disclosing.

Various specific behaviors have been identified by researchers and scholars as grooming by adult offenders, such as identifying or targeting specific children, giving gifts, giving compliments, special treatment or special activities, engaging in peer-like environments and sexual desensitizing, isolation, placing the responsibility on

the child, secrecy, and favoritism. Grooming is directly intended to facilitate access to the victim, however, the process also serves to manipulate family members of potential victims and individuals in the victim's social network, in order to facilitate abuse.

The offender isolates the victim in an effort to destroy the victim's frame of reference. The offender then becomes the frame of reference for the victim. Once the offender has isolated the victim, the offender often gradually introduces sexual themes, which may include jokes, references to pornography, other sexual images or references, so that the victim slowly becomes adjusted to sexual acts being a part of the relationship. This is the process by which an offender "normalizes" sexual acts with the child victim.

Research shows that grooming establishes an emotional connection, establishing trust and rapport between the offender and the victim. The offender uses the grooming process to pick up on insecurities and vulnerabilities of the victim and then uses these to develop trust and dependency. Offenders typically demonstrate antisocial behaviors that enable them to act as master manipulators of insecure and vulnerable victims. Offenders will often target victims who are disenchanted with home-life and life circumstances, display insecurities or depression, and are therefore easier to manipulate and control.

The grooming process can also involve gifts (according to one study, 43% of offenders report using gifts), but these gifts are often tied to the emotional connection with the victim and can reinforce this relationship on multiple levels.

Isolation often causes the child victim to feel complicit in the activities, including the abuse, and very often leads the victim to feel an emotional connection with the offender. These very by-products of the grooming phase are a direct cause of delayed or non-disclosure of child sexual abuse.

*Delayed disclosure*

The process of grooming develops a strong emotional connection between the offender and the victim. In one study, 46% of victims reported being in love with or feeling a close friendship with the offender.

Because the grooming process has established trust and an emotional connection, the victim has already been taught not to disclose. The victim may be afraid of getting in trouble. The offender has groomed the victim away from their family and authority figures who would be the figures they would disclose to.

Of those victims who do disclose their sexual abuse, a significant number don't disclose until adulthood. Over half of victims wait at least three years to disclose fully.

A very small percentage of sexual abuse crimes are reported; a very small percentage of all sexual abuse crimes result in criminal convictions. Victims will often defend the offender. Partial disclosure of the abuse is also a common result after a victim has been groomed by an offender. The victim will often test how adults react to partial details of the abuse to see whether it is safe to tell all of the details.

In support of his opinions, Dr. Turner will reference his own clinical experience, research, and expertise. He will also reference findings from some of the following studies:

- Akdeniz, Y. (2009). Internet Child Pornography and the Law: National and International Responses. Surrey: Ashgate Publishing.
- Beauregard, E., Proulx, J., Rossmo, D.K., Leclerc, B., & Allaire, J.F. (2007). A script analysis of patterns in the hunting process of serial sex offenders. Criminal Justice and Behavior, 34, 1069-1084.
- Bennett, N., & O'Donohue, W. (2014). The construct of grooming in child sexual abuse: conceptual and measurement issues. Journal Of Child Sexual Abuse, 23(8), 957-976. doi:10.1080/10538712.2014.960632.
- Black, P. J., Wollis, M., Woodworth, M., & Hancock, J. T. (2015). Research article: A linguistic analysis of grooming strategies of online child sex offenders: Implications for our understanding of predatory sexual behavior in an increasingly computer-mediated world. Child Abuse & Neglect, 44140-149. doi:10.1016/j.chiabu.2014.12.004.
- Brackenridge, C. H. (2001). Spoilsports: Understanding and preventing sexual exploitation in sports. London, England: Routledge.
- Christiansen, J. R., & Blake, R. H. (1990). The grooming process in father-daughter incest. In A. L. Horn (Ed.) The incest perpetrator: A family member no one wants to treat (pp. 88 – 98). Thousand Oaks, CA: Sage.
- Craven, S., Brown, S., & Gilchrist, E. (2006). Sexual grooming of children: Review of literature and theoretical considerations." Journal of Sexual Aggression, 12, 287-299.
- Elliott, I. A. (2017). A Self-Regulation Model of Sexual Grooming. Trauma, Violence, & Abuse, 18, 83-97.
- Elliott, M., Browne, K., & Kilcoyne, J. (1995). Child sexual abuse prevention: What offenders tell us. Child Abuse and Neglect, 19, 579-594.
- European Online Grooming Project: Webster, S., Davidson, J. Bifulco, A., Gottschalk, P., Caretti, V., Pham, T., Grove-Hills, J., Turley, C., Tompkins, C., Ciulla, S., Milazzo, V., Schimmenti, A., & Craparo, G. 2012. European Online Grooming Project Final Report. European Union. Retrieved April 21, 2012 (http://www.european-online-grooming-project.com/).
- Finkelhor, D. (1984). Child sexual abuse: New theory and research. New York, NY: Free Press
- Hanson, R. K. & Morton-Bourgon, K. E. (2005). The characteristics of persistent sexual offenders: A meta-analysis of recidivism studies. Journal of

Consulting and Clinical Psychology, 73, 1154-1163. doi: 10.1037/0022-006X.73.6.1154.

- Hare, R. D. (2003). Hare PCL-R, 2nd edition. New York: Multi-Health Systems.
- Howitt, D. (1995). Pedophiles and sexual offences against children. Oxford, England: John Wiley and Sons.
- Kaufman, K.L., Hilliker, D.R., & Daleiden, E.L. (1996). Subgroup differences in the modus operandi of adolescent sexual offenders. Child Maltreatment, 1, 17-24.
- Leberg, E. (1997). Understanding child molesters: Taking charge. Thousand Oaks, CA: Sage.
- McAlinden, A.M. (2006). 'Setting 'em up'. Personal, familial, and institutional grooming in the sexual abuse of children. Social and Legal Studies, 15, 339-362.
- McElvaney, R. (2015). Disclosure of child sexual abuse: Delays, non-disclosure, and partial disclosure. What the research tells us and implications for practice. Child Abuse Review, 24, 159-169.
- Moors, R., & Webber, R. (2012). The dance of disclosure: Online self-disclosure of sexual assault. Qualitative Social Work, 12, 799-815.
- O'Connell, R. (2003). A typology of cyber sexploitation and online grooming practices. Preston, England: University of Central Lancashire. Retrieved from http://www.uclan.ac.uk/host/cru/docs/cru010.pdf
- Olson, L.N., Daggs, J.L., Ellevoild, B.L., & Rogers, T.K. (2007). Entrapping the innocent: Toward a theory of child sexual predators' luring communication. Communication Theory, 17, 231-251.
- Ospina, M., Harstall, C., & Dennet, L. (2010). "Sexual exploitation of children and youth over the internet: A rapid review of the scientific literature." Retrieved May 2, 2012 (http://www.ihe.ca/documents/Online%20Sexual%20Exploitation.pdf).
- Ost, S. (2009). Child Pornography and Sexual Grooming: Legal and Societal Responses. Cambridge: Cambridge University Press.
- Proeve, M., & Howells, K. (2002). "Shame and guilt in child sexual offenders." International Journal of Offender Therapy and Comparative Criminology, 46, 657-667.
- Przbylski, Roger (2015). Recidivism of Adult Sexual Offenders. Sex Offender Management Assessment and Planning Initiative Research Brief.
- Salter, A.C. (1988). Treating Child Sex Offenders and Victims: A Practical Guide. London: Sage Productions.
- Smallbone, S., & Wortley, R. (2000). Child sexual abuse in Queensland: Offender characteristics and modus operandi: Full report. Brisbane, Australia: Queensland Crime Commission.
- Sullivan, J., & Beech (2004). A comparative study of demographic data relating to intra- and extra-familial child sexual abusers and professional perpetrators. Journal of Sexual Aggression, 10, 39-50.

- van Dam, C. (2001). Identifying child molesters: Preventing child sexual abuse by recognizing the patterns of offenders. Binghamton, NY: The Haworth Press.
- Ward, T. (2000). Sexual offenders' cognitive distortions as implicit theories." Aggression and Violent Behavior, 5, 491-507.
- Whittle, H. (2015). A comparison of victim and offender perspectives of grooming and sexual abuse. Deviant Behavior, 36, 539-564.
- Whittle, H., Hamilton-Giachritses, C., Beech, A., & Collings, G. (2013). A review of young people's vulnerabilities to online grooming. Aggression and Violent Behavior, 18, 135-146.
- Whittle, H., Hamilton-Giachritses, C., Beech, A., & Collings, G. (2013a). A review of online grooming: Characteristics and concerns." Aggression and Violent Behavior, 18, 62-70.
- Williams, R., Elliott, I. A., & Bech, A. R. (2014). Identifying sexual grooming themes used by internet sex offenders. Deviant Behavior, 34, 135-152. Doi:10.1080/01639625.2012.707550
- Wolf, S.C. (1984). A model of sexual aggression/addiction. Journal of Social Work and Human Sexuality, 7, 131-148.

The below articles are also enclosed, for your reference.

- Somer, Variables in Delayed Disclosure of Childhood Sexual Abuse (Exhibit F)
- Hebert, Prevalence of Childhood Sexual Abuse and Timing of Disclosure in a Representative Sample of Adults from Quebec (Exhibit G)
- London, Disclosure of Child Sexual Abuse (Exhibit H)

Very truly yours,

JOHN R. LAUSCH, JR.
United States Attorney

By:    *Elizabeth R. Pozolo*
Elizabeth R. Pozolo
Jeannice W. Appenteng
Jason A. Julien
Brian Williamson
Assistant United States Attorneys

6

# Exhibit A

Grooming and other Offense-Related Behaviors in Child Molestation Cases: An Analysis of

Offender Self-Reported Behaviors and Beliefs

Abstract

Most scholars agree that adult offenders who perpetrate sexual abuse of children engage in preparatory grooming behaviors to facilitate this abuse.  The current study explored this phenomenon from the perspective of child molesters - gathering information from sexual offenders about this constellation of behaviors and their attitudes and beliefs surrounding it. Adult first-time male sex offenders (N = 23) in a post-conviction outpatient treatment program with one or more child victims volunteered to participate in an anonymous study examining grooming behaviors.  Participants engaged in a structured interview about specific grooming behaviors which also included a free-response portion in which offenders discussed their own grooming behaviors as well as their general thoughts on grooming in general.  This portion also included the offender's thoughts on grooming as a construct (i.e., does it exist) and the qualitative difference between grooming a child for sexual purposes and pursuing a sexual relationship with a consenting adult (47.8% felt there was no difference between the two sets of behaviors).  Data analysis also suggested five distinct indexes: the Grooming Index, Predatory Behavior Index, Efforts to Avoid Detection Index, Perpetuating Behavior Index, and Cognitive Distortion Index. Results are discussed in relation to applied field settings.

    *Keywords:* sexual offender, grooming, child sexual abuse

Grooming and other Offense-Related Behaviors in Child Molestation Cases: An Analysis of

Offender Self-Reported Behaviors and Beliefs

Grooming in the context of child molestation by adults is the process by which offenders

isolate intended victims, gradually introduce sexual themes and behaviors to systematically

desensitize victims to the introduction of sex into the relationship, and prevent victims from

disclosing. Though many definitions have been proffered, these fundamental aspects are agreed

upon by the majority of authors in the field (Whittle, 2015; Olson, Daggs, Ellevoid, & Rogers,

2007; McAlinden, 2006; Elliot, 2017; & Whittle, Hamilton-Giachritsis, & Beech, 2015). Some

scholars do not, however, include disclosure prevention in their conceptualization of this

construct (Williams, Elliott, & Beech, 2013). Regardless, this preparatory process has been

acknowledged by most scholars in the field of adults who sexually offend against children

(Beauregard, Proulx, Rossmo, Leclerc, & Allaire, 2007; Finkelhor, 1984; Kaufman, Hilliker, &

Daleiden, 1996; Smallbone & Wortley, 2000; Wolf, 1984). Grooming is directly intended to

facilitate access to the victim, however; the process also serves to manipulate family members of

potential victims and individuals in the victim's social network in order to facilitate abuse as well

(McAlinden, 2006; Craven, Brown, & Gilchrist, 2006). Grooming can involve physical,

psychological, and social or community-based strategies to facilitate and perpetration of sexual

abuse (Leberg, 1997). Various specific behaviors have been identified by researchers and

scholars, such as identifying or targeting specific children (van Dam, 2001; Brackenridge, 2001;

engaging in peer-like environments and sexual desensitizing (van Dam, 2001), tickling and

bathing (Howitt, 1995; Bennett & O'Donohue, 2014), isolation (van Dam, 2001; Brackenridge,

2001; McAlinden, 2006; Whittle et. Al, 2015; Elliott, 2017), placing the responsibility on the

child (van Dam, 2001), secrecy (Brackenridge, 2001; Christiansen & Blake, 1990), and

favoritism (Christiansen & Blake, 1990).

Most theoretical approaches to grooming suggest a stage or model process, whereby

offenders engage in steps to facilitate the sexual abuse. A brief overview of one such stage

theory, as developed by O'Connel (2003), follows. The first stage, known as the *Friendship*

*Forming Stage,* involves the offender making contact with the targeted victim and establishing

rapport, such as learning about likes and dislikes. This friendship is furthered in the next stage,

the *Relationship Forming Stage,* whereby the offender discusses more personal constructs, such

as family, friends, and social lives, and compassion is shown. The offender then engages in the

*Risk Assessment Stage*, which involves more careful analysis of both the intended victim's

behavior patterns and the likelihood of being caught. In the *Exclusivity Stage,* which follows,

offenders make efforts to avoid detection through isolating the victim. This may also involve

threats against the victim to guarantee secrecy, which could involve threats of violence, threats

about the impact on the victim's family, or even threats about the potential loss of the

relationship with the offender (Black et al., 2015). Lastly, the *Sexual Stage* takes place, during

which the offender engages in sexualized behavior with the victim including viewing

pornography, having sexualized conversations, and discussing the next step of a sexual

relationship. Again, numerous models have been proposed which explain the process of

grooming equally as thoroughly (McAlinden, 2006; Williams, Elliott, and Beech, 2013) to

include Elliott's Self-Regulation Model of Sexual Grooming (2017), and Olson et. al's 2007

study examining Child Sexual Predators' luring communication patterns (2007).

However, although some have postulated definitions and mechanisms, no true consensus

exists in the clinical, research, or forensic fields as to what grooming actually entails, making

description and adequate measurement nearly impossible. Bennet and O'Donohue (2014), rightly noting this, attempted to generate a uniform approach to defining it, synthesizing scholar definitions into a two part definition of grooming: "(a) the behavior being evaluated must in and of itself be inappropriate and a case for this inappropriateness must be made, and (b) a sound argument must be presented that the behavior or behaviors increases the likelihood of future sexual abuse" (p 969). They provide examples of behavior that meet their criteria, such as: sexualization of relationships, gift giving, inappropriate touching, isolation, favoritism, secrecy, boundary violations, and providing the child with substances (e.g., drugs and alcohol).

Research of grooming has increased in quantity over the last decade, with some works examining the consequences of legal and societal responses to grooming and the use of child pornography (Ost, 2009; Akdeniz, 2009). Additionally, a large body of work examines the quality of grooming in the context of the internet (Whittle, Hamilton-Giachritsis, Beech, 2014; Whittle, Hamilton-Giachritses, Beech, Collings, 2013; Whittle, Hamilton-Giachritsis, Beech, 2014; and Kloess, Hamilton-Giachritsis, & Beech, 2017). Among the most seminal of these works is the European Grooming Project report on online grooming (2012).

In the present study, we sought to further the growing understanding of grooming behaviors by conducting structured interviews of adult male sexual offenders who offended against children focusing on specific grooming and offense-related behaviors as well as their opinions about grooming in general. This allowed for examination of what offenders believe to constitute grooming behaviors, how these behaviors take place, and the context in which they emerge. Of particular interest was sexual offenders' perceptions about what does and does not constitute grooming, as we believe this can help inform clinical work, research, and forensic practice, including cause, effect, treatment, and prevention of sexual abuse. We foresee

information gained from this research being directly applicable in applied work, such as forensic psychology (i.e. risk assessment evaluations and treatment of sex offenders and their victims) and law enforcement (i.e. formulating interview approaches of suspects). In our opinion, informing the knowledge base about particular behaviors with information from the persons that engage in them is of particular benefit given that the "outside" view of these behaviors by those involved in such cases may not accurately represent the view held by those perpetrating. Such an understanding will, hopefully, facilitate communication with offenders by professionals in mental health or legal capacities.

## Method

We conducted structured interviews with 23 first-time sexual offenders enrolled in a post-prison release group outpatient sexual offender treatment program. All offenders were adult males who had offended against at least one child and had been convicted. The treatment program is a condition of their supervised release (eg. parole, probation, deferred adjudication), and it is facilitated by Master's level Licensed Sex Offender Treatment Providers. Participants were compensated by being allowed to miss one homework assignment or one group meeting without sanction by the outpatient facility. A Licensed Clinical Forensic Psychologist conducted the interviews which each lasted approximately 45 minutes.

In addition, participants were guaranteed that the treatment providers at the outpatient clinic where they received treatment would neither ask researchers about participant responses nor would researchers discuss the offenders' responses with treatment clinic. Given the propensity of sex offenders to engage in positive impression management and tendency to be less than completely forthright about the extent of their abusive behaviors (Salter, 1988; Proeve &

Howells, 2002), this aspect of the study was important in the effort to obtain valid and accurate responses from the participants.

**Materials and Procedure**

  **Structured interview.** Participants in our study underwent a structured interview to assess their beliefs and behaviors related to sexual offending behaviors and grooming. A Licensed Clinical Forensic Psychologist asked them specific questions pertaining to known grooming behaviors (eg., isolating the victim, giving gifts, showing special attention to the intended victim), as well as those related to predatory behavior, efforts to avoid detection, and behaviors that perpetuate or promote sexual dysregulation or offending. Participants were also asked general opinion questions about grooming (e.g., whether it is an actual phenomenon, whether it differs from an adult male pursuing an adult female for consensual sex), and open-ended questions about which grooming behaviors they perpetrated. Participants were also asked to discuss grooming behaviors in general in the open-ended portion of the interview, not necessarily specific behaviors in which they themselves had engaged. This line of questioning occurred regardless of whether they themselves believed they groomed their own victims. The offenders also provided information about their victims, their behavior during the offense (e.g., using substances during the offense), the presence of a personal sexual abuse history, the use of pornography either with victims or as a means of masturbatory fantasy, and basic demographic information.

  *Grooming Index.* We created a Grooming Index, which was a sum of the items that tapped specific grooming behaviors that the sexual offenders were asked to endorse as either having engaged or not engaged in during the time period prior to their sexual offending with their victim(s) or immediately surrounding it. This Index included the following behaviors:

talking about sex with the victim, graduated touching, giving compliments, giving gifts, showing adult-only pornography to the victim, showing child-involved pornography to the victim, being nude in the home (without a sexual nature), making online contact, and consuming alcohol with the child victim.

*Predatory Behavior Index.* We created a Predatory Behavior Index, which was a sum of items that tapped specific predatory behaviors that sexual offenders were asked to endorse as engaging or not engaging in during the time period prior to their sexual offending with their victim(s) or immediately surrounding it. This Index included the following behaviors: targeting families with children, seeking employment with access to children, and isolating their victim away from others.

*Efforts to Avoid Detection Index.* We created an Efforts to Avoid Detection Index, which was a sum of items that tapped specific detection-avoiding behaviors. The sexual offenders were asked to indicate whether they did or did not engage in these behaviors during the time period prior to their sexual offending with their victim(s) or immediately surrounding it. This Index included the following behaviors: using physical violence, threatening physical violence, asking the victim not to tell others, telling the victim not to tell others, warning the victim of the impact disclosing would have on the victim's family, warning the victim that others would disbelieve the victim, and threatening the victim with the loss of his/her relationship with the offender.

*Perpetuating Behavior Index.* We created a Perpetuating Behavior Index, which was a sum of items that tapped specific behaviors that perpetuate or promote sexual dysregulation or offending that sexual offenders were asked to endorse as engaging or not engaging in during the time period prior to their sexual offending with their victim(s) or immediately surrounding it.

This Index included the following behaviors: viewing child pornography, masturbating to fantasies or actions similar to the perpetrator's offending, viewing pornography similar to the offense (eg. viewing pornography involving sex with a babysitter when the intended victim was working as a babysitter for the offender), and masturbating to memories of the abuse of the victim.

*Cognitive Distortions Index.* We created a Cognitive Distortions Index, which was a sum of items that tapped specific endorsement of items indicative of thinking errors supportive of offense behaviors. The offenders were asked to indicate yes or no agreement with two statements surrounding their victim(s): 1) feeling the victim(s) wanted the sexual contact, and 2) feeling the victim(s) initiated the sexual contact.

*Free-Response Grooming Behavior Items.* The sexual offenders were additionally asked two free-response questions related to grooming behaviors. The first required the offenders to describe grooming behaviors they participated in, while the second required offenders to describe grooming behaviors in general and what the process of grooming might entail. These free-response items were coded into categories based upon their free responses, resulting in 11 total categories: Complimenting, Giving Gifts, Special Activities, Special Treatment, Desensitization, Rapport, Trust, Manipulation, Rationalization, Access, and Other.

*Opinion Questions.* The participants were asked opinion questions about grooming. Specifically, they were asked to respond to whether they participated in grooming, if grooming actually existed and occurred in the community (i.e., was it a real construct), and if the types of behaviors used on children in grooming were the same types of behaviors used on adults in courting (i.e., is grooming children the same as "grooming" adults who are the object of sexual interest).

## Results

The 23 male sexual offenders in our sample were, on average, 32.04 years old ($SD$ = 10.12) at the time of their offense and 40.70 years old ($SD$ = 12.80) at the time of the study. The majority (52.2%, $n$ = 12) identified as Hispanic, 34.8% ($n$ = 8) identified as Caucasian, two offenders identified as African American (8.7%), while one offender identified as Asian (4.3%). All had been convicted of at least one contact sexual offense against a minor, had received some sort of sanction through the court, and were currently in free society under some type of supervision and receiving mandatory sex offender treatment. The offenders had an average of 1.48 victims ($SD$ = 1.16, range = 1 – 5). The average time between meeting their victim(s) and engaging in illegal sexual behavior ranged from 1 to 5,110 days/14 years ($M$ = 997.12 days/2.73 years, $SD$ = 1,477.24 days/ 4.05 years, Median = 365.00 days/1 year).

### Grooming Index

The Grooming Index was composed of yes or no responses to the following eight behaviors: giving compliments (60.9%), graduated touching (52.2%), giving gifts (43.5%), talking about sex with the victim (34.8%), consuming alcohol with the child victim (30.4%), showing adult-only pornography to the victim (21.7%), %), making online contact (17.4%), being nude in the home (without a sexual nature; 13.0%), and showing child-involved pornography to the victim (4.3%). On average, the participants endorsed 2.78 behaviors ($SD$ = 1.81, range = 0 – 6). The Total Grooming Index Score was positively correlated with the Total Predatory Behavior Score ($r$ = .45, $p$ = .031).

### Predatory Behavior Index

The Predatory Behavior Index was composed of yes or no responses to the following three items: isolating their victim away from others (56.5%), targeting families with children

(4.3%), and seeking employment with access to children (4.3%). On average, the participants endorsed 0.65 behaviors ($SD = 0.57$, range $= 0 - 2$). The Predatory Behavior Index Score was positively correlated with the Grooming Index Score (described previously), as well as the Cognitive Distortions Index ($r = .42$, $p = .044$).

**Efforts to Avoid Detection Index**

The Efforts to Avoid Detection Index was composed of yes or no responses to the following six items: asking or telling the victim not to tell others (30.4%), using physical violence (17.4%), threatening the victim with the loss of his/her relationship with the offender (13.0%), threatening physical violence (4.3%), warning the victim of the impact disclosing would have on the victim's family (4.3%), and warning the victim that others would disbelieve the victim (4.3%). On average, the participants endorsed 0.74 behaviors ($SD = 0.92$, range $= 0 - 3$). The Predatory Behavior Index Score was positively correlated with the Cognitive Distortions Index ($r = .45$, $p = .033$).

**Perpetuating Behavior Index**

The Perpetuating Behavior Index was composed of yes or no responses to the following four items: masturbating to memories of the victim (17.4%), masturbating to fantasies or actions similar to the perpetrator's offending (8.7%), viewing child pornography (4.3%), and viewing pornography similar to the offense (4.3%). On average, the participants endorsed 0.35 behaviors ($SD = 0.57$, range $= 0 - 2$). The Perpetuating Behavior Index was not significantly related to any of the other Indexes.

**Cognitive Distortions Index**

The Cognitive Distortions Index was composed of yes or no responses to the following two items: feeling the victim(s) wanted the sexual contact (69.6%) and feeling the victim(s)

GROOMING AND OTHER OFFENSE-RELATED BEHAVIORS                                    12

initiated the sexual contact (30.4%). On average, the participants endorsed 1.13 thoughts ($SD$ =

0.76, range = 0 – 2). The Cognitive Distortions Index was significant correlated with the Efforts

to Avoid Detection Index and the Predatory Behavior Index (both as previously described).

**Free-Response Grooming Behavior Items**

The offenders provided 132 free response answers to the two questions pertaining to the

grooming behaviors in which they engaged and in what behaviors they constituted grooming in

general. These answers could differ from the Index scores in that those were specific probes

requiring yes/no answers while these grooming questions were asked prior to those. This allowed

for un-cued answers and, thus, an untainted analysis of grooming behaviors in which these

sexual offenders believed they may have been engaging. Table 1 presents the responses coded

into 11 categories, based on deductive coding strategies, summarized by what the offenders

believed to be their grooming behaviors in comparison to of what they believed grooming

behaviors in general likely consisted.  Offenders saw themselves as engaging more in categories

such as Special Treatment and Desensitization and provided notably more Rationalizations than

they attributed to occurring in grooming in general. They were more likely to attribute Giving

Gifts, Rapport, Trust, and Manipulation as occurring during grooming but engaged in by

themselves.

**Opinion Questions**

When asked whether they participated in grooming, only 43.5% affirmatively answered

that they had engaged in grooming behaviors, although 87.0% agreed that grooming existed and

occurred in the community (i.e., was it a real construct). Perhaps most interesting, 47.8% of the

offenders stated that the types of behaviors used by adults on children during the grooming

process were no different than the types of behaviors adults use on adults in courting (i.e., "Is grooming children the same as "grooming" adults of sexual interest?").

## Discussion

Overall, the sexual offenders in our sample perpetuated a wide array of grooming-related behaviors across a number of different domains. For instance, nearly 60% endorsed at least one item on the Grooming Index (giving compliments), while nearly 57% endorsed at least one item on the Predatory Behavior Index (isolating their victim). However, what we find to be most notable is that participants believe that grooming of intended child victims for sexual assault by an adult was no different from behaviors engaged in by an adult who is attempting to establish a sexual relationship with another consenting adult. Nearly half (47.8%) of participants indicate there was no difference between these two wholly opposite sexual behaviors. This finding, combined with the finding regarding the belief among participants that their child victims desired the sexual contact (69.6%) and the finding that nearly one third indicated that they felt the child victim(s) actually initiated the sexual contact, were among the most frequently endorsed items in the current study. These findings reflect the findings of Ward regarding victim blame among child molesters (2000). While it is not uncommon for offenders to engage in victim blame, these findings may be attributable to a "two-way street" of sexualization of children by pedophiles. That is, while pedophilic offenders are sexually attracted to children, they also attribute sexual desires, motivations, thoughts, and actions to children that non-pedophiles do not. If pedophilic offenders view children (at times) not as victims, but as willing sexual participants, then risk assessment evaluators, psychologists, psychiatrists, victim advocates, law enforcement, treatment providers, and other multidisciplinary team members involved in cases of sexual offenses against children may be well served to incorporate this understanding into their interactions with

offenders. It may be understandably difficult for non-pedophiles to accept this possibility and put themselves in a position to discuss the abuse with the offender in this context, yet it may provide an insight into the thinking and behavior of the offender that would not be accessible otherwise. It is also of note that the Cognitive Distortion Index contained the most frequent endorsement of its items – second only to the Grooming Index –, and offenders were most likely to attribute "rationalization" to themselves than they were any other free-response coded behavior (25.4%).

Another notable finding was that downward social comparison is also evident in the results of our study. Our participants, like many other offenders, view their offenses as being "not as bad" as "those other offenders." The offenders who engaged in digital fondling, for example, of a child view their behavior as being "not as bad" as an offender who engages in genital intercourse with a child. That offender who does engage in sexual intercourse with a child will not view his behaviors as being "as bad" as an offender who engages in violent coercion of his victim for sexual purposes. Initiating clinical contact with adults who sexually offend against children with this knowledge will aid the evaluator (detective, CPS worker) in establishing rapport for the purposes of gaining the most information from this offender. Offenders, though not asked to comment on "other" or "most" offenders, did tend to respond to questions about grooming in general in this manner. This phenomenon may inform potential alternatives to direct questioning of an offender when defense mechanisms are preventing progress in an interview or treatment session. A review of Table 1 reveals that the more openly manipulative behaviors associated with grooming are more often attributed to "other" offenders. For example, giving gifts, establishing trust, and manipulation are significantly more attributed to other offenders.

We also found that grooming also appears to be much more of an emotional construct than one involving actual tangible gifts, money, alcohol or drugs, etc. This finding is commensurate with previous research by Leberg (1997) and McClinden (2006) that address the emotional and psychological aspects of the grooming process. (The majority of free-response grooming behaviors as well as items endorsed during direct questioning are related to establishing an emotional relationship with the intended victim(s). For example, giving gifts (43.5%) or providing alcohol (30.4%) were the only grooming behaviors that involved tangible items as addressed in O'Connel 2003 study as well as others (Ospina, Harstall, & Dennet (2010); Whittle et al. 2013a). Other behaviors such as giving compliments (60.9%), and free response behaviors such as special activities, special treatment, desensitization, rapport, trust, and manipulation were endorsed with far more frequency. This finding likely reflects two phenomena, the first being that predators are aware of effective means with which to gain the trust and establish a relationship with their intended victim(s). The second aspect represented by this finding is that many pedophiles emotionally identify with children, a risk factor identified in the seminal Hanson et. al meta-analysis (2004), This second aspect includes engaging in activities most commonly enjoyed by children (i.e., frequenting certain child-themed establishments, playing, video games, frequenting locations often visited by children, etc.). This positioning of oneself in environments in which an offender has easy access to children is reflected in the research as well (Sullivan & Beech, 2004).

Importantly, nearly all of the above noted grooming activities involve isolating the intended victim. Isolating the victim as a direct question was endorsed by 56.5% of the participants and was among the most highly endorsed items in the entire study. Isolation of an intended victim serves to allow for the graduated introduction of sexual themes (i.e., through

graduated touching (52.2%), talking about sex with the victim (34.8%), showing adult-only pornography to the victim (21.7%), %), being nude in the home (without a sexual nature; (13.0%), entering into the relationship without a social frame of reference to inhibit the offender's ability to do so. Many of these themes (isolation, graduated introduction of sexual themes) have been discussed in theoretical discussions of grooming and were borne out in the current study (Craven et. al, 2006; Whittle et. al, 2015). In a sense, the offender, with enough isolation, *becomes* the victim's frame of reference, and is able to repeatedly reinforce the notion of sex between the child and adult as a "normal," "positive," and "universal" idea. This also serves, over the course of the abuse, to cause the child victim to feel complicit in the activities, including the abuse, and very often leads the victim to feel an emotional connection with the offender. These very by-products of the grooming phase are a direct cause of delayed or non-disclosure of child sexual abuse (Moors et. al, 2012; McElvaney, 2015). It is important to note that, in support of this notion, threatening the victim that he or she would lose the relationship with the perpetrator (13%) was among the three most frequently endorsed items in the Efforts to Avoid Detection Index, including asking or telling the victim not to tell others (30.4%), and using physical violence (17.4%). This means that, essentially, the grooming process creates such a perceived bond between the victim and the offender that an offender is able to continue to abuse the victim by threatening (in a less direct manner), "If you tell, I won't be able to abuse you like this anymore." This finding replicates a previous finding from a research study by Elliott et. al (1995).

Overall, the indexes established by the analysis of data are informative and revealing of offender behavior, and they are an effective manner in which to conceptualize the grooming process. While grooming behaviors will differ from one case to another, there are certain themes

common to grooming across cases, and understanding these themes can facilitate the overall understanding of sexual offending against children by adults and aid in the detection, evaluation, prosecution, and treatment of these offenders. It may also provide a framework with which layperson triers of fact may understand the complicated aspects of grooming, sexual assault of children, and the subsequent and often "counter-intuitive" behaviors of the victims that occur after the abuse and as a result of the grooming process (i.e., delayed disclosure, non-disclosure, seeming defensive of the offender, etc.).

**Limitations and Future Directions**

The sample in our study had two interrelated limitations. First, the sample size is relatively small, and, of course, more participants could have added to the robustness of the findings. Second, they were engaged in treatment, which would have impacted the amount of knowledge and insight they had about their grooming behaviors and grooming behaviors in general. However, we believe the strengths of our study far outweigh this limitation, and we believe that, given the lack of uniformity in answers, although they were all in the same treatment program, their responses obviously contained authenticity (as opposed to rote recollection of treatment concepts). We see future research building upon our free-response questions. Specifically, the purpose of the free-response portion of the interview was to allow offenders to provide their own description of the grooming process, as opposed to attempting to "box" offenders into a pre-conceived notion of what grooming involves by using pre-existing questionnaires or instruments designed by persons who study these behaviors but have not themselves engaged in them. A follow-up study that included data gleaned from the free-form responses in the direct question and answer portion may help provide even more data to assist in the understanding of what is, unfortunately, a growing problem in our society.

**Conclusions**

In this study, we asked sexual offenders about the practices they engage in related to grooming and their opinions about such practices. We found sexual offenders to provide valuable insight into the field's limited understanding of this complex system of behaviors. These results have direct field implications as they relate to apprehension, assessment, risk management, and treatment of sexual offenders, as well as research and theoretical importance.

References

Akdeniz, Y. (2009). Internet Child Pornography and the Law: National and International

Responses. Surrey: Ashgate Publishing.

Beauregard, E., Proulx, J., Rossmo, D.K., Leclerc, B., & Allaire, J.F. (2007). A script analysis

of patterns in the hunting process of serial sex offenders. *Criminal Justice and Behavior,*

*34,* 1069-1084.

Bennett, N., & O'Donohue, W. (2014). The construct of grooming in child sexual abuse:

conceptual and measurement issues. *Journal Of Child Sexual Abuse*, *23*(8), 957-976.

doi:10.1080/10538712.2014.960632

Black, P. J., Wollis, M., Woodworth, M., & Hancock, J. T. (2015). Research article: A linguistic

analysis of grooming strategies of online child sex offenders: Implications for our

understanding of predatory sexual behavior in an increasingly computer-mediated

world. *Child Abuse & Neglect*, *44*140-149. doi:10.1016/j.chiabu.2014.12.004

Brackenridge, C. H. (2001). *Spoilsports: Understanding and preventing sexual exploitation in*

*sports*. London, England: Routledge.

Christiansen, J. R., & Blake, R. H. (1990). The grooming process in father-daughter incest. In A.

L. Horn (Ed.) *The incest perpetrator: A family member no one wants to treat* (pp. 88 –

98). Thousand Oaks, CA: Sage.

Craven, S., Brown, S., & Gilchrist, E. (2006). Sexual grooming of children: Review of literature

and theoretical considerations." *Journal of Sexual Aggression, 12*, 287-299.

Elliott, I. A. (2017). A Self-Regulation Model of Sexual Grooming. *Trauma, Violence, & Abuse,*

*18*, 83-97.

Elliott, M., Browne, K., & Kilcoyne, J. (1995).  Child sexual abuse prevention: What offenders tell us.  *Child Abuse and Neglect, 19*, 579-594.

European Online Grooming Project: Webster, S., Davidson, J. Bifulco, A., Gottschalk, P., Caretti, V., Pham, T., Grove-Hills, J., Turley, C., Tompkins, C., Ciulla, S., Milazzo, V., Schimmenti, A., & Craparo, G. 2012.  *European Online Grooming Project Final Report.* European Union.  Retrieved April 21, 2012 (http://www.european-online-grooming-project.com/).

Finkelhor, D. (1984). Child sexual abuse:  New theory and research.  New York, NY: Free Press

Hanson, R. K. & Morton-Bourgon, K. E. (2005). The characteristics of persistent sexual offenders: A meta-analysis of recidivism studies. *Journal of Consulting and Clinical Psychology, 73*, 1154-1163. doi: 10.1037/0022-006X.73.6.1154

Hare, R. D. (2003). *Hare PCL-R, 2nd edition.* New York: Multi-Health Systems.

Howitt, D. (1995). *Pedophiles and sexual offences against children.* Oxford, England: John Wiley and Sons.

Kaufman, K.L., Hilliker, D.R., & Daleiden, E.L. (1996).  Subgroup differences in the modus operandi of adolescent sexual offenders.  *Child Maltreatment, 1*, 17-24.

Leberg, E. (1997). *Understanding child molesters: Taking charge.* Thousand Oaks, CA: Sage.

McAlinden, A.M. (2006).  'Setting 'em up'.  Personal, familial, and institutional grooming in the sexual abuse of children*. Social and Legal Studies, 15*, 339-362.

McElvaney, R. (2015). Disclosure of child sexual abuse: Delays, non-disclosure, and partial disclosure.  What the research tells us and implications for practice.  *Child Abuse Review, 24*, 159-169.

Moors, R., & Webber, R. (2012). The dance of disclosure: Online self-disclosure of sexual

   assault. *Qualitative Social Work, 12*, 799-815.

O'Connell, R. (2003). A typology of cyber sexploitation and online grooming practices. Preston,

   England: University of Central Lancashire. Retrieved from

   http://www.uclan.ac.uk/host/cru/docs/cru010.pdf

Olson, L.N., Daggs, J.L., Ellevoild, B.L., & Rogers, T.K. (2007). Entrapping the innocent:

   Toward a theory of child sexual predators' luring communication. *Communication

   Theory, 17*, 231-251.

Ospina, M., Harstall, C., & Dennet, L. (2010). "Sexual exploitation of children and youth over

   the internet: A rapid review of the scientific literature." Retrieved May 2, 2012

   (http://www.ihe.ca/documents/Online%20Sexual %20Exploitation.pdf).

Ost, S. (2009). Child Pornography and Sexual Grooming: Legal and Societal Responses.

   Cambridge: Cambridge University Press.

Proeve, M., & Howells, K. (2002). "Shame and guilt in child sexual offenders." International

   Journal of Offender Therapy and Comparative Criminology, 46, 657-667.

Salter, A.C. (1988). Treating Child Sex Offenders and Victims: A Practical Guide. London:

   Sage Productions.

Smallbone, S., & Wortley, R. (2000). *Child sexual abuse in Queensland: Offender

   characteristics and modus operandi: Full report.* Brisbane, Australia: Queensland

   Crime Commission.

Sullivan, J., & Beech (2004). A comparative study of demographic data relating to intra- and

   extra-familial child sexual abusers and professional perpetrators. *Journal of Sexual

   Aggression, 10*, 39-50.

van Dam, C. (2001). *Identifying child molesters: Preventing child sexual abuse by recognizing the patterns of offenders.* Binghamton, NY: The Haworth Press.

Ward, T. (2000). Sexual offenders' cognitive distortions as implicit theories." *Aggression and Violent Behavior, 5,* 491-507.

Whittle, H. (2015). A comparison of victim and offender perspectives of grooming and sexual abuse. *Deviant Behavior, 36*, 539-564.

Whittle, H., Hamilton-Giachritses, C., Beech, A., & Collings, G. (2013). A review of young people's vulnerabilities to online grooming. *Aggression and Violent Behavior, 18,* 135-146.

Whittle, H., Hamilton-Giachritses, C., Beech, A., & Collings, G. (2013a). A review of online grooming: Characteristics and concerns." *Aggression and Violent Behavior, 18*, 62-70.

Williams, R., Elliott, I. A., & Bech, A. R. (2014). Identifying sexual grooming themes used by internet sex offenders. *Deviant Behavior*, *34*, 135-152. Doi:10.1080/01639625.2012.707550

Wolf, S.C. (1984). A model of sexual aggression/addiction. *Journal of Social Work and Human Sexuality, 7*, 131-148.

GROOMING AND OTHER OFFENSE-RELATED BEHAVIORS                23

Table 1.

*Percentage of Response to Grooming Behavior Items for Self-Perpetrated and Other-Perpetrated Opinions of Offenders*

| Type of Grooming Behavior | Self-Perpetrated (%) | Other-Perpetrated (%) |
|---|---|---|
| Complimenting | 6.3 | 1.5 |
| Giving Gifts | 4.8 | 20.6 |
| Special Activities | 4.8 | 8.8 |
| Special Treatment | 12.7 | 5.9 |
| Desensitization | 17.5 | 7.4 |
| Rapport | 7.9 | 14.7 |
| Trust | 3.2 | 11.8 |
| Manipulation | 9.5 | 17.6 |
| Rationalization | 25.4 | 1.5 |
| Access | 3.2 | 4.4 |
| Other | 4.8 | 5.9 |

# Exhibit B

## DARREL B. TURNER, PhD – CASE LIST
748 Bayou Pines East, Suite D – Lake Charles, LA 70601
337.842.6339  FAX  337.419.0490

### FEDERAL CASES

| | | |
|---|---|---|
| US v Damarcus Fitzhugh | Eastern District of Michigan | Defense – Evaluation/Consult |
| US v Syed Hussain | Eastern District of Michigan | Defense – Evaluation/Consult |
| US v Zachary Talamonti | Southern District of Indiana | Defense – Evaluation/Consult |
| US v Numann | District of Alaska | Evaluation/Consultation/Testimony |
| US v Hamrick | District of Nevada | Evaluation/Consultation |
| US v Wendell Eaves | Middle and Western Districts of Louisiana | Defense – Evaluation/Consult |
| US v Harold Anderson | Middle and Western Districts of Louisiana | Defense – Evaluation/Consult |
| US v Disney | Eastern District of Pennsylvania | Evaluation/Consultation/Testimony |
| US v Christopher Harling | District of Montana | Evaluation/Consultation |
| US v Dane Gillis | Middle District of Florida | Evaluation/Consultation/Testimony |
| US v Antonio Fontana | Eastern District of Michigan – Southern Division | Evaluation/Consultation |
| US v Brian Graco | Eastern District of Louisiana | Evaluation/Consultation/Testimony |
| US v Phillip Bradley Sanderson | District of Nevada | Evaluation/Consultation/Testimony |
| US v Moseley | Western District of Oklahoma | Evaluation/Consultation |
| US v Sam Elliott | District of New Mexico | Evaluation/Consultation/Testimony |
| US v Jose Zanabria | Western District of Oklahoma | Evaluation/Consultation/Testimony |
| US v McGrath | Southern District of Texas | Evaluation/Consultation/Testimony |

| US v Telles | Northern District of California | Testimony |
|---|---|---|
| US v Kyle Soto | District of South Dakota | Current |
| | | |
| US v William Jon Patric Ebert | Western District of North Carolina | Blind Testimony on Grooming/Qualified Expert on Grooming and Victim Behavior |
| | | |
| Srok v Coppola Wine Co | Santa Rosa, California | Testimony/Record Review on Behalf of Srok (Plaintiff) |
| | | |
| State v Jerrell Bundy | New Mexico Attorney General | Testimony/Record Review |
| | | |
| State v Morris Wright | Superior Court of California | Record Review |
| | | |

**SCFO CIVIL CASES**

| Richards | Montgomery | Depo/Trial |
|---|---|---|

**TEXAS - SPU CASES - CIVIL**

| Hatcher, George | Montgomery | Depo/Trial |
|---|---|---|
| San Miguel, Samuel | Montgomery | Depo/Trial |
| Massingill, Winfred | Montgomery | Depo/Trial |
| Hatcher, George | Montgomery | Depo/Trial |
| Clemmons, Dennis | Montgomery | Depo/Trial |
| Black, Stephen | Guadalupe | Depo/Trial |
| Harris, Bobby | Harris | Depo/Trial |
| Sternadel, Thomas | Harris | Depo/Trial |
| Gray, David | Travis | Depo/Trial |
| Bluitt, Maurice Jr | Tarrant | Depo/Trial |
| Salomon, Leonel | Nueces | Depo/Trial |
| Williams, Jeffrey | Tarrant | Depo/Trial |
| Drakes, David | McLennan | Depo/Trial |
| Stephens, George | Orange | Depo/Trial |
| Hull, Donald | Jefferson | Depo/Trial |
| Ramshur, John | Tyler | Depo/Trial |

| | | |
|---|---|---|
| Carden, Kenneth | Tarrant | Depo/Trial |
| Trevino, Richard | Webb | Depo/Trial |
| Falcon, Philip Jr | Newton | Depo/Trial |
| Rhinehart, Charles | Galveston | Depo/Trial |
| Cain, Leon | Tarrant | Depo/Trial |
| Sanchez, Justin | Tarrant | Depo/Trial |
| Stonecipher, Timothy | Harris | Depo/Trial |
| Limon, Raymond | Nueces | Depo/Trial |
| Vela, Juan | Nueces | Depo/Trial |
| Garcia, Rolando | Travis | Depo/Trial |
| Joiner, Gregory | Grayson | Depo/Trial |
| Riggs, Ronald | Gregg | Depo/Trial |
| Metcalf, Daniel | Bowie | Depo/Trial |
| Ovalle, Jose | Nueces | Depo/Trial |
| Shelton, Justin | Denton | Depo/Trial |
| Guzman, Daniel | Galveston | Depo/Trial |
| Throm, Robert | Jefferson | Depo/Trial |
| Woods, Joe | Tarrant | Depo/Trial |
| Barnes, Kenneth | Grayson | Depo/Trial |
| Farley, Gerald | Denton | Depo/Trial |
| Scott, David | Bell | Depo/Trial |
| Summers, Michael | Galveston | Depo/Trial |
| Wiley, Richard Sr. | Wharton | Depo/Trial |
| Eddings, Jeffrey | Tarrant | Depo |
| Pansky, Andrew | Harris | Depo/Trial |
| Salderna, Martin | San Patricio | Depo/Trial |
| Claxton, Michael | Ellis | Depo/Trial |
| Coles, Willie | Tarrant | Depo/Trial |
| West, Cedric | Dallas | Depo/Trial |
| Vela, Genaro | Hidalgo | Depo/Trial |
| Parfait, Hal Vernon | Brazos | Depo/Trial |
| Nolan, Gary | Bexar | Depo/Trial |
| Delarosa, Juan Carlos | Fayette | Depo/Trial |
| Mayo, Vance Allen | Ellis | Depo/Trial |
| Danas, March | Harris | Depo/Trial |
| Bohannan, Michael | Montgomery | Depo/Trial |
| Pena, Andrew | Hale | Depo/Trial |
| Brice, Gene | Dallas | Depo |
| Hill, William | Harris | Depo/Trial |
| Jackson, Derrick | Tarrant | Depo/Trial |
| Revels, Kendrick | Dallas | Depo/Trial |

| Encalade, Lonnie | Harris | Depo/Trial |
|---|---|---|
| Hale, Stephen | Harris | Depo/Trial |
| Auvil, George | Shelby | Depo/Trial |
| Gutierrez, Louis | Harris | Depo |
| Torres, Pedro | Tarrant | Depo/Trial |
| Nickerson, Charles | Bell | Depo |
| Atchison, Thomas | Harris | Depo/Trial |
| Encalade, Lonnie | Harris | Depo/Trial |
| Ybarra, Sammy | Bear | Depo/Trail |
| Howard, Robert | Harris | Depo/Trial |

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____)
UNITED STATES OF AMERICA,       )
                                )
                                )
                                )  DOCKET NO. 3:19-CR-244
          vs.                   )
                                )  VOLUME II OF III
WILLIAM JON PATRIC EBERT,       )
                                )
          Defendant.            )
_____)


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE FRANK D. WHITNEY,
UNITED STATES DISTRICT COURT JUDGE
THURSDAY, JULY 16, 2020 AT 8:40 A.M.


APPEARANCES:

On Behalf of the Government:

          KIMLANI MURRAY FORD, ASSISTANT U.S. ATTORNEY
          ERIK A. LINDAHL, ASSISTANT U.S. ATTORNEY
          U.S. Attorney's Office
          227 W. Trade Street, Suite 1650
          Charlotte, North Carolina  28202


On Behalf of the Defendant:

          JUSTIN CHRISTOPHER OLSINSKI, ESQ.
          The Olsinski Law Firm, PLLC
          216 N. McDowell Street, Suite 200
          Charlotte, North Carolina  28204


          JILLIAN M. TURNER, RMR, CRR, CRC
          Official U.S. District Court Reporter
          United States District Court
          Charlotte, North Carolina

I N D E X

PAGE

GOVERNMENT'S WITNESSES

NATHAN ANDERSON

      Direct Examination by Ms. Ford         27
      Cross-Examination by Mr. Olsinski    98
      Redirect Examination by Ms. Ford    124
      Cross-Examination by Mr. Olsinski  126

HANNAH HOLLIS

      Direct Examination by Ms. Ford     128
      Cross-Examination by Mr. Olsinski  174
      Redirect Examination by Ms. Ford    206

DARREL TURNER

      Direct Examination by Mr. Lindahl  209
      Cross-Examination by Mr. Olsinski  233

MICHAEL EBERT

      Direct Examination by Mr. Lindahl  240
      Cross-Examination by Mr. Olsinski  255
      Redirect Examination by Mr. Lindahl 261

ZOE NELSON

      Direct Examination by Mr. Lindahl  266
      Cross-Examination by Mr. Olsinski  286


GOVERNMENT'S EXHIBITS

| NO. | RECEIVED |
|-----|----------|
| 1 | 34 |
| 2 | 35 |
| 3 | 36 |
| 3b | 37 |
| 3C | 38 |

|  |  |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. LINDAHL: |
| 3 | Q.   Good afternoon.  Would you please introduce yourself to |
| 4 | our jury and spell your name for our court reporter. |
| 5 | A.   Yes.  I'm Darrel Turner.  And my name is spelled |
| 6 | D-a-r-r-e-l, Turner, T-u-r-n-e-r. |
| 7 |         Are you the court reporter? |
| 8 | Q.   Dr. Turner, are you working currently? |
| 9 | A.   Yes. |
| 10 | Q.   And where are you working? |
| 11 | A.   Well, right now I'm working in North Carolina.  I have |
| 12 | an office in Louisiana where I'm licensed, and I have an |
| 13 | office in Texas where I'm licensed as well.  I generally |
| 14 | travel a lot and work all across the United States. |
| 15 | Q.   What is your position? |
| 16 | A.   I'm a clinical psychologist, a doctor of clinical |
| 17 | psychology, and I focus on forensic psychology. |
| 18 | Q.   Can you tell the jurors what clinical psychology is? |
| 19 | A.   Sure.  Clinical psychology requires a doctorate or a PhD |
| 20 | in psychology, and it is dealing with patients, testing, |
| 21 | making diagnoses, treatment plans, generally treating |
| 22 | patients for mental illness. |
| 23 | Q.   You mentioned a focus in forensic psychology.  Can you |
| 24 | tell the jurors what forensic psychology is. |
| 25 | A.   Sure.  Forensic psychology is when the law and |

D. TURNER - DIRECT                                210

1    psychology meet for whatever reason.  There's certain
2    questions that have to be answered with a knowledge of the
3    law of a certain jurisdiction.  That just means a certain
4    place or area.  And an expertise in psychology.
5         And so forensic psychology is when those areas combine,
6    and my work is relevant in a courtroom setting, whether it's
7    criminal or civil.
8    Q.   Can you tell me how many years you have worked as a
9    clinical psychologist with specialty in forensic psychology?
10   A.   Sure.  I was licensed in 2013, so about eight years.
11   And then I've been doing this work under some supervision
12   since about 2007 or 2008.  So about 13 years.
13   Q.   Dr. Turner, will you describe your educational
14   background that led you to the career that you're in today?
15   A.   Yes, sir.  I have a bachelor's in psychology from
16   McNeese State University in Louisiana.  I have a master's
17   degree in counseling psychology also from McNeese.  And I
18   have a PhD or a doctorate in clinical psychology from Sam
19   Houston State University in Huntsville, Texas.  I completed a
20   predoctoral internship with the Federal Bureau of Prisons at
21   the Federal Correctional Institution at FCI Fort Worth.  And
22   I've worked for the Federal Government as a staff
23   psychologist and a forensic psychologist and a correctional
24   psychologist, and I'm currently in private practice.
25   Q.   So does that overview provide all the jobs that you've

D. TURNER - DIRECT                          211

1   had in psychology since you got your doctorate?
2   A.   Yes, sir.
3   Q.   What was your role with the Bureau of Prisons?
4   A.   My role with the Bureau of Prisons was acting as a
5   correctional psychologist and a forensic psychologist during
6   my year of supervision there, which is -- I just explained
7   what forensic psychology is.  And in correctional psychology
8   is working specifically with inmates and problems that they
9   may have.
10        And then my work as a staff psychologist was at a
11  penitentiary, which is a very high security facility, so it
12  was responding to a lot of emergencies, sexual assaults,
13  physical assaults, and things of that nature.  So that was --
14  those are some of my duties with the Federal Bureau of
15  Prisons.
16  Q.   Thank you, Doctor.
17       You took us through the Government work leading up to
18  your current role in private practice.  How long have you
19  been in private practice?
20  A.   I've been in private practice since 2012.
21  Q.   And you talked about being licensed in Louisiana.  Is
22  that a license in clinical psychology?
23  A.   Yes.
24  Q.   Do you have any certifications that you can speak to?
25  A.   I'm certified in Louisiana on a registry to provide

1    treatment for sex offenders in the state of Louisiana.

2    Q.   Dr. Turner, how much of your practice is focused now on

3    forensic psychology?

4    A.   I think if I had to break it down now, I'd say it's

5    about half and half.  It's about half clinical work and then

6    half forensic work.

7    Q.   Do you have a specialty within your forensic psychology

8    practice?

9    A.   Yes.

10   Q.   And what would that be?

11   A.   My specialty within my forensic psychology practice is

12   in the area of sexual offending, specifically adults who

13   sexually offend against children, how they go about doing

14   that, how that impacts the child victims, and different

15   aspects involved in that process.

16   Q.   So does your specialty as you've described include a

17   focus on a grooming practices employed by adult sex offenders

18   who prey on minors?

19   A.   Yes.  That's a big part of what I do, yes.

20   Q.   Would it also include minor victims and how they behave

21   in sex abuse cases?

22   A.   Yes, the impact of sexual abuse on minor victims, or

23   sometimes adult victims who were offended against as minors.

24   Q.   So in your career, have you worked with specifically sex

25   offenders who target minor children as in met with them and

1    done -- and practiced with them as a patient?

2    A.   Yes.

3    Q.   Do you have a rough estimate as to the number of these

4    kind of offenders that you've interviewed as part of your

5    practice?

6    A.   If we're just looking at interviews, so sex offenders

7    who have sexually offended against minors that I've

8    interviewed in one capacity or another, it's thousands.

9    Q.   And have you also worked by interviewing childhood

10   victims of sexual abuse?

11   A.   Yes, either while they're still children or while --

12   after they've become an adult.

13   Q.   Do you have an idea as to how many of this kind of

14   interview you conducted in your career?

15   A.   It would be less.  It would still be a lot.  I would

16   say -- I would say it's certainly in the hundreds, but not as

17   many as I have dealt with in the offender realm.

18   Q.   In this specialty, specifically grooming behaviors and

19   victim behaviors in sexual abuse cases involving minors, have

20   you done any research?

21   A.   Yes.

22   Q.   Can you describe that for the jurors.

23   A.   Sure.  So I've been contacted twice by the United States

24   Senate to participate in developing research for them in the

25   area of adults who sexually offend against children,

D. TURNER - DIRECT                                214

1   profiling their personalities and some of the behaviors that
2   we can expect to see.  One of those was in about 2015, and
3   one of those was about two months ago.
4        I've been contacted by the FBI, the Naval Criminal
5   Investigative Service, Department of Homeland Security and
6   different federal agents to consult in cases involving sexual
7   abuse of children by adults.
8        I've worked with state agencies.  I've worked with
9   prosecution.  I've worked with defense.  I've worked directly
10  for the courts in some cases.  So lots of -- lots of
11  different ways.
12  Q.   So it's common for you to work on pending criminal cases
13  involving charges related to the sexual abuse of children?
14  A.   Yes.
15  Q.   I believe you mentioned that for this particular
16  purpose, you've been hired both by the prosecution and the
17  defense?
18  A.   Correct.
19  Q.   Have you ever testified before as an expert witness in
20  this area regarding adult offenders who prey on minor victims
21  and victim behaviors?
22  A.   Many times, yes.
23  Q.   Would the testimony have occurred in both state and
24  federal court?
25  A.   Yes.

D. TURNER - DIRECT                                    215

1   Q.   How many times have you testified as an expert in adults
2   who sexually offend against children regarding grooming
3   practices and victim behavior?
4   A.   I don't know.  I couldn't tell you a number.  You know,
5   that's -- it's the majority of what I do.
6        So in most of the cases that I testify, I'm going to
7   talk about grooming behavior.  I'm going to talk about the
8   impact of sexual abuse on a child.  And that's going to be
9   true whether I'm in court testifying or whether I'm providing
10  training or presentation, which I've done internationally in
11  a number of different countries.
12       So I can't really give you a number.  It would be a lot
13  of speculation on my part.
14  Q.   Well, let me ask you:  Have you testified in state court
15  more than 20 times?
16  A.   Oh, yes.
17  Q.   More than 50 times?
18  A.   Yes.
19  Q.   More than 100 times?
20  A.   Yes.
21  Q.   And in each of those circumstances, you were accepted by
22  the Court and allowed to give your opinion?
23  A.   Yes.
24  Q.   Have you testified in federal court more than 20 times?
25  A.   Yes.

D. TURNER - DIRECT                                216

1   Q.   More than 50 times?

2   A.   Probably not more than 50 times in federal court, no.

3   Q.   And in each of those circumstances, you were accepted by

4   the Court as an expert and allowed to give your opinion?

5   A.   Yes.

6   Q.   And when it comes to actual in-court testimony, have you

7   testified on behalf of both the prosecution and the

8   defendant?

9   A.   Yes, sir.

10           MR. LINDAHL:  Your Honor, at this time the

11  Government will move to tender Dr. Turner as an expert in the

12  grooming behavior and techniques of adult offenders who

13  sexually abuse minors and the characteristics of sexually

14  abused children.

15           THE COURT:  One moment.  Can you repeat that?

16           MR. LINDAHL:  Yes, Your Honor.  The Government is

17  tendering Dr. Turner as an expert in the grooming behavior --

18           THE COURT:  Yes.

19           MR. LINDAHL:  -- and techniques of adult offenders

20  who sexually abuse minors and characteristics of sexually

21  abused children.

22           THE COURT:  All right.  Would you like to voir dire

23  the witness now or do it later in cross?

24           MR. OLSINSKI:  Yeah, I would, Your Honor.

25           THE COURT:  You may proceed.

D. TURNER - DIRECT                                    217

1  Q.   Dr. Turner, is there -- you testified both to grooming
2  and the behavior of alleged victims?
3  A.   Yes.
4  Q.   And you've testified in both those matters 50 times, 100
5  times?
6  A.   Yes.
7  Q.   So there is -- you're telling the Court there is a set
8  way that victims behave?
9  A.   No.  What I'm telling the Court is that there is a lot
10 that we know about how the majority of victims behave, and
11 there's a lot that we know about how -- the way a victim is
12 groomed impacts the way that they behave and the way that
13 they may or may not disclose as well as when they may or may
14 not disclose.
15 Q.   And when you say you know a lot, how much is a lot?
16 A.   Enough that there are people like me that are qualified
17 as experts to do this kind of work and testify in court on
18 it.
19 Q.   Well, I guess I should rephrase that question.  A lot of
20 information regarding how victims act.  You know, there's no
21 scientific conclusion on how victims act, correct?
22 A.   Well, what we know is that there's no -- there's no
23 corner that we can box victims into to say that a victim who
24 is 12 years old who is sexually abused by someone with this
25 particular relationship will behave this way.  But we do know

1    certain things about their likelihood of, say, disclosing.

2    Q.    Um-hum.

3    A.    We know things about their likelihood of to whom they

4    will disclose, how much they will disclose, based on things

5    like whether they have a good socioeconomic background, based

6    on whether they have a good social support group, based on --

7    I mean, we even know things about whether or not if they've

8    been abused before and made an outcry before to their mother

9    but haven't been believed by their mother, how much less

10   likely they are to disclose if it were to happen again.

11        So there's a lot of information that we do know, and

12   there's a lot of information that we can say -- that we

13   can -- because what happens is a lot of people testify, for

14   example, that Victim A did not do this, and this is what

15   victims usually do.  Therefore, Victim A must not really be a

16   victim.

17   Q.    Um-hum.

18   A.    And that's a dangerous assumption to make.  And so in

19   the studying that we've done of victims, we're able to say,

20   you know, that's not always the case.  That's not necessarily

21   the case.  It's not fair to say that because he, you know,

22   told two different stories across a six-month period, that he

23   must be lying.

24   Q.    Now, when you say you have statistics, you're talking

25   about studies?

D. TURNER - DIRECT                                219

1    A.    Correct.

2    Q.    Studies you've done?

3    A.    I've authored studies.  I have one study that is

4    published in the U.S. Bulletin.  I have other studies that

5    have been peer reviewed and presented at professional

6    meetings or like --

7    Q.    And those studies are on how victims react?

8    A.    They're on how victims can react and then behavior of

9    offenders, grooming behavior as well as victim behavior and

10   how it is impacted by how they were groomed.

11          And also other information that's very important in

12   these types of cases, such as percentages of child victims

13   that wait at least five years before they disclose, or the

14   percentage of child victims that wait until they're an adult

15   to disclose, things like that that we previously thought

16   didn't really happen.

17          You know, we picture kids running and finding the first

18   adult that they can find and telling the whole story the

19   first time.  But we know from these types of studies and in

20   talking with victims over time and publishing these studies

21   and getting together at professional meetings and conferences

22   and going over the data, we know a lot now that we didn't

23   know, you know, even 10 years ago.

24               THE COURT:  Let me cut in here.

25               Mr. Olsinski, are you opposing Dr. Turner as an

D. TURNER - DIRECT                                    220

1  expert at this point?
2          MR. OLSINSKI:  Well, I don't know that -- I haven't
3  gotten any clarification in terms of what he testifies is
4  nothing more than just -- you know, it may be this, it may be
5  that.  I mean, I don't know if there's -- he'd be an expert
6  on it.  It could possibly be a million other things.  He
7  hasn't given me any kind of --
8          THE COURT:  All right.  He's testified over 50
9  times in federal court, over one hundred times in state
10 court.
11         MR. OLSINSKI:  Um-hum.
12         THE COURT:  So --
13         MR. OLSINSKI:  Well, I mean, that may well be true.
14 But, I mean, it doesn't add any more validity to him saying
15 statistically, 50 percent of people disclose this way.  I
16 mean, I don't think that's --
17         THE COURT:  Well, the Court actually has heard
18 enough.  The Court does make the determination whether an
19 individual is qualified.
20         Sorry I didn't have my mic close to my mask.
21         So the Court at this time does believe the
22 Government has sufficiently shown that Dr. Turner is -- has
23 specialized knowledge and can be deemed an expert under
24 Rule 702 of the Federal Rules of Evidence in grooming
25 behavior and techniques of adult offenders who sexually abuse

D. TURNER - DIRECT                           221

1    minors and the characteristics of sexually abused children.

2              With that said, ladies and gentlemen, even though

3    the Court qualifies someone or allows someone to be qualified

4    as an expert, you still make the decisions here.  And so if

5    you want to reject the expert's testimony, you're permitted

6    to do that.  You make the determination.

7              But the Court has determined that the witness does

8    qualify as an expert, as I've already claimed -- already

9    identified the area, grooming behavior, et cetera, et cetera.

10   But with that said, I turn it back over to the Government.

11             MR. LINDAHL:  Thank you, Your Honor.

12   Q.   Dr. Turner, with regard to the case on trial this week,

13   have you reviewed any of the specific evidence in this

14   matter?

15   A.   No, sir.

16   Q.   Are you familiar with any of the facts?

17   A.   Very, very basic facts.

18   Q.   Can you give us an idea of what you've been told before

19   your testimony?

20   A.   I'm aware that -- that the alleged victim has accused

21   her biological father of sexually perpetrating against her

22   beginning at about age 11, and that there was some delay in

23   disclosure, and that's all I know.

24   Q.   So with your testimony today, do you intend on offering

25   up what's known as blind expertise?

D. TURNER - DIRECT                           222

1   A.   Yes, sir.

2   Q.   Can you explain what that means?

3   A.   Yes, sir.  So blind expertise is when I have not

4   evaluated the person that's been accused of a crime.  I've

5   not read details of an alleged offense.  I've not interviewed

6   or evaluated the alleged victim of an offense.

7        I'm here to provide information about an area that I'm

8   an expert in because of the work that I've done and the

9   experience that I have in that area.  And the reason for that

10  is because there are so many common threads in these types of

11  offenses that can be confusing to triers of fact; triers of

12  fact being jurors or a judge.

13       So it's to help people that are making legal decisions

14  understand matters where psychology and the law meet.

15  Q.   And for your testimony today, are you being paid by the

16  United States?

17  A.   Yes.

18  Q.   At what rate?

19  A.   250 an hour.

20  Q.   Since entering private practice, do you charge an hourly

21  rate in all criminal investigations or pending cases that you

22  assist with?

23  A.   Yes.

24  Q.   So that would include both cases where you have been

25  hired by the prosecution and cases where you've been hired by

D. TURNER - DIRECT                                    223

1   a defendant?

2   A.    Yes.

3   Q.    I'm going to turn now to sex offenses.

4         With regard to sex crimes, have you found in your

5   research a difference in matters involving adult victims with

6   those that involve children victims?

7   A.    Yes.

8   Q.    Can you tell us a little about that.

9   A.    When a child is targeted and is sexually abused, their

10  response is going to generally be different than the response

11  would be of an adult in a variety of ways.

12  Q.    With that said, can you give us some unique issues that

13  relate to child victims in these kind of cases?

14  A.    Sure.  Child victims have yet to have gained an

15  understanding about a lot of different relationships:  Sexual

16  relationships, familial relationships, relationships with

17  trust, romantic relationships.  And so when a child is

18  sexually abused, especially by someone that they know, it can

19  be very confusing to that child, and it can lead to all kinds

20  of factors that make it difficult for that child to fully

21  disclose that they have been sexually abused by that

22  individual.

23  Q.    Dr. Turner, would you please define grooming behavior as

24  it relates to sex offenses involving children?

25  A.    Sure.  So there's lots of big long definitions, but the

D. TURNER - DIRECT                                    224

1  one that I think is most concise and that covers everything
2  the best is grooming behavior are behaviors that are engaged
3  in by potential child sexual predators in order to gain
4  access to a victim, in order to increase the likelihood of
5  that victim willingly -- and I put that in quotes because
6  they're children, and they cannot willingly engage in sex --
7  but "willingly" meaning not fight back, and then prevent
8  disclosure as best they can.  In other words, prevent that
9  child from telling anyone about the sexual abuse.  And that's
10 what grooming is, behaviors that make that likely to happen.
11 Q.   So beyond that general definition you've provided, are
12 there specific different types of grooming behaviors?
13 A.   Yes.
14 Q.   And are -- in your research and in your practice, have
15 you found that the behaviors implemented can have a different
16 impact when dealing with prepubescent victims when compared
17 with adolescent victims?
18 A.   Yes.
19 Q.   What age range is typically associated with a
20 prepubescent victim?
21 A.   When we talk about prepubescent victims, we're generally
22 talking in clinical terms of someone that's under the age of
23 13.
24 Q.   And what about with regard to an adolescent victim?
25 A.   An adolescent victim is generally referring to someone

D. TURNER - DIRECT                              225

1    that is older than 13 or 13 and older.  And generally puberty
2    is the mark that we're aiming for there.  Someone that has
3    either not been through puberty or someone that has been
4    through puberty.
5    Q.   Is there typically a difference in understanding and
6    attitude toward sex between prepubescent children and
7    adolescent children?
8    A.   Yes.
9    Q.   Can you explain that?
10   A.   Well, quite simply, in prepubescent children, there
11   really isn't much of an attitude towards sex.  Prepubescent
12   children don't know a whole lot about sex.  They're not
13   generally driven by sexual goals or sexual desires.  They
14   don't have sexual motives, sexual fantasies like we see in
15   post-prepubescent children who have started to have those
16   fantasies and started to feel sexual arousal and sexual
17   attraction.  So there's a world of difference in the two.
18   Q.   And are there certain behaviors or patterns that occur
19   across most cases involving an offender grooming a
20   prepubescent child victim?
21   A.   Can you repeat that question, please?
22   Q.   Sure.  Are there certain behaviors or patterns that
23   occur across most cases involving an offender who is grooming
24   a prepubescent victim?
25   A.   Yes.

D. TURNER - DIRECT                    226

1   Q.   Can you talk more about that?

2   A.   Sure.  One thing that we're going see in nearly every

3   case is an effort by the offender to isolate the child victim

4   as much as possible and as often as possible.  We're also

5   going to see a gradual, that is, an over time introduction of

6   sex and sexual themes in an attempt to normalize sex and

7   introduce sex to that prepubescent child.

8   Q.   And does an isolated prepubescent victim tend to

9   simplify an offender's ability to shape their attitude

10  towards sex?

11  A.   Yes.

12  Q.   Can sexual grooming occur in family units?

13  A.   Yes.

14  Q.   In a parent-child relationship?

15  A.   Yes.

16  Q.   Are there any sexual grooming behaviors that are unique

17  in a sex crime occurring in a parent-child relationship?

18  A.   Well, one of the things that we see unfortunately in a

19  situation where the sexual abuse is being perpetrated by a

20  parent on a child, especially a biological child, is that a

21  lot of the work involved in grooming is essentially already

22  done for that perpetrator.  They've already had access to

23  isolation of that victim whenever they want.  They can teach

24  that victim anything they want to know about sex because

25  they're the parent that usually teaches a child, you know,

D. TURNER - DIRECT                                    227

1    what we hope a child is being taught about sex.  So it
2    facilitates the grooming process when the offender is a
3    parent a great deal.
4    Q.    What role does emotional connection have as it relates
5    to grooming?
6    A.    One of the things that were found in research, and in my
7    research in particular, finding over and over is that the
8    more people think of grooming as -- especially in younger
9    children, fireworks, quarters, cotton candy, what we're
10   really seeing is an effort to establish a trusting
11   relationship.
12        So for younger kids, it is done a lot of times by giving
13   gifts and things like that, but we see the gifts change when
14   the victims get older.  It might turn into alcohol or
15   marijuana or the ability to stay out later, get away with
16   certain things.
17   Q.    You talked about how grooming techniques can have an
18   impact on a child victim's willing participation in sex
19   abuse.  Can you expand upon that and describe how emotional
20   connection might play into that?
21   A.    Sure.  So there's a study that shows that about
22   30 percent to 40 percent of police officers who are involved
23   in cases where children have been sexually abused feel that
24   the child is somehow in love with the perpetrator.  A child
25   who has been groomed, what has happened is a relationship, a

1  trusting emotional relationship has been formed in which that

2  child feels a connection to the offender, which seems to go

3  against everything that we would think.

4       We would think they would want nothing to do with that

5  offender, but what we find is the offense.  Very often

6  they're very defensive of that offender.  They yearn to

7  continue to be around that offender, and they may even feel

8  guilty or feel as though they're somewhat responsible for the

9  abuse that took place.

10 Q.   Dr. Turner, I want to turn you back to the family

11 structure as it relates to these kind of crimes.

12      Can you tell us, what are some ways that perpetrators

13 are able to isolate victims within a family unit?

14 A.   Well, it's as simple as choosing which child to spend

15 most of your time with.  What we see in families where a

16 child is being molested is that that child is very often

17 singled out more than other children to do things with,

18 whether it's staying up late and watch movies or go to the

19 mall.  They are very often given an ability to get away with

20 things.  They don't get in trouble for what the other

21 children get in trouble for.  Those are some of the ways that

22 we see isolation within a family context.

23 Q.   And how, in a family context, does minor victim's need

24 for or effort to seek approval impact an offender's ability

25 to groom that victim?

D. TURNER - DIRECT                                      229

1  A.   Well, if we take sex out of the picture, all of us just

2  think for a second about how we felt about our parents when

3  we were growing up.  That's a very, very powerful

4  relationship.

5       Now you imagine if that parent had inserted a sexual

6  aspect to that relationship.  It's going to be extremely

7  confusing for that child, and it's going to give that parent

8  a great deal of control over what that child does and does

9  not do.

10 Q.   Dr. Turner, can you describe the concept of normalizing

11 as it relates to a grooming behavior in these cases?

12 A.   Sure.  We talked earlier about children who generally

13 don't think about sex yet.  They're not motivated by sex.

14 They don't make decisions based on sex, especially if they're

15 prepuberal.

16      Normalizing is when the groomer or the potential

17 offender makes sex something that is okay to talk about, that

18 is okay to joke about, it is okay to do.  And so that's what

19 normalizing is.

20 Q.   Does that include conversations about masturbation?

21 A.   Yes, it can.

22 Q.   What about pornography?  Does that play a role in some

23 of the cases you've analyzed?

24 A.   Absolutely, both child and adult pornography.

25 Q.   And are there circumstances where normalizing can

D. TURNER - DIRECT                    230

1   include establishing a comfort level with being nude in front
2   of the adult offender?
3   A.    Absolutely.
4   Q.    When we were speaking about prepubescent victims, you
5   mentioned the origin of grooming at that point, the
6   isolation, the beginning to expose them to sexually -- sexual
7   topics.  Do these grooming cases tend to operate in a
8   progression where the techniques develop toward illegal
9   sexual contact?
10  A.    Yes, they do.
11  Q.    Can you talk more about that?
12  A.    Well, we don't see these cases start off with, you know,
13  going to the movies together and then, you know, having oral
14  sex with one another.  It's a gradual thing.  It's comments
15  made about the way a child looks.  You look cute in that.
16  You look pretty today.  You look pretty like your mom.  It's
17  pats on the bottom, rubbing shoulders, sexual jokes, maybe
18  sexual pornography in the form of jokes, and then moving on
19  to things that are and would be considered illegal.  That's
20  generally the normalizing process, and it happens over time.
21  Q.    Dr. Turner, are there circumstances in these cases where
22  offenders successfully normalize illegal sexual conduct in
23  their victims?
24  A.    Absolutely.
25  Q.    Has -- could that include the creation of child

D. TURNER - DIRECT                                    231

1   pornography?

2   A.    Yes.

3   Q.    How does that impact a minor victim's understanding of

4   whether what they're doing is right or wrong?

5   A.    You said the creation of child pornography?

6   Q.    Including, yeah.

7   A.    Well, if we're talking about creating child pornography,

8   then we're talking about a child who is now seeing themselves

9   naked and often engaging in sexual activities, and there's

10  generally a threat that that is going to be shown to other

11  people.

12        So as a means of normalizing sex, showing pornography is

13  one thing.  Showing child pornography to normalize sex among

14  children in adults is another.  Producing child pornography

15  with the victim would -- would -- that's a totally different

16  ballgame in terms of control over a victim.

17  Q.    And a participant in that kind of contact, a victim

18  participant, how is it the normalizing may impact their

19  ability to know whether something like that is right or wrong

20  if the grooming started at a prepubescent time in their life?

21  A.    Well, because our parents are the ones that tell us

22  what's right and what's wrong.  They're the ones that tell us

23  not to put our hand on the stove and not to cross the street

24  without looking left and right.  So if they're the ones that

25  are also telling us that it's okay to let me take these

D. TURNER - DIRECT                    232

1    pictures or okay for you to take these pictures, whatever the
2    case may be, then that's going to be looked on as the truth,
3    especially if there has been sufficient isolation so that you
4    don't have people in their environment telling them that it's
5    odd, that it's wrong or that you should report that.  That's
6    the whole point of isolation as well.  So I don't know if
7    that backs over an old question.
8    Q.   Dr. Turner, in a parent-child relationship in these
9    cases, how does the offender use grooming to prevent the
10   victims from reporting to other family members?
11   A.   Well, in a lot of cases, in a majority of cases, that's
12   done through guilt.  And the guilt is often in the form of
13   either you're just as guilty in all of this as I am; or if
14   you tell, here are some negative things that will happen to
15   our family as a result.  I could get taken away.  Your mom
16   won't be able to support you-all, things of that nature.
17   Those, I would say, would be the two biggest grooming factors
18   in order to prevent disclosure in that context.
19   Q.   Is it uncommon to see grooming occur between a parent
20   and child in these kind of cases over a period of six years?
21   A.   No.
22   Q.   How does -- do these grooming techniques impact child
23   victims as it relates to reporting after the abuse has ended?
24   A.   Well, a lot of times when the child is considering
25   reporting, there are two main things that they're concerned

D. TURNER - CROSS                                                        233

1    with.  One is am I going to be believed; and two is am I

2    going to get in trouble somehow for this; with a close third

3    being, you know, is my family going to completely implode

4    like I've been warned they would.

5          And so what we see in a lot of disclosure when it does

6    happen is it happens later.  Eighty percent of the time it

7    happens after they've reached adulthood, and we see this

8    gradual sort of dipping their toe in the pool.  So it's

9    telling a little bit to see if they're going to be believed

10   or if the world is going to explode; and then maybe a little

11   while later, telling a little bit more.  There's -- we tend

12   to see a gradual progression.

13         But the more direct answer to your question is we're

14   going to see a delayed disclosure process, and very

15   oftentimes, a step-wise disclosure process.

16              MR. LINDAHL:  No further questions, Your Honor.

17              THE COURT:  All right.  Defense witness.

18              MR. OLSINSKI:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. OLSINSKI:

21   Q.   Now, you testified about the isolation phase of

22   grooming?

23   A.   Yes, sir.

24   Q.   And that the person tries to keep the victim away from

25   other people?

D. TURNER - CROSS                                234

1   A.   Yes, sir.

2   Q.   Away from a reference point?

3   A.   Right.  Away from someone who will kind of undo what

4   they've done so far in the grooming process.

5   Q.   Okay.  And that this isolation is a form of

6   brainwashing?

7   A.   I never used the word brainwashing.

8   Q.   You haven't used that in previous testimony you've

9   given?

10  A.   I may have.  I didn't use it today.

11  Q.   Okay.  So when you testified in the *United States v.*

12  *David* Tellis (phonetic) on October 17th in Oakland,

13  California, you didn't use the term brainwashing?

14  A.   I may have.  You -- you said it today, and I was just

15  saying that I didn't say it today.

16  Q.   Okay.  But that's what you're getting at with the

17  isolation, is to try and control the child?

18  A.   Yes.

19  Q.   To brainwash?

20  A.   You could -- you could look at it like that, yes.

21  Q.   And the whole goal of that is the further away to get

22  from, like you said, a reference point, the easier it is to

23  control?

24  A.   Yes.

25       MR. OLSINSKI:  Nothing further, Your Honor.

D. TURNER - CROSS                                            235

1          THE COURT:  Redirect?

2          MR. LINDAHL:  No, Your Honor.

3          THE COURT:  All right.  Can we release Dr. Turner?

4          MR. LINDAHL:  Yes.  The Government would be

5    requesting that he be released from his subpoena.

6          THE COURT:  Yes.

7          MR. LINDAHL:  Yes, Your Honor.

8          MR. OLSINSKI:  No objection.

9          THE COURT:  No problem, right?

10         MR. OLSINSKI:  No.

11         THE COURT:  All right.  Dr. Turner, thank you very

12   much.  You're released.

13         THE WITNESS:  Thank you, Your Honor.

14         MR. LINDAHL:  Your Honor, the Government is

15   bringing in our next witness.  It will be Michael Ebert.  But

16   I am requesting a sidebar before this witness testifies.

17         THE COURT:  All right.  Quick sidebar.

18         (At sidebar on the record:)

19         THE COURT:  All right.

20         MR. LINDAHL:  Thank you, Your Honor.

21         Your Honor, the Government is making a motion *in

22   limine* in advance of this individual's testimony to preclude

23   him from being able to testify about having undergone the

24   EMDR procedure in his own therapy or any opinion evidence

25   that may be elicited with respect to his own impact having

# Exhibit D

Page 1

1                    UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF PENNSYLVANIA (ALLENTOWN)

2

     UNITED STATES OF AMERICA,     ) Case No:
3                 Plaintiff,       ) 5:12-cr-00287-JKG-1
              vs.                  )
4    JOHN GRAHAM DISNEY,           ) March 5, 2013          FILED
                  Defendant.       ) 9:47 a.m.

5                                                          NOV – 5 2013
                    TRANSCRIPT OF JURY TRIAL
6          BEFORE THE HONORABLE JAMES KNOLL GARDNER
                 UNITED STATES DISTRICT JUDGE

7                                                      ORIGINAL
     APPEARANCES:

8

     For Plaintiff:        SHERRI A. STEPHAN, AUSA
9                          U.S. ATTORNEY'S OFFICE
                           615 Chestnut Street, Suite 1250
10                         Philadelphia, PA 19106
                           (215) 861-8585
11                         sherri.stephan2@usdoj.gov

12   For Defendant:        BENJAMIN BRAIT COOPER, ESQ.
                           609 Hamilton Street, Suite 9
13                         Allentown, PA 18101
                           (484) 844-9455
14                         cooper@bcooperlaw.net

15   ESR OPERATOR:         JENNIFER FITZKO

16   TRANSCRIBER:          JUDI Y. OLSEN, RPR

17

     (Proceedings recorded by electronic sound recording,
18   transcript produced by transcription service.)

19

20

21

22

23          VERITEXT NATIONAL COURT REPORTING COMPANY
                        MID-ATLANTIC REGION
24            1801 Market Street – Suite 1800
                    Philadelphia, PA  19103
25                     (888) 777-6690

1          You may follow Jennifer out.

2                    -   -   -

3                (Jury out.)

4                    -   -   -

5          THE COURT:  The jury has departed the

6     courtroom.

7                You may declare a 15-minute recess.

8                ESR OPERATOR:  Please remain seated.

9     This court is in recess for 15 minutes.

10                   -   -   -

11                (Whereupon, a recess was had between

12    3:47 p.m. and 4:16 p.m.)

13                   -   -   -

14                (Jury in.)

15                   -   -   -

16          THE COURT:  Ladies and gentlemen, that

17    break took a little longer than I anticipated because

18    the attorneys and I had to discuss a few matters out

19    of your hearing.  But we have completed that now, and

20    we'll proceed with the Government's calling its first

21    witness.

22          MS. STEPHAN:  Thank you, Your Honor.  I

23    call Dr. Darrel B. Turner.

24          THE COURT:  All right.

25          Swear him again.

1          ESR OPERATOR:  Please remain standing

2    and raise your right hand.

3                        .-  -  -

4          (DARREL B. TURNER, Ph.D., SWORN.)

5                    -  -  -

6          ESR OPERATOR:  Please be seated.  State

7    and spell your name for the record.

8          THE WITNESS:  My name is Dr. Darrel B.

9    Turner, D-a-r-r-e-l, B., as in boy, Turner,

10   T-u-r-n-e-r.

11         THE COURT:  Thank you.

12         You may proceed.

13         MS. STEPHAN:  Thank you, Your Honor.

14                    -  -  -

15           DARREL B. TURNER, Ph.D.,

16          having been first duly sworn, was

17          examined and testified as follows:

18                    -  -  -

19              VOIR DIRE EXAMINATION

20                    -  -  -

21   BY MS. STEPHAN:

22   Q.    Good afternoon, Dr. Turner.

23   A.    Good afternoon.

24   Q.    Can you please tell the jurors, what is your

25   occupation?

Page 158

```
1   A.      I'm a clinical psychologist.  I specialize in
2   forensic psychology and sex offending, and I'm
3   currently in private practice in the state of
4   Louisiana, where I'm licensed.
5   Q.      Can you please summarize your education and
6   experience?
7   A.      Sure.  I received a bachelor's degree in
8   psychology from McNeese State University in Louisiana
9   and also a master's in counseling psychology from the
10  same school.  And I received my doctorate in clinical
11  psychology from Sam Houston State University in
12  Huntsville, Texas.
13          After that, I did a year's internship at -- in
14  the Federal Bureau of Prisons as an intern at the
15  Federal Correctional Institute at Fort Worth, Texas,
16  and I've since worked at the United States
17  Penitentiary at the Federal Correctional Complex in
18  Pollock, Louisiana.
19  Q.      Thank you.  Now, you had already testified that
20  you have a specialty in forensic psychology and
21  sexual offending.  Can you please tell the jurors
22  what -- what part of your background that specialty
23  is focused on?
24  A.      Sure.  The doctoral program that I attended at
25  Sam Houston State University has traditionally been a
```

1   forensic psychology program.  While I was in school

2   there, we were accredited as a clinical psychology

3   program.  However, most of the research tracks and

4   courses and practicum placements dealt with things of

5   a forensic nature.

6          And early on in a doctoral program, you kind of

7   latch on to a professor and choose what kind of

8   research you're going to do, and for me, that was

9   violent sexual offending, risk assessment, that sort

10  of thing.  And so throughout my graduate career and

11  since then, I've been involved in studying and

12  publishing in that area.

13  Q.     And have you published in that area, you said?

14  A.     Yes, I have, several times.

15  Q.     Numerous different articles?

16  A.     Numerous different articles in numerous

17  different peer-reviewed journals as well as

18  co-authored a textbook chapter.

19  Q.     Okay.  And -- and that was on specific topics

20  related to sexual offending?

21  A.     Yes.

22  Q.     And I'm sorry.  You said you are licensed in

23  Louisiana as a clinical psychologist?

24  A.     That's correct.

25  Q.     And you had also testified that you had worked

1    at the Federal Detention Center for a period of time.

2    Can you please explain what that position entailed?

3    A.      I worked at a United States Penitentiary after

4    my internship.  A penitentiary is just about the

5    highest level of security that you can get, and so

6    there's not a whole lot of therapy that goes on at

7    that level, as you can maybe imagine.  It's a lot of

8    putting out fires, suicide risk assessments.  There

9    are numerous sexual assaults among inmates there.

10        And my job as a staff psychologist is -- it's

11   kind of a fancy term for a catch-all.  I get to do

12   all the work that the fancier psychologists aren't

13   doing.

14        So I do interviews with victims of the sexual

15   assaults, assessments of this -- the offenders in

16   those cases, confrontation avoidance, intakes,

17   medication management, that sort of things.

18   Q.     Okay.  Can you please tell me what, if any,

19   research you've conducted or been -- or participated

20   in any way that pertained to sexual offending or

21   victimization?

22   A.      Yes.  Most of the research that I've been

23   involved with -- I would say 90 percent -- has

24   related to sex offending.  My dissertation was on the

25   civil commitment of violent sexual offenders in

1    Texas, and it was the first study of its kind to poll

2    jurors and involve them in questionnaires after the

3    fact as to what mattered to them in their

4    decision-making processes.

5         And from that study -- it was a -- kind of a

6    large study, so we had broken it up into smaller

7    things -- I've gotten to present to different -- at

8    different conferences and to different organizations

9    many times over in many different places, and it's

10   been a good opportunity for me to -- to network and

11   meet people.

12        And I'm currently conducting a study with --

13   with the Federal Bureau of Prisons that looks at all

14   sex offenders -- child sex offenders in the federal

15   system in the year 2011 that have child pornography

16   as well as contact child sex offenses, and we're

17   looking at things such as grooming patterns and

18   demographics and that sort of thing.  So that's --

19   that's a current research study that I'm involved

20   with.

21   Q.   Okay.  And over the course of your career so

22   far, how many sexual offenders or victims have you

23   either counseled, treated, or evaluated?

24   A.   It's -- it's easily hundreds.  I don't know an

25   exact number.

1    Q.     Okay.  And are you a member -- or are you -- I

2    guess -- I guess it would be considered a member --

3    of the Louisiana Registry of Sex Offender Treatment

4    Providers?

5    A.     Yes, I am.

6    Q.     And what is that?

7    A.     In the state of Louisiana, you have to be a

8    member of this registry in order to be eligible to

9    treat sex offenders for the state of Louisiana.  And

10   the requirements are pretty rigid, and they require

11   a -- a good amount of documentation of your hours in

12   training and any experience that you've had in the

13   area of treating sex offenders.  And so I'm -- I'm

14   now a member of that registry based on completion of

15   that documentation.

16   Q.     Okay.  Based upon your specialty area -- as you

17   said, forensic psychology with an emphasis on sexual

18   offending -- are you familiar with the research

19   that's been conducted and published in that specific

20   area?

21   A.     Yes, I am.

22   Q.     And as part of your profession, can you tell me

23   how research plays a role in what you do on a daily

24   basis?

25   A.     Certainly.  It plays a huge role.  It's one of

1    the major factors.  We're ethically bound as

2    psychologists to stay abreast of the most current

3    research.  We make very important decisions that

4    affect people's lives, and we are expected -- it's

5    part of our ethical code, and it's just morally

6    right -- to know what the most current treatments

7    are, what the facts state, what the numbers are

8    looking like, how things are changing in the

9    population with, for example, the advent of the

10   Internet, things like that.

11        So just as a medical doctor has to stay abreast

12   of -- of new medications and things that work -- so

13   that they don't maybe have to amputate your leg; they

14   can give you a pill for it -- we have to stay abreast

15   of -- of what's new and -- and what's current in our

16   field as well.

17   Q.    And have you done that specifically in the area

18   of sexual offending?

19   A.    Yes, I have.  Especially because I work in that

20   area and publish in that area, I have to stay abreast

21   of -- of the most recent and important articles, yes.

22   Q.    Okay.

23            MS. STEPHAN:  May I approach the

24   witness, Your Honor?

25            THE COURT:  You may.

Page 164

1    BY MS. STEPHAN:

2    Q.      Dr. Turner, I just handed you what's been

3    premarked as Government's Exhibit Number 1.  Do you

4    recognize this document?

5    A.      Yes, I do.

6    Q.      And what is it?

7    A.      This is a copy of my CV, or my curriculum

8    vitae.

9    Q.      Does it accurately -- does it accurately

10   reflect your education, background, including,

11   basically, your jobs, any kind of publications, or

12   teaching assignments that you've had?

13   A.      It does, yes.

14   Q.      Thank you.

15                   MS. STEPHAN:  Your Honor, I move for the

16   admission of Government's Exhibit Number 1.

17                   THE COURT:  Any objection?

18                   MR. COOPER:  No, Your Honor.

19                   THE COURT:  In the absence of objection,

20   Government's Exhibit Number 1 is received into

21   evidence.

22                        -   -   -

23                   (Whereupon, Exhibit Government's-1 was

24   admitted into evidence.)

25                        -   -   -

```
 1   BY MS. STEPHAN:

 2   Q.      Dr. Turner, through your contact with sexual

 3   offenders, do you gain insight and understanding into

 4   the ways sexual offenders succeed in committing their

 5   crimes, including such things as grooming behaviors?

 6   A.      Yes, I do.

 7   Q.      And I think you may have already testified, but

 8   has that been a focus of your -- your own

 9   professional goals?

10   A.      It has.  It's been a focus of treatment.  It's

11   been a focus of interest in risk assessment and

12   certainly in research that I have conducted and am

13   conducting and plan to publish.

14           MS. STEPHAN:  Your Honor, at this time,

15   I'd like to move this expert in as an expert in

16   clinical psychology with an emphasis in forensic

17   psychology and sex offending.

18           THE COURT:  Do you care to cross-examine

19   on qualifications, Mr. Cooper?

20           MR. COOPER:  Briefly, Your Honor.

21           THE COURT:  You may do so.

22                    -   -   -

23             VOIR DIRE EXAMINATION

24                    -   -   -

25   BY MR. COOPER:
```

Page 166

1    Q.    Good afternoon, sir.

2    A.    Good afternoon.

3    Q.    Have you ever been qualified before as an

4    expert in the field of clinical psychology with the

5    emphasis on sex offender treatment?

6    A.    No, I have not.

7    Q.    And how long have you been a clinical

8    psychologist with this area of specialty?

9    A.    I received my Ph.D. in 2011, and I've worked

10   before and since that time in -- in this field.

11   Q.    Okay.  And when you've worked before and since

12   that time in this field, your work before, as you

13   testified before, was with your internship and

14   working in the federal penitentiary; is that correct?

15   A.    No, sir.  I've worked in the federal

16   penitentiary since I've -- since I've graduated --

17   Q.    Okay.

18   A.    -- as a staff psychologist.

19   Q.    All right.  And in your testimony, have you

20   ever been asked before today to be an expert, to be

21   qualified as an expert?

22   A.    No, I have not.

23              MR. COOPER:  Thank you very much.

24              THE COURT:  All right.  Any redirect on

25   qualifications?

1    MS. STEPHAN:  No, Your Honor.

2    THE COURT:  Mr. Cooper, any objection to

3  the qualifications of this witness to render expert

4  opinions in the field of clinical psychology with an

5  emphasis on forensic psychology and sex offending?

6    MR. COOPER:  No, Your Honor.

7    THE COURT:  In the absence of objection,

8  I find Dr. Turner qualified to render expert opinions

9  in that field and in those fields.

10    What weight, if any, will be given to

11  the opinions of the expert will be determined by you,

12  the jury.

13    You may examine him on the merits.

14    MS. STEPHAN:  Thank you, Your Honor.

15         -  -  -

16    DIRECT EXAMINATION

17         -  -  -

18  BY MS. STEPHAN:

19  Q.    Dr. Turner, can you please tell me what is

20  meant by grooming?

21  A.    Grooming is a term used to describe behaviors

22  that a sex offender engages in primarily to get

23  victims, to keep victims, and to get victims to not

24  tell.  That's sort of a -- a nutshell definition of

25  what grooming is.  It's -- of course, it's much more

1    complicated than that, but --

2    Q.    Can you give some examples of types of grooming

3    behaviors that you're familiar with or that you see

4    frequently based upon your education and research?

5    A.    Certainly.  Some of the more common types of

6    grooming behaviors involve overexposure of the

7    intended victim to sexuality, whether it's exposing

8    the victim to other images -- and I'm speaking of a

9    child victim -- whether it's exposing that victim to

10   other images of child pornography, whether it's

11   exposing that victim to other images of pornography

12   in general, adult pornography, whether it's talking

13   about porn -- pornography, talking about sex.

14   Anything that can normalize sex, that's a common

15   technique that's used.

16           The use of alcohol is -- is -- is a very -- one

17   of the more common grooming techniques as well.

18           Threats, sometimes direct physical threats,

19   sometimes more indirect covert threats that play on

20   guilt and fear.

21   Q.    Do grooming behaviors have any impact on victim

22   resistance?

23   A.    Yes, they do.

24   Q.    And can you please tell me in what ways you see

25   that?

1   A.      One of the -- one of the primary functions --

2   functional behaviors in grooming is going to be

3   isolation.  Isolation is one of the most, if not the

4   most, important factor in grooming.

5          The reason for that is, a child having sexual

6   contact with an adult is against the law, and -- and

7   it's bad, and it doesn't happen all the time.  And

8   we, as a society, do a good job or -- or do our best

9   to make sure that that doesn't happen.  We warn our

10  children.  We talk to our children.  We have

11  commercials and things like that, teachers,

12  educators.

13         And during the grooming process, an offender

14  wants to get their intended victim as far away from

15  those warnings as possible.  They want to isolate

16  that victim.  They want to basically destroy that

17  victim's frame of reference.

18         And when I say "frame of reference," I mean

19  anyone or anything that could remind that child that,

20  hey, this isn't normal; this isn't good; this isn't

21  supposed to happen.

22         So if -- if a child is successfully isolated,

23  successfully according to the offender, then that

24  child's sense of what's happening and -- and the

25  rightness of it and the goodness of it, and, in some

 1   cases, the -- the fun of it, depending on -- on what

 2   nature the grooming takes, becomes very warped.

 3        The child is removed from their social support

 4   system, from the people that would normally act as

 5   their frame of reference and as their protectors, so

 6   much so that the offender oftentimes becomes the only

 7   social support system that remains for the victim.

 8        And -- and when that occurs, you can imagine

 9   that -- that there's little chance for that victim to

10   have a normal response to the abuse.

11   Q.   Can you tell me how alcohol fits into what it

12   is that you just talked about?

13   A.   Certainly.  Alcohol is, from an offender's

14   point of view, from a groomer's point of view, an

15   extremely effective tool.  I think we're all aware

16   that alcohol acts as an inhibition-lowerer.  When

17   human beings consume alcohol, the larger amount of

18   alcohol you consume, the more willing you are to do

19   things that you wouldn't normally do.

20        In the area of child sex offending, it -- it

21   does more than that.  Because you're -- because

22   you're dealing with children -- so not only are you

23   lowering inhibitions, but you're establishing a sense

24   of -- I don't know if trust is the right word, but

25   you're establishing a sort of special relationship,

1    in that, this is our secret; no one knows about it;

2    I'm giving you alcohol; you're drinking alcohol;

3    you're having a good time drinking the alcohol; maybe

4    your friends are involved; maybe they're not.

5         And that causes the victim to question their

6    own sense of responsibility in the abuse.  You know,

7    I -- I -- I did have fun; my friends were there; does

8    that mean that I -- does that mean that I enjoyed

9    this as well; I've been being told that this is

10   normal; I've been being shown these images.

11        It becomes very, very, very, very confusing;

12   and it makes it less likely that the victim will come

13   forward or will ever seek help.

14   Q.    Can you please further elaborate on that point?

15   Based upon your education and your research and your

16   clinical experience, when alcohol is provided by a

17   sex offender to an adolescent or a teenager and the

18   teenager or adolescent accepts it and drinks it --

19   and you -- you -- you just talked about this -- this

20   secret sort of relationship exists -- how does that

21   impact, if in any way, reporting, disclosing, telling

22   anybody about what's going on?

23   A.    One way that it does that is that children feel

24   bad -- and if they don't, they're most certainly told

25   by the offender that they should feel bad for

1    consuming alcohol or that it's wrong.

2            And so you get the sense that even if I do come

3    forward, I've done enough -- I've done enough bad

4    things that I'm not going to be believed; my -- my

5    credibility is shot.  So here I am now, this troubled

6    child that drinks and shouldn't drink and is doing

7    all these things and looking at all these pictures,

8    who's -- who's going to believe me?

9            So that's probably the -- the most -- one --

10   one of the more negative ways or powerful ways that

11   alcohol can impact coming forward.

12   Q.      And have you seen this in -- in your background

13   and research?

14   A.      Absolutely, yes.

15   Q.      Now, you touched upon two -- showing of

16   pornography, showing adult pornography.  I think you

17   testified about reducing inhibitions.  Can you -- can

18   you talk a little bit further about how that impacts

19   a victim and allows for victimization?

20   A.      Certainly.  We -- we talk about normalizing

21   sexuality in children as part of the grooming

22   process.  As I said earlier, a child having sex with

23   an adult is not normal in our society, so the

24   offender wants to make it appear normal.  They want

25   to almost -- you can think of it as re-parenting, if

1    you would.  So you're re-teaching.

2         During your opening statements, you mentioned,

3    you know, I'll show you, or let me show you, as you

4    talked about the videos and things like that.

5    Constantly talking about sex, constantly seeing these

6    images, coupled with isolation, coupled with alcohol,

7    coupled with a poor, perhaps, social support

8    structure to begin with, and the -- the thought that

9    sex is bad or that sex as a child with an adult is

10   bad, it becomes a -- it becomes a hazy ground.  It's

11   not as clear as it once was, especially as day after

12   day after day after day after day, they're being

13   reinforced.

14        And sometimes it's -- sometimes it's not as

15   much of a threat as it is just a simple -- the simple

16   fact that the child is getting attention from

17   someone.

18        A lot of these children that are victims come

19   from -- from homes where their social support system

20   is nonexistent.  And so simply getting attention from

21   an adult, even if it's -- even if it's strange or bad

22   attention, can be very rewarding for these victims.

23   Q.   Okay.  I believe that you've probably touched

24   on this already, but can you tell me, what are

25   counterintuitive behaviors of sexual assault victims?

1   What does that mean?

2   A.      We tend to think as a society that when a child

3   is victimized, he or she runs screaming to the first

4   house that they can find and bangs on the door and

5   tells someone and the police are called and

6   everything is taken care of.

7          Research shows that this is not the case at

8   all.  60 to 80 percent -- we -- we understand now,

9   through multiple research studies, that 60 to 80

10  percent of victims of child sexual abuse don't

11  disclose their abuse until they become an adult.

12         There's a lot more statistics.  I don't know

13  how many of them you want me to get into.

14  Q.      Well, let me -- let me just start with this.

15  When you refer to a child --

16  A.      Um-hmm.

17  Q.      -- are we referring to basically anybody under

18  the age of 18?

19  A.      Correct.

20  Q.      Okay.  So research that you're talking about

21  talks about all different age ranges?

22  A.      Is generalized to anyone under that age, yes.

23  Q.      Under 18, okay.

24         So can you tell me, when -- when you're talking

25  about counterintuitive, you're saying that -- that

1   some people may think that most victims cry out and

2   report immediately, maybe tell a parent immediately,

3   fight back physically.  You're saying that in your

4   research and experience that that is actually not the

5   norm, not what is seen most times?

6   A.      That's right.  That's more the exception than

7   the norm.  Most of the time, there's going to be at

8   least a delay.  In 58 percent of the cases, it's at

9   least a five-year delay in reporting anything at all,

10  and usually that's just from the onset of the

11  victimization.

12  Q.      Is there such a concept as family grooming?

13  A.      There is, yes, or environment grooming.  And

14  that is when you -- as an offender, there's not only

15  grooming of the victim, of the specific child, but

16  there's grooming of the environment as well.  There's

17  establishing a trust -- a trusting relationship with

18  parents.  There's, you know, I'm isolating this

19  child, and I'm spending a lot of time with this child

20  because I want to help this child, or because I want

21  to provide this child with the -- you know, whatever

22  parental support they never got.

23          I mean, it varies from case to case, but there

24  is.  And sometimes that involves taking a position

25  in -- in society that -- that simply allows access to

Page 176

1   children, frequent access to children.

2         So environmental or family grooming can mean --

3   means both.  It means establishing the trust of the

4   caregiver so that they're likely to allow you access

5   to their child or the victim, and it also means

6   putting yourself in a position where it would make

7   sense, because of the job you have, that you would

8   have that access; you're a daycare worker, whatever

9   the case may be.

10  Q.     Would an example of that include a situation in

11  which a perpetrator would say to a parent -- a

12  mother, a father, or a parent -- that they were

13  helping the victim, for instance, with an alcohol

14  problem?

15  A.     Certainly, yes.

16  Q.     And if I understand you correctly, it -- it's a

17  manner in which to convince the parent or guardian

18  that your intentions are good and not bad?

19  A.     Right, that your intentions are to help the

20  child, that you -- whatever the case may be.  A

21  good -- someone that's good at grooming is going to

22  be able to touch whatever buttons they need to touch

23  in the parents to get frequent -- what's the word --

24  unsupervised access to the children.

25         And then, also, that becomes -- that feeds on

1   itself in terms of family grooming because, in a

2   sense, what they're doing also by establishing that

3   trust is if -- if the child ever does disclose, then

4   they have this sort of ground work that they've laid

5   as to, hey, I was -- we all knew what a troubled

6   child this was; I was helping; you know, what -- can

7   you believe this; this is what I get for trying to

8   help and be a good person, that sort of thing.

9   Q.    Okay.  Do you see fitting into that any

10  attempts by a perpetrator/offender to try to alienate

11  the child from its caregiver or parent or try to

12  create any kind of, like, rifts between a child and a

13  parent?

14  A.    That's extremely common, and -- and it's --

15  it's seen with great frequency, along with the use of

16  alcohol and discussion and showing of pornography to

17  a -- to an intended victim as being one of the -- the

18  main or preferred types of grooming, yes.

19  Q.    Okay.  And what can you tell me about a

20  victim's either lack of support structures or, you

21  know, how that compares to victims who have good

22  support structures?  Is -- is -- do you see any kind

23  of correlation between counterintuitive behaviors

24  and -- and disclosures with victims who have no

25  support compared to those who do?

1    A.    Yes.

2    Q.    If you understand that question.

3    A.    I do.

4    Q.    Okay.

5    A.    I do.  When you say "counterintuitive

6    behaviors," you refer to what we were talking about

7    earlier in terms of maybe not disclosing right

8    away --

9    Q.    Right.

10   A.    -- or maybe not even necessarily trying to

11   distance themselves from the offender, and -- and

12   that happens all the time.  And a big push in

13   research is to kind of get that to be not considered

14   a counterintuitive behavior anymore, because it's

15   actually not; it's more -- it's more normal.

16         So -- and research does show a strong

17   relationship between a troubled home life or lack of

18   good, solid, consistent support system to a

19   likelihood of not disclosing or disclosing at a much

20   later date or even disclosing to maybe -- maybe

21   friends or anyone other than parents, police,

22   authority.

23         They're afraid that they're not going to be

24   trusted.  They're afraid that they're going to be

25   blamed for not stopping it themselves.  And this

1   is -- and this is what's kind of counted on by the

2   offenders, unfortunately.

3   Q.      Can you tell me, following up on that, whether

4   or not self-esteem issues or lack of self confidence

5   plays any role in victimization?

6   A.      It can, especially if the offender can pick up

7   on that and can use that as part of the grooming

8   process.  So not only -- it kind of goes with what we

9   were talking about earlier about any attention.

10  So -- so even negative attention -- but it doesn't

11  have to be negative attention.  It can be, this is

12  the person -- this is the only person in their life

13  telling them that they're attractive or that they're

14  smart or that they're fun to be around or that

15  they're photogenic, whatever the case may be.

16  Q.      Okay.  And what about a victim feeling shame?

17  How does that impact their behaviors?

18  A.      It -- it goes hand in hand with abuse.  It

19  certainly goes hand in hand with abuse that involves

20  the use of alcohol, because alcohol does lower

21  inhibitions and -- and alcohol does affect -- I mean,

22  everything.  It affects everything.  And it -- it

23  is --

24          Shame and fear are -- are probably the two --

25  the two biggest emotions that are shown in the

1    literature and that I've seen in my experience that

2    are experienced by victims.  They are -- they are

3    afraid of what may occur, sometimes physically, but

4    they're also -- they're also quite ashamed.

5         And it's not necessarily a fear of what may

6    happen to them, but sometimes the offenders tell

7    them, you know, I'll -- sometimes it can be as

8    blatant as, if you tell anyone, I'll kill your

9    mother, or I'll kill your father, and sometimes it

10   can be as passive as, well, you know your father

11   would kill me if he ever found out, and you know what

12   would happen to your family if that -- if that were

13   to happen; he'd go to jail, and they'd all end up,

14   you know, blah, blah, blah.

15        So there's this -- there's the sense of fear,

16   and then there's also the sense of shame,

17   recognizing -- disclosing that you've been abused

18   means recognizing and admitting that you've been

19   abused, and -- and that's an extremely shameful and

20   horrible thing to have to admit to yourself and to

21   everyone in your world, especially as a child.

22   Q.    Thank you.

23        Based upon your research and experience, have

24   you seen any situations where the victim fails to

25   report or disclose because they want to protect a

1    loved one in some way or -- some way?

2    A.    Certainly.  That's very common.  There's a lot

3    of pressure that victims often feel to hold the

4    family together.  In some cases, it's, I don't want

5    to be a cause for my parents splitting.  Or in some

6    cases I've seen it's, I don't -- if I don't take this

7    abuse, then it will -- it's going to be one of my

8    siblings.

9         So it's a lot of -- it's a lot of pressure

10   that's felt by the victim -- by the child victim

11   to -- to hold -- hold the family together, and -- and

12   the only way to do that is to -- to not say anything,

13   because saying something would be so explosive

14   that -- that the family would then have all these

15   huge problems which are, of course, their fault, or

16   that's how they would feel.

17   Q.    Would it follow from that that if a victim

18   didn't want to disclose because -- felt like a parent

19   would be harmed or put in a worse situation because

20   of a disclosure, that they decide to wait and not say

21   anything?

22   A.    Certainly.  That's a -- that's a very big

23   factor in waiting to disclose.

24         There's also a direct relationship between

25   female victims that have sort of a troubled

1   relationship with their mothers and hesitancy in

2   disclosing or not disclosing at all.  That's a very

3   strong relationship that the research has showed.

4   Q.    Okay.  And what about fighting back?  Is it

5   normal for a victim to fight back, or is it not

6   normal, based upon your education and research?

7   A.    I would say it's -- it's more -- it happens

8   more often that a victim doesn't fight back, and if

9   they do, it's not -- it's not for very long.  Again,

10  these are children, and for all -- all of the same

11  reasons that they're scared to disclose, they're --

12  they're scared to fight back.

13        Usually -- usually fighting back occurs, if

14  it -- if it is going to occur, it occurs early on

15  and -- and not for long.

16  Q.    Okay.  And how does grooming behaviors like the

17  giving of alcohol or exposure to adult pornography

18  affect a -- a child deciding to fight back or not?

19  A.    Well, that -- I mean, that -- that's the

20  kicker.  If the grooming is done to a certain degree

21  or if the -- if the grooming punches all the right

22  buttons and uses all of the right tools and

23  techniques, then the likelihood that the child is

24  going to fight back becomes less and less.

25        You can almost think of it as -- in terms of

Page 183

1    if -- if someone were to try to sexually assault a

2    child the first time they met them, there's a pretty

3    greater chance that the child is going to run away or

4    tell someone.  But what research shows us is that

5    eight out of ten child sexual assault victims know

6    their offender.

7         And so there is this process.  There is this

8    sort of foot-in-the-door technique of kind of they're

9    okay with this, then they're okay with this, and this

10   makes them feel weird.  But then it becomes more and

11   more of a car salesman giving you more and more and

12   more, and you need that TrueCoat, and so on and so

13   forth until -- and that's kind of the process that's

14   used.

15   Q.    Okay.  Thank you.

16             MS. STEPHAN:  I have no further

17   questions at this time, Your Honor.

18             THE COURT:  All right.  You may

19   cross-examine.

20             MR. COOPER:  Thank you, Your Honor:

21                  -   -   -

22             CROSS-EXAMINATION

23                  -   -   -

24   BY MR. COOPER:

25   Q.    Good afternoon, sir.

Page 184

1   A.     Good afternoon.

2   Q.     I want to go over some of the particulars of

3   the testimony that you just gave.

4          First of all, when you are doing your work in

5   clinical assessment, you are talking with people, and

6   you're looking at documentation to either confirm or

7   deny what's being reported; is that correct?

8   A.     That's correct some of the time, yes.

9   Q.     Some of the time, that wouldn't be correct.

10  Some of that time, there would be simply the

11  reporting by the alleged victim?

12  A.     That's correct.

13  Q.     And the determination is being made based on

14  what that particular person tells you, as far as

15  your -- your knowledge of the field is concerned; is

16  that correct?

17  A.     Yes.  If I understand the question, that's

18  correct.

19  Q.     And that's for purposes of treating that

20  victim; is that correct?

21  A.     Correct.

22  Q.     For what they claim to have happened to them;

23  is that correct?

24  A.     That's correct.

25  Q.     And this is not done for assessment to say --

1  to go into court and to testify as to the credibility

2  of this particular person; is that correct?  You

3  don't do that?

4  A.    No, I don't do that.  I've also never testified

5  in that capacity.

6  Q.    Okay.  And as far as the -- the -- the

7  information that is being given to you, it's being

8  given to you pretty much in terms of a therapeutic or

9  clinical environment, is that correct?

10  A.    That's correct.

11  Q.    And that would not be what would be called a

12  forensic environment?  And what I mean by "forensic,"

13  I mean like a courtroom, where there would be direct

14  examination, cross-examination, questions about bias,

15  questions about motive, any of those things.  Is that

16  correct?

17  A.    I have conducted a risk assessment before, and

18  I did use collateral information and so on and so

19  forth.  But if you're talking about terms of

20  treatment, then -- then yes.  And if -- if it's not a

21  court-related issue, then you're right; it's

22  generally what's reported to me.

23  Q.    Now, you've also examined sex offenders; is

24  that correct?

25  A.    Yes.

Page 186

1    Q.    Or you're treating sex offenders or assessed

2    sex offenders; is that correct?

3    A.    Yes.

4    Q.    And you assess them for purposes of what the

5    problem might be and future risk and treatment needs

6    and things of that nature, is that correct?

7    A.    Correct.

8    Q.    And that would be offenders that would be

9    adults mainly?

10   A.    Yes.  I've also worked with juveniles before,

11   but primarily adults.

12   Q.    Primarily adults?

13   A.    Yes.

14   Q.    And when I say "adult," this would be anybody

15   over the age of 18?

16   A.    Yes.

17   Q.    And up to whatever?

18   A.    Correct.

19   Q.    Okay.  And as far as when you talked to those

20   sex offenders and the age ranges, if you talked to --

21   have you talked to sex offenders that are in the age

22   range of 50 and above?

23   A.    Yes.

24   Q.    How many times?

25   A.    I -- I -- I don't remember.

1    Q.    Okay.  Well, you've done -- you said you've

2    talked to hundreds?

3    A.    Yes.

4    Q.    But you don't know how many as far as that age

5    group is concerned; am I understanding you right?

6    A.    That's correct.

7    Q.    Okay.  And you do remember talking to some in

8    that age group; is that correct?

9    A.    Yes.

10    Q.    And when you've talked to some in that age

11    group and they give you their history of what they

12    did in terms of the abuse or their patterns, okay,

13    they had -- if they were 50 and above, they had a

14    long history of doing this; is that correct?

15    A.    Not necessarily, no.

16    Q.    In some cases, yes, and in some cases, no?

17    A.    Correct.

18    Q.    It would just depend on who said what; is that

19    correct?

20    A.    Yes.

21    Q.    Okay.  You also said that -- and I want to be

22    sure I'm accurate when you -- you say that -- you

23    said that the studies are that eight out of ten of

24    the victims of sexual abuse know who the perpetrator

25    is, know them before that; in other words, know who

1     they were --

2     A.      Yes.

3     Q.      -- is that correct?

4     A.      Yes.

5     Q.      And that is based on the research studies; is

6     that right?

7     A.      Yes.

8     Q.      And the research studies are based on the same

9     type of information that you're getting, which is the

10    clinical evaluation; is that correct?

11    A.      Research studies can be based on a -- on a

12    variety of information.

13    Q.      Okay.  It could be information just like you

14    talked about doing or other types of information; is

15    that correct?

16    A.      Correct.

17    Q.      The general knowledge is that eight out of ten

18    know who the perpetrator of the assault is; is that

19    correct?

20    A.      Correct.

21    Q.      And then you also said that, if I'm -- if I'm

22    correct -- I want to do some numbers just to make

23    sure that I'm accurate on the numbers.

24          Did I hear you say 60 to 80 percent of the

25    victims don't disclose until they reach adult age?

1    A.      60 to 80 percent of victims who do disclose do

2    not do so until they've reached adult age.

3    Q.      Okay.  60 to 80 percent of those disclose [sic]

4    until they reach adult age.  So that means -- does

5    that mean that 20 to 40 percent will disclose it

6    immediately, even if they're under 18?  Is that what

7    that means?

8    A.      No, sir.

9    Q.      Okay.  Does it mean that in the cases that

10   you've -- that you've studied, the cases vary,

11   meaning that sometimes -- sometimes a victim will

12   disclose it immediately?  Is that correct?

13   A.      Certainly.

14   Q.      That does happen?

15   A.      Yes, sir, absolutely.

16   Q.      And it happens when -- let's say they're under

17   the age of 18, between the ages of 14 and 18.

18   Let's -- let's deal with that age range.  Okay?  In

19   the age range of 14 to 18, what is your research

20   information, if you have it, of those that do

21   disclose it immediately?

22   A.      What is my research information in terms of

23   what percent disclose immediately?

24   Q.      If you have it.

25   A.      In that age range, I don't have that.  I do

1    have a study that looks at children in general and --

2    and those that disclose immediately.  I could look at

3    that if you like, but it's not -- it's not specific

4    to 14 to 17 year olds.

5    Q.     Okay.  Would that be specific to children under

6    the age of 18?

7    A.     Yes, sir.

8    Q.     And that would be ages lower than 14?

9    A.     It would include ages lower than 14, yes, sir.

10   Q.     And it doesn't break it down by age in terms of

11   which percentage in what age group?  It doesn't --

12   the study doesn't do that?

13   A.     No, sir.

14   Q.     Now, you also said that -- if I understand you

15   correctly, that in the delay -- when you said -- you

16   talked about a five-year delay sometimes that

17   happens.  I want to make sure I heard you right.  Did

18   you say 50 percent involve a five-year delay?  Am I

19   stating that accurately?

20   A.     50 per -- I'm sorry.  56 percent --

21   Q.     56?

22   A.     -- of those who disclose have at least a

23   five-year delay between the onset of victimization

24   and their disclosure.

25   Q.     Okay.  50 percent of those -- 56 percent of

1    those who disclose, there's a time gap of event

2    versus disclosure of five years?

3    A.    Of at least five years, yes.

4    Q.    Now, you said before, when I asked you earlier,

5    this is the first time you've ever testified as an

6    expert in this field?

7    A.    Yes.

8    Q.    And you are -- in your work that you've done

9    and the studies that you've done and the -- and the

10   research that you've done -- are you in private

11   clinical practice now?

12   A.    Yes, I am.

13   Q.    And for how long have you been in private

14   clinical practice?

15   A.    I've been in private clinical practice for

16   about two weeks.

17   Q.    And before that, if you were not in private

18   clinical practice, you were working as a staff

19   psychologist, for example?

20   A.    Yes.

21   Q.    And that would have been at the federal

22   penitentiary?

23   A.    Yes.

24   Q.    And before you worked at the federal

25   penitentiary and being a staff psychologist, you

1    worked as an intern in the Federal Bureau of Prisons.

2    A.    Yes.

3    Q.    And you also did some internships.

4          In your work right now -- in your clinical work

5    right now, how much are you being paid to testify

6    today, if anything?

7    A.    250 an hour.

8    Q.    $250 per hour?

9    A.    Yes.

10   Q.    Okay.  And you come from Louisiana; is that

11   correct?

12   A.    Yes.

13   Q.    You traveled from Louisiana?

14   A.    Yes, I did.

15   Q.    Okay.  And that's being taken care of as well?

16   A.    Yes.

17             MR. COOPER:  May I have a moment, Your

18   Honor?

19             THE COURT:  You may.

20             THE WITNESS:  I'm not reimbursed --

21             I'm sorry.  May I say --

22             THE COURT:  Yeah, you may complete your

23   answer.

24             THE WITNESS:  Clarify.  I'm reimbursed

25   for travel at a lesser rate than 250 an hour.

```
 1              MR. COOPER:  Understood.

 2              THE WITNESS:  Okay.

 3                   -  -  -

 4                  (Pause)

 5                   -  -  -

 6  BY MR. COOPER:

 7  Q.    The last question is, with this particular

 8  matter that's in court, the United States versus

 9  Disney, you have not interviewed anyone with respect

10  to that; is that correct?

11  A.    That's correct.

12  Q.    Okay.

13              MR. COOPER:  That's all I have, Your

14  Honor.  Thank you.

15              THE COURT:  All right.  Any redirect?

16              MS. STEPHAN:  Very brief, Your Honor.

17              THE COURT:  Go ahead.

18                   -  -  -

19              REDIRECT EXAMINATION

20                   -  -  -

21  BY MS. STEPHAN:

22  Q.    Dr. Turner, can you tell me what psychologists

23  in your profession can learn through interviews or

24  treatment of sex offenders?

25  A.    We can learn a great deal.  Interviews and
```

1    treatment -- if -- if a -- if a sex offender is -- is

2    engaged in treatment, we can oftentimes learn things

3    about their grooming behaviors, things about their

4    past, things about their -- their thinking, their

5    planning, their degree of empathy, their sex --

6    degree of sexual deviance.  We -- we learn things

7    about their history, their criminal history,

8    everything that we can.

9    Q.    Okay.  And would you say a fair number of

10   research is focused on learning things through the

11   sexual offender rather than the victim?

12   A.    Yes.

13   Q.    And during your time working for the -- a

14   Federal Detention Center -- I forget.  What -- what

15   was -- what is the name of the place you worked?

16   A.    United States Penitentiary.

17   Q.    United States Penitentiary?

18   A.    Um-hmm.

19   Q.    Were you permitted to engage in something of

20   this nature, being called as an expert in a case like

21   this?

22   A.    No, I was not.

23   Q.    Can you just explain?

24   A.    There's a conflict of interest in working as a

25   staff psychologist conducting therapy with inmates

1   and testifying in federal court in this nature.  So I

2   was not allowed to do that --

3   Q.    Okay.

4   A.    -- as an employee of the Bureau of Prisons.

5   Q.    And you worked there for the past two and a

6   half years; is that accurate?

7   A.    Yes.

8   Q.    And during your time at the federal

9   penitentiary, did you have occasion to have contact

10  and counsel sex offenders?

11  A.    Yes, I did.

12  Q.    Thank you.

13          MS. STEPHAN:  I have nothing further,

14  Your Honor.

15          MR. COOPER:  No recross, Your Honor.

16          THE COURT:  All right.  Attorney

17  Stephan, is this witness excused from further

18  participation in the trial?

19          MS. STEPHAN:  Yes, please.

20          THE COURT:  Any objection from the

21  defense?

22          MR. COOPER:  No, sir.

23          THE COURT:  All right.  Dr. Turner, you

24  are excused.  Thank you for your testimony.  And you

25  may step down, and you may leave if you wish.

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  You may stay, if you wish.

 3    It's a public trial.

 4              THE WITNESS:  Thank you, Your Honor.

 5                     -  -  -

 6              (Witness excused.)

 7                     -  -  -

 8              THE COURT:  May I see counsel briefly at

 9    the bench, not for the record.

10                     -  -  -

11              (Whereupon, there was a brief sidebar

12    conference held off the record.)

13                     -  -  -

14              THE COURT:  The attorneys and I are

15    going to have to be in court another 45 minutes or so

16    on things we need to discuss and decide out of your

17    hearing to make it run more smoothly for you when

18    you're in the courtroom, and so we're going to excuse

19    you for the evening in a moment, but not them.

20              And we'll ask you to return tomorrow

21    morning a few minutes before 9:30, and we will

22    attempt to resume the trial at that time with the

23    next witness.

24              Leave your notes on your chairs.  My

25    staff will lock them up.
```

# Exhibit E

```
1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                         ORLANDO DIVISION

3

   UNITED STATES OF AMERICA,     )
4                                )
              Plaintiff,         )        Case Number
5                                )
                   v.            )    6:15-cr-226-Orl-41GJK
6                                )
   DANE GILLIS,                  )
7                                )
              Defendant.         )
8  _____)

9

10

                       Transcript of the sentencing
11
                  before the Honorable Carlos E. Mendoza
12
                     September 21, 2016; 9:04 a.m.
13
                           Orlando, Florida
14

15

16  Appearances:

17  Counsel for Plaintiff:  Karen L. Gable
                            Emily C.L. Chang
18

19  Counsel for Defendant:  Karla M. Reyes
                            James T. Skuthan
20

21

        Proceedings recorded by mechanical stenography,
22  transcript produced by computer.

23  _____

                     Diane Peede, RMR, CRR
24            Federal Official Court Reporter
           401 West Central Boulevard, Suite 4600
25                   Orlando, Florida  32801
```

Index of transcript

                                                    Page

                        Susan Sullivan
Direct by Ms. Reyes                                  10
Cross by Ms. Gable                                   16
Redirect by Ms. Reyes                                28


                        Darrel Turner
Direct by Ms. Gable                                  32
Cross by Ms. Reyes                                   51
Redirect by Ms. Gable                                62

- - - - - - - -

```
 1      that's not yours and I'll have them clean up after you.
 2                   Ms. Reyes, do you have any further witnesses to
 3      call at this time?
 4                   MS. REYES:  No, Your Honor.
 5                   THE COURT:  Will your client be making a statement
 6      to the Court before we move on to the government's case?
 7                   MS. REYES:  Can he be the last one to speak, Your
 8      Honor?
 9                   THE COURT:  He can be the last one.
10                   MS. REYES:  Thank you.
11                   THE COURT:  Ms. Gable, do you have any witnesses
12      you'd like to call at this time?
13                   MS. GABLE:  We do, Your Honor.  We call Dr. Darrel
14      Turner.
15                   THE COURTROOM DEPUTY:  Please come forward and be
16      sworn.  Raise your right hand.
17                   Do you solemnly swear or affirm under the penalty
18      of perjury that the testimony you give will be the truth, the
19      whole truth and nothing but the truth?
20                   DR. DARREL TURNER:  Yes, ma'am.
21                   DARREL TURNER, PLAINTIFF'S WITNESS, SWORN
22                   THE COURTROOM DEPUTY:  Have a seat there, please.
23                   THE COURT:  All right.  And once seated, please
24      make yourself comfortable with the chair's proximity to the
25      microphone, state your full name into that microphone,
```

1   spelling your last name.

2               THE WITNESS:  Yes, Your Honor.  My name is Dr.

3   Darrel Turner, last name T-u-r-n-e-r.

4               THE COURT:  Ms. Gable, your witness.

5               MS. GABLE:  Thank you.

6                         DIRECT EXAMINATION

7   BY MS. GABLE:

8   Q    Good morning, Dr. Turner.  What do you do for a living?

9   A    I'm a clinical and forensic psychologist.

10  Q    Where do you practice?

11  A    I'm sorry.  I'm licensed in the states of Louisiana and

12  in Texas.

13  Q    Did you go to school?

14  A    I did, yes.

15  Q    Where did you go to school and what degrees did you

16  receive?

17  A    I have a bachelor's degree in psychology from McNeese

18  State University in Louisiana, a master's degree in

19  counseling psychology from the same institution, and a Ph.D.

20  in clinical psychology from Sam Houston State University in

21  Huntsville, Texas.

22  Q    Do you conduct psychosexual risk assessments?

23  A    I do, yes.

24  Q    What are those?

25  A    It's the use of factors that are supported in research

1  to be either risk factors or protective factors.  It's

2  looking at all of them in totality, and it is determining,

3  based on those research-supported factors, to what degree a

4  person represents risk to re-offend.

5  Q      How many risk assessments have you conducted?

6  A      I don't know an exact number.  It's hundreds.  It's -- I

7  would say it's the majority of my forensic practice.

8  Q      And in what capacity or for what agencies have you

9  conducted risk assessments?

10  A      I work with the State of Texas.  There's a Civil

11  Commitment Program there for sexually violent predators, and

12  I've worked with the defense as well as prosecution in that

13  context.  I've worked with federal defense attorneys, federal

14  prosecutors, local, state defense and prosecutors, sometimes

15  court-appointed as well.

16  Q      Have you conducted any research or done any research in

17  the area of psychosexual risk assessment?

18  A      I have, yes.

19  Q      What kind of research have you done?

20          MS. REYES:  Your Honor, pardon the interruption.

21  As stated earlier, we are willing to stipulate to Dr.

22  Turner's expertise.

23          THE COURT:  And I appreciate the collegiality

24  there.  I will tell you that your expert that just testified,

25  I was able to consider her entire curriculum vitae when she

```
 1    testified at the motion in limine.  While that's a very
 2    generous offer to the government, I'm going to leave it to
 3    them as to whether or not they want to lay it out.
 4              I don't have a C.V. on this witness that I have on
 5    yours.  I don't know anything about this witness.  So, Ms.
 6    Gable, the ball is in your court on this one.
 7              MS. GABLE:   Thank you.
 8    BY MS. GABLE:
 9    Q    Are have you conducted research in the area of
10    psychosexual risk assessment?
11    A    Yes, I have.
12    Q    And what research have you conducted?
13    A    I've published numerous studies in the area of -- well,
14    the broad area of risk assessment of sex offenders, risk
15    assessment of adults who sexually offend against children,
16    ethical considerations in sex offender risk assessments.
17    That was a textbook chapter that I co-authored.
18         I was contacted recently by the F.B.I.'s behavior
19    analysis unit to participate or collaborate in a study on
20    risk factors among contact child molesters as well as
21    non-contact child pornography offenders.
22         I've done research on grooming.  A large part of my
23    practice is research.  I'm a bit of a nerd in that way.
24    Q    Have you received any training in the area of
25    psychosexual risk assessment?
```

1  A    Yes, I have.

2  Q    What kind of training have you received?

3  A    The program that I attended at Sam Houston State

4  University, it was a clinical program, but the majority of

5  the practicum placements and a lot of the specialized classes

6  that you could take were in the field of mental health and

7  law, forensic psychology.

8      I've worked at numerous correctional facilities,

9  juvenile and adult.  My predoctoral internship was with the

10 Federal Bureau of Prisons, and my first job was with the

11 Federal Bureau of Prisons.

12 Q    Dr. Turner, at the request of the United States have you

13 conducted a psychosexual risk assessment of the defendant,

14 Mr. Gillis?

15 A    Yes, I have.

16 Q    And in preparing for your assessment, did you review

17 documents in this case?

18 A    I did, yes.

19 Q    What did you review?

20 A    I reviewed the -- quite a bit, actually.  The

21 Superseding Indictment.  I reviewed the computer evidence;

22 the adult B.D.S.M., which is bondage sadomasochistic

23 pornography, as well as child erotica that was seized from

24 his computer; various photographs of the victim, Michelle;

25 trial Exhibit 17 -- well 12 through 17, which were various

pictures and photographs; transcripts of his e-mail

correspondence with other Craigslist users; a summary of his

e-mail correspondence with the undercover agent; the thank

you note to Mr. Gillis from the victim, Michelle; transcripts

of e-mails between the defendant and various other parties

related to kidnapping and rape of the adult victim; his

Internet search history and his Internet -- so his search-

specific titles that he used to search as well as his

Internet history that was obtained during the forensic

examination by the government; his Samsung Galaxy extraction

report; the Bing toolbar search terms obtained during the

forensic examination; a summary of his interview with the

F.B.I. subsequent to his arrest; a copy of the polygraph

examination; a CV of Dr. Sullivan; Dr. Sullivan's report; Dr.

Sullivan's handwritten notes; a partial trial transcript of

U.S. versus Dane Gillis; and then the testing results for the

in M.M.P.I., the Abel, the P.C.L.R. as submitted by Dr.

Sullivan; the United States Attorney's Sentencing Memorandum.

That's just about it.

Q    After reviewing all of that material, have you formed an

opinion regarding the defendant's risk to re-offend sexually?

A    Yes, I have.

Q    What is your opinion?

A    My opinion is that he represents a high risk to

re-offend sexually.

1    Q     What is the basis of your opinion?

2    A     The basis of the opinion uses empirically supported risk

3    factors.  It's factors that are shown across research studies

4    to increase or lower a person's degree of risk of

5    re-offending sexually.

6    Q     In the field of risk assessment, are there predictors of

7    sexual recidivism?

8    A     Yes.

9    Q     What are those predictors?

10   A     Well, the two largest predictors of sexual re-offending

11   are the presence of antisociality, which is antisocial

12   beliefs, personality, usually indicated by behaviors as well.

13   So because they have these personality characteristics, they

14   tend to act a certain way.  And that's one of the biggest

15   risk factors.

16         The second most powerful predictive risk factor is

17   degree of sexual deviance.

18   Q     What is "sexual deviance"?

19   A     "Sexual deviance" can be sort of defined differently by

20   different people, but essentially it's just a sexual

21   attraction to something, in this case something that would

22   require victimization.  It can be indicated by a fetish,

23   sexual attraction to an inanimate object, children, sadism.

24   All those are considered sexual deviancy.

25   Q     Is there an authoritative manual in the practice or

```
 1   field of psychology that psychologists use to diagnose sexual

 2   deviancy?

 3   A    Yes.

 4   Q    What is that?

 5   A    Well, used to diagnose paraphilias, yes, and that's the

 6   Diagnostic and Statistical Manual-5, the D.S.M.-5.

 7   Q    Do you have an opinion as to whether or not the

 8   defendant meets the criteria, the diagnostic criteria for any

 9   sexual deviances?

10   A    Yes, I do.

11   Q    And what is your opinion?

12   A    He meets criteria for pedophilia, non-exclusive type,

13   attracted to females; and he meets criteria for sexual

14   sadism.

15   Q    What is "pedophilia"?

16   A    "Pedophilia" is a sexual attraction to prepubescent

17   children.  A guideline is given of about age 13, but people

18   can reach sexual maturity at different ages.  So it varies

19   from case to case.  That cause -- that last over a certain

20   amount of time.  The guideline is given of six months, but

21   that's just to show a pattern, that it wasn't just someone

22   got high on PCP and looked at child pornography one night.  I

23   mean, it's a pattern and it causes problems for them.

24   Q    And what are the indicators or what evidence did you

25   review that shows that the defendant meets the diagnostic
```

1    criteria for pedophilia?

2    A      Well, he's viewed child pornography since 2011, at

3    least.  So we have the six-month criteria is easily met, 2011

4    through 2015.

5           He was convicted of conspiring to meet with an

6    eleven-year-old girl for sex.

7           I viewed the child erotica that he was looking at.  I

8    don't know if you want me to describe that at this point or

9    not.

10   Q      What did it depict?

11   A      Well, it was -- it was prepubescent children in

12   underwear or, I guess, sort of lingerie and they were in

13   sexual poses.  Some of the times they were nude, but they

14   would have their hands over their chest.  They didn't really

15   have breasts, so I guess it was just their nipples, or they

16   would have their panties partially moved to almost show their

17   vaginas.  So we have that from 2011 to 2015.

18          And the erotica was just what was seized on his

19   computer.  We have him convicted of planning to meet an

20   eleven-year-old for sex, him talking about what he would do

21   with the eleven-year-old sexually.  He admitted to the F.B.I.

22   that he found it titillating.  Some of the statements that he

23   made to the undercover agent about is she -- is she bald down

24   there, or something to that effect; statements that he made

25   of things that he would like to do to her as well as the fact

1  that, you know -- so the second criteria being does it cause

2  problems for them in functioning.  Well, he was -- he was

3  convicted of that, and so, you know, he certainly meets

4  criteria for the disorder.

5  Q      Did you find evidence that the defendant has any other

6  sexual deviancies?

7  A      I did, yes.

8  Q      And what is that?

9  A      Sexual sadism.

10  Q      What is "sadism"?

11  A      "Sadism" is gaining sexual arousal from the humiliation

12  of the victim, inflicting of pain, seeing fear, feeling the

13  power and control, things like that, in a sexual situation

14  such that -- and then it goes on to say, you know, it causes

15  problems for them and has existed for a period of time, so is

16  therefore a pattern.

17  Q      What evidence did you see in the record that the

18  defendant has a diagnosis of sexual sadism?

19  A      He admits in several different places to an interest in

20  violent sexual encounters, forcing others to have sex with

21  him.  The transcripts with other Craigslist users and the

22  undercover agent are quite graphic in his descriptions of

23  what he wanted to do to the victim, Michelle.

24        And then we also have the B.D.S.M. pornography that was

25  collected from his computers, which I viewed, which depicted

1    vary graphic scenes of rape and torture of a sexual nature of

2    older females and younger females.

3    Q    How many times have you diagnosed sexual sadism and

4    pedophilia in the same individual?

5    A    Never.

6              MS. REYES:  Object to improper bolstering.

7              THE COURT:  "How many times have you diagnosed

8    sexual sadism and pedophilia in the same individual?"  The

9    objection is bolstering.  I'm going to overrule the objection

10   and allow the question to be answered.

11   A    Never.

12   Q    How does -- do these -- within the defendant, as you

13   viewed the evidence, do these two sexual deviancies that he

14   has, do they exist in a vacuum?

15   A    No, they do not.

16   Q    And how -- what evidence do you have of that?

17   A    Well, we have no evidence that he is sexually attracted

18   to adult females only when he's inflicting pain, rape and

19   torture on them, but with children, he wants a nice, sweet

20   relationship.  I mean, there's nothing to indicate that.

21        In fact, the evidence that is present indicates that the

22   two paraphilias sort of intersect and cross.  He talks with

23   the undercover agent about getting the adult victim together

24   with the eleven-year-old female and letting them do things

25   together.  So we see what we usually see when there's lots of

1  different types of sexual deviance.  We see a crisscross and

2  an intermingling of the two.

3  Q    Do you have an opinion as to why the defendant obsessed

4  on the victim, M.O., in this case, Michelle?

5  A    I do.

6              MS. REYES:  Objection to speculation.

7              THE COURT:  What's the response?

8              MS. GABLE:  Your Honor, he's testifying as an

9  expert.  I'm asking him for an opinion.  It will then be tied

10  up to his overall risk assessment of this defendant.

11             THE COURT:  I'm going to overrule the objection.

12  A    Based on the description of the victim that I received

13  in the record, she appears to be rather innocent, maybe even

14  naive, sort of a soccer mom kind of individual, and this

15  would speak exactly to his desire to dominate and control.

16      When we think of sexual attraction, we think of

17  someone --

18             MS. REYES:  Objection to non-responsive.

19             THE COURT:  Overruled.  Go on ahead and continue.

20  A    -- we think of someone as being sexually attracted to

21  another individual because of physical beauty or some kind of

22  physical attraction; but when you're looking at something

23  like sadism, you have to keep in mind that what constitutes

24  the sexual attraction is the domination and the inflicting of

25  pain and humiliation.  So what better person than someone

1   that is that idyllic and rather Donna Reedish, if you will.

2   Q   How does the fact that the defendant has both -- these

3   two paraphilias that you've discussed, how does that affect

4   your overall risk assessment of this defendant in terms of

5   his risk to re-offend sexually?

6   A   Sure.  It increases his risk.

7   Q   And how is that?

8   A   Well, it increases his risk because it's further

9   evidence of sexual deviance.  And so when we're considering

10   the two biggest risk factors, we're looking at antisociality

11   and sexual deviance.  So he has more sexual deviance than,

12   say, someone who is strictly a pedophile or strictly a

13   sadist.

14      And then, also, you have to look at a potential victim

15   pool, and we already see evidence of that.  He's not only

16   capable of hurting children for sexual gratification; he's

17   capable of hurting adults as well for sexual gratification.

18   So that increases his risk in turn.

19   Q   Dr. Turner, in reviewing the defendant -- or Dr.

20   Sullivan's report, she indicated that the defendant tested on

21   the Abel Assessment as being sexually attracted to

22   adolescents ages 14 through 17, and then opined that that did

23   not indicate sexual deviancy.  Do you agree with that?

24   A   No, I don't.

25   Q   And why not?

1   A      There's some controversy about the Abel instrument.

2   Fourteen to 17 is a night and day difference, and Abel says

3   in the manual that it's prejudicial and it should not be

4   considered abnormal.

5       And I wouldn't say that it's abnormal for an adult man

6   to be sexually attracted to a 17-year-old female.  I would

7   say that it's abnormal for a adult man to be sexually

8   attracted to a 14-year-old female.

9       So I think to just chuck 14 and 17 as the same thing is

10  inaccurate, and I think what should happen would be a follow-

11  up period of questioning about, okay.  Well, let's look.  Is

12  it 17 or is it 14?

13  Q    Did you see any indication that that follow-up was done

14  in this case?

15  A    No.

16  Q    Is there, in fact, a D.S.M. diagnosis for sexual

17  attraction to younger adolescents?

18  A    It's not in the D.S.M., but there is a paraphilia

19  entitled hebophelia, yes.

20  Q    And what is hebophelia?

21  A    Hebophelia is a sexual attraction to children, but

22  children that are either peri-, so going through puberty, or

23  post-pubescent, around twelve to 14.

24  Q    Now, you also mentioned that the other predictor of

25  recidivism is antisociality?

```
1    A      Correct.

2    Q      What is "antisociality"?

3    A      "Antisociality" is the presence of traits of

4    entitlement; grandiosity; shallow affect, meaning not showing

5    much of emotion; lack of remorse; lack of ability to

6    empathize with other people; feeling entitled, that you're

7    owed something; being willing to victimize other people; and

8    then generally just irresponsible behavior, impulsivity, not

9    taking responsibility for your own actions.  It usually shows

10   up in some sort of criminal history, substance abuse,

11   unstable background, things like that.

12   Q      Is there a test that psychologists administer to test

13   antisociality?

14   A      The P.C.L.R. is administered to assess for psychopathy.

15   Antisociality and psychopathy are closely related, but

16   they're not exactly the same thing.

17   Q      Were you able to administer the P.C.L.R. in this case?

18   A      No, I was not.

19   Q      And why not?

20   A      Well, I didn't interview the -- Mr. Gillis in person.

21   And sometimes there's enough information and the A.P.A.

22   ethical guidelines even account for conducting forensic

23   evaluations without an interview just because it happens so

24   frequently, and sometimes there's enough information to score

25   based on the records and other interviews that may have
```

1    occurred, but in this case I didn't feel that ethically I

2    could provide a total score based on the information that I

3    had.

4    Q    And was the information that you had primarily in the

5    report of Dr. Sullivan?

6    A    About his background and history, yes, ma'am.

7    Q    What other kind of information would you have sought

8    from Mr. Gillis?

9    A    Well, in a psychosexual risk assessment I would want to

10   ask about anything that would lead to a diagnosis of

11   Antisocial Personality Disorder.  I would want to know

12   whether he played with fire as a child.  I would want to know

13   whether he hurt animals for fun.  I would want to know

14   whether he shoplifted.  I would want to know whether he was

15   truant, was he suspended, was he expelled from school, what

16   kind of things was he in trouble for, was he a bully, was he

17   in physical altercations.

18       I would want to know about his school history, why he

19   left the different schools, why there was a ten-year period

20   between different schools, what he did during those ten-year

21   periods.

22       I would want to know more about his activity with

23   prostitutes.  He admitted to sexual activity at least six

24   times with prostitutes.  That wasn't really followed up.

25       I would want to know more about the period of arrest and

```
1   being pursued by law enforcement and placed on probation.  I
2   would want to know if he completed that probation
3   successfully.
4        I would want to know more about his substance use
5   history and then his sexual history.  That's really what
6   we're here for.  So I would want to know about his
7   masturbation habits, when he first looked at pornography, how
8   often he looked at pornography, what were his preferences
9   when he masturbated, just a lot of detail that wasn't
10  available in the report.
11  Q    Based on the evidence that you reviewed, did you see
12  evidence that Mr. Gillis possesses characteristics of
13  antisociality or associated with antisociality?
14  A    Yes, I did.
15  Q    And what is that?  What evidence did you see?
16  A    He does have a criminal history.  He was arrested for
17  D.U.I. in 1985.  He was placed on probation in 1989 after
18  evading arrest for a period of time.
19       You know, we -- in my review of the testing materials
20  and his responses, he was quite dishonest about numerous
21  things that were contraindicated by his interview with the
22  F.B.I., for example, and his activity online.
23       You know, his statements about what he wanted to do to
24  the victim, the fact that he had ridden in the car with the
25  victim's children but was still planning all this, put her
```

```
 1   picture out there, her name, that's evidence of callousness
 2   and a lack of ability to empathize.
 3        You know, I -- I asked you -- at one point during our
 4   discussions I told you what I imagined his presentation on
 5   the stand --
 6             MS. REYES:  Objection, Your Honor, to speculation.
 7             MS. GABLE:  I'll cut this off.  Thank you, Your
 8   Honor.
 9             THE COURT:  All right.  I'll sustain it, then.
10   BY MS. GABLE:
11   Q    Did you review the defendant's testimony and the direct
12   and cross-examination of the defendant's trial testimony?
13   A    Yes, I did.
14   Q    And in reviewing that testimony, did you see any
15   indicators of lack of empathy or callousness?
16   A    Yes, I did.
17   Q    And what was that?
18   A    It was the -- his general response pattern.  He seemed
19   rather glib.  There wasn't any expression of remorse that I
20   saw.
21        He referred to the victim as "the MILF" repeatedly.  So
22   that's a depersonalization.  So that's -- that's evidence of
23   the personality construct, at least, of antisociality,
24   psychopathy, conning, manipulation, failure to accept
25   responsibility for his own actions.
```

1    Q    Did you see any evidence that he was irresponsible in

2    his life?

3    A    I did, yes.

4    Q    What was that?

5    A    Well, he had a pretty extensive history of substance

6    use, cocaine, marijuana, alcohol, and then some that the

7    report said he refused to reveal what they were.

8         I know that there was one job that some of the records

9    indicated he was fired from for anger.

10        His history of relationships is unstable.  By his own

11   report, in the report to Dr. Sullivan he says that he looks

12   back on his life as failure after failure after failure after

13   failure.

14        He does have an arrest history.  He does have a history

15   of anger.  He does have a history of anger outbursts.

16        He admitted to missing work at times due to substance

17   abuse, drinking, things like that.  All of that is evidence

18   of irresponsibility.  And that's only what I was able to

19   glean without an interview, based on the records.

20   Q    You've mentioned the term "protective factor" earlier in

21   your testimony.  What is a "protective factor"?

22   A    A "protective factor" is something that can lower a

23   person's risk of re-offending.

24   Q    Did you see any evidence of a protective factor or any

25   protective factors in this case?

1    A    I did, with -- with a caveat, yes.

2    Q    And what was that?

3    A    His age.  Generally, a relatively older offender

4    represents a younger -- I'm sorry -- represents a lower risk

5    of re-offending than a younger offender; but the caveat is

6    that that's generally reserved for someone that offends very

7    young, serves a period of time, and then is released as an

8    older individual.

9        But in this case that's mitigated.  The protective

10   nature of his age is mitigated by the fact that these

11   offenses just occurred and all signs indicate that his

12   behavior and fantasies and degree of violence was actually

13   escalating.

14   Q    And what is it that you saw in the record that indicated

15   that?

16   A    The pornography, the fact that he had progressed from

17   viewing pornography to seeking out others online, to actually

18   planning to meet, to actually showing up to meet, that he had

19   engaged in specific behaviors to facilitate the abduction of

20   Michelle, such as looking over her shoulder and seeing her

21   phone pin, knowing her schedule, posting that online.  So

22   those would be some examples.

23   Q    How does the evidence of his escalating behaviors affect

24   your risk assessment of the defendant in this case?

25   A    Well, it speaks directly to his risk assessment.  He has

```
 1   engaged in these behaviors over a period of many years, and
 2   he's escalating in his intensity and degree of violence and
 3   what he's willing to do that is illegal in order to satisfy
 4   those sexual urges.
 5        In Dr. Sullivan's report, she also indicates that due to
 6   erectile dysfunction, he has to seek more arousing
 7   pornography.  I find it concerning that the "arousing
 8   pornography" that he's seeking is more and more violent
 9   pornography, leading up to the subsequent offenses that he's
10   been sentenced for.
11   Q    Thank you, sir.  I have no further questions.
12             THE COURT:  Ms. Reyes, cross-examination?
13             MS. REYES:  Yes, Your Honor.
14                       CROSS-EXAMINATION
15   BY MS. REYES:
16   Q    Dr. Turner, when were you retained by the government in
17   this case?
18   A    I believe it would have been sometime in the summer or
19   late spring.  I don't have an exact date.
20   Q    Do you have an exact month?
21   A    No.
22   Q    Do you -- did you know, based on all of the documents
23   that you looked at in this case, that he was convicted in May
24   of this year?
25   A    I'm sure I read that at some point, yes.
```

```
1    Q    And that sentencing in this case was set for August of
2    this year?
3    A    Yes.
4    Q    And that a continuance was granted so that you could
5    conduct an evaluation of my client?  A two-month continuation
6    was granted in this case so that you could conduct an
7    evaluation of my client; did you know that?
8    A    No, I was not aware of that.
9    Q    Okay.  At any point did you ever ask me for permission
10   to meet with my client?
11   A    No.
12   Q    How much have you been paid by the government in this
13   case?
14   A    I don't have an exact amount.  I'd have to estimate it
15   for you.
16   Q    Have you been paid at all as of today, September 21,
17   2016?
18   A    No.
19   Q    Okay.  And how many times have you testified for the
20   federal government on the prosecution side?
21   A    I've been retained or testified?
22   Q    The question is:  How many times have you testified for
23   the federal government, prosecution side?
24   A    I believe three times.
25   Q    And what is the total amount of money that you have
```

```
 1  received from the Department of Justice for your services?

 2  A     I have no idea.

 3  Q     The latest publication that you have listed in your C.V.

 4  is the bulletin from last July, correct?

 5  A     Correct.

 6  Q     And this was an article that you published in connection

 7  with the Department of Justice?

 8  A     Correct.

 9  Q     And it's basically a how-to, debunking defense experts

10  in sentencing proceedings for child pornography offenders?

11  A     That's not how I would describe it, but I could see that

12  you would see it that way.

13  Q     Were you paid for that article?

14  A     No.

15  Q     So you did it pro bono?

16  A     Correct.

17  Q     Did you review the images that are -- that you're -- on

18  direct examination that you're characterizing as child

19  pornography?

20  A     Yes.

21  Q     And would it surprise you -- and that was mentioning the

22  child pornography, that Mr. Gillis viewed it for over a

23  five-year period, that was a big part of your assessment,

24  correct?

25  A     Correct.
```

```
 1   Q     However, those images are not child pornography,
 2   correct?
 3             MS. GABLE:  Your Honor, I'll object to that.
 4             THE COURT:  I would imagine the expert is in a good
 5   position to answer that question.  Overruled.  He can answer.
 6             MS. GABLE:  Well, he isn't a lawyer, Your Honor.
 7             THE COURT:  I understand and I'll take that into
 8   consideration.
 9             MS. GABLE:  Thank you.
10   A     I think there are guidelines for attorneys, agents to
11   consider things as child pornography, child erotica.
12         From my standpoint, as a source of sexual attraction,
13   what I saw I would consider it child pornography.
14   Q     Would it surprise you to learn that he was never charged
15   with possession of child pornography?
16   A     No.
17   Q     The Abel Assessment that you testified on direct
18   examination, you're actually not licensed to conduct that
19   test, correct?
20   A     No, I'm not licensed specifically by Abel, if that's
21   what you mean.
22   Q     Okay.  So your concerns about it are you couldn't -- you
23   couldn't have done the follow-up for it had you wanted to or
24   taken the time to because you're not licensed for that,
25   correct?
```

```
1    A    No, that's not correct.

2    Q    You're not licensed to do the Abel Assessment?

3    A    Correct.

4    Q    Okay.  So the concerns that you've mentioned on direct

5    examination to the government, you couldn't have followed up

6    with them had you chosen to because you're not licensed to do

7    the Abel Assessment?

8    A    No, that's not correct.

9    Q    Okay.  To your knowledge, in your vast experience, the

10   Abel Assessment is graded off site?

11   A    Yes.

12   Q    So it's objectively graded?

13   A    Portions of it are objective.  Portions of it are

14   subjective because they're self-report.

15   Q    And based on what you testified on direct examination,

16   it has to be a totality of the circumstances of every single

17   test, right?

18   A    Correct.

19   Q    Okay.  Would you agree -- you're concerned about the

20   Abel grouping 14 to 17 year olds, right?

21   A    Yes.

22   Q    Okay.  Would you agree that 14 to 17 includes both

23   prepubescent and post-pubescent?

24   A    It's possible.  People reach pubescence at different

25   periods.
```

 1    Q     Are you saying that you're able to tell a difference

 2   between a 14-year-old post-pubescent girl and a 17-year-old

 3   post-pubescent girl?

 4    A     Sometimes, I think.  Sometimes not.

 5    Q     Are you challenging the foundation of the Abel

 6   Assessment Test?

 7    A     I'm challenging grouping 14 and 17 in the same group and

 8   saying they're the same thing.  So if that means that I'm

 9   challenging the foundation, then that's fine.

10    Q     And have you contacted Dr. Abel to tell him that his

11   test is not valid?

12    A     No.  There's plenty of criticism in the research of his

13   test already.

14    Q     Have you published any articles or done any research on

15   attacking the validity of the Abel Assessment Test?

16    A     No, ma'am.

17    Q     You testified on direct examination that Mr. Gillis has

18   been fired from work for anger management purposes?

19    A     Yes.

20    Q     Were you privy to the Presentence Investigation Report

21   in this case?

22    A     No.

23    Q     So your information was gleaned from a conversation with

24   the prosecutor regarding that specific issue?

25    A     Yes.

```
 1    Q     Would it surprise you to learn that he's never, ever
 2    been fired from a job for anger management reasons?
 3    A     It wouldn't surprise me.
 4    Q     Okay.  But you just testified to that on direct
 5    examination, right?
 6    A     I was told that, yes.
 7    Q     Okay.  And you testified on direct examination regarding
 8    his unstable relationships, correct?
 9    A     Yes.
10    Q     Okay.  Would it surprise you to learn that he's had
11    three relationships and all three have been long-term?
12    A     No.  I knew that.
13    Q     Okay.  But you would consider that to be unstable?
14    A     The nature of his relationships, yes.
15    Q     Okay.  And what is the nature of his relationships that
16    you find to be unstable?
17    A     Well, one of them was with a married woman, one of them
18    was with a 19-year-old when he was in his 40s.  I mean,
19    things like that.
20    Q     Which one was the relationship with the married woman?
21    A     The first.  His first relationship.
22    Q     Would you --
23    A     Or one of his first relationships.
24    Q     Would it surprise you to learn that that's absolutely
25    incorrect?
```

1    A    It would surprise me to learn that.

2    Q    Okay.  And as part of your investigation in this case,

3    did you actually read his entire transcript that he testified

4    at trial?

5    A    No.

6    Q    So you pick and choose what parts of the transcript to

7    read?

8    A    No.

9    Q    What parts of the transcript did you read?

10   A    I read portions of the transcript that were sent to me

11   related to various parts of the offense conduct.

12   Q    So this transcript was approximately 110 pages.  You

13   could not have read that since July of -- or since you were

14   hired in the summer?

15   A    I don't know -- I don't know how much of it I read.  I

16   read what I was sent.

17   Q    Okay.  You testified on direct regarding a paraphilic

18   disorder that is not in the D.S.M., correct?

19   A    Correct.

20   Q    Okay.  So if it's not in the D.S.M., would you agree

21   with me that it's not relied on by actual professionals?

22   A    No.

23   Q    Okay.  You testified that Mr. Gillis has lived a life of

24   irresponsibility?

25   A    Yes.

1    Q    Did you testify to that on direct?

2    A    Yes.

3    Q    Okay.  Would you consider it irresponsible to take

4    family members in when they have nowhere else to go?

5    A    No.

6    Q    Would you consider it irresponsible to have a job when

7    you're 19 years old for 19 years?

8    A    No.

9    Q    Would you consider it irresponsible to have -- after

10   that, to have a second career in the culinary industry?

11   A    No.

12   Q    Would you consider it irresponsible to take care of an

13   ailing father prior to his demise?

14   A    No.

15   Q    Would you consider it irresponsible to completely uproot

16   your entire life and travel from Illinois to Florida to

17   accomplish that?

18   A    No.

19   Q    Would you consider it irresponsible to then, after the

20   father dies, actually move permanently to Florida to care for

21   an ailing mother?

22   A    No.

23   Q    Would you consider it irresponsible to help raise young

24   women?

25   A    I would consider it maybe concerning, in light of the

1   offenses he was sentenced for.

2   Q     Okay.

3              MS. REYES:  May I have a brief moment, Your Honor?

4              THE COURT:  Certainly.

5   BY MS. REYES:

6   Q     You testified on direct examination that Mr. Gillis lied

7   about substance abuse.

8   A     I don't know if I said he -- if I did say he lied about

9   substance abuse, I think -- I didn't mean to say he lied.  He

10  was just -- he wasn't completely forthright about it.

11  Q     And where did you get that information?

12  A     It's in the -- it's on the testing results, multiple

13  testing results and his interview with Dr. Sullivan.

14  Q     Would it surprise you to learn that in his interview

15  with a United States Probation Officer sentencing guideline

16  specialist, he was completely forthright about his substance

17  abuse?

18  A     No.

19  Q     And his substance abuse is approximately 30 years old?

20  A     No, that wouldn't surprise me.

21  Q     And you testified on direct that you're very concerned

22  about a D.U.I. that he got in 1985, correct?

23  A     I said I'm concerned that he has a criminal history.

24  Q     Which includes one D.U.I. from over 30 years ago?

25  A     Correct.

1    Q    That concerns you?

2    A    Yes.

3    Q    Okay.  You testified on direct that one of the most

4    effective ways to measure antisocial behavior is through the

5    P.C.L.R.?

6    A    Correct.

7    Q    And you were very concerned about all these questions

8    that weren't developed in Dr. Sullivan's report?

9    A    Correct.

10   Q    But you had access to her raw data, correct?

11   A    Correct.

12   Q    And all of those -- the checklist for this was properly

13   administered by Dr. Sullivan, correct?

14   A    I had a hard time reading the notes from her evaluation.

15   I saw the score for the P.C.L.R. that she administered.

16   Q    If you wanted to follow up, based on all of these

17   concerns that you mentioned on direct, there was nothing

18   stopping you from talking to my client, correct?

19   A    That wasn't my understanding, no.

20   Q    Was it your understanding that the government asked for

21   a continuance in order for you to evaluate my client?

22   A    No, that was not my understanding.

23   Q    You testified on direct that Mr. Gillis has been viewing

24   child pornography since 2011?

25   A    Correct.

```
1    Q    Where did you get that information?
2    A    It was in the summary of his interview with the F.B.I.
3    Q    Have you -- in your vast experience, have you learned of
4    defendants not agreeing with what the F.B.I. agent attributes
5    to them?
6    A    Sure.  Absolutely.
7    Q    Okay.  You had access in Texas or Louisiana -- you
8    actually had access to all of the evidence in this case,
9    correct?
10   A    Yes.
11   Q    Okay.  Based on your view of the evidence, would it be
12   fair to say that his viewing of what you term "pornography"
13   was intermittent?
14   A    Yes.
15   Q    And it wasn't continuous for 2011 to 2015?
16   A    Correct.
17             MS. REYES:  Nothing further, Your Honor.
18             THE COURT:  Thank you, Ms. Reyes.
19             Redirect examination?
20                  REDIRECT EXAMINATION
21   BY MS. GABLE:
22   Q    Dr. Turner, regarding the instability of the defendant's
23   relationships, did you obtain the information that the
24   defendant's first relationship was a married woman from the
25   report of Dr. Sullivan?
```

```
1    A    I did, yes.

2    Q    And did you obtain the information that he was with a

3    19-year-old woman when he was 40 from the report of Dr.

4    Sullivan?

5    A    Yes, I did.

6    Q    Dr. Turner, did you -- in the testimony that you

7    reviewed from the trial, was it the direct and cross-

8    examination of the defendant, Dane Gillis?

9    A    Yes, it was.

10   Q    Thank you.  I have no further questions.

11              THE COURT:  Thank you, Doctor.  Feel free to be

12   seated in the courtroom.

13              Will the government be calling any further

14   witnesses at this time?

15              MS. GABLE:  No, Your Honor.  I do have a letter --

16   it's a very short letter -- to read from the victim to the

17   Court.

18              THE COURT:  Well, that was going to be my next

19   question.  Why isn't the victim here?

20              MS. GABLE:  Your Honor, candidly, she was afraid.

21              THE COURT:  All right.  And she asked you to read

22   that letter to the Court?

23              MS. GABLE:  She did, yes.

24              THE COURT:  All right.  Feel free to read the

25   letter.
```

# Exhibit F

*American Journal of Orthopsychiatry, 71*(3), July 2001
© 2001 American Orthopsychiatric Association, Inc.

# Variables in Delayed Disclosure of Childhood Sexual Abuse

Eli Somer, Ph.D., and Sharona Szwarcberg, M.S.W.

*In a study of 41 adult survivors of childhood sexual abuse, the level of childhood traumatization was found to have contributed to delayed disclosure of the abuse. Other delaying variables included: belief in the importance of obedience to grownups, mistrust of people, fear of social rejection, and fear of the criminal justice system. Variables such as media attention to similar cases and experiences of personal achievement were inversely related to the age at disclosure. Recommendations for policy are discussed.*

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

A wide array of social, psychological, and somatic problems has been connected with childhood sexual abuse (CSA). These problems include sleep disorders, eating disorders, self-mutilation, social withdrawal, antisocial behavior, sexual dysfunction, injured sense of self, and disorders of attachment *(Bagley & Ramsay, 1985; Briere & Runtz, 1989; Browne & Finkelhor, 1986; Cohen & Mannarino, 1988; Finkelhor, 1987; Herman, 1981; Roth & Lebowitz, 1988; Young, 1992).* The consequences of undetected abuse compound the immediate trauma in child victims and are associated with grave developmental outcomes typically characterized by impaired capacities for trust, intimacy, and sexuality, and by a variety of chronic mental health problems.

Despite the pain associated with childhood abuse, early confiding of intrafamilial maltreatment is fairly rare, and often meets with adverse responses *(Everill & Waller, 1995).* Herman *(1992)* stated that the main dialectic of emotional trauma is the conflict between the need to deny unbearable experiences and the need to give testimony. The literature suggests that the majority of children do not disclose until adulthood *(Lamb & Edgar-Smith, 1994),* if at all *(Sauzier, 1989);* that up to 40% of adult survivors had never disclosed their secret be-

fore data were collected *(Finkelhor, 1987);* that the average age at disclosure of incest is 25.9 years *(Roesler & Wind, 1994);* and that 22% of disclosing survivors did so at least 15 years following their last incident of sexual abuse *(Somer, 1995).* Personal accounts of CSA experiences by adult survivors mark a potential shift in the survivors' ability to form a trusting relationship with another human being *(Harvey, Orbuch, Chwalisz, & Garwood, 1991).* For people who suffered CSA, confiding may signal the beginning of a move from the role of silent victim to that of indignant survivor.

Because early disclosure by victims may serve to ameliorate the destructive relationship and mitigate the deleterious effects of prolonged abuse, we designed this study to identify empirically those variables associated with delayed disclosure of CSA. We constructed a research instrument to assess retrospectively those changes in survivors' life circumstances and beliefs that might help to explain their leap from secrecy to testimony. First, we generated a list of potentially relevant factors and searched the literature for supportive evidence. Presented below are the variables that seemed pertinent. We have distinguished between variables that potentially delay disclosure (coded "D") and those that potentially facilitate it (coded "F").

*A revised version of a paper submitted to the Journal in October 2000. Authors are at: School of Social Work, University of Haifa, Israel (Somer); and Department of Education, Ben Gurion University of the Negev, Be'er Sheba, Israel (Szwarcberg).*

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 148 of 198 PageID #:1806

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Based on our review of the literature and our own clinical experience, we identified four categories of variables pertinent to the withholding or disclosure of CSA. These consisted of: *1)* ten psychological variables, associated with victims' intrapsychic processes: *2)* five familial variables, associated with interpersonal processes within the family; *3)* four social variables, associated with societal norms and influences; and *4)* one trauma-related variable. These are listed, coded, and briefly defined in the following four sections.

## Psychological Variables

*Accommodation* (D). Some professionals have suggested that the pathological environs of the abusive family force the child to develop unusual coping strategies that are both creative and destructive *(Herman, 1992; Summit, 1983)*. Victims of CSA learn to distort their oppressive reality and to deny the perversion they are subjected to by regarding it as acceptable and normal.

*Guilt and self-blame* (D). Several studies of the long-term effects of CSA have reported guilt as a common reaction of survivors *(Browne, 1991; Coffey, Leitenberg, Henning, Turner, & Bennett, 1996; Goodwin, 1989; Finkelhor, 1987)*. Briere *(1992)* suggested that children's mode of thinking about the world could give rise to an "abuse dichotomy," in which they attribute their incestuous injury to one of only two things: either they have been bad or their parent has been bad. Guilt and self-blame by CSA victims have been seen as instrumental in preserving the relationship with abusive caregivers *(Price, 1993)* and as in keeping with children's self-centered perspectives *(Herman, 1992)*.

*Helplessness* (D). Bagley and King *(1989)*, using Seligman's theory of learned helplessness, noted that CSA can induce feelings of powerlessness and a subsequent decrease in responsiveness. According to James *(1989)*, because many children feel that there is nothing and no one able to protect them or halt their abuse, the ensuing sense of powerlessness pervades their self-image. These assertions are supported by other clinical and research reports *(Coffey et al., 1996; Liem, O'Toole, & James, 1996; Shapiro, 1996)*.

*Emotional attachment to the perpetrator* (D). Survivors of CSA develop intense, tenacious attachments to abusive others. Object-relations and attachment theories have been used to explain the need of survivors to preserve the self and the attachment to the abusing caretaker. To satisfy that need, abused children employ several defenses, including splitting, dissociation, and idealization *(Blizard, 1997a, 1997b; Blizard & Bluhm, 1994)*. When a child idealizes an object, it is preserved as good, and the child can safely maintain a positive attachment to it. To do so, the child often also needs to displace the blame for the abuse onto the self and to devalue it *(Kernberg, 1975)*. Preservation of the self may also take the form of identification with the aggressor, involving an attempt to empower oneself at a time of utter helplessness *(Freud, 1966)*. A similar paradoxical phenomenon, termed "the Stockholm syndrome," describes the development of reciprocal, positive feelings between hostages and their terrorist captors, as a means of coping with captivity *(Auerbach, Kiesler, Strentz, Schmidt, & Serio, 1994; Graham et al., 1995)*.

*Idealized self-identity* (D). Price *(1993, 1994)* suggested that some abused children replace their helplessness with an illusionary sense of control and omnipotence, an adaptive mechanism utilized to cope with a traumatic and pathological situation and provide them with a sense of self-worth.

*Mistrust of others* (D). Green *(1996)* described paranoid reactions and mistrust as core sequelae of CSA. Given the mistreatment by their caretakers, sexually abused children may come to believe that there is little chance of strangers offering greater protection *(Finkelhor, 1987; Herman, 1992)*.

*Dissociation* (D). Early links between history of trauma and dissociation have been documented in several studies *(Carrion & Steiner, 2000; Somer & Weiner, 1996; Zlotnick et al., 1996)*. Sexually abused children commonly use dissociation of affect to protect themselves from overwhelming emotions, thoughts, and sensations, thus decreasing awareness of their abusive circumstances.

*Burden of the secret* (F). Some survivors who no longer feel dependent on the perpetrator have a need to break their silence and relieve themselves of their secret. A study of incest survivors' narratives of their process of disclosure *(Mize, Bentley, Helms, Ledbetter, & Neblett, 1995)* found that feelings during or immediately following disclosure included relief and a sense of reconnection with others.

*Successful/ego-strengthening experiences* (F). Feelings of empowerment are among the emotions reportedly engendered by the act of disclosure *(Mize et al., 1995)*. However, empowering experiences can also be antecedents to disclosure. Our

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

own clinical work indicates that successful academic or professional experiences can provide a much-needed sense of mastery and competence, which may evolve into the enabling processes necessary for disclosure of the incestuous secret.

*Concern for others* (F). Many CSA survivors exhibit concern for the well-being of younger family members. Whereas accommodation, guilt, and self-blame may initially keep these victims silent, once their abuse ends, many seek to unmask the perpetrator out of fear that younger relatives may be in jeopardy. An analysis of the annual reports of the Union of Rape Crisis Centers in Israel revealed that 11% of CSA victims who phoned in for help were motivated by concern for other at-risk children *(Somer, 1995)*.

**Family Variables**

*Loyalty to the family* (D). The degree of familial closeness between victim and abuser seems to be another relevant variable in predicting loyalty to the perpetrator and maintenance of secrecy. The more enmeshed the family, the closer the kinship with the abuser, the more severe the abuse, the more difficult the disclosure is reported to be *(Chen, 1996; Faust, Runyon, & Kenny, 1995; Mennen-Ferol, 1993; Wyatt & Newcomb, 1990)*.

*Cultural norms reinforcing obedience* (D). Radical feminist theory holds that patriarchy is related to the oppression and victimization of women. Solomon *(1992)* argued that this theoretical framework could be used to understand children as victims of sexual abuse by family members. Others have concurred that the sociopolitical and cultural contexts in which children are raised provide a frame of reference for the internalization of oppression and victimization through sexual abuse *(Comas-Diaz, 1995; Fontes, 1993, 1995; Okamura, Heras, & Wong, 1995)*.

*Concern for family integrity* (D). Perpetrators of CSA and incest use a variety of techniques to threaten, persuade, and manipulate their victims, so that the sexual encounters are kept secret. Prominent among these are manipulative warnings that disclosure will lead to the dissolution of the family *(de Young, 1981; Ussher & Dewberry, 1995)*.

*Conservative sexual morality* (D). The dynamics of sin and shame, and the lack of family idioms with which to discuss sexual behavior, characteristics common to very conservative communities, could contribute to CSA victims' difficulties in disclosing their plight *(Carbo & Gartner, 1994)*.

In many cases of incest, abusive fathers have been reported to be men who are devout, moralistic, and fundamentalist in their religious beliefs *(Hoorwitz, 1983; Hudson, 1996; Manlowe, 1995)*.

*Fear of blame* (D). Sexually abused children seem to be able to assess accurately the outcome of their disclosure. Lawson and Chafin *(1992)* found that the tendency of children afflicted with venereal diseases to disclose sexual abuse was predicted by the attitudes of their family members, who were independently assessed prior to the interview with the child. The outcome of childhood disclosure of CSA is often met with disbelief, denial, or blame *(Mize et al., 1995; Roesler & Wind, 1994)*.

**Social Variables**

*Rejection and avoidance of victims* (D). Victims are frequently perceived as weak, passive, and at least partially responsible for their tribulations. Staley and Lapidus *(1997)* found that subjects who did not know an incest survivor personally were significantly more likely than those who did to agree with victim-blaming statements. Reactions to survivors' initial revelations include indifference, skepticism, negative or rejecting responses, and blame *(Armsworth, 1989; Friese, Hymer, & Greenberg, 1987; Flannery, 1990; Gurley, 1991; Harter, Alexander, & Neimeyer, 1988)*. The inclinations of CSA victims to share their pain with others could be influenced by this perceived atmosphere.

*Stigma* (D). Survey responses from 195 college students indicate that there is a stigma surrounding CSA that varies with gender and with length and type of relationship at the time of the disclosure *(Tomlin, 1991)*.

*Mistrust of the judicial system* (D). Prevailing attitudes toward rape and rape victims are often mirrored in the legal and judicial systems. Survivors of sexual assault frequently complain that their experience with the criminal justice system was humiliating. Inappropriate sexual interest, derogatory questioning, and a generally disrespectful attitude often mark the process *(Krieger & Robbins, 1985; Mazelan, 1991)*.

*Publicity in the media* (F). Beckett *(1996)*, in a content analysis of reports on sexual abuse in four leading news magazines between 1970 and 1994, found that the framing of CSA in media discourse has undergone a significant transformation. With increased media attention to personal and social costs of CSA, violence against children has been

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

steadily moving out of the shadows and into the arenas of research, prevention, intervention, and public awareness *(McDevitt, 1996; Roesler & Wind, 1994)*.

**Trauma-Related Variables**

*Intensity of traumatization* (D). Children's failure to report their sexual victimization may be due to their being overwhelmed by the objective weight of these harmful experiences. The level of traumatization and the ensuing psychological damage have been attributed to: early onset of the abuse *(Zivney, Nash, & Hulsey, 1988)*, its duration *(Elliot & Briere, 1992; Herman & Schatzow, 1987)*, the age difference between victim and abuser *(Finkelhor, 1987)*, the number of perpetrators *(Peters, 1988)*, the intrusive level of the abuse *(Finkelhor, Hotaling, Lewis, & Smith, 1989)*, and the number of different types of abuse *(Briere & Runtz, 1989; Henschel, Briere, Magallanes, & Smiljanich, 1990; Elliot & Edwards, 1991)*.

**METHOD**

**Study Aims and Hypotheses**

This study sought to examine whether any of the potential variables believed to be affecting the likelihood of disclosure of CSA were related to the age at which the secret was first revealed. It was posited that: *1)* The burden of the secret; successful and ego-strengthening experiences; concern for the safety of others; and publicity in the media (i.e., the facilitating variables) would be associated with increased likelihood of disclosing the incestuous secret, while all the other variables reviewed (the delaying variables) would be negatively related to the chances of early disclosure. *2)* Variables classified as facilitating would be rated as having had more subjective validity during the time immediately following the disclosure of abuse, whereas delaying variables would receive a higher ranking for the period that preceded the disclosure. *3)* Trauma scores would be positively related to respondents' age at disclosure and to delaying variables.

**Subjects and Procedure**

Volunteers and therapists in ten Israeli rape crisis centers and clinical institutions specializing in the treatment of sexual abuse trauma were asked to solicit the participation of Hebrew-speaking clients who were not suffering from any acute emotional condition. This was, therefore, a convenience sample, deliberately recruited from a small population. Forty-one survivors of CSA, who were assessed by their caretakers as having regained sufficient emotional stability to partake in this study, consented to participate. Very few recruits declined the invitation; the response rate was near-perfect. The anonymous research questionnaires were returned directly to the investigators via stamped, self-addressed envelopes included in the research packages. Thirty-nine respondents were women, two were men. Their mean age was 32 years (range: 16–56; $SD$=9.46). They had an average of 14 years of schooling (range: 6–20; $SD$=2.71). Thirty-seven percent of the participants had never married, 34% were divorced, and 29% were married.

**Instruments**

*Child Sexual Abuse Delayed Disclosure Checklist*
The CSADDC was designed by the present authors to assess variables associated with the likelihood of disclosure of CSA. The instrument was constructed in the following way. Six statements were generated for each of the 19 variables comprising the psychological, familial, and social variable categories. (The single trauma-related variable was assessed by means of a separate instrument, as noted below.) For example, the variable of "guilt and self-blame" was assigned such statements as: "I feel guilty about what happened to me" and "I should have behaved differently."

In the next stage, the 114 statements were validated in a series of steps. First, all the statements were written down on numbered cue cards. Ten Hebrew-speaking, university-educated adults were asked to sort them based on best conceptual fit with the 19 variables. The degree of agreement between the researchers' classification and that of the raters, as well as the interrater agreement, was noted for each statement. For example, if the statement "I am a weak person" was identified with the "helplessness" variable by nine of the ten raters, interrater agreement was 90%.

The second step in the validation procedure involved the use of a questionnaire containing the 19 variables, each with its six statements listed below. Twenty-six Hebrew-speaking, university-educated adults who had not participated in the prior step rated the degree of agreement between each statement and the variable to which it was assigned, using a ten-point scale (1=does not describe the variable at all; 10=describes it very well). With mean agreement scores and standard deviations having

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

been calculated, statements were given standard scores; during the final validation phase, all statements were given two scores, then ranked in descending order of interrater agreement and standard score. Four statements were also added from the Dissociative Experiences Scale *(Carlson, 1997)*, two of them describing amnesia symptoms and two representing depersonalization symptoms. Ultimately, 42 statements comprised the items on the CSADDC.

Respondents were asked to rate the degree to which they identified with each statement on the CSADDC during two different periods: *a)* predisclosure, i.e., the period of the abuse and their keeping it secret; and *b)* immediately following disclosure. Rankings were based on a five-point Likert scale (1=Did not feel it/believe in it; 5=Felt it/believed in it very strongly). Potential total scores on the CSADDC for each reference period ranged from 42 to 210. Reliability measures for the CSADDC were calculated four times. Cronbach's alpha and split-half reliability procedures were performed on the CSADDC for each of the two periods: predisclosure (0.83 and 0.82, respectively) and following disclosure (0.75 and 0.70, respectively), revealing good internal consistency for the measurements performed for the first period and moderately good internal consistency for the second period.

*Traumatic Experiences Questionnaire*

The TEQ *(Nijenhuis, van der Hart, & Vanderlinden, 1998)*, later slightly modified and relabeled the Traumatic Experiences Checklist *(Nijenhuis, 1999)*, is a self-report questionnaire inquiring about 25 types of interpersonal and noninterpersonal life events that could be potentially traumatic. When interpersonal violence was explored, subjects were asked to indicate if immediate family members, relatives, or others hurt them. TEQ items ask whether respondents had suffered from the following stressors: parentification (a child needing to act in a parental role), major loss (e.g., death of a loved one), life-threats, traumatic life events, emotional neglect, emotional abuse, physical abuse, sexual harassment, or sexual abuse.

The TEQ specifically addresses the subjective impact of the event (i.e., how traumatic was it for the respondent), and also elicits information on the number of perpetrators of emotional, physical, and sexual abuse. The questions contain short descriptions aimed at defining the events of concern. All

items are preceded by the phrase: "Did this happen to you?" For example, a TEQ sexual harassment item is: "Sexual harassment (acts of a sexual nature that *do not* involve physical contact) by your parents, brothers, or sisters." Similarly, a sexual abuse item is: "Sexual abuse (unwanted sexual acts involving physical contact) by your parents, brothers, or sisters."

Moderate to strong associations of the TEQ total score and composite scores, in particular physical and sexual abuse, with current psychological and somatoform dissociation supports the construct validity of the TEQ. These associations were found when studying psychiatric outpatients with dissociative and other mental disorders *(Nijenhuis, Spinhoven et al., 1999)*, and gynecology patients with chronic pelvic pain *(Nijenhuis, Van Dyck et al., 1999)*.

Among the key factors defining an event as traumatic are: perception of the event as having highly negative valence *(Carlson, 1997)*, multiple perpetrators *(Peters, 1988)*, duration and frequency of the abuse *(Elliott & Briere, 1992)*, and abuse at an earlier age *(Zivney, Nash, & Hulsey, 1988)*. The TEQ composite trauma score reflects these relevant traumatogenic factors. Each experience identified as a trauma item was given one point. Subjects could score 0–3 trauma points, depending on the number of perpetrating sources. Additional points were given to each personal trauma score if the subject was younger than age ten when traumatized, if the trauma lasted more than one year, and if the impact of the traumatic event was rated as 4 or 5 on a five-point subjective severity scale. Personal trauma scores in each of the nine categories ranged from 0–7. Composite personal trauma scores ranged from 0–63.

*Personal Data Questionnaire*

The PDQ includes 17 items, incorporating sexual trauma-related questions adapted from King et al. *(1995)*. Subjects were asked open- and closed-ended questions that included items regarding the circumstances in which they had first become aware of the abuse, the reactions they received following their disclosure, and the meaning of the disclosure in their lives. The PDQ also yielded a sexual traumatization score that reflected the frequency, age at onset, and termination of the abuse (range 6–15). In addition, there were items designed to assess variables such as sex, age, level of education, marital status, and country of birth, and

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

questions pertaining to the age at and circumstances of the disclosure.

## RESULTS
### Circumstances of the Abuse/Disclosure

The average age of respondents in this study was 7.11 years (range: 1–15, $SD$=3.85) at CSA onset, and 14.08 years (range: 7–23, $SD$=4.14) when the abuse ended. They first became aware of having been victimized at an average age of 15.8 years (range: 5–39, $SD$=7.6) and were, on average, 22.08 years old when they first disclosed their secret to someone else (range: 10–46, $SD$=9.18). When asked about the circumstances of having become aware of CSA, 43% responded that they had always realized that what happened to them was improper, 33% became aware that they had been abused following a significant triggering event associated with sexuality (e.g., sex education classes, sexual experiences, pregnancy), 9% realized something was wrong following a direct question from a family member, 9% following a direct question from a therapist, and 6% became spontaneously aware of their abuse during psychotherapy. TABLE 1 describes the distribution of perceived reactions of study respondents by age at disclosure.

In all cases but one, disclosure to the mother elicited a hostile/indifferent reaction; further, 95% of respondents chose to disclose to a nonfamily member. A content analysis of responses to the question regarding the meaning of the disclosure and its outcome revealed that none of those who had disclosed during childhood perceived the disclosure as having had a positive impact on their lives (e.g., "The reaction I received silenced me until I was 46 years old"). The older the survivors were at the time of disclosure, the more likely they were to report a positive outcome. For example, 73% of those who first disclosed during adulthood felt the experience to be positive (e.g., "I understood it wasn't my fault" or "It was only after the disclosure that I realized I deserved to heal").

### Delaying and Facilitating Variables

The correlation coefficient of the mean composite CSADDC score for the delaying variables and the age at disclosure of the abuse was .35 ($p$<.05). Items related to familial variables had a correlation of .29 with age at disclosure ($p$=.06). A closer analysis of relationships between specific items and age at disclosure revealed that statements about the importance of obedience to grownups ($r$=.31, $p$<.05) contributed most to this finding.

Psychological variables showed a correlation of .31 ($p$=.05) with age at disclosure. Among the items comprising this cluster, those that contributed most to this relationship were statements about mistrust of people ($r$=.25, $p$=.05), a sense of helplessness ($r$=.24, $p$=.06), and amnesia ($r$=.22, $p$=.08). Social variables showed the most powerful effect on CSA disclosure ($r$=.45, $p$<.005). Fear of social rejection ($r$=.31, $p$<.05) and fear of being condemned by the criminal justice system ($r$=.32, $p$<.05) were the items most strongly related to an older age at disclosure.

The mean composite score for the delaying variables was 3.75 ($SD$=.62) for the predisclosure period, and 2.76 ($SD$=.76) for the time immediately following. This difference was significant ($p$<.001), thereby providing further validation for the delaying valence of these items.

The correlation coefficient of the mean composite CSADDC score for the facilitating variables and age at disclosure of CSA was -.36 ($p$<.05). The items contributing most to this result related to publicity in the media of similar cases ($r$=-.34, $p$<.05), experiences of personal achievement ($r$=-.33, $p$<.05) and concern for the welfare of other potential victims ($r$=-.22, $p$=.09). Mean score for the facilitating variables was 2.63 ($SD$=.97) for the predisclosure period and 3.70 ($SD$=.67) postdisclosure. This difference was significant ($p$<.001), thereby providing additional validation for the facilitating valence of these items. These results confirmed our first and second research hypotheses.

### Trauma and CSA Disclosure

Forty-nine percent of respondents had experienced all five major abuse categories (emotional neglect, psychological abuse, physical abuse, sexual harassment, and sexual abuse). Emotional neglect and psychological abuse had been experi-

### Table 1
PERCEIVED SUPPORTIVE AND HOSTILE/INDIFFERENT REACTIONS FOLLOWING CSA DISCLOSURE BY AGE AT DISCLOSURE

| AGE | REACTION | N |
|---|---|---|
| 9–12 Years | Supportive | 0 |
| | Hostile/indifferent | 5 |
| 13–18 Years | Supportive | 6 |
| | Hostile/indifferent | 7 |
| 19–46 Years | Supportive | 19 |
| | Hostile/indifferent | 3 |

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

enced by 90% of the respondents, and 54% had experienced physical abuse in addition to their sexual victimization.

The composite trauma score (TEQ) was correlated with age at CSA disclosure at a level of .30 ($p<.05$). Specific trauma experiences that showed the strongest relationship with an older age at disclosure were emotional neglect ($r=.39$, $p<.05$) and sexual harassment ($r=.33$, $p<.05$). The TEQ also showed a highly significant relationship with the mean composite CSADDC score for the delaying variables ($r=.43$, $p<.001$). Among the specific trauma categories, those that showed the strongest relationship with delayed CSA disclosure were psychological abuse ($r=.49$, $p<.001$), emotional neglect ($r=.36$, $p<.05$), and sexual abuse ($r=.36$, $p<.05$). These findings confirmed our third research hypothesis.

To investigate further the relationship between traumatic experiences, delaying variables, and facilitating variables and the age at disclosure of CSA, a hierarchical multiple regression was performed (see TABLE 2). The order of the steps was hypothesis-driven, while the criterion for a variable entering the equation at each step was set at $p<.05$. In the first step, the composite TEQ score was entered. In the second step, we entered the mean composite CSADDC score for the facilitating variables, $R=.52$, $R^2=.27$, $F(2, 38)=7.04$, $p<.005$. The mean composite CSADDC score for the delaying variables did not meet the required significance criterion.

## DISCUSSION

This retrospective study explored the circumstances and experience of CSA disclosure and the relationships among level of childhood traumatization, disclosure variables, and age at disclosure. Although no claim can be made that our research sample was representative of all victims of CSA in Israel, it seems reasonable to suggest that these respondents are representative of the adult population of clients seeking help for CSA-related psychopathology in our country.

Several important findings emerged. Respondents in this study had first been molested when they were about seven years old; more than 8.5 years elapsed before they became aware of their maltreatment; and more than six additional years (close to 15 years since the onset of the abuse) elapsed prior to the disclosure of their ordeals. None of the respondents had ever filed a complaint against their perpetrators. These findings underscore the problems of delayed reporting and underreporting of CSA. They validate previous Israeli findings *(Somer, 1995)* and are in line with North American reports *(Lamb & Edgar-Smith, 1994; Wyatt, Tamra, Beatriz, Carmona, & Romero, 1999)*.

Roesler and Wind *(1994)* noted that when children told about abuse, they were most likely to tell adults in their family. By contrast, most of the respondents in the present study disclosed to non-family members. The few who had disclosed within the family reported an indifferent or hostile reaction. Among factors that contributed prominently to the delayed disclosure were fears of social rejection and condemnation, mistrust of people, and adoption of family-indoctrinated values of obedience. These variables represent perceived concentric circles of social disbelief, incomprehension, and oppression that had stifled motivation to disclose.

These respondents' tribulations started some 25 years before data were collected and ended 16 years prior to their being surveyed. Victimization, therefore, occurred before recent changes in Israeli public awareness about CSA and prior to local legislation of mandatory reporting laws. Whether or not sexually abused children in Israel are currently disclosing their abuse at an earlier age and are being met with more supportive reactions remains a research question to be investigated.

Ninety percent of the respondents also reported having been psychologically mistreated. A major factor involved in delayed reporting of CSA was the extent of concomitant childhood traumatization. Delaying variables did not add significantly to the explanation of delayed reporting beyond the contribution of the composite trauma score. We believe that the psychological battering of these children may have weakened their ability to view

Table 2

HIERARCHICAL REGRESSION OF TRAUMATIC EXPERIENCES, DELAYING VARIABLES, AND FACILITATING VARIABLES ON AGE AT DISCLOSURE

| VARIABLES | $B$ | $SE\ B$ | $\beta$ |
|---|---|---|---|
| Step 1 | | | |
| Traumatic Experiences | 1.45 | 0.61 | 0.36* |
| Constant | 13.66 | | |
| Step 2 | | | |
| Facilitating Variables | -3.47 | 1.27 | -0.38** |
| Traumatic Experiences | 1.60 | 0.56 | 0.38** |
| Constant | 22.22 | | |

*$p<.05$; **$p<.01$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

themselves as worthy of benevolent care, and severely damaged their capacity to trust adults.

The present data suggest that the variable of media attention was positively associated with disclosure of CSA. This supports our clinical experience and involvement with local rape crisis centers, where we have seen that high-profile media attention to CSA is typically followed by a surge of phone calls and requests for help from people who had never before revealed having been abused. This finding has important implications for research, since little is known about the effects of media campaigns targeted at young, high-risk populations. Still, media campaigns alone are unlikely to help children overcome the oppressive forces that prevent disclosure. The present findings suggest that mistrust of adults (in particular adult family members) and anticipation of adverse response to disclosure were strongly related to the delayed disclosure by respondents. Child victims of sexual abuse, particularly intrafamilial abuse, may not be willing to sacrifice the integrity of their families and their sense of belonging to it.

**Implications for Policy and Practice**

Perhaps the key policy-related question raised by the present research is: "What can be done to promote early disclosure of CSA?" We suggest that children might be less reluctant to reveal their plight if they and their families believed that rehabilitative sentencing were an option. The dilemma of choice between a rehabilitative and a punitive model in sentencing CSA and incest offenders has recently been addressed in the literature *(Fox, 1999; Stone, Winslade, & Klugman, 2000)* and is currently being debated among Israeli child welfare policy makers. Family therapy for victim and offender in cases of father-daughter incest was endorsed in earlier clinical reports *(Eist & Mandel, 1968; Hoorwitz, 1983; Madanes, 1990; Meiselman, 1990)*. However, in the absence of immediate legal sanctions, incestuous families show a tendency to avoid therapy *(Byrne & Valdiserri, 1982)*.

It may be instructive, in these cases, to think of the child survivor as having two main categories of therapeutic challenge: processing the sexual trauma itself and correcting the maladaptive family experience (including the ideas and values inculcated by the incestuous family). Treatment options as alternatives to incarceration of fathers who confess their incest could help victims disclose their secret earlier, and make it more likely that offenders will take responsibility for the pain they have inflicted. Early intervention in incestuous families, as an alternative to the incarceration of the offending parent, can enhance the prospect of the child benefiting from a healthier family environment.

Parallel programs to optimize the facilitating variables identified in this research should also be developed. Investing in preventive school-based programs is not only clinically wise but economically sensible. Suffering abuse puts children at greater risk for many difficulties throughout their lives. For example, it has been estimated that some 30% of abused children in the United States have some type of language or cognitive impairment; over 50% have socioemotional problems; 14% exhibit self-mutilative or other self-destructive behavior; over 50% have school difficulties, including poor attendance and misconduct; and 22% have a learning disorder *(Daro & McCurdy, 1991)*. Caldwell *(1992)* estimated that one-quarter of all children from abusive households will receive some special education services for at least one year between kindergarten and twelfth grade. If we add to this the costs of foster care, medical and psychological care, and juvenile justice services, the fiscal rationale for developing child-focused interventions designed to make children less vulnerable targets for abuse becomes self-evident. Caldwell further maintained that the costs of two types of prevention efforts—home visitor and parent education programs—were, respectively, 3.5% and 7.0% of the calculated costs of child abuse.

There is a need for child protective services and school counselors and administrators to plan public and school-based educational campaigns aimed at increasing awareness of children's needs and their rights to proper care; to teach children self-protective skills; and to provide a potential "safe haven" for these children, as well as a family rehabilitative option for the courts to consider. Even the most effective prevention programs may not eliminate entirely the scourge of childhood sexual abuse. Still, modest steps in this direction can bring huge benefits to children and to society.

**References**

Arnsworth, M. (1989). Therapy of incest survivors: Abuse or support. *Child Abuse and Neglect, 13,* 549–562.

Auerbach, S., Kiesler, D., Strentz, T., Schmidt, J.A., & Serio, C. (1994). Interpersonal impacts and adjustment to the stress of simulated captivity: An empirical test of the Stockholm syndrome. *Journal of Social and Clinical Psychology, 13,* 207–221.

Bagley, C., & King, K. (1989). *Historical perspectives in*

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 155 of 198 PageID #:1813

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

*child sexual abuse: The search for healing.* London: Tavistock.

Bagley, C., & Ramsay, R. (1985). Sexual abuse in childhood: Psychological outcomes and implications for social work practice. *Journal of Social Work & Human Sexuality, 4,* 33–48.

Beckett, K. (1996). Culture and the politics of signification: The case of child sexual abuse. *Social Problems, 43,* 57–76.

Blizard, R.A. (1997a). Therapeutic alliance with abuser alters in DID: The paradox of attachment to the abuser. *Dissociation, 10,* 246–254.

Blizard, R.A. (1997b). The origins of dissociative identity disorder from an object relations and attachment theory perspective. *Dissociation, 10,* 223–229.

Blizard, R.A., & Bluhm, A.M. (1994). Attachment to the abuser: Integrating object-relations and trauma theories in treatment of abuse survivors. *Psychotherapy, 31,* 383–390.

Briere, J.N. (1992). *Child abuse trauma: Theory and treatment of lasting effects.* Thousand Oaks, CA: Sage Publications.

Briere, J.N., & Runtz, M. (1989). The trauma symptom checklist (TSC-33): Early data on a new scale. *Journal of Interpersonal Violence, 4,* 151–163.

Browne, A. (1991). The victims' experience: Pathways to disclosure. *Psychotherapy, 28,* 150–156.

Browne, A., & Finkelhor, D. (1986). Impact of child sexual abuse: A review of research. *Psychological Bulletin, 99,* 66–77.

Byrne, J.P., & Valdiserri, E.V. (1982). Victims of childhood sexual abuse: A follow-up study of a non-compliant population. *Hospital and Community Psychiatry, 33,* 938–940.

Caldwell, R.L. (1992). *The costs of child abuse vs. child abuse prevention: Michigan's experience.* Report submitted to the Michigan Children's Trust Fund.

Carbo, R.A., & Gartner, J. (1994). Can religious communities become dysfunctional families? Sources of countertransference for the religiously committed psychotherapist. *Journal of Psychology and Theology, 22,* 264–271.

Carlson, E.B. (1997). *Trauma assessments: A clinician's guide.* New York: Guilford Press.

Carrion, V.G., & Steiner, H. (2000). Trauma and dissociation in delinquent adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry, 39,* 353–359.

Chen, R. (1996). Sexual abuse among college students in Taiwan. *Journal of Interpersonal Violence, 11,* 79–93.

Coffey, P., Leitenberg, H., Henning, K., Turner, T., & Bennett, R.T. (1996). Mediators of the long-term impact of child sexual abuse: Perceived stigma, betrayal, powerlessness, and self-blame. *Child Abuse and Neglect, 20,* 447–455.

Cohen, J.A., & Mannarino, A.P. (1988). Psychological symptoms in sexually abused children. *Child Abuse and Neglect, 12,* 571–577.

Comaz-Diaz, L. (1995). Puerto Ricans and sexual child abuse. In L.A. Fontes, (Ed.), *Sexual abuse in nine North American cultures: Treatment and prevention* (pp. 31–66). Thousand Oaks, CA: Sage Publications.

Daro, D., & McCurdy, K. (1991). *Current trends in child abuse reporting and fatalities: The results of the 1990 annual fifty state survey* (Working Paper #808). Chicago: National Committee for Prevention of Child Abuse.

De Young, M. (1981). Promises, threats and lies: Keeping incest secret. *Journal of Humanics, 9,* 61–71.

Eist, H.I., & Mandel, A.U. (1968). Family treatment of ongoing incest behavior. *Family Process, 7,* 216–232.

Elliot, D.M., & Briere, J. (1992). Sexual abuse trauma among professional women: Validating the Trauma Symptom Checklist-40 (TSC-40). *Child Abuse and Neglect, 16,* 391–398.

Elliot, D.M., & Edwards, K.J. (1991, August). *Individuals raised by alcoholic versus mentally ill parents: A compari-*

*son study.* Paper presented at the annual meeting of the American Psychological Association, San Francisco.

Everill, J., & Waller, G. (1995). Disclosure of sexual abuse and psychological adjustment in female undergraduates. *Child Abuse and Neglect, 19,* 93–100.

Faust, J., Runyon, M.K., & Kenny, M.C. (1995). Family variables associated with the onset and impact of intrafamilial childhood sexual abuse. *Clinical Psychology Review, 15,* 443–456.

Finkelhor, D. (1987). The sexual abuse of children: Current research reviewed. *Psychiatric Annals, 17,* 233–237.

Finkelhor, D., Hotaling, G., Lewis, I.A., & Smith, C. (1989). Sexual abuse and its relationship to later sexual satisfaction, marital status, religion, and attitudes. *Journal of Interpersonal Violence, 4,* 279–299.

Flannery, R.B. (1990). Social support and psychological trauma: A methodological review. *Journal of Traumatic Stress, 3,* 593–611.

Fontes, L.A. (1993). Disclosure of sexual abuse by Puerto Rican children: Oppression and cultural barriers. *Journal of Child Sexual Abuse, 2,* 21–35.

Fontes, L.A. (1995). Culturally informed interventions for sexual child abuse. In L.A. Fontes, (Ed.), *Sexual abuse in nine North American cultures: Treatment and prevention* (pp. 259–266). Thousand Oaks, CA: Sage Publications.

Fox, R.G. (1999). Competition in sentencing: The rehabilitative model versus the punitive model. *Psychiatry, Psychology and Law, 6,* 153–162.

Freud, A. (1966). *The ego and the mechanisms of defense* (Rev. ed.). New York: International Universities Press.

Friese, I.H., Hymer, S., & Greenberg, M.S. (1987). Describing the crime and the crime victim: Psychological reactions to victimization. *Professional Psychology: Research and Practice, 18,* 299–315.

Goodwin, J.M. (1989). *Sexual abuse and incest: Victims and their families.* Boston: Wright.

Graham, D.L.R., Rawlings, E.I., Ihms, K., Latimer, D., Follano, J., Thompson, A., Suttman, K., Farrington, M., & Hacker, R. (1995). A scale for identifying "Stockholm syndrome" reactions in young dating women: Factor structure, reliability, and validity. *Violence and Victims, 10,* 3–22.

Green, A.H. (1996). Overview of child sexual abuse in S.J. Kaplan, (Ed.), *Family violence: A clinical and legal guide* (pp. 73–104). Washington, DC: American Psychiatric Press.

Gurley, D. (1991). The mixed roles of social support and social obstruction in recovery from child abuse. In D.D. Knudsen & J.L. Miller (Eds.), *Abused and battered: Social and legal responses of family violence. Social institutions and social change* (pp. 89–99). New York: Aldine De Gruyter.

Harter, S., Alexander, P.C., & Neimeyer, R.A. (1988). Long-term effects of incestuous child abuse in college women: Social adjustment, social cognition, and family characteristics. *Journal of Consulting and Clinical Psychology, 56,* 5–8.

Harvey, J.H., Orbuch, T.L., Chwalisz, K.D., & Garwood, G. (1991). Coping with sexual assault, The roles of account making and confiding. *Journal of Traumatic Stress, 4,* 515–531.

Henschel, D., Briere, J., Magallanes, M., & Smiljanich, K. (1990, April). *Sexual abuse related attributions: Probing the role of "traumatogenic factors."* Paper presented at the annual meeting of the Western Psychological Association, Los Angeles.

Herman, J.L. (1981). *Father-daughter incest.* Cambridge, MA: Harvard University Press.

Herman, J.L. (1992). *Trauma and recovery.* New York: Basic Books.

Herman, J.L., & Schatzow, E. (1987). Recovery and verification of memories of childhood sexual trauma. *Psychoanalytic Psychology, 4,* 1–14.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Hoorwitz, A. (1983). Guidelines for treating father-daughter incest. *Social Casework, 64*, 515–524.

Hudson, J.J. (1996). Characteristics of the incestuous family. In C.C. Kroeger & J.R. Beck (Eds.), *Women, abuse, and the Bible: How scripture can be used to hurt or to heal* (pp. 70–85). Grand Rapids, MI: Baker Books.

James, B. (1989). *Treating traumatized children: New insights and creative interventions.* Lexington, MA: Lexington Books.

Kernberg, O.F. (1975). *Borderline conditions and pathological narcissism.* Northvale, NJ: Jason Aronson.

Krieger, M., & Robbins, J. (1985). The adolescent incest victim and the judicial system. *American Journal of Orthopsychiatry, 55*, 419–425.

Lamb, S., & Edgar-Smith, S. (1994). Aspects of disclosure mediators of outcome of childhood sexual abuse. *Journal of Interpersonal Violence, 9*, 307–326.

Lawson, L., & Chafin, M. (1992). False negatives in sexual abuse disclosure interviews. *Journal of Interpersonal Violence, 7*, 532–542.

Liem, J.H., O'Toole, J.G., & James, J.B. (1996). Themes of power and betrayal in sexual abuse survivors' characterizations of interpersonal relationships. *Journal of Traumatic Stress, 9*, 745–761.

Madanes, C. (1990). *Sex, love and violence: Strategies for transformation.* New York: Norton.

Manlowe, J. (1995). *Faith born of seduction: Sexual trauma, body image, and religion.* New York: New York University Press.

Mazelan, P. (1991). The myths and realities of rape. In R. Cochrane & C. Douglas (Eds.), *Psychology and social issues: A tutorial text. Contemporary psychology series.* (pp. 53–62). London, UK: Falmer Press/Taylor & Francis.

McDevitt, S. (1996). The impact of news media on child abuse reporting. *Child Abuse and Neglect, 20*, 261–274.

Meiselman, K.C. (1990). *Resolving the trauma of incest: Reintegration therapy with survivors.* San Francisco: Jossey-Bass.

Mennen-Ferol, E. (1993). Evaluation of risk factors in childhood sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry, 32*, 934–939.

Mize, L.K., Bentley, B., Helms, S., Ledbetter, J., & Neblett, K. (1995). Surviving voices: Incest survivors' narratives of their process of disclosure. *Journal of Family Psychotherapy, 6*(4), 43–59.

Nijenhuis, E.R.S. (Ed.). (1999). *Somatoform dissociation: Phenomena, measurement, and theoretical issues.* Assen, Netherlands: Van Gorcum.

Nijenhuis, E.R.S., Spinhoven, P., Van Dyck, R., Van der Hart, O., & Vanderlinden, J. (1999). Degree of somatoform dissociation in dissociative disorder is correlated with reported trauma. *Journal of Traumatic Stress, 11*, 711–730.

Nijenhuis, E.R.S., Van der Hart, O., & Vanderlinden, J. (1998). *The traumatic experiences questionnaire.* Unpublished manuscript.

Nijenhuis, E.R.S., Van Dyck, R., ter Kuile, M., Mourits, M., Spinhoven, P., & Van der Hart O. (1999). Evidence for associations between somatoform dissociation, psychological dissociation, and reported trauma in chronic pelvic pain patients. In E.R.S. Nijenhuis (Ed.), *Somatoform dissociation: Phenomena, measurement, and theoretical issues* (pp. 146–160). Assen, Netherlands: Van Gorcum.

Okamura, A., Heras, P., & Wong K.L. (1995). Asian, Pacific Island, and Filipino Americans and sexual child abuse. In L.A. Fontes (Ed.), *Sexual abuse in nine North American cultures: Treatment and prevention,* (pp.67–96). Thousand Oaks, CA: Sage Publications.

Peters, S.D. (1988). Child sexual abuse and later psychological problems. In G.E. Wyatt & G.E. Powell (Eds.), *Lasting effects of child sexual abuse* (pp. 108–118). Newbury Park, CA: Sage Publications.

Price, M. (1993). The impact of incest on identity formation in women. *Journal of the American Academy of Psychoanalysis, 21*, 213–228.

Price, M. (1994). Incest and the idealized self: Adaptations to childhood sexual abuse. *American Journal of Psychoanalysis, 54*, 21–36.

Roesler, T.A., & Wind, T.W. (1994). Telling the secret: Adult women describe their disclosures of incest. *Journal of Interpersonal Violence, 9*, 327–338.

Roth, S., & Lebowitz, L. (1988). The experience of sexual trauma. *Journal of Traumatic Stress, 1*, 79–107.

Sauzier, M. (1989). Disclosure of child sexual abuse: For better and for worse. *Psychiatric Clinics of North America, 12*, 455–469.

Shapiro, J.P. (1996). Attribution-based treatment of self-blame and helplessness in sexually abused children. *Psychotherapy, 32*, 581–591.

Solomon, J.C. (1992). Child sexual abuse by family members: A radical feminist perspective. *Sex Roles, 27*, 473–485.

Somer, E. (1995). *Begov Ha'arayot (In the lion's den: Demographic characteristics of survivors of incest calling a rape crisis hotline).* Tel Aviv: Israeli Union of Rape Crisis Centers. [Hebrew]

Somer, E. & Weiner, A. (1996). Dissociative symptomatology in adolescent diaries of incest victims. *Dissociation 9*(3), 197–209.

Staley, J.M., & Lapidus, L.B. (1997). Attributions of responsibility in father-daughter incest in relation to gender, socioeconomic status, ethnicity, and experiential differences in participants. *Journal of Clinical Psychology, 53*, 331–347.

Stone, T.H., Winslade, W.J., & Klugman, C.M. (2000). Sex offenders, sentencing laws and pharmaceutical treatment: A prescription for failure. *Behavioral Sciences and the Law, 18*, 83–110.

Summit, R.C. (1983). Child sexual abuse accommodation syndrome. *Child Abuse and Neglect, 7*, 177–193.

Tomlin, S.S. (1991). Stigma and incest survivors. *Child Abuse and Neglect, 15*, 557–566.

Ussher, J., & Dewberry, C. (1995). The nature and long-term effects of childhood sexual abuse: A survey of adult women survivors in Britain. *British Journal of Clinical Psychology, 34*, 177–192.

Wyatt, G.E., & Newcomb, M. (1990). Internal and external mediators of women's sexual abuse in childhood. *Journal of Consulting and Clinical Psychology, 58*, 758–767.

Wyatt, G.E., Tamra, B.L., Beatriz, S., Carmona, J.V., & Romero, G. (1999). The prevalence and circumstances of child sexual abuse: Changes across a decade. *Child Abuse and Neglect, 23*, 45–60.

Young, L. (1992). Sexual abuse and the problem of embodiment. *Child Abuse and Neglect, 16*, 89–100.

Zivney, O.A., Nash, M.R., & Hulsey, T.L. (1988). Sexual abuse in early versus late childhood: Differing patterns of pathology as revealed on the Rorschach. *Psychotherapy, 25*, 99–106.

Zlotnick, C., Shea, M.T., Pearlstein, T., Begin, A., Simpson, E., & Costello, E. (1996). Differences in dissociative experiences between survivors of childhood incest and survivors of assault in adulthood. *Journal of Nervous and Mental Disease, 184*, 52–54.

For reprints: Eli Somer, Ph.D., School of Social Work, University of Haifa, Mt. Carmel, Haifa 31905, Israel [E-mail: somer@research.haifa.ac.il]

# Exhibit G

## Brief Communication

# Prevalence of Childhood Sexual Abuse and Timing of Disclosure in a Representative Sample of Adults From Quebec

**Martine Hébert, PhD[1,2]; Marc Tourigny, PhD[2,3]; Mireille Cyr, PhD[2,4]; Pierre McDuff, MSc[5]; Jacques Joly, PhD[3]**

**Objective:** Our study sought to explore patterns of disclosure of child sexual abuse (CSA) in a sample of adult men and women.

**Method:** A telephone survey conducted with a representative sample of adults ($n$ = 804) from Quebec assessed the prevalence of CSA and disclosure patterns. Analyses were carried out to determine whether disclosure groups differed in terms of psychological distress and symptoms of posttraumatic stress, and a logistic regression was used to examine factors associated with prompt disclosure.

**Results:** Prevalence of CSA was 22.1% for women and 9.7% for men. About 1 survivor out of 5 had never disclosed the abuse, with men more likely not to have told anyone, than women. Only 21.2% of adults reported prompt disclosure (within a month of the first abusive event), while 57.5% delayed disclosure (more than 5 years after the first episode). CSA victims who never disclosed the abuse and those who delayed disclosure were more likely to obtain scores of psychological distress and posttraumatic stress achieving clinical levels, compared with adults without a history of CSA. In the multivariate analysis, experiencing CSA involving a perpetrator outside the immediate family and being female were factors independently associated with prompt disclosure.

**Conclusion:** A significant number of adult women and men reported experiencing CSA, and most victims attested to either not disclosing or significantly delaying abuse disclosure.

Can J Psychiatry. 2009;54(9):631–636.

**Clinical Implications**

- The high frequency of undisclosed or delayed disclosure underscores the need for health professionals to inquire about past CSA.
- The high rate of revictimization suggests that health professionals should promote self protective skills among CSA survivors.
- Prevention initiatives need to promote prompt disclosure of CSA, especially for boys and victims of abuse by an intrafamilial perpetrator.

**Limitations**

- The sample is relatively small and precluded the possibility of conducting separate analyses within gender groups.
- Data regarding attributions or feelings of blame associated with the abuse that may impact disclosure patterns were not documented.
- Variables related to disclosure (recipient, nature of the response following disclosure) that may influence subsequent distress were not investigated.

**Key Words:** *sexual abuse, disclosure, psychological distress*

In past years, numerous CSA programs have been implemented in schools.[1] One of the main messages is to encourage victims to promptly disclose the abuse to a trusted adult to prevent further abuse. Disclosure of CSA is likely to be followed with numerous interventions from judiciary, medical, and treatment settings to address resulting symptoms.[2] As such, it would be plausible to expect disclosure of CSA to be associated with better long-term outcomes. However, empirical data have not found disclosure to be a reliable predictor of long-term outcomes as no clear-cut relation between telling someone about the abuse and psychological distress can be derived from current empirical studies[2–4] underlying the need for further investigation in this area. In addition, data regarding disclosure rates are scarce[5] and few studies have explored factors related to prompt disclosure in representative samples. Published studies have often relied exclusively on women's experience of CSA. Our study aims to explore disclosure patterns of CSA victims in a representative sample of both adult women and men in Quebec.

## Method

### Participants

Data were collected by a telephone survey with a sample of adults ($n = 1002$) from Quebec. Selection without substitution was performed in 2 steps. First, households with telephones were selected by random digit dialing. Then, in each selected household, a respondent aged 18 years or older and able to complete the survey in either French or English was chosen using a random selection schedule with no substitution of respondent allowed. The overall response rate was 30%, considering refusals, incomplete interviews, and selected households that remained impossible to reach after 5 attempts on different days and times.

Data from respondents ($n = 1002$) were weighted by region, age, and sex based on the 2001 Canadian census data of adults aged 18 years and older.[6] A correction for design effect was applied. Design effect is equal to $1/(1 + \text{variance of weighted coefficients})$ and each weighted coefficient was multiplied by 0.81 (or 1/1.24) to correct for the weighting effect on statistical accuracy.[7] This weighting and correction for design effect reduces disparities between characteristics of the sample and those of the population, prevents overestimating, and

supports statistical precision. Analyses were performed with this representative sample of adults ($n = 804$). The telephone survey was conducted in April and May 2006 by an established survey firm. Verbal consent of respondents was solicited and our study received approval from the Internal Review Board of the University of Sherbrooke.

### Measures

Two indicators of CSA were used: unwanted sexual touching and unwanted sexual intercourse before the age of 18 years.[8] Respondents indicated if any of these experiences ever happened to them and the identity of the perpetrator: a member of the immediate family (for example, father, stepfather, brother), a member of the extended family (for example, grandfather, uncle, cousin), a known but unrelated person (for example, friend of the family, neighbour, teacher), and an unknown perpetrator. Participants were asked their age during the first abusive episode, whether they ever disclosed the abuse, and the delay between the first episode and the disclosure, and any sexual revictimization (another episode of sexual abuse involving a different perpetrator).

The brief French version of the Psychological Distress Scale of the Quebec Health Survey[9] (translation of the Psychiatric Symptom Index[10,11]) was used to obtain a measure of psychological distress symptoms in the week prior to evaluation. Each item is coded on a 4-point Likert scale, from 0 (never) to 3 (very often), with higher scores indicating increased severity of distress. Normative values (80th percentile) are available for a noninstitutionalized Quebec population by sex and age[12] and were used to define clinical levels of distress.

The PC-PTSD[13] is intended to reflect the 4 factors specific to the PTSD construct: reexperiencing, numbing, avoidance, and hyperarousal.[14–16] A positive response to the screen indicates that the respondent may have PTSD or trauma-related problems and that further investigation by a mental health professional may be warranted. A cut-off score of 2 is recommended to optimize sensitivity or to detect positive cases.[13] PC-PTSD scores are highly correlated with scores derived from a structured clinical interview (Clinician Administered PTSD Scale).

## Results

### Prevalence of CSA

In our sample, 21.4% of women and 9.5% of men reported unwanted sexual activities involving touching by an adult or a child 3 years older than them, and 5.2% of women and 2.3% of men reported rape, for an overall CSA prevalence of 22.1% of women and 9.7% of men (Table 1). Both unwanted touching ($n = 797$, $\chi^2 = 21.43$, $df = 1$, $P < 0.001$) and rape ($n = 800$, $\chi^2 = 4.56$, $df = 1$, $P < 0.05$) were reported more frequently by women, compared with men. Nearly one-fifth of

Prevalence of Childhood Sexual Abuse and Timing of Disclosure in a Representative Sample of Adults From Quebec

| Table 1  Prevalence of CSA, disclosure patterns, and revictimization, % | | | |
|---|---|---|---|
| | Women (*n* = 411) | Men (*n* = 393) | Overall sample (*n* = 804) |
| Touching | 21.4 | 9.5 | 15.6 |
|     Member of immediate family | 27.1 | 5.4 | 20.5 |
|     Member of extended family | 29.4 | 21.6 | 27.0 |
|     Known person | 32.9 | 45.9 | 36.9 |
|     Unknown person | 10.6 | 27.0 | 15.6 |
|     Age at first episode, years | | | |
|         <6 | 21.8 | 2.8 | 16.3 |
|         6–11 | 37.9 | 63.9 | 45.5 |
|         12–18 | 40.2 | 33.3 | 38.2 |
| Rape | 5.2 | 2.3 | 3.8 |
|     Member of immediate family | 20.0 | 44.4 | 27.6 |
|     Member of extended family | 15.0 | 11.1 | 13.8 |
|     Known person | 50.0 | 44.4 | 48.3 |
|     Unknown person | 15.0 | 0.0 | 10.3 |
|     Age at first episode, years | | | |
|         <6 | 9.5 | 0.0 | 6.7 |
|         6–11 | 19.0 | 33.3 | 23.3 |
|         12–18 | 71.4 | 66.7 | 70.0 |
| Any CSA | 22.1 | 9.7 | 16.0 |
| Disclosure of the abuse | | | |
|     Never | 15.7 | 34.2 | 21.3 |
|     Within 24 hours | 20.2 | 10.5 | 17.3 |
|     Within 1 month | 5.6 | 0.0 | 3.9 |
|     Within 5 years | 7.9 | 10.5 | 8.7 |
|     After more than 5 years | 50.6 | 44.7 | 48.8 |
| Sexual revictimization | 22.2 | 21.1 | 21.9 |

survivors, both men (21.4%) and women (22.2%) reported revictimization (*n* = 128, $\chi^2$ = 0.21, *df* = 1, nonsignificant).

Regarding disclosure patterns, almost 1 out of every 5 CSA victims had not disclosed the sexual abuse to anyone prior to the survey, with men more likely not to have told (34.2%) than women (15.7%) (*n* = 127, $\chi^2$ = 5.43, *df* = 1, *P* < 0.05). Overall, 21.2% of victims reported having promptly disclosed the abuse (within a month), while nearly one-half (48.8%) of victims waited 5 years or more following the abuse to tell someone.

### Disclosure Patterns and Outcomes

Table 2 shows the mean and standard deviation of the psychological distress and PTSD scales for the nonvictimized group and the abused groups (prompt disclosers [less than 1 month], late disclosers [1 month or more], and nondisclosers). An analysis of variance revealed a significant main effect. Further posthoc analyses, using the Games-Howell statistic to account for unequal *n*'s and lack of homogeneity of variance of scores across groups, indicated that victims of sexual abuse who delayed disclosure obtained scores indicating greater psychological distress (mean difference = 7.11, *P* < 0.01) and PTSD (mean difference = 0.53, *P* < 0.01) than adults without a history of CSA. In addition, a marginal effect was found suggesting that adults who never disclosed the abuse displayed higher psychological distress relative to adults without a history of CSA (mean difference = 8.95, *P* = 0.06).

Chi-square analyses were performed on the percentage of cases reaching clinical levels of psychological distress and PTSD (Table 3) and adjusted standardized residuals are presented (values greater than 1.96 flag observed values

| Table 2  Means (SD) of psychological distress and PTSD scores by groups | | | | | |
|---|---|---|---|---|---|
| | No CSA ($n = 673$) | CSA promptly disclosed ($n = 27$) | Delayed disclosure of CSA ($n = 74$) | CSA not disclosed ($n = 27$) | $F$ |
| Psychological distress | 10.42 (11.57) | 12.49 (8.37) | 17.53 (17.29) | 19.37 (17.32) | 11.26[a] |
| PTSD | 0.34 (0.79) | 0.51 (0.82) | 0.87 (1.28) | 0.95 (1.32) | 11.93[a] |
| [a] $df = 3{,}800$; $P < 0.001$ | | | | | |

| Table 3  Percentage (adjusted residuals) of participants reaching clinical levels by groups | | | | | |
|---|---|---|---|---|---|
| | No CSA ($n = 673$) | CSA promptly disclosed ($n = 27$) | Delayed disclosure of CSA ($n = 74$) | CSA not disclosed ($n = 27$) | $\chi^2$ |
| Psychological distress | 10.1% (−3.8) | 7.4% (0.7) | 25.7% (3.8) | 25.9% (2.3) | 20.92[a] |
| PTSD (score 2) | 3.3% (−5.8) | 7.4% (0.5) | 17.8% (5.0) | 19.2% (3.2) | 38.80[a] |
| [a] $df = 3$; $P < 0.001$ | | | | | |

significantly different than expected). In both cases, a significant effect was found and follow-up $2 \times 2$ chi-square analyses indicate that both victims who did not disclose the abuse ($n = 700$, $\chi^2 = 6.79$, $df = 1$, $P < 0.01$) and those who delayed the disclosure ($n = 747$, $\chi^2 = 15.71$, $df = 1$, $P < 0.001$) were more likely to achieve clinical scores of psychological distress, compared with adults without a history of CSA. A similar pattern is evident for the analysis of clinical scores on the PTSD scale ($n = 700$, $\chi^2 = 17.14$, $df = 1$, $P < 0.001$ and $n = 747$, $\chi^2 = 31.07$, $df = 1$, $P < 0.001$). Finally, a higher percentage of adults who delayed disclosure achieved scores reaching clinical levels of psychological distress relative to participants in the prompt disclosure group ($n = 100$, $\chi^2 = 4.01$, $df = 1$, $P < 0.05$).

### Variables Related to Prompt Disclosure

A logistic regression analysis was conducted where prompt disclosure served as the dependent variable and severity of abuse (penetration), relation to perpetrator, age of onset, and sex of the victim served as the independent variables while controlling for age of the respondent. Results revealed a significant effect ($n = 125$, $\chi^2 = 12.54$, $df = 2$, $P < 0.01$). After controlling for other variables, sex ($P < 0.05$) and relation to the perpetrator ($P < 0.05$) were independently predictive of prompt disclosure. Odds ratios indicate that abuse disclosure within 1 month was 6.76 times greater for victims abused by perpetrators outside their immediate family, compared with victims abused by a family member. Moreover, female victims of CSA had 3.76 times greater probability of prompt disclosure, compared with male victims.

### Discussion

In our study, 22.1% of women and 9.7% of men reported CSA, rates similar to those in North American community samples.[17] Our data suggest that one-fifth of all adults sexually victimized in childhood had not disclosed the abuse prior to the survey, with men more likely not to have told anyone. Moreover, nearly one-half of the victims who had disclosed waited more than 5 years after the first episode to do so. These results are similar to data provided in a study[18] that focused solely on adult women and highlights the fact that delayed disclosure of CSA is quite frequent. Our results indicate that victims who never disclosed the abuse and those who delayed the disclosure are more likely to achieve clinical level scores of psychological distress and posttraumatic stress, compared with adults without a history of CSA.

In exploring variables predicting prompt disclosure, only 2 variables were found to independently predict rapid disclosure of the abuse: sex of the victim and identity of the perpetrator. Being female was associated with a higher probability of telling promptly. Socialization practices and traditional views of masculinity may contribute to male victims experiencing greater feelings of shame. Male victims may be more likely to blame themselves for not being able to prevent the abuse, which in turn may hinder disclosure.[19] Our results also indicate that sexual abuse involving a perpetrator outside the immediate family was more likely to be promptly disclosed, while abuse by a family member was less likely to be associated with rapid disclosure. This finding is consistent with empirical reports and theory on the family dynamics of

intrafamilial abuse involving secrecy.[18,20,21] Extrafamilial abuse may be easier to disclose as there are fewer potential costs associated with disclosing. On the other hand, intrafamilial sexual abuse may be more likely to be associated with a sense of betrayal as well as major life changes following disclosure.[22] Victims of CSA involving a family member may be more reluctant to disclose and seek help as this may imply a sense of disloyalty toward a member of their own family.[23]

The high frequency of undisclosed or delayed disclosure of CSA found in this Quebec sample underscores the need for health professionals in clinical and counselling settings to inquire about past CSA. Unfortunately health professionals rarely ask adults about the occurrence of CSA, particularly when encountering male clients.[24] Male victims may come less to the attention of health care professionals, thereby reducing their probability of benefiting from adequate referrals for counselling and further intervention.[19]

While this analysis provides pertinent information concerning the disclosure patterns of CSA victims, the study presents limitations. The scope of our findings is limited by the cross-sectional nature of the survey design. In addition, the sampling method by telephone number precluded participation from people who may be especially at risk for CSA, such as homeless or institutionalized adults, and a phone survey may not be fully accurate for the disclosure of past CSA. The survey had a response rate of 30% and it is possible that a larger percentage of respondents would have elicited different findings; thus the results may not be generalizable to the community under study. The results cannot be taken to imply causation as nondisclosure or late disclosure of CSA may be a marker of family dysfunction that may lead to increased risk for symptoms, as well as for not disclosing or delaying disclosure of CSA. It is possible the abuse-related variables (for example, type of acts involved, relation between the victim and the aggressor, or age disparity) may influence outcomes. Future studies with larger samples are needed to explore these issues more systematically.

### Funding and Support

Our research received a grant from the Marie Vincent Foundation.

## References

1. Hébert M, Tourigny M. Child sexual abuse prevention: a review of evaluative studies and recommendations for program development. In: Shohov SP, editor. Advances in psychology research. New York (NY): Nova Science Publisher; 2004.

2. Ullman SE. Social reaction to child sexual abuse disclosures: a critical review. J Child Sex Abus. 2003;12(1):89 121.

3. Kogan SM. The role of disclosing child sexual abuse on adolescent adjustment and revictimization. J Child Sex Abus. 2005;14(2):25 47.

4. Sinclair BB, Gold SR. The psychological impact of withholding disclosure of sexual abuse. Violence Vict. 1997;12(2):137 145.

5. London K, Bruck M, Ceci SJ, et al. Disclosure of child sexual abuse: what does the research tell us about the ways that children tell? Psychol Public Policy Law. 2005;11(1):194 226.

6. Institut de la statistique du Québec. Population de 18 ans et plus selon le groupe d'âge, régions administratives du Québec, 2001 (Recensement du Canada, 2001) [Internet]. Montreal (QC): 2004 Gouvernement du Québec. [cited 2009 Jun 30]. Available from: http://www.stat.gouv.qc.ca/regions/lequebec/population_que/tot18pop20.htm.

7. Kish L. Survey sampling. New York (NY): John Wiley & Sons; 1965.

8. Finkelhor D, Hotaling G, Lewis IA, et al. Sexual abuse in a national survey of adult men and women: prevalence, characteristics, and risk factors. Child Abuse Negl. 1990;14(1):19 28.

9. Préville M, Boyer R, Potvin L, et al. La détresse psychologique: détermination de la fiabilité et de la validité de la mesure utilisée dans l'enquête Santé Québec. Cah Rech. 1992;7.

10. Ilfeld FW. Further validation of a psychiatric symptom index in a normal population. Psychol Rep. 1976;39(2):1215 1228.

11. Ilfeld FW. Psychologic status of community residents along major demographic dimensions. Arch Gen Psychiatry. 1978;35(4):716 724.

12. Boyer R, Préville M, Légaré G, et al. La détresse psychologique dans la population du Québec non-institutionnalisée: résultats normatifs de l'enquête Santé Québec. Can J Psychiatry. 1993;38:339 343.

13. Prins A, Ouimette P, Kimerling R, et al. The primary care PTSD screen (PC PTSD): development and operating characteristics. Prim Care Psychiatry. 2004;9(1):9 14.

14. Asmundson GJ, Frombach I, McQuaid JR, et al. Dimensionality of posttraumatic stress symptoms: a confirmatory factor analysis of DSM-IV symptom clusters and other symptom models. Behav Res Ther. 2000;38:203 214.

15. Foa EB, Riggs DS, Gershuny BN. Arousal, numbing, and intrusion: symptom structure of PTSD following assault. Am J Psychiatry. 1995;152:116 120.

16. Simms LJ, Watson D, Doebbeling BN. Confirmatory factor analyses of posttraumatic stress symptoms in deployed and nondeployed veterans of the Gulf War. J Abnorm Psychol. 2002;111:637 647.

17. Putnam FW. Ten-year research update review: child sexual abuse. J Am Acad Child Adolesc Psychiatry. 2003;42:269 277.

18. Smith DW, Letourneau EJ, Saunders BE, et al. Delay in disclosure of childhood rape: results from a national survey. Child Abuse Negl. 2000;24(2):273 287.

19. Yeager JC, Fogel J. Male disclosure of sexual abuse and rape [Internet]. Medsc Top Adv Pract Nurs. 2006;6(1):9 11. Available from: http://www.medscape.com/viewarticle/528821.

20. Elliott DM, Briere J. Forensic sexual abuse evaluation of older children: disclosures and symptomatology. Behav Sci Law. 1994;12:261 277.

21. Sauzier M. Disclosure of child sexual abuse: for better or worse. Psychiatr Clin North Am. 1989;12:455 469.

22. Lovett BB. Child sexual abuse: the female victim's relationship with her nonoffending mother. Child Abuse Negl. 1995;19:729 738.

23. Jonzon E, Lindblad F. Disclosure, reactions, and social support: findings from a sample of adult victims of child sexual abuse. Child Maltreat. 2004;9(2):190 200.

24. Lab DD, Feigenbaum JD, De Silva P. Mental health professionals' attitudes and practices towards male childhood sexual abuse. Child Abuse Negl. 2000;24(30):391 409.

Manuscript received April 2008, revised, and accepted November 2008.

[1]Professor, Département de Sexologie, Université du Québec à Montréal, Montréal, Québec.

[2]Professor, Chaire de recherche interuniversitaire Fondation Marie Vincent sur les agressions sexuelles envers les enfants, Montréal, Québec.

[3]Professor, Département de Psychoéducation, Université de Sherbrooke, Sherbrooke, Québec.

[4]Professor, Département de psychologie, Université de Montréal, Montréal, Québec.

[5]Research Associate, Département de psychologie, Université de Montréal, Montréal, Québec.

Address for correspondence: Dr M Hébert, Département de sexologie, Université du Québec à Montréal, CP 8888 Succursale Centre Ville, Montréal, QC H3C 3P8; hebert.m@uqam.ca

**Résumé : La prévalence de l'abus sexuel dans l'enfance et le moment de la divulgation dans un échantillon représentatif d'adultes du Québec**

**Objectif :** Notre étude cherchait à examiner les modèles de divulgation de l'abus sexuel dans l'enfance (ASE) dans un échantillon d'hommes et de femmes.

**Méthode :** Un sondage téléphonique mené auprès d'un échantillon représentatif d'adultes ($n = 804$) du Québec a évalué la prévalence d'ASE et les modèles de divulgation. Des analyses ont été effectuées pour déterminer si les groupes de divulgation différaient en ce qui a trait à la détresse psychologique et aux symptômes de stress post-traumatique, et une régression logistique a servi à examiner les facteurs associés à une divulgation rapide.

**Résultats :** La prévalence des ASE était de 22,1 % chez les femmes et de 9,7 % chez les hommes. Environ un survivant sur 5 n'avait jamais divulgué l'abus, les hommes étant plus susceptibles que les femmes de n'avoir jamais rien dit à personne. Seulement 21,2 % des adultes déclaraient une divulgation rapide (moins d'un mois après le premier abus) alors que 57,5 % ont retardé la divulgation (plus de 5 ans après le premier épisode). Les victimes d'ASE qui n'ont jamais divulgué l'abus et celles qui ont retardé la divulgation étaient plus susceptibles d'obtenir des scores de détresse psychologique et de stress post-traumatique atteignant des seuils cliniques, comparativement aux adultes sans antécédents d'ASE. Dans l'analyse multivariée, l'expérience d'un ASE impliquant un agresseur hors de la famille immédiate et être de sexe féminin étaient des facteurs indépendamment associés à une divulgation rapide.

**Conclusion :** Un nombre significatif d'hommes et de femmes adultes ont déclaré avoir vécu un ASE et la plupart des victimes attestaient soit ne pas l'avoir divulgué, soit avoir significativement retardé la divulgation.

Copyright of Canadian Journal of Psychiatry is the property of Canadian Psychiatric Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# Exhibit H

Psychology, Public Policy, and Law
2005, Vol. 11, No. 1, 194–226

Copyright 2005 by the American Psychological Association
1076-8971/05/$12.00    DOI: 10.1037/1076-8971.11.1.194

# DISCLOSURE OF CHILD SEXUAL ABUSE
## What Does the Research Tell Us About the Ways That Children Tell?

Kamala London and Maggie Bruck
Johns Hopkins University

Stephen J. Ceci
Cornell University

Daniel W. Shuman
Southern Methodist University

The empirical basis for the child sexual abuse accommodation syndrome (CSAAS), a theoretical model that posits that sexually abused children frequently display secrecy, tentative disclosures, and retractions of abuse statements was reviewed. Two data sources were evaluated: retrospective studies of adults' reports of having been abused as children and concurrent or chart-review studies of children undergoing evaluation or treatment for sexual abuse. The evidence indicates that the majority of abused children do not reveal abuse during childhood. However, the evidence fails to support the notion that denials, tentative disclosures, and recantations characterize the disclosure patterns of children with validated histories of sexual abuse. These results are discussed in terms of their implications governing the admissibility of expert testimony on CSAAS.

Although it is widely acknowledged that the sexual assault of children is a major societal concern, it is not known how many children are victims of sexual abuse in the United States (Ceci & Friedman, 2000). There are two major reasons for this lack of data. First, present estimates of the incidence of child sexual abuse (CSA) are primarily based on reports received and validated by child protection agencies. These figures, however, do not reflect the number of unreported cases or the number of cases reported to other types of agencies (e.g., sheriff's offices) and professionals (e.g., mental health diversion programs). Second, the accuracy of diagnosis of CSA is often difficult because definitive medical or physical evidence is lacking or inconclusive in the vast majority of cases (Bays & Chadwick, 1993; Berenson, Heger, & Andrews, 1991), and because there are no gold standard psychological symptoms specific to sexual abuse (Kendall-Tacket, Williams, & Finkelhor, 1993; Poole & Lindsay, 1998; J. M. Wood & Wright, 1995). Given these limitations of medical and psychological evidence, children's statements typically represent the central evidence for judging the occurrence of

Kamala London, Department of Psychiatry and Behavioral Sciences, Johns Hopkins Medical Institutions, Johns Hopkins University; Maggie Bruck, Division of Child and Adolescent Psychiatry, Johns Hopkins Medical Institutions, Johns Hopkins University; Stephen J. Ceci, Department of Psychology, Cornell University; Daniel W. Shuman, Department of Psychology, Southern Methodist University.

Correspondence concerning this article should be addressed to Kamala London, Department of Psychiatry and Behavioral Sciences, Johns Hopkins Medical Institutions, 600 N. Wolfe Street, Baltimore, MD 21287-4346, or to Maggie Bruck, Division of Child and Adolescent Psychiatry, Johns Hopkins Medical Institutions, 600 N. Wolfe Street, Baltimore, MD 21287-4346. E-mail: klondon1@jhmi.edu or bruck@welch.jhu.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 167 of 198 PageID #:1825

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

CSA. In making these judgments, professionals must often address the delicate issue concerning how children disclose abuse.

According to some experts, a major problem with relying on children's statements in forensic investigations is that many sexually abused children remain silent about abuse; they may deny that abuse ever occurred, or they may produce a series of disclosures of abuse followed by recantations of these disclosures. In 1983, Roland Summit, a psychiatrist, published a formal description of how sexually abused children disclose abuse. The purpose of this model, termed *child sexual abuse accommodation syndrome* (CSAAS),[1] was to outline for clinicians why child victims of intrafamilial abuse may be reluctant to disclose abuse.[2] Summit's model included five components: (a) secrecy; (b) helplessness; (c) entrapment and accommodation; (d) delayed, conflicted, and unconvincing disclosures; and (e) retraction of disclosure. Summit argued that children who have been sexually abused may respond with self-blame and self-doubt. They may fear the perpetrator and the possible consequences of disclosure. Hence, in order to survive sexual abuse by a trusted family member, children make accommodating efforts to accept the abuse and to keep the abuse secret. Furthermore, according to Summit (1983), when children do reveal their abuse, disclosure will be incremental over time, a process that often includes outright denials and recantations of prior disclosures, and then reinstatements of the abuse. It is important to keep in mind that there are two separate aspects of this model, each with its own components. The first stipulates the psychological consequences of abuse (fear, blame, and accommodation). The second aspect, the focus of this article, stipulates the consequences that these psychological states have on behavior (secrecy, denial, and recantation).

Summit's (1983) model has received much attention and has had a significant impact in the area of child sexual abuse. His 1983 article was rated by professionals as one of particular influence in the area of child sexual abuse (Oates & Donnelly, 1997). The components of his CSAAS model have been endorsed by many clinicians and scholars who continue to base clinical and forensic judgments on its tenets (e.g., Adams, 1994; Browne, 1991; Carnes, 2000; Elias, 1992; Ford, Schindler, & Medway, 2001; Kelley, Brant, & Waterman, 1993; King Mize, Bentley, Helms, Ledbetter, & Neblett, 1995; Leonard, 1996; MacFarlane, 1992; Reichard, 1992; Reiser, 1991; Waterman, Kelly, Oliveri, & McCord, 1993; see also Conte, Sorenson, Fogarty, & Rosa, 1991, for a survey of professionals' beliefs). For example, Browne (1991) stated, "Disclosure is almost always an ongoing process. It may begin with an initial quite dramatic first step, or it may manifest itself as a series of tentative revelations, hints, and explorations" (p. 153). Similarly, Kelley et al. (1993) wrote, "Disclosures are often delayed and gradual" (p. 82). Salter (1995) declared, "The child is viewed as having betrayed the family by telling 'strangers,' and such children are frequently pressured to recant" (p. 231). Salter also stated, "Denial is not a door that victims exit; it is a

---

[1]A similar model posited by Sgroi (1982), child sexual abuse accommodation (CSAA), provided a checklist of 20 hypothesized behavioral indicators of CSA. MacFarlane and Krebs (1986) also proposed a model of reluctant disclosure, one that they termed "no-maybe-sometimes syndrome."

[2]In 1992, Summit (1992) expanded the model to include victims of extrafamilial abuse.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

line that victims walk back and forth many times before moving forward" (Salter, 1995, p. 243).

Today these beliefs are echoed in guidelines for assessment and diagnosis of CSA. For example, Children's Institute International,[3] a California-based child abuse assessment and treatment center that has trained over 40,000 professionals worldwide, recommends training and offers a course on CSAAS for all professionals and paraprofessionals who work with children. Another influential organization, the National Children's Advocacy Center (Carnes, 2000), states in one of its publications, "Forensic evaluation is a process of extended assessment of a child when that child is too frightened or young to be able to fully disclose their experiences on an initial forensic interview" (p. 14). "For many children, abuse disclosure is a process, not an event" (Carnes, 2000, p. 21). "Reluctance is commonplace and difficult to overcome in suspected child sexual abuse cases" (Carnes, 2000, p. 42).

Some professionals have gone as far as suggesting that children who readily disclose abuse should be considered suspect. Rather, only those children who initially deny abuse, then make a sexual abuse allegation, then recant it, and later re-disclose, should be considered reliable cases of sexual abuse. For example, Summit (1983) states, "The more illogical and incredible the initiation scene [of the abuse] might seem to adults, the more likely it is that the child's plaintive description is valid" (p. 183). These beliefs are echoed in the courtroom, as demonstrated in the following examples.

> Finally, the majority of children who are sexually abused underreport the extent and severity of the abuse. If I would have heard about lengthy disclosures with a specific beginning, middle, and end to the story, I would have been less impressed since that type of recounting is not likely with sexually abused children, particularly preschoolers. The two most common types of reports that I hear from a sexually abused child of this age are either flat denials or fragmented segments of an incident. (Expert testimony in *Lillie v. Newcastle City Council,* 2002, p. 42)

In the following, a prosecutor questions his expert witness:

> Q: Doctor, you mentioned earlier that with respect to child victims, it is not unusual that they would fully describe all of the events in your first interview.
> A: No.
> Q: And if they do, is it suspicious to you?
> A: To me, yes. (*People v. Carroll,* 2001, p. 70)

Although Summit (1992) wrote that he did not intend to imply that CSAAS is present in all abused children, or that it should be treated as diagnostic of abuse, many professionals have adopted CSAAS as a template by which to diagnose sexual abuse (Fisher, 1995; Kovera & Borgida, 1998; Robin, 1991; Summit, 1992). Perhaps the best example of this practice is reflected in *State v. Michaels* (1993). Margaret Kelly Michaels was accused and convicted of 115 counts of sexual abuse involving 20 children from the Wee Care Day Nursery in Maple-

---

[3]See http://childrensinstitute.org/ for Children's Institute International's description of their contemporary interview training procedures.

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 169 of 198 PageID #:1827

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

wood, New Jersey. Expert testimony was presented at trial by Eileen Treacy, who stated that children in the case showed behavior consistent with CSAAS and thus their testimony and conduct was consistent with CSA. After 5 years in prison, Michaels' conviction was overturned for reasons including the inadmissibility of testimony that uses CSAAS as a tool to diagnose abuse.

In keeping with the legal rule of excluding expert testimony that seeks to tell the jury to believe a witness (i.e., that the child witness is being truthful, or in general that children are truthful), the courts have uniformly excluded CSAAS evidence that is used to persuade the jury that a child's testimony about sexual abuse is truthful or diagnostic of abuse (e.g., *People v. Duell,* 1990; *Snowden v. Singletary,* 1998; *State v. Gokey,* 1990; *State v. JQ,* 1993; *State v. Jones,* 1993; *State v. Myers,* 1984; see also Freckelton, 1997, for a review of New Zealand and Australian rulings). When a child's inconsistency has been the subject of an attack on credibility during cross-examination, however, most courts have assumed that CSAAS rests on a reliable scientific foundation and have permitted the prosecution to introduce evidence of CSAAS to explain "what would be expected of, or what would be consistent with, facts surrounding other victims of childhood sexual abuse" (*State v. Huntington,* 1998, p. 698).

Given the widespread appeal and currency of CSAAS in the mental health community and its acceptance in the forensic arena, especially when used to rehabilitate an inconsistent child witness on redirect, it is important to examine the empirical basis for this syndrome. In his original article, Summit (1983) stated that the CSAAS model was based on an empirical foundation:

> This study draws in part from statistically validated assumptions regarding prevalence, age, relationships and role characteristics of child sexual abuse and in part from correlations and observations that have emerged as self-evident within an extended network of child abuse treatment programs and self-help organizations. (Summit, 1983, p. 180)

Despite this claim, however, Summit's (1983) article contained no data and seemed to be predicated solely on clinical intuition. Almost a decade later, Summit (1992) clarified, "It should be understood without apology that the CSAAS is a clinical opinion, not a scientific instrument" (p. 156).

In the rest of this article, we review and evaluate the existing empirical data to assess the scientific support for the behavioral components of CSAAS— secrecy/silence, denial, and recantation. We draw on two major sources of empirical data on children's disclosure patterns, each with its own limitations: (a) retrospective accounts from adults who claimed to have been abused as children and (b) examinations of children undergoing sexual abuse evaluations. To foreshadow the results of this review, we conclude that although a substantial proportion of children delay reporting or altogether fail to report incidents of CSA (the secrecy stage), there is little evidence to suggest that denials, recantations, and re-disclosures are typical when abused children are directly asked about abuse. As is seen later in the present article, this emerges as an important distinction on both scientific and applied grounds.

## Patterns of Disclosure Among Adults in Retrospective Surveys

### Disclosure Rates

The studies discussed in this section include those in which adults with self-reported histories of CSA were asked in a survey whether and at what age they first disclosed their abuse. Table 1 lists 11 studies that yielded rates of childhood disclosure of CSA. Studies that did not provide relevant statistics are not listed in the table but are cited when relevant for related topics (e.g., predictors of disclosure patterns). Finally, we focused on studies that were conducted since 1990 in order to control for cohort effects; in other words, the rates obtained in older studies might reflect practices of several decades ago that are no longer current because of changes in education, advocacy, increased sensitivity, and legal procedures.

As shown in Table 1, the modal childhood disclosure rate (in 6 of the 11 studies) is just over 33%. Three other studies (7, 8, 9) reported slightly higher rates of disclosure that are still low and are consistent with the claims of the CSAAS model that nondisclosure of sexual abuse (silence) in childhood is very common. The disclosure rate of 87% reported by Fergusson, Lynskey, and Horwood (1996) is much higher than those found in other studies, an issue to which we later return. In summary, these data indicate that two thirds of adults who claimed in retrospective surveys to have been abused as children reported that they did not disclose the abuse during childhood.

Disclosure rates were similar for studies that specifically recruited adults with childhood histories of CSA (see Table 1; Studies 3, 4, 5, 8, and 9) and for studies that recruited adults from the general population (Studies 1, 2, 6, and 10). For example, Somer and Szwarcberg (2001) questioned 41 Israeli women who reported that they were sexually abused as children and who at the time of the interview were attending rape crisis centers. (It is unclear whether the women were seeking treatment at the centers for the childhood abuse incident or for some more recent incident.) Less than half (45%) reported that they had disclosed abuse by age 17, and the average delay between abuse onset and disclosure was 15 years. Lamb and Edgar-Smith (1994) questioned 48 women and 12 men who responded to a city newspaper advertisement seeking research participants who had been sexually assaulted during childhood. Although a high proportion of these respondents reported severe intrafamilial abuse, only 36% of the participants disclosed the abuse during childhood (defined in this study as before age 14). The same childhood disclosure rate of 36% was obtained from a sample of women who reported sexual abuse by a relative before the age of 16 (Roesler & Wind, 1994). In another study (Roesler, 1994), 37% of adults with childhood histories of abuse involving genital contact disclosed abuse during childhood. Finally, a slightly higher rate of childhood disclosure was obtained in Ussher and Dewberry's (1995) survey of 775 women who responded to a questionnaire published in a women's magazine. Approximately 54% of these participants disclosed CSA during childhood. These women reported a range of abuse severity, from unwanted sexual attention to severe and repeated abuse from family members. The mean age at disclosure for this group was 26 years, 12 years after the average time when the abuse had ended.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 1
*Childhood Disclosures of Sexual Abuse: Retrospective Studies*

| Study | n | Sample source[a] | Definition of CSA | Reports abuse at survey | Childhood disclosure | Report to authorities | Avg. age at time of abuse (yrs.) | Avg. age of sample (yrs.) |
|---|---|---|---|---|---|---|---|---|
| 1. Arata (1998) | 860 (f) | College sample | Unwanted contact before 14 yrs. | 24.0% | 31% (at time of abuse) | 10% | 8.50 | 23 |
| 2. Smith et al. (2000) | 3,220 (f) | National probability sample | Rape | 9.0% | 34% (within 6 months of abuse) | 12% | 10.90 | 45 |
| 3. Roesler & Wind (1994) | 286 (f) | CSA hotline callers | Intrafamilial before 16 yrs. | 100% | 36% | | 6 | 41 |
| 4. Lamb & Edgar-Smith (1994) | 48 (f) 12 (m) | Newspaper ad | Not specified | 100% | 36% (by age 13) | | 8.15 | 30 |
| 5. Roesler (1994) | 168 (f) 20 (m) | Abuse center | Genital contact before 16 yrs. | 100% | 37% | | <16.00 | 41 |
| 6. Tang (2002) | 1,151 (f) 887 (m) | Hong Kong Chinese college students | Unwanted sexual experiences before 18 yrs. | 6.0% | 38% | | 11.00 | 21 |
| 7. Finkelhor et al. (1990) | 1,481 (f) 1,145 (m) | National probability sample | Before 18 yrs. | 27.0% (f) 16.0% (m) | 42% within 1 yr. of abuse | | 9.70 | 30 39 |
| 8. Somer & Szwarcberg (2001) | 41 (f) | Israeli abuse center | CSA survivors | 100% | 45% (by age 17) | | 7.11 | 32 |
| 9. Ussher & Dewberry (1995) | 775 (f) | Magazine survey | Unwanted sexual attention | 100% | 54% | 18% | 8.50 | 38 |
| 10. Fergusson et al. (1996) | 1,019 (m & f) | New Zealand longitudinal study | Unwanted experience before 16 yrs. | 10.0% | 87% (by age 18) | | <16.00 | 18 |
| 11. Hanson et al. (1999) | 4,008 (f) | National probability sample | Nonconsensual penetration assaults before 18 yrs. | 8.5% | | 13% | <18.00 | 38 |

*Note.* CSA = child sexual abuse; Avg. = average; yrs. = years; f = female; m = male.
[a] Unless noted, all studies were conducted in the United States.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

One might argue that the rates of childhood disclosure obtained in these five studies may not be reliable population estimates because they were obtained from samples of participants who had to declare before study enrollment that they had been abused as children. Perhaps such procedures draw victims with very late disclosures and exclude those who had disclosed at much earlier ages. Alternatively, it could be argued that these rates underestimate the failure to disclose because those who never told anyone may be less likely to respond to such advertisements. Notwithstanding these competing suggestions, however, similar findings have been obtained in studies that included convenience samples of college students as well as national probability samples that were not selected on the basis of childhood histories. For example, Smith et al. (2000) examined data from a nationally representative telephone survey on women's experiences with trauma and mental health (Resnick, Kilpatrick, Dansky, Saunders, & Best, 1993). In this study, 9% of the women retrospectively reported at least one incident of rape (i.e., vaginal, oral, and/or anal penetration by a penis, finger, or object) prior to their 18th birthday. Approximately 27% of these abused women remembered disclosing the rape to someone within 1 month of the sexual abuse; another 34% said they had disclosed within 6 months of the abuse; an additional 18% were not sure when they had first disclosed the abuse. Thus, a considerable number of women delayed or altogether failed to disclose the childhood rape; 47% waited more than 5 years to report the abuse, and 28% said that they had never told anyone about the incident prior to the telephone interview.

Similar rates of nondisclosure were obtained by Finkelhor, Hotaling, Lewis, and Smith (1990) in their national telephone survey of 2,626 American men and women. In that study, 27% of women and 16% of men reported a history of CSA. Of those with histories of CSA, 42% reported having disclosed abuse within 1 year of the incident, 20% told someone of the event later, and 38% had never told anyone of the abuse prior to the telephone interview. Abused men were more apt than abused women never to have disclosed the abuse (42% vs. 33%).

Low rates of disclosure also characterized two college student samples. Arata (1998) found that 24% of female undergraduate students attending a southeastern university reported unwanted sexual contact before age 14 by someone 5 or more years older. Of those with CSA histories, 31% reported having disclosed the abuse to someone around the time of the abuse. Tang (2002) found that in a sample of Hong Kong Chinese college students who reported abuse, 38% disclosed abuse in childhood.

Only 1 of the 11 studies in Table 1 reported high rates of disclosure. The study was carried out in New Zealand by Fergusson et al. (1996) and involved a longitudinal study of 1,265 children. Sexual abuse was defined broadly in this study, ranging from noncontact activities, such as indecent exposure or lewd suggestions (including experiences with same-aged peers), to rape before age 16. At 18 years old, 87% of the abused subsample reported having told someone about the abuse. There are several factors that may account for Fergusson et al.'s finding of high disclosure rates relative to the other studies. As the authors noted, such high rates of disclosure may partially reflect the young age of the adults in their sample: possibly some were still denying the abuse, thus producing lower rates of CSA with concomitantly inflated rates of disclosure. Another factor that could explain high rates of disclosure is that many of their participants reported

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

noncontact activities such as lewd suggestions, which reportedly the participants did not consider as incidents of CSA. This could also explain why many of these participants denied abuse history 3 years later, during a follow-up interview (Fergusson, Horwood, & Woodward, 2000).

In summary, although one study yielded extremely high disclosure rates (Fergusson et al., 1996), the results of the 10 other retrospective studies indicated that only one third of adults who suffered CSA revealed the abuse to anyone during childhood. Given the differences in methodology, definitions of abuse, and sample characteristics, the general consistency of these findings across these studies is noteworthy.

## Predictors of Nondisclosure

In addition to providing overall disclosure rates, some studies also examined predictors of disclosure rates. In this section, we examine associations of some of these predictors from data within studies and, when possible, across studies.

Summit's (1983) original model was based on disclosure patterns of children who were victims of familial abuse. Thus, one would expect that such children would be less likely to disclose than children who were abused by nonfamilial perpetrators. The results of two studies (Hanson, Resnick, Saunders, Kilpatrick, & Best, 1999; Smith et al., 2000) are consistent with these claims; CSA disclosure was more likely when the perpetrator was a stranger rather than a family member. Consistent with these findings, Ussher and Dewberry (1995) reported longer delays to disclosure among intra- versus nonfamilial abuse. In contrast to these three supporting studies, five studies failed to find an association between relationship to perpetrator and CSA disclosure (Arata, 1998; Kellogg & Hoffman, 1995; Kellogg & Huston, 1995; Lamb & Edgar-Smith, 1994; Roesler, 1994). These are surprising findings given the fact that Summit (1983) originally constructed his model to account for nondisclosure in the context of intrafamilial abuse.

Age at time of abuse has not been consistently associated with failure to disclose. Although Smith et al. (2000) found that younger victims were more likely to delay disclosure than older child victims, other researchers (e.g., Arata, 1998; Kellogg & Hoffman, 1995) failed to find any relationship between age and delay of disclosure. There is one important caveat to this conclusion. When study participants reported experiencing CSA during adolescence, this was consistently accompanied by high disclosure rates (Everill & Waller, 1995; Kellogg & Hoffman, 1995; Kellogg & Huston, 1995). For example, in the Everill and Waller (1995) study, in which the mean age at time of abuse was 14 years, 69% of this female sample reported having disclosed to a friend, most around the time of the incident. Kellogg and Huston (1995) found that 85% of their sample of young adults (mean current age = 19.5 years, mean age of abuse = 14 years) had also disclosed at some point in the past. In these cases, the most common confidant was another adolescent (Lamb & Edgar-Smith, 1994; Tang, 2002). In contrast, adults reporting that they revealed CSA as school-aged children did so to a parent rather than to a peer (Arata, 1998; Lamb & Edgar-Smith, 1994; Palmer, Brown, Rae-Grant, & Loughlin, 1999; Roesler, 1994; Roesler & Wind, 1994; but see Smith et al., 2000; Somer & Szwarcberg, 2001). These studies, taken together,

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

imply that disclosure rates may vary as a function of age at CSA onset, which in turn is associated with the availability of a same-aged confidante.

Finally, no systematic relationships have been reported between demographic variables, such as race and ethnicity, and childhood disclosure rates (e.g., Arata, 1998; Hanson et al., 1999; Kellogg & Hoffman, 1995; Kellogg & Huston, 1995; Smith et al., 2000). However, most of the retrospective studies have too little variability in their sample's demographic composition to test for differences. (For discussions on how demographic variables—race and gender—may be related to CSA disclosure, see Fontes, 1993; Kazarian & Kazarian, 1998; Kenny & McEachern, 2000; Levesque, 1994; Toukmanian & Brouwers, 1998.)

We examined the existing data to determine its support for one of the major assumptions of the CSAAS model; that is, disclosure is related to the amount of fear or violence associated with the abuse. According to the model, children do not disclose because they are afraid of the perpetrator who physically coerced or harmed them. In addition, children also do not disclose because they are threatened with consequences of disclosure that involve harm to family members or to the self. On the basis of these assumptions, it is predictable that the more severe or frightening the abuse or the more the child is threatened postabuse, the less likely the child would be to disclose.

In general, the data do not support the hypothesis that disclosure rates are related to severity of abuse. Although Arata (1998) found lower disclosure rates for contact versus noncontact abuse, there was no relationship between disclosure and method of coercion (e.g., threat, gift, curiosity, appeal to authority, or physical force). To further call into question the validity of this assumption of the CSAAS model, most researchers have either found the opposite pattern—that is, higher disclosure rates are associated with incidents that are life threatening and involve physical injury (Hanson et al., 1999; Kellogg & Hoffman, 1995)—or have not found any significant relationship between severity and method of coercion and disclosure (Lamb & Edgar-Smith, 1994; Roesler, 1994; Smith et al., 2000).

Another method to examine the relationship between severity/coercion/physical harm and disclosure is to compare the rates among studies in Table 1 in terms of the types of abuse that were included in the study. Some experimenters defined CSA broadly (i.e., unwanted sexual attention by anyone), and some defined it more narrowly (e.g., forcible penetration). Despite the differences in definitions (excluding the outlier study by Fergusson et al., 1996), disclosure rates reported across studies were very similar. In summary, the data indicate no consistent association between severity or method of coercion and disclosure.

Next, we searched for studies that examined the relationship between threats that were used to secure the child's silence ("Don't tell or else. . . .") and disclosure. The major problem encountered was that the few studies that reported threat data did not stipulate whether the measure of "threat" referred to statements or actions during the commission of the assault to engender physical compliance or to threats used to engender silence (see, e.g., Arata, 1998; Hanson et al., 1999; Roesler, 1994; Smith et al., 2000). This failure to provide operational definitions of threats is problematic on methodological grounds (How did the study participant interpret the question?) and on interpretational grounds (How does the consumer of the literature interpret the statistics?). Hence, the extant retrospective

data are insufficient to examine whether childhood disclosure rates vary as a function of whether the child was threatened to remain silent.

*Summary*

The results of the retrospective studies make two important contributions to our knowledge about the patterns of children's disclosure of abuse. First, these data, when taken at face value, reveal that approximately 60%–70% of adults do not recall ever disclosing their abuse as children, and only a small minority of participants (10%–18%) recalled that their cases were reported to the authorities (see Table 1, Column 7). Furthermore, to underscore the results of nondisclosure, many of the adults reported that their first disclosure was during the study survey. Thus, the retrospective studies provide evidence to support the assumption that many incidents of CSA go unreported and that the stage of silence in the CSAAS model has a strong empirical foundation. Second, analyses of predictor variables in these retrospective studies provide few insights into the factors associated with disclosure. They do suggest, however, that commonly held assumptions, such as fewer disclosures among more severe cases of CSA, or in cases of intrafamilial abuse, lack empirical support. We must await further data to examine these issues definitively.

There are two limiting aspects, however, of the adult retrospective literature. The first is common to all retrospective studies; namely, the design raises concerns about the accuracy of the informants' reports. Specifically, it is possible that some adults in these retrospective studies had been abused but continued to deny abuse. Such false denials would work to reduce the overall CSA prevalence rates and inflate the disclosure rates. Alternatively, it is possible that some adults in these retrospective studies had not been abused but claimed to have been. Such false allegations would inflate the incidence of CSA and render the data on disclosure nonmeaningful. Finally, some adults may have disclosed abuse in childhood, despite their reports to the contrary. In some cases, participants may have misdated their disclosure, placing it much further from their victimization than was the actual case. In a related vein, they may in fact have told someone but failed to remember having done so. A rich cognitive psychology literature demonstrates the myriad of retrospective biases, even when the events in question are highly emotional (e.g., Freyd, 1996; Neisser, 1997; Read & Lindsay, 1997; Ross, 1989). In their investigation of flashbulb memories, Schooler and colleagues (Schooler, Ambadar, & Bendiksen, 1997; Schooler, Bendiksen, & Ambadar, 1997) coined the term "forgot-it-all-along-effect" to describe the finding that people sometimes inaccurately recall to whom, when, and whether they reported an important life event. Adults' denial of CSA reports that were actually made during childhood would not affect prevalence rates of CSA but would lead to an underestimation of childhood disclosure rates.

A second constraint in the interpretation of the adult retrospective literature is that although the studies indicate that delayed disclosure or silence is common among sexually abused children, these studies are uninformative as to the frequency that abused children deny or recant abuse reports. This is because participants in these retrospective surveys were not asked if as children anyone had ever asked them about abuse, and, if so, what they had replied. Thus, it is not

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

known whether the high rates of childhood silence reflected the fact that survey participants had never been asked about abuse, or whether it reflected denial to abuse-related questions. In order to examine the probability of this latter outcome, the literature on children's patterns of disclosure must be examined.

## Patterns of Disclosure Among Children Treated or Evaluated for Sexual Abuse

In this section, we review studies of disclosure patterns of children who were specifically assessed or treated for sexual abuse. We examine studies that yielded data on (a) delay of disclosure, (b) denial, and (c) recantation. We also searched for studies that reported data on the correlates of delay, denial, and recantation. As with the retrospective studies reported above, we excluded studies published prior to 1990 because of possible cohort effects that could be due to the changes in interviewing practices and prevention programs (for children) that have occurred in the decade of the 1990s.

### Delay of Disclosure (Silence)

The results of the studies using child samples echo the adult retrospective finding regarding delay of abuse disclosure; namely, when children do disclose, it often takes them a long time to do so. For example, disclosure rates of children whose cases were referred for prosecution were examined by Goodman et al. (1992) and by Sas and Cunningham (1995). Although 37%–42% of the children had disclosed within 48 hr of the abuse, it took more than 6 months or even 1 year for many of the children to make a disclosure. Even higher rates of delayed disclosure were obtained in Elliott and Briere's (1994) study, in which 75% of children did not disclose CSA within the first year following the abuse, and 18% waited more than 5 years to disclose the abuse. Similarly, Henry (1997) found that, among 89 criminal CSA records, there was an average 2-year delay between abuse and disclosure. Some of the variability in the length of delay in the child studies may reflect the settings in which the data were collected. Shorter periods of delay may show up in surveys of children in criminal trials simply because delayed disclosure cases might be excluded from consideration because of the inherent difficulty in obtaining convictions. Therefore, it may be that cases in the prosecutor's office are unrepresentative of those that never reach the courtroom.

Few of the studies on delay of disclosure examined individual differences. Nonetheless, there are some data on gender differences, suggesting that boys may be more reluctant to disclose than girls (e.g., DeVoe & Faller, 1999; Goodman-Brown, Edelstein, Goodman, Jones, & Gordon, 2003; Gries, Goh, & Cavanaugh, 1996; Sas & Cunningham, 1995; Stroud, Martens, & Barker, 2000; but see DiPietro, Runyan, & Fredrickson, 1997; Keary & Fitzpatrick, 1994, who report null gender findings). However, as Goodman-Brown et al. (2003) discuss, gender differences in disclosure rates may be suppressed by other abuse-related variables associated with gender (e.g., prior disclosure or relationship to perpetrator).

With regard to empirical findings on disclosure and ethnicity or race, Shaw, Lewis, Loeb, Rosado, and Rodriguez (2001) found that Hispanic girls waited longer to disclose (average delay = 19 months) than African American girls (average delay = 9 months). This finding is consistent with the report that African

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

American children received more maternal support to disclose abuse than did Hispanic children (Rao, DiClemente, & Ponton, 1992). Although it has been suggested that children raised with values typifying Eastern cultures (e.g., collectivist values, preservation of family, etc.) may be more apt to conceal abuse than children raised in Western cultures (e.g., Futa, Hsu, & Hansen, 2001; Rao et al., 1992; Toukmanian & Brouwers, 1998; Wong, 1987), data are needed to address this hypothesis. In short, there are reasons to suspect that members of certain ethnic groups, as well as boys, may face additional and culture-specific barriers to CSA disclosure. However, the studies that have examined children's disclosure patterns to date do not present a coherent canvas of the effects of demographic variables on abuse disclosure.

Some researchers have examined the association of the abuse characteristics and delay of disclosure. At times, when associations between abuse variables and disclosure are reported, the researchers fail to provide adequate operational definitions of the abuse variables. For example, as was the case with the retrospective studies, the data on "threats" are difficult to interpret because researchers do not specify whether threats are defined tactics to gain the child's compliance during the commission of the assault or as tactics to scare the child into not revealing the abuse. When clearly defined data on abuse characteristics do exist, they are sparse and do not consistently support assumptions underlying the CSAAS model. For example, Sas and Cunningham (1995) found that children waited longer to disclose abuse when the perpetrator "groomed" them and established a close relationship than if the perpetrator used force. Some researchers have found that children who are victims of familial abuse tend to delay disclosure longer than those experiencing extrafamilial abuse (Goodman-Brown et al., 2003; Sjöberg & Lindblad, 2002). However, these studies are exceptional because the majority of studies we examined either failed to find such an association or failed to report an association.

As the analyses of Goodman-Brown et al. (2003) demonstrated, the relationship between delayed disclosure and abuse characteristics is mediated by a complex interplay of variables. These researchers found that in a sample of 218 CSA cases referred for prosecution, older children and victims of familial abuse tended to perceive that more negative consequences would result from disclosure, which in turn was associated with the time taken to disclose. Goodman-Brown et al. (2003) also found increased delays among children feeling responsible for the abuse; additionally, older children were more apt than younger children to feel responsible for the abuse. It is clear from the results of this study that future work must focus on a multivariate model that attempts to provide a causal explanation for the timing of disclosure. Note that none of the studies covered in this section addressed issues concerning denial of abuse. These are addressed in the next section.

## Rates of Disclosure (Denial)

In this section, we review 16 articles that were published since 1990 that contained statistics on the frequency of denial. These are listed in Table 2, Column 4, in ascending order of disclosures. When relevant, we cite other studies

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

LONDON, BRUCK, CECI, AND SHUMAN

Table 2
*Disclosure and Recantation Rates From Child Clinic Studies*

| Study | n | Age (range) | Disclosing | Recantations | No. SSI citations | Type of interview |
|---|---|---|---|---|---|---|
| Gonzalez et al. (1993) | 63 | (2–12) | 24% | 27.0% | 9 | Therapy |
| Sorenson & Snow (1991) | 116 | Mode = 6–9 (3–17) | 25% | 22.0% | 70 | Therapy |
| Lawson & Chaffin (1992) | 28 | M = 7.00 | 43% | | 31 | Social worker |
| Carnes et al. (2001) | 147 | M = 6.00 (2–17) | 45% | | not listed | CSA team |
| B. Wood et al. (1996) | 55 | M = 5.70 (6–11) | 49% | | 2 | CSA team |
| Bybee & Mowbray (1993) | 106 | M = 5.60 (2–11) | 58% | 11.0% | 5 | CPS and therapy records |
| Canton et al. (1996) | 1,535 | Mode = 4.00 (2–17) | 61% | | 3 | CSA team |
| Gries et al. (1996) | 96 | M = 8.30 (3–17) | 64% | 15.0% | 2 | CSA clinic |
| Stroud et al. (2000) | 1,043 | M = 8.40 (2–18) | 65% | | 1 | CSA clinic |
| Gordon & Jaudes (1996)[a] | 141 | M = 6.40 (3–14) | 74[b] | | 4 | CSA team |
| DiPietro et al. (1997) | 179 | M = 7.50 (1.4–22) | 76% (47%)[c] | | 4 | CSA team |
| Dubowitz et al. (1992) | 132 | M = 6.00 (< 12) | 83% (59%)[c] | | 22 | CSA clinic |
| Elliott & Briere (1994) | 399 | M = 11.03 (8–15) | 85% (57%)[c] | 9.0% | 31 | Clinician |
| DeVoe & Faller (1999) | 76 | M = 6.80 (5–10) | 87% (62%)[c] | | 7 | Social worker |
| Keary & Fitzpatrick (1994) | 251 | Mode = 6–10 | 91% (50%)[c] | | 16 | CSA team |
| Bradley & Wood (1996) | 234 | M = 10.00 (1–18) | 96%[c] | 4.0% | 16 | CPS |
| Faller & Henry (2000) | 323 | M = 11.70 (3–21) | | 6.5% | 1 | CPS/police |

*Note.* SSI = Social Sciences Citation Index; CSA = child sexual abuse; CPS = Child Protective Services.
[a] We do not report Gordon and Jaudes's (1996) "recantation" rate because the child was not interviewed under the same clinical watch, but rather the first interview was a brief medical screening. Also, the authors include parents' disclosures (i.e., as historian) in the base rate. [b] This rate is the percentage of children from the total sample disclosing during the investigative interview. The authors do not report the percentage of disclosing during the investigative interview for substantiated cases. [c] Denotes studies based on cases classified as probable abuse cases; the first disclosure rate is that of children classified as substantiated, high probability, and so forth, the second disclosure rate is for all children examined, regardless of classification of abuse likelihood.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

that did not provide data on the rate of disclosure in their sample but that do shed light on the correlates of disclosure.

Most of the studies listed in Table 2 involved "chart reviews" of children who were interviewed by child protective services (CPS), mental health, or medical professionals specializing in the assessment and treatment of sexual abuse (see Table 2, Column 7, for the type of assessment in each study). Children presented at these various settings for a variety of reasons that included a prior disclosure to an adult, a suspicion of abuse by an adult or an agency, or the need for a second opinion or more extensive interviewing. Thus, across and within studies, there is often great variability in the methods by which children were interviewed, in the information collected, and in the procedures of diagnosing CSA. Furthermore, in some studies, as is later noted, researchers categorized the children according to the likelihood of abuse (e.g., highly probable, unclear, or not abused); in other studies, only children who met some prespecified criteria for abuse were included; and in still other studies, the certainty of abuse status was not specified. For those studies that categorized children by likelihood of abuse, the rates for substantiated cases are presented first in Column 4 of Table 2.

The pooled mean of disclosures for studies listed in Table 2 is 64% (range = 24%–96%), or the mean of denials is 36%. For reasons discussed below, however, these figures should not be viewed as the best estimate of central tendency. We focus on four factors that account for the enormous between-study variability in disclosure/denial rates in order to highlight methodological and design factors that need to be considered in evaluating the generalizability, validity, and reliability of the findings in Table 2. These factors are age of the child, previous disclosure of abuse, substantiation of abuse, and representativeness of the selected sample. We conclude that when such factors are considered, mean denial rates are quite low when children are explicitly asked about sexual abuse.

*Developmental differences.* The wide variation in the ages of the children, both within and between studies (see Table 2, Column 3), could account for differences in the rates of disclosure across studies. In order to examine this hypothesis, age–denial associations were examined within studies. Although no significant relationships between age and denial were found in two studies (Bradley & Wood, 1996; DeVoe & Faller, 1999), the more common finding was that school-aged children are more apt than preschoolers to disclose abuse during formal evaluation. For example, B. Wood, Orsak, Murphy, and Cross (1996) found that older children made more credible disclosures of abuse than younger children.[4] Similarly, DiPietro, Runyan, and Fredrickson (1997) found that older children were more likely to disclose than younger children and that children generally became more likely to disclose abuse after age 4. Keary and Fitzpatrick (1994) conducted a chart review of 251 children assessed by a multidisciplinary team at a CSA unit. Only 29% of children younger than 5 years disclosed during the assessment, compared with 51%, 64%, and 67% of 6- to 10-year-olds, 11- to

---

[4]B. Wood et al. (1996) defined a *credible disclosure* as one that "was adequate for use as evidence in a future legal and/or child protection proceedings" (p. 84). The "not credible" category included cases "where the child did not disclose, denied sexual abuse, refused to cooperate, provided insufficient detail or was not believable" (p. 84). The authors did not cite the number of children falling into each of the not credible subcategories.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

15-year-olds, and 16+ years, respectively. And finally, among foster children receiving therapy for suspected CSA, children who disclosed abuse in the first interview were likely to be older ($M = 9.3$ years) than were children who took two sessions to disclose ($M = 5.8$ years) (Gries, Goh, & Cavanaugh, 1996). Thus, it appears that different rates of disclosure/denial will be obtained depending on the age levels of the children in the sample (see also Cantlon, Payne, & Erbaugh, 1996; Sas & Cunningham, 1995). Of course, these rates are only meaningful if all the children in the sample were actually sexually abused—an issue that we address later in this article.

There are several possible explanations to account for these developmental differences in children's abuse disclosures. They could reflect the single influence or combined influences of linguistic, cognitive, and social–emotional factors. Thus, younger children may not have the same linguistic skills to convey their abuse experience, or younger children may not understand the "meaning" of abusive acts and thus fail to make explicit disclosures. Studies that examine the intent of children's disclosing statements provide some data for this developmental hypothesis. These studies show that younger children are more likely to make accidental disclosures, whereas older children are more likely to make purposeful disclosures (Campis, Hebden-Curtis, & DeMaso, 1993; Fontanella, Harrington, & Zuravin, 2000; Nagel, Putnam, Noll, & Trickett, 1997). That is, younger children are more likely to make spontaneous statements about abuse that are not consistent with the topic of conversation or of the ongoing activity (e.g., stating, while watching TV, "Uncle Bob hurt my bottom"). In contrast, older children are more likely to report the abuse to an adult when asked. Although the conclusions are consistent across studies, the ages of the "younger" and "older" children are not the same across studies. Thus, there is no objective age cutoff that can be inferred from the literature.

A second possible explanation for developmental differences in rates of denial is that there may be higher rates of true denials among younger than older children. This hypothesis is based on several interrelated findings. Younger children may be more likely than older children to be brought for assessment because of their caregivers' concerns about behaviors (rather than an abuse disclosure) that often are ambiguous and do not necessarily reflect CSA (see Campis et al., 1993; Fontanella et al., 2000; Levy, Markovic, Kalinowski, Ahart, & Torres, 1995; Nagel et al., 1997). Thus, in any sample there may be a greater proportion of younger nonabused children than of older nonabused children, and the higher denial rates by younger children would then reflect a higher rate of denial that are true negatives. For example, Keary and Fitzpatrick (1994) were less likely to categorize younger children's presentation as diagnostic of CSA compared with that of the older children; in addition, the younger children were less likely to disclose abuse. Unfortunately, these researchers did not present data on age differences in denial rates among older versus younger children who were classified as "founded" by the assessment team.

Although most of the data indicate that younger children may be less likely to disclose than older children, upon closer investigation, there may also be patterns specific to adolescents. At least among cases that reach authorities, children are most likely to reveal the abuse to their primary caregiver (Campis et al., 1992; Faller & Henry, 2000; Fontanella et al., 2000; Gray, 1993; Henry, 1997;

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Sas & Cunningham, 1995). However, adolescents may have a greater appreciation of the consequences of disclosing intrafamilial abuse and thus withhold information. It is also possible that they may not readily disclose extrafamilial abuse to family members or to investigators because they feel it is a personal matter, or they have already disclosed to peers, as noted in the retrospective studies reviewed in the first part of this article. Hence, the rate of CSA disclosure to parents and authorities may resemble an inverted U-pattern, with an increase in disclosure as one moves from preschoolers to school-aged children, followed by an apparent decrease as one moves into adolescence. There are, however, few data on disclosure patterns in adolescence, and we must await these before drawing any definite conclusions. In addition, regardless of potential developmental differences in disclosure patterns, it is highly likely (although not yet researched) that different factors account for denial or disclosure at different age levels.

*Prior disclosure of abuse predicts disclosure during formal assessment.* The studies included in Table 2 focus on children's reports during forensic interviews and psychotherapy. That is, the children in these studies were specifically brought to a clinic, mental health professional, or law enforcement agency either because they had previously made a claim of abuse or because there was a suspicion of abuse that required further investigation. Thus, most of the children in each study had been questioned by someone (e.g., teacher, parent) about abuse prior to the formal interviews or therapy sessions. This fact is important because, as shown in Table 3, the most significant predictor of disclosure in the formal interview is whether the child had disclosed before (e.g., to a parent, a teacher, a CPS worker, etc.). For example, Keary and Fitzpatrick (1994) reported that of the 123 children who had made a prior disclosure, 86% disclosed again during the formal interview; in contrast, only 14% of the 128 children with no prior disclosures disclosed at interview.[5] Similar patterns of results were found by Gries et al. (1996), DiPietro et al. (1997), and DeVoe and Faller (1999).

This pattern of consistency of disclosure is most common in older children. Among children who had disclosed prior to formal assessment, older children were more likely than younger children to disclose again during formal assessment (Keary & Fitzpatrick, 1994; see also Ghetti, Goodman, & Eisen, 2002).

In summary, several studies suggest that once children have made an abuse disclosure, they are likely to maintain their allegations during formal assessments. This finding suggests that if children have already told a professional or a caretaker about an abusive event, then they are likely to repeat the disclosure in a formal investigation. Discrepant cases (in which a child discloses before the formal interview but denies at the time of the formal interview) represent a small minority and may occur most commonly among very young children.

*Abuse substantiation.* The third and perhaps most important methodological factor that accounts for variation in disclosure patterns across studies concerns the validity of the diagnosis of CSA. In conducting studies of CSA disclosure

---

[5]When children have made a prior allegation but do not repeat it during a formal investigation, this should not be categorized as a recantation because it is possible that the child's first allegation was incorrect or misinterpreted, and the report during the formal investigation is accurate. In this article, *recantations* are defined as statements that are made to the same assessment team who heard the disclosure.

LONDON, BRUCK, CECI, AND SHUMAN

Table 3
*Rates of Disclosure During Forensic Interviews as a Function of Prior Disclosure*

| Study | % of children disclosing at formal interviews with prior disclosure | % of children disclosing at formal interviews with no prior disclosure |
|---|---|---|
| DeVoe & Faller (1999) | 74 | 25 |
| DiPietro et al. (1997) | 77 | 7 |
| Keary & Fitzpatrick (1994) | 86 | 14 |
| Gries et al. (1996) | 93 | 40 |

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

patterns, it is of utmost importance to ensure that the group under study had in fact experienced CSA; otherwise, counts of frequency of delay to disclosure, denials, recantations, and restatements are meaningless. That is, children may deny because they in fact never were abused; children may take a long time to disclose because it is only with repeated suggestive interviewing that they will make disclosures that are false; and children may recant in order to correct their prior false disclosures.

In order to address problems of substantiation of abuse, some researchers have classified children in the sample in terms of the likelihood of abuse having occurred. Cases of suspected abuse that meet one or more of the following criteria (depending on the study) are classified as substantiated abuse cases: perpetrator convictions, plea bargains or confessions, medical evidence, other physical evidence, and children's statements. Although the use of such criteria is a good start, it should be noted that there are problems with each. First, the accused may be persuaded to accept a plea bargain because of the stress, financial burden, and uncertain outcome of facing trial. Also, there are some accused who have been falsely convicted despite the absence of direct evidence to prove child abuse, and on appeal, their convictions have been overturned (Ceci & Bruck, 1995). Although this may not be common, it does happen. Next, medical evidence is not always an accurate indicator of abuse. In the statistically rare case in which genital or anal abnormalities are found, similar abnormalities can sometimes be found among nonabused children (Berenson et al., 1991). Finally, in terms of the studies that are included in this article, the children's statements at the time of formal interview are used as indicators of abuse. But this is a circular exercise whereby children who make spontaneous disclosures with much elaboration, for example, are categorized in the "high-certainty" abuse group. The analysis of the disclosure patterns of the high-certainty group indicates that the children disclosed spontaneously and/or with much elaboration (or did not deny).

Notwithstanding these problems with the use of certainty criteria, there must be some reliable basis to categorize the children in studies of CSA disclosure, lest the disclosure rates obtained merely reflect the overall responses of children (abused and nonabused alike) who are assessed for sexual abuse. Keeping these reservations in mind, we now review those studies that have examined disclosure patterns as a function of the certainty of abuse diagnosis. We argue that, with a few exceptions, high disclosure rates characterize those samples that contain sexually abused children with high-certainty diagnoses, and low disclosure rates

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

are associated with samples for which the diagnoses of abuse are either unknown or questionable. If correct, then this conclusion bypasses the sundry assumptions of models, such as the CSAAS, and in their place posits that children are found to disclose least when their history of sexual abuse is least certain.

Referring to the studies listed in Table 2, the highest disclosure rates (76%–96%) were obtained from those studies that focused on children with high-certainty diagnoses of sexual abuse. Disclosure rates are greatly lowered in these same studies when the data from the unsubstantiated or unclear cases are averaged with the substantiated cases (see data in parentheses in Table 2, Column 4). Thus, although only 62% of DeVoe and Faller's (1999) entire sample of 5- to 10-year-olds disclosed abuse, when only substantiated cases are included, the disclosure rate rises to 87%. The overall rate of disclosure in the Keary and Fitzpatrick (1994) study was 50%; however, when only the substantiated cases are included, the rate was 95%. DiPietro et al. (1997) classified each of the children in their sample who were assessed because of suspicions of CSA as unfounded, possible, probable, or definitive abuse. Rates of disclosure during the first visit increased as a function of abuse certainty, with 7%, 8%, 59%, and 76%, respectively, disclosing. The overall disclosure rate in Dubowitz, Black, and Harrington (1992) was 58%; however, among their cases rated by an interdisciplinary team as holding low to possible likelihood, the disclosure rate was only 19%, compared with the disclosure rate of 83% for the moderate to high likelihood cases. Elliott and Briere (1994) examined the case records of 399 8- to 15-year-olds who were seen at a child sexual assault assessment center. Overall, 57% of the 399 cases disclosed abuse, with 20 of these children later recanting. When only the 248 children who were in the "abused" category were included in the calculation, the rate of disclosure increased to 84%. It is interesting to compare the profiles of these children with the 20% of the sample who were categorized as "unclear." The latter sample all made noncredible disclosures or noncredible denials of abuse. These unclear children were more likely to be referred by a mandated reporter because of a suspicion of abuse, more likely to be male, and more likely to exhibit increased sexual acting-out behavior.

Returning to Table 2, studies that include cases without providing information on their diagnostic certainty (in ascending order, Gordon & Jaudes, 1996; Stroud et al., 2000; Gries et al., 1996) yield disclosure rates (61%–74%) that are lower than those of the studies just discussed. In these studies, there is no other evidence to confirm the abuse status of these children, and hence the disclosure rates of true positive abuse cases are not ascertainable from the data.

Table 2 shows that the lowest rates of disclosure are provided by Sorensen and Snow (1991) and Gonzalez et al. (1993). On the basis of our analysis of the cases included in these studies, we conclude that these low rates reflect the unreliable diagnoses of sexual abuse in these two studies. Because the Sorensen and Snow study is most frequently cited as supporting the notion that sexually abused children deny and recant (see Table 2, Column 6), it is important to carefully review this study and the characteristics of the sample.

Sorensen and Snow (1991) selected 116 cases of confirmed CSA from a larger sample of 633 children who were involved in CSA allegations from 1985 to 1989. Sorensen and Snow reported that 72% of children denied abuse when first questioned by either a parent or an investigative interviewer; only 7% of these

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

deniers immediately moved into an "active disclosure" stage, which involved detailed, coherent, first-person descriptions of the abuse. Seventy-eight percent moved into a "tentative disclosure" stage, with partial, vague, or vacillating disclosures of sexual abuse. Eventually, 96% of children made an active disclosure.

There are several factors to be considered in interpreting these data. First, the authors do not state the criteria by which they selected the 116 cases out of the larger sample of 633. One needs some reassurance that the disclosure patterns of this group were similar to that of the larger sample, assuming that the larger sample also contained "confirmed" cases. Second, the children in this study were selected from the private psychological practice of the two authors, and most had been in therapy with Dr. Snow. Sorensen and Snow (1991) did not note how long the children were in therapy or what type of therapeutic methods were used to elicit these eventual disclosures, recantations, and re-disclosures. (For example, it is unclear how forensically based these therapeutic interviews were, compared with, say, the use of play therapy, empowerment enactments with dolls and props, visualization exercises, or other techniques that have been shown to reduce a child's report accuracy.) This raises the issue that the reported patterns of disclosure were consequences of the specific therapeutic practices (of the authors) rather than of reflections of the manner in which children disclose abuse under formal interviewing conditions. This raises the hypothesis that many of the children in their sample may not have been abused (see Ceci & Bruck, 1995).

A glimpse of the authors' clinical practices and cases can be gleaned from a review of the social science and legal records. First, in 1990, Snow and Sorensen (1990) published an article entitled "Ritualistic Child Abuse in a Neighborhood Setting," in which ritualistic abuse was defined as repetitive, bizarre sexual, physical, and psychological abuse of children that included supernatural themes and/or religious activities. Of the 575 cases of alleged child abuse in which the authors served as therapists and/or evaluators between 1985 and 1988, 52 were identified as ritualistic child abuse. Of the 52 children, 39 were allegedly abused in a neighborhood setting. In a number of these cases, the children were first brought in for therapy because of allegations of ritualistic abuse by a nonfamily member; during the course of therapy, the children came to make the following types of disclosures:

> Cross-dressing, masks, and costumes (31%) included red and black robes, men's wearing of women's erotic underwear and dresses, clowns and devil's masks, capes, and costumes such as a lion, bear, snake, witch, devil, Darth Vader, vampires, skeleton, and leather loin cloths. The killing of children and infants was identified by six children in four neighborhoods (15%). Thirteen percent of the children said that they had participated in eating flesh. (Snow & Sorensen, 1990, p. 483)

The disclosures resulted in trials and convictions of two adults. One of the cases, *State v. Hadfield* (1990), was successfully appealed. In addition, five adolescents from other neighborhoods were accused, three of whom were acquitted, and two pleaded guilty.

There is a high probability that a number of the children classified as ritually abused were included in Sorensen and Snow's (1991) study, which sampled from

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

the same but slightly smaller population that was described in their 1990 study. In addition, because the accused in their neighborhood cases either made pleas or were convicted, these cases met criteria for substantiated cases of abuse.

The problem with the inclusion of these types of cases into studies of disclosure patterns is that there is no evidence to support the once popular belief that ritualistic sexual abuse is common (see Nathan & Snedekor, 1995, for examples). Numerous authorities have failed to find any physical evidence to support the many allegations that have been made and that were the basis of many of the multivictim, multiperpetrator criminal trials of the 1980s and early 1990s (e.g., Lanning, 1991). Furthermore, it appears that the large proportion of reported cases of ritualistic abuse can be accounted for by the practices of a small minority of clinicians (Bottoms, Shaver, & Goodman, 1996; Lanning, 1991). Because Sorensen and Snow diagnosed so many "ritually abused" children in their practice, this, by inference, leads to the possibility that these children's allegations were a product of the practices and beliefs of these clinicians. This information would undermine the reliability of the results of the Sorensen and Snow (1991) disclosure study, rendering them scientifically doubtful.

Reviews of the court records for two trials in which patients of Snow testified about allegations of sexual abuse provide support for the view that the children's allegations were associated with biased suggestive interviewing practices:

> Defendant offered several witnesses at trial who described the suggestive and coercive interviewing techniques allegedly utilized by Dr. Snow and one police officer who described how the children in Dr. Snow's care were able to reproduce specific information after he had suggested to Dr. Snow that such information should be presented in their statements. (*State v. Hadfield*, 1990, p. 508)

On the basis of Snow's testimony in *State v. Bullock* (1989), one of the judges in the case concluded,

> Indeed, Dr. Snow herself admitted that she used interrogation procedures that were not intended to sift truth from error. She forthrightly admitted she was not a neutral interviewer; rather she was "an ally for the child", "biased", and not a fact collector like the police. . . . She also testified in effect that there was nothing in her methods that served as a standard for determining the truthfulness of the stories she produced by her interrogation. . . . But since she starts an interrogation with the assumption that abuse occurred, she then proceeds to prove that point. . . . In short, any claim that scientific principles or Dr. Snow's own expertise and experience validated her conclusions and procedures is devastatingly refuted by her own statement, "I didn't believe any of those kids when they told me it didn't happen." (*State v. Bullock,* 1989, p. 175)

Given the nature of the "validated" cases in the Sorensen and Snow (1991) sample, as well as in the apparently biased and suggestive interviewing/therapeutic techniques, the results of the study are uninterpretable. The patterns of disclosure may merely be characteristic of children who come to make false allegations as a result of suggestion. This would explain why these children originally denied having been abused (because they were telling the truth), why they eventually disclosed (because they were pressured into making allegations), and why they recanted (they wanted to restate the truth).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

The Gonzalez et al. (1993) study suffers from many of the same problems. These authors examined the disclosure and recantation patterns of 63 children in therapy for sexual and ritualistic abuse in day care facilities. Gonzalez et al.'s source of data was the therapists' retrospective accounts of the behavior they reportedly saw in their child patients. They found that within the first 4 weeks of therapy, 76% of the children had made vague disclosures ("bad things had happened")[6]; that by 8 weeks, 45% of the children had disclosed highly specific terrorizing acts (killing of adults, children, and animals); and that by 20 weeks, 43% of the children had reported aspects of ritualistic abuse (organized cults). However, for the same reasons that apply to the Snow and Sorensen (1990) article, the findings of this study are scientifically problematic. First, the children in this study were from the *McMartin Preschool* case and other cases that arose in the community at the same time. The allegations in this case, which involved claims of ritualistic abuse, arose after multiple highly suggestive interviews with evaluators and therapists (see Nathan & Snedekor, 1995). At the time of their study, the children had been in therapy on average for over 1 year. There was no physical or corroborative evidence of abuse, and the charges in these cases were eventually all dropped. The interviewing methods used by the children's therapists and evaluators have been documented elsewhere (e.g., Garven, Wood, Malpass, & Shaw, 1998), and the scientific evidence now shows that these methods can produce erroneous reports when used in interviews with children. Thus, the patterns of disclosures made by children in the Gonzalez et al. study may represent those of children who make false disclosures as a result of suggestive interviewing practices.

Finally, the results of the Bybee and Mowbray (1993) study may be open to the same criticism as detailed above. The participants in this study were all involved in a Michigan day care case that involved multiple perpetrators. The case eventually resulted in only one conviction, which was overturned on appeal. Compared with the other studies in Table 2, disclosure rates were quite low; of the 106 children, 58% disclosed abuse.

*Representativeness of selected sample.*  In order to examine the rates of disclosure among sexually abused children who are questioned about abuse, the sample in question not only should have substantiated diagnoses of sexual abuse but also should not be selected on the basis of their preinterview disclosure patterns. For example, it would be meaningless to examine disclosure patterns in a sample of children who were selected because they had already disclosed abuse; the results of this type of study would merely indicate the consistency of children's responses across time. Similarly, one would not want to study disclosure rates of children who were selected for study because they had previously denied abuse. The results of the latter type of study would only address the issue of the degree to which deniers disclose sexual abuse with repeated interviewing.

Three studies in Table 2 (Carnes, Nelson-Gardell, Wilson, & Orgassa, 2001; Lawson & Chaffin, 1992; B. Wood et al., 1996) reported the disclosure rates of

---

[6]We present a disclosure rate of 24% in Table 2 because it seems that 76% of the children merely said that "bad things had happened," thus not making any claims of abuse. But the denial rate could be higher if the remaining 24% clearly denied any wrongdoing.

children who had not disclosed abuse during an initial interview. The Lawson and Chaffin (1992) study is used to illustrate the point because this sample included children with medical substantiations of sexual abuse; thus, the degree of abuse certainty is high in this study. From a sample of over 800 children who tested positive for a sexually transmitted disease (STD) at a large pediatric hospital, cases that met the following criteria were selected: The presenting complaint was solely physical; there was no prior disclosure or suspicion of abuse; the child was older than 3 and premenarcheal. A sample of 28 girls met these criteria; their mean age was 7 years, and most of the children were from minority households without a father. These 28 children and their mothers were called back to the hospital after they tested positive for an STD. During this interview, the mothers were given the diagnosis for the first time and then were interviewed about sexual abuse. Next, their daughters were interviewed by a trained social worker. Only 43% of the girls made an abuse disclosure during this initial interview.[7] This rate, however, is based on a very different population than sampled in other studies, in which children were brought in either because of a suspicion or disclosure of abuse. Rather, in the Lawson and Chaffin study, children were selected because of their medical history and because they had not disclosed abuse. Because it is not known how many of the 800 children in the larger sample had already disclosed abuse, this subgroup of 28 children with no prior disclosure might compose an unusual sample; that is, they may represent the small hard core of children who do not disclose abuse when directly asked. If they are a small minority, then these results are not generalizable to the entire population of children with STDs. In addition, it should be remembered that very few children who have been sexually abused have any physical symptoms or STDs, and thus this sample again is not representative of the CSA population. There is a second factor that is important to consider. In this study, when the children were called back to the hospital, their mothers were first informed of the STD diagnosis of their children. Children whose mothers accepted the possibility of abuse (the parents were labeled as supportive) were more likely to disclose (63% of this group disclosed), compared with children whose parents were not supportive and did not believe their child had been abused (only 17% of these children disclosed). Elliott and Briere (1994) also found a similar pattern of higher disclosure rates for children with supportive mothers. Among children who disclosed abuse in their sample, 78% had supportive mothers, whereas only 40% of nondisclosers had supportive mothers. Thus, differences among studies might reflect the role of parental support, which might be quite low when parents are first confronted with the fact that their children were abused, as was the case in the Lawson and Chaffin study.[8]

    B. Wood et al. (1996) examined 55 videotaped interviews of children referred

---

[7]In a follow-up study, Chaffin, Lawson, Selby, and Wherry (1997) located 5 of these 28 participants. Though not specifically asked about their children's disclosure, four out of five mothers spontaneously mentioned that the child disclosed CSA subsequent to this initial evaluation.

[8]Although many mothers do not support their children's disclosures of abuse, many are supportive, especially if the defendant is an estranged husband or partner rather than a current one. In many studies, the support rate is between 50% and 85% (see Lyon, 1999, notes 238–239, for details).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

by CPS to a multidisciplinary assessment center. All 55 children had been interviewed previously by CPS or law enforcement officials and were included in the study because they had not disclosed. Thus, the disclosure rate of 49% in Table 2 is based on the percentage of children disclosing out of these 55 children who had not previously disclosed during police or CPS interviews. Finally, Carnes et al. (2001) reported that their sample of children undergoing extended CSA assessment because of failure to initially disclose represented approximately 10%–15% of the total population presenting for assessment to the clinics in their study. Thus, the results of this study, as well as the results of the B. Wood et al. study, merely indicate the response patterns of children who had previously failed to disclose abuse during an initial assessment. Furthermore, although this is not the case for the Lawson and Chaffin (1992) study, there are no data on the number of children in both the B. Wood et al. and the Carnes study who met acceptable criteria for diagnosis of sexual abuse. Thus, children who did or did not disclose with extra assessment may or may not have been abused.

*Recantations.*    There are fewer studies on recantations than on denials or disclosures of sexual abuse. All but one of eight studies that have examined this issue (see Table 2, Column 5) also included information on disclosure rates. For the one exception, Faller and Henry (2000) examined the recantation rates of children who testified at trial about their sexual abuse. Thus, all these children had made prior disclosures that were judged as credible by the prosecutors' office. Before reviewing the actual data of the studies, it is important to point out that there could be two different interpretations of recantation. The first is that the child is withdrawing a true statement of abuse. The second is that the child is withdrawing a false allegation of abuse. The child's underlying motivation for a statement is unknowable in each study.

The recantation rates of the studies listed in Table 2 range from 4% to 27%. Our analysis of the variability is very similar to that just carried out with respect to the disclosure rates; namely, the highest rates of recantation are obtained for studies that have the least certain diagnoses of sexual abuse. The two studies with the highest recantation rates were those of Gonzalez et al. (1993) and Sorensen and Snow (1991), in which the recantation rates were 27% and 22%, respectively. Because of concerns about the actual abuse status of the children in these studies, one might argue that these recantation rates reflect the number of children who attempt to discredit their own previous false allegations by setting the record straight.[9] (In the Gonzalez et al. [1993] and Sorensen and Snow [1991] studies, these attempts appeared to have failed, however, as the authors of both studies reported that most of the children reinstated their earlier accusations.)

The lowest rates of recantation are obtained from samples that have the most certain diagnoses of sexual abuse (4%: Bradley & Wood, 1996; 6.5%: Faller & Henry, 2000; 9%: Elliott & Briere, 1994). The slightly higher rate of 15% reported by Gries et al. (1996) is difficult to interpret because there is no information on the number of children who were diagnosed as clear or unclear cases of abuse.

---

[9]There were also issues concerning the validity of the sexually abused sample in Bybee and Mowbray (1993), who reported a much lower recantation rate of 11%. Thus, recantation rates do not necessarily have to be high for doubtful cases.

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 189 of 198 PageID #:1847

Although our analysis shows that some children recant sexual abuse, the results of this analysis show that recantation is uncommon among sexually abused children. In fact, it shows just the opposite; that is, only a small percentage of children in these studies recant.

## Conclusions

We began this article by describing the popular view that sexually abused children do not readily disclose their abuse and that even when they disclose, they commonly recant such disclosures. Given how frequently these claims are made in the literature (as well as in proffered expert testimony), we sought to examine their scientific basis. A review of retrospective studies showed that most adults with histories of CSA recall that they never told anyone about the abuse during childhood. This pattern confirms the view that failure to disclose is common among sexually abused children. However, these findings do not address the issue of whether children will deny abuse or recant their disclosures when interviewed. In order to examine these issues, it is necessary to study how sexually abused children disclose abuse when asked directly. Because it is difficult if not impossible to obtain accurate information if the first disclosure is made outside a formal setting (e.g., to a parent, friend, or teacher), we have to rely on studies in which children are questioned in formal investigative interviews. We identified 17 studies that contained relevant data and found that, when the analysis focused on children with substantiated diagnoses of abuse and on children who have not been subjected to the potentially suggestive techniques, most children do disclose abuse within the first or second interview. Only a small minority of these children recant their abuse reports. Even if analyses were broadened to include children with less certain CSA diagnoses, in all but two studies, the majority of children disclosed abuse when directly asked, and only a minority of them recanted their previous disclosures.

One of the basic problems in interpreting the literature on children's disclosures of sexual abuse involves the issue of the validity of sexual abuse diagnosis. As we stated above, in many of the cited studies, classification of abuse was often based in part on children's disclosures; consequently, the conclusion that abused children do disclose abuse during formal interviews may be circular. However, there is some evidence that shows that when children are classified as abused on the basis of medical evidence or other nonchild factors (confession, material evidence), most of these children do disclose abuse. For example, in the Elliott and Briere (1994) study, there were 118 children involved in cases with external evidence: 84% of these 118 children at one point disclosed abuse. In Dubowitz et al. (1992), the finding that 83% of children disclosed abuse was based on the calculation of the number of children with medical findings (but see Gordon & Jaudes, 1996).

Although there are a number of studies to address issues of patterns of disclosure, several overriding issues remain to be addressed. These issues focus on the central theme of individual differences in rates of secrecy, denial, and recantation. Specifically, although the data clearly demonstrate that most children who are interviewed about sexual abuse do disclose and do not later recant, there does exist a minority of children who fit the behavioral pattern that is put forth in

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

the CSAAS model. The outstanding issues thus focus on the characteristics of these children, and whether these children fit the psychological profiles of the CSAAS model. For example, although Summit's (1983) CSAAS model was developed to explain why children may not disclose intrafamilial abuse, there are few data on potential differences in disclosure patterns when the alleged abuse is intrafamilial versus extrafamilial. Next, there needs to be a greater focus on developmental differences in disclosure patterns. In many of the studies we reviewed, children ranged in age from early preschool to late adolescence. Clearly, it is not very informative to provide group means when age ranges are so great. Studies are needed to examine potential developmental trends in loyalty to family and peers, reactions to fear, need for privacy, choice of confidants, and then to relate these factors to disclosure patterns in children of various ages. Another important area concerns the potential role of threats, which plays a central role in the CSAAS model. In this future research venture, it is crucial to distinguish threats that were used to coerce the child into molestation from threats that were used to secure the child's silence. Finally, in most of the studies cited in this article, there was little if any detailed information about how the children were interviewed and the degree to which standardized and validated protocols were used. In future studies, it would be important to compare the disclosure patterns of children interviewed with current standardized interviews (e.g., Hunter, Yuille, & Harvey, 1990; Sternberg, Lamb, Esplin, Orbach, & Hershkowitz, 2002). If these protocols do in fact optimize the elicitation of reliable statements from children, then the disclosure patterns produced by these instruments would provide the most reliable data to test various hypotheses about the disclosure patterns of sexually abused children and to explore the factors that distinguish disclosers from nondisclosers.

The status of the scientific findings of disclosure patterns is of importance, not only for diagnostic and assessment purposes but also for issues regarding the interviewing of children. As mentioned above, the CSAAS has provided a basis for experts to advocate that when children deny abuse when directly asked, then they should be questioned further and even should be questioned suggestively (e.g., Carnes, 2000; Faller & Toth, 1995; MacFarlane & Krebs, 1986). In order for such practices to be empirically grounded, it is important to demonstrate first that children will commonly deny abuse when questioned (thus calling forth the need for special strategies), and, second, that the use of special strategies will lead to accurate reports of abuse. The findings presented in this article address the first issue only. The second issue has been addressed by a multitude of researchers in the past decade (e.g., Ceci & Bruck, 1995; Ghetti & Goodman, 2001; Poole & Lindsay, 2002; J. M. Wood & Garven, 2000). Professionals need to be aware that although suggestive techniques may produce correct reports from otherwise silent children, these same techniques, especially when used by biased interviewers, entail a risk of producing false allegations (e.g., Bruck, Ceci, & Hembrooke, 2002; Poole & Lamb, 1998). Part of the bias may include the notion that when children deny abuse, they must be pursued until they disclose their abuse; however, as we demonstrated in this present article, the need for suggestive interviewing is probably overestimated because denial of sexual abuse to professionals is not as rampant as previously suspected. Our analysis clearly shows that

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

when children who have been abused are questioned in formal settings, they will usually tell, obviating the need for suggestive questioning strategies.

We have provided a host of studies that fail to support the view that children who are sexually abused most commonly deny abuse and frequently recant disclosures. Nonetheless, we find that the strong and unqualified assertions regarding the frequency of denials and recantations continue and are supported by the most scientifically problematic of the many studies we examined (e.g., Gonzalez et al., 1993; Sorensen & Snow, 1991). For example, in some recent reviews of the literature, we find the following statements: "It is appropriate to tell the jury that accommodation frequently occurs among abused children, in order to disabuse the jury of misconceptions regarding about how children ought to behave" (Lyon, 2002, p. 110); "A review of the research on CSAAS clearly supports the conclusion that a substantial proportion of abused children exhibit accommodation" (Lyon, 2002, p. 132)[10]; "Furthermore, research reveals that disturbing numbers of children deny their sexual victimization even in the face of compelling evidence to the contrary" (Paine & Hansen, 2002, p. 290); and "Investigations of abuse have frequently been impeded when children fail to disclose abuse, deny abuse that has occurred, or recant a prior disclosure" (Paine & Hansen, 2002, p. 272).

Moreover, even when researchers themselves find low rates of denials or recantations, they still maintain that these are consistent with the popular view. For example, although Elliott and Briere (1994) found high rates of disclosure and low rates of recantation, they concluded their article with the following: "Consistent with Sorensen and Snow's (1991) data, the present results suggest that disclosing sexual abuse is more an ongoing process than a single event" (Elliott & Briere, 1994, p. 274).

The courts have a long history of grappling with how to handle expert testimony regarding characteristics of sexually abused children. In most cases, when courts have permitted expert testimony concerning CSAAS, they have not carefully scrutinized its scientific basis. Instead, they have relied on the unsubstantiated assurances of the proffering expert (as exemplified in the above quotations) or the acceptance of CSAAS by other courts (e.g., *State v. Edelman,* 1999). As shown above, this reliance can result in experts providing incorrect opinions. In recognizing that it makes no sense to accept that an assertion is scientifically grounded "just because somebody with a diploma says it is so" (*United States v. Ingham,* 1995, p. 226), *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) and its progeny in the federal and state courts have directed trial judges to assume the role of gatekeeper and, as such, to examine the relevance and reliability of all proffers of expert testimony. In this role, trial judges are directed to consider falsifiability, error rates, publication, peer review, and general acceptance. In other words, the expert testimony must "rest on a reliable foundation . . ." (*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 1993, p. 2799; see also *General Electric Co. v. Joiner,* 1997). *Daubert* standards hold for scientific as well as nonscientific experts (*Kumho Tire Company Ltd. v. Carmichael,* 1999).

---

[10]See Lyon, 2002, p. 109, for Lyon's operational definition of child sexual abuse accommodation.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

According to these testimonial standards, the only component of the CSAAS that has empirical support is that delay of abuse disclosure is very common. However, the probative value of expert testimony on delayed disclosure, whether for evidentiary or rehabilitative reasons, is undetermined; some evidence suggests that knowledge about delay of disclosure is within the ken of the jury, perhaps therefore obviating the need for expert evidence on the issue of delay. Gray (1993) surveyed a sample of adults from the general public and a sample of jurors regarding whether they agreed that delayed disclosure was common among abused children ranging from 1 (*strongly agree that delay is common*) to 6 (*strongly disagree*). They found that the general public had a mean rating of 2.3, and jurors had a mean rating of 1.7, suggesting that laypeople tend to believe that delayed disclosure is common. Presently, there is insufficient evidence to conclude whether expert testimony on delayed disclosure meets the *Daubert* standard of possessing probative value for jurors.

The research on denial and recantation shows that when directly questioned in a formal setting, only a small percentage of abused children demonstrate these behaviors. In terms of *Daubert's* concern with error rate, our review of the literature revealed that there was high variability in specific behaviors across studies and that in some cases, the reported rates were inaccurate, reflecting methodological flaws of the study. In summary, there is no convincing evidence that CSAAS testimony on denial or recantation provides relevant or reliable assistance to the fact finder to assess allegations of CSA.

Our intention in writing this article was to examine the empirical basis of professional and lay opinions about disclosure patterns of CSA. In so doing, we found that, although there was much support for the silence/secrecy stage of the accommodation syndrome, most of the evidence failed to provide empirical support for the rest of the model. In order to clearly present these conclusions, it was necessary to dissect the methodological sections of each study and to point out major problems when these occurred. It was also our intent to provide the readers with a host of other studies that provided relevant data that were not prone to the same or as many methodological weaknesses. We believe that child abuse professionals should be aware of this information and incorporate it into their clinical practice as well as into their expert courtroom testimony. If the field is to be guided by scientifically validated concepts, then this must be predicated on the literature that comes closest to the standards of science.

## References

Adams, C. B. (1994). Examining questionable child sexual abuse allegations in their environmental and psychodynamic contexts. *Journal of Child Sexual Abuse, 3,* 21–36.

Arata, C. M. (1998). To tell or not to tell: Current functioning of child sexual abuse survivors who disclosed their victimization. *Child Maltreatment, 3,* 63–71.

Bays, J., & Chadwick, D. (1993). Medical diagnosis of the sexually abused child. *Child Abuse & Neglect, 17,* 91–110.

Berenson, A., Heger, A., & Andrews, S. (1991). Appearance of the hymen in newborns. *Pediatrics, 87,* 458–465.

Bottoms, B. L., Shaver, P. R., & Goodman, G. S. (1996). An analysis of ritualistic and religion-related child abuse allegations. *Law & Human Behavior, 20,* 1–34.

Bradley, A. R., & Wood, J. M. (1996). How do children tell? The disclosure process in child sexual abuse. *Child Abuse & Neglect, 20,* 881–891.

Browne, A. (1991). The victim's experience: Pathways to disclosure. *Psychotherapy, 28,* 150–156.

Bruck, M., Ceci, S. J., & Hembrooke, H. (2002). The nature of children's true and false narratives. *Developmental Review, 22,* 520–554.

Bybee, D., & Mowbray, C. T. (1993). An analysis of allegations of sexual abuse in a multi-victim day-care center case. *Child Abuse & Neglect, 17,* 767–783.

Campis, L. B., Hebden-Curtis, J., & DeMaso, D. R. (1993). Developmental differences in detection and disclosure of sexual abuse. *Journal of the American Academy of Child & Adolescent Psychiatry, 32,* 920–924.

Cantlon, J., Payne, G., & Erbaugh, C. (1996). Outcome-based practice: Disclosure rates of child sexual abuse comparing allegation blind and allegation informed structured interviews. *Child Abuse & Neglect, 20,* 1113–1120.

Carnes, C. N. (2000). *Forensic evaluation of children when sexual abuse is suspected* (2nd ed.). Huntsville, AL: National Children's Advocacy Center.

Carnes, C. N., Nelson-Gardell, D., Wilson, C., & Orgassa, U.C. (2001). Extended forensic evaluation when sexual abuse is suspected: A multisite field study. *Child Maltreatment, 6,* 230–242.

Ceci, S. J., & Bruck, M. (1993). The suggestibility to the child witness: A historical review and synthesis. *Psychological Bulletin, 113,* 403–439.

Ceci, S. J., & Bruck, M. (1995). *Jeopardy in the courtroom: A scientific analysis of children's testimony.* Washington, DC: American Psychological Association.

Ceci, S. J., & Friedman, R. D. (2000). The suggestibility of children: Scientific research and legal implications. *Cornell Law Review, 86,* 34–108.

Chaffin, M., Lawson, L., Selby, A., & Wherry, J. N. (1997). False negatives in sexual abuse interviews: Preliminary investigation of a relationship to dissociation. *Journal of Child Sexual Abuse, 6,* 15–29.

Conte, J. R., Sorenson, E., Fogarty, L., & Rosa, J. D. (1991). Evaluating children's reports of sexual abuse: Results from a survey of professionals. *American Journal of Orthopsychiatry, 61,* 428–437.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

DeVoe, E. R., & Faller, K. C. (1999). The characteristics of disclosure among children who may have been sexually abused. *Child Maltreatment, 4,* 217–227.

DiPietro, E. K., Runyan, D. K., & Fredrickson, D. D. (1997). Predictors of disclosure during medical evaluation for suspected sexual abuse. *Journal of Child Sexual Abuse, 6,* 133–142.

Dubowitz, H., Black, M., & Harrington, D. (1992). The diagnosis of child sexual abuse. *American Journal of Diseases of Children, 146,* 668–693.

Elias, H. M. (1992). Commentary: "Abuse of the child sexual abuse accommodation syndrome." *Journal of Childhood Sexual Abuse, 1,* 169–171.

Elliott, D. M., & Briere, J. (1994). Forensic sexual abuse evaluations of older children: Disclosures and symptomatology. *Behavioral Sciences and the Law, 12,* 261–277.

Everill, J., & Waller, G. (1995). Disclosure of sexual abuse and psychological adjustment in female undergraduates. *Child Abuse & Neglect, 19,* 93–100.

Faller, K. C., & Henry, J. (2000). Child sexual abuse: A case study in community collaboration. *Child Abuse & Neglect, 24,* 1215–1225.

Faller, K. C., & Toth, P. (1995). *Forensically defensible interviewing.* Oklahoma City, OK: American Professional Society on the Abuse of Children.

Ferguson, D. M., Horwood, L. J., & Woodward, L. J. (2000). The stability of child abuse reports: A longitudinal study of the reporting behaviour of young adults. *Psychological Medicine, 30,* 529–544.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Fergusson, D. M., Lynskey, M. T., & Horwood, L. J. (1996). Childhood sexual abuse and psychiatric disorder in young adulthood: I. Prevalence of sexual abuse and factors associated with sexual abuse. *Journal of the American Academy of Child & Adolescent Psychiatry, 35,* 1355–1364.

Finkelhor, D., Hotaling, G., Lewis, I. A., & Smith, C. (1990). Sexual abuse in a national survey of adult men and women: Prevalence, characteristics, and risk factors. *Child Abuse & Neglect, 14,* 19–28.

Fisher, C. B. (1995). American Psychological Association's (1992) ethics code and the validation of sexual abuse in day-care settings. *Psychology, Public Policy, and Law, 1,* 461–478.

Fontanella, C., Harrington, D., & Zuravin, S. J. (2000). Gender differences in the characteristics and outcomes of sexually abused preschoolers. *Journal of Child Sexual Abuse, 9,* 21–40.

Fontes, L. A. (1993). Disclosures of sexual abuse by Puerto Rican children: Oppression and cultural barriers. *Journal of Child Sexual Abuse, 2,* 21–35.

Ford, H. H., Schindler, C. B., & Medway, F. J. (2001). School professionals' attributions of blame for child sexual abuse. *Journal of School Psychology, 39,* 25–44.

Freckelton, I. (1997). Child sexual abuse accommodation evidence: The travails of counterintuitive evidence in Australia and New Zealand. *Behavioral Sciences and the Law, 15,* 247–283.

Freyd, J. J. (1996). *Betrayal trauma theory: The logic of forgetting childhood abuse.* Cambridge, MA: Harvard University Press.

Futa, K. T., Hsu, E., & Hansen, D. J. (2001). Child sexual abuse in Asian American families: An examination of cultural factors that influence prevalence, identification, and treatment. *Clinical Psychology: Science and Practice, 8,* 189–209.

Garven, S., Wood, J. M., Malpass, R., & Shaw, J. S. (1998). More than suggestion: Consequences of the interviewing techniques from the McMartin preschool case. *Journal of Applied Psychology, 83,* 347–359.

General Electric Co. v. Joiner, 522 U.S. 136 (1997).

Ghetti, S., & Goodman, G. S. (2001). Resisting distortion. *Psychologist, 14,* 592–595.

Ghetti, S., Goodman, G. S., & Eisen, M. L. (2002). Consistency in children's reports of sexual and physical abuse. *Child Abuse & Neglect, 26,* 977–995.

Gonzalez, L. S., Waterman, J., Kelly, R., McCord, J., & Oliveri, K. (1993). Children's patterns of disclosures and recantations of sexual and ritualistic abuse allegations in psychotherapy. *Child Abuse & Neglect, 17,* 281–289.

Goodman-Brown, T. B., Edelstein, R. S., Goodman, G. S., Jones, D. P. H., & Gordon, D. S. (2003). Why children tell: A model of children's disclosure of sexual abuse. *Child Abuse & Neglect, 27,* 525–540.

Goodman, G. S., Taub, E. P., Jones, D. P., England, P., et al. (1992). Testifying in criminal court: Emotional effects on child sexual assault victims. *Monographs of the Society for Research in Child Development, 57*(5, Serial No. 299).

Gordon, S., & Jaudes, P. K. (1996). Sexual abuse evaluation in the emergency department: Is the history reliable? *Child Abuse & Neglect, 20,* 315–322.

Gray, E. (1993). *Unequal justice: The prosecution of child sexual abuse.* New York: Free Press.

Gries, L. T., Goh, D. S., & Cavanaugh, J. (1996). Factors associated with disclosure during child sexual abuse assessment. *Journal of Child Sexual Abuse, 5,* 1–20.

Hanson, R. F., Resnick, H. S., Saunders, B. E., Kilpatrick, D. G., & Best, C. (1999). Factors related to the reporting of childhood rape. *Child Abuse & Neglect, 23,* 559–569.

Henry, J. (1997). System intervention trauma to child sexual abuse victims following disclosure. *Journal of Interpersonal Violence, 12,* 499–512.

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 195 of 198 PageID #:1853

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Hunter, R., Yuille, J. C., & Harvey, W. (1990). A coordinated approach to interviewing in child sexual abuse investigations. *Canada's Mental Health, 38,* 14–18.

Kazarian, S. S., & Kazarian, L. Z. (1998). Cultural aspects of family violence. In S. S. Kazarian & D. R. Evans (Eds.), *Cultural clinical psychology: Theory, research, and practice* (pp. 316–347). New York: Oxford University Press.

Keary, K., & Fitzpatrick, C. (1994). Children's disclosure of sexual abuse during formal investigation. *Child Abuse & Neglect, 18,* 543–548.

Kelley, S. J., Brant, R., & Waterman, J. (1993). Sexual abuse of children in day care centers. *Child Abuse & Neglect, 17,* 71–89.

Kellogg, N. D., & Hoffman, T. J. (1995). Unwanted and illegal sexual experiences in childhood and adolescence. *Child Abuse & Neglect, 19,* 1457–1468.

Kellogg, N. D., & Huston, R. L. (1995). Unwanted sexual experiences in adolescents: Patterns of disclosure. *Clinical Pediatrics, 34,* 306–312.

Kendall-Tacket, K. A., Williams, L. M., & Finkelhor, D. (1993). Impact of sexual abuse on children: A review and synthesis of recent empirical studies. *Psychological Bulletin, 113,* 164–180.

Kenny, M. C., & McEachern, A. G. (2000). Racial, ethnic, and cultural factors of childhood sexual abuse: A selected review of the literature. *Clinical Psychology Review, 7,* 905–922.

King Mize, L., Bentley, B., Helms, S., Ledbetter, J., & Neblett, K. (1995). Surviving voices: Incest survivors' narratives of their process of disclosure. *Journal of Family Psychotherapy, 6,* 43–57.

Kovera, M. B., & Borgida, E. (1998). Expert scientific testimony on child witnesses in the age of *Daubert*. In S. Ceci & H. Hembrooke (Eds.), *Expert witnesses in child abuse cases: What can and should be said in court* (pp. 185–215). Washington, DC: American Psychological Association.

Kumho Tire Company Ltd. v. Carmichael, 119 S. Ct. 1167, 1999 U.S. LEXIS 2189 (1999).

Lamb, S., & Edgar-Smith, S. (1994). Aspects of disclosure: Mediators of outcome of childhood sexual abuse. *Journal of Interpersonal Violence, 9,* 307–326.

Lanning, K. (1991). Ritual abuse: A law enforcement view or perspective. *Child Abuse & Neglect, 15,* 171–173.

Lawson, L., & Chaffin, M. (1992). False negatives in sexual abuse disclosure interviews: Incidence and influence of caretaker's belief in abuse in cases of accidental abuse discovery by diagnosis of STD. *Journal of Interpersonal Violence, 7,* 532–542.

Leonard, E. D. (1996). A social exchange explanation for the child sexual abuse accommodation syndrome. *Journal of Interpersonal Violence, 11,* 107–117.

Levesque, J. R. (1994). Sex differences in the experience of child sexual victimization. *Journal of Family Violence, 9,* 357–369.

Levy, H. B., Markovic, J., Kalinowski, M. N., Ahart, S., & Torres, H. (1995). Child sexual abuse interviews: The use of anatomic dolls and the reliability of information. *Journal of Interpersonal Violence, 10,* 334–353.

Lillie v. Newcastle City Council (2002) EWHC 1600.

Lyon, T. D. (1999). The new wave of suggestibility research: A critique. *Cornell Law Review, 84,* 1004–1087.

Lyon, T. D. (2002). Scientific support for expert testimony on child sexual abuse accommodation. In J. R. Conte (Ed.), *Critical issues in child sexual abuse* (pp. 107–138). Newbury Park, CA: Sage.

MacFarlane, K. (1992). Commentary: Summit's "abuse of the CSAAS." *Journal of Child Sexual Abuse, 1,* 165–167.

MacFarlane, K., & Krebs, S. (1986). Techniques for interviewing and evidence gathering.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

In K. MacFarlane & J. Waterman (Eds.), *Sexual abuse of young children* (pp. 67–100). New York: Guilford Press.

Nagel, D. E., Putnam, F. W., Noll, J. G., & Trickett, P. K. (1997). Disclosure patterns of sexual abuse and psychological functioning at a 1-year follow-up. *Child Abuse & Neglect, 21,* 137–147.

Nathan, D., & Snedekor, M. (1995). *Satan's silence: Ritual abuse and the making of a modern American witch hunt*. New York: Basic Books.

Neisser, U. (1997). Jane Doe's memories: Changing the past to serve the present. *Child Maltreatment, 2,* 126–133.

Oates, R. K., & Donnelly, A. C. (1997). Influential papers in child abuse. *Child Abuse & Neglect, 21,* 319–326.

Paine, M. L., & Hansen, D. J. (2002). Factors influencing children to self-disclose sexual abuse. *Clinical Psychology Review, 22,* 271–295.

Palmer, S. E., Brown, R. A., Rae-Grant, N. I., & Loughlin, M. J. (1999). Responding to children's disclosure of familial abuse: What survivors tell us. *Child Welfare, 78,* 259–282.

People v. Carroll, Ind. No. B-10431 (N.Y. Crim. Ct., Rensselaer County 2001).

People v. Duell, 558 N.Y.S.2d 395 (N.Y. App. Div. 1990).

Poole, D. A., & Lamb, M. E. (1998). *Investigative interviews of children: A guide for helping professionals*. Washington DC: American Psychological Association.

Poole, D. A., & Lindsay, D. S. (1998). Assessing the accuracy of young children's reports: Lessons from the investigation of child sexual abuse. *Applied & Preventative Psychology, 7,* 1–26.

Poole, D. A., & Lindsay, D. S. (2002). Children's suggestibility in the forensic context. In M. L. Eisen, J. A. Quas, & G. S. Goodman, (Eds.), *Memory and suggestibility in the forensic interview. Personality and clinical psychology series* (pp. 355–381). Mahwah, NJ: Erlbaum.

Rao, K., DiClemente, R., & Ponton, L. E. (1992). Child sexual abuse of Asians compared with other populations. *Journal of the American Academy of Child and Adolescent Psychiatry, 31,* 880–886.

Read, J. D., & Lindsay, D. S. (Eds.). (1997). *Recollections of trauma: Scientific research and clinical practice*. New York: Plenum Press.

Reichard, R. D. (1992). Is the grass greener on the other side of the river? The child sexual abuse accommodation syndrome in Indiana's courts. *Journal of Child Sexual Abuse, 1,* 143–146.

Reiser, M. (1991). Recantation in child sexual abuse cases. *Child Welfare, 70,* 611–621.

Resnick, H. S., Kilpatrick, D. G., Dansky, B. S., Saunders, B. E., & Best, C. L. (1993). Prevalence of civilian trauma and posttraumatic stress disorder in a representative national sample of women. *Journal of Consulting and Clinical Psychology, 61,* 984–991.

Robin, M. (1991). Beyond validation interviews: An assessment approach to evaluating sexual abuse allegations. *Child and Youth Services, 17,* 93–113.

Roesler, T. A. (1994). Reactions to disclosure of childhood sexual abuse: The effect on adult symptoms. *Journal of Nervous and Mental Disease, 182,* 618–624.

Roesler, T. A., & Wind, T. W. (1994). Telling the secret: Adult women describe their disclosures of incest. *Journal of Interpersonal Violence, 9,* 327–338.

Ross, M. (1989). Relation of implicit theories to the construction of personal histories. *Psychological Review, 96,* 341–357.

Salter, A. C. (1995). *Transforming trauma: A guide to understanding and treating adult survivors of child sexual abuse*. Thousand Oaks, CA: Sage.

Sas, L. D., & Cunningham, A. H. (1995). *Tipping the balance to tell the secret: The public*

Case: 1:19-cr-00567 Document #: 260-2 Filed: 08/08/22 Page 197 of 198 PageID #:1855

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

*discovery of child sexual abuse.* London, Ontario, Canada: London Family Court Clinic.

Schooler, J. W., Ambadar, Z., & Bendiksen, M. A. (1997). A cognitive corroborative case. In D. S. Lindsay (Ed.), *Recollections of trauma: Scientific research and clinical practice* (pp. 379–388). New York: Plenum Press.

Schooler, J. W., Bendiksen, M. A., & Ambadar, Z. (1997). Taking the middle line: Can we accommodate both fabricated and recovered memories of sexual abuse? In M. Conway (Ed.), *Recovered memories and false memories* (pp. 251–292). Oxford, England: Oxford University Press.

Sgroi, S. M. (1982). *Handbook of clinical intervention in child sexual abuse.* Lexington, MA: Lexington Books.

Shaw, J. A., Lewis, J. E., Loeb, A., Rosado, J., & Rodriguez, R. A. (2001). A comparison of Hispanic and African-American sexually abused girls and their families. *Child Abuse & Neglect, 25,* 1363–1379.

Sjöberg, R. L., & Lindblad, F. (2002). Delayed disclosure and disrupted communication during forensic investigation of child sexual abuse: A study of 47 corroborated cases. *Acta Paediatrica, 91,* 1391–1396.

Smith, D., Letourneau, E. J., Saunders, B. E., Kilpatrick, D. G., Resnick, H. S., & Best, C. L. (2000). Delay in disclosure of childhood rape: Results from a national survey. *Child Abuse & Neglect, 24,* 273–287.

Snow, B., & Sorensen, T. (1990). Ritualistic child abuse in a neighborhood setting. *Journal of Interpersonal Violence, 5,* 474–487.

Snowden v. Singletary, 135 F.3d 732 (11th Cir. 1998).

Somer, E., & Szwarcberg, S. (2001). Variables in delayed disclosure of childhood sexual abuse. *American Journal of Orthopsychiatry, 71,* 332–341.

Sorensen, T., & Snow, B. (1991). How children tell: The process of disclosure of child sexual abuse. *Child Welfare, 70,* 3–15.

State v. Bullock, 791 P.2d 155 (Utah 1989).

State v. Edelman, 593 N.W.2d 419 (S.D. 1999).

State v. Gokey, 574 A.2d 766 (Vt. 1990).

State v. Hadfield, 788 P.2d 506 (Utah 1990).

State v. Huntington, 575 N.W.2d 268 (Wis. 1998).

State v. Jones, 863 P.2d 85 (Wash. 1993), *review denied,* 881 P.2d 254 (Wash. 1994).

State v. JQ, 617 A.2d 1196 (N.J. 1993).

State v. Larson, 453 N.W.2d 42 (Minn.), *vacated,* 498 U.S. 801 (1990).

State v. Michaels, 625 A.2d 489 (N.J. Super. Ct. App. Div. 1993), *aff'd,* 642 A.2d 1372 (N.J. 1994).

State v. Myers, 359 N.W.2d 604 (Minn. 1984).

Sternberg, K. J., Lamb, M. E., Esplin, P. W., Orbach, Y., & Hershkowitz, I. (2002). Using a structure interview protocol to improve the quality of investigative interviews. In M. Eisen (Ed.), *Memory and suggestibility in the forensic interview* (pp. 409–436). Mahwah, NJ: Erlbaum.

Stroud, D., Martens, S. L., & Barker, J. (2000). Criminal investigation of child sexual abuse: A comparison of cases referred to the prosecutor to those not referred. *Child Abuse & Neglect, 24,* 689–700.

Summit, R. C. (1983). The child sexual abuse accommodation syndrome. *Child Abuse & Neglect, 7,* 177–193.

Summit, R. (1992). Abuse of the child sexual abuse accommodation syndrome. *Journal of Child Sexual Abuse, 1,* 153–163.

Tang, C. S. (2002). Childhood experience of sexual abuse among Hong Kong Chinese college students. *Child Abuse & Neglect, 26,* 23–37.

Toukmanian, S. G., & Brouwers, M. C. (1998). Cultural aspects of self-disclosure and

psychotherapy. In S. S. Kazarian & D. R. Evans (Eds.), *Cultural clinical psychology: Theory, research, and practice* (pp. 106–126). New York: Oxford University Press.

United States v. Ingham, 42 M.J. 218 (A.C.M.R. 1995).

Ussher, J. M., & Dewberry, C. (1995). The nature and long-term effects of childhood sexual abuse: A survey of women survivors in Britain. *British Journal of Clinical Psychology, 34,* 177–192.

Waterman, J., Kelly, R. J., Oliveri, M. K., & McCord, J. (1993). *Behind the playground walls: Sexual abuse in preschools*. New York: Guilford Press.

Wong, D. (1987). Preventing child sexual assault among Southeast Asian refugee families. *Child Today, 16,* 18–22.

Wood, B., Orsak, C., Murphy, M., & Cross, H. J. (1996). Semistructured child sexual abuse interviews: Interview and child characteristics related to credibility of disclosure. *Child Abuse & Neglect, 20,* 81–92.

Wood, J. M., & Garven, S. (2000). How sexual abuse interviews go astray: Implications for prosecutors, police, and child protection services. *Child Maltreatment: Journal of the American Professional Society on the Abuse of Children, 5,* 109–118.

Wood, J. M., & Wright, L. (1995). Evaluation of children's sexual behaviors and incorporation of base rates in judgments of sexual abuse. *Child Abuse & Neglect, 19,* 1263–1273.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.