UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 19 CR 567 |
| v. | Honorable Harry D. Leinenweber |
| ROBERT SYLVESTER KELLY, aka "R. Kelly," DERREL McDAVID, and MILTON BROWN, aka "June Brown" | |

**GOVERNMENT'S RESPONSE TO DEFENDANT
DERREL MCDAVID'S MOTIONS TO COMPEL DISCOVERY[1]**

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to Defendant Derrel McDavid's Motion to Compel Discovery [R. 247], and Supplemental Motion to Compel Discovery [R. 252].

Defendant McDavid's motions to compel discovery should be denied. As set forth more fully below, defendants ask the Court to authorize a fishing expedition into matters as wide-ranging as "DOJ policies and procedures governing the retention of data," "an explanation" for a victim's nickname, and toll records reflecting communications between the government and potential witnesses. They attempt to justify this expedition based upon two sets of materials previously disclosed to the defense by the government: (a) email exchanges through which an author provided to the government an about-to-be-published manuscript about R. Kelly; and (b) text

---

[1] During the pretrial conference held on August 3, 2022, defendant Robert Sylvester Kelly orally joined McDavid's Motion to Compel Discovery. Subsequently, in a separate motion for discovery (R. 254), Kelly joined McDavid's Supplemental Motion for Discovery.

messages between a prosecutor and one of Kelly's victims, primarily scheduling later calls or meetings. Neither set of materials provides a basis for the discovery defendants seek. Moreover, nothing in Rule 16, Brady, or the Jencks Act authorizes defendants' broad requests. Defendants' motion should be denied.

## BACKGROUND

### *The Charges*

The superseding indictment alleges that, from approximately 1996 to 2001, Robert Sylvester Kelly engaged in unlawful sexual conduct with minors, including minors referred to in the indictment as Minor 1, Minor 3, Minor 4, Minor 5, and Minor 6. R. 93. As part of this abuse, Kelly recorded himself engaged in sexually explicit conduct with minors on videotape. *Id.* at 1-4; 8, 17-19. According to the indictment, Derrel McDavid—who worked as Kelly's accountant and business manager from approximately 1991 until 2014— and others knew of Kelly's unlawful sexual contacts with minors, including, specifically, that Kelly had recorded himself engaged in such conduct on videotape. R. 93 at 8. McDavid conspired with Kelly, and with others, to protect Kelly from allegations of child sexual abuse and exploitation, including by, *inter alia*, concealing evidence and pressuring others to do so, and paying others to collect and return incriminating videotapes. *Id.* at 8-13. Based on this conduct, McDavid and Kelly, and another of Kelly's employees, Milton (June) Brown, are charged in this case with federal offenses including sexual exploitation of a minor (Kelly), conspiracy to obstruct justice (McDavid and Kelly), conspiracy to receive child pornography (Kelly, McDavid, Brown), receipt of child pornography (Kelly, McDavid), and enticement of minors to engage in unlawful sexual conduct (Kelly).

2

### *Discovery*

Beginning on August 2, 2019, shortly after the indictment in this case was returned, the government began a rolling production of documents and other materials, in accordance with Fed. R. Crim. P. 16. From the beginning, the government's document productions far exceeded its Rule 16 obligations; for example, the government included in its first production numerous witness statements, investigative reports, and grand jury transcripts. Collectively, the government has produced to defendants approximately 12,451 files (including documents, images, spreadsheets, and audio/video recordings) totaling 49.54 GB, as well as 7,996 files totaling nearly 11.8 GB of materials which were received from the U.S. Attorney's Office for the Eastern District of New York on March 8, 2022.

