UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA<br><br>v.<br><br>DERREL McDAVID | Case No. 19 CR 567-2<br><br>Judge Harry D. Leinenweber |
|---|---|

**GOVERNMENT'S RESPONSE TO DEFENDANT McDAVID'S MOTION FOR ATTORNEY'S FEES AND LITIGATION EXPENSES**

Defendant Derrel McDavid stood by Robert Kelly's side for decades while Kelly sexually abused young girls and manufactured child pornography. These young girls included Jane, Kelly's goddaughter, who was 14 years old when Kelly began filming her engaged in various sex acts with him and others—criminal conduct that the jury found beyond a reasonable doubt was depicted in Videos 1, 2, and 3.

In the wake of his acquittal on related charges—that he (1) conspired to obstruct justice in an effort to cover up Kelly's illicit sexual contacts with minors and Kelly's creation of child pornography; (2) conspired to receive child pornography, and (3) actually received child pornography—McDavid now contests the manner of his prosecution by attempting to collect attorney's fees and litigation expenses pursuant to the Hyde Amendment. But relief under the Hyde Amendment is exceedingly rare. It is reserved for cases of extreme prosecutorial misconduct where the case presented has no tether to the facts or the law. Here, there was no misconduct. Instead, the government presented ample evidence upon which a grand jury found probable cause to return charges against McDavid. As this Court found in denying McDavid's Rule 29 motion for a judgment of acquittal following the government's case-in-chief, the

government also presented sufficient evidence at trial from which a reasonable jury could have convicted McDavid on all charges. This evidence included the illicit videos themselves, testimony from witnesses involved in the scheme to retrieve the videos, and corroborative testimony from others unwittingly drawn into the conspiracy's orbit.

On this record, and as detailed below, this Court cannot conclude that the government's investigation and prosecution of McDavid was vexatious, frivolous, or in bad faith, as the Hyde Amendment requires. Defendant's motion therefore should be denied. In the alternative, if the motion, which is also untimely, is allowed to proceed, McDavid should be required to prove that he is a "prevailing party" under the Hyde Amendment, in particular, that his net worth was less than $2 million when a grand jury returned an indictment in this matter in July 2019.

## I. FACTUAL BACKGROUND

McDavid maintains that each of the government's charges against him were "factually and legally unsound"—both at the indictment stage and at trial. R. 342 at 3. To demonstrate the baselessness of defendant's claims, the government next summarizes the evidence presented against McDavid both before the grand jury and at trial, including evidence that McDavid omits from his motion. In doing so, the government also addresses defendant's arguments regarding inconsistencies in witness testimony and his allegations of purported misconduct during the government's investigation and at trial.

### A. Overview of Investigation

In February 2019, the Cook County State's Attorney's Office ("CCSAO") provided the government with access to a VHS tape that the CCSAO received from an attorney. The tape contained two different scenes, referred to as Video 2 and Video 3, of what the government determined to be Kelly engaging in sex acts with 14-year-old Jane. At this time, the government was already in possession of Video 1, which also depicted sex acts between Kelly and Jane, and which was the subject of Kelly's 2008 state prosecution that resulted in an acquittal.

The receipt of these videos launched the government's investigation into Kelly and, subsequently, McDavid. Over the next five months, up to and including July 2019, the government interviewed numerous individuals, many of whom testified before a federal grand jury, and obtained pertinent documents and materials, including additional evidence as set forth below. Ultimately, on July 11, 2019, and February 13, 2020, a federal grand jury returned an indictment and superseding indictment, charging McDavid with a conspiracy to obstruct justice related to child pornography and child exploitation, a conspiracy to receive child pornography, and receipt of child pornography. R. 1, 93.

### B. The Government's Evidence More than Supported its Charge That McDavid Conspired To Obstruct Justice.

Count Five of the superseding indictment alleged that McDavid conspired with Kelly and others to obstruct justice in violation of 18 U.S.C. §§ 371 and 1519. Specifically, the superseding indictment charged McDavid with conspiring to conceal the existence of videos portraying Kelly engaged in sexual conduct with minors and

to prevent victims, witnesses, and others from cooperating with law enforcement investigating this conduct, including during the 2008 state trial against Kelly relating to Video 1.

These charges were amply supported by the evidence presented before the grand jury and at trial, and as this Court already has found, sufficient as a matter of law to be decided by a jury.

**1. After Hearing Evidence of McDavid's Participation in a Conspiracy To Obstruct Justice, a Grand Jury Found Probable Cause Existed To Indict.**

A federal grand jury returned the superseding indictment on Count Five, finding probable cause to believe that McDavid had conspired with Kelly and others to obstruct justice. The evidence heard by this grand jury as to both the overall scheme to obstruct justice and overt acts occurring during the operative statute of limitations period in particular was compelling, and despite what McDavid now argues, more than sufficient to establish a foundation that payments made by Kelly after 2014 to Jane were "connected to buying silence," R. 342 at 4, and that payments made to McDavid during the same period related to services rendered by McDavid in facilitating the coverup.

[redacted]

[redacted]

[redacted]

[1] [redacted] All of the documents cited in this brief were provided to defendant during discovery. The government is providing them to the Court *ex parte* and *in camera*.



2



**2. At Trial, Jurors Heard Evidence Consistent With the Evidence Presented to the Grand Jury Regarding McDavid's Participation in the Conspiracy to Obstruct Justice.**

The evidence at trial was consistent with the evidence heard by federal grand jurors as to Count 5. Jane testified at trial, consistent with her statements before the federal grand jury, that she received payments from Kelly after she contacted him in 2014. Trial Tr. 840. Her testimony was corroborated by documentary evidence

showing that, as late as 2014, Kelly sent monthly payments to Jane, in the amounts of $1,100 or $1,150. Gov. Ex. 414. Some of those payments were annotated with the word "settlement," despite the absence of any legal settlement between Kelly and Jane. *Id.* The jury also reviewed financial records showing payments in 2014 and 2015 from Kelly to McDavid in the wake of their settlement agreement (Gov. Ex. 413), along with the filed complaint and executed confidential settlement agreement between McDavid and Kelly (Gov. Exs. 337, 339), although discussion of McDavid's draft complaint and its allegations was limited by this Court's pretrial rulings. And financial records displayed at trial also showed that Kelly issued numerous checks to Brandon in the months leading up to and after Kelly's 2008 state trial. Gov. Ex. 411.

In his motion, McDavid contends that Jane and her mother "denied that any payments were made for the purpose of concealing anything, and particularly that Mr. McDavid had never suggested that either of them lie." R. 342 at 4. That claim is belied by both the facts established during the grand jury investigation, as stated above, and the evidence presented at trial. At trial, Jane testified at length how the tactics, including physical abuse, that Kelly used to control her after his 2008 acquittal created fear and financial dependency. Trial Tr. 838-39, 873-74. And despite McDavid's efforts to mischaracterize her testimony, Jane never made any denials at trial with regard to the nature of the rent payments she received from Kelly in 2014 and 2015. Instead, she consistently described an abusive and controlling relationship between her and Kelly, continuing even after Kelly's 2008 acquittal, and that testimony provided critical context from which a jury could reasonably infer that

Kelly's "rent" payments were, in fact, efforts to continue to buy Jane's silence. *Id*. at 840, 873-74. As to Susan, she did not have direct insight into the nature of payments from Kelly to her husband and daughter, but was quite clear in describing Kelly's intimidation of her family in and around—and well before—the 2008 trial. *See* Trial Tr. 1291. In light of the evidence the jury also heard about McDavid's role in managing Kelly's affairs, including his role in assisting the concealment of his criminal conduct, Jane and Susan's testimony more than supported the government's charge that McDavid participated in a conspiracy to obstruct justice that extended past 2014.

**3. Based on the Strength of the Government's Evidence of McDavid's Obstructive Conduct and the Soundness of the Government's Legal Theory, This Court Denied Defendant's Rule 29 Motion.**

At the conclusion of the government's case-in-chief, this Court determined that the government had presented sufficient evidence from which a reasonable juror could convict McDavid of conspiracy to obstruct of justice. McDavid's failed Rule 29 motion was premised on arguments nearly identical to those he now raises in his motion for fees. In particular, in his plea for a judgment of acquittal, McDavid premised his challenge on "the [government's] complete inability to establish that an overt act occurred within the statute of limitations period" because the payments to McDavid and Jane were not connected to the conspiracy to obstruct justice. R. 293 at 3-12. McDavid makes the same claim now. R. 342 at 3 ("Both the substantive allegations of the charge itself, as well as the government's attempts to bring the

charge within the statute of limitations, suffered from critical factual and legal deficiencies.”).

This Court has already and directly refuted that contention. It ruled that “[w]hen put in context and viewed in the light most favorable to the government, the Court finds that a rational jury could infer that these payments were made to keep Jane and McDavid from coming forward.” Trial Tr. 2737-38. Moreover, the Court held “a rational jury could find that sufficient evidence existed to infer that an agreement to conceal existed at the outset of the conspiracy and thus it could . . . extend to the payments Kelly made to Jane and McDavid in late 2014 through 2015.” Trial Tr. 2739.

### C. The Government’s Evidence More than Supported its Charge That McDavid Conspired to and Actually Received Child Pornography.

Count 6 of the superseding indictment alleged that McDavid, along with Kelly and Milton Brown, conspired with each other and others to receive child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), specifically Videos 2, 3, and 4. Counts 7 and 8 of the superseding indictment charged McDavid and Kelly with actual receipt of Videos 2 and 3, and Video 4, respectively, in violation of 18 U.S.C. § 2252A(a)(2) and 18 U.S.C. § 2.

As was the case with Count Five, Counts Six through Eight were amply supported by the evidence presented before the grand jury and at trial, and as this Court has already found, sufficient as a matter of law to be decided by a jury.

**1. After Hearing Evidence of McDavid's Participation in the Conspiracy to Receive and Receipt of Child Pornography, a Grand Jury Found Probable Cause Existed to Indict.**

A federal grand jury returned the superseding indictment on Counts 6 through 8, finding probable cause to believe that McDavid conspired to receive and actually received child pornography. The grand jury's finding was based on substantial evidence regarding the general scheme embarked upon by McDavid, Kelly, and others to retrieve Videos 2, 3, and 4, as well as specific testimony indicating that McDavid received and viewed the tapes himself.





[redacted]

**2. At Trial, Jurors Heard Evidence Consistent with Evidence Presented to the Grand Jury Regarding McDavid's Participation in the Conspiracy to Receive and Actual Receipt of Child Pornography.**

The evidence at trial was largely consistent with the evidence heard by grand jurors as to Counts Six through Eight. Despite McDavid's present contentions—based on selective and misleading excerpts of trial testimony, rather than the evidence taken as a whole—relevant trial witnesses did not present material inconsistencies. On the contrary, these witnesses agreed on core aspects of their testimony, including the existence of Videos 2, 3, and 4 and the content contained therein, as well as McDavid's involvement in retrieving and viewing the videos in question. The recollections of these witnesses at trial were independently corroborated by other witness testimony and documentary evidence, such as that of the polygraphers that conducted examinations in relation to the tape. In sum, Van Allen, Freeman, and Murrell testified consistently both among themselves and with their sworn pre-trial

5 [redacted]

testimony regarding how they obtained Videos 2, 3 and 4, and what was depicted on them.[6]

Beginning with Freeman, he testified at trial that, in 2001, Kelly contacted him about recovering videotapes on his behalf, and that he later received a call from McDavid about the tapes. Trial Tr. 1358. He subsequently obtained a videotape containing Video 2 and Video 3 in Georgia and provided the tape to McDavid and Palladino in exchange for a cash reward, following a polygraph. Trial Tr. 1396, 1402, 1410. Freeman kept two copies of the tape, which he identified at trial as the ones that were ultimately turned over to the CCSAO. [redacted]

Van Allen testified extensively at trial, including as to how she came to acquire the VHS tape she stole from Kelly containing Videos 2, 3 and 4. Van Allen—and Murrell as well—testified that they met with McDavid, along with Milton Brown, in Chicago when Murrell flew up from Kansas City with an excerpt of Video 4 in his possession. Trial Tr. 1853-54. Consistent with testimony presented to the grand jury, Murrell testified that McDavid and Van Allen left the room to go watch a video. Trial

[6] McDavid argues, inaccurately, that Van Allen testified inconsistently with her 2008 state trial testimony regarding having previously seen Video 2 and Video 3. *See* R. 342 at 7. Specifically, in his motion, McDavid takes a quote from Van Allen out of context to suggest that she had only seen Video 4 before the 2008 state trial. *Id.* McDavid, through counsel, made the same inaccurate statement during his cross-examination of Van Allen during the recent federal trial. Trial Tr. 1918. During redirect examination, Van Allen clarified that in the excerpt from her 2008 trial testimony transcript that McDavid's counsel showed her during cross-examination, she was referring to never having seen a tape containing *Video 1* before law enforcement showed it to her in preparation for the 2008 state trial. Trial Tr. 2123:25-2124:9. [redacted] There, Van Allen accurately described the contents of Video 2 and Video 3 while testifying in the state grand jury without ever having been shown those tapes by law enforcement.

Tr. 2208, 2244. At trial, Van Allen recalled that, together, she and McDavid watched the video she had taken from Kelly containing Videos 2, 3, and 4. Trial Tr. 1853. Murrell testified differently, explaining that McDavid and Van Allen retreated to watch Video 4 alone. Trial Tr. 2213-14. According to Murrell, after McDavid learned that Murrell did not bring the original tape to their first meeting, McDavid paid Murrell and Van Allen $20,000 each as an incentive to return the original. Trial Tr. 2218-2221. Murrell subsequently returned to Chicago and turned over the original, full-length tape that Van Allen had sent him, where he was rewarded by McDavid. Tr. 2226-2228. Under either Van Allen's or Murrell's trial testimony, though, core facts supporting the charges against McDavid remain the same: Murrell came to Chicago to return Kelly's tapes to McDavid, those tapes contained child pornography, and McDavid watched at least one version of those tapes.

In his motion, McDavid impugns the consistency of the trial testimony of Van Allen and Freeman, arguing that it "could not possibly be true" that Van Allen took a tape from Kelly containing Videos 2, 3 and 4; that Freeman recovered a stolen tape from Georgia; and that a copy of tape containing Videos 2, 3 and 4 was later provided by Murrell to McDavid. McDavid's efforts, however, attempt to equate the commonplace and inevitable discrepancies in witness testimony with prosecutorial misconduct. Especially after allowing for a nearly 20-year passage of time that would have understandably eroded the sharpness of witnesses' recollections and the potential circulation of multiple copies of the tape in differing formats, the consistency

of the evidence presented by the government far outweigh largely immaterial inconsistencies.

To that point, Van Allen testified at trial that she took the tape from Kelly's bag and described seeing videos depicting Kelly and Jane on a black-and-white checkered floor and a bedroom—descriptions that match Videos 2 and 3. Trial Tr. 1833-1835. That is precisely how Freeman described the scenes he saw from the video he recovered in Georgia. Trial Tr. 1388-1389. As to Video 4, both Van Allen and Jane testified at trial as to their firsthand knowledge of their sex acts being recorded by Kelly, Trial Tr. 1817-1818, 782, and both Freeman and Murrell confirmed viewing a threesome video generally matching that description. Trial Tr. 1416, 1423, 2233-2234. And as stated earlier, despite having differing recollections as to the exact content of the tape turned over to McDavid, both Van Allen and Murrell agreed that McDavid viewed some portion of the recovered videos when they met with him in Chicago. Trial Tr. 1853-54, 2244. Moreover, the jury was able to watch Videos 2 and 3 at trial, and heard from witnesses that directly corroborated the testimony of Freeman, Murrell, and Van Allen, including the polygraph examiners.

Yet despite the overall consistency with which evidence was presented to the jury, McDavid goes even further, claiming "the government made no legitimate effort to correct, and, at times, embraced clear and undeniable falsities espoused by their witnesses," in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). R. 342 at 18. But the record does not reflect falsehoods, only inconsistencies, which defense counsel was free to—and did—extensively explore on cross-examination. Trial Tr. 1471-1730.

More to it, the government responded to the defense's alleged *Napue* violation at length during trial, and the court declined the opportunity for further correction in favor of cross-examination. Trial Tr. 1468. The government nonetheless on redirect examination probed inconsistencies within Freeman's testimony eliciting a clarification with regard to a difference in his federal grand jury statements from his trial testimony. Trial Tr. 1742.

Moreover, and contrary to McDavid's contentions otherwise (R. 342 at 8-9), the government's opening statements were consistent with how the government reasonably expected the evidence to come in, based on testimony presented in grand jury proceedings. For example, the quotation cited by McDavid as to the government's expectation that Freeman would testify that Milton Brown placed a copy of Video 4 into a VCR for Freeman to watch, [redacted] even if it did not entirely comport with his eventual testimony at trial. Regardless of who pressed play on the video, it should not be overlooked that Freeman testified consistently about the existence of Video 4 and Kelly and McDavid's efforts to retrieve it. McDavid's contentions in his motion are further undermined by the fact that at no point does he argue that the government misrepresented evidence in its closing arguments. Nor could he. Instead, the government expressly acknowledged potential weaknesses in both the overall credibility and specific testimony of its witnesses (*see e.g.,* Trial Tr. 3707-09), a fact which directly contravenes any possible finding of vexatiousness or bad faith.

**3. Based on the Strength of the Government's Evidence Demonstrating McDavid's Participation in a Conspiracy To Receive and His Actual Receipt of Child Pornography, This Court Denied Defendant's Rule 29 Motion.**

At the conclusion of the government's case-in-chief, and based on the strength on the evidence presented at trial, this Court determined that there was sufficient evidence from which a reasonable jury could convict McDavid of conspiracy to receive, and actual receipt, of child pornography.

As with Count 5, McDavid now raises many of the same arguments regarding Counts 6 through 8 that he raised in his unsuccessful motion for judgment of acquittal. Specifically, in his Rule 29 motion, McDavid argued that the government's case on Counts Six through Eight was "particularly weak" because "[i]t relied almost exclusively on the testimony of two completely unreliable witnesses: Charles Freeman and Lisa Van Allen," both of whom "contradicted themselves an[d] one another to such an extent that they should be deemed incredible as a matter of law." R. 239 at 14. In his instant motion, McDavid has advanced the same fundamental claim. The Court already rejected McDavid's argument, "disagree[ing] that acquittal as a matter of law" was appropriate on Counts Six through Eight, and finding that "[g]iven the current record, the Court will not substitute its judgment on the credibility of the witnesses . . . for that of the jurors." Trial Tr. 2741.

## II. LEGAL STANDARD

The Hyde Amendment provides:

> [T]he court, in any criminal case … may award to a prevailing party other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds

> that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for under Section 2412 of title 28, United States Code [the Equal Access to Justice Act, "EAJA"]. To determine whether to award fees or costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal…

18 U.S.C. § 3006A (Pub. L. 105—119, Title VI, § 617, Nov. 26, 1997); *see also United States v. Sriram*, 482 F.3d 956, 958-89 (7th Cir. 2007) (Hyde Amendment "authorizes the court in a criminal case to award a reasonable attorney's fee to 'a prevailing party, other than the United States,' if the court finds that the government's position was 'vexatious, frivolous, or in bad faith.'"). The Hyde Amendment was modeled on the EAJA, which awards attorney's fees to the prevailing party in civil cases in certain circumstances, and courts lean on civil EAJA cases to analyze Hyde Amendment claims. Unlike in the EAJA context, however, in a criminal case, the defendant has the burden to prove his claims by a preponderance of the evidence. *United States v. Terzakis*, 854 F.3d 951, 954 (7th Cir. 2017); *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1182 (9th Cir. 2003); *United States v. Knott*, 256 F.3d 20, 28 (1st Cir. 2001); *United States v. Truesdale*, 211 F.3d 898, 908 (5th Cir. 2000).

Here, McDavid fails to meet both requirements, in addition to his motion being untimely. First, he has not established, nor could he based on the record to date, that he is a "prevailing party" within the meaning of the statute, with a net worth less than $2 million. And second, he cannot show that the government's position in this case was in any way vexatious, frivolous, or in bad faith.

## III. ANALYSIS

### A. McDavid Has Not Proven His Status as a "Prevailing Party."

McDavid's motion[7] should not proceed because he fails to prove he qualifies as a "prevailing party" under the EAJA. As defendant acknowledges, among the requirements for relief under the Hyde Amendment are that a defendant must show "his net worth was less than two million dollars" at the time of the indictment, *United States v. Adkinson*, 247 F.3d 1289, 1291 n.2 (11th Cir. 2001), a standard derived from the Hyde Amendment's incorporation of the EAJA. *See* 28 U.S.C. § 2412(d)(1)(B) (listing, among other requirements, that any "party" seeking an award of fees and expenses must be "an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed").

In his attempt to satisfy this burden, McDavid offers a mere one-sentence footnote statement that his "net worth was below $2,000,000 when he was indicted and throughout the pendency of his prosecution." R. 342 at 14 n. 5. But this barebones assertion is woefully inadequate under the circumstances. As the Seventh Circuit has explained, "the party seeking to recover its litigation costs . . . [bears] the burden of

---

[7] McDavid's motion for attorney's fees and litigation expenses is also untimely. The Hyde Amendment expressly incorporates the procedures and limitations of 28 U.S.C. § 2142, among which are a provision that requires a party seeking an award of fees or other expenses to submit their application to the court within 30 days of final judgment in the action. *See* 28 U.S.C. § 2142(d)(1)(B); 18 U.S.C. 3006A note ("awards shall be granted pursuant to the procedures and limitations provided for an award under section 2412 of title 28, United States Code"). Here, McDavid was acquitted on September 14, 2022, and the judgment entered on the docket effective as to the same day. R. 336. McDavid did not file the present motion until October 17, 2022. R. 342. Because he filed his motion three days late, it must be denied as untimely. *See United States v. Lange*, 2005 WL 8160512, at *2 (N.D. Fla. Oct. 14, 2005) (denying as untimely defendant's Hyde Amendment motion for attorney's fees and costs when it was filed beyond the 30 days provided in 28 U.S.C. § 2142(d)(1)(B).)

establishing that it [meets] the net worth limitations of the EAJA." *Sosebee v. Astrue*, 494 F.3d 583, 587 (7th Cir. 2007) (citing *Woll v. United States,* 44 F.3d 464, 470 (7th Cir. 1994)). When challenged as to eligibility, "the party seeking such an award must do more than make a bare assertion that it meets the statutory criteria." *Id.* (quoting *Shooting Star Ranch, LLC v. United States*, 230 F.3d 1176, 1178 (10th Cir. 2000)). And courts regularly hold that bare assertions of net worth are insufficient when, as here, "there was contradictory evidence in the record about the plaintiff's net worth." *Id.* (citing *Doe v. United States*, 54 Fed. Cl. 337, 343 (Fed. Cl. 2002)). Such contradictory evidence has included, for example, where "the underlying cause of action began with the assertion that plaintiff was a prospective buyer of a yacht." *Doe*, 54 Fed. Cl. at 343.

Here, as outlined below, the trial record is replete with statements by McDavid himself attesting to his wealth, along with substantial documentary evidence showing the same. Even McDavid's motion for fees concedes that "he must now liquidate real property and other assets in an attempt to pay" outstanding legal fees (R. 342 at 3), suggesting the existence of property and assets the value of which could cover such costs.

- From approximately March 2006 to December 2015, Kelly paid McDavid approximately $11,850,359 for his role as Kelly's business manager. *See* Gov. Ex. 413.

- McDavid testified that he is in the real estate and restaurant business and has owned a restaurant in Chicago since 2009. Trial Tr. 3037. McDavid explained that the income from his real estate enterprises was "substantial" because he had "six or seven properties." Trial Tr. 3039-40.

- McDavid testified that from at least 2006 until 2013, he earned 10 percent of Mr. Kelly's earnings, which, upon questioning from counsel, he explained had "made [him] a lot of money." Trial Tr. 3454. These earnings included $1 million in commissions alone in 2008. Trial Tr. 3459. Elsewhere, McDavid admitted that upon questioning that he "ma[de] several million dollars working for R. Kelly." Trial Tr. 3581; *see also* Trial Tr. 3583.

Because the trial record contradicts McDavid's present assertion that he did not have a net worth of $2 million at the time he was indicted, the government respectfully requests the court begin by ordering an affidavit from McDavid attesting to his financial situation at the time of the July 2019 indictment in light of the EAJA's requirements. *See Sosebee*, 494 F.3d at 588 ("Insofar as the district court was saying that an affidavit of net worth would be an efficient way of presenting evidence [as to party status under the EAJA] … we agree with it.").

**B. The Government's Investigation and Prosecution of McDavid Was Not Frivolous, Vexatious, or in Bad Faith.**

On its merits, McDavid's motion nonetheless fails because it does not establish the government's investigation or prosecution of him was in any way frivolous, vexatious, or in bad faith as the Hyde Amendment requires. It should not be discounted that a federal grand jury returned an indictment, a threshold showing of probable cause, against McDavid. Nor should the court's denial of McDavid's request for a judgment of acquittal be forgotten or diminished, (R. 306), itself serving as a determination that there was evidence sufficient to sustain a conviction based on the government's case-in-chief alone.

In arguing to the contrary, McDavid offers only self-serving and misleading excerpts from the trial record—a review of the case in its entirety shows the merit

and propriety of the government's prosecution from start to finish. *See Commissioner v. Jean*, 496 U.S. 154, 161-62 (1990) ("… the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than atomized line-items.") Accordingly, McDavid cannot prove, as he must, by a preponderance of the evidence that the government's position or conduct in this case was vexatious, frivolous, or in bad faith. *See United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) ("From the plain meaning of the language Congress used, it is obvious that a lot more is required under the Hyde Amendment than a showing that the defendant prevailed at the pre-trial, trial, or appellate stages of the prosecution. A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct … ."); *United States v. Monson*, 636 F.3d 435, 439 (8th Cir. 2011) ("Requiring proof of prosecutorial misconduct thus means that a defendant seeking to prove entitlement to a Hyde Amendment award faces a 'daunting obstacle.'"); *United States v. Schneider*, 395 F.3d 78, 86 (2d Cir. 2005) (Hyde Amendment claims should be analyzed "consistent with the legislative purposes that guided Congress in enacting the statute—to penalize government for prosecutorial abuses and to deter such inappropriate conduct").

Indeed, McDavid's motion does not offer a description of prosecutorial misconduct or abuse in a manner that even approaches the threshold needed to surmount this "daunting obstacle." *Monson*, 636 F.3d at 439. Instead, McDavid relies on mere inconsistencies in witness testimony that do not serve to undermine the validity of the prosecution when viewed in whole. Furthermore, he conveniently omits

the facts that the jury viewed Videos 2 and 3, and convicted Kelly on counts related to the same, thus demonstrating that the jurors found purportedly "incredible" witnesses credible to a significant degree. He likewise ignores the presence of corroborating witnesses and documentary evidence that support in material fashion the recollections of Van Allen, Freeman and Murrell. For all the above reasons, his motion should be denied.

**1. The Government's Investigation and Prosecution of McDavid Was Not Vexatious.**

To prove that the government's investigation and prosecution was vexatious, McDavid must show that the government acted maliciously or with an intent to harass him, and that the indictment was deficient or without merit. *Manchester Farming*, 315 F.3d at 1182; *Knott*, 256 F.3d at 29. As the First Circuit explained in *Knott*, requiring a finding of both objective deficiency in the case and a showing of maliciousness or intent to harass or annoy "best comports with the language employed by Congress." 256 F.3d at 29. *Knott* continued: "This is especially so when considered in the context of Congress's concern to protect against prosecutorial misconduct while at the same time providing a sufficiently stringent standard to avoid undermining appropriate prosecutorial zeal." *Id.*

McDavid does not argue that the government directly harassed or acted maliciously toward McDavid. Instead, he argues that the government's investigation and prosecution was vexatious because it "was without reasonable or probable cause or excuse," namely that (1) there was no excuse for claiming payments after 2014 were for the purchase of silence by Jane; (2) there was no excuse for claiming the legal

settlement between McDavid and Kelly was for an illicit purpose; and (3) there was no excuse for advancing to the jury the theory regarding the videotape in support of Counts 6-8 when witnesses testified inconsistently. R. 342 at 16.

But this Court has already ruled in a manner which would preclude a finding of vexatiousness founded on McDavid's first two arguments, denying McDavid's Rule 29 motion because, among other reasons, "a rational jury could infer that these payments were made to keep Jane and McDavid from coming forward." Trial Tr. 2737-38. And as to the third basis, relying on imperfect witnesses does not and cannot render the government's position vexatious: "[T]he government is often saddled with imperfect witnesses, requiring juries to sift through and evaluate the testimony despite these shortcomings." *United States v. Schneider*, 395 F.3d 78, 86 (2d Cir. 2005). A finding of vexatiousness cannot result every time this occurs during an investigation or trial. Even then, these witnesses agreed on certain core aspects, such as the existence and general provenance of the videos, the descriptions of the contents contained therein, the fact that McDavid was involved in their re-acquisition by Kelly, and the fact that McDavid viewed at least one of the videos.

Nor is McDavid correct in contending that the testimony presented to the jury at trial was so inconsistent as to be incredible. On the contrary, it is clear that the jury granted the testimony of Van Allen and Freeman at least some credence and weight during their deliberations—such testimony supported the jury's finding beyond a reasonable doubt that Videos 2 and 3 were transported in interstate commerce.

**2. The Government's Investigation and Prosecution of McDavid Was Not Frivolous.**

A case is frivolous when it is groundless and has little chance of success because, for example, it is foreclosed by binding precedent, *Manchester Farming*, 315 F.3d at 1183, or is "utterly without foundation in law and fact." *Monson*, 636 F.3d at 440. McDavid does not contend the government's case was foreclosed by binding precedent. Instead he argues that, with regard to Count 5, the government produced no evidence for a reasonable juror to conclude any overt act occurred during the limitations period and, with regard to Counts 6-8, the government's theory was not supportable by testimony and evidence at trial. R. 342 at 15.

Again here, this Court's prior determinations on McDavid's Rule 29 motion are compelling in that the government presented sufficient evidence in its case-in-chief to convict McDavid on all counts. With regard to Counts 6 through 8 in particular, the Court found that, based on the evidence presented, "a rational jury could find that all three defendants conspired to receive child pornography and that Kelly and McDavid actually received it." Trial Tr. 2471. Such findings are directly relevant to a frivolousness analysis, and should serve to preclude relief on the basis of that argument. *See United States v. Curtin*, 107 F. Appx 767, 769 (9th Cir. 2004) (affirming the district court's denial of a Hyde Amendment motion as well as its finding that although "the case was weak," it was "not frivolous," and in doing so, observing that "the district court denied defendants' Rule 29 motion, concluding that a reasonable jury could believe the victim's account").

**3. The Government's Investigation and Prosecution of McDavid Was Not in Bad Faith.**

Bad faith "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; … it contemplates a state of mind affirmatively operating with furtive design or ill will." *Gilbert*, 198 F.3d at 1299; *Manchester Farming*, 315 F.3d at 1183. That did not happen here. McDavid argues the government acted in bad faith because it mischaracterized evidence in its opening statement and relied on witnesses who testified with inconsistency at trial. R. 342 at 17-18. This, McDavid argues, was the result of the government making "no effort to determine which, if any, of the witnesses' irreconcilable stories were true." *Id.* at 18.

But for all of the reasons stated above, McDavid's contentions fall well short of the bad-faith standard and represent a purposeful mischaracterization on his part not only of the diligent efforts of investigators and prosecutors during the pendency of the case, but of the true state of the evidence as well. Here, too, the Court has already disagreed with McDavid's line of analysis. When defense counsel raised a *Napue* claim based on the purportedly false testimony of witnesses at trial, the Court did not sustain or even entertain such a finding. It instead directed the defense to address any witness inconsistencies through the far more routine remedy of cross-examination. Moreover, and as already noted, in its closing arguments, the government expressly acknowledged potential weaknesses in both the overall credibility and specific testimony of its witnesses (*see, e.g.,* Trial Tr. 3707-09), a fact which directly contravenes any possible finding of bad faith.

The argument that the government operated in bad faith when bringing and prosecuting the case against McDavid is even less credible when viewed through the lens of the entirety of the evidence accumulated during the investigation, not just the evidence presented at trial. That universe of evidence included, for example, [REDACTED] The undisputed existence of this evidence—coupled with the evidence the jury did hear, as well as this Court's Rule 29 rulings substantiating the strength of that evidence—more than demonstrates the reasonableness of the government's conduct in its prosecution of McDavid.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny defendant's motion, or, in the alternative, require McDavid to prove that he is a "prevailing party" for purposes of the Hyde Amendment.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: */s/ Brian Williamson*
JEANNICE APPENTENG
ELIZABETH R. POZOLO

JASON A. JULIEN
BRIAN WILLIAMSON
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300