UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19 CR 567 |
| | ) | |
| -vs- | ) | |
| | ) | Hon. Harry D. Leinenweber |
| | ) | |
| ROBERT SYLVESTER KELLY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT KELLY'S SENTENCING MEMORANDUM

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

## <u>TABLE OF CONTENTS</u>

INTRODUCTION..................................................................................................................1

BRIEF FACTUAL BACKGROUND..................................................................................3

ARGUMENT.......................................................................................................................4

I.     The Guidelines Sentencing Range Is 135 to 168 Months' Imprisonment..........................4

     A.    *Ex Post Facto*..................................................................................................5

     B.    Offense Levels.................................................................................................5

     C.    Grouping........................................................................................................14

     D.    Criminal History Category............................................................................14

     E.    Combined Offense Level................................................................................16

II.    The Sentence Should Run Concurrent to Kelly's 30-Year EDNY Sentence...................17

III.   Application of § 3553(a) Factors Demands a Low Guidelines-Range Sentence..............19

     A.    The Nature and Circumstances of the Offense..........................................19

     B.    The History and Characteristics of the Defendant....................................21

     C.    The Sentence Must Be Sufficient But Not Greater than Necessary to Satisfy the Sentencing Goals..................................................................................27

          1.    Reflect Seriousness of the Offense; Promote Respect for the Law; and to Provide Just Punishment for the Offense..................................27

          2.    To Afford Adequate Deterrence............................................................28

          3.    To Protect the Public from Further Crimes of the Defendant.................30

          4.    To Provide Defendant With Needed Treatment......................................30

CONCLUSION..................................................................................................................31

## INTRODUCTION

Robert Kelly, 56 years old, is currently serving a 30-year sentence of incarceration dispensed by the United States District Court for the Eastern District of New York ("EDNY") in connection with the case *United States v. Kelly,* 19 CR 286. A 30-year sentence of imprisonment for an African American man with diabetes is a life sentence statistically speaking.[1] Because the crimes for which Kelly was convicted in this prosecution could have, and should have, been brought pursuant to the EDNY Racketeer Influenced and Corrupt Organizations Act ("RICO") prosecution, significant incremental punishment is not warranted, particularly where Kelly is already serving a *de facto* life sentence.

As fleshed out below, the EDNY prosecution charged Kelly with RICO under a theory that he engaged in a pattern of racketeering activity between 1994 and 2018 as part of an enterprise that had the purpose of recruiting women and girls to engage in illegal sexual activity and to produce child pornography. (Ex. A - EDNY Superseding Indictment at ¶2) The charges brought in this district could have been brought in the EDNY indictment since the conduct alleged in this prosecution occurred during the relevant time period and was covered by the purpose of Kelly's alleged RICO enterprise. Kelly faced a guidelines range of life in prison in the EDNY case and was sentenced to 30 years. As a matter of fairness and double jeopardy, Kelly should not face consecutive sentencing where piece-meal prosecution by the federal government was designed to unfairly enhance his punishment. The federal government's obsession with ensuring that Kelly dies in prison is particularly troubling where it seems to have no appetite for

---

[1] The United States Sentencing Commission Preliminary Quarterly Data Report indicates that a person held in a general prison population has a life expectancy of about 64 years. *People v. Buffer,* 2017 IL App (1st) 142931, ¶59. *see also, United States v. Nelson,* 491 F. 3d 344, 349-50 (7th Cir. 2007) (acknowledging the decreased life expectancy for incarcerated individuals based on United States Sentencing Commission data).

investigating or initiating prosecutions of numerous other famous (White) musicians with credible histories of sexually abusing underage women.

As set out below, Kelly accepts that he faces a mandatory prison sentence of 10 years in connection with his convictions here. However, Kelly contends that his guidelines range is 135 to 168 months' imprisonment. The government inappropriately places the range higher at 168 to 210 months' imprisonment on the erroneous claim that the inducement counts carry higher adjusted offense levels than they do. Because Kelly did not use physical force, threats of force, or tactics instilling fear in Jane, Pauline or Nia to gain their compliance in the prohibited sexual conduct, the government's efforts to artificially raise the offense level of the inducement counts must be rejected.

When considering the factors set forth in 18 U.S.C. § 3553(a), including Kelly's significant mitigation evidence and the fact that he is already serving a 30-year sentence for a "pattern of racketeering activity" that could have included the conduct alleged in the NDIL indictment, a concurrent sentence at the lower end of the guidelines range is sufficient but not greater than is necessary to comply with the purposes of sentencing. A consecutive sentence will serve no specific deterrent as Kelly is likely to die in prison either way. Even if he beat the statistical odds, he would not be released from prison until well into his 80s, long after he is a threat of any kind to the general public. A consecutive sentence serves no general deterrent purpose either (at least no stronger purpose than what has been accomplished with his EDNY sentence) since the government (and society at large) have reserved a unique, unprecedented contempt for Kelly that is wanting as to his similarly situated White counterparts. In fact, iconic White musicians like Elvis Pressley, who married his 14-year old girlfriend, are currently being celebrated in Academy nominated movies. In contrast, the government argues that one life

sentence isn't enough for Kelly. No one will be deterred by a consecutive sentence in this case because no one believes that they will ever face the punishment Kelly has faced for the same exact conduct.

This Court is tasked with sentencing Kelly to an appropriate sentence that addresses the harms a jury found he caused, but an appropriate sentence is a lower guidelines-range sentence run concurrent to the EDNY case which is the functional equivalent of a life sentence. Such a sentence punishes Kelly for conduct that is over a quarter-century old while taking into account his individual characteristics that include his own horrific child sexual abuse that shaped him and provides some explanation (not an excuse) for the conduct that underlies his convictions in this case.

## **BRIEF FACTUAL BACKGROUND**

Kelly was convicted of three separate offenses of 18 U.S.C. §2251(a), stemming from the creation of three videos depicting sexual conduct with Jane who testified that she was 14-years old at the time the videos were created. Defendant was also convicted of violating 18 U.S.C. §2422(b) as to Jane with whom he had a relationship that lasted roughly 12 years.

The jury returned two additional guilty verdicts for violations of 18 U.S.C. §2422(b) as to Nia and Pauline. Nia testified at trial that Kelly fondled her in a hallway at his studio on a single occasion when he was 29 years old and she was either 15 or 16 years old. Nia testified that the isolated encounter occurred the summer of 1996 but she could not state precisely when the incident occurred. Pauline testified that she began engaging in sexual conduct with Kelly when she was 15 years old. The prohibited sexual relationship endured long after Pauline became an adult and she considered Kelly her boyfriend.

Kelly was acquitted of all remaining counts of the indictment.

**ARGUMENT**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007). After a proper calculation, a sentencing judge considers the seven factors set forth in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant;" the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available;" the applicable Guidelines range itself; and relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants;" and "the need to provide restitution to any victims." 18 U.S.C. § 3553 (a)(1)-(7); *see also, Gall,* 552 U.S. at 50, n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553 (a)(2).

**I.    The Guidelines Sentencing Range Is 135 to 168 Months' Imprisonment.**

Defendant's guidelines range for the instant case is 135 to 168 months' imprisonment - not 168 to 210 months as the government argues.[2]

---

[2] The range is certainly not as probation contends where probation clearly did not read the testimony of the complaining victims, ripped much of the PSR from the EDNY case, and demonstrated a concerning bias where it attributed a criminal history point to Kelly based on an

4

A. *Ex Post Facto*

The government advocates application of the 1997 Federal Sentencing Guidelines. Kelly agrees that the 1997 Sentencing Guidelines should apply since the conduct for which Defendant was convicted occurred prior to November 2000. Probation applies the 2000 sentencing guidelines. Probation applies the wrong guidelines, but it does not seem to impact the guidelines range.

B. **Offense Levels**

1. **Counts 1 through 3 - "the child pornography counts"**

| | |
|---|---|
| Base Offense Level | 27 |
| Adjusted Offense Level | 29 |

Defendant agrees with the government that the base offense level is 27 pursuant to Guideline § 2G2.1(a). Defendant further concedes that a two-level enhancement is appropriate pursuant to § 2G2.1(b)(1) because Jane was over the age of 12 but under the age of 16. This would be true whether applying the 1997 or 2000 guidelines.

2. **Count 9 - "inducement count" as to Jane**

---

"unsourced internet article." In its recommendation of a maximum guidelines sentence, probation did not even accurately summarize the conduct for which Kelly was convicted. For example, probation summarized conduct related to Nia that was neither pled in the charging instrument nor related to the count for which Kelly was convicted. Probation claims that Kelly's conduct against Nia was "not a one, or two-time occurrence" when it was precisely a two-time occurrence and did not involve anything more than touching. In its recommendation, probation relied heavily on facts that a jury expressly rejected and even invented facts that were never alleged by anyone. A jury rejected the government's evidence that Kelly enlisted people to retrieve contraband. The jury acquitted all *three* defendants of receiving child pornography which demonstrates that the jury clearly rejected the government's claim that Kelly "enlisted persons " to obtain any tapes. Probation seems to have blatantly ignored the jury's verdict to the extent that it benefits Kelly. Probation even boldly claims in its recommendation that Kelly began "blackmailing" Jane. This is nothing short of a fabrication. In sum, probation did not do its job. It demonstrated extreme bias and a lack of competence in putting together the PSR. Its recommendation should be ignored.

| | |
|---|---|
| Base offense level | 15 |
| Adjusted offense level | 15 |

The base offense level for this count is 15 pursuant to §§ 2G1.1(c)(3) and 2A3.2. The parties agree that the starting point for calculating an offense level for the inducement counts is § 2G1.1 but the parties disagree on which cross reference sub-section applies, if any. Section 2G1.1(c)(2) & (3) read as follows:

(2) If the offense involved criminal sexual abuse, attempted criminal sexual abuse, or assault with intent to commit criminal sexual abuse, apply §2A3.1 (Criminal sexual abuse; Attempt or Assault with Intent to Commit Criminal Sexual Abuse)

(3) If the offense did not involve promoting prostitution, and neither subsection (c)(1) nor (c)(2) is applicable, use the offense guideline applicable to the underlying prohibited sexual conduct. If no offense guideline is applicable to the prohibited sexual conduct, apply §2X5.1 (Other Offenses).

The application notes provide that the cross reference at subsection (c)(3) addresses those cases where the offense did not involve promoting prostitution and neither (c)(1) not (c)(2) applicable and includes such prohibited sexual conduct as criminal sexual abuse of a minor under 18 U.S.C. § 2243(a).

Contrary to the government's position (and the position of probation), Kelly's sexual contact with Jane did not involve an offense of "criminal sexual abuse" or "aggravated criminal sexual abuse" as defined by federal law and the law of this Circuit, since it did not involve force or threat of force or the use of fear to engage Jane in the prohibited conduct. Accordingly, cross referencing to § 2A3.1 is prohibited.

Section 2A3.1 of the sentencing guidelines applies when a defendant has committed the offenses of 18 U.S.C. §§2241 or 2242. *See* USSG § 2A3.1, comment. A violation of 18 U.S.C. § 2241, also known as aggravated sexual abuse, can be reached when a person "knowingly causes another person to engage in a sexual act - (1) by using force against that person; (2) by

threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping." 18 U.S.C. §2241(a). Force "is the exertion of *physical* power upon another to overcome that individual's will to resist." *United States v. Cates,* 973 F. 3d 742, 745 (7th Cir. 2020) (emphasis added). The Seventh Circuit has expressly rejected any interpretation of "force" to mean psychological coercion rather than *physical* force. *In re Cates v. United States,* 882 F. 3d 731, 737 (7th Cir. 2018) (emphasizing that in order to convict on aggravated sexual abuse, the jury must find the defendant used actual physical force against the victim or made a specific kind of threat like fear of death, serious bodily injury, or kidnapping).

Section 2A3.1 of the sentencing guidelines would also apply if Kelly committed a violation of 18 U.S.C. § 2242. Notably, the government did not charge Kelly with a violation of 18 U.S.C. § 2242 and a jury was never asked to decide whether the elements of sexual abuse were satisfied. A violation of 18 U.S.C. § 2242, also known as sexual abuse, requires the government to prove that the defendant "knowingly causing another to engage in a sexual act by threatening them or placing them in fear." *United States v. Boyles,* 57 F. 3d 535, 544 (7th Cir. 1995). The fear contemplated by section §2242(1) excludes such fear that a person will be subjected to death or serious bodily injury but encompasses the use of any kind of threat or other fear-inducing coercion to overcome the victim's will. *Cates v. United States,* 882 F. 3d 731, 737 (7th Cir. 2018).

The record fails to reflect *any* evidence whatsoever that Kelly used "fear" or threats to coerce Jane into prohibited sexual conduct; the government never claimed as much at trial. In a highly instructive case, *United States v. Law,* 990 F. 3d 1058 (7th Cir. 2021), a jury convicted the defendant Rita Law of sex trafficking and forced labor. Law owned and operated three massage spas that offered sex services to its customers. *Id.* at 1060. Two of Law's "employees," HV and

XC who were born in Vietnam and China respectively and traveled to work for Law at her massage spas. They spoke no English and had no support systems in the United States. The evidence at trial revealed that once at the spa, Law forced HV to provide sex services to customers by claiming that HV's husband owed her a debt that HV had to work at the spa to pay off Law. Law bullied XC into providing sex services and demanded money for room and board. HV and XC were pressured into working at the spas under brutal conditions, were not permitted to leave the spas unaccompanied, were denied hourly wages and adequate food. Law confiscated HV and XC's passports and threated to have them arrested if they did comply with her demands to provide sex services; Law also physically intimidated the women. On one occasion, when HV called Law and told her she was experiencing severe bleeding and feared a miscarriage, Law did nothing and forced her back to work at the spa the following afternoon. *Id.* at 1061. On appeal from her sex trafficking and forced labor convictions, Law challenged, *inter alia,* the district court's application of § 2A3.1 of the sentencing guidelines, as defendant does here, challenging the "fear" element of a §2242 violations. The Seventh Circuit affirmed finding that Law had placed HV and XC in fear in a number of ways including threatening to have them arrested, threatening them financially, and threatening them physically.

In contrast, the record is devoid of any evidence whatsoever that Kelly ever threatened Jane or placed Jane in "fear" of any type of harm. At no point during her days of testimony did Jane testified that Kelly made her feel fearful and that was the reason she engaged in prohibited sex with him. Indeed, the government's entire theory, as kicked off by Dr. Turner's testimony, was that Kelly groomed Jane, manipulated her, and induced her into prohibited sexual conduct through a number of ways. But there is simply no evidence that "threats" or "fear" was a tactic utilized by Kelly.

8

Janes testified about how the relationship first turned physical when she was 14 years old:

> So we were sitting in the office area of the studio on the couch, talking, watching
> TV. And obviously we had began phone sex. And this particular time it became
> more physical with touch of the breasts and him rubbing on [her genitalia area]
> (R731) Jane explained that the sexual contact eventually escalated (Ex. B - Jane's
> testimony at R735)

When asked why she engaged in sex talk with Kelly, Jane responded, "I just kind of went with the flow. She said, he was an adult and that she looked up to him, "so again, I went with the flow." (*Id.* at R753-754) Although at one point in her testimony Jane testified that she participated in the prohibited sexual conduct because of "intimidation" she immediately explained that Kelly was an adult and that she "looked up to" him. She called herself a passive person and stated, "I just kind of went along with things, and then it somewhat became normal." (*Id.* at R754) Jane did not say she feared Kelly or that he said or did anything to instill any type of fear in her that caused her to have sexual contact with him. When asked to elaborate why she had sexual relations with Kelly, Jane testified "I started having feelings for him. I was attracted to him in that way and things were happening so frequently, it was kind of just like being done out of repetition." (*Id.* at R755) She testified "I developed feelings for him, and I felt good about our interactions. . . That he loved me, that he would take care of me, that he was my protector." Jane repeatedly stated that Kelly made her feel good.

Although the government may have plenty to say about Kelly's tactics in inducing Jane into a sexual relationship when she was underage, the use of threats or fear was not why Jane engaged in sex with Kelly during the first five years of their decade-long relationship. Jane testified that the relationship turned darker after Mr. Kelly was acquitted in 2008. When asked how the relationship changed and when, Jane testified, "[i]t changed after the trial was complete. It changed for the worse as far as other women being involved, as far as abuse coming into play

and things of that nature." (*Id.* at R831-832) Jane was 23 or 24 years old at the time Kelly was acquitted and when the relationship allegedly "changed."

A fair and honest review of Jane's testimony leads to the inescapable conclusion that the applicable cross reference provision is § 2G1.1(c)(3) because Kelly's conduct as described by Jane arguably satisfies the elements of 18 U.S.C. § 2243(a) *not* 18 U.S.C. §§ 2242 or 2241. Section 2243(a), sexual abuse of a minor, occurs when a defendant "knowingly engaged in a sexual act with another person who has attained the age of 12 but has not attained the age of 16; and is at least four years younger that the person so engaging." 18 U.S.C. § 2243(a).

To find the defendant guilty of the inducement count, the jury had to conclude that defendant violated the Illinois aggravated criminal sexual abuse statute which generally incorporates in different sub-sections 18 U.S.C. §§ 2241, 2242, *and* 2243. The government's proposed jury instruction *only* included a theory related to statutory rape and did not ask the jury to consider whether defendant used threats or force. The jury was instructed that to find that defendant guilty of the inducement counts, it had to find beyond a reasonable doubt that:

> A person commits aggravated criminal sexual abuse if that person commits an act of sexual penetration or sexual conduct with a victim who is at least 13 years of age but under 17 years of age and the person is at least 5 years older than the victim (Ex. E at pg. 38)

This language is akin to the elements of §2243(a) *not* §§ 2241 or 2242. A person is capable of committing aggravated criminal sexual abuse under Illinois law by using threats of force but the evidence was so lacking the government did not even bother to offer this instruction to the jury as an alternative means of finding a violation of the statute.

The record speaks for itself. Jane did not testify that Kelly used *threats* of any kind or did or said anything that created a fear that compelled her to engage in prohibited sexual behavior. Quite the opposite, Jane described Kelly as showing her affection and love that caused her to

participate in the prohibited sexual conduct. That Jane testified that defendant later engaged in some abusive behavior *after* he was acquitted in 2008 is irrelevant to whether he used threats or fear to gain her compliance with the prohibited sexual behavior. Accordingly, there is no evidentiary basis to support application of the cross reference § 2G1.1(c)(2). The most applicable cross reference is §§ 2G1.1(c)(3) and 2A3.2 which means that the adjusted offense level for this inducement count is 15.

### 3. Count 10 - "inducement count" as to Nia

| | |
|---|---|
| Base offense level | 15 |
| Adjusted offense level | 15 |

As was the case with count nine, the base offense level for this count is 15 pursuant to §§ 2G1.1(c)(3) and 2A3.2. As argued, *supra,* the record is devoid of any evidence that defendant used force, threats of force, threats of any kind, or fear tactics to engage Nia in the prohibited sexual contact at his studio when she was 15 or 16 years old in the summer of 1996.

Nia testified unequivocally that she met Kelly in a mall in Atlanta when she was 15 years old and he invited her to a concert in Minneapolis. Nia explained that she was attracted to Kelly and had romantic feelings for him. (Ex. C -Nia's Testimony at R2591) She stated she spoke to him numerous times by telephone and she "felt very good" when she spoke to him and she looked forward to seeing him. (*Id.* at R2591) Nia testified that she traveled to Minnesota for the concert and called Kelly when she arrived. She attended the concert but only saw him the following morning when he came to her hotel room. (*Id.* at R2598) Nia testified that Kelly kissed her, touched her breasts, kissed her breasts and then masturbated. (*Id.* at R2602) Kelly told her that he wanted her to come to Chicago and she accepted the invitation. (*Id.*)

11

Kelly did not follow up on the invitation and did not book any arrangements for Nia to come to Chicago. (*Id.* at R2605) However, Nia made her own arrangements and went to stay with family in Chicago that summer unbeknownst to Kelly. (*Id.* at R2605; 2635) Nia called Kelly and he invited her to his studio but made no arrangements for her to get there. Nia convinced her cousins to take her to the studio. (*Id.* at R2606) Nia arrived at the studio with her cousins and Kelly showed them around and took them to a waiting area where they could see him record. Nia and her cousins stayed most of the evening but Kelly was recording and was not hanging out with Nia and her cousins for most of the evening. (*Id.* at R2610) At some point, Nia was told Kelly wanted to talk to her in the hallway and Nia went into the hallway to see Kelly. Nia testified, "he greeted me with a hug, with a kiss, and held on to her for a moment" and they "kind of made out a little." (*Id.* at R2611) Nia elaborated, "I remember his hand being around my waist on my bottom, my butt. And then he motioned his hands into my pants as we kissed. And he fondled my chest, and he, you know, kissed we just kind of made out within the time frame that we were in the hallway." (*Id.* at R2612) Nia stated, "he touched my vagina and he caressed my bottom, my behind." (*Id.* at R2612) Nia testified that before she left, she had a similar encounter with Kelly. She stated they "embraced, hugged. He held on to me, held my bottom and things of that nature but it wasn't as long as the first on. It was more of like, you know, kind of, like a good-bye, see you later." (*Id.* at R2613)

Nia never saw or spoke to Kelly again. But in 2002, Nia sued Kelly and the case settled for $500,000. (*Id.* at R2615; 2617)

There is not a single word in Nia's testimony from which any jury or any judge under any standard of proof could find or infer that Kelly used threats or fear tactics to engage Nia in prohibited sexual contact. Nia was extremely forthcoming when she testified that she approached

Kelly for an autograph in Atlanta and that they spoke on the phone and she was excited when he invited her to Minnesota to see a concert, so excited that she bought him a red rose on the way there. As to the charged offense in Chicago, Nia admitted that *she* went to Chicago to see him and contacted him - not the other way around. There was a quick encounter in the hallway at his studio where he fondled her; they embraced and kissed; and Kelly touched her vaginal area. Nia was hurt and upset when Kelly did not return her phone calls after that encounter.

The government cannot point to testimony whatsoever that suggests that defendant committed an act of sexual abuse pursuant to 18 U.S.C. §§ 2241 or 2242. The applicable statute in this case is 18 U.S.C. §§ 2243 (which is incorporated into the Illinois criminal sexual abuse statute on which the jury was instructed). As such, The applicable cross reference is §§ 2G1.1(c)(3) and 2A3.2 which means that the adjusted offense level for this inducement count is 15.

### 4.  Count 12  - "inducement count" as to Pauline

|  |  |
|---|---|
| Base offense level | 15 |
| Adjusted offense level | 15 |

As with the prior inducement counts, the base offense level for this count is 15 pursuant to §§ 2G1.1(c)(3) and 2A3.2. Pauline's testimony is devoid of any claim that the defendant threatened her (physically or otherwise) or instilled "fear" in her to gain her compliance in prohibited sexual conduct. Pauline testified that after she discovered Kelly and Jane engaged in sexual conduct, she began engaging in sexual conduct with Kelly and Jane. Pauline considered Kelly her boyfriend and stated she loved Kelly. When asked the objectionable question of why she was testifying, Pauline testified that she takes responsibility for having sex with Kelly and that she probably could have just said "no," but she loved him. (Ex. D - Pauline's Testimony at

13

R2317) Pauline offered that she still loves him and that he was like "best friend meets boyfriend meets dad in one person."

While the government's argument that Kelly "groomed" Jane and Pauline and induced and exploited them in manipulative ways is fair game, the government cannot convert this testimony into a claim that Kelly used threats or fear to compel the prohibited sexual conduct with Pauline - or any other victim. In addition to the testimony itself, this Court should look at the government's closing argument. The government never once argued that Kelly used any types of threats or fear to compel the prohibited sexual activity.

There is no evidentiary support for the government (and probation's) claim that Kelly used threats or fear to gain Jane, Pauline, and Nia's compliance. As such, an offense level of 27 (adjusted offense level of 29) for the inducement counts is not permissible.

### C.     Grouping

Defendant concedes that the production of child pornography is not a groupable offense pursuant to USSG § 3D1.1 notwithstanding that the counts all involve the same victim.

### D.     Criminal History Category

Defendant and the government agree that Kelly's criminal history category is II. Probation contends that Kelly's criminal history category is III because an unidentified "internet source" reveals that he pled no contest and received unsupervised probation in 1997 in connection with a simple battery charge. Probation admits that it has been unable to obtain *any* court records that reflect Kelly's plea of no contest, his sentence, or proof of how the case was resolved. Instead, it relies on an unsourced "internet article" containing information that was allegedly obtained from pleadings in a related civil case. Probation cannot even identify the "internet article" on which it relies. Critically, Mr. Alper who prepared the PSR contacted

14

undersigned counsel earlier this week and conceded that a law enforcement representative from Louisiana informed him that the arrest and disposition from the 1996 Louisiana arrest was expunged, but Mr. Alper has yet to amend the PSR to reflect that Kelly should not receive a criminal history point from this incident since expunged convictions cannot be counted toward criminal history points.[3] *See* USSG § 4A1.2(j)

An unidentified internet source is hardly reliable information on which probation should be relying to increase Kelly's criminal history category. In applying the guidelines, the guidelines range must be established by the government by a preponderance of *reliable* evidence. *United States v. Moore,* 52 F. 4th 697, 700 (7th Cir. 2022). USSG § 6A1.3 (comment "The Commission believes that the use of preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding the application of the guidelines to the facts of a case.") "The court may consider relevant information without regard to its admissibility under the rules applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy." *Id. see also United States v. Polson,* 285 F. 3d 563, 566 (7th Cir. 2002). A district court may consider hearsay evidence in determining a defendant's sentence but the hearsay evidence must be reliable. *Id.*

Probation can offer no reliable evidence that shows that Kelly pled no contest to a simple battery in 1997 for a sentence of unsupervised probation that was *not* expunged. Indeed, if the

---

[3] Demonstrating probation's clear bias against Mr. Kelly, Mr. Alper told undersigned counsel that he was trying to get further information about the expungement with the help of the government. Mr. Alper explained, in sum and substance, that he couldn't just rely on the hearsay statements of a law enforcement official in Louisiana, "that's just not how we do things." Only it's exactly how probation did it when they hit Kelly with a criminal history point based entirely on an unsourced internet article. Presumably the hearsay statement of a law enforcement officer is more reliable than an unidentified "internet article." Apparently, hearsay is only unreliable to probation when it works to the benefit of Kelly.

incident happened at all, it seems obvious that it was expunged based on the representations of a law enforcement official in Louisiana and the fact that no documents from the proceedings are available. Expungement aside, an unsourced internet article that probation cannot even cite based on some information about a *civil* case that references a prior criminal case is not reliable evidence. Indeed, this "evidence" is not mere hearsay; it constitutes four or five levels of hearsay and lacks foundation since probation does not even identify the mystery "internet article" that serves as the source of the information. An unknown internet reporter for an unknown online publication obtained information from a civil court proceeding or document that apparently referenced a distinct criminal proceeding for which there are no available records and then reported that information in an unknown, unnamed "internet article." This information is not sufficiently reliable to raise Kelly's criminal history category. Thus, Kelly's criminal history category is II.

### E.    Combined Offense Level

The combined offense level is 32. As USSG § 3D1.4 instructs, the offense level applicable to the Group with the highest offense level is 29 which relates to one child pornography count. Because Kelly was convicted of two additional child pornography counts which are equally serious, three levels are added to the highest offense level of 29 for a total combined offense level of 32. Because the inducement counts have an adjusted offense level of 15 as discussed, *supra,* they do not increase the offense level.

Accordingly, Kelly's guidelines range is 135 to 168 months' imprisonment. Defendant concedes that he is subject to a statutory minimum sentence of ten years' imprisonment.

## II.   The Sentence Should Run Concurrent to Kelly's 30-Year EDNY Sentence

Pursuant to USSG § 5G1.3(c), the sentence in this case may be imposed concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense. Application Note 4 directs the court to consider the following factors:

> (a)   the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;
> (b)   the time served on the undischarged and the time likely to be served before release;
> (c)   The fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
> (d)   any other circumstances relevant to the determine of an appropriate sentence for the instant office.

The foregoing factors militate in favor of a concurrent sentence. Kelly has been sentenced to a 30-year sentence which as discussed, *supra,* is tantamount to a life sentence. According to data compiled by the sentencing commission the average life expectancy of an inmate in general population is 64 years old; Kelly is already 56 years old and has barely begun his sentence. Kelly's health issues do not improve his chances of discharging his EDNY sentence. Additionally, the sentence was imposed by another federal court, rather than a state-court.

Another relevant circumstance for this Court to consider is that Kelly's punishment has been enhanced because the government unnecessarily engaged in piece-meal prosecution of him, presumably with the purpose of increasing his punishment. In fact, Kelly's northern district prosecution arguably runs afoul of due process and double jeopardy principles where the offenses charged in this case were covered by EDNY's RICO prosecution.

Because the government rarely (if ever) prosecutes defendants in separate, simultaneous prosecutions as the government did here, there is no authority to address whether consecutive

sentences would violate due process or double jeopardy prohibitions. However, the Supreme

Court decision in *Rutledge v. United States*, 517 U.S. 292, 307 (1996) is instructive. In *Rutledge,*

the United States Supreme Court held that narcotics conspiracy is a lesser included offense of a

continuing criminal enterprise and that it is therefore unconstitutional to impose cumulative

punishments for both crimes. That means that if one U.S. attorneys' office prosecuted a

defendant for a narcotics conspiracy and another U.S. attorneys' office simultaneously

prosecuted a continuing criminal enterprise that included conduct addressed by the narcotics

conspiracy, the sentences would have to run concurrently without violating the double jeopardy

clause.

Similarly, the specific RICO theory advanced by the EDNY prosecutors included the

conduct alleged in the northern district indictment. The EDNY indictment alleged that the

purpose of Kelly's so-called enterprise was to, *inter alia,* sexually abuse minors and produce

child pornography between the years 1994 and 2018. [Ex. A] The offenses charged in this

indictment squarely fall within the alleged purpose of the RICO enterprise. No logical reason

exists for the government's failure to bring the case in a single indictment except to unfairly

enhance Kelly's punishment. Even if consecutive sentences would not run afoul of the double

jeopardy clause, the sentences should run concurrently as a matter of fairness.

The government contends that "significant incremental punishment is necessary in this

case to account for the fact that this case is different from the New York case in nature and

scope. Here, defendant was convicted of sexually abusing minors, and that abuse occurred prior

in time to the abuse of the adult woman and minor victims in the New York case." [Gov. Mem at

19] The government is simply wrong. The EDNY indictment speaks for itself. EDNY charged

conduct from the 1990s like that charged in this case, including presenting testimony that Kelly

18

allegedly had a sexual relationship with an underage Aaliyah in 1994. Like the government did here, the prosecution in EDNY also presented evidence that Kelly recorded sexual conduct with 17-year old Stephanie in 1999 which constituted sexual exploitation. The scope of the enterprise covered the exact same time period and the EDNY prosecutors maintain that creating child pornography and having sex with minors was one purpose of the enterprise. Under these circumstances, there was no reason for the government to engage in piece-meal prosecution *except* to attempt to enhance Kelly's punishment (and perhaps give both U.S. Attorney's office an opportunity to hold press conferences). Under these circumstances, and the fact that Kelly is serving a *de facto* life sentence, this Court should exercise its discretion and order the sentence in this case to run concurrent to the EDNY sentence.

### III.    Application of § 3553(a) Factors Demands a Low Guidelines-Range Sentence.

Section 3553(a) sets forth various factors that this Court must consider in rendering a sentence.

#### A.    The Nature and Circumstances of the Offense

Kelly concedes he has been convicted of serious offenses involving three victims, including three counts of producing child pornography with Jane when she was 14 years old. The most serious counts of the indictment relate to Jane with whom Kelly had a 12-year romantic relationship and a seemingly genuine friendship until the government indicted Kelly after the airing of *Surviving R. Kelly* in 2019. Indeed, Jane would have been happy to put her experience with Kelly behind her until the government revived the case and insisted that she cooperate with the prosecution, including by inducing her to participate with promises of restitution riches.

As the evidence showed, Kelly and Jane texted regularly with one another, attended each other's birthday celebrations, and frequently socialized including with Jane's parents. When Jane

lost her grandmother, Jane encouraged Kelly to reach out to her mother to give his condolences. Kelly assisted Jane with financial needs long after any claims of obstruction could be made, and Jane told Kelly she "loved" him shortly before he was indicted when she was worried about the impact the *Surviving R. Kelly* series had on him. Jane admitted from the stand that her relationship with Kelly was close and friendly as of 2019.

That Kelly and Jane maintained a close relationship until he was indicted in 2019 is, of course, not an excuse for the offenses for which Kelly has been convicted and will be sentenced. But to ignore that Kelly and Jane's illegal and inappropriate sexual relationship that began in 1997 and morphed into a lengthy relationship between adults who remained close friends until Kelly's indictment 2019 indictment ignores the *full* nature and circumstances of the offenses for which he was convicted.

Importantly, it was not Kelly who placed the tapes into the public domain which may have caused Jane as much harm as the acts themself. That Kelly did not produce child pornography for any commercial purpose does not relieve him of criminal responsibility, but if Kelly *had* been responsible for placing the tapes into the public, the government surely would point to that fact as aggravating evidence. It is most certainly relevant that the tape of Jane and Kelly was stolen by her own aunt and given to the Chicago Sun Times. To undersigned's knowledge, Jane's aunt, Stephanie Edwards, also known as "Sparkle," was never indicted for trafficking in child pornography.

Similarly, as to Pauline, she testified that her relationship with Kelly that started when she was a teenager also morphed into an adult-relationship in which she loved Kelly. Indeed, Pauline testified adamantly that Kelly was wrong for taking sexual advantage of her when she was underage, but she acknowledged that she loved him and *still* loves him. Again, these facts

are not relevant as it relates to Kelly's culpability in the crimes charged, but they are important factors when considering the circumstances of the offenses and its impact on the complaining victims. Conduct must be considered on a continuum of seriousness, and Kelly's conduct, while serious, did not involve some of the aggravation that is typical of child pornography cases and sex trafficking cases.

Finally, the inducement count as to Nia (count 10) is far less serious than the counts related to Jane or even Pauline. Nia admitted that she sought out Kelly; she moved to Chicago for the summer to see him; she insisted on going to his studio; and during an isolated incident in the hallway Kelly kissed her, embraced her, and touched her genitalia. Nia was either 16 years or almost 16 years old when this occurred. Kelly was 28 years old. This incident did not involve threats, violence, coercion, and occurred primarily because Nia wanted to pursue a romantic and sexual connection with Kelly as she testified to. Of course, a jury found Kelly of an inducement offense as to Nia and he faces punishment for that offense, but it does not mean the circumstances of this offense rise to the seriousness of even the other inducement counts in this case.

There is no denying that Kelly convictions are serious and the harm caused real, but the government's insistence that there is *nothing* mitigating about Kelly's conduct or life is inconsistent with the actual evidence presented at trial and heard by the jury.

### B.    The History and Characteristics of the Defendant

Defendant is widely accepted as a musical genius with a rags-to-riches story. He is considered the greatest living R & B singer and has earned multiple Grammy awards. He has written and produced music for celebrated artists like Michael Jackson and Whitney Houston. Notwithstanding his legendary status, Robert Kelly is a man with a complicated story that is

highly relevant to this Court's goal of fashioning an appropriate sentence for him. Defendant has been portrayed by the government and the media as a one-dimensional villain, undeserving of any measure of humanity or dignity. This Court is charged with considering Defendant's unique history and characteristics in rendering an appropriate sentence. Defendant's history and characteristics reveal that he is not an evil monster but a complex (unquestionably troubled) human-being who faced overwhelming challenges in childhood that shaped his adult life. This evidence is critical to understanding how and why Defendant finds himself in the current situation.

In this vein, this Court must consider the offenses at issue in this case are 25 years old. Contrary to the government and probation's contentions, Kelly did not engage in a pattern of creating child pornography after his state-court indictment in 2002. While Kelly was not a child in the late 1990s, he also was not the middle-aged man he was at the time of his 2019 indictment. In the mid to late 1990s (the time of the underlying conduct) Kelly was a damaged man in his late 20s with an extraordinarily traumatic childhood that he failed to confront. He lacked the insights or ability to appreciate the ways in which his traumatic childhood impacted his unhealthy sexual development and harmful choices.

As acknowledged in the Presentencing Investigation Report and set out more fully in extensive reports prepared by Dr. Park Dietz, M.D., M.P.H., Ph.D., and Dr. Renee Sorrentino, M.D.,[4] Defendant experienced a traumatic childhood involving severe, prolonged childhood

---

[4] Kelly has attached the mitigation reports that were prepared in connection with his EDNY sentencing that occurred last June. Kelly has redacted those portions of the expert reports that relate solely to the EDNY case. Kelly was unable to retain the experts to modify or amend the reports specifically for use in this case due to a lack of resources. Even if Kelly had access to resources, the government has restrained his ability to use any resources for his defense. The reports are relevant to the extent that they speak to Kelly's personal history and characteristics.

sexual abuse, poverty, and violence. His victimization continued into adulthood where, because of his literacy deficiencies, Kelly has been repeatedly defrauded and financially abused, often by the people he paid to protect him.

Dr. Dietz's report focuses on adverse childhood experiences, illiteracy, and Kelly's positive character traits. (Exhibit F – Report of Dr. Park Dietz) Incorporated into Dr. Dietz's report are findings of Dr. Daniel Martell, Ph.D. who conducted neuropsychological testing of Defendant. Dr. Sorrentino's report contains a complete history of Kelly and focuses on Kelly's sexual history, including a detailed discussion of the sexual abuse he suffered as a child. (Exhibit G – Report of Dr. Renee Sorrentino) Dr. Shawnte Alexander, Ed.D. conducted collateral interviews in connection with these reports. The reports are lengthy, and Defendant will not quote from them extensively but will highlight certain portions. (Ex. I – Expert CVs)

Critical to understanding the history and characteristics of the Defendant is understanding the traumatic childhood that shaped him. As Dr. Dietz writes:

> Traumatic childhood events such as abuse, neglect, and witnessing experiences like crime, parental conflict, mental illness, and substance abuse can result in long-term negative effects on learning, behavior and health. Often referred to as adverse childhood experiences (ACEs), these types of events create dangerous levels of stress that can derail healthy brain development, and increase risk for smoking, alcoholism, depression, heart disease, and dozens of other illnesses and unhealthy behaviors throughout life.

Dr. Dietz opines that Kelly endorses a significantly high number of adverse childhood experiences ("ACEs") that cannot be overlooked when considering his history and characteristics. Dr. Dietz writes: "[m]any of Mr. Kelly's problems are now known to be adverse outcomes associated with cumulative ACEs, including but not limited to below average academic and literacy skills by kindergarten age, lower school engagement, learning/behavior problems, not complete high school, sexually transmitted disease, having 50 or more sexual

23

partners, anxiety, panic disorder, and criminal conviction. Separately, there is now substantial evidence that a history of being sexual abused as a child is associated with subsequent conviction for sex offenses."

As set forth in detail in Dr. Dietz's report, Kelly grew up in poverty and experienced a chaotic home life. One of his long-time employees and friends aptly writes in a letter of support:

> Robert was born in poverty. But even as a kid he had a passion for music. He shared with me some of the abusive circumstances he grew up in. It was a horrible environment for any child and Robert is amazingly resilient to have even survived it. As a young adult, he was homeless and earning money as a street performer on the frigid streets of Chicago. Eventually his hard work and talent earned him a record deal, but that deal wouldn't take away his illiteracy or the traumatic experiences he endured. [Exhibit H – Letter of Diana Copeland]

Kelly never knew his father and was raised by his mother and stepfather who by all accounts were heavy drinkers and would sometimes violently fight. During one vivid fight, Defendant's stepfather pushed his mother and her dress got stuck in a car door before Defendant's stepfather drove off, dragging his mother for a short while her sons threw bricks at his car. By objective accounts, Kelly and his two brothers suffered physical abuse at the hands of their mother who disciplined them with whippings with cords and switches. On one occasion, Kelly's mother grabbed a knife to threaten Kelly and his brothers and accidentally stabbed Kelly in the left arm. Neither Kelly (nor his brothers) consider the punishments meted out by his mother as abusive. Indeed, Kelly's mother was beloved by her children.

Kelly lived in a violent neighborhood with significant gang and drug activity. Kelly steered clear of gang and drug pressures but still witnessed significant violence that made a lasting impact on him. For example, at the age of 14, Kelly was shot in the arm with a .22 round while riding his bike down the block.

Critically, Kelly experienced multiple sources of childhood sexual abuse and premature sexualization that sheds significant light on some of his behaviors. Dr. Sorrentino and Dr. Dietz write at length about how Kelly was sexually abused as a child for many years by his older sister. Both of Kelly's brothers report being sexually abused by their sister. Defendant was also sexually abused by a landlord and family friend known as Mr. Henry.

When Kelly was only six or seven years old, his sister started molesting him. The abuse included oral sex and intercourse and persisted into middle school. Kelly's sister began dating their first cousin Louis and she would have Kelly take Polaroid photos of them having sex. Mr. Henry sexually abused Defendant on a weekly basis during the same general period of time. The abuse included oral and anal sex.

Dr. Sorrentino opines that Defendant's history of childhood sexual abuse should be considered a mitigating factor in his sentencing hearing. It is my opinion with reasonable medical certainty that Mr. Kelly's history of childhood sexual abuse is consistent with the definition of mitigating factors as any fact or circumstance that lessen the severity or culpability of the criminal act. The following evidence supports this opinion:

(1) Mr. Kelly's history of childhood sexual abuse represents a hardship or circumstance that was out of his control.

(2) This history has been described in scientific literature as contributing to adult hypersexual behaviors.

(3) Mr. Kelly's adult hypersexual behaviors were factors in his criminal convictions. [Ex. G. at pg. 22]

Defendant suffered other childhood trauma, including witnessing the drowning death of his first childhood girlfriend Lulu. When they were eight or nine years old, Defendant and Lulu

lived in Chicago Heights and were walking near a "river" when another boy pushed Lulu into the river. Defendant did not know how to swim and began screaming as he watched his friend drown. Multiple sources confirm this traumatic event and opine that it had a significant impact on Kelly.

Kelly is functionally illiterate. Kelly's inability to read and write as a child was a significant source of shame and embarrassment that persists to this day. Kelly was bullied as a child because he could not read or write and eventually dropped out of high school after being held back several times. Kelly spoke of the shame and fear he experienced later in life when accepting Grammy awards since he could not read the teleprompter. At the time of the underlying offenses, Kelly functioned (and still does to some degree) as a much younger person than he actually was. Even Lisa Van Allen testified that she and Kelly connected because they shared the same interests despite their significant age difference. Kelly's intellectual disabilities shed some light on why he engaged in inappropriate relationships.

Dr. Dan Martell reexamined Defendant and reported that he "had significant impairments in all areas of academic functioning, placing him in the bottom first to third percentiles and at the early elementary school level (i.e., first to third grade) overall." Dr. Martell's testing indicated that Mr. Kelly's "cognitive abilities are not evenly developed, such that his Full-Scale IQ, which fell in the borderline range (FSIQ=79), does not adequately reflect his overall level of intellectual ability which is more likely in the low average range," in part due to "his lack of school learning."

Defendant's literacy deficiencies have led to chronic victimization in adulthood. Defendant has been financially exploited his entire adult life. At one point in his career, he was told he was worth $900 million; he is now destitute.

Dr. Dietz also details a number of positive attributes of the Defendant as reported by collateral sources. Defendant is by all accounts a generous and forgiving person. Defendant has employed his family and friends and continually re-employed them after they stole from him. One of Defendant's friends' recounts:

> [H]e really has a good heart. He's not a bad person. He has a real forgiving heart you know. People that did things to him, people around him that sued him, and came back and, you know, he forgave them and gave them their jobs back. And, you know, he, you know, he's real. He's a real kind-hearted person. (Ex. F. at pg. 29)

Another friend described Defendant as follows:

> He is compassionate and empathetic. When Robert learned of a shooting that took place that claimed many lives and devastated a small community in Virginia, he stopped what he was doing and wrote a song called "Rise Up" which to this day is still played and every penny of the proceeds is shared by the families, the college and the community. (Ex. H – Letter from Alicia Evans)

> Another time I recall worth honorable mention was when Robert saw on the news that a horrific incident had taken place at the E2 nightclub in his hometown. There had been a stampede where 21 people were trampled to death. Robert gave 21 families whom he did not know, money towards funeral expenses. *Id.*

Defendant is also described as down-to-earth and someone who eschewed the celebrity life, more comfortable keeping close to the community of his childhood.

Reports from Dr. Dietz and Dr. Sorrentino and supporting letters provide additional and significant evidence of Defendant's history and characteristics.

### C. The Sentence Must Be Sufficient But Not Greater than Necessary to Satisfy the Sentencing Goals.

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing as set out below:

### 1. Reflect Seriousness of the Offense; Promote Respect for the Law; and to Provide Just Punishment for the Offense.

A sentence at the lower end of the guidelines range would reflect the seriousness of the offense, promote respect for the law, and provide just punishment. Kelly has already discussed at length the nature and circumstances of the offenses. At bottom, Kelly engaged in prohibited sexual relationship with Jane and Pauline starting in the late 1990s. Unfortunately, Kelly was not the first or the last man to engage in a sexually prohibited relationship with a teenager. Frankly, most men who engaged in sexually prohibited relationships in the 1990s (and before) have never paid any consequence for their actions, let alone facing a sentence of life in prison. *Any* sentence of imprisonment for 25-year old conduct reflects the seriousness of the offense and will promote respect for law in light of the government's apathy toward such crimes prior to the #MeToo movement. Moreover, Kelly is already serving a *de facto* life sentence for conduct like that charged here. Any sentence of imprisonment promotes the respect for law where Kelly is likely to die in prison no matter what this Court sentences him too in this case.

### 2. To Afford Adequate Deterrence

At the outset, Kelly's 30-year sentence in connection with his EDNY already solves any specific deterrence consideration since Kelly is unlikely to survive prison. Defendant is serving a *de facto* life sentence in connection with his EDNY case where the life expectancy of the general prison population is 64 years old; Kelly is 56 years old. The United States Sentencing Commission Preliminary Quarterly Data Report indicates that a person held in a general prison population has a life expectancy of about 64 years. *People v. Buffer,* 2017 IL App (1st) 142931, ¶59. *see also, United States v. Nelson,* 491 F. 3d 344, 349-50 (7th Cir. 2007) (acknowledging the decreased life expectancy for incarcerated individuals based on United States Sentencing Commission data). Kelly would have to defy all statistical odds to make it out of prison alive.

Kelly's existing 30-year sentence has assured that he will have no opportunity to commit any crimes in the future.

In the unlikely event that Kelly was to survive his 30-year sentence, there is no reason to believe he would reoffend as a geriatric in his mid-80s. The overwhelming majority of Kelly's criminal conduct was committed a quarter century ago. As Drs. Dietz and Sorrentino confirm, Kelly is not a pedophile despite his convictions for child exploitation where his youngest victim was Jane who was not a prepubescent minor. As Drs. Dietz and Sorrentino confirm, Defendant is not a pedophile which is a diagnosis that Kelly has never received.

Dr. Sorrentino opined:

I considered the diagnosis of Pedophilia given Mr. Kelly's alleged history of sexual contact with minors. The diagnosis of Pedophilia is used to refer to individuals who experience recurrent, intense, sexually arousing fantasies or sexual urges involving sexual activity with prepubescent child or children (generally age 13 years of younger). I rejected the diagnosis because Mr. Kelly does not report a history of sexual arousal to prepubescent individual and his sexual behavior has never involved prepubescent individuals.

In sum, no sentence is necessary to specifically deter Kelly since he is already likely to spend to the rest of his life incarcerated.

Whatever sentence this Court imposes on Kelly, whether it is 10 years' imprisonment or something greater than 10 years' imprisonment, the sentence will afford little deterrence to the general public because the general public has no reason to believe that they would be targeted for prosecution and enhanced punishment as Kelly has. The following iconic music artists, Bob Dylan, Elvis Presly, Jerry Lee Lewis, David Bowie, Jimmy Page, Bill Wyman, Ted Nugent, Steven Tyler, Mick Jagger, Iggy Pop, and Marilyn Manson have *all* been accused of abusing underage girls. None have been prosecuted and none will die in prison. The government has shown a unique appetite in prosecuting and punishment Kelly as compared to his White

counterparts. Thus, it is unlikely that Kelly's sentence will have any deterrent effect on the general public. It surely will have no additional deterrent effect than does Kelly's existing 30-year sentence. The general assumption is that the government would not prosecute anyone *but* Kelly as harshly for similar conduct. To have a deterrent value, the general public has to conclude that they too could face the consequences that Kelly faced if they engaged in similar conduct. The government's failure to focus its attention on other artists and musicians with similar backgrounds to Kelly fails to leave the general public with that impression.

**3.      To Protect the Public from Further Crimes of the Defendant**

Whatever sentence this Court imposes will do nothing to protect the public since Kelly has already been incapacitated by a sentence that is the functional equivalent of life given his age. Kelly has already addressed this sentencing consideration in the preceding section in connection with discussion about "specific deterrence."

**4.      To Provide Defendant With Needed Treatment**

As stated already, Kelly is already sentenced to a term that amounts to a life sentence. His sentence affords plenty of opportunity for Kelly to obtain treatment in prison (with which he would comply) but he has little to no chance of being released from prison. As such, this factor is irrelevant.

A concurrent sentence at the lower end of the guidelines range will unlikely change Kelly's fate, but it leaves a sliver of hope that Kelly may survive prison and have the change to die outside prison walls. That is the best Kelly can hope for absent reversal of his EDNY conviction. The § 3553(a) factors, and specifically the mitigation presented to this Court, demands that Kelly be afforded that tiny chance of leaving prison someday when he far to old to be any risk of harm to anyone.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendant's sentencing range is 135 to 168 months' imprisonment. A concurrent sentence at the lower end of the guidelines range is sufficient but not more than necessary to satisfy the sentence goals.

Respectfully Submitted,

<u>/s/JENNIFER BONJEAN</u>

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY  10022
718-875-1850

## **CERTIFICATE OF SERVCE**

I, JENNIFER BONJEAN, an attorney at law, certify that I filed Defendant's Sentencing

Memorandum on February 9, 2023 via the ECF filing system.

/s/JENNIFER BONJEAN