### *Production of Documents Relating to Author Jim DeRogatis*

On August 1, 2022, the government provided defendants with materials documenting communications on April 16 and 30, 2019, between Angel Krull, an Assistant United States Attorney formerly assigned to this case,[2] and Jim DeRogatis, an investigative reporter and author who had written a book titled, *Soulless: The Case Against R. Kelly* ("*Soulless*"), based on his long-term investigation of allegations of child sexual abuse by Kelly. In a telephone conversation with AUSA Krull, DeRogatis agreed to provide the government with a PDF copy of his book, which was

---

[2] AUSA Angel Krull was assigned to this case while working at the Chicago U.S. Attorney's Office. On November 5, 2020, AUSA Krull left the Chicago U.S. Attorney's office to care for a family member suffering from cancer. Subsequently, she joined the U.S. Attorney's Office for the District of Connecticut.

then in final manuscript form. DeRogatis's book was released to the public on June 4, 2022.

As documented by the records produced to defendants, email messages relating to the delivery of DeRogatis's book were exchanged using a Gmail account with the email address, "piedpiper312@gmail.com," subscribed to under the name "Demetrius Slovenski." This email account was created by, and at the suggestion of, a Homeland Security Investigations ("HSI") agent. The emails, four in number, were saved and subsequently preserved as PDF documents by an HSI employee:

> (1)     The first email was sent by AUSA Krull to DeRogatis on April 16, 2019, at 5:33 p.m. AUSA Krull thanked DeRogatis for speaking earlier that day, and told him he could send his book using this email address. The email was signed, "Angel."

> (2)     The second email was sent by DeRogatis approximately 20 minutes later, at 5:56 p.m. In this email, DeRogatis forwarded a PDF copy of the "Soulless" manuscript, asked for confirmation of receipt of the manuscript, and offered to "chat" if the AUSA had any questions.

> (3)     The third email was sent to by AUSA Krull to DeRogatis approximately one hour later, at 7:07 p.m. The email confirmed receipt of the manuscript, and was signed, "Angel."

> (4)     The fourth and final email was sent by DeRogatis on April 30, 2019, at 1:43 p.m. In this email, DeRogatis, asked whether the book had been of any help, and added that he had received a call "a little bit ago from a prominent 'enabler' mentioned [in the book], . . . who [was] convinced he has become a target . . . ." DeRogatis commented that the enabler "sounded very shook up," and had reported that the investigation appeared to be "moving fast." DeRogatis explained the purpose of his email this way: "I wouldn't be a reporter if I didn't check in!"

Although the two emails sent by AUSA Krull reflected the name of the sender as "Demetrius Slovenski," both were signed using AUSA Krull's true name, "Angel."

The other two emails were sent by DeRogatis, who was fully aware of the identity of the account user. In the first, DeRogatis forwarded the manuscript, and requested confirmation of its receipt. The second email was also limited in scope: DeRogatis inquired whether the book had been helpful, and "checked in" with AUSA Krull in his capacity as a reporter.[3]

The telephone conversation referred to in AUSA Krull's first email was brief and focused on the prospect of DeRogatis sharing the manuscript of his book. AUSA Krull did not discuss the investigation with DeRogatis and did not provide him with any confidential details about the case. Moreover, AUSA Krull did not respond to DeRogatis's April 30, 2019, email, or to two subsequent telephone messages he left for her after she had left the U.S. Attorney's Office for the Northern District of Illinois. There were no further communications regarding this matter between DeRogatis and AUSA Krull or any other employee or agent of the Chicago U.S. Attorney's office, and neither AUSA Krull nor any other AUSA or government agent has ever provided DeRogatis with any confidential information regarding this matter at any time. No other private or personal email accounts were opened or used by agents or prosecutors as part of the investigation or prosecution of this case.

As the government has previously advised defendants and this Court, the government has no intention of calling DeRogatis as a witness; nor is the government

---

[3] DeRogatis has made public statements regarding his communications with the prosecutors, indicating the limited nature of their contacts. *See* https://www.chicagotribune.com/news/criminal-justice/ct-r-kelly-chicago-federal-pretrial-conference-20220803-cvtntra5vfdpvktzgkt456f5eu-story.html; https://chicago.suntimes.com/2022/8/3/23290251/r-kelly-prosecutor-accused-using-fake-name-email-communicate-journalist (both accessed Aug. 8, 2022).

aware of any information in the *Soulless* manuscript that is in any way exculpatory or otherwise helpful to the preparation of the defendants' defense. Nevertheless, the government disclosed the manuscript and related emails to defendants in an abundance of caution.[4]

### *Production of Text Messages Involving Minor 1*

On June 2, 2022, the government produced to defendants records documenting text messages between AUSA Krull and Minor 1 during the period July 7, 2019, through July 20, 2020. The text messages—detailed in the table attached hereto as Exhibit A—consist of short messages focused almost exclusively on arranging telephone calls and visits, which were sent and received using AUSA Krull's personal cell phone. As reflected in the records produced to defendants, the text messages were preserved for the file as screenshots. AUSA Krull preserved these screenshots and placed them in the case file before she left the office so that they could be produced in discovery in the case.

### *Defendants' Motions to Compel Additional Discovery*

In response to these disclosures, McDavid filed his Motion to Compel Discovery, which Kelly subsequently joined, seeking extensive discovery concerning communications with DeRogatis and the private email account used to exchange the four emails described above. R. 247. The motion sets forth multiple requests for an

---

[4]  None of the members of the current prosecution team were assigned to this case when the email account used to communicate with DeRogatis was created. The current team members first learned of the above emails as a result of the government's review of HSI correspondence records for potential disclosure to the defendants in advance of trial. Because the documents' nature and origin were unclear, the documents were not immediately produced when they were first discovered in May 2022.

extensive quantity of information and documents, including, in summary: (1) all reports and records (including toll, text, and social media records) of any communication between DeRogatis and any employee or agent of the Chicago U.S. Attorney's Office concerning Robert Kelly or Derrel McDavid; (2) all communications between any prosecution team member with any potential witness in this case using a personal email address; (3) an explanation of who, other than Ms. Krull, was aware of the use of the private email account to communicate with Derogatis, and whether the communication was approved by supervisors at the U.S. Attorney's Office; (4) an explanation of why screenshots of the communications with DeRogatis were made at the time they were made, and who was involved in the decision to disclose the screenshots to the defense in August of 2022; and (5) all DOJ or USAO policies and procedures governing the retention of account data, including, but not limited to, messages sent, received, and deleted, as well as the access logs for the private email account used to communicate with DeRogatis and any other personal account used to communicate with potential witnesses.

On August 5, 2022, McDavid filed a Supplemental Motion to Compel Discovery, R. 252, which Kelly also joined, seeking documents and information concerning communications between AUSA Krull and other members of the prosecution team and the alleged victims of defendant Kelly's offenses. In summary, defendants' wide-ranging requests include requests for: (1) all communications between AUSA Krull and Minor 1 or any other civilian witness at any time, whether or not the government intends to call them as a witness at trial; (2) an explanation for why the name "Boss

Baby" (or "BB" for short) was used, and why and when it was input in AUSA Krull's I-phone; (3) all contacts between Agent Amalia Molina and Minor 1 or any other civilian potential witness in this case; and (4) all communications exchanged between AUSA Krull and Agent Molina during this investigation (excluding communications regarding other investigations and sensitive matters).

As discussed below, both motions should be denied.

## I.     ARGUMENT

### A.     Applicable Law

"There is no *general* constitutional right to discovery in a criminal case . . . ." *United States v. Vargas*, 915 F.3d 417, 421 (7th Cir. 2019) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837 (1977) (cleaned up and emphasis added)). *See also United States v. Ruiz*, 536 U.S. 622, 629 (2002). The federal government's discovery obligations in criminal cases are generally established by Rules 16 and 26.2 of the Federal Rules of Criminal Procedure, 18 U.S.C. §3500 (the Jencks Act), as well as *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

Rule 16(a), in particular, sets forth the grounds upon which a criminal defendant may obtain discovery from the government. In relevant part, it provides that the government must produce upon request defendant's statements, as well as "books, papers, documents, data, ... or portions of any of these items" if they are "within the government's possession, custody, or control" and either "material to preparing the defense," likely to be used in the government's case-in-chief at trial, or

the item was obtained from or belongs to the defendant. Fed. R. Crim. P. 16. Rule 16 also identifies categories of information that are not subject to disclosure. *Id.*

Under *Brady*, the government has a duty to disclose any information in its possession that is favorable to the defense and material either to guilt or punishment. *Brady*, 373 U.S. at 88. Information favorable to the defense includes evidence which "would tend to exculpate [the defendant] or reduce the penalty," *Brady*, 373 U.S. at 87, and evidence regarding the reliability or credibility of a government witness, *see Giglio*, 405 U.S. at 154-55.

Materiality, in this context, means that the discovery sought must "significantly help in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal." *United States v. Owens*, 18 F.4th 928, 935 (7th Cir. 2021) (citing *United States v. Gaddis*, 877 F.2d 605, 611 (7th Cir. 1989) (citation and internal quotation marks omitted)). This Court has described material evidence as that which will "enable the accused to substantially alter the quantum of proof in his favor." *Owens*, 18 F.4th at 935 (citing *United States v. Orzechowski*, 547 F.2d 978, 984 (7th Cir. 1976) (cleaned up)); *see also United States v. Ross*, 511 F.2d 757, 762 (5th Cir. 1975) ("Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case.").

The defendant bears the burden to "make at least a *prima facie* showing that the requested items are material to his defense." *Owens*, 18 F.4th at 936 (citing *United States v. Thompson*, 944 F.2d 1331, 1342 (7th Cir. 1991)). This burden cannot

9

be met by "general descriptions or conclusory arguments"; instead, the defendant must "convincingly explain how [the discovery sought] will significantly help him uncover admissible evidence, prepare witnesses, or corroborate, impeach, or rebut testimony." *Id.*; *United States v. Caputo*, 373 F. Supp. 2d 789, 793 (N.D. Ill. 2005) (collecting cases). *See also United States v. Clarke*, 979 F.3d 82, 97 (2d Cir. 2020) (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990)), *cert. denied*, —— U.S. ——, 141 S. Ct. 2581 (2021). Additionally, the trial court should "consider the materials that have already been produced, the availability of the requested materials from other sources, and the defendant's own knowledge." *Caputo*, 373 F. Supp. 2d at 794 (citing *Ross*, 511 F.2d at 763).

### B. Defendants Have Established No Legal Basis for Obtaining Additional Discovery Based on Communications Involving Jim DeRogatis.

Defendants have not come close to establishing a basis for obtaining additional discovery based on records related to communications with author Jim DeRogatis. The communications with DeRogatis related to his sharing of a manuscript copy of his soon-to-be-released book. The government has provided defendants with the manuscript and the published book has been available to defendants and the public since June 4, 2019.

Defendants argue that they are entitled to the additional discovery they seek because DeRogatis is a potential witness. As the government has advised defendants and the Court, it has no intention of calling DeRogatis as a witness in its case-in-chief. Moreover, although defendants vaguely suggest that they may call DeRogatis

in the defense case, they offer no explanation of the testimony he might give, or how that testimony would benefit the defense. Given the nature of DeRogatis's relationship to the case, it is highly unlikely that he would have any testimony beneficial to the defense. In any event, the government has produced all records in its possession related to communications between DeRogatis and members of the investigation and prosecution teams in this case; nothing more is required.

Arguing that the government's use of a private email account to receive DeRogatis's manuscript requires "additional investigation," defendants make expansive requests for information related to the use that account, including records relating to internal decision-making and supervision of the use of the account or similar accounts, and "any and all DOJ policies and procedures" regarding use of personal email accounts and retention of records related to such use.

None of the defendants' requests seek the disclosure of information required by Fed. R. Crim. P. 16, the Jencks Act, or *Brady* or *Giglio*, and none seek information that has any relevance to the elements of any of the charged offenses. To the contrary, all of defendants' requests rest on the faulty premise that the government's use of the private email account was deceptive or otherwise improper. As noted above, this email account was used for the limited purpose of receiving DeRogatis's book manuscript; none of the emails exchanged using the account were in any way deceptive. AUSA Krull did not create the account or decide on the names associated with it; she signed each of the messages she sent in her own name. DeRogatis was at all times fully aware that he was communicating with an AUSA assigned to the R.

Kelly investigation. The government's communications with DeRogatis and DeRogatis's manuscript were disclosed to defendants prior to trial. And the government has advised that all emails exchanged using the private account were produced to the defendants, and that no other private email accounts were used in connection with the investigation or prosecution of this case.

Defendants offer no legal authority—and the government is aware of none—supporting their effort to conduct a wide-ranging fishing expedition in the hopes of turning up evidence of some kind of government misconduct. Defendant has not come close to establishing that evidence related to the use of a private email account for a limited purpose in this case could "significantly help in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal"—much less that it would enable defendant to "substantially alter the quantum of proof in his favor."

Finally, defendants also seek "any and all records of communications between any member of the prosecution team with any potential witness in this case not memorialized in an official government report." Unsurprisingly, once again defendants offer no legal authority for this broad request, and for the reasons discussed above, the government's use of a private email account does not justify it. As stated above, the government has already produced to the defendants all reports and grand jury testimony in its possession reflecting relevant statements of potential government witnesses, even though pretrial disclosure of such materials was required under neither the Jencks Act nor Fed. R. Crim. P. 16 (a)(2), which exempts

from disclosure reports, memoranda, or other internal government documents made by a government agent in connection with investigating or prosecuting a case. Where, as here, the relevant official reports and transcripts have been disclosed, nothing more is required.

Contrary to defendants' suggestion, as a general matter, members of the prosecution team are not obligated to prepare a report of each and every contact or communication they have with a potential trial witness. What is required is that relevant statements of witnesses be preserved and produced to defendants no later than after the witness has testified. Here, even though the government has no intention of calling DeRogatis as a witness, it produced to defendants its communications with DeRogatis and the manuscript he provided in an abundance of caution. The government has fulfilled this obligation under applicable law by providing all records of relevant witness statements in its possession prior to trial, and it recognizes its continuing duty to expeditiously relay any new, relevant statements made by its witnesses. Defendants are entitled to nothing more. Accordingly, defendants' motion to compel discovery related to communications with Jim DeRogatis should be denied.

**C.   Defendants Have Established No Legal Basis for Obtaining Additional Discovery Related to Scheduling Texts.**

Likewise, defendants have not come close to establishing a basis for obtaining additional discovery based on the text messages exchanged between AUSA Krull and Minor 1. To begin, none of the information defendants seeks is discoverable under Fed. R. Crim. P. 16, the Jenks Act, or *Brady* or *Giglio*. To the contrary, as discussed above, the government has produced all relevant statements in its possession made by the witnesses it intends to call in its case in chief—including, to any extent they contain relevant statements, the text messages at issue in defendants' motion—as well as all evidence in its possession that may be viewed as exculpatory, impeaching of its witnesses, or material to the preparation of the defendants' defenses. Nothing more is required.

As was the case with defendants' requests with respect to the DeRogatis emails, defendants' motion for additional discovery related to communications with Minor 1 is grounded on the contention that the text messages between AUSA Krull and Minor 1 produced by the government suggest that AUSA Krull may have attempted to improperly influence Minor 1's testimony in this case. This contention is refuted by substance of the subject text messages, as well as the fact that, at the time of the subject texts, Minor 1 had *already* testified to the grand jury.

As reflected in the texts themselves, they relate almost exclusively to the scheduling of phone calls, meetings, and the trial. *See* Ex. A. For example, in the first text message, sent on July 7, 2019, AUSA Krull sought to set up a meeting with Minor 1, noting that she was texting because Chad [the case agent], who was then on

14

vacation, had indicate that Minor 1 wanted to meet that week. *See* Ex. A, *infra*, at 16. All of the texts that followed on July 7, 8, and 9 discuss the time and location of the proposed meeting. *Id.* Similarly, when on January 17, 2020, Minor 1 told AUSA Krull that she had "some upcoming things to update on," and agreed to meet the following week, AUSA Krull said that she would check and let her know what day worked for her and Amalia, a case agent. *See* Ex. A, *infra*, at 21. The nineteen texts that followed concerned the date and location of the meeting. *See id.*, *infra*, at 21-23.

Moreover, the texts generally indicate that the phone calls and meetings being scheduled were not private meetings or calls between AUSA Krull and Minor 1, but rather, meetings and calls in which an agent or other office representative would also be present. In the texts, AUSA Krull repeatedly made reference to needing to reach out to an agent to be on the call or at the meeting before she (AUSA Krull) could speak with Minor 1. Indeed, many of the texts mentioned government agents or employees who would participate by name; in others, AUSA Krull used the term "we" in discussing logistics. For example, when AUSA Krull texted Minor 1 on August 21, 2019, she asked whether she was "[f]ree for a call from me and Felice" (the U.S. Attorney's Office's victim-witness coordinator). *See* Ex. A, *infra*, at 20. Similarly, when Minor 1 texted AUSA Krull to see if she could take a call on February 24, 2020, AUSA Krull answered, "Sure but I have to get Amalia or Melissa [case agents] on the line. Let me check if they are free." *See id.*, *infra*, at 22.

Defendants' suggestions that AUSA Krull's text communications with Minor 1, and/or her recording of Minor 1's telephone number in her telephone contacts under

the name "Boss Baby," were improper are equally baseless. Although there is no requirement that AUSAs or agents document every non-substantive contact they have with a potential witness, AUSA Krull preserved all her case-related text communications in screenshots, and all of them have been produced to defendants. As for the use of the term "Boss Baby" or "BB" for short, there is nothing improper about AUSA Krull's identifying Minor 1 in her phone as "Boss Baby," rather than using the victim's true name; nor is there anything improper about AUSA Krull's limited use of that nickname in referring to or communicating with Minor 1.

Finally, defendants claim that Minor 1's sharing of photographs with a case agent and AUSA Krull indicates the formation of an unduly close relationship which may have led to "improper influence" of Minor 1's testimony. This claim is baseless. The photographs in question were professional photos of Minor 1 which Minor 1 shared with many people, in celebration of her joy in being an expectant mother. The reaction AUSA Krull shared reflected nothing more than sincere happiness for a person who had suffered a great deal, but who was now experiencing great personal joy. AUSA Krull's spontaneous reaction was natural and in no way improper.

In sum, the text messages produced to defendants in no way suggest any impropriety or provide a basis for any further discovery on the subject, and the defendants' efforts to attack the government personally or discourage a testifying victim should not be countenanced.[5] Defendants are free to explore the issue of bias

---

[5] Defendants' inflammatory and wholly careless suggestion that the departures of AUSA Krull and Agent Amalia Molina were due to misconduct is baseless and improper. In fact, as

in their cross-examination of Minor 1, and they have no need for any additional discovery to do so—particularly in light of the vast quantity of information and documents already produced to them in discovery and available to them through other means. Accordingly, defendant's motion for additional discovery related to communications with Minor 1 should be denied.

CONCLUSION

For the reasons stated above, the Court should deny defendants' Motion to Compel Discovery, and Supplemental Motion to Compel Discovery.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/ Jason A. Julien*
JEANNICE W. APPENTENG
ELIZABETH R. POZOLO
JASON A. JULIEN
BRIAN WILLIAMSON
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

---

discussed above, AUSA Krull left the office to care for a family member suffering from cancer. Agent Molina was transferred to another location as a result of a promotion.