# EXHIBIT B

751

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    UNITED STATES OF AMERICA,          )
                                        )
4                      Plaintiff,       )
                                        )
5    -vs-                               )  Case No. 19 CR 567
                                        )
6    ROBERT SYLVESTER KELLY, a/k/a      )  Chicago, Illinois
     "R. Kelly"; DERREL McDAVID;        )  August 18th, 2022
7    and MILTON BROWN, a/k/a "June      )  2:03 p.m.
     Brown,"                            )
8                                       )
                       Defendants.      )
9
                      VOLUME 4-B
10            TRANSCRIPT OF PROCEEDINGS - Trial
        BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury
11
     APPEARANCES:
12
     For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
13                         NORTHERN DISTRICT OF ILLINOIS
                           BY:  MS. JEANNICE WILLIAMS APPENTENG
14                              MS. ELIZABETH ROSE POZOLO
                               MR. JASON A. JULIEN
15                             MR. BRIAN WILLIAMSON
                           219 South Dearborn Street
16                         5th Floor
                           Chicago, IL  60604
17
     For Defendant Robert  BONJEAN LAW GROUP
18   Sylvester Kelly:      BY:  MS. JENNIFER A. BONJEAN
                                MS. ASHLEY BLAIR COHEN
19                              MS. DIANE O'CONNELL
                           750 Lexington Avenue
20                         9th Floor
                           New York, NY 10022
21
     Court Reporter:       AMY M. SPEE, CSR, RPR, CRR
22                         FRANCES WARD, RPR, RMR, FCRR
                           Federal Official Court Reporters
23                         United States District Court
                           219 South Dearborn Street, Room 2318A
24                         Chicago, IL  60604
                           Telephone:  (312) 818-6531
25                         amy_spee@ilnd.uscourts.gov

752

```
 1    APPEARANCES (CONT'D):

 2    For Defendant          LAW OFFICES OF VADIM A. GLOZMAN
      Derrel McDavid:        BY:  MR. VADIM A. GLOZMAN
 3                           53 West Jackson Boulevard
                             Suite 1128
 4                           Chicago, IL  60604

 5                           LAW OFFICES OF BEAU B. BRINDLEY
                             BY:  MR. BEAU B. BRINDLEY
 6                                MR. MICHAEL THOMPSON
                             53 West Jackson Boulevard
 7                           Suite 1410
                             Chicago, IL  60604

 8
      For Defendant          FEDERAL DEFENDER PROGRAM
 9    Milton Brown:          BY:  MS. MARY HIGGINS JUDGE
                                  MS. KATHLEEN LEON
10                                MR. KYLE KENT
                             55 East Monroe Street
11                           Suite 2800
                             Chicago, IL  60603

12

13    Also Present:          Ms. Melissa Siffermann, Homeland
                             Security Investigations
14

15

16

17

18

19

20

21

22

23

24

25
```

Jane - direct by Appenteng

753

```
 1              (Proceedings heard in open court.  Jury in.)
 2                   THE COURT:  Please be seated.
 3                   The witness may resume the stand.
 4                   Ms. Appenteng, you may continue your direct
 5      examination.
 6                   MS. APPENTENG:  Thank you, Your Honor.
 7                   JANE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
 8                        DIRECT EXAMINATION (RESUMED)
 9      BY MS. APPENTENG:
10      Q.   Jane, you can take off your mask.
11      A.   Okay.  Thank you.
12      Q.   And pull that microphone nice and close.
13                   Now, you explained in your testimony earlier today
14      that the conversations changed to sex talk with Mr. Kelly.
15                   Do you recall that testimony?
16      A.   Yes.
17      Q.   Can you explain to the jury if you know why you all
18      engaged in sex talk at that time?
19      A.   Again, after he became my godfather, there became an
20      attraction, and he started making advances, and that's how it
21      unfolded.
22      Q.   And why did you engage in the sex talk with him?
23      A.   I just kind of went with the flow.  He kind of threw me
24      off.  I wasn't exactly sure how to respond or how I should
25      handle it, so I just was being responsive.
```

Jane - direct by Appenteng

754

1   Q.  And how did you view him, Mr. Kelly, at that time when the

2   sex talk started and you participated in it?  How did you view

3   him at that time?

4   A.  As an authoritative figure.

5   Q.  What do you mean?  Can you explain that?

6   A.  Well, he was an adult, and he was somebody that I looked

7   up to, so he was an authoritative figure over me at the time,

8   aside from the sexual acts or anything like that.  So, again,

9   I went with the flow.

10  Q.  Okay.  And then we talked -- in your testimony, you

11  explained to the jurors that the -- you started to engage in

12  sex acts.  And, again, we are talking about before you turned

13  15 when the sexual intercourse began.  Okay.  So we're talking

14  about that time frame between -- when you were 14 years old.

15  A.  Mm-hmm.

16  Q.  Why -- and you said you engaged in sex acts with

17  Mr. Kelly.

18       Why did you participate in those sex acts?

19  A.  It was out of intimidation.  And, again, like, he was an

20  authoritative figure, so I didn't know how to respond.  I

21  didn't know how to say no.  I felt uncomfortable, but at the

22  same token, I looked up to him.  I did see him as an

23  authoritative figure, so I just kind of went along with

24  things, and then it somewhat became normal.

25  Q.  Okay.  So when you say "it somewhat became normal," what

Jane - direct by Appenteng

1   do you mean?  What did you start feeling for him?

2   A.   I started having feelings for him.  I was attracted to him

3   in that way, and things were happening so frequently, it was

4   kind of just like being done out of repetition.

5   Q.   And when you say things that were happening so frequently,

6   what are you talking about?

7   A.   Sexual involvement, engagement, and our interactions.

8   Q.   Okay.  And then -- again -- so we were talking about the

9   period when you were 14 and sex acts were occurring.

10          And then you explained to the jury that when you were

11  15, that progressed to sexual intercourse; is that correct?

12  A.   Yes.

13  Q.   And you had explained that you knew you were 15 because

14  you had lost your virginity; is that right?

15  A.   Correct.

16  Q.   And just to be clear, who -- to whom did you lose your

17  virginity?

18  A.   Robert.

19  Q.   And how were you feeling about him around that time, when

20  you engaged in -- first began engaging in sexual intercourse

21  when you were 15?

22  A.   I developed feelings for him, and I felt good about our

23  interactions.

24  Q.   What are some of the things that, if any, he was saying to

25  make you feel good about your interactions?

Jane - direct by Appenteng

756

1   A.   That he loved me, that he would take care of me, that he

2   was my protector.

3   Q.   And what were your -- what were your responses to those --

4   those things that he was saying about being -- that he would

5   protect you and that he loved you?

6   A.   I would respond in the same way, "I love you, too," and I

7   would feel good about the level of comfort that he was giving

8   me.  So it made me feel good.

9   Q.   And you also talked about -- there was a point where you

10  were willing to bring in your friends into the sexual acts and

11  sexual intercourse with Mr. Kelly.

12          Why were you comfortable -- I take that back.

13          Why did you do those things?

14  A.   Because I considered myself to be a submissive person and

15  I wanted to give him what he wanted or required.

16  Q.   What were the ways in which you encouraged your friends --

17  again, we were talking about specifically Pinky and Brittany

18  -- to join you all in those sex acts?

19  A.   It would start off as like joking conversations of me

20  having a crush on him or just discussing different

21  interactions that me and him had just to gauge like how they

22  might feel or if they would want to be included.

23  Q.   When we were talking about Brittany earlier, you mentioned

24  that she was older than you.  How much older than you was

25  Brittany -- is Brittany?

Jane - direct by Appenteng

1    A.   I believe a year.

2    Q.   So when you engaged -- first engaged in sex acts with

3    your -- was it your testimony that that occurred when you were

4    15?

5    A.   Yes.

6    Q.   And so Brittany would have been how old?

7    A.   16.

8    Q.   And can you please explain to the jury that first

9    experience, if you will, with Brittany, how you engaged her

10   into the sex acts with Mr. Kelly.

11   A.   It would start out with me just joking and saying, like,

12   "Oh, I have a crush on him.  He's like -- I like his music.  I

13   like when he says this with the music or that.  It was like

14   things that he would have me to say that would make them --

15   like put something on their minds to be engaged with us.

16   Q.   And can you recall the first instance with Brittany when

17   that -- the first time it happened with Brittany?

18   A.   It was at Chicago Trax in the lounge of the studio.

19   Q.   Okay.  If you recall, can you just describe that

20   interaction.

21   A.   We were all sitting on the couch after a studio session,

22   watching TV is how we would usually go or maybe listening to

23   some music that had just got finished up, and then we would

24   start by like him saying, "I want to see you do this to

25   Brittany" or "I want to see this or that."  And that's when

Jane - direct by Appenteng

1   the emotions would start or the interactions would start

2   sexually.

3   Q.  And when you say he was saying, "I want to see you do

4   this" or "I want to see you do that," what were those things?

5   Can you describe them.

6   A.  Kissing, grabbing on each other's breasts or like grinding

7   and holding each other by the waist and like dancing, dance

8   movements.

9   Q.  Okay.  And would you do those things as he instructed?

10  A.  Yes.

11  Q.  Why were you willing to do those things?

12  A.  Again, I was thinking I was in love at the time and I was

13  being submissive and I wanted to give him what he wanted and I

14  didn't want to upset him or make him feel like I wasn't

15  cooperating, so I went along with it.

16  Q.  Now, you had mentioned that you had feelings -- again,

17  when you were 14 and 15.  But you had feelings for him that

18  you loved him; is that right?

19  A.  Yes.

20  Q.  And what, if anything -- or some of the things that he was

21  doing at this time when you were 14, 15, and 16 that made it

22  seem like he was -- you all were in love with one another?

23  A.  Just the time that he would allow me to be around him,

24  through certain emotions or, like, certain things he would do

25  for me, like, if it was my birthday or if -- anything that I

Jane - direct by Appenteng
759

1   wanted, he just made it seem like it was available to me.  So

2   not just like materialistic, more like emotional support with

3   anything that I was going through, whether it was school, my

4   group, or friends, he was just there for me.  He was

5   supportive.

6   Q.  What about events; did he attend any events that you were

7   participating in?

8   A.  Yes.  It would be like if my group was doing something or

9   if I was having like basketball games, things of that nature.

10  Q.  And what would he do at your music groups or basketball

11  games, if anything?

12  A.  He would just show up and be supportive and, you know, it

13  looked really cool from my friends' perspective that I had

14  this celebrity showing up for me.  So it was more so like

15  that.

16  Q.  How did that make you feel when he showed up -- when he

17  showed up for you?

18  A.  It made me feel good, excited.

19  Q.  What, if anything, did he buy you in terms of gifts?

20          MS. BONJEAN:  Objection.  Foundation.

21          THE COURT:  All right.  Give some time frame.

22          MS. APPENTENG:  Yes, Your Honor.

23  BY MS. APPENTENG:

24  Q.  During the time frame when you were 14, 15, 16 years old,

25  what, if anything, did Mr. Kelly buy you in terms of gifts?

Jane - direct by Appenteng

760

1    A.   He bought me jewelry.  He bought me a PT Cruiser.

2    Q.   And, again, just during the time period you were 14, 15,

3    16.

4    A.   Mm-hmm.

5    Q.   You said jewelry?

6    A.   Yes.

7    Q.   What did he buy you?

8    A.   He bought me a cross necklace.

9    Q.   And how old were you when that -- when he bought you that

10   cross necklace, time frame?

11   A.   I was about 17 or 18.

12   Q.   Okay.  And then when you were -- you mentioned a car?

13   A.   Yes.

14   Q.   And when -- when did he purchase a car for you?

15   A.   When I turned 16.

16   Q.   Where were you when you -- when he purchased this car?

17   A.   In Florida.

18   Q.   Okay.  What type of car was it?

19   A.   A black PT Cruiser.

20   Q.   You said you were in Florida?

21   A.   Yes.

22   Q.   How -- did the car come back to Illinois with you at some

23   point?

24   A.   Yes.

25   Q.   Do you recall how it got back here?

Jane - direct by Appenteng

761

1    A.   I'm not exactly sure.

2    Q.   What did you tell your friends about this car?

3    A.   I told them that my godfather bought me a new car and that

4    I was excited to take them for a ride, and that was pretty

5    much it.

6    Q.   Were you allowed to tell people about this car, that he

7    bought it for you?

8              MS. BONJEAN:   Objection to the foundation of that

9    question.   Allowed by whom?

10   BY MS. APPENTENG:

11   Q.   What, if anything, did Mr. Kelly tell you about who you

12   could share the car with?

13             MS. BONJEAN:   Objection.   The car or the information

14   about the car?

15             THE COURT:   I'm not -- I don't see the basis of the

16   objection.

17             You can clarify it, if you wish.

18             Go ahead.

19   BY MS. APPENTENG:

20   Q.   What, if anything, did Mr. Kelly say that you could tell

21   people about the car?

22   A.   Just to only share with my close friends and family and

23   that I was not allowed to have any guys in the car.

24   Q.   You mentioned a necklace that Mr. Kelly purchased for you,

25   and you said that -- how old -- you were 17 or 18 years old?

Jane - direct by Appenteng

762

1  A.  Yes, about 17 or 18.

2  Q.  Did you already have a cross necklace?

3  A.  Yes.

4  Q.  Who gave you the cross necklace that you already had when

5  Mr. Kelly gave you a second cross necklace?

6  A.  My parents.

7  Q.  When did they give you that -- when did they give you that

8  necklace?

9  A.  When I was about 13.

10  Q.  Were your parents with you when Mr. Kelly bought --

11  purchased the PT Cruiser for you?

12  A.  Yes.

13  Q.  Did they question why he purchased this car for you?

14  A.  No, they didn't question it.  They were excited for me.

15  Q.  During this time period when you were engaging in sex acts

16  and sexual intercourse with Mr. Kelly -- so you were 14, 15,

17  16; that's the time period we're talking about right now --

18  who, if anyone, did you tell that you were engaging in these

19  sex acts and sexual intercourse?

20  A.  No one knew besides Brittany and Pinky.

21  Q.  And why is that?

22  A.  Because I was told to keep it a secret and not to share it

23  with anyone.

24  Q.  Who told you to keep it a secret and not share it with

25  anyone?

Jane - direct by Appenteng

763

```
 1   A.   Robert.

 2   Q.   When did he tell you this?

 3   A.   As soon as we became involved sexually.

 4   Q.   So this was -- was this around the time you were having

 5   phone sex, so when you were 14?

 6          MS. BONJEAN:   I'm going to --

 7   BY THE WITNESS:

 8   A.   Yes.

 9          MS. BONJEAN:   -- object to the leading.

10          How about when did that happen?   That's the

11   appropriate question, not the leading.

12          THE COURT:   Yes, it's leading.   So -- go ahead.

13          MS. APPENTENG:   Yes, Your Honor.

14   BY MS. APPENTENG:

15   Q.   When did this happen when he first instructed you not to

16   tell anyone?

17   A.   When I was about 13 or 14 and we became sexual.

18   Q.   Okay.   When you say "became sexual," does that include the

19   phone conversations?   Do you include that when you're saying

20   "we became sexual"?

21   A.   Yes.

22   Q.   Did his instructions in terms of keeping it quiet or a

23   secret -- I think those were your words -- did that ever

24   change?

25   A.   Can you rephrase the question for me, please?
```

Jane - direct by Appenteng

764

1  Q.  What did he tell you about keeping your -- the sexual acts

2  a secret?

3  A.  That it was very important that I didn't share our sexual

4  relationship with anyone because he could get in a lot of

5  trouble and he wanted to protect that side of things.  So he

6  was just overly stressing how important it was that I remain

7  loyal to him and not share this involvement with anyone.

8  Q.  Did you want to share it with anyone at that time?  Again,

9  we're talking about when you were 14, 15, 16 years old.

10 A.  Yes.

11 Q.  At that time who did you want to share it with?

12 A.  I wanted to share it with my friends.  I thought about

13 sharing it with my aunt.  Eventually I did.

14 Q.  But not at the time when you were 14, 15, and 16; is that

15 right?

16 A.  No, not at that time.

17 Q.  And in your mind, why did you -- why did you not share it

18 with those friends that you wanted to share it with when you

19 were 14, 15, and 16?

20 A.  Because I was afraid.

21        MS. BONJEAN:  I'm going to object.

22        You mean aside from Pinky and the other -- Brittany?

23        I'm just confused at this point.

24        MS. APPENTENG:  Your Honor, if we could not have

25 speaking objections.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 16 of 212 PageID #:10976
Jane - direct by Appenteng
765

1    THE COURT:  Well, I don't see a basis for the

2    objection.

3    MS. BONJEAN:  Well, she said her friends.  I would

4    object on foundation.  It's not clear to me because she

5    previously testified that she was having threesomes with

6    Pinky --

7    THE COURT:  Just a minute.  Let me see.

8    All right.  The objection is overruled, but let's go

9    on.

10   BY MS. APPENTENG:

11   Q.   The question was:  What -- what did you want to share with

12   your friends when you were 14 and 15 and 16 about the sexual

13   relationship with Mr. Kelly?

14   A.   I more so wanted to share the relationship because I was

15   excited.  Again, I thought I loved this person, and it

16   wasn't -- it was exciting but a secret.  So there were times

17   other than Brittany or Pinky that I was close to people that I

18   would have liked to share what was happening between us, but I

19   didn't feel comfortable doing that because I was told to keep

20   it a secret.

21   Q.   And you had said that you were -- you were scared, and

22   that's where we had stopped before the judge --

23   MS. BONJEAN:  I'm going to object.  That is leading.

24   THE COURT:  Objection.  She answered the question.

25   Let's move on.

Jane - direct by Appenteng

766

BY MS. APPENTENG:

Q.  All right.  Let's move to when Mr. Kelly and you were

engaged in sex acts and sexual intercourse.  Again, that time

frame where that shifted was 14 to 15 years old.

        Did Mr. Kelly ever record you two engaged in sexual

activity?

A.  Yes.

Q.  And when did that start?

A.  When I was 14.

Q.  Do you recall the first time that he recorded you two

engaged in sex acts?

A.  Not the first time, but I recall around the time it

started happening, yes.

Q.  Okay.  How were the recordings made?  What equipment was

being used to make the recordings?

A.  There was lighting, camcorders.

Q.  How did you feel about being recorded?

A.  I felt uncomfortable.

Q.  Why did you go along and do it if you felt uncomfortable?

A.  Because, again, he was an authoritative figure over me,

and I didn't feel comfortable telling him no or I didn't want

to look awkward for engaging and not participating.  So I just

went with the flow of whatever he said to do.

Q.  Where did these recordings take place?  Again, when you

were 14, 15, and 16 years old.

Jane - direct by Appenteng

767

1  A.  It would be on the bus at the studios, whether that was

2  Chicago Trax or B.A.S.E. Productions, as well as the George

3  Street house.

4  Q.  Was there -- what if -- was there any setup to these

5  recordings?  Would you discuss them in advance?

6  A.  No.

7  Q.  When the -- the first time there was a recording, how did

8  you know that -- that you were being recorded?  How did you

9  know that it was happening?

10  A.  Because he let me know that he wanted to videotape me, and

11  when we were in the room, he was, like, setting everything up

12  as far as like, again, lighting and the camcorder and things

13  like that.

14  Q.  Why was there -- sorry.  You said when he was setting up

15  the camcorder.  What would he do to set up the camcorder?

16  A.  Put the tape in, position the camera a certain way, just

17  get certain, like, angles with lighting.

18  Q.  Okay.  So prior to your testimony today, did you view some

19  of these recordings that Mr. Kelly made of him and you

20  engaging in sex acts?

21  A.  Yes.

22  Q.  Specifically, did you view three separate and distinct

23  sexual encounters?

24  A.  Yes.

25  Q.  Where did these sexual encounters -- oh, let me back up.

Jane - direct by Appenteng

768

1     When I say "three separate and distinct," were those

2  different times -- at different times?

3  A.  Yes.

4  Q.  Where did these three sexual encounters occur?

5  A.  One was in the living room at the George Street house, one

6  was upstairs in the bedroom of the George Street house.  And

7  the other one was in the log cabin of the George Street house.

8  Q.  And when you say "log cabin of the George Street house,"

9  what room is that?

10  A.  It's like the basement, like log cabin area.

11  Q.  Okay.  What -- is there any type of special equipment or

12  something that's in that room?

13  A.  Yes, a Jacuzzi.

14  Q.  Okay.  And you saw that in the pictures that we reviewed?

15  A.  Yes.

16  Q.  No, we did not review those earlier.

17     You saw those in the pictures we reviewed prior to

18  your testimony; is that correct?

19  A.  Mm-hmm.

20  Q.  Now, before we discuss these -- these recordings, I'd like

21  for us to get on the same page about the location that you are

22  talking about.

23     I'm showing you what's been already admitted into

24  evidence as Government's Exhibit 112-A.

25     All right.  You see that on the screen in front of

Jane - direct by Appenteng

769

1   you, 112-A?

2   A.  Yes.

3   Q.  Do you recognize the building that's depicted in 112-A?

4   A.  Yes.

5   Q.  What is that?

6   A.  The George Street house.

7   Q.  And, again, that's the place where these three sexual

8   encounters that you're talking about occurred?

9   A.  Yes.

10  Q.  All right.  Let's start with the sexual encounter --

11  encounters that occurred, as you stated, in Mr. Kelly's

12  bedroom and in his living room.

13          For the purpose of this trial, we're calling those,

14  respectively, Video 3, the video in the bedroom -- the

15  recording in the bedroom, and Video 2, the recording in the

16  living room.

17          I'm showing you what's been previously marked as

18  Government's Exhibit 002.

19          Do you see that in front of you?

20  A.  Yes.

21  Q.  Does Government Exhibit 2 contain depictions of two

22  separate sexual encounters?

23  A.  Yes.

24  Q.  Are those two encounters Video 3, which we were just

25  talking about that occurs in the bedroom, and Video 2, which

Jane - direct by Appenteng

770

1  occurs in Kelly's living room?

2  A.  Correct.

3  Q.  And how do you recognize it to be the disk that contains

4  those two depictions of those two sexual encounters?

5  A.  With my initials and the date.

6  Q.  I'm sorry.  Can you speak into the mic.

7  A.  Through my initials and through the date.

8        MS. BONJEAN:  I'm sorry, Counsel, what exhibit is

9  this?

10        MS. APPENTENG:  Government's Exhibit 002.

11        MS. BONJEAN:  And is this one of the exhibits you

12  provided to us?

13        MS. APPENTENG:  It's -- no.  It's -- we can't provide

14  it to you.  It's contraband.  I can show it to you.

15        MS. BONJEAN:  That seems fair.

16        THE WITNESS:  Thank you.

17  BY MS. APPENTENG:

18  Q.  Okay.  So, again, the question was:  How do you recognize

19  it to be the disk that contains those two scenes?

20  A.  Through my initials and the date.

21  Q.  And your initials and the date are where?  Where do they

22  appear?

23  A.  On the lower left hand of the disk.

24  Q.  Did you watch each of those sexual encounters, Video 3 and

25  Video 2, from beginning to end?

Jane - direct by Appenteng

771

1    A.   Yes.

2    Q.   Did you watch them with sound?

3    A.   Yes.

4    Q.   And who are the individuals depicted in Videos 3 and 2 on

5    Government's Exhibit 002?

6    A.   Robert and myself.

7    Q.   Do you recognize the voice in the Videos 3 and 2 to be

8    yours and Mr. Kelly's?

9    A.   Yes.

10   Q.   In general terms for now, what is depicted on Government's

11   Exhibit 002?

12   A.   I get confused with the numbers, but I can --

13   Q.   Sure.  You can just describe the two sex scenes.

14   A.   Okay.  The one in the living room was taking place on the

15   floor, on the tile part of the floor in front of the projector

16   screen; and the other one took place in the upstairs bedroom

17   on the bed.

18   Q.   And in both of those scenes, you're engaging in sex acts

19   with Mr. Kelly; is that correct?

20   A.   Yes.

21   Q.   How old were you when the acts depicted in those two

22   sexual encounters occurred?

23   A.   14.

24   Q.   Does Video 3 -- that's the -- the scene in the bedroom

25   that you were talking about -- truly and accurately depict the

Jane - direct by Appenteng

772

1   sexual encounter that occurred between Robert Kelly and you in

2   his bedroom at 1010 George Street when you were 14 years old?

3   A.  Yes.

4   Q.  And does Video 2 truly and accurately depict a sexual

5   encounter that occurred between Robert Kelly and you in his

6   living room at 1010 George Street when you were 14 years old?

7   A.  Yes.

8           MS. APPENTENG:  Your Honor, the government would move

9   to admit Government's Exhibit 002.

10          We're not publishing it.  I'm just moving --

11          THE COURT:  Pardon?

12          Are there objections in addition to the previous --

13  any objections, I guess I should say?

14          MS. BONJEAN:  Judge, I don't -- I mean, I don't know

15  that that's properly authenticated.  We haven't seen it.  I

16  don't know what she's identifying on that.  It's a CD.  It's

17  not original tape, but --

18          THE COURT:  She has identified them.  So over the

19  objection, I'll admit them.

20          MR. BRINDLEY:  Judge, for the record, we'll object.

21          THE COURT:  Pardon?

22          MR. BRINDLEY:  Judge, for the record, we'll object to

23  chain of custody based on the current --

24          THE COURT:  Yes.  I understand.  You don't need to

25  repeat that.  That objection has been made.  I overruled it.

Jane - direct by Appenteng

773

1    So it's a standing objection.

2             All right.  They're admitted.

3          (Government's Exhibit No. 002 was received in evidence.)

4             MS. APPENTENG:  Thank you, Your Honor.

5    BY MS. APPENTENG:

6    Q.   Let's talk a little bit about Video 3, the bedroom

7    encounter.

8             Can you please describe the bedroom that this

9    encounter occurred in.

10   A.   There was a TV, a dresser, a bed.  We were on the bed

11   engaging in sexual activity.  At some points I was facing him

12   and at some points I wasn't.

13   Q.   And can you describe generally the types of sex acts that

14   you two were engaging in.

15   A.   He was laying down and I was on top of him, and he was

16   putting lotion on my face.

17   Q.   Did the sex acts include oral sex?

18   A.   Yes.

19   Q.   And did they include -- again, you -- you said you were 14

20   at this time?

21   A.   Yes.

22   Q.   Did these sex acts include intercourse at this time?

23   A.   No.

24   Q.   Were you simulating sexual intercourse?

25   A.   Yes.

Jane - direct by Appenteng

774

1  Q.  During the video, what, if any, statements did you make

2  about your age or your body parts?

3  A.  I was referring to my body parts with my age as

4  14-year-old breasts, *et cetera*.

5  Q.  Why were you doing that?

6  A.  Because he asked me to.

7  Q.  Were you indeed 14 years old at the time?

8  A.  Yes.

9  Q.  Turning to Video 3.  Did you know that that sexual

10 encounter was being recorded at the time?

11 A.  Yes.

12 Q.  How did you know that?

13 A.  Because I saw the videotape or the camcorder, I should

14 say.

15 Q.  How did you feel about -- in that moment, because -- as

16 you sit here today, do you recall that encounter?

17 A.  Yes.

18 Q.  How did you feel about the recording -- it being recorded

19 at that time?

20 A.  I felt uncomfortable.

21 Q.  Why did you engage in -- why did you allow -- or why did

22 you continue with the sex acts as they were being recorded if

23 you felt uncomfortable?

24 A.  Just out of obligation or intimidation, I just kind of --

25 I was uncomfortable, like, I was a little intimidated.  And,

Jane - direct by Appenteng

775

1   again, I was being submissive and I was thinking I was giving

2   him something that he wanted.

3   Q.   How were you feeling about him in terms of any type of

4   feelings?  You said at some point you did love him.

5   A.   Mm-hmm.

6   Q.   How were you feeling about that at this point, from when

7   you were 14 years old and you were being recorded during this

8   sex act?

9   A.   That's when I begin to love him.  So I felt as if I was in

10  a relationship and these were normal things to happen.

11  Q.   Let's talk a little bit about Video 2.  That's the living

12  room scene.

13          During Video 2, you already described it a little

14  bit, where did it occur again?

15  A.   It was in the living room in front of the projector on the

16  floor laying on the towel -- tile.

17  Q.   Can you describe what that -- the tile looked like?

18  A.   It was, like, black, white, or gray.

19  Q.   Showing you what's been previously admitted as

20  Government's Exhibit 112-O.

21          Do you see that on the screen in front of you?

22  A.   Yes.

23  Q.   What -- what is Government's Exhibit 112-O?

24  A.   That's the living room space at George Street.

25  Q.   Is this the same room where the sex acts that you are

Jane - direct by Appenteng

776

1   describing and that are depicted on Government's Exhibit 002

2   took place?

3   A.   Yes.

4   Q.   And I'm showing you Government's Exhibit -- it's already

5   been admitted as Government's Exhibit 112-P.  What's depicted

6   in 112-P?

7   A.   That's the living room space at the George Street.

8   Q.   Is this the same room -- is this the room that you're

9   talking about where the sexual encounter that appears on

10  Government's Exhibit 1- -- sorry -- Government's Exhibit 002

11  exists?

12  A.   Yes.

13  Q.   Now, during this video, Video 2, can you describe the sex

14  acts that Mr. Kelly engaged you in -- engaged in with you.

15  A.   I was laying on the floor.  He was giving me Cristal.  It

16  was oral sex.  And he urinated on my vagina.

17  Q.   You said that he was giving you Cristal.  Is that what you

18  said?

19  A.   Yes.

20  Q.   What is Cristal?

21  A.   It's a champagne.

22  Q.   How old were you?  I'm sorry I didn't ask you, how old

23  were you at the time of this -- this sexual encounter?

24  A.   14.

25  Q.   You testified that he urinated on you?

Jane - direct by Appenteng

777

1   A.   Correct.

2   Q.   And what part of your body did he urinate?

3   A.   My vagina.

4   Q.   During this sexual encounter, what, if anything -- what,

5   if any, statements did you and/or Robert Kelly make regarding

6   your body parts and your age?

7   A.   He asked me to say, "With my 14-year-old vagina."

8   Q.   And did you say that?

9   A.   Yes.

10  Q.   Now, let's move on to that -- the final sexual encounter

11  that you testified earlier that you viewed prior to your

12  testimony today.  That's the encounter that you said occurred

13  in the log cabin room.

14          And for the purposes of this trial, we're calling

15  that Video 1.  Okay?

16  A.   Mm-hmm.

17  Q.   Okay.  So you have there in front of you what's been

18  previously marked as Government's Exhibit 001.

19          Do you see that in front of you?

20  A.   Yes.

21  Q.   Does Government's Exhibit 001 contain a depiction of a

22  sexual encounter that occurred in Mr. Kelly's log -- as you

23  describe it, the log cabin room?

24  A.   Yes.

25  Q.   How do you recognize it to be a disk that contains that

Jane - direct by Appenteng

778

1    sexual depiction?

2    A.   Because it's initialed by me with the date.

3    Q.   Did you watch that sexual encounter that appears on

4    Government's Exhibit 001 from beginning to end?

5    A.   Yes.

6    Q.   And did you watch it with sound?

7    A.   Yes.  Yes.

8    Q.   And who are the individuals depicted in Video 1 that

9    appears on Government's Exhibit 001?

10   A.   Robert and myself.

11   Q.   Did you recognize the voices in Video 1 to be yours and

12   Mr. Kelly's?

13   A.   Yes.

14   Q.   And in general terms for now, what is depicted in Video 1

15   that is on Government's Exhibit 001?

16   A.   There's the Jacuzzi.  I'm sitting down giving him oral

17   sex, and he urinates on me.

18   Q.   Are you doing other things in the video that you can

19   recall, as you sit here today?

20   A.   Sitting on top of him and oral sex.

21   Q.   How old were you when -- the acts depicted in Video 1,

22   which is on Government's Exhibit 001, how old were you when

23   those sexual acts occurred?

24   A.   14.

25   Q.   Does Video 1 truly and accurately depict a sexual

Jane - direct by Appenteng

779

1   encounter that occurred between Robert Kelly and you in the

2   basement or log cabin room at his house at 1010 George Street

3   when you were 14 years old?

4   A.   Correct.

5   Q.   I'm sorry.  Can you just speak up for -- just for the

6   court reporter.

7   A.   Yes.

8            MS. APPENTENG:  Your Honor, we move to admit

9   Government's Exhibit 001.  We are not publishing it at this

10  time.

11           THE COURT:  It's admitted.  You may publish it.

12           MS. BONJEAN:  No, objection --

13           MR. BRINDLEY:  We are renewing --

14           MS. BONJEAN:  -- Judge.

15           MR. BRINDLEY:  -- our same objection.  I just want to

16  make sure.

17           MS. BONJEAN:  Just for the record.  Authenticity and

18  chain of custody.

19           MR. BRINDLEY:  Agreed.

20           THE COURT:  I said that I'd overrule those objections

21  prior to trial so that you don't need to raise them.  I

22  understand that that's your objection and that will stand as

23  your objection.  You don't have to repeat it.

24       (Government's Exhibit No. 001 was received in evidence.)

25  BY MS. APPENTENG:

Jane - direct by Appenteng

780

```
 1    Q.   Now, you had described the room in which this encounter
 2    occurred as the log cabin room.  I'm showing you what's been
 3    previously marked as Government's Exhibit No. 112-D.
 4         Do you see that on the screen in front of you?
 5    A.   Yes.
 6    Q.   What is depicted in Government's 112-D?
 7    A.   The Jacuzzi in the basement of the log cabin.
 8    Q.   Is this -- does this truly and accurately depict the
 9    location of where the sexual encounter occurred that's in
10    Video 1 on Government's Exhibit 001?
11    A.   Yes.
12    Q.   If you recall, at the beginning of Video 1, what if --
13    does -- what, if anything, does Mr. Kelly hand to you?
14    A.   Money.
15    Q.   What type of money?  Bills?  Coins?
16    A.   Bills.
17    Q.   Why?
18         MS. BONJEAN:  Objection.  If she knows.  But
19    objection as to speculation.
20    BY MS. APPENTENG:
21    Q.   If you know, why did he hand you money at the beginning of
22    the video?
23         THE COURT:  If she knows.
24    BY MS. APPENTENG:
25    Q.   If you know.
```

Jane - direct by Appenteng

781

1    A.   Because if anybody saw the tape or if it was released for

2    some reason, he wanted it to appear as if I was like a

3    prostitute.

4           MS. APPENTENG:  Your Honor, can we take a break?  If

5    not, that's fine.

6           THE COURT:  Let's go on.  We might as well finish it.

7           MS. APPENTENG:  Okay.

8    BY MS. APPENTENG:

9    Q.   Jane, were you -- other than these three encounters that

10   we were just talking about, were you recorded -- did Mr. Kelly

11   record you engaging in sexual acts at other times?

12   A.   Yes.

13   Q.   Do you know a person named Lisa Van Allen?

14   A.   Yes.

15   Q.   And can you just pull the -- turn that maybe.

16   A.   Yes.

17   Q.   How do you know her?

18   A.   Through Robert.

19   Q.   How old were you when you first met Lisa Van Allen?

20   A.   14.

21   Q.   Under what circumstances did you meet Ms. Van Allen?

22   A.   Sexually.

23   Q.   You can take a second.

24          When you say "sexually," what do you mean?  Describe

25   the circumstances.

Jane - direct by Appenteng

1  A.  She would be around like at the studio or at the gym, and

2  it was somebody that he let me know that he was involved with

3  and that he wanted us to all engage in sexual activity

4  together.

5  Q.  And when you say "he," you're talking about Robert Kelly?

6  A.  Correct.

7  Q.  And did you indeed engage in sexual acts together with

8  Lisa Van Allen and Robert Kelly?

9  A.  Yes.

10  Q.  Where did those sexual encounters take place and how old

11  were you at the time?

12  A.  I was 14, and they would take place at the studio, at the

13  George Street house, or maybe sometimes on the bus.

14  Q.  Were those -- were some of those interactions recorded?

15  A.  Yes.

16  Q.  Where were those -- where were those interactions recorded

17  and how old were you at the time?

18  A.  At the George Street house, at the studio, wherever we

19  were.  And I was 14.

20  Q.  Where in the George Street house did the sexual encounters

21  occur with -- and, again, we're talking about with Lisa Van

22  Allen and Mr. Kelly when you were 14 years old.

23  A.  In the basement of the log cabin.

24  Q.  In that log cabin room; is that what you said?

25  A.  Yes.

Jane - direct by Appenteng

783

1    Q.   Do you recall a specific instance where there -- where you

2    were engaging in sexual activity with Lisa Van Allen and

3    Robert Kelly in the wood panel -- sorry -- in that log cabin

4    room?

5    A.   On the Jacuzzi, in that area, yes.

6    Q.   Did that occur -- did that happen on more than one

7    occasion in the log cabin room with Lisa Van Allen and Robert

8    Kelly?

9    A.   Yes.

10   Q.   And do you -- was there recordings of that that had

11   occurred on more than one occasion?  Again, the same room, the

12   same age.

13   A.   Yes.

14   Q.   What, if anything, do you know about what happened to the

15   recordings that were made at the time that they were made?

16   A.   I'm sorry.  Can you repeat that?

17   Q.   What, if anything, do you know about what happened to the

18   actual, like, cassette recordings?  You had -- let me take it

19   back a little bit.

20        You had testified earlier when I said how did you

21   know, how did he set up the camera, and you said that he put a

22   tape in.  Is that what you said?  And you would see the tape

23   go in, and then you'd start engaging in sex acts.

24        What, if anything, happened, if you know, to those

25   tapes?

Jane - direct by Appenteng

784

1          MS. BONJEAN:  I'm going to object to the foundation.

2     There's multiple tapes that have been referenced, so . . .

3          THE COURT:  Okay.  What are we talking about?

4     BY MS. APPENTENG:

5     Q.  When Mr. Kelly recorded you having sexual intercourse, and

6     he would use a tape --

7          MS. BONJEAN:  Objection.  She actually didn't testify

8     that there was sexual intercourse.  That is misstating her

9     testimony.

10         MS. APPENTENG:  I can restate the question,

11    Your Honor.

12         THE COURT:  I'm not sure what -- what are we talk --

13    which one are we talking about here?  Any tape -- all tapes or

14    any tapes or specific tapes?

15    BY MS. APPENTENG:

16    Q.  Let's start with the specific tapes with Videos 1, 2, and

17    3 that we talked about.

18         And you were engaging in sex acts, correct, not

19    sexual intercourse, because you were 14 years old, correct?

20    A.  Yes.

21    Q.  So what -- what happened to those tapes, Videos 1, 2, and

22    3?  Like, where would they be kept, if you know?

23    A.  They were kept in a gym bag or in the log cabin area of

24    the basement.

25    Q.  How do you know that?

Jane - direct by Appenteng

785

1   A.   Because I would see where he put them.

2   Q.   And what -- what would you see?  Describe what you saw.

3   A.   There were like -- on the shelves, like where the TV was,

4   there were like several shelves, so they would be like kept

5   behind certain decor in that area, or if we were finishing up,

6   he would put them in his gym bag or I would see him take them.

7   Q.   When you say "finishing up," what do you mean?

8   A.   After we were done recording.

9   Q.   And you said -- and he put them in a gym bag?

10  A.   Yes.

11  Q.   All right.  And to be clear, when you -- you were

12  describing videos on a shelf.  Did you know what all of those

13  videos were -- or are?

14  A.   I had a pretty good idea.

15  Q.   But you didn't know for sure?

16  A.   No.

17  Q.   You saw a collection of videos; is that right?

18  A.   Yes.

19  Q.   And the same thing for the gym bag that you just

20  described, what was in the gym bag?

21  A.   I'm not exactly sure what was in the bag, but I did see

22  him put tapes in the bag before.

23  Q.   And the tapes you're talking about are the tapes that you

24  just said when you finished up, he would put it in a -- in a

25  gym bag?

Jane - direct by Appenteng

786

1    A.   Yes.

2    Q.   Who else did you see, if anyone, handling that gym bag?

3    A.   June.

4    Q.   Who?

5    A.   June.

6    Q.   Is June this individual's nickname or his true name?

7    A.   That's the name that I know him by, yes.

8    Q.   Do you know him by any other names?

9    A.   Yes.

10   Q.   What other names?

11   A.   Milton.

12   Q.   Do you know his last name?

13   A.   Brown.

14   Q.   Did you ever have any conversations with Mr. Brown about

15   what was in that gym bag?

16   A.   No.

17   Q.   If you saw Mr. Brown in the courtroom today -- if you saw

18   him today, would you be able to recognize him?

19   A.   Yes.

20        MS. APPENTENG:  Your Honor, we'd like to ask if

21   everybody in the courtroom --

22        THE COURT:  Take your masks off, please.

23   BY MS. APPENTENG:

24   Q.   Jane, I'd like you to take a look around the courtroom and

25   if you see Mr. Brown, could you please describe an article of

Jane - direct by Appenteng

787

1   clothing that he's wearing and where he is located in the

2   courtroom.

3   A.  He's to the -- he's directly in front of me with a

4   burgundy tie.

5        MS. APPENTENG:  Your Honor, can the record reflect

6   that Jane has identified Milton Brown, the defendant?

7        THE COURT:  All right.  She's identified him.  Thank

8   you.

9   BY MS. APPENTENG:

10  Q.  So at this point, you -- we were talking about the tapes

11  and those -- sorry, not the tapes -- those Videos 1, 2, and 3

12  that we were discussing, you were 14 years old in those,

13  correct?

14       When you were -- when you were 14, 15, 16 years old,

15  did you tell anyone, other than Pinky or Brittany, about

16  sexual encounters with Robert Kelly?

17  A.  No.

18  Q.  I'd like to direct your attention to April 2000.

19       Do you recall being interviewed or spoken to by

20  people from the Department of Children and Family Services?

21  A.  Yes.

22  Q.  What do you recall about the encounter?

23  A.  There was an allegation made about the nature of Robert

24  and I -- excuse me -- the nature of Robert and I's

25  relationship, and they wanted to come out and ask questions to

Jane - direct by Appenteng

788

1  investigate if there was anything sexual happening between us.

2  Q.  And in 2000 -- April 2000 you were still 15; is that

3  right?  You turned 16 in April of -- I'm sorry -- in September

4  of 2000; is that right?

5  A.  Yes.

6  Q.  Okay.  So April 2000 you were 15 years old.

7          What was your response to the questioning from DC --

8  from the Department of Children and Family Services about

9  their allegations?

10  A.  I denied it.

11  Q.  Why did you deny it?

12  A.  I was afraid that something bad would happen to Robert.

13  He really instilled that in me, if anybody found out about the

14  nature of our relationship, that things would be really bad

15  for him, and I wanted to protect him, so I did everything I

16  could to keep that a secret.

17  Q.  So you were -- just to be clear, you were untruthful with

18  the Department of Children and Family Services; is that right?

19  A.  Yes.

20  Q.  And you testified that you wanted to protect him?

21  A.  Yes.

22  Q.  Why did you want to protect him?

23  A.  Well, again, I did look up to him.  I didn't want to see

24  anything bad happen to him, and at this point with the way

25  things were happening between us, I was also afraid.

Jane - direct by Appenteng

789

1    Q.   Afraid of what?

2    A.   I didn't want to upset him, I didn't want to trigger

3    anything, and I didn't want to expose what was happening

4    between us.

5    Q.   Did you want to keep your relationship intact?

6    A.   I did.

7    Q.   Now, at this time -- again, this is April of 2000, you

8    were 15 years old -- did you tell your parents about what was

9    happening between you and Robert Kelly?

10   A.   No.

11   Q.   Why?

12   A.   Because that was something that I would take to my grave.

13   I was not going to reveal that to anybody after many

14   conversations of him drilling how important it was that he

15   would be in big trouble if anybody found out about this, so I

16   looked at it as I was protecting him.

17   Q.   Did you feel comfortable telling your parents that you

18   were engaging in sexual activity with Robert Kelly at that

19   time?  Again, this is April 2000.

20   A.   No.

21   Q.   Why?

22   A.   Because I knew it was something they wouldn't approve of.

23   Q.   Now, after that, you were approached and questioned by

24   Department of Children and Family Services.  You were later

25   questioned by Chicago Police Department officers; is that

Jane - direct by Appenteng

790

1    correct?

2    A.   Yes.

3    Q.   And what -- what were they asking you about?  What were

4    they questioning you about?

5    A.   Robert and I's relationship, have we had any sexual

6    contact with each other.

7    Q.   What was your response to that questioning?

8    A.   No.

9    Q.   Why did you respond that way?

10   A.   Because, again, I just -- it was embedded in me that this

11   could never come out, and I didn't want my parents to find

12   out, either, so I was doing everything I could to keep it a

13   secret.

14   Q.   Did you tell Mr. Kelly about CPD questioning you?

15   A.   Yes.

16   Q.   What was his response?

17   A.   He was just asking what type of questions they were

18   asking, asking me how did I answer the questions, and he was

19   telling me that I did a good job and that I handled everything

20   correctly.

21   Q.   Again -- so now we're talking about the time of when CPD

22   was questioning you, so this was sometime after you had turned

23   15.

24            How did you feel about Mr. Kelly at this time?

25   A.   Can you repeat the question for me one more time.

Jane - direct by Appenteng
791

 1   Q.   Around the time of the CPD questioning --

 2   A.   Mm-hmm.

 3   Q.   -- how did you feel about Robert Kelly at that time?

 4   A.   I cared for him.  Emotionally, I cared for him.

 5   Q.   So around this time -- again, I'll direct your attention

 6   to some other allegations that -- that you learned about.

 7           So I'm directing your attention to late 2001, early

 8   2002, and how old were you during that time.

 9           So in 2001, how old did you turn?

10   A.   I was about 16.

11   Q.   So we just talked about -- in 2000, you turned 16.  So in

12   2001, you would have turned 17 years old?

13   A.   Yes.

14   Q.   Okay.  And so late 2001, early 2002, during that time

15   frame when you were 17 years old, what, if anything, did you

16   learn about -- from -- what, if anything, did you learn about

17   additional allegations from Stephanie, your aunt?

18   A.   That there was a sex tape leaked that was including Robert

19   and I.

20   Q.   That was including who?

21   A.   Robert and I.

22   Q.   So at this time, again, late 2001, early 2002, did you see

23   this recording?  Did you know what it was?

24   A.   I heard things about it, but I never saw it.

25   Q.   What, if anything, did you learn about this tape from

Jane - direct by Appenteng

792

1    Stephanie?

2    A.   That it had been made public and that there was sexual

3    engagement between Robert and I on the tape, and that was

4    pretty much it.

5    Q.   So at this point did you discuss this with any of your

6    family members?

7    A.   No.

8    Q.   Did you discuss this -- the existence -- or that there was

9    rumors or that there was a tape that had been surfaced that

10   showed you engaging in sex acts with Robert Kelly?  Did you --

11   at that moment, did you talk to any of your family members

12   about it?

13   A.   No.

14   Q.   Did your parents question you about it?

15   A.   Yes.

16   Q.   And what, if anything, did they say?

17   A.   They were asking me is this true, they were asking me what

18   was -- about the nature of Robert and I's relationship, and I

19   denied everything.

20   Q.   I'm sorry.  I didn't hear the last part.

21   A.   They were asking me if the tape did include us, and they

22   were inquiring about the nature of Robert and I's

23   relationship, and of course I denied everything.

24   Q.   Why do you say "of course I denied everything," the "of

25   course"?

Jane - direct by Appenteng

793

1   A.   Because it was instilled in me not to admit that to

2   anybody, and that's exactly what I did.

3   Q.   Instilled by whom?

4   A.   Robert.

5   Q.   So what was your reaction to hearing this news or rumors

6   that this videotape had surfaced that possibly showed you and

7   Mr. Kelly engaged in sex acts?

8   A.   I was extremely scared.

9   Q.   Why were you scared?

10  A.   Of the possibility that it was true.  I was scared that my

11  parents were going to find out and -- about our relationship,

12  and I was also afraid of what would happen to him.

13  Q.   Did you talk to Mr. Kelly about it?

14  A.   Yes.

15  Q.   What were your conversations?

16  A.   He was just continuing to stress how important it was that

17  I kept this information a secret about our relationship and

18  that I had to be very firm and confident when speaking to

19  people about it and to continue to deny.

20  Q.   What was his reaction to the news that there may be a tape

21  that others had that showed you and Mr. Kelly engaging in sex

22  acts?

23  A.   He seemed afraid as well.

24  Q.   I'm sorry?

25  A.   He seemed afraid or concerned as well.

Jane - direct by Appenteng

794

1   Q.  So early 2002, did you have a conversation in person with

2   Mr. Kelly about these allegations that there was a sex -- that

3   there was a tape out there showing the two of you engaged in

4   sex acts?

5   A.  Yes.

6   Q.  Who was involved in that meeting?

7   A.  It was my mom, my dad, and Robert and myself.

8   Q.  And who set up this meeting, if you know?

9   A.  Derrel.

10          MR. BRINDLEY:  Objection for foundation, Judge.

11          MS. APPENTENG:  I can ask her.

12  BY MS. APPENTENG:

13  Q.  How do you know that Mr. McDavid set up this meeting?

14  A.  Through conversation that Robert and I had prior to this

15  and just knowing that he was involved in the game plan that

16  was about to take place as far as the approach.

17  Q.  Okay.  And we'll talk a little bit more about that.

18          So where did this meeting take place?

19  A.  It was at a hotel in Oak Park.

20  Q.  Okay.  And I believe you had said the person that set it

21  up you believe was Derrel.

22          Did you say that?

23  A.  Yes.

24  Q.  And do you know what his last name is?

25  A.  McDavid.

Jane - direct by Appenteng

795

1   Q.  If you were to see Derrel McDavid today, would you be able

2   to identify him?

3   A.  Yes.

4          MS. APPENTENG:  Your Honor, I'd ask if you could ask

5   the courtroom to remove their masks.

6          MR. BRINDLEY:  Judge, we'll stipulate --

7          THE COURT:  All right.  It's stipulated that she

8   identifies Mr. McDavid.

9   BY MS. APPENTENG:

10  Q.  So prior to this meeting in Oak Park that you're talking

11  about, how did you feel about -- like, what was your feelings

12  going into this meeting?

13  A.  I was extremely scared.

14  Q.  Why were you scared?

15  A.  Because my parents were going to finally find out that I

16  had been engaging in sexual activity with Robert.

17  Q.  Why did you have the impression that your parents were

18  going to find out at this meeting?

19  A.  Because prior -- in a prior conversation that Robert and I

20  had, he finally admitted to me that it was true, that there

21  was a tape leaked between us, and it was about to become

22  legal, so he needed to let my parents know to get them on

23  board with further approaches.

24  Q.  Okay.  So let's back up.

25          So you said -- he said that that was about to become

Jane - direct by Appenteng

796

1  legal.  Is that what you said?

2  A.  Yes.

3  Q.  What did you understand that to mean?

4  A.  Well, I knew that they were planning on turning the tape

5  over to the authorities.

6  Q.  Who was?

7  A.  Stephanie or whomever had the possession of the tape.

8  Q.  Okay.  So then when you said things were going to get

9  legal, what does -- what does that mean to you?

10  A.  He just basically explained to me that things were about

11  to go to the next level as far as authorities becoming

12  involved, so I needed to let my parents know that we did have

13  a sexual relationship because they were going to find out

14  confirmed through the authorities.

15  Q.  You had said that he finally let me know that the tape had

16  been leaked.  What are you talking about, "he finally let me

17  know"?

18  A.  When it was originally presented to me, it was as if it

19  was speculation, they weren't sure if the tape was leaked or

20  not.  So he was presenting it to me through conversation that

21  it was a possibility but not for certain.

22  Q.  Okay.  So then when you say he confirmed, what did

23  he . . .

24  A.  That basically they weren't able to retrieve the tape back

25  so that it was going to become very public and it was going to

Jane - direct by Appenteng

1    be turned over to a legal team.

2    Q.  And then you also said -- you said that this was about to

3    become a situation that your parents needed to know about now?

4    A.  Yes.

5    Q.  Okay.  And why would your parents need to know now

6    about -- about the sexual relationship that you two were

7    having?

8    A.  He wanted to let them know that it was true, and it was

9    also an effort to get them to be --

10            MS. BONJEAN:  Objection to her speculating as to

11   Mr. Kelly's state of mind.  If she has firsthand knowledge --

12            THE COURT:  She could say what he said, but not what

13   she thinks he thought.  So I'll sustain the objection.

14            You can reframe the question.

15   BY MS. APPENTENG:

16   Q.  What did he say about why your parents needed to become

17   involved?

18   A.  Because he wanted them on his team as far as handling the

19   legal aspects of what was about to take place.

20   Q.  Okay.  So we were talking about this --

21            MS. APPENTENG:  Should we take a break?

22            THE COURT:  In about 15 minutes we'll do it.

23            MS. APPENTENG:  Okay.

24            THE COURT:  Half past.

25            MS. APPENTENG:  Okay, Your Honor.

Jane - direct by Appenteng

798

1  BY MS. APPENTENG:

2  Q.  So we were talking about this in the lead-up to this

3  meeting that you were talking about that occurred in Oak Park.

4        So who attended this meeting?

5  A.  It was me, my mom, my dad, and Robert.

6  Q.  Okay.  And, again, we had talked about it a little bit

7  earlier.  So to reorient ourselves, we were talking about

8  early 2002; is that correct?  That's when this meeting

9  occurred?

10 A.  Yes.

11 Q.  You had mentioned that Mr. McDavid had set it up, but was

12 Mr. McDavid there present at the meeting?

13 A.  I can't remember if he was there or not.

14 Q.  You don't know one way or the other whether he was there?

15 A.  No.

16 Q.  What happened when you -- when you and your -- did you

17 arrive at the meeting with your parents?

18 A.  Yes.

19 Q.  What happened when you arrived with your parents?

20 A.  My dad and Robert stepped away in a room, like in a -- we

21 were kind of -- my mom and I were kind of waiting on one side

22 and they were talking in another room.  And I just remember my

23 dad storming out and being upset.  And he told my mom that it

24 was true, that there was a videotape of Robert and I, and he

25 was crying and he was upset.  And we got on the elevator, and

Jane - direct by Appenteng

799

1   Robert was begging for his forgiveness and pleading to --

2   don't turn on him and all of that.  And my dad -- I remember

3   his words very clearly saying --

4           MS. BONJEAN:  I'm going to object to hearsay as to

5   his -- what the father said, but --

6           THE COURT:  This is not hearsay.  It's a statement of

7   fact what she heard.  Overruled.

8   BY MS. APPENTENG:

9   Q.  Go ahead.

10  A.  He just was saying, "I can't help you.  I can't help you."

11  And we got our belongings and we left.

12  Q.  So let's back up a little bit.  So what happened first was

13  your father and Mr. Kelly were off having a conversation by

14  themselves; is that correct?

15  A.  Yes.

16  Q.  Do you know exactly what was said during that conversation

17  between the two of them?

18  A.  No.

19  Q.  When they joined -- came back and joined you and your

20  mother, was your -- how was your father's emotional state at

21  that moment?

22  A.  It was hysterical.

23  Q.  What did you observe about Robert Kelly at that moment?

24  What was he doing?

25  A.  He was crying.  He was sincere.  I remember him dropping

Jane - direct by Appenteng

800

1    to his knees and grabbing his head and apologizing profusely

2    and just asking for my dad's forgiveness.

3    Q.   What were you and your mother doing at this point?

4    A.   We were crying.  We were emotional.

5    Q.   Why were -- why were you crying and emotional?

6    A.   Because I was embarrassed for lying to my parents.  They

7    finally understood everything was true, and it was just my

8    first admittance to them as far as what was happening.  And I

9    was also afraid and fearful for what was going to happen to

10   Robert.

11   Q.   What, if anything, did you communicate about your feelings

12   for Robert in that meeting?

13   A.   I was very emotional, and I was telling them how much I

14   care for him and how much I loved him and how much he loved

15   me.  And I was on his side as far as begging for their

16   forgiveness and just pleading for them not to turn on him or

17   go against him.

18   Q.   You said then you all got to the elevator.  Who -- who was

19   making their way to the elevator?

20   A.   Me, my dad, and my mom.

21   Q.   Did Mr. -- was Mr. Kelly with you all when you were

22   leaving?

23   A.   Yes, he was walking out because he was still trying to

24   have a conversation with my dad.

25   Q.   What was he saying?

Jane - direct by Appenteng

801

1   A.  He was just pleading for his forgiveness and just asking

2   him not to turn on him.

3   Q.  Was there a response at that time from your mom or dad

4   about not turning on him?

5   A.  My dad, he was saying, "I can't help you."

6   Q.  And after -- after you got in the meeting -- excuse me --

7   after you got to the elevator, did -- is that when you and

8   your parents left?

9   A.  Yes.

10  Q.  And did you have -- so in the -- in the days after the

11  meeting, what conversations, if any, did you have with

12  Mr. Kelly about what happened in the meeting?

13  A.  We were just talking about -- it was just like gauging,

14  like -- excuse me -- how my parents were like responding to me

15  at home, has any other topics of conversation come up with --

16  about the tape or just really gauging what took place at that

17  time and what was the environment like out -- after that.

18  Q.  So to get this straight, he was asking you questions about

19  what was happening on -- in the environment at your home.  Is

20  that what you're saying?

21  A.  Yes.

22  Q.  What kind of questions?

23  A.  He would ask like how my parents were feeling, could I get

24  a feel for, you know, their mentalities towards this situation

25  and what did I think they were going to do and just

Jane - direct by Appenteng

802

1    reinforcing how important it was to -- now that we have

2    admitted it to them, to not admit it to anyone else.

3    Q.  What, if anything, did he say about what you all had

4    talked about before the meeting, which was letting your

5    parents know in an effort to get them on his side?

6            MS. BONJEAN:  Object to the foundation of the

7    question.  And the U.S. Attorney keeps going back, like ask a

8    question, get an answer and then just continue to go back.

9    It's cumulative.  It's been asked and answered.

10           THE COURT:  Let me read the question.

11           I think he -- I think she answered that before.  I

12   think it's correct.  So I'll sustain the objection.

13   BY MS. APPENTENG:

14   Q.  So at some point -- so after -- shortly after this

15   meeting -- or in the weeks that followed the meeting, did you

16   leave the country for a trip?

17   A.  Yes.

18   Q.  Why did you -- why did you leave the country?

19   A.  Because there was a lot of negative attention happening

20   around the videotape, and Robert wanted us to leave the

21   country to pretty much clear our heads, figure out what the

22   approaches were going to be moving forward and just to not

23   have any attention on us or for us to be available or just

24   around or like accessible.

25   Q.  Available or accessible for what?

Jane - direct by Appenteng

803

1   A.   Like the authorities or just press, things of that nature.

2   Q.   Where did you go?

3   A.   To the Bahamas and Cancun, Mexico.

4   Q.   Who went with you?

5   A.   My mom and my dad.

6   Q.   How long was the trip, if you recall?

7   A.   From what I remember, I want to say maybe two weeks.

8   Q.   So -- and so just to put a bookmark between the time, so

9 between the meeting and before you went on the trip, how were

10 you interacting with your parents at that time?

11   A.   I was really shut down, really standoffish. I was told to

12 make them feel uncomfortable so that they would not turn

13 against him, and that's exactly what I did.

14   Q.   You said you were told to make them feel uncomfortable.

15 By whom?

16   A.   Robert.

17   Q.   What types of things were you doing to -- to create

18 distance between you and your family -- your parents, I should

19 say, your parents?

20   A.   I was not talking to them.

21   Q.   What else?

22   A.   I would sleep in my closet, just like totally shut down

23 from the world.

24   Q.   So when you went on the trip, how were you interacting

25 with your parents?

Jane - direct by Appenteng

804

1    A.   Things started to pick up a little bit better.  We started

2    communicating a little bit more.  They were trying to just

3    understand what was happening with me.  So it got a little bit

4    better.

5    Q.   Overall, how was the trip, like was it a fun vacation?  Or

6    how was the time spent?

7    A.   It was not a fun vacation.  It was not considered to be a

8    vacation.  It was literally us trying to understand all of the

9    positions that we were in.

10   Q.   And what do you mean by all of the positions that you were

11   in?

12   A.   Well, I lied to my parents and I was keeping that -- the

13   nature of my relationship with Robert a secret, so they had to

14   digest all of that and they had questions for me.  So it

15   was -- it was really uncomfortable.

16   Q.   Were you in touch with Mr. Kelly during this trip?

17   A.   Yes.

18   Q.   How were you communicating?

19   A.   By phone.

20   Q.   What were the -- what was the nature of the conversations

21   during the trip?

22   A.   Everything was pretty much revolved around how we were

23   going to handle the videotape.

24   Q.   And what do you mean "how we were going to handle the

25   videotape"?

Jane - direct by Appenteng

805

1   A.   Again, it was just him reinforcing how much this should be

2   kept a secret, how I need to deny all of these allegations and

3   not have certain conversations with certain people, don't talk

4   over the phone, don't communicate with this person, it's about

5   trust.  It was just the nature of how to handle myself in this

6   situation.

7   Q.   Did you discuss your parents?

8   A.   Yes.

9   Q.   What did you discuss about your parents?

10   A.   I just let him know that I was following his instructions

11   on how I should handle them and I was trying to gauge where

12   their mentalities were as far as what they wanted to do or not

13   to do.  So in a sense, in all honesty, I was kind of working

14   on them to be in his favor.

15   Q.   When you say "working on them to be in his favor," what

16   does that mean?  Can you explain a little bit more.

17   A.   Just begging them, pleading with them how much I love him,

18   how much he loves me and to please don't turn on him.  I don't

19   want his career to be ruined.  I don't want this secret about

20   me to be true, either.  So it was just me really trying to get

21   them to not turn on him, as it was referenced.

22         THE COURT:  Is this a good time to break now?

23         MS. APPENTENG:  Sure.  Thanks, Your Honor.

24         THE COURT:  We'll take a 15-minute recess until a

25   quarter to 4:00.

Jane - direct by Appenteng

806

1              THE COURT SECURITY OFFICER:  All rise.

2         (Jury out.)

3         (Change of court reporters.)

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 58 of 212 PageID #:11018
Jane - direct by Appenteng
807

1        (The following proceedings were had in open court.  Jury

2   out.)

3              THE COURT:  How much longer on direct?

4              MS. APPENTENG:  At least half an hour.

5              THE COURT:  Half-hour?

6              MS. APPENTENG:  At least.

7              THE COURT:  Okay.

8        (Jury in at 3:45 p.m.)

9              THE COURT:  Please be seated.

10             Ms. Appenteng, you may continue your direct

11   examination.

12             MS. APPENTENG:  Thank you, your Honor.

13   BY MS. APPENTENG:

14   Q.  Good afternoon, Jane.

15   A.  Good afternoon.

16   Q.  Before we move on to our next topics, I wanted to circle

17   back to the Videos 1 and 2.

18             I did not ask you these questions, and they are:  How

19   did you know that the Video 2, which is a living room scene

20   that you described earlier, how did you know that it was being

21   filmed?

22   A.  Because I saw the camcorder.

23   Q.  Where was it in terms of inside the room, outside the

24   room?

25   A.  It was inside of the room.

Jane - direct by Appenteng

1    Q.   And as to Video 1, which was the log cabin scene, how did

2    you know that that was being filmed?

3    A.   Because it was also in the room.

4    Q.   What was in the room?

5    A.   The camcorder.

6    Q.   Okay.  Let's move on to -- we were talking about the trip

7    that you were on with your parents.  You were talking about

8    that you were in touch with Mr. Kelly during the trip.

9         Did you and your parents come to any agreements or

10   conclusions about how you would go forward with regard to

11   disclosing to anyone your sexual relationship with Robert

12   Kelly?

13   A.   Yes.

14   Q.   What was the conclusion or agreement that you and your

15   parents came to?

16   A.   They were going to do as I asked and basically stay on his

17   side as far as how they were going to handle the situation

18   legally.

19   Q.   What does that mean, "stay on his side"?

20   A.   At the time, they had to quit their jobs.  They weren't

21   working.  They couldn't afford lawyers.  So they also didn't

22   want to lose me within the equation.  So they agreed to be on

23   his side as far as denying the fact that I was on the

24   videotape.

25   Q.   I have some follow-up questions regarding that.

Jane - direct by Appenteng

809

1    So you said that at that time your parents had lost

2   their jobs.

3    When was it that they lost their jobs?

4   A.  After the videotape was made public.

5   Q.  To try to bring it down to a little -- a smaller time

6   frame, was that before or after the trip that you all went on?

7   A.  Before.

8   Q.  I want to talk about one other thing that occurred on the

9   trip.

10   While you were in Mexico, did you --

11   MS. BONJEAN:  Objection.  Are we in the Bahamas, or

12   are we in Mexico?

13   BY MS. APPENTENG:

14   Q.  While you were in Mexico, did you get tattoos?

15   A.  Yes.

16   Q.  What were those tattoos?

17   A.  One was on my lower back.  It was a butterfly with a vine

18   around it, and the other one was a heart with, like, some

19   fiery signs with Robert's name in the middle of the heart.

20   Q.  Did your parents know about this?

21   A.  No.

22   Q.  At the trip -- while you were on the trip, did they know

23   this happened?

24   A.  No.

25   Q.  Why didn't you tell them?

Jane - direct by Appenteng

810

1    A.   Because everything was still really sketchy with them

2    finding out about the relationship that we were in, and I

3    wanted to keep that a secret.  It wasn't to tell anyone.  It

4    was just something I wanted to do.

5    Q.   Why did you get those tattoos?

6    A.   Because I loved him and I cared for him, and I wanted to

7    show and express that I was loyal to him.

8    Q.   Who else knew about these tattoos?

9    A.   At the time, just Robert and I.

10   Q.   So when did he know about the tattoo?

11   A.   It was shortly after I came back from the trip.

12   Q.   When after you came back after the trip?  Are we talking

13   weeks or months?

14   A.   I would say, like, a month after.

15   Q.   How did you tell him or show him?

16   A.   I was a little afraid to share it with him because I knew

17   that everything was already drawn a lot of attention to.  So I

18   kind of just acted as if I was surprising him, and I let him

19   know that I got a tattoo with his name on it on my body.

20   Q.   Did you show it to him?

21   A.   Yes.

22   Q.   What was his reaction?

23   A.   He acted like, you know, he was -- like he liked it, but

24   he was, like, "That's a problem.  You can't have a tattoo like

25   that with everything that we have going on as far as the

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 62 of 212 PageID #:11022
Jane - direct by Appenteng
811

1    videotape.

2    Q.  What, if anything, was done to make sure that no one else

3    would find out about this tattoo?

4    A.  He told me that I had to -- he told me that I had to get

5    it covered up.

6    Q.  Who told you you had to get it covered up?

7    A.  Robert.

8    Q.  And did you get it covered up?

9    A.  Yes.

10   Q.  How?

11   A.  Milton took me to a tattoo artist's house, and that's when

12   I got it covered up.

13   Q.  How did -- you said Milton took you?

14   A.  Yes.

15   Q.  Milton Brown?

16   A.  Yes.

17   Q.  How did he get involved?

18   A.  I'm not exactly sure.  I would assume that he and Robert

19   had a conversation about the tattoo.

20        MS. BONJEAN:  Objection to her assumptions, but --

21        THE COURT:  All right.  Objection sustained.

22   BY MS. APPENTENG:

23   Q.  How is it that you -- how is it that you got in a car --

24   did you get in a car with Milton Brown to take you to the

25   house to --

Jane - direct by Appenteng
812

1  A.  Yes.

2  Q.  -- get this tattoo removed or covered?

3  A.  He --

4  Q.  I was going to ask a question.

5      How is it that you got into a car with Milton Brown

6  to go to get this done to your tattoo?

7  A.  Robert let me know that June Brown was coming to pick me

8  up to take me to get the tattoo covered up.

9  Q.  Did you have any conversations with Mr. Brown prior to

10 getting in the car about the tattoo?

11 A.  No.

12 Q.  Did you have any conversations with Mr. Brown on the way

13 to the house to get the tattoo covered with Mr. Brown?

14 A.  No.

15 Q.  When you got to this house, was it a -- even though it was

16 a house, was it a professional, like, tattoo shop?

17 A.  It was set up as a tattoo shop, yes.

18 Q.  And who -- do you know the people that were in -- did you

19 ever -- had you ever met those people inside that ultimately

20 would be working on the tattoo?

21 A.  No.

22 Q.  How did you know where to go and what to do when you got

23 there?

24 A.  Because Milton Brown let me know what I needed to do when

25 we got to the house.

Jane - direct by Appenteng

813

1   Q.   And what is it that you needed to do when you got to the

2   house?

3   A.   To go inside.  He was expecting that he had to do a

4   coverup, and to not have much conversation, and that was it.

5   Q.   Sorry.  So who were you talking to on the inside of the

6   house?

7   A.   The tattoo artist.

8   Q.   Did you speak to the tattoo artist, or did Milton Brown

9   come in and speak to the tattoo artist?

10  A.   He did go inside with me, but I was communicating with the

11  tattoo artist.

12  Q.   About how long did the procedure take?

13  A.   Maybe about 20 minutes, 30 minutes.

14  Q.   Was Mr. Brown there with you the entire time?

15  A.   Yes.

16  Q.   Did the two of you leave the -- "two of you" meaning you

17  and Mr. Brown -- leave the house together?

18  A.   Yes.

19  Q.   And where did he take you, if you recall?

20  A.   I believe back to the studio.

21  Q.   And on the way back, did you talk about the tattoo or what

22  had happened while you were in the tattoo -- while you were

23  getting something done to the tattoo?

24  A.   No.

25  Q.   What exactly did they do to the tattoo, the tattoo artist?

Jane - direct by Appenteng

814

1   A.   He shaded the inside of the heart in with, like, a design

2   over the name.

3   Q.   And is that shaded design still -- do you still have that

4   on your body today?

5   A.   Yes.

6   Q.   Has it -- have you changed the tattoo again in any way?

7   A.   No.

8   Q.   Who paid for that procedure?

9   A.   I believe Robert.

10        MS. BONJEAN:  Objection to her belief of who paid.

11  Either she knows or she doesn't.

12  A.   Robert.

13        MS. APPENTENG:  I could ask a series of questions.

14        THE COURT:  Overruled.  I will let it stand.

15  BY MS. APPENTENG:

16  Q.   How do you know Robert paid for it?

17  A.   Because he was the one who had me get it covered up.

18  Q.   That happened, as you mentioned, on the heels of you

19  coming back from this trip to Mexico and Cancun with your

20  parents, correct?

21  A.   Yes.

22  Q.   So when you all came back from the trip, did things change

23  in terms of your interactions with your parents?  Did things

24  change with respect to the interactions with your parents?

25  A.   Yes.

Jane - direct by Appenteng

815

1  Q.  How did it change?

2  A.  They were kind of wavering as far as how they wanted to --

3  as to whether or not they wanted to protect Robert in the

4  situation.

5          So again, I became really different with them, not

6  talking to them, distancing myself and just -- I became out of

7  character so they could feel uncomfortable about feeling like

8  they wanted to go against him.

9  Q.  How were you making them feel uncomfortable?

10 A.  I was suicidal.  I stopped eating.  It was just a series

11 of things that was taking place within the family that were

12 affecting me.  They were under a lot of pressure.  But I was

13 so focused on protecting him that I was willing to do anything

14 to have them not go against him in any way.

15 Q.  Were your parents still -- you had mentioned they were out

16 of work.

17          Were they still out of work at this time -- again,

18 this time period when you came back from the trip?

19 A.  Yes.

20 Q.  How was your relationship with Mr. Kelly when you returned

21 from the trip?

22 A.  It was okay.  He was just -- at this point we were

23 sneaking contact with each other because we were not trying to

24 include everybody in our business, sort of speak, as far as

25 knowing our approaches with how we were going to handle the

Jane - direct by Appenteng

816

1   videotape situation.  So we got closer.

2   Q.  When you say "closer," what do you mean?

3   A.  Just on a bonding side.  Everything that he was saying, it

4   kind of made sense to me.  I wanted to protect him.  I loved

5   his children.  He was very successful in his career.  I didn't

6   want anything to happen to him.  And I did love and care about

7   him.

8   Q.  Did you all think that you -- did you think that you had a

9   future with him at this point?  This is right after you get

10  back from the trip.

11  A.  Yes.

12  Q.  What kind of a future did you think you had with him?

13  A.  Marriage.

14  Q.  Now, he was still married at the time; is that right?

15  A.  Yes.

16  Q.  How did his current marriage play into the plans that you

17  had for the two of you to get married?

18  A.  He would have conversation with me expressing to me how

19  much he loved me and how much he was in love with me and that

20  he was trying to figure out how to leave that situation to

21  make me his wife.

22  Q.  By "that situation," you mean leave his current wife; is

23  that right?

24  A.  Yes.

25  Q.  So when you came back from the trip, this was early in

Jane - direct by Appenteng

817

1    2002, correct?

2    A.  Yes.

3    Q.  In early 2002 or in those months -- early months of 2002,

4    what, if anything, was happening -- strike that.

5         Did you receive a subpoena to testify before the

6    grand jury?

7    A.  Yes.

8    Q.  And it was a grand jury with Cook County, from the State;

9    is that correct?

10   A.  Yes.

11   Q.  Who else in your family, if anyone, received grand jury

12   subpoenas to testify in a State grand jury?

13   A.  I believe my father.

14   Q.  In 2002, did you indeed testify in the grand jury?

15   A.  Yes.

16   Q.  And before you went into the grand jury, did you talk to

17   Mr. Kelly?

18   A.  Yes.

19   Q.  Again, when I say go in, I mean before you testified.

20   A.  Yes.

21   Q.  What was the nature of that conversation?

22   A.  It was just about my loyalty to him; how to handle myself

23   during the meeting as far as being confident; how I should

24   answer questions, just about, like, my delivery with just

25   answering questions; and just reiterating how strong and stern

Jane - direct by Appenteng
818

1    I needed to be as far as denying our relationship and the sex
2    tape.
3    Q.   So then, what was your understanding of why you were being
4    subpoenaed to even testify in the State grand jury?
5    A.   Because I was involved in child pornography.
6    Q.   That was your understanding of what the type of questions
7    they would be asking you?
8    A.   Yes.
9    Q.   So did you follow Mr. Kelly's instructions when you went
10   into the grand jury?
11   A.   Yes.
12   Q.   When you went to testify in the grand jury, did you -- was
13   a lawyer present with you?
14   A.   Yes.
15   Q.   Was that your lawyer?
16   A.   It was a lawyer that he got for me, yes.
17   Q.   Who's "he"?
18   A.   Robert.
19   Q.   How do you know that he got a lawyer for you?
20   A.   Because he let me know that I would have somebody
21   representing me, to never speak to any authorities without my
22   lawyer being present, and that was pretty much it.
23   Q.   Did you have an opportunity to meet with that person
24   beforehand, before you testified?
25   A.   Yes.

Jane - direct by Appenteng

819

1   Q.  Do you recall what that person's name is?

2   A.  I do not.

3   Q.  What were the conversations with that -- generally, what

4   were the conversations with that attorney?

5   A.  Just questions about what they would be asking me about my

6   cross necklace that I was wearing and just how to answer

7   questions and how to handle myself.

8   Q.  When you say cross necklace that you were wearing, why was

9   that an issue?  Why did that come up?

10  A.  Because the cross that they were going to be questioning

11  me about was a cross that I had on my passport picture that

12  was also -- that I was also wearing in the videotape.

13  Q.  Okay.  So the cross -- just let me back up a little bit.

14          So the videotape, what videotape are you talking

15  about?

16  A.  The one that took place in the basement in the log cabin.

17  Q.  So you are talking about the video scene -- sorry.

18          You are talking about a sexual encounter that

19  occurred in 1010 West George in the basement of Mr. Kelly's

20  home; is that right?

21  A.  Yes.

22  Q.  What was your understanding about how the cross played

23  into that at all?

24  A.  It was considered evidence, and it needed to be gotten rid

25  of.  So I was instructed to bring in the cross as well as my

Jane - direct by Appenteng

820

1   passport that showed me wearing the necklace that I was

2   wearing in the videotape.

3   Q.  So just to be clear, did that happen at this time before

4   you were going into the grand jury or at another time?

5   A.  It happened at another time, but it was all related to the

6   lead-up of me going in to speak with them.  So that was my

7   conversation with that lawyer.

8            MS. BONJEAN:  Objection.  Foundation is lacking

9   there, but --

10           THE COURT:  "Another time."  I'm not sure.  This is

11  right before she went into the grand jury.

12           MS. BONJEAN:  But then the U.S. Attorney said, or was

13  that another time?  So she just led her with some alternative

14  time, and then the witness agreed to it.  So now we have no

15  foundation.

16           MS. APPENTENG:  Your Honor, we can talk later about

17  the next time that she was --

18           THE COURT:  All right.  Let's go on.

19           MS. APPENTENG:  -- the cross.

20           Thank you.

21  BY MS. APPENTENG:

22  Q.  So before you went into the grand jury, you were saying

23  you were having these conversations about the cross.

24           You recall the recording that was on -- you recall

25  that encounter, that sexual encounter with Mr. Kelly in the

Jane - direct by Appenteng

821

1    basement of his home when you were 14 years old that is

2    depicted on Video 1; is that correct?

3    A.   Yes.

4    Q.   And what, if anything, piece of jewelry, that you were --

5    were you wearing in that video?

6    A.   The silver cross.

7    Q.   And was it a silver cross -- we had talked early in your

8    testimony about silver crosses, one that Mr. Kelly bought for

9    you and one that your parents bought for you?

10   A.   Yes.

11   Q.   What cross were you wearing in Video 1?

12   A.   The one that my parents bought for me.

13   Q.   So prior to your testimony in the grand jury, as you are

14   walking into the room, do you recall being sworn in to tell

15   the truth?

16   A.   Yes.

17   Q.   They put you under oath similar to like what they did

18   here?

19   A.   Yes.

20   Q.   And when you went into the grand jury, were you truthful

21   about your sexual relationship with Robert Kelly?

22   A.   No.

23   Q.   Do you recall the things that you were not truthful about?

24   A.   Yes.

25   Q.   What did you tell them that was not true?

Jane - direct by Appenteng

822

1   A.   That I was not involved with him sexually and that we had

2   never made any videotapes.

3   Q.   When you were in that grand jury back in 2002, were you --

4   did the people that were presenting materials in that grand

5   jury, did they show you photos or pictures?

6   A.   Yes.

7   Q.   Were you actually depicted in those photos or pictures?

8   A.   Can you rephrase the question for me.

9   Q.   Were you depicted in those photos?

10  A.   Yes.

11  Q.   And what were those photos of, if you can remember?

12  A.   Me with a certain hairstyle making certain poses or

13  gestures that I was doing during the videotape.

14  Q.   Were they -- you are saying that they were from the

15  videotape?

16  A.   Yes.

17  Q.   And you looked at those images in the grand jury?

18  A.   Yes.

19  Q.   And you were depicted in them?

20  A.   Yes.

21  Q.   And did you say it was you?

22  A.   No.

23  Q.   So you were -- you were untruthful?

24  A.   Correct.

25  Q.   And why were you untruthful?

Jane - direct by Appenteng

1  A.  Because I was afraid to expose Robert, because I was

2  afraid of what might happen to my parents.  I also did not

3  want that person to be me.

4  Q.  When you say you didn't "want that person to be me," what

5  do you mean?

6  A.  I was ashamed.

7  Q.  Were you uncomfortable with being untruthful?

8  A.  Yes.

9  Q.  As part of this investigation -- as part of this case that

10  led to the charges today, you received immunity from the

11  government; is that correct?

12  A.  Yes.

13  Q.  What does that mean, that you have immunity?

14  A.  That if I correct my mistake by telling the truth, that I

15  won't be prosecuted.

16  Q.  That you won't be prosecuted for what?

17  A.  For lying under oath.

18  Q.  Does your immunity also extend to all of the things that

19  you have said to the investigators in this case?

20  A.  Yes.

21  Q.  What is your understanding of what you need to do, your

22  responsibility in order for the government to uphold its end

23  of the bargain?

24  A.  Tell the truth.

25  Q.  Tell the truth when?

Jane - direct by Appenteng

824

1    A.   Now.  Here, right now.

2    Q.   And did you also need to tell the truth when you were

3    meeting with the investigators?

4    A.   Yes.

5    Q.   And if the government determined that you were being

6    untruthful -- if you were found to be untruthful, what would

7    happen?

8    A.   I could potentially be prosecuted for lying under oath.

9    Q.   And would the government be able to use statements that

10   you have made against you in further cases?  Is that right?

11   A.   Yes.

12   Q.   Now, after the State grand jury in 2002, did you learn

13   that Mr. Kelly was indeed charged by the State?

14   A.   Can you repeat that.

15   Q.   After the grand jury -- when you went into the grand jury

16   in 2002, did you learn that Mr. Kelly was charged with

17   criminal --

18   A.   Yes.

19   Q.   -- criminal charges by the State?

20   A.   Yes.

21   Q.   What was your understanding of what those charges were

22   related to?

23   A.   The videotape that we made, which was considered child

24   pornography.

25   Q.   And the videotape, which videotape?  Which video are you

Jane - direct by Appenteng

1   talking about?

2   A.   The basement log cabin scene.

3   Q.   Shortly after he was charged in 2002, what, if anything,

4   did Mr. Kelly ask you to sign?

5   A.   A confidentiality agreement.

6   Q.   What was contained in this confidentiality agreement?

7   A.   To be completely truthful, I'm not exactly sure because I

8   didn't read it, but he explained to me that it was just for

9   his protection to make sure that I didn't go off and tell the

10  truth or change my story as far as what things took place with

11  our sexual relationship.  So if I wanted to show him my

12  loyalty, I needed to sign that agreement.

13  Q.   So in the weeks and months after the charges and leading

14  up into preparation for Mr. Kelly's trial in 2000 -- the trial

15  was in 2008.  Prior to that, after the grand jury -- so we are

16  talking about between 2002, 2008.

17       In preparation for the trial, did you meet with

18  Mr. Kelly's lawyers that he was working with for those

19  charges?

20  A.   Yes.

21  Q.   And early in your testimony, you had mentioned that you

22  had a meeting with lawyers about a cross?

23  A.   Yes.

24  Q.   Can you explain to us why you brought up that cross and in

25  relation to this meeting.

Jane - direct by Appenteng

826

1    What was that -- sorry.

2    In relation to these meetings with the lawyers, what

3    was that about?

4    A.   That cross was a big part of evidence.  So they were

5    really adamant about me giving the cross over to them so they

6    could get rid of it, as well as giving them my passport.  They

7    were just asking me different questions about where did I buy

8    it from, what was it made out of it, and that they needed my

9    passport with the picture on it so that it was no longer

10   evidence.

11   Q.   Okay.  So in this -- did this conversation that you are

12   talking about, did it happen in one meeting?

13   Is it your recollection that it happened in one

14   meeting, or was this multiple conversations?

15   A.   It was multiple conversations.

16   Q.   Who would be present when you were meeting with the

17   lawyers talking about this necklace -- this cross necklace?

18   A.   It was, like, Derrel McDavid and Robert.

19   Q.   So when lawyers were talking about you having to turn in

20   the cross, why would you have to turn in the cross?

21   Why was it evidence, from your understanding of these

22   conversations?

23   A.   Because it was the cross I was wearing in the videotape.

24   Q.   So did you indeed turn over the cross to someone?

25   A.   Yes.

Jane - direct by Appenteng

827

1   Q.   Who?

2   A.   To the lawyers.

3   Q.   Do you know specifically what lawyers?

4   A.   I don't remember.

5   Q.   What else, if anything, did you turn over to the lawyers?

6   A.   My passport.

7   Q.   I'm showing you what's been previously marked as

8   Government's Exhibit 115.

9        Do you see that on the screen there?

10  A.   Yes.

11  Q.   What's depicted in Government's Exhibit 115?

12  A.   The cross I was wearing in the video.

13  Q.   I'm sorry?

14  A.   The cross I was wearing in the video.

15  Q.   And what is this a picture of?

16  A.   That's my passport picture.

17  Q.   Is this a photo from the passport that you applied for in

18  March 1997?

19  A.   Yes.

20  Q.   So in March 1997, you -- in 1997, you would have turned

21  13 in September of that year; is that right?

22  A.   Yes.

23  Q.   Is this a true and accurate depiction of the passport

24  photo that was in your passport book that you turned over to

25  Mr. Kelly's lawyers?

Jane - direct by Appenteng

828

1   A.  Yes.

2   Q.  This is a true and accurate depiction of you in your

3   passport photo?

4   A.  Yes.

5           MS. APPENTENG:  Your Honor, we move to admit

6   Government's Exhibit 115.

7           THE COURT:  Any objections?

8           MR. BRINDLEY:  No, not now.  No, Judge.

9           THE COURT:  Admitted.

10          You may publish.

11      (Said exhibit was received in evidence.)

12  BY MS. APPENTENG:

13  Q.  This is you, Ms. -- Jane?

14  A.  Yes.

15  Q.  Again, which cross are you wearing in this passport photo?

16  A.  The one my parents bought me.

17  Q.  Do you recall any of the names of the lawyers on Robert's

18  team that you met with leading up to his trial?

19  A.  Yes.

20  Q.  What are some of their names?

21  A.  Ed Genson, and I believe there was a Sam.

22  Q.  Anyone else?

23  A.  Palladino.

24  Q.  Did you -- when you met with these lawyers, what was the

25  nature of the conversations?

Jane - direct by Appenteng

829

1    A.   It was about my line of questioning as far as the

2    videotape was concerned; again, the cross; the passport; how

3    to handle myself when being questioned; how to respond to

4    certain questions that were being asked of me; and to continue

5    to deny the videotape.

6    Q.   You say, "continue to deny."

7         Did they know that that was you on the videotape?

8         MR. BRINDLEY:  Objection, your Honor.  That is purely

9    speculative of the lawyers.

10        THE COURT:  The objection is sustained.

11   BY MS. APPENTENG:

12   Q.   Why did you have to turn over the passport again?

13        MR. BRINDLEY:  Objection, your Honor.  Speculation as

14   to the motivation of a group of lawyers.

15        THE COURT:  "Why did you have to turn over the

16   passport again?"

17        Objection sustained.

18   BY MS. APPENTENG:

19   Q.   You did turn over your passport, however, to these

20   lawyers; is that correct?

21   A.   Yes.

22   Q.   So leading up to the trial, did your relationship with

23   Mr. Kelly change at all, leading up to the trial, between 2002

24   and 2008?

25   A.   Yes.

Jane - direct by Appenteng

830

1    Q.   When did it change and how?

2    A.   Can you give me the dates again?

3    Q.   Sure.

4         So 2002 is when you testified in the grand jury.

5    Late 2002 -- sorry.  Not late 2002.

6         2002, Mr. Kelly was charged with the State.

7         So then between 2002 and 2008 was the time between

8    charges and the trial.

9    A.   It changed tremendously after he was found not guilty.

10        MS. BONJEAN:  Objection.  Not responsive.

11        THE COURT:  Overruled.

12   BY MS. APPENTENG:

13   Q.   So let's talk about the time period leading up to the

14   trial.

15        Where were you living during that time period leading

16   up to the trial?

17   A.   Can you give me, like, the dates, and, like, rephrase the

18   question so I can process it?

19   Q.   Sure.

20        So in 2002 and 2003, 2004, and 2005, those years

21   leading up to Mr. Kelly's state court trial, where were you

22   living?

23        So you would have been 17, 18, 19 years old at the

24   time.

25   A.   I was living at the house in Olympia Fields.

Jane - direct by Appenteng

831

1   Q.   Prior to that -- just prior to that, where were you

2   living?

3   A.   With my parents.

4   Q.   Were you living with them exclusively from the time you

5   got back from that trip until you moved into Olympia Fields?

6   A.   Yes.

7   Q.   About what age -- at what age did you move to Olympia

8   Fields?

9   A.   I was 17.

10  Q.   Okay.  And when you say "Olympia Fields," what are you

11  talking about?

12  A.   His house -- Robert's house in Olympia Fields.

13  Q.   So at 17 years old, you moved to his house in Olympia

14  Fields?

15  A.   Yes.

16  Q.   Why did you move to his house in Olympia Fields when you

17  were 17?

18  A.   We were still in a relationship at the time, and he wanted

19  me to be closer to him so that if anything happened or --

20  basically, like, I was under his wing of avoiding anything

21  with the media or family, like I was basically more so in his

22  control.

23  Q.   So we were talking about this in the context of how things

24  changed.

25         Did your relationship change from being one -- did

Jane - direct by Appenteng

1    your relationship change?

2    A.  Yes.

3    Q.  How did it change and when?

4    A.  It changed after the trial was complete.

5            It changed for the worse as far as other women being

6    involved, as far as abuse coming into play and things of that

7    nature.

8    Q.  What do you mean by "abuse coming into play"?

9            MS. BONJEAN:  Judge, I have an objection.  I would

10   like to place it on the record at a sidebar.

11           THE COURT:  All right.

12       (The following proceedings were had at sidebar:)

13           THE COURT:  Go ahead.

14           MS. BONJEAN:  I'm waiting for the --

15           THE COURT:  Oh, all right.

16           MS. BONJEAN:  Thank you, your Honor.

17           I would object to any characterization of this

18   relationship after 2008.  I don't know what it's relevant to.

19   She is an adult at this point.  There is nothing about the

20   abusive relationship that's relevant to anything.

21           Whatever probative value it has is substantially

22   outweighed by its prejudicial effect.  It doesn't go to the

23   charges here.

24           THE COURT:  Okay.

25           MS. APPENTENG:  Your Honor, we alleged in the

Jane - direct by Appenteng

833

1    indictment in the conspiracy to obstruct justice count that

2    there was intimidation and other things that were at play that

3    kept witnesses that could come forward quiet.

4              Your Honor also ruled in the motion *in limine* that,

5    regarding the government's notice of intent to admit direct

6    evidence about this, that we could introduce testimony and

7    evidence of the physical, emotional, and sexual abuse that

8    Kelly inflicted on Minors 1, 3, 5, and 6.

9              That motion was granted.

10             MS. BONJEAN:  She is not a minor, your Honor.

11             If it's directly related to an effort to obstruct, I

12   suppose that's a different matter.

13             But we are going to get into -- I mean, they dated

14   for another ten years.  Are we going to go through ten years

15   of her describing, you know, whatever abusive conduct she is

16   going to testify about?

17             It's just highly prejudicial.  It just really doesn't

18   have much to do with the charges.

19             MS. APPENTENG:  The conspiracy is alleged to have

20   occurred between 2000 and 2015.

21             And again, this is part of the obstruction -- the

22   conspiracy to obstruct justice.  That's the allegation in the

23   superseding indictment.

24             MS. BONJEAN:  There has to be a nexus.

25             THE COURT:  I'm not sure either.

Jane - direct by Appenteng

834

1          What is it?  That he was not nice to her, but she

2    stayed with him?  What is it?

3          MS. APPENTENG:  I'm sorry, your Honor?

4          THE COURT:  I'm trying to figure out what the

5    testimony is going to be.  I don't know.

6          MS. APPENTENG:  The testimony is that, as part of

7    being in an abusive relationship, that it's complicated.  The

8    abuse, while it still is ongoing, it's intimidating.  She

9    will -- you will hear her testify that that's one of the

10   reasons why she didn't want to leave, she didn't want to --

11   she did not ultimately leave and did not disclose what had

12   happened to her.

13         THE COURT:  When did she leave?  I mean, I don't know

14   this.

15         MS. BONJEAN:  When she was 26 years old.

16         MS. APPENTENG:  Your Honor, we don't have to discuss

17   every year by year what happened.  We can appreciate that.  We

18   can describe it in a summary fashion and move on.

19         THE COURT:  I hope you can because --

20         MS. APPENTENG:  Yes, your Honor.

21         THE COURT:  I will overrule the objection, but let's

22   move this thing along.  This is taking about twice as long as

23   I think it should have, but let's go.

24         MS. APPENTENG:  Yes, your Honor.

25         THE COURT:  All right.  Overruled.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 86 of 212 PageID #:11046
Jane - direct by Appenteng
835

1          (End of sidebar proceedings.)

2    BY MS. APPENTENG:

3    Q.  Jane, you were just testifying that you had suffered some

4    type of abuse.

5          Can you just generally describe that abuse that --

6    during this time period?

7          MS. BONJEAN:  Objection.  Foundation.

8          If we can get a time period?

9          THE COURT:  What is the time period?  I have lost

10   track.

11         MS. APPENTENG:  The witness was testifying about the

12   time period when she --

13         MS. BONJEAN:  The witness can testify rather than the

14   U.S. Attorney.  I would like to hear it from the witness.

15         THE COURT:  We were talking about while she was

16   living in --

17         MS. APPENTENG:  Olympia Fields, your Honor.

18         THE COURT:  -- Olympia Fields with Mr. Kelly.

19         So is that the time period we are talking about?

20         MS. APPENTENG:  Yes, your Honor.

21         THE COURT:  All right.  Proceed.

22         MS. BONJEAN:  Your Honor, that was many years.  We

23   are talking years.

24         Is it immediately?

25         I think it's fair, I mean, given the length of time

Jane - direct by Appenteng

836

1    she was living with him, that they pinpoint at least a year.

2              THE COURT:  Give us some kind of chronology so we

3    know when you are talking about.

4              MS. APPENTENG:  Yes, your Honor.

5    BY MS. APPENTENG:

6    Q.  When did you move to the Olympia Fields -- Mr. Kelly's

7    Olympia Fields' home?  How old were you?

8    A.  Seventeen.

9    Q.  And you had started to testify about abuse that you

10   endured when you were living there; is that correct?

11   A.  Yes.

12   Q.  When did that abuse start?

13   A.  At about 17.

14   Q.  And when did it end?

15   A.  When I left.

16   Q.  When was that?

17   A.  I was about 24.

18   Q.  And just in very general terms, can you describe the type

19   of abuse.

20   A.  It involved being spanked and hitting.

21   Q.  And how did that make you feel?

22   A.  Horrible.

23   Q.  How were you -- why did you stay with Mr. Kelly at this

24   time, if you felt horrible?

25   A.  Because sometimes that abuse would come from me trying to

Jane - direct by Appenteng

837

1   leave.

2   Q.  So again, why were you living at -- you explained already

3   why you were living at the George -- at the Olympia Fields

4   home.

5        In lead-up to the trial, were you able to talk to

6   your parents about what was going on with you?

7   A.  No.

8   Q.  Were you financially dependent on Mr. Kelly at this time?

9        MS. BONJEAN:  I object to the leading.  This is just

10  the U.S. Attorney testifying.

11       MS. APPENTENG:  I'm trying to move things along.

12       THE COURT:  Overruled.

13       She can answer that.  Just don't lead her anymore.

14  BY THE WITNESS:

15  A.  Yes.

16  BY MS. APPENTENG:

17  Q.  Why were you financially dependent on Mr. Kelly at this

18  time period?

19       Again, we are talking about between the time you were

20  17 years old until you were 26.

21  A.  Because I wasn't allowed to work.

22  Q.  I'm sorry.  You said you were 24 years old.  I apologize

23  for that.

24       Why weren't you able to work?

25  A.  He didn't allow me to.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 89 of 212 PageID #:11049
Jane - direct by Appenteng
838

1   Q.  How did this abuse that you suffered and being financially

2   dependent on Mr. Kelly factor into your decision to, if at

3   all, to tell people, to tell anyone about what happened to you

4   when you were 14, 15, 16 years old, in terms of the sexual

5   relationship you had with Mr. Kelly?

6           MS. BONJEAN:  I am going to object to the continuing

7   relevance of this and as it relates to any count in this

8   indictment for the same reasons that I have already placed on

9   the record, your Honor.

10          THE COURT:  Overruled.  She can answer.

11  BY THE WITNESS:

12  A.  Can you rephrase the question for me?

13  BY MS. APPENTENG:

14  Q.  Sure.

15          How did this abuse and being financially dependent on

16  Mr. Kelly lead to you not disclosing, not telling anyone what

17  happened to you when you were 14, 15, 16 years old and having

18  a sexual relationship with Mr. Kelly?

19  A.  It created fear.

20  Q.  How?  Can you please explain.

21  A.  At this point I was afraid to talk to anybody.

22          And then I had buried these secrets within myself and

23  my surroundings.  So it just really made me timid and afraid

24  to speak to anyone about it.

25          It was just really difficult because it would happen

Jane - direct by Appenteng

839

1    frequently when I would try to leave or even to stay.  It

2    was -- both seemed difficult.

3         (Brief pause.)

4              THE COURT:  Anything further, or are we --

5              MS. APPENTENG:  Yes, your Honor, there is further

6    questioning.  About 15 minutes, probably less than that.

7    BY MS. APPENTENG:

8    Q.  After -- you were living at the Olympia Fields house after

9    the trial -- after Mr. Kelly's trial; is that correct?

10   A.  Yes.

11   Q.  You were still living there?

12   A.  Yes.

13   Q.  And that was in 2008?

14   A.  Yes.

15   Q.  At what point did you -- you said that you were trying to

16   leave.

17              At what point did you actually leave Mr. Kelly?

18              How old were you?

19   A.  About 23, 24.

20   Q.  Where did you move away to?  Where did you move to?

21   A.  To University Park.

22   Q.  You moved away from Mr. Kelly?

23   A.  Yes.

24   Q.  And how were you able to pay for your living expenses?

25   A.  He was helping me with that.

Jane - direct by Appenteng

840

1    Q.   How was he helping you?

2    A.   He would help me pay the rent financially.

3    Q.   Were there any other ways in which he helped you

4    financially?

5    A.   During that time, like after leaving?

6    Q.   Yes.

7    A.   Yes.  He helped me with rent, and I started working

8    shortly after that.  So he helped me get transportation by

9    giving me a car so I would be able to get to work.

10   Q.   What kind of car was that?

11   A.   A Denali.

12   Q.   You said that -- directing your attention to 2014.  Did

13   you ask Mr. Kelly to help you with your rent?

14   A.   Yes.

15   Q.   And what was his response?

16   A.   He said "yes."

17   Q.   Did he -- how did he help you with your rent?

18   A.   He wrote out a check.

19   Q.   One check or multiple checks?

20   A.   I can't remember exactly how it was coming through, but I

21   do remember going to an office and picking up a check before.

22   Q.   Did any of the checks have anything that appeared unusual

23   to you on it?

24   A.   Yes.

25   Q.   What?

Jane - direct by Appenteng

841

1    A.   I noticed when I deposited one of the checks it said,

2    "Settlement."

3    Q.   Did you have any type of settlement agreement with

4    Mr. Kelly?

5    A.   No.

6    Q.   After the 2008 trial -- again, leading up to 2014, when

7    you were receiving those checks and still in communication

8    with Mr. Kelly -- did you tell anybody about the abuse you

9    suffered -- strike that.

10        Did you tell anybody about the sexual relationship

11   that you had with Mr. Kelly when you were 14, 15, 16, 17 years

12   old?

13   A.   Yes.

14   Q.   Who?

15   A.   I was talking to my parents about it.

16   Q.   Did you tell any police or law enforcement?

17   A.   No.

18   Q.   Leading up to your testimony today, however, did you tell

19   law enforcement?

20   A.   No.

21   Q.   In preparation for your trial -- sorry.

22        In preparation for your testimony today, did you tell

23   law enforcement about what had happened to you back when you

24   were 14, 15, and 16 and 17 years old?

25   A.   Yes.

Jane - direct by Appenteng

842

1   Q.   When did that happen?

2   A.   It started about two or three years ago.

3   Q.   Why did you tell law enforcement at that time, after so

4   many years?

5   A.   Because I became exhausted with living with his lies.

6   Q.   Was it hard for you to say the words about what happened

7   to you when you were 14, 15, 16 years old?

8   A.   Yes.

9   Q.   Why?

10          MS. BONJEAN:  Judge, objection to this.  I mean, I

11  have no problem with her explaining --

12          THE COURT:  Objection sustained.

13          MS. APPENTENG:  Just a moment, your Honor.

14          THE COURT:  Okay.

15      (Brief pause.)

16          MS. APPENTENG:  We have nothing further, your Honor.

17          THE COURT:  Pardon?

18          MS. APPENTENG:  We have nothing further, your Honor.

19          THE COURT:  Okay.  We will suspend until 10:00

20  o'clock tomorrow.

21          MR. BRINDLEY:  Judge, I was going to -- I'm going to

22  go first, Judge.  I won't be long today, I don't think.

23          THE COURT:  Do you want to ask some questions now?

24          MR. BRINDLEY:  I think I might be able to get done by

25  5:00.

Jane - cross by Brindley

843

1        THE COURT:  All right.  Proceed, then.

2        Thank you.

3        Mr. Brindley, you may question.

4        MR. BRINDLEY:  Thank you, your Honor.

5        CROSS-EXAMINATION ON BEHALF OF DEFENDANT McDAVID

6    BY MR. BRINDLEY:

7    Q.  Jane, my name is Beau Brindley.  I'm a lawyer.  I

8    represent Derrel McDavid.

9        I am going to -- it's been a long day, right?

10   A.  Yes.

11   Q.  So I'm going to try to get through this pretty quickly

12   with you.  I know it's been a long day.

13       My first question has to do with, you had said that

14   you had met with multiple lawyers at -- I believe it's the law

15   office of Ed Genson, right?

16   A.  Yes.

17   Q.  And there were different meetings you had with the various

18   lawyers there, right?

19   A.  Yes.

20   Q.  Now, the way Eddie's office was set up, there was a big

21   suite with multiple offices, right?

22   A.  I can't remember the setup.

23   Q.  Okay.  Was there an area out in the front where people

24   could sit and then there were offices where you could go back

25   and talk?  Does that sound about right?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 95 of 212 PageID #:11055
Jane - cross by Brindley
844

1    A.   I honestly don't remember the setup of the office.

2    Q.   Okay.  You know that there were occasions when you met

3    with the lawyers, and Derrel McDavid was in the office, right?

4    A.   Yes.

5    Q.   Okay.  But in terms of when you were actually talking to

6    the lawyers behind closed doors, you can't really recall for

7    sure whether he was in there at that time or whether he was

8    out in the front.

9         Is that fair to say?

10   A.   Yes.

11   Q.   Okay.  And you talked about having discussions with the

12   lawyers about your cross necklace, right?

13   A.   Yes.

14   Q.   The cross necklace is something that you had been asked

15   about at the grand jury, right?

16   A.   Correct.

17   Q.   The passport photo and the cross necklace is something

18   that the State investigators knew about and they questioned

19   you about, right?

20   A.   Correct.

21   Q.   That was back when you had a lawyer that Robert had gotten

22   for you, who was there with you, right?

23   A.   Yes.

24   Q.   So this cross necklace was not some kind of a secret.  It

25   was known, right?

Jane - cross by Brindley

1   A.   Yes.

2   Q.   At some point, you said the lawyers wanted you to give

3   them the cross necklace, correct?

4   A.   Correct.

5   Q.   Do you remember if you gave it to Eddie, Mr. Genson?

6   A.   I'm not exactly sure who I gave it to.

7   Q.   One of those guys, though, right?  Eddie or Sam or one of

8   the lawyers?

9   A.   Yes.

10  Q.   Okay.  And they asked you questions about your necklace,

11  too, right?

12  A.   Yes.

13  Q.   They asked you about, where did you get it, right?

14  A.   Uh-huh.

15  Q.   Is that -- you got to say "yes" or "no" for the reporter.

16  A.   Yes.

17  Q.   They asked you about what it was made out of, I think you

18  said, right?

19  A.   Yes.

20  Q.   And you don't know whether they gave it to somebody to --

21  some kind of an expert to look at to see if it could be

22  regenerated on a video.  You don't know what they did with it,

23  right?

24  A.   No.

25  Q.   You certainly don't know what the lawyers told to

Jane - cross by Brindley

846

```
 1    Mr. McDavid about the necklace, do you?

 2    A.   No.

 3    Q.   You don't know what the lawyers told to McDavid about this

 4    case -- Mr. McDavid.  I'm sorry.

 5            You don't know what they told him about this case in

 6    general, do you?

 7    A.   No.

 8    Q.   And you don't know how the things the lawyers said to

 9    Derrel might have impacted his thinking about this whole

10    situation, do you?

11    A.   No.

12    Q.   Now, as I have understood what you said here today, it's

13    that Robert Kelly basically -- I don't know how to put it.  He

14    coached you to lie to all kinds of people.  Is that fair?

15    A.   Yes.

16    Q.   He coached you to give false statements to your parents,

17    right?

18    A.   Yes.

19    Q.   He coached you to give false statements to whatever

20    investigators you came across right?

21    A.   Yes.

22    Q.   He coached you to give false statements to a grand jury,

23    right?

24    A.   Yes.

25    Q.   And you did what he told you, right?
```

Jane - cross by Brindley

847

1   A.  Correct.

2   Q.  Because, as you have said, he had that kind of power over

3   you at the time.  Fair to say?

4   A.  Yes.

5   Q.  And Mr. Kelly, as I understood what you said, he was --

6   according to what you said today, he was using this

7   goddaughter-godfather relationship as sort of a cover to

8   prevent anybody from knowing about the secret part of his

9   life, right?

10  A.  Yes.

11          MS. BONJEAN:  Objection to that.  Misstates what her

12  prior testimony was.

13          THE COURT:  What was the objection again?

14          MS. BONJEAN:  It misstates what her prior testimony

15  was.

16          THE COURT:  Okay.  The jury may remember.

17          So go ahead.

18  BY MR. BRINDLEY:

19  Q.  The godfather-goddaughter relationship -- you can correct

20  me if I'm wrong, but I thought that you were saying that that

21  was sort of used as a means of -- as a cover to keep secret

22  the sexual part of the relationship, the secret part of the

23  relationship.

24          Am I right?

25  A.  Yes.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 99 of 212 PageID #:11059
Jane - cross by Brindley
848

1  Q.  Okay.  So it's fair to say, then, that, based on what you

2  have described Robert saying to you today, he made it clear

3  that there was this part of his life that involved you and

4  this secret sexual relationship, he wanted that kept secret

5  from the world, right?

6  A.  Yes.

7  Q.  He was a public figure, right?

8  A.  Yes.

9  Q.  He had a huge public persona that you have said really

10 appealed to you, right?

11 A.  Yes.

12 Q.  And that public persona is far different than what you

13 have been describing here today, right?

14 A.  Correct.

15 Q.  So he, as you have said -- as I understood you, he went

16 through a lot of efforts in talking with you to make sure that

17 the public part of his persona was never impacted by this

18 secret part, right?

19         MS. BONJEAN:  I am going to object.

20         Her testimony on this stands.  This is just

21 Mr. Brindley recharacterizing.  I don't know what it's

22 relevant to.  Her testimony about her conversations with

23 Mr. Kelly have already been made that of her examination.

24         He is just summarizing and recharacterizing to his

25 liking.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 100 of 212 PageID #:11060
Jane - cross by Brindley
849

1          MR. BRINDLEY:  That's cross-examination.

2          THE COURT:  You don't need to argue.

3          I'm overruling the objection.

4          This is cross-examination.  He can lead the witness.

5    The witness is certainly able to disagree.

6          If he characterizes your prior testimony incorrectly,

7    in your view, you are certainly able -- or should correct him.

8          Okay.

9    BY MR. BRINDLEY:

10   Q.  If I am saying something wrong, please tell me.  But I

11   thought that what you were saying was basically that he had a

12   public persona, and this part of his life about the sexual

13   part with you and some of the other people you talked about,

14   he talked to you about making sure that never impacted his

15   public life, right?

16   A.  Yes.

17   Q.  It was supposed to be kept a secret.  He took steps to

18   keep it a secret, right?

19   A.  Yes.

20   Q.  Okay.  That went on throughout the duration, between when

21   you met him and this all started and from the time of the

22   trial in 2008.  That went on that entire time, this process of

23   keeping it a secret from everybody, right?

24   A.  Yes.

25   Q.  And you certainly didn't hear what Robert Kelly was

Jane - cross by Brindley

1   telling to Derrel McDavid when you weren't there about any of

2   this, did you?

3   A.  Can you repeat the question?

4   Q.  When you weren't around, you don't know what Robert told

5   Derrel, do you?

6   A.  You said when I was around or I wasn't?

7   Q.  When you were not.

8   A.  No, I don't.

9   Q.  Okay.  But what you do know and what you described today

10  is, Robert was involved in an effort to lie about or deny this

11  to the world, right?

12  A.  Yes.

13          MR. BRINDLEY:  One moment, your Honor.

14       (Brief pause.)

15          MR. BRINDLEY:  I have no further questions for the

16  witness.

17          THE COURT:  Ms. Judge, will you be that quick?

18          MS. JUDGE:  No, Judge.  We will go tomorrow.

19          THE COURT:  All right.  We will suspend until 10:00

20  o'clock tomorrow morning.

21          Members of the jury, don't discuss the case.  Don't

22  go on social media and describe your experiences or ask

23  questions.  Don't do any independent research.  Don't discuss

24  the case with your family or anything else, and don't read

25  about it.

1              But have a nice evening anyway.

2              THE COURT SECURITY OFFICER:  All rise.

3          (Jury out at 4:51 p.m.)

4              THE COURT:  All right.  Outside the presence of the

5    jury, does anybody want to put anything on the record before

6    we suspend until tomorrow?

7              MS. BONJEAN:  Yes, Judge.

8              Again, I would renew my motion for a mistrial.

9              This is clearly just incredibly antagonistic

10   defenses.  I don't know how much Mr. Kelly should have to do

11   to defend a case.

12             We have the government to contend with.  We have

13   Mr. McDavid to contend with.  We have Mr. Brown to contend

14   with.  And we also have Mr. Brindley, who completely misled

15   this Court and me by suggesting that when we did our motion to

16   sever that, oh, this is just Ms. Bonjean being so overreactive

17   and hysterical.  She is just manufacturing a basis for a

18   severance because she was upset about not getting a

19   continuance, which, of course, I didn't manufacture it.

20   Clearly this is always going to be antagonistic.  And here we

21   are.

22             So Mr. Kelly is in the unfortunate position of having

23   the government -- essentially three different government type

24   of entities that he has to defend against.

25             So we move for a mistrial.

1        THE COURT:  All right.  The motion is denied.

2        I suppose you did figure this is a little bit of

3   finger-pointing, but as Judge Easterbrook said, that's

4   sometimes not a bad thing.

5        However, it's my understanding that to have

6   sufficient antagonistic defenses, that the jurors must make a

7   choice between one or the other, and that's not the case here.

8        So the motion is denied.

9        Have a nice evening, everybody.

10       MS. BONJEAN:  Judge, I'm sorry.  I don't want to

11  belabor the point, but it is -- I would argue that it is

12  actually precisely that scenario.  I would be happy -- I'm

13  going to put it in writing, Judge.  I'm not going to take up

14  any more tonight.

15       THE COURT:  That's fine.  Put it in writing.

16       Thank you.

17     (An adjournment was taken at 4:54 p.m.)

18

19

20

21

22

23

24

25

```
 1                        * * * * * * *

 2                  C E R T I F I C A T E

 3          We, Frances Ward and Amy Spee, do hereby certify that

 4    the foregoing is a complete, true, and accurate transcript of

 5    the proceedings had in the above-entitled case before the

 6    Honorable HARRY D. LEINENWEBER, one of the judges of said

 7    Court, at Chicago, Illinois, on 8/18/2022.

 8

 9    /s/ Frances Ward, RPR, RMR, FCRR___       August 18, 2022
      Official Court Reporter
10
      /s/ Amy Spee, CSR, RPR, CRR               August 18, 2022
11    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                     Plaintiff,      )
                                       )
 5             -vs-                    )  Case No. 19 CR 567
                                       )
 6    ROBERT SYLVESTER KELLY, a/k/a    )  Chicago, Illinois
      "R. Kelly"; DERREL McDAVID;      )  August 19, 2022
 7    and MILTON BROWN, a/k/a "June    )  10:00 a.m.
      Brown,"                          )
 8                                     )
                       Defendants.     )
 9
                             VOLUME 5-A
10               TRANSCRIPT OF PROCEEDINGS - Trial
          BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury
11
      APPEARANCES:
12
      For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
13                          NORTHERN DISTRICT OF ILLINOIS
                            BY:  MS. JEANNICE WILLIAMS APPENTENG
14                               MS. ELIZABETH ROSE POZOLO
                                 MR. JASON A. JULIEN
15                               MR. BRIAN WILLIAMSON
                            219 South Dearborn Street
16                          5th Floor
                            Chicago, IL 60604
17
      For Defendant Robert  BONJEAN LAW GROUP
18    Sylvester Kelly:      BY:  MS. JENNIFER A. BONJEAN
                                 MS. ASHLEY BLAIR COHEN
19                               MS. DIANE O'CONNELL
                            750 Lexington Avenue
20                          9th Floor
                            New York, NY 10022
21

22    Court Reporter:       JUDITH A. WALSH, CSR, RDR, F/CRR
                            Federal Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street
24                          Chicago, IL 60604
                            Telephone: (312) 818-6531
25                          judith_walsh@ilnd.uscourts.gov
```

854

```
1   APPEARANCES (CONTINUED):

2   For Defendant        LAW OFFICES OF VADIM A. GLOZMAN
    Derrel McDavid:      BY:  MR. VADIM A. GLOZMAN
3                        53 West Jackson Boulevard
                         Suite 1128
4                        Chicago, IL 60604

5                        LAW OFFICES OF BEAU B. BRINDLEY
                         BY:  MR. BEAU B. BRINDLEY
6                             MR. MICHAEL THOMPSON
                         53 West Jackson Boulevard
7                        Suite 1410
                         Chicago, IL 60604
8
    For Defendant        FEDERAL DEFENDER PROGRAM
9   Milton Brown:        BY:  MS. MARY HIGGINS JUDGE
                              MS. KATHLEEN LEON
10                            MR. KYLE KENT
                         55 East Monroe Street
11                       Suite 2800
                         Chicago, IL 60603
12
13  ALSO PRESENT:        MS. MELISSA SIFFERMANN,

14                       Homeland Security Investigations

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court.  Jury out.)

2          THE COURT:  The government wants to raise some point,

3   so as soon as you sit down.  I think everybody is here.

4          Yes?

5          MS. POZOLO:  Yes, your Honor.  We are tendering your

6   Honor with a proposed jury instruction.  Yesterday when the

7   government moved to admit Government Exhibit 2 which contains

8   Videos 2 and 3, Ms. Bonjean objected and stated that she

9   didn't know what the exhibit was and asked whether this was

10  one of the exhibits the government provided to her.

11         Ms. Appenteng said, "No, we cannot provide it to you

12  because it is contraband."

13         Ms. Bonjean responded, "That seems fair."

14         Her comments about discovery took place in front of

15  the jury and contrary to her representation that she would not

16  discuss discovery matters in front of the jury.  That's motion

17  in limine No. 10.  Before trial, the government moved to

18  exclude this precise type of commentary, especially as it

19  relates to child pornography which cannot be turned over to

20  the defense.  They have to come review it in a controlled

21  setting which was done in this case by each of the defendants'

22  counsel.

23         So we think it's improper that the jury now has the

24  impression that the government is not making evidence

25  available to the defendants which is not the case, and we're

1   asking that your Honor give this two-sentence instruction

2   which states:  "You heard testimony yesterday about Government

3   Exhibits 1 and 2 that contain what is referred to as Videos 1,

4   2, and 3.  Prior to trial, Government Exhibit 1 and Government

5   Exhibit 2 remain available."

6           THE COURT:  Okay.  Ms. Bonjean, how do you respond?

7           MS. BONJEAN:  Well, first of all, it wasn't provided

8   to us, and I wasn't suggesting that the contents of it.  They

9   handed an exhibit that they didn't even give us a photocopy

10  of.  It was a CD.  And they didn't give us a copy of even the

11  front of the photo -- of the CD.

12          So when I asked, is this -- there are so many copies

13  of these things, so I said, which I think, since it wasn't in

14  our book of exhibits, was this provided to us.  It was the

15  U.S. Attorney that said no.  She didn't say, "Yes, counselor,

16  it was provided to us -- provided to you.  It's the same" --

17  she said, "No, it wasn't because it's contraband."

18          I have every right to know precisely what this

19  witness was looking at, and I simply asked to -- I wasn't

20  asking for the imagery.  I was asking for, what is the actual

21  physical thing you're presenting to her right now.  And we

22  weren't provided with a copy of it.

23          So first of all, this instruction is wrong.  It

24  wasn't provided to us, and the AUSA admitted as much.  She

25  didn't have to admit that in front of the jury.  I didn't ask

1    her to.  I just said, "Can you just show it to us?"

2           And when she said, "No, we didn't provide it to you,"

3    I said, "Okay, can I" -- she says, "I can show it to you."

4           And I said, "That seems fair."  That wasn't a

5    discovery --

6           THE COURT:  Well, you have -- it was made available

7    for your review, wasn't it?

8           MS. BONJEAN:  I don't know what's on those things.  I

9    don't know what's on those disks.  I have to take the

10    government's word for --

11           MS. POZOLO:  Your Honor, that is--

12           MS. BONJEAN:  -- what's on those disks.

13           MS. POZOLO:  Your Honor, that is disingenuous because

14    we have provided an exhibit list weeks ago repeatedly

15    reminding defense counsel if they wish to view the child

16    pornography, it can be -- arrangements can be made.  We have

17    done that several times in this case.  Ms. Bonjean herself

18    came to HSI and reviewed those images.

19           MS. BONJEAN:  Yes, the images, but what they were

20    presenting to the witness, I did -- I don't know what they

21    did.  They could have just copied it and said this is what she

22    looked at, here's the date she looked at it because she put a

23    date on it, here are her initials.  That was not provided.

24           So they're the ones that are being disingenuous.

25    They are asking us to take their word, when there's a

1    bazillion copies of these things out there --

2           THE COURT:  All right.  All right.  I don't feel it's

3    necessary to make a big deal out of this at this time.  We'll

4    see how things play out from now on.  So I'm going to leave it

5    alone, and I will not give that instruction at this precise

6    time.

7           One thing, however, there had -- there did show up a

8    problem of what to call the various minors' pseudonyms.  So

9    as -- will all of the witnesses that -- from here on out, will

10   they be schooled on what the specific minor's nickname or

11   pseudonym is?

12          MS. POZOLO:  Yes, your Honor.

13          THE COURT:  So that won't pose a problem then.

14          MS. POZOLO:  No, it will not, your Honor.

15          And one other thing I wanted to raise was related to

16   the witness after Jane is concluded.  We will be calling

17   Special Agent Melissa Siffermann to publish the child

18   pornography to the jury.  And pursuant to your ruling on

19   motion in limine No. 4, the government -- you granted the

20   government's unopposed request that that -- that the courtroom

21   be cleared of the public spectators, the overflow courtrooms

22   be disconnected, and that the jury and the parties are the

23   only individuals here.  So that is coming up during Agent

24   Siffermann's testimony likely today.

25          THE COURT:  Any comments?

1          MS. BONJEAN:  Well, one comment is, again, the

2     government has not provided us with the actual clips they

3     intend to use.  I feel we are entitled to have the clips

4     designated.  These are 30-minute tapes.  They're not using all

5     the tapes which they shouldn't, but we still should know what

6     they're using --

7          THE COURT:  Well --

8          MS. BONJEAN:  -- from those tapes.

9          THE COURT:  I don't think it's necessary to clear the

10    courtroom.  I think that makes -- but I would suggest that

11    everybody turn their monitors away from the public areas.  I

12    don't see any particular reason that --

13         MS. POZOLO:  Your Honor, there's audio.  There's very

14    graphic audio and --

15         THE COURT:  Well, the audio --

16         MS. POZOLO:  -- there's no way to prevent the

17    viewing.  The monitors are all over the courtroom.

18         THE COURT:  I don't think the audio is the problem.

19    It's the viewing of it.  So I don't think we need to clear the

20    courtroom.  But just for those on that side and this side,

21    turn the monitors --

22         MS. BONJEAN:  Can we at least know -- I'm sorry,

23    Judge.  Go ahead.

24         Could we at least know how long these clips are that

25    they're playing?  We just don't have any information about

1    what they are --

2              THE COURT:  Yes.  How long are the clips?

3              MS. POZOLO:  The clips are between 30 seconds and two

4    minutes.

5              THE COURT:  Okay.

6              MS. POZOLO:  And so in total, we've cut,

7    significantly cut down the videos.  And again, your Honor, the

8    exhibit list containing the number of clips was provided a

9    long time ago to defense counsel, and they had every

10   opportunity to view it.  And they just --

11             THE COURT:  All right.

12             MS. POZOLO:  -- hadn't decided, and now they want to

13   make an issue of it.

14             THE COURT:  All right.  Okay.  We'll proceed that

15   way, but I don't see the need to but, please, those on -- turn

16   your monitors away from the corners and the sides.

17             Otherwise, ready for the jury?

18             MS. JUDGE:  I have something, Judge --

19             THE COURT:  Yes.

20             MS. JUDGE:  -- if I may very quickly.

21             Last night after Minor 1 testified, I contacted the

22   government and requested that they not be contact -- not be

23   speaking with her because she's still on the stand, and they

24   confirmed that they did not have any intention of doing so.

25             And then about 11:00 o'clock, I got an email about

1    the government's victim liaison at the U.S. Attorney's office

2    who had a conversation.  The government's not going to use

3    that conversation.  I'm not concerned about what the content

4    is.  But this individual that's escorting any of the minors in

5    this case, I just want to make sure she is a member of the

6    prosecution team, that she be admonished not to be having

7    conversations about the content of this prosecution.

8         I understand she's perhaps -- I really don't know

9    exactly what her job is at the U.S. Attorney's office with

10   these now adults that were once minors, but they're what the

11   government is calling victims.  So she was here in court.  She

12   brings her in.  She leaves with her.  But she cannot be having

13   conversations with her because she also is a member of the

14   prosecution team when the witnesses are in between testimony.

15        THE COURT:  I assume that the liaison does not

16   discuss testimony.  Is that correct?

17        MS. POZOLO:  Yes, your Honor.

18        THE COURT:  Okay.  Ready for the jury?

19        Have the jury come in, please.  Thank you.

20        MS. POZOLO:  And, your Honor, does your instruction

21   to the sketch artists still stand in terms of not sketching

22   the witness' face?

23        THE COURT:  Yes.  I happened to watch the news this

24   morning, and I don't know who -- it was on WGN.  I don't know

25   whose it was, but it was properly made indescribable,

Jane - cross by Leon

1    whatever -- and where is the witness?

2         (Proceedings heard in open court.  Jury in.)

3              THE COURT:  Please be seated.

4              The witness can resume the stand.

5              Who is going to go first; Ms. Judge or Ms. Bonjean?

6              MS. LEON:  Brown's defense will go first.

7              THE COURT:  Pardon?

8              MS. LEON:  We are, your Honor.

9              THE COURT:  Okay.

10        (Pause.)

11             THE COURT:  Is the witness en route?

12             MS. APPENTENG:  Yes, your Honor.  The CSOs are moving

13   throughout the building with her.

14        (Pause.)

15             THE CLERK:  All rise.

16             THE COURT:  Please be seated.

17             Ms. Leon, you may question the witness.

18             MS. LEON:  Thank you, Judge.

19             JANE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

20                       DIRECT EXAMINATION

21   BY MS. LEON:

22   Q.  Hi, Jane.

23   A.  Good morning.

24   Q.  Do you need a second to get --

25   A.  No.  I'm okay.

Jane - cross by Leon

1   Q.   Okay.  My name is Kathleen Leon, and I'm an attorney for

2   Mr. Brown.  Okay?

3   A.   Okay.

4   Q.   I'm going to ask you a few questions about your testimony

5   yesterday.  Okay?

6   A.   Okay.

7   Q.   So yesterday, you talked about surprising Mr. Kelly when

8   you showed him your tattoo.

9   A.   Yes.

10  Q.   And I believe you said he wasn't upset about it, but he

11  needed you to get it covered up?

12  A.   Correct.

13  Q.   And to do that, he asked you to go to a tattoo parlor?

14  A.   Correct.

15  Q.   And to fill in the tattoo, cover up his name?

16  A.   Yes.

17  Q.   Okay.  And that was because you -- at that time, you were

18  both denying the nature of your relationship to the world?

19  A.   Correct.

20  Q.   I think you've said yesterday that Mr. Kelly let you know

21  that Milton was going to pick you up?

22  A.   Yes.

23  Q.   And take you to the tattoo shop for this coverup?

24  A.   Correct.

25  Q.   Mr. Kelly had already given you the instructions on what

Jane - cross by Leon

1    you needed to do?

2    A.   Correct.

3    Q.   Okay.  And yesterday, you testified that Mr. Kelly went

4    through great lengths to keep the sexual relationship between

5    the two of you a secret?

6    A.   Correct.

7    Q.   And that meant lying to everyone around you?

8    A.   Correct.

9    Q.   Because if anyone found out, you were concerned they would

10   threaten to ruin his life?

11   A.   Correct.

12   Q.   And he was concerned?

13   A.   Yes.

14   Q.   And they could, in fact, ruin his life with this

15   information?

16   A.   Yes.

17   Q.   And you also said yesterday, you weren't there when

18   Mr. Kelly called Milton Brown and told him to pick you up?

19   A.   Correct.

20   Q.   So you don't know what Mr. Kelly told Milton Brown?

21   A.   No.

22   Q.   You have no idea if he told Milton why you were having the

23   tattoo covered up?

24   A.   I don't.

25   Q.   Okay.  All you know is that Mr. Kelly needed to keep his

Jane - cross by Leon

865

1   secrets secret?

2   A.   Correct.

3   Q.   Okay.  So let's talk about the drive to the tattoo parlor

4   but first, let's talk about some rules.  Mr. Kelly had some

5   rules for you, right?

6   A.   Yes.

7   Q.   And this included even how you behaved when you were being

8   driven somewhere?

9   A.   Yes.

10  Q.   Okay.  And these rules were meant to control you?

11  A.   Yes.

12  Q.   And control his employees?

13  A.   Correct.

14  Q.   That was part of his way of hiding this secret?

15  A.   Yes.

16  Q.   Of making sure that he can continue living his double

17  life?

18  A.   Yes.

19  Q.   Okay.  The men who work for Mr. Kelly could not speak to

20  any of his guests or his artists?

21  A.   Yes.

22  Q.   Yes, they could not speak to them?

23  A.   Right.

24  Q.   Okay.  They would get in trouble if they did?

25  A.   Yes.

Jane - cross by Leon

1   Q.  Even get fired?

2   A.  Yes.

3   Q.  Not paid?

4   A.  Yes.

5   Q.  Okay.  Mr. Kelly would even get mad at you if you broke

6   the rules?

7   A.  Correct.

8   Q.  So you followed the rules?

9   A.  Yes.

10  Q.  Okay.  So when you get in the car with Milton, you sit in

11  the back seat?

12  A.  Correct.

13  Q.  He's the chauffeur?

14  A.  Yes.

15  Q.  Okay.  Even if there's only you in the car, you're sitting

16  in the backseat?

17  A.  Yes.

18  Q.  I think you said yesterday you had no conversation about

19  the tattoo with Milton?

20  A.  Right.

21  Q.  You had no conversation at all with Milton on the way

22  there?

23  A.  No.

24  Q.  Okay.  And you had no conversation with him because you

25  knew the rules?

Jane - cross by Leon

867

1  A.  Correct.

2  Q.  So when -- now we're going to move on to when you get to

3  the tattoo parlor.  Okay.  Again, Mr. Kelly had already given

4  you directions on what was going to happen.  Milton was going

5  to drive you there, and you were going to get the tattoo

6  covered up?

7  A.  Yes.

8  Q.  So when you get to the tattoo parlor, it wasn't what you

9  were expecting.  It was a house?

10 A.  Yes.

11 Q.  Milton let you know you've arrived at the address?

12        I just need a verbal answer.

13 A.  Yes.

14 Q.  Okay.  And you and Milton go into the house?

15 A.  Yes.

16 Q.  And even though it looked like a home from the outside,

17 when you get inside, it's actually been transformed into a

18 tattoo parlor?

19 A.  Yes.

20 Q.  So you walk into what looks like a living room area?

21 A.  Yes.

22 Q.  And that area is kind of like a waiting area, right?

23 A.  Uh-huh.

24 Q.  Okay.  And they take you to a private area or something

25 that has a little tattoo setup?

Jane - cross by Leon

868

```
 1   A.  Yes.

 2   Q.  Like any other tattoo shop?

 3   A.  Correct.

 4   Q.  And it's like a sanitized location, people aren't just

 5   walking around freely?

 6   A.  Correct.

 7   Q.  Okay.  You said yesterday that you spoke to the tattoo

 8   artist?

 9   A.  Yes.

10   Q.  And you let them know the directions that Mr. Kelly had

11   given you?

12   A.  Yes.

13   Q.  You had a tattoo, you needed to get it covered up?

14   A.  Yes.

15   Q.  Okay.  And the artist did just that, he covered up the

16   tattoo?  I think you said he shaded it in?

17   A.  Yes.

18   Q.  Okay.  And when you were done, you came out, and you and

19   Milton left?

20   A.  Yes.

21   Q.  Okay.  And yesterday, you testified that Milton never

22   talked to the tattoo artist?

23   A.  Correct.

24   Q.  And you also said yesterday that you had no conversation

25   with Milton on the drive back to, I believe it was, the
```

Jane - cross by Leon

869

1   studio?

2   A.  Yes.

3   Q.  Okay.  I want to move on to the bags that you were talking

4   about.

5   A.  Yes.

6   Q.  Okay.  So Milton not only drives you, but he drives a lot

7   of people, right?

8   A.  Yes.

9   Q.  Guests, artists, other celebrities, Mr. Kelly's friends?

10  A.  Yes.

11  Q.  It's fair to say that R. Kelly, the celebrity, is not

12  carrying his own luggage and bags when he gets to his

13  destination?

14  A.  Sometimes.

15  Q.  Sometimes, but not all the time?

16  A.  Right.

17  Q.  Okay.  He's got people to do that most of the time?

18  A.  Yes.

19  Q.  Okay.  Milton was not the only one who had the job of

20  carrying Kelly's bags, right?

21  A.  Correct.

22  Q.  Can you name some of the other people who had this job?

23  A.  Just other employees that were working for him.

24  Q.  Other employees.  Other employees like Tom Arnold?

25  A.  Yes.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 122 of 212 PageID #:11082
Jane - cross by Bonjean
870

1    Q.   George Kelly who I think his nickname is June Bug?

2    A.   Correct.

3    Q.   Okay.  And even more than that?

4    A.   Yes.

5    Q.   Okay.  And you've never seen any of these other employees,

6    basically chauffeurs, go through R. Kelly's or his celebrity

7    guests' bags, right?

8    A.   No.

9         MS. LEON:  Okay.  May I confer, your Honor?

10        THE COURT:  Yes.

11        MS. LEON:  Thank you.  No further questions.

12        THE COURT:  Ms. Bonjean, you may question the

13   witness.

14        MS. BONJEAN:  Thank you, your Honor.

15                   CROSS-EXAMINATION

16   BY MS. BONJEAN:

17   Q.   Good morning, Jane.

18   A.   Good morning.

19   Q.   My name is Jenny -- Jennifer, and I represent Mr. Kelly.

20   A.   Excuse me.

21   Q.   If I understand your testimony correctly, you had about a

22   12-year relationship with Robert; is that right?

23   A.   Yes.

24   Q.   And I think you testified yesterday that this relationship

25   commenced, sexual relationship, when you were around 14 or

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 123 of 212 PageID #:11083
Jane - cross by Bonjean
871

1  around that time in 1998-ish.  Is that about right?

2  A.  Correct.

3  Q.  And then ultimately, you left the relationship, I think,

4  in 2010.  Does that sound right?

5  A.  Sounds about right.

6  Q.  Okay.  And that means you were about 26 years old, if my

7  math is correct, give or take?

8  A.  Yes.

9  Q.  And you said yesterday that when you left, you moved into

10  an apartment, I think in University Park; is that correct?

11  A.  Correct.

12  Q.  And that he helped you get set up there with rent, paying

13  for the rent and getting you an apartment there; is that

14  right?

15  A.  Correct.

16  Q.  And I think you also said that he made sure that you had

17  transportation.  I think there was -- I think you mentioned a

18  Denali or something like that?

19  A.  Yes.

20  Q.  And that was like a -- that was like a Denali.  That

21  wasn't brand-new, that was something that was used, right?

22  A.  Correct.

23  Q.  Okay.  And you testified in 2002 before the grand jury in

24  Cook County when you were 17 years old, right?

25  A.  Yes.

Jane - cross by Bonjean

872

1    Q.  And you understand that at 17 years old in the state of

2    Illinois, you were considered an adult?

3    A.  Correct.

4    Q.  All right.  And you were still in a relationship with

5    Robert at that time, correct?

6    A.  Yes.

7    Q.  And by that point, the relationship was a legal

8    relationship because you were of legal age in terms of

9    consenting, right?

10          MS. APPENTENG:  Objection, your Honor.  Excuse me.

11   Objection, your Honor.  Calls for a legal conclusion that the

12   witness may not be aware of.

13          MS. BONJEAN:  Were --

14          THE COURT:  Well, overruled.

15   BY MS. BONJEAN:

16   Q.  You were aware that at 17, you were actually permitted to

17   have a relationship with him in the eyes of the law in

18   Illinois, right?

19   A.  I was not aware of that.

20   Q.  Okay.

21   A.  I thought it was age 18.

22   Q.  Okay.  And at the time -- in 2008 when Robert was

23   prosecuted for the charges related to child pornography, you

24   also were still in a relationship with him; is that right?

25   A.  Yes.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 125 of 212 PageID #:11085
Jane - cross by Bonjean
873

1    Q.   And, in fact, at that time you were about 24 years old,

2    correct?

3    A.   Correct.

4    Q.   And you were living with him, right?

5    A.   Yes.

6    Q.   And his wife was living there too, right?

7    A.   Yes.

8    Q.   And you claim that Robert, after this time, became abusive

9    and controlling.  Is that correct?

10   A.   Yes.

11   Q.   Okay.  But before that, the relationship wasn't abusive or

12   controlling?  It was after the 2008 prosecution and subsequent

13   acquittal, right?

14   A.   It got worse during that time.

15   Q.   All right.  And this behavior that you're talking about,

16   this increased abuse that you were talking about, this didn't

17   have anything to do with his 2008 acquittal, I assume, right?

18   A.   No.

19   Q.   The case was over and done with at that point, correct?

20   A.   Right.

21   Q.   And you put it behind you at that point, correct?

22   A.   Yes.

23   Q.   Robert put it behind him at that point, right?

24   A.   Yes.

25        MS. APPENTENG:  Objection, your Honor.  Speculation

Jane - cross by Bonjean

1    as to what Robert Kelly knew.

2    BY MS. BONJEAN:

3    Q.   Well, you were living with him, weren't you?

4    A.   Yes.

5    Q.   You talked to him pretty regularly given the fact that you

6    lived with him and I guess his wife, right?

7    A.   Correct.

8    Q.   In fact, you also had a sexual relationship with him and

9    his wife, right?

10   A.   That's what he wanted.

11   Q.   You did that, though, as an adult, right?

12   A.   Correct.

13   Q.   And you understood that after 2008 acquittal from your

14   conversations with Robert that this is all in the past, right?

15   A.   Correct.

16   Q.   Now, when you did move out -- strike that.  Let me ask you

17   one other thing.

18          You testified that you weren't allowed to work when

19   you were living with Robert, but that's not true, right?

20   A.   No, I was not allowed to work.

21   Q.   Didn't you -- weren't you going to school at Moraine

22   Community College trying -- going to classes there?

23   A.   Correct, but I was also not able to choose what I wanted

24   to go to school for.

25   Q.   Okay.  But and you were also working at a daycare center;

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 127 of 212 PageID #:11087
Jane - cross by Bonjean
875

1  isn't that right?

2  A.  After the trial, yes, that is correct.

3  Q.  Even before, you were working at a daycare center and

4  going to classes, correct?

5  A.  No.

6  Q.  All right.  Well, do you remember being interviewed by the

7  U.S. Attorneys back, let's see, on May 3rd of 2019?

8  A.  I don't remember dates, but if you can refresh my memory.

9  I'm not saying that didn't happen.

10 Q.  And at that point, you admitted that you were taking

11 childhood courses at Moraine Valley College for approximately

12 one-and-a-half to two years, right?

13 A.  Yes.

14 Q.  So he didn't prevent you from taking classes at a

15 community college, right?

16 A.  Well, during the trial, I was not able to go to school for

17 what I wanted to study, is all I'm saying.

18 Q.  Okay.  We're talking about after the acquittal.  Okay.

19 That's what -- that's the timeframe I'd like to focus on.

20 A.  Yes, after that, I was able to, that is correct.

21 Q.  Right.  And he paid for that, right?

22 A.  Yes.

23 Q.  Now, after you moved out, you maintained a very tight

24 relationship with Robert, didn't you?

25 A.  Yes.

Jane - cross by Bonjean

876

1   Q.   Despite how terribly abusive it was, according to you, you

2   remained close to him, correct?

3   A.   He wasn't like that all the time.

4   Q.   Uh-huh.  In fact, your whole family was very close to

5   him --

6   A.   Yes.

7   Q.   -- even -- even after you broke up because of this alleged

8   abusive relationship, right?

9   A.   Yes.

10  Q.   Indeed, your dad worked pretty consistently with Robert

11  between 1998 and 2011; isn't that correct?

12  A.   Yes.

13  Q.   He worked with Robert before the sex tape scandal came and

14  after it was all over, correct?

15  A.   Yes.

16  Q.   And even after you left Robert, he worked with your dad,

17  right?

18  A.   Yes.

19  Q.   In fact, your father was a guitarist, as I understand it;

20  is that correct?

21  A.   Yes.

22  Q.   And as I understand it, a very talented guitarist.  You'd

23  agree with that, I assume?

24  A.   Correct.

25  Q.   He worked with people other than R. Kelly, correct?

Jane - cross by Bonjean

877

1   A.   Yes.

2   Q.   And, in fact, that album that you identified on the wall

3   of Robert's studio that had all of those platinum and -- I

4   think it was called *R,* or *Reality.*  Is that what it's called?

5   A.   I'm not exactly sure.

6   Q.   Okay.  Well, you identified it.  Should we put the picture

7   up, or do you know which one I'm talking about?

8   A.   I know which one you're referencing, yes.

9   Q.   And your dad worked on that album, didn't he?

10  A.   Yes.

11  Q.   In fact, that's the album for which Mr. Kelly received a

12  Grammy, right?

13  A.   Yes.

14  Q.   That's the album that has the song *I Believe I Can Fly* on

15  it, right?

16  A.   Yes.

17  Q.   And that's the album your father worked on in 199' -- late

18  1997, '98, before there was any sex tape scandal, correct?

19  A.   Yes.

20  Q.   Your father worked on a number of albums with Mr. Kelly,

21  correct?

22  A.   Yes.

23  Q.   And he worked with other artists, right?

24  A.   Correct.

25  Q.   And this was all before the tape that became public in

Jane - cross by Bonjean

878

1    2002 was released, right?

2    A.  Yes.

3    Q.  And it was your aunt who released that tape?

4    A.  I'm sorry?

5    Q.  It was your aunt that released that tape to Jim DeRogatis,

6    right?

7    A.  To my understanding, yes.

8    Q.  Sparkle?

9    A.  Correct.

10   Q.  Her real name is Stephanie Edwards?

11   A.  Uh-huh, yes.

12   Q.  Now, your father worked on the Grammy-nominated album *Love*

13   *Letter* in 2011, right?

14   A.  Yes.

15   Q.  And that was after you and Mr. Kelly were completely over

16   with romantically, right?

17   A.  Yes.

18   Q.  And after you and Robert broke up, you cared about him and

19   he cared about you, right?

20   A.  Yes.

21   Q.  Even after you broke up, you sometimes came back together

22   and had intimate times together; is that fair?

23   A.  Yes.

24   Q.  And he helped you out from time to time with finances and

25   things you needed, correct?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 131 of 212 PageID #:11091
Jane - cross by Bonjean
879

1    A.   Correct.

2    Q.   For instance, you testified that in 2014 and 2015, Robert

3    helped you with rent payments, right?

4    A.   Yes.

5    Q.   I think, it looked like your rent was, what, about $1100

6    or $1,100, does that sound about right, during that period?

7    A.   Yes.

8    Q.   And Robert wasn't writing checks to you; he would delegate

9    that to somebody, right?

10   A.   Correct.

11        MS. APPENTENG:  Objection, your Honor.  That's

12   speculation as to what Mr. Kelly was doing.

13        MS. BONJEAN:  Well, I can clarify.

14        THE COURT:  What he was doing?  I don't see how

15   that's speculating.  Overruled.

16   BY MS. BONJEAN:

17   Q.   You would receive checks not directly from Robert but from

18   somebody that worked for Robert, right?

19   A.   Yes.

20   Q.   And sometimes you would receive wire transfers from

21   somebody who would initiate those wires, right?

22   A.   Yes.

23   Q.   And having spent 12 years plus a whole friendship

24   afterwards with Robert, you're aware that he wasn't the person

25   that would manage his finances personally, right?

Jane - cross by Bonjean

1   A.   Correct.

2   Q.   He had managers who did that, correct?

3   A.   Yes.

4   Q.   He wasn't someone who was intimately involved in the

5   business side of things.  He was the artist, correct?

6   A.   Yes.

7   Q.   And he also struggled with things like math and reading

8   and writing and all those things, right?

9   A.   Yes.

10  Q.   So he delegated those activities to people like

11  Mr. McDavid, correct?

12  A.   Yes.

13  Q.   And then there were other managers as well.  Do you --

14  were you familiar with some of Robert's other managers?

15  A.   Not that I can think of.

16  Q.   Okay.  And after you broke up, you would continue to go to

17  his concerts, right?

18  A.   Yes.

19  Q.   Your family would go to his concerts?

20  A.   Yes.

21  Q.   Your brother, I understand it, is also a musician; is that

22  right?

23  A.   Correct.

24  Q.   And he would also attend events that Robert would invite

25  you to, correct?

Jane - cross by Bonjean

881

1    A.   Yes.

2    Q.   And after you -- in 2008 after he was acquitted, this

3    relationship that you had with Robert, it wasn't centered at

4    all around the scandal and the 2008 acquittal, was it?

5    A.   No.

6    Q.   In fact, that was a subject matter that you and Mr. Kelly

7    did not want to talk about, correct?

8    A.   No.

9    Q.   You didn't?

10   A.   No.

11        Excuse me.

12   Q.   Now, I want to show you -- well, strike that.  I'm sorry.

13        In September of 2008, this would have been --

14   A.   Thank you.

15   Q.   Let me back up a second.  You're familiar with the

16   docuseries *Surviving R. Kelly*, right?

17   A.   Correct.

18   Q.   And you're aware that it was premiered in, like, January

19   of 2019, right?

20   A.   Yes.

21   Q.   Because your life kind of changed when that came out,

22   right?

23   A.   Yes.

24   Q.   But before that, late 2018, you were communicating

25   regularly with Robert via text and sometimes on the phone,

Jane - cross by Bonjean

882

```
 1   right?
 2   A.  Yes.
 3        MS. BONJEAN:  I am going to mark this as -- hold on
 4   one second.
 5        Okay.  I'm going to have you look at the screen,
 6   okay, and because I want -- I don't want to say something
 7   publicly.  We're going to mark this as Defendant's 100, for
 8   identification purposes.
 9        Okay.  And can you pull out the bottom there?
10        MS. JUDGE:  Excuse me, if I may.  Just for
11   clarification, if we could label your exhibits Defendant Kelly
12   so we can separate them --
13        MS. BONJEAN:  Sure.
14        MS. JUDGE:  -- that would be appreciated.
15        MS. BONJEAN:  Yeah, sure.
16        MS. JUDGE:  Thank you.
17   BY MS. BONJEAN:
18   Q.  Do you see the screen?
19   A.  Yes.
20   Q.  If you can look at the bottom there, not the blue part but
21   right below it, I don't want to put it --
22   A.  There's nothing on my screen.
23   Q.  I don't want to put it publicly on the record.  But do you
24   recognize your phone number there at the bottom -- or your old
25   phone number there at the bottom?
```

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 135 of 212 PageID #:11095
Jane - cross by Bonjean
883

1   A.   Yes.

2   Q.   Okay.  And do you recognize Mr. Kelly's phone number right

3   above it, the one that begins with the 6?

4   A.   I don't remember the number, but --

5   Q.   Okay.

6   A.   -- it looks familiar.

7   Q.   Okay.  So let's go -- I'm going to have you scroll through

8   that.  Go to the next page and take a look.  And go ahead and

9   read it to yourself and then --

10  A.   It's actually not legible.

11  Q.   Okay.  How about that?

12  A.   Okay.

13  Q.   Read it to yourself, and then you can tell me if you

14  recognize it.

15          Go to the next page next.  Keep going.

16          Do you remember these exchanges?

17  A.   Yes.

18  Q.   And they were exchanges with Mr. Kelly, correct?

19  A.   Yes.

20  Q.   Okay.  And do they appear to be your communications with

21  Mr. Kelly during this time period right before the release of

22  Surviving R. Kelly?

23  A.   Yes.

24          MS. BONJEAN:  Okay.  Judge, I would offer them into

25  evidence not for the truth of the matter asserted but for the

Jane - cross by Bonjean

884

1    respect of state of mind.

2              THE COURT:  Any objection?

3              Hearing none, they're admitted.  You may publish

4    them.

5              MS. BONJEAN:  Thank you, your Honor.

6         (Defendant Kelly Exhibit 100 received in evidence.)

7              MS. APPENTENG:  The government objects to the

8    publishing.  It has the witness' telephone number on it, and

9    it's not redacted.

10             THE COURT:  Oh, okay.

11             MS. BONJEAN:  We'll redact it.

12             THE COURT:  I understand it's not a working number,

13   is it?

14             MS. BONJEAN:  No, it's not a working number, but

15   we'll still redact it.

16             MS. APPENTENG:  It can still be used to identify even

17   though it's not working, your Honor.

18             MS. BONJEAN:  That's fine.  We'll redact it.

19             THE COURT:  Okay.  Redact it.  Other than that, you

20   may publish.

21             MS. BONJEAN:  It's not -- that's not the one.  That's

22   not what...

23             While we're redacting, your Honor, I'll keep asking

24   some questions.  Okay.

25             THE COURT:  Okay.

Jane - cross by Bonjean

885

1          MS. BONJEAN:  Let's go to the next page.  It has been
2     redacted.
3          LAW CLERK:  So should I publish it?
4          MS. BONJEAN:  I would move to publish.  I think the
5     judge said okay.
6          MS. APPENTENG:  No, it's not redacted yet.
7          THE COURT:  Yes, it can be published.
8          MS. BONJEAN:  This is -- it's on the next multiple
9     pages, though.
10          MS. COHEN:  I understand.  I'm going to do it as we
11     go.
12          MS. BONJEAN:  So we'll go to the next page.  It is
13     redacted.  What are you referencing?
14          THE COURT:  Why don't you proceed with the rest of
15     them while they're being redacted, and then you can show them
16     all.
17          MS. BONJEAN:  That's not her phone number that you're
18     pointing to.  That's not her phone number.
19          MS. APPENTENG:  Then it's not relevant.
20          MS. BONJEAN:  I have to go to the next page.
21          MS. APPENTENG:  So are we publishing this page that
22     is not her phone number?
23          MS. BONJEAN:  Do you see the bottom part?  It had
24     their phone numbers.  We just redacted her phone number.  It
25     has Mr. Kelly's phone number and then it had her number.  We

Jane - cross by Bonjean

886

```
 1    redacted it.

 2              MS. APPENTENG:  So the messages that she does not

 3    identify as being hers shouldn't be appearing on the screen.

 4              MS. BONJEAN:  That's not true.  I'm going to the next

 5    page.

 6              THE COURT:  Wait, wait, wait.  Let's -- is there

 7    objection on the floor and, if so, state the basis for the

 8    objection.

 9              MS. APPENTENG:  The objection is relevance.  The

10    defense counsel has just indicated that there's numbers on

11    here, telephone numbers that are neither Jane's or

12    Mr. Kelly's, so those shouldn't be -- those messages should

13    not be there.  We understand that the numbers that are -- the

14    messages between them, the numbers are redacted.

15              MS. BONJEAN:  Okay.

16              THE COURT:  I was under the impression -- I was under

17    the impression that she identified these messages and that

18    there's a phone number on there which has long not been used,

19    so I don't see what the problem is.

20              MS. BONJEAN:  And we just redacted them.  They're

21    just looking at a portion of the document that, the half -- we

22    had to look at the bottom half of the page.  So we've now

23    moved on to the next page.  Okay.

24              Jane -- ready?  Okay.

25    BY MS. BONJEAN:
```

Jane - cross by Bonjean

887

1   Q.   These are your messages to Mr. Kelly, right?

2   A.   Correct.

3   Q.   And the date on that is September 26th, 2018, correct?

4   A.   Yes.

5   Q.   And you sent him a message saying, "I'm next to you, LOL."

6   And then you said, "Let's share a toast for my 34th glo'day,"

7   right?

8   A.   Correct.

9   Q.   What's a glow day?

10  A.   It was my birthday.

11  Q.   So you wanted to celebrate your birthday with him in

12  September of 2018, right?

13  A.   We were in the same party.

14  Q.   Okay.  Well, you sent him a link to where you were going

15  to be hosting your birthday, right?

16  A.   That sounds about right.

17         MS. COHEN:  Sorry.

18  BY MS. BONJEAN:

19  Q.   Okay.  And then you had to change the location of your

20  birthday, right?

21  A.   I don't remember that, but that could be true.

22  Q.   You said, "Also tonight I had to change the location.  Joy

23  District at 8:00 o'clock."  Right?

24  A.   Yes.

25  Q.   And did you, in fact, have a birthday celebration there at

Jane - cross by Bonjean

888

1    8:00 o'clock?

2    A.  Yes.

3    Q.  Did he attend?

4    A.  I don't think so, no.

5    Q.  He didn't respond to your messages actually, right, at

6    least these messages, correct?

7    A.  That could be true.  That's not what I see on the screen,

8    so yeah.

9         MS. BONJEAN:  All right.  Are we able to go to the

10   next page?

11        And honestly, Judge, this isn't even her number.

12   She's changed her number since, so I'm just going to keep

13   going.

14        MS. APPENTENG:  Your Honor, the government still

15   objects as it can be used to identify her which we noted

16   earlier.

17        THE COURT:  Yes, keep going.  I don't see any

18   problem, if the number isn't in -- has no connection with her

19   anymore or even exists.  So go ahead.

20        MS. BONJEAN:  Okay.  Go to the next one, Ashley,

21   please.

22        MS. COHEN:  Can I do it non-redacted?

23        MS. BONJEAN:  Yes.  Go to the next page.

24   BY MS. BONJEAN:

25   Q.  Then you sent him a text saying, "Hope to see you."  And

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 141 of 212 PageID #:11101
Jane - cross by Bonjean
889

1   then on -- he didn't respond.  On October 15th, 2018, you

2   said, "My mom lost her mother.  Check on her when you get a

3   moment, please."  Right?

4   A.  Yes.

5   Q.  Because Mr. Kelly was close to your mother, right?

6   A.  Yes.

7   Q.  Even at this point; isn't that fair?

8           That's correct, right?

9   A.  Yes.

10  Q.  And he responded a little bit later, and he said, "Wow, I

11  just got this.  Sorry to hear that.  Send me her number,

12  please," which you did, right?

13  A.  Yes.

14  Q.  And he said, "I'm okay.  How are you doing?"

15          And you said, "My heart is heavy, but it will get

16  better with time," right?

17  A.  Correct.

18          MS. BONJEAN:  The next page.

19  BY MS. BONJEAN:

20  Q.  Then you asked him, "What have you been up to?"

21          And he gave you -- he said, "I understand you're

22  talking to the mirror right now, but you're right, it will all

23  get better if you really believe that like I do."

24          And you responded, "I can only imagine.  I think

25  about you and pray for you often."

Jane - cross by Bonjean

890

1    He responded, "And it's working.  I appreciate it."

2    And you said, "I feel -- I feel it, so I know you

3    do."  And then you said, "Let me know when you can catch up."

4    Go to the next page.

5    And you said, "Okay" -- and he said, "Okay, baby.

6    Just stay on my radar.  It's all good."

7    And you said, "Will do."

8    And then you reached out to him on December 30th of

9    2018.  "WYA," what does that mean?

10   A.  "Where you at."

11   Q.  And he didn't respond, right?

12   A.  No.

13   Q.  And then you said, "Hey."  And go to the next page.

14   And then he says, "Happy new year, Shorty."  "Shorty"

15   is one of your nicknames, right?

16   A.  Yes.

17   Q.  And you said, "Hey, happy new year.  Peace, loving, and

18   blessings.  You going to Oceans?"

19   What is Oceans?

20   A.  It's a strip club.

21   Q.  And he -- you said a strip club?

22   A.  Yes.

23   Q.  And what was being celebrated there, if you remember?

24   A.  I don't remember, but I'm sure he was, like, hosting or

25   something like that.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 143 of 212 PageID #:11103
Jane - cross by Bonjean
891

1   Q.   He was hosting?

2   A.   I said I believe he was hosting or something like that.

3   Q.   Okay.

4   A.   Or I don't know if it was a birthday.  I don't know

5   exactly.

6   Q.   Well, except that he responded, "No.  We at the studio.

7   You all can pull up if you want."  Right?

8   A.   Right.

9   Q.   So he wasn't hosting anything at the strip club, right?

10  A.   Apparently not, no.

11  Q.   Okay.  But you just assumed he was because it's a strip

12  club?

13  A.   No.  It was obviously something that may have happened in

14  the media or on social media that would have made me think

15  that he was or going to be there for some reason because

16  that's not a random question I would ask him.

17  Q.   Except you had friends in common.  You might think that he

18  might be some -- be going to this because you had friends in

19  common who were going, right?

20  A.   No.

21  Q.   Okay.  So you just assumed he was going to Oceans even

22  though he says, "No, we all at the studio, you all can pull up

23  if you want," right?

24  A.   Correct.

25  Q.   And you said, "Cool.  Thanks.  I'll text you."

Jane - cross by Bonjean

892

1          And then the next page -- or actually, you said,

2     "Hey," and then he responded, "Hey, you."

3          And you said -- again, this is January 3rd of 2019.

4     That was around the time -- actually, I think it's the exact

5     date that the docuseries premiered.  Does that sound right?

6     A.  Yes.

7     Q.  Although I guess the fallout from it wasn't entirely aware

8     until a little bit later, correct?

9     A.  I don't know what you mean by that.  Can you rephrase the

10    question?

11    Q.  Did you watch it on January 3rd, 2019?

12    A.  No.

13    Q.  All right.  So you said, "What's up with you?  You feel

14    like stopping by Pressure Point?"

15          Pressure Point's a studio?

16    A.  Correct.

17    Q.  And then you said, "Or can me, J Blaze, and her girl April

18    stop by your studio?  Hey."

19          So you've asked him multiple times to hang out,

20    right, or to come by the studio?

21    A.  Yes.

22    Q.  And then he says, "Sorry, I just found this damn phone in

23    the couch in the studio.  LOL.  But it's all good.  Let me

24    know the next time y'all going out, and depending on the

25    stupid shit, LOL, I'll come with."  Right?

Jane - cross by Bonjean

893

1    A.  Correct.

2    Q.  And if you go to the next page, and you said, "Who you

3    telling?  Pressure Point, though, is a studio.  I wasn't

4    asking you to go out, LOL, but that would be nice also."

5              And he said, "What be going on there?"

6              And you responded, "I work there in the evening.

7    It's J's husband's spot now.  They had April, the mother

8    of" -- I won't say the names, someone's child -- "and she's

9    writing.  Just thought it would be a nice vibe for you to pull

10   up.  Come today.  It's really private."

11             You wanted him to come to hang out, right?

12   A.  Yes.

13   Q.  That was just in January of 2019, right?

14   A.  Yes.

15   Q.  And then you hit him up again on January 3rd.  "What you

16   doing tonight?"  Do you see the top one?

17   A.  Yes.

18   Q.  And he says, "Studio session, but I will be there drinking

19   and chilling."

20             And you said, "Okay.  I'm going to come through."

21             "Come through" means, "I'm going to stop by," right?

22   A.  Correct.

23   Q.  And he said, "Hit me around 8:30 or 9:00."

24             And then you texted him later and said, "Are you

25   there?"  You said, "Need you to respond right away."  Right?

Jane - cross by Bonjean

894

1   A.   Correct.

2   Q.   "Hey, are you there?  We're pulling up now."  And then he

3   didn't respond, right?

4   A.   Correct.

5   Q.   And then later on, he said, "What happened?"

6          And you said, "I came.  You never responded, and I

7   kept calling your phone while I was outside."

8          Do you remember that night?

9   A.   Not exactly, but that sounds about right.

10  Q.   And then he said, "Oh, my God, are you serious?  Why not

11  do what everybody else does.  Just come in.  LOL.  It's a

12  party.  I can't hear my phone.  People grabbing on me trying

13  to take pictures."

14          MS. APPENTENG:  Your Honor, we're going to object to

15  these.  Counsel showed the witness a first few pages.  The

16  witness has not looked at any of these pages and identified

17  that these are conversations that she actually recalls.  So

18  she has to do that first in order to lay the foundation for

19  these to be admitted and published.

20          MS. BONJEAN:  I will ask her, Judge.

21          THE COURT:  All right.

22  BY MS. BONJEAN:

23  Q.   You recognize --

24          MS. APPENTENG:  Your Honor, it's still published to

25  the jury.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 147 of 212 PageID #:11107
Jane - cross by Bonjean
895

1        THE COURT:  Well, if it's published to the jury, it's

2   there, but you can ask her if these are hers, I guess.

3   BY MS. BONJEAN:

4   Q.  You recognize those as your text messages with Robert,

5   right?

6   A.  Yes.

7        MS. BONJEAN:  Okay.

8        THE COURT:  Okay.

9        MS. BONJEAN:  Do you want to scroll through the rest

10  so she can recognize to the very end and then --

11        MS. COHEN:  I can't do it with the redaction.

12  BY MS. BONJEAN:

13  Q.  Okay.  You don't have any reason to believe that these

14  aren't your text messages with him, right?

15  A.  No.

16  Q.  Okay.  Let's keep going.  And you said, "Yeah, I

17  definitely wasn't trying to walk up to the door and have

18  problems with everything going on.  I get that.  But wait, you

19  taking pictures now?"  And then you said, "Just let me know

20  when you're free."

21        And then he says, "No, I say they were trying to take

22  pictures, but depending on who it is, I do take a picture here

23  and there.  Why you say that?"

24        And you responded, "I'm just laughing because I know

25  you don't usually do that, so it was cool."

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 148 of 212 PageID #:11108
Jane - cross by Bonjean
896

1      And he responded, "Well, here's something even

2   funnier.  I didn't take one picture with nobody last night.

3   There were a lot of full moon woofers in there."

4      And you said, "Please call me and explain what a full

5   moon woofer is.  LOL."

6      Okay.  That was on January 5th of 2019.  Do you see

7   that?

8   A.  This isn't really legible up here, so if you want to zoom

9   in again --

10  Q.  Sure.

11  A.  -- that would be helpful.

12      MS. BONJEAN:  Can you zoom in to the first half of

13  that, Ash?

14  BY MS. BONJEAN:

15  Q.  Okay.  Do you see that?

16  A.  Yes.

17  Q.  Okay.  And then you see this message which is, "Thank you,

18  guys, for everything.  I'm tired now."

19      That was January 6th of 2019, right?

20  A.  Yes.

21  Q.  And that was after the *Surviving R. Kelly* series came out

22  and he was pretty upset, right?

23  A.  Yes.

24  Q.  And then you responded with, "Wait.  What?  Are you okay?

25  I'm super worried about you."  Right?

Jane - cross by Bonjean

897

1   A.  Yes.

2   Q.  And you were worried about him, right?

3   A.  Yes.

4         MS. BONJEAN:  Are you able to do the next page?  Keep

5   going.

6   BY MS. BONJEAN:

7   Q.  And then you hit him with a lot of messages here where you

8   say, "Where are you?  Don't do this.  Respond to me."  And you

9   said, "I long you don't let the devil win," but then you

10  corrected yourself which was, "I love you don't let the devil

11  win," right?

12  A.  Correct.

13  Q.  And then you were like, "Rob, exclamation point,

14  exclamation point, exclamation point."

15        And then the last page of this particular exchange or

16  series of exchanges is, and you said, "Trust me.  I know

17  firsthand how you feel.  You have my prayers.  You need to

18  come to the studio.  It's super safe and private.  I have

19  something you should come remix."

20        And he responded, "Sorry.  Okay.  Major breakdown,

21  but now I'm on a major buildup."

22        And you said, "Yea, I had one too."

23        Do you remember that?

24  A.  Yes.

25  Q.  Okay.  And that kind of relates to this series coming out

Jane - cross by Bonjean

898

1  which upset you too, right?

2  A.  Correct.

3  Q.  You got -- people started hitting you up, harassing you,

4  right?

5  A.  Yes.

6  Q.  Lisa Van Allen was messaging you, correct?

7  A.  Correct.

8  Q.  You didn't want to be talking to her, did you?

9  A.  I didn't have a reason to.

10  Q.  Now, give me one second.

11      And because of all the attention you started getting

12  from *Surviving R. Kelly*, you actually changed your phone

13  number, didn't you?

14  A.  Yes.

15  Q.  And in your conversations with Robert, he wasn't -- he

16  wasn't trying to influence you to do anything?  You guys were

17  just commiserate that this was coming back up, right?

18  A.  Right.

19  Q.  Okay.  Now, I would like you to look at, this is just

20  three more pages of an exchange between -- well, you take a

21  look at it.

22      MS. BONJEAN:  And put -- just for her.

23      MS. COHEN:  They have to do it.

24      MS. BONJEAN:  Just for -- okay.  All right.

25  BY MS. BONJEAN:

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 151 of 212 PageID #:11111
Jane - cross by Bonjean
899

1  Q.  Now, regard the first three blue bubbles, okay, and look

2  at where it says, "278."  Do you see that?  Do you recognize

3  your new phone number there, the phone number you changed it

4  to?

5  A.  Honestly, I don't.

6            MS. BONJEAN:  Highlight the number.

7            THE WITNESS:  I'm sorry.  No, I can see it, but I

8  don't remember that as being my number.  That's not one that

9  stands out.

10  BY MS. BONJEAN:

11  Q.  Okay.

12  A.  I'm not saying it wasn't.  I just don't recognize it.

13  Q.  Okay.  And do you see the message there that says, "This

14  is," and you don't have to -- don't say it out loud, the name,

15  but it says, "This is Jane, my new number."  Right?

16  A.  Yes.

17  Q.  Do you remember sending that message to Mr. Kelly on

18  January 7th of 2019?

19  A.  Yes.

20            MS. BONJEAN:  All right.  Go to the next page.  If

21  you could pull out, Ashley, so she can see those a little

22  more.

23  BY MS. BONJEAN:

24  Q.  Do you see your messages to him?

25  A.  Yes.

Jane - cross by Bonjean

1   Q.  Do you recognize these messages?

2   A.  Yes.

3   Q.  Do these messages appear to fairly and accurately reflect

4   your text exchanges with Mr. Kelly during this period of time?

5   A.  Yes.

6           MS. BONJEAN:  Okay.  Go to the last page so we have

7   all of them, and if you could just pull it out so she can see

8   it.

9   BY MS. BONJEAN:

10  Q.  And for this page, does your answer stand that you

11  remember these text messages?

12  A.  Yes.

13  Q.  Okay.  That's not your number anymore; is that right?

14  A.  Correct.

15          MS. BONJEAN:  Okay.  Let's go back to the first page.

16  Ashley, make sure you redact any reference to her real name

17  there.  Okay.

18          Judge, this is just a three-page document.  I would

19  move to admit it as Defendant Kelly 101.

20          THE COURT:  Any objection?

21          It's admitted.

22          MS. APPENTENG:  No, your Honor.

23          THE COURT:  You may publish.

24      (Defendant Kelly Exhibit 101 received in evidence.)

25  BY MS. BONJEAN:

Jane - cross by Bonjean

901

Q.   Okay.  You hit him up on January 7th, 2019.  You said,
"This is Jane, my new number," right?

A.   Correct.

Q.   Go to the next page.

     And then you sent a number of messages to him.  The
first one is, "What you doing now," right?

A.   Yes.

Q.   "Happy Glo'day," correct?

A.   Correct.

Q.   "Glow day" is birthday, right?

A.   Uh-uh.

Q.   And was it his birthday?

A.   Yes.

Q.   You asked him, "What are you doing tonight?"  This was on
January 11th, right?

A.   I'm on January 9th.

Q.   Right.  But then you said, "What are you doing tonight" on
January 11th, correct?

A.   I don't see that on my screen.

Q.   I don't know --

A.   Yeah.

Q.   Okay.  And then on January 11th, you said, "Trying to
reach.  We need to talk.  Very important."  Correct?

A.   Yes.

Q.   And he's not responding; is that fair?

Jane - cross by Bonjean

902

1   A.   Yes.

2   Q.   And then you said, "How is that I'm texting you at such a

3   critical time and you're not getting back to me," right?

4   A.   Yes.

5   Q.   And this is related to the *Surviving R. Kelly* series,

6   isn't it?

7   A.   Yes.

8   Q.   And then you said, "It's Jane, call me," on January 18th,

9   right?

10  A.   Yes.

11  Q.   And then keep going.  And he said, "Damn, I did not

12  recognize this number."

13          And you said, "Been calling and texting you."

14          And he said, "I'm just waking up.  I'm not used to

15  this new number, but I'm going to lock it in."

16          And then on February 14th of 2019, you said, "I need

17  to speak with you ASAP."  Right?

18  A.   Correct.

19  Q.   And then you also said, "You need to call me right away,

20  or I'm making decisions on my own."  Right?

21  A.   Yes.

22  Q.   And he didn't call you, did he?

23  A.   I believe we did have a phone conversation after that, if

24  I can remember correctly.

25  Q.   Okay.  You didn't tell the U.S. Attorneys that when you

Jane - cross by Bonjean

903

1    met with them, did you?

2    A.   I'm not sure if they asked me that or not.

3    Q.   You told the U.S. Attorneys that you hadn't had

4    communications with him at this point, right?

5    A.   Right.

6    Q.   Actually, and that would have -- you actually made false

7    statements to the U.S. Attorneys when you said that you were

8    on a friendly/not so friendly basis but you hadn't been in

9    contact with him, right?

10   A.   I told them we were in contact.

11   Q.   Let's see.  I want to draw your attention to -- do you

12   remember speaking with the U.S. Attorneys on April 11th, 2019?

13   A.   I'm not sure of the date, but I know that I did speak with

14   them, yes.

15   Q.   And do you remember telling the U.S. Attorneys on that

16   date that your relationship with Kelly was friendly but not

17   friendly, that you contacted Kelly because it was his birthday

18   and contacted him after the documentary aired.  And you

19   described him as not sounding well and seemed stressed, that

20   you contacted Kelly again after information circulated on the

21   news but was not successful.

22        You told them you weren't successful in contacting

23   him?

24   A.   So again, the timeline of everything that you're asking, I

25   might not be completely accurate about in that sense, but we

Jane - cross by Bonjean

904

1   did communicate about the documentary.  So that's why I

2   answered it that way.

3   Q.  Okay.  But you just said that you believe that you had

4   conversations after you told him, "I'm going to do what I'm

5   going to do if you don't get in contact with me," right?

6   A.  I just meant in reference to the documentary.  I can't say

7   that it was that particular conversation after text messages.

8   Q.  All right.  And on February 14th when you were hitting him

9   up to try to get in contact with him, that's because the Cook

10  County State's Attorney's office was trying to reach you,

11  right?

12  A.  Yes.

13  Q.  And you didn't want to talk to the Cook County State's

14  Attorney's office, correct?

15  A.  Correct.

16  Q.  And that's because you had heard that Michael Avenatti --

17  do you know who Michael Avenatti is?

18  A.  I don't.

19  Q.  Okay.  You had heard that there was a tape that had been

20  given to the Cook County State's Attorney's office, right?

21  A.  Yes.

22  Q.  And the first person you called was Robert, right?

23  A.  Yes, because we were a team.  Correct.

24  Q.  In 2019, you were a team?

25  A.  Well, I'm saying in reference to handling this situation,

Jane - cross by Bonjean

905

1   whether we were on good terms or bad terms, I felt comfortable

2   enough to reach out to him because I was afraid.  I didn't

3   know how to handle myself with the situation, so yes, I did.

4   Q.  But he didn't contact you, right?

5   A.  No.

6   Q.  You knew that Kim Foxx had set up a hotline for anyone who

7   had information about R. Kelly, right?

8   A.  No, I did not know that.

9   Q.  But on February 14th, the Cook County State's Attorney's

10  office came, and you refused to speak to them, right?

11  A.  Yes.

12  Q.  And just like in 2002, you didn't want to have anything to

13  do with this, right?

14  A.  Correct.

15  Q.  And you were getting lots of attention, right?

16  A.  Yes.

17  Q.  And you were also getting offers and opportunities to, you

18  know, essentially appear in documentaries and other types of

19  media broadcasts.  Would you agree?

20  A.  Yes.

21  Q.  And you went to Robert, and you told him that if he paid

22  you, you wouldn't cooperate with them, right?

23  A.  That is not correct.

24  Q.  You told him you were going to make the decision by

25  yourself if he didn't get back to you about whether he was

Jane - cross by Bonjean

1   going to pay you?

2   A.   The decision that I was going to make would have been to

3   cooperate with the authorities because I no longer wanted to

4   carry his lies.

5   Q.   Right.  But you had opportunity after opportunity to not

6   carry his lies, and when there's an investigation going on,

7   the first person you call is Robert, right?

8   A.   That's what I was used to, you're right, yes.

9   Q.   Right.  I mean, and you didn't -- you didn't talk to the

10  Cook County State's Attorney's office when they came knocking

11  on your door, right?

12  A.   No.

13  Q.   You called Robert because you wanted to work out a

14  situation where he would pay you not to cooperate?

15  A.   That is not correct.

16  Q.   Uh-huh.  And then he was arrested by law enforcement on

17  February 22nd, 2019.  Do you remember that?

18  A.   Yes.

19  Q.   Okay.  You weren't talking to him at this point, right?

20  A.   Correct.

21  Q.   And he made bail, right?

22  A.   Yes.

23  Q.   And he didn't try to talk to you either, correct?

24  A.   No.

25  Q.   He made no efforts to speak to you, can we -- right?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 159 of 212 PageID #:11119
Jane - cross by Bonjean
907

1   A.  Right.

2   Q.  You decided to cooperate at that point because -- not

3   because you wanted to get something off your chest all of a

4   sudden but because there were benefits involved in it,

5   correct?

6   A.  No.

7   Q.  I mean, you have a deal right now after this trial where

8   you're going to go tell your story.  Your brother was posting

9   about that, right?

10  A.  No, that's not correct.

11  Q.  Okay.  You don't have any -- you don't have any deals

12  right now that are -- is going to materialize after you

13  testify here in court, any that would enrich you?

14  A.  No.

15          MS. APPENTENG:  Objection, your Honor.  There's no

16  foundation for any of these questions.

17          MS. BONJEAN:  Okay.  Well, actually, do you have --

18  we'll come back to it.

19          MS. APPENTENG:  Your Honor, can you --

20          THE COURT:  Well, if there is foundation, as an

21  officer of the court, you tell me there's a good-faith basis,

22  you may do it.  Otherwise, I'll sustain the objection.

23          MS. BONJEAN:  There is, Judge.  Let me -- if you give

24  me one second.

25  BY MS. BONJEAN:

Jane - cross by Bonjean

908

1   Q.  Did your brother post a post on Instagram about how you

2   were so brave and that you had -- you were going to be a

3   spokesperson for Project Refine with a collaboration with Grey

4   Goose Vodka?

5   A.  Yes.

6   Q.  That's what I was talking about.  Any other deals like

7   that?

8   A.  So that's not a deal.  That is my non-for-profit

9   organization that I just started.  It's a mentoring program.

10  That's not for my profit.  That's my passion for what I'm

11  doing in my personal life.  It has nothing to do with a deal.

12  Grey Goose didn't give me any deals or I don't have anything

13  to look forward with them after what took place the other day.

14  Q.  Okay.  But there is a collaboration with Grey Goose Vodka,

15  right?

16  A.  There was, yes.

17  Q.  Any other types of -- I won't use the word "deal."  Any

18  other types of opportunities you have after your testimony

19  here today?

20  A.  No.

21  Q.  Now, even though Robert had no communications with you

22  after you hit him up and said you were going to make your own

23  choice or something of that nature, you hadn't -- you went and

24  spoke with U.S. Attorneys with a person by the name of Fred

25  Crawford, right?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 161 of 212 PageID #:11121
Jane - cross by Bonjean
909

1   A.  Yes.

2   Q.  And you call him your godbrother, right?

3   A.  Yes.

4   Q.  What's a godbrother to you?

5   A.  It's just a terminology that I use for how close he and I

6   are, how he's helped me out, how we've -- he gave me work.

7   Like, he's just a really close friend to my family, so I

8   consider him not a real brother but a godbrother.

9   Q.  Okay.  Is he older than you?

10   A.  About a year, yeah.

11   Q.  Okay.  And on April 11th of 2019, you were interviewed by

12   an Assistant United States Attorney by the name of Angel

13   Krull?

14   A.  Correct.

15   Q.  And you became pretty close with her, correct?

16   A.  I wouldn't say "close."

17   Q.  You were -- I mean, you texted back and forth with her

18   from time to time, right?

19   A.  Yes.

20   Q.  All right.  And during that first interview, you refused

21   to answer any questions about your interactions with

22   Mr. Kelly, right?

23   A.  Yes.

24   Q.  You even told the Assistant State's Attorneys during that

25   interview that you didn't know whether Kelly -- you weren't

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 162 of 212 PageID #:11122
Jane - cross by Bonjean
910

1    sure whether Kelly had relations with young girls, right?

2    A.  I don't remember the conversation you're speaking of

3    actually.

4    Q.  If you had said that, according to you, that would be a

5    lie, right?

6    A.  Correct.

7    Q.  And you told that lie to the U.S. Attorneys on April 11,

8    2019, not because Robert told you to tell that lie, because

9    you decided to tell that lie, right?

10            MS. APPENTENG:  Objection, your Honor.  That

11   misstates her testimony.  She says she doesn't recall what she

12   said on that day if it --

13            THE COURT:  All right.  Clarify --

14            MS. BONJEAN:  Well, I can prove it up.

15            THE COURT:  Clarify her answer then.

16            MS. BONJEAN:  Sure.  Shall I -- maybe we have -- let

17   me refresh her recollection first.  Perhaps that will help.

18            THE COURT:  Okay.

19            MS. BONJEAN:  The April 11th, do you have it?  And

20   just show it to her, though.

21   BY MS. BONJEAN:

22   Q.  Okay.  Do you see what appears to be a Department of

23   Homeland Security report in front of you?

24   A.  Yes.

25   Q.  Okay.

1    A.  Can you zoom in a little bit?

2              MS. BONJEAN:  Yeah, sure.  I'll pull out the portion.

3    And about the fifth paragraph down, first pull out that for

4    her.

5    BY MS. BONJEAN:

6    Q.  Okay.  Can you see it a little closer now?

7    A.  Yes.

8    Q.  Okay.  And at that point, you said you weren't comfortable

9    answering any questions?

10   A.  Can you repeat that?

11   Q.  Do you remember telling the U.S. Attorneys that you were

12   not comfortable answering any questions about your

13   interactions with Mr. Kelly, your sexual interactions with

14   Mr. Kelly?

15   A.  Yes.

16   Q.  And then on the next page about halfway down where it

17   says -- I'm not going to use your initials.  I'm just going to

18   say Jane.  And go ahead.

19             Do you see where it's highlighted there, that first

20   sentence?

21   A.  Yes.

22   Q.  Okay.  Does that refresh your recollection about whether

23   you told the U.S. Attorneys you're not sure whether Kelly had

24   relations with other young girls?

25   A.  Yes.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 164 of 212 PageID #:11124
Jane - cross by Bonjean
912

1    Q.  Okay.  And today, you're saying you do know that he had

2    relationships with other young girls, right?

3    A.  Yes.

4    Q.  So when you told the U.S. Attorneys that on April 11th,

5    2019, that was not true?  That was a false statement, right?

6    A.  Yes.

7    Q.  Okay.  So even on April 11th of 2019, you were making

8    false statements to the U.S. Attorney's office, right?

9    A.  I didn't want to get other people involved so, yes, I did

10   do that.  The girls that I did know, I did say that.

11   Q.  Right.  You told a false statement to the U.S. Attorney's

12   office which, in fact, is a federal crime, right?

13          MS. APPENTENG:  Objection, your Honor, as to what the

14   witness may know in terms of legal conclusions about official

15   charges.

16          THE COURT:  Overruled.  She can give a general

17   answer.

18   BY MS. BONJEAN:

19   Q.  And Mr. Kelly didn't tell you to tell that lie.  You told

20   that lie, right?

21   A.  Yes.

22          MS. BONJEAN:  You can take that down.

23   BY MS. BONJEAN:

24   Q.  You had your own reasons for not wanting to be truthful

25   with the authorities, right?

Jane - cross by Bonjean

913

1    A.   At that time, yes, not the other times.

2    Q.   In fact, that was your first interview you gave about

3    anything related to Mr. Kelly since you spoke to, I guess, the

4    police in 2000, right?

5    A.   I don't remember exactly but...

6    Q.   Okay.  And during this interview, the U.S. Attorneys made

7    it clear to you that it kind of wasn't your choice, that if

8    they subpoenaed you to testify before a federal grand jury,

9    you were going to have to show up on a subpoena, right?

10   A.   Correct.

11   Q.   All right.  And then even in the next interview you had --

12   oh, by the way, during that interview, you refused to look at

13   any video, right?

14   A.   Yes.

15   Q.   In fact, until August 9th, like last week, you've never

16   seen the video, right?

17   A.   Correct.

18   Q.   So you have no idea what was shown at the criminal trial

19   in 2008, right?

20   A.   Only through loose still images.

21   Q.   You looked at some still images and that's when you denied

22   that it was you, right?

23   A.   Yes.

24   Q.   Okay.  Now, on April 13th of 2019, you again met with the

25   U.S. Attorney's office, and you still didn't want to talk.

Jane - cross by Bonjean

914

1    You were uncooperative.  Right?

2    A.  Can you repeat that for me?

3    Q.  On April 13th of 2019 at a second interview, you still

4    were unwilling to speak with the U.S. Attorneys, correct?

5    A.  Yes.

6    Q.  And speak with them about Mr. Kelly and yourself and all

7    of that.  That's what I'm talking about, right?

8    A.  Yes.

9    Q.  And again, that had nothing to do with Mr. Kelly; that was

10   all your decision making, right?

11   A.  Yes.

12   Q.  And on that day, you again refused to look at any videos

13   of yourself or discuss your relationship with Mr. Kelly,

14   right?

15   A.  Right.

16   Q.  And you weren't communicating with Robert at this time,

17   right?

18           And isn't it true that the U.S. Attorney's office

19   told you that you would be entitled to restitution if

20   Mr. Kelly was convicted, right?

21   A.  Yes.

22   Q.  And restitution is money, right?

23   A.  Yes.

24   Q.  And you are seeking restitution or will seek restitution

25   if he is convicted, correct?

Jane - cross by Bonjean

915

1   A.  I'm still undecided with that.  No, that is not correct.

2   Q.  You haven't decided whether you're going to seek

3   restitution?

4   A.  No.

5   Q.  But you know you have the right to seek restitution,

6   correct?

7   A.  That is correct.

8   Q.  And the U.S. Attorneys told you that you had the right to

9   seek restitution even before you ended up giving and

10  cooperating with them, right?

11  A.  That is incorrect.

12          MS. APPENTENG:  Objection, your Honor.  We need a

13  sidebar on this.

14      (Proceedings heard at sidebar:)

15          MS. APPENTENG:  Your Honor, your Honor granted a

16  motion in limine regarding not bringing into evidence or

17  questioning witnesses about punishment or anything that flows

18  from that if defendant is convicted, and this is treading into

19  that territory.

20          MS. BONJEAN:  I'm not using it to highlight

21  punishment.  It's motive, bias.

22          THE COURT:  Okay.  As long as you don't go beyond

23  that, that's okay.  Thank you.

24          MS. BONJEAN:  I'll go -- I'm done with that.

25          THE COURT:  Okay.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 168 of 212 PageID #:11128
Jane - cross by Bonjean
916

1           MS. BONJEAN:  Thank you.

2           MS. APPENTENG:  Thank you, your Honor.

3       (Proceedings heard in open court:)

4           THE COURT:  You may continue.

5   BY MS. BONJEAN:

6   Q.   Okay.  Now, on April 18th of 2019 is when you decided that

7   you would cooperate with the investigation, right?

8   A.   Yes.

9   Q.   Okay.  So you testified yesterday that you just -- you

10  were just so tired of keeping the secret and you needed to get

11  it off your chest, but you took some time making that

12  decision, didn't you?

13  A.   Yes.

14  Q.   And you told the government that you would not -- you

15  would not cooperate unless they could give you an immunity

16  deal, right?

17  A.   I did not tell them that, no.

18  Q.   You asked for an immunity -- you asked for an immunity

19  deal through counsel, right?

20  A.   Correct.

21  Q.   And you asked for immunity for your parents too, right?

22  A.   Yes.

23  Q.   Now, if your parents didn't know anything and they were

24  innocents in all this, why did you ask for immunity for them?

25  A.   Because with them not being truthful the first time as far

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 169 of 212 PageID #:11129
Jane - cross by Bonjean
917

1   as what took place in 2008, I just wanted to make sure that

2   they were protected with telling the truth in moving forward.

3   Q.  And I want to go back -- and they agreed to give you

4   immunity and protect your parents as well, right?

5   A.  Correct.

6   Q.  And I know your father has since passed, and I'm sorry for

7   that.  But at the time that you were speaking with the

8   government in April of 2019, he was living, right?

9   A.  Yes.

10   Q.  You were introduced to Robert by your aunt, Stephanie

11   Edwards, who goes by the name Sparkle, right?

12   A.  Correct.

13   Q.  And you said that even though she was like ten years older

14   than you, you thought of her as a friend, right?

15   A.  Yes.

16   Q.  And actually, your relationship with her was pretty

17   inappropriate, wasn't it?

18   A.  Yes.

19   Q.  You were a young girl, and she told you about her

20   relationship with Robert, right?

21   A.  Yes.

22   Q.  And she even shared with you her sexual relationship with

23   Robert, right?

24   A.  Yes.

25   Q.  And she brought you to Robert's studio, correct?

Jane - cross by Bonjean

918

1    A.   Yes.

2    Q.   And Robert's studio was a pretty bustling place, active

3    place, lots of artists coming in and out, right?

4    A.   Yes.

5    Q.   Musicians, right?

6    A.   Yes.

7    Q.   Managers, runners?  It was a pretty vibrant place for

8    someone who was interested in music, correct?

9    A.   Yes.

10   Q.   And you enjoyed going there because you came from a

11   musical family and you yourself was a musician, right?

12   A.   Yes.

13   Q.   And you enjoyed seeing your aunt perform -- or I guess

14   perform is the wrong word, but like be in the studio making

15   music --

16   A.   Yes.

17   Q.   -- correct?

18        And you testified that it was Sparkle who instructed

19   you to develop this connection to Robert, right?

20   A.   Yes.

21   Q.   And you testified I think yesterday that she told you to

22   sit on his lap, rub his head, and ask him to be your

23   godfather, correct?

24   A.   Correct.

25   Q.   And is "godfather" like code for something because I'm

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 171 of 212 PageID #:11131
Jane - cross by Bonjean
919

1   confused.  Like, what is -- what does it mean to ask someone

2   to be your godfather?

3   A.  Well, it -- again, if you look up to somebody that's

4   within our race, if you look up to somebody and you say that

5   term, like, more casually, that's just the way I feel like she

6   introduced me to be more, like, closer to him.

7   Q.  I see.  And to be clear, it wasn't Robert that asked you

8   to be his goddaughter, it was you that asked him to be his --

9   godfather because Sparkle had said you should do this, right?

10  A.  Yes.

11  Q.  And in looking back, you've said that you think Sparkle

12  was pushing Kelly on you; isn't that right?

13  A.  Yes.

14  Q.  In fact, you believe that Sparkle used you as bait with

15  Kelly?  That's something you opined about, right?

16  A.  Yes.

17  Q.  And, of course, you know Sparkle has said that you are not

18  being truthful about this, right?

19          MS. APPENTENG:  Objection, your Honor.  It calls for

20  hearsay about what Sparkle said.

21          MS. BONJEAN:  I'm not -- it's not offered for the

22  truth.

23          THE COURT:  Yes, not for the truth.  Overruled.

24  BY MS. BONJEAN:

25  Q.  Did you see Sparkle's Tweet last night?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 172 of 212 PageID #:11132
Jane - cross by Bonjean
920

1   A.   No.

2   Q.   Okay.  She said that you were lying because the

3   government's forcing you to testify, is --

4             MS. APPENTENG:  Objection, your Honor.  Relevance as

5   to what's happening right now.  This is about the trial and

6   about the evidence that has already been introduced and will

7   be --

8             MS. BONJEAN:  It goes to interest and bias --

9             MS. APPENTENG:  -- on social media last night --

10            THE COURT:  Wait, wait, wait.  Hold on.  Hold on.

11  Hold on.

12            MS. BONJEAN:  If she made the statement to a -- she

13  made the statement to the public.  If she had made it to an

14  investigator, it would be a non-issue.  She made it -- she

15  made the statement.

16            MS. APPENTENG:  Your Honor, we are talking about an

17  out-of-court statement that's being offered.  Number one, the

18  witness has said she is not familiar with the statement.

19            THE COURT:  Okay.  This is -- would be for the truth,

20  so the motion -- the objection is granted.  The motion --

21            MS. BONJEAN:  That's fine, Judge.  I'll move on.

22  BY MS. BONJEAN:

23  Q.   And then after -- you testified yesterday that after this

24  godfather relationship came to be that things starting turning

25  romantic, sexual between you and Mr. Kelly, right?

Jane - cross by Bonjean

921

1    A.   Can you repeat the question?

2    Q.   Yeah.  That after he agreed to be your godfather, that was

3    the turning point from the relationship.  It became

4    inappropriate at that point, right?

5    A.   Yes.

6    Q.   And you've testified that your parents were okay with this

7    because, you know, he was your godfather, right?

8    A.   Correct.

9    Q.   But he wasn't your godfather?  Your parents knew that,

10   right?

11   A.   Well, they accepted him as my godfather when he agreed to

12   be that.

13   Q.   Okay.  Just so just because you asked and he accepted,

14   that was -- that in and of itself had such meaning that your

15   parents were okay with you spending hours at the studio and

16   all of the things that you testified about?

17   A.   I can't answer that for them.

18   Q.   Okay.  That's fine.  I think we'll wait -- we'll keep that

19   for another witness.

20           Now, you have previously stated that Sparkle knew

21   about your relationship, right?

22   A.   She knew what she encouraged me to do, yes.

23   Q.   And she was angry with Kelly about some fallout over a

24   record deal, right?

25   A.   Yes.

Jane - cross by Bonjean

1    Q.  And you have testified that your parents didn't know about

2    this relationship with Kelly until this interaction at the

3    hotel where there were all these tears and everyone was upset

4    and Mr. Kelly begged for forgiveness and he had all this

5    remorse.  Do you remember that testimony?

6    A.  Yes.

7    Q.  Okay.  But your parents were actually the subject of a

8    DCFS investigation in April of 2000, right?

9    A.  Yes.

10   Q.  And that -- and have you determined whether or not it was

11   Sparkle who initiated that DCFS investigation?

12   A.  I'm not sure who it was.

13   Q.  Okay.  So when you say they didn't know, you're saying

14   they didn't believe, right?

15   A.  Yes.

16          MS. APPENTENG:  Objection, your Honor, as to what, if

17   she knows what her parents, what was in her parents' mind at

18   that time.

19          MS. BONJEAN:  She testified yesterday at length

20   multiple times that her parents didn't know.  She kept it a

21   secret.  They had no idea.

22          THE COURT:  Overruled.

23   BY MS. BONJEAN:

24   Q.  Okay.  So they did know about allegations, they just

25   didn't believe them.  Is that right?

Jane - cross by Bonjean

923

1   A.   They asked me if it was true, and I said no.

2   Q.   And they believed you, right?

3   A.   Correct.

4   Q.   And then shortly after this DCFS investigation, there was

5   also a police investigation, and you and your parents were

6   interviewed by a detective, Detective Everett.  Do you

7   remember that?

8   A.   Vaguely.

9   Q.   Okay.  And that interview happened in Oak Park?

10  A.   Yes.

11  Q.   And you denied any relationship with Mr. Kelly, right?

12  A.   Uh-huh.

13  Q.   And you've testified that you didn't want Robert to get

14  into trouble, right?

15  A.   Correct.

16  Q.   You were protecting him, correct?

17  A.   Yes.

18  Q.   You wanted to preserve the relationship too, right?

19  A.   Yes.

20  Q.   As inappropriate as it was, you wanted to hold onto that

21  relationship, right?

22  A.   Yes.

23  Q.   And then at that point, the relationship or the -- strike

24  that.

25            At that point, the investigation was closed as

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 176 of 212 PageID #:11136
Jane - cross by Bonjean
924

1    unfounded, and that was that, right?

2    A.  Yes.

3    Q.  And despite all of that, you continued to spend

4    significant amounts of time with Mr. Kelly, right?

5    A.  Yes.

6    Q.  And I think you said he got you a black PT Cruiser for

7    your birthday, and your parents were happy for you?

8    A.  Yes.

9    Q.  Did your parents allow you to travel with Robert

10   unsupervised when you were under 17?

11   A.  No.  They would think that I was with him and his wife.

12   Q.  So they did allow you to but -- so they did allow you to?

13   A.  That's not unsupervised, so I don't know what you mean by

14   that exactly.

15   Q.  Oh, I see.  So I meant unsupervised by them.  But you're

16   saying that supervised by who?  Kelly's wife?

17   A.  Yes.

18   Q.  You testified that you had sex with Robert hundreds of

19   times between the ages of, I think, 14 or 17 and 18.  Is that

20   right?

21   A.  Yes.

22   Q.  That means you were spending a great deal of time with

23   him, right?

24   A.  Yes.

25   Q.  And again, you're still adamant that your parents at that

Jane - cross by Bonjean

925

1   point were blissfully unaware of this relationship, right?

2   A.  Yes, because they thought I was around the family.  They

3   didn't know I was spending time with him separately, correct.

4   Q.  Now, Jane, you testified that you had a number of

5   threesomes with your friend Pinky and your friend Brittany

6   when you were under 17 years of age, right?

7   A.  Yes.

8   Q.  And you've testified that Robert was absolutely adamant

9   that your relationship be secret, right?

10  A.  Yes.

11  Q.  But according to you, he entrusted this secret with a

12  bunch of other high schoolers, right?

13  A.  I would say those two people, not a bunch of other high

14  schoolers.

15  Q.  Two other high schoolers, is that your testimony?

16  A.  Yes.

17  Q.  Okay.  But -- so he didn't trust his closest confidants,

18  but you and a couple high schoolers, he was -- he was willing

19  to, you know, engage in this conduct and entrust the secret

20  with three high schoolers, right?

21  A.  Yes.

22  Q.  And you did have threesomes with Pinky and Brittany, but

23  it wasn't until after you were over 17 years of age, right?

24  A.  No.  It was before.

25  Q.  And was that before -- and when you had threesomes with

Jane - cross by Bonjean

926

1   Robert and his wife, was that over 17 years of age too?

2   A.  Yes.

3   Q.  Now, you turned 17 on September -- remind me.

4   A.  I don't remember when I turned 17.

5   Q.  Well, okay.  It was 2001.  Does that sound right?

6   A.  It sounds about right.

7   Q.  It was before you testified before the grand jury, right?

8   A.  Yes.

9   Q.  And then in 2002, you learned that someone had provided a

10  copy of the tape that you are calling or we were calling Tape

11  1 yesterday, right, to a reporter, right?

12  A.  Yes.

13  Q.  And that person is Sparkle, right?

14  A.  Can you repeat the question?

15  Q.  That person that provided the tape was Sparkle?

16  A.  That's what I understand, yes.

17  Q.  And isn't it true that Sparkle made copies of that tape?

18  A.  That's what I understand, yes.

19  Q.  Do you know whether Sparkle's ever been indicted for her

20  conduct?

21  A.  No.

22          MS. BONJEAN:  All right.

23          THE COURT:  Is this a good time to take a recess?

24          MS. BONJEAN:  Sure.

25          THE COURT:  Okay.  We'll take a 15-minute recess.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 179 of 212 PageID #:11139
Jane - cross by Bonjean
927

1          (Recess from 11:30 a.m. to 11:51 a.m.)

2               THE COURT:  Please be seated.

3               Ms. Bonjean, you may conclude your cross.

4               MS. BONJEAN:  Thank you, your Honor.

5     BY MS. BONJEAN:

6     Q.   Jane, I want to go back to, just for reference, after this

7     video goes into the public, that must have been super

8     upsetting to you, right?

9     A.   Yes.

10    Q.   You said it's embarrassing, right?

11    A.   Correct.

12    Q.   And it was after that happened that you and Robert and

13    your parents had this emotional meeting in Oak Park, right, at

14    a hotel.  Is that correct?

15    A.   Yes.

16    Q.   And you said that Robert broke down.  Your father, you

17    know, was upset and that your father told Robert, "Man, I

18    can't help you," right?

19    A.   Yes.

20    Q.   And Robert was apologetic, correct?

21    A.   Yes.

22    Q.   He didn't threaten your parents, right?

23    A.   No.

24    Q.   He was deeply remorseful during this meeting, right?

25    A.   Yes.

Jane - cross by Bonjean

928

1   Q.  And you were upset because you didn't want the

2   relationship to end either, right?

3   A.  Right.

4   Q.  And again, at this point you're 17 years old; and at that

5   point, you didn't need to hide your relationship anymore,

6   correct?

7   A.  That was not to my understanding at the time.  I didn't

8   know that.

9   Q.  Okay.  But you didn't -- certainly didn't want the

10  relationship to end, right?  And you didn't want your parents

11  to get in any type of trouble for anything, right?

12  A.  Right.

13  Q.  You didn't want to get into trouble for anything, correct?

14  A.  Correct.

15  Q.  You didn't want Robert to be in trouble for anything,

16  right?

17  A.  Right.

18  Q.  And Robert -- well, it was -- who came up with the idea,

19  as far as you know, that maybe when this video was getting

20  released into the public and was that -- I'm sorry -- that

21  perhaps it was a good time to get out of town for a few weeks?

22  A.  Robert.

23  Q.  Okay.  And did he say -- and I think you testified

24  yesterday that he said, "Go and, you know, think on it,"

25  because your dad was like, "I can't help you, man," right?

Jane - cross by Bonjean

1    A.   Right.

2    Q.   And you and your parents then went to the Bahamas and

3    Mexico, right?

4    A.   Yes.

5    Q.   And this was supposed to be this time of reflection about,

6    you know, what course you were going to take, right?

7    A.   Correct.

8    Q.   You said you were in contact with Robert, but Robert

9    didn't go on this trip with you, correct?

10   A.   Yes.

11   Q.   That's correct, right?

12   A.   That is correct.

13   Q.   Okay.  And it was during this period of time that you also

14   got a tattoo with Robert's name or initial; is that correct?

15   A.   It was with his name, yes.

16   Q.   And you were very hopeful for a future relationship with

17   Robert at that point?

18   A.   Yes.  I did believe his promises, yes.

19   Q.   Okay.  And you did have a future relationship with him?

20   You ended up being with him for another ten years, right?

21   A.   Yes.

22   Q.   And the trip was a couple of weeks.  Is that about right?

23   A.   Yes.

24   Q.   Okay.  And then you came back.  The problem didn't go

25   away, right?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 182 of 212 PageID #:11142
Jane - cross by Bonjean
930

1   A.  Right.

2   Q.  Your parents still had to be interviewed by the police;

3   isn't that right?

4   A.  I can't remember.

5   Q.  And, in fact, they were interviewed by the police after

6   they came back from that trip, correct?

7   A.  I can't remember how their setup was exactly.  I'm not

8   sure.

9   Q.  Well, let me see if you remember this.  Do you remember

10  being -- do you remember going with your parents for an

11  interview with Chicago police detectives?

12  A.  Yes.

13  Q.  And do you remember not speaking to them?  You had a

14  lawyer, and you did not make any statements to the Chicago

15  Police Department at that time?

16          MS. APPENTENG:  Objection, your Honor, as to

17  foundation as to the timeframe, if we could just specify when

18  we're talking about.

19  BY MS. BONJEAN:

20  Q.  Sure.  I can put a -- I'm talking about March of 2002.

21          Do you remember sitting down or going to the police

22  station with your parents?

23  A.  Yes.

24  Q.  Okay.  And you did not speak to Detective Everett at that

25  time, correct?

Jane - cross by Bonjean

931

1   A.  I don't remember not speaking.

2   Q.  Okay.  Do you remember speaking?

3   A.  I don't remember speaking or not speaking.

4   Q.  Got you.  Do you remember your parents being interviewed?

5   A.  I actually don't remember that interaction all the way.

6   Q.  Okay.  But you do remember that you had counsel and your

7   parents had counsel before you went there, right?

8   A.  Yes.

9   Q.  And you consulted with your counsel before this interview,

10  fair?

11  A.  Yes.

12  Q.  And then it wasn't for a little bit, maybe like a month or

13  so later that you all received subpoenas to testify before the

14  grand jury, right?

15  A.  Right.

16  Q.  And you had counsel for that also, correct?

17  A.  Yes.

18  Q.  And you consulted with your counsel before you testified

19  before the grand jury, correct?

20  A.  Yes.

21  Q.  And you've testified today and yesterday that you

22  testified untruthfully, right?

23  A.  Yes.

24  Q.  Because you wanted to protect Robert, right?

25  A.  Yes.

Jane - cross by Bonjean

932

1   Q.  You were in love with him, right?

2   A.  Correct.

3   Q.  And also you didn't want this really terrible,

4   embarrassing tape to be associated with you, right?

5   A.  Correct.

6   Q.  And you wanted to protect your parents too, right?

7   A.  Yes.

8   Q.  Because there had already been a DCFS investigation and a

9   police inquiry before, right?

10  A.  Right.

11  Q.  So you had a number of your own reasons why you didn't

12  want this to come out, legitimate reasons, correct?

13  A.  Correct.

14  Q.  And your parents too testified untruthfully, right, as far

15  as you know?

16  A.  Yes.

17  Q.  And they had their own reasons for not wanting it to come

18  out too, correct?

19        MS. APPENTENG:  Objection, your Honor.  Again, her

20  testifying about what her parents' reasons were calls for

21  speculation.

22        THE COURT:  Well, it's pretty -- her own reasons

23  obviously.  Overruled.  It can stand.

24  BY MS. BONJEAN:

25  Q.  You had conversations with your parents about this, right?

Jane - cross by Bonjean

933

1   A.   Yes.

2   Q.   And your mom did not want this to be out there, right?

3   A.   Correct.

4   Q.   And your dad too, correct?

5   A.   Uh-huh.

6   Q.   Okay.  Now, and it's not until, fast forward to, I guess,

7   now 2019 that you are actually now coming forward and telling

8   the truth about this, right?

9   A.   Yes.

10  Q.   And that's under an immunity deal with the government,

11  correct?

12  A.   Correct.

13  Q.   And your immunity deal doesn't just cover you for your

14  past perjury, right?  It covers you really for anything that

15  might be related to Mr. Kelly or really anything related to

16  your conduct as well, right?

17  A.   Can you repeat that?

18  Q.   Hold on one second.  Let me pull it up.

19         First of all, you had your own counsel that

20  negotiated on your behalf, right?

21  A.   Yes.

22  Q.   And your immunity deal basically says that nothing you

23  say, nothing you reveal during the course of your interviews

24  with the government can be used against you in any way, right,

25  as long as you come in here and tell the truth, right?

Jane - cross by Bonjean

934

1    A.   Yes.

2    Q.   And they are the arbiters of what the truth is?  It's the

3    truth as determined by the government, correct?

4    A.   I'm telling my truth.  I don't know how it's determined

5    after that.

6    Q.   Well, I understand you're telling your truth, but it's the

7    government that gets to decide whether your truth is the

8    truth, right?

9            MS. APPENTENG:  Objection, your Honor.  It calls for

10   speculation from that witness.

11           THE COURT:  Well, it's what her understanding is, but

12   I think she's answered it.  She doesn't know.

13           MS. BONJEAN:  Well, in your -- I'm going to mark as,

14   what are we at?  Defendant Kelly 103?

15           MS. COHEN:  102.

16   BY MS. BONJEAN:

17   Q.   102.  I'm going to ask that you look at the screen, Jane.

18   Do you recognize this document?

19   A.   Yes.

20   Q.   Okay.  And if you'd read the first paragraph to yourself,

21   and then I'm going to ask you some questions.  This is to help

22   refresh your recollection.

23   A.   Okay.  Thank you.

24   Q.   Let me know when you're finished.

25   A.   I'm just reading the first paragraph, correct?

Jane - cross by Bonjean

935

1   Q.   Yeah, for now.

2   A.   Okay.  I'm done.

3   Q.   Okay.  So it was your attorney who advised the government

4   that you had information that may tend to incriminate you,

5   right?

6   A.   Yes.

7   Q.   All right.  And the government agreed that none of that

8   information that you relayed to them will -- in connection

9   with this case, so anything you tell them will be used against

10  you in any criminal prosecution.  Isn't that right?

11  A.   Yes.

12  Q.   And they're not -- even -- they even promise that no leads

13  or information directly or indirectly derived from this

14  investigation could be used against you in a criminal

15  prosecution, correct?

16  A.   I'm not exactly sure what that means.

17  Q.   Well, you signed this document, correct?

18  A.   I did.

19  Q.   You presumably understood it when you signed it, right?

20  A.   I -- yes.  If you can just rephrase how you're saying it

21  so I can understand.

22  Q.   Sure.  Why don't I -- look at the second paragraph, and if

23  you'd peruse it.  It probably was a bad question on my part,

24  so let me -- go ahead and read, and then I'll ask it.

25  A.   Okay.

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 188 of 212 PageID #:11148
Jane - cross by Bonjean
936

1    Q.  So they've agreed that no leads or information directly or

2    indirectly derived from the information you provide can be

3    used against you in some type of criminal prosecution, right?

4    A.  Yes.

5    Q.  And the government didn't specify just perjury, they --

6    the agreement is broader than that.  It's pretty much anything

7    can't be used against you in a criminal prosecution, right?

8    A.  Yes.

9    Q.  And then if you could, read the last paragraph there to

10   yourself where it starts, "As stated."  Let me know when

11   you're finished there.

12   A.  Okay.

13   Q.  So the government says you have to tell truthful and

14   complete testimony, but in the event that they determine that

15   you violated this provision or they determined that you didn't

16   give truthful testimony, then there would be consequences for

17   that, right?

18   A.  Yes.

19   Q.  Okay.  So it's them making that determination, not you,

20   right?

21   A.  Correct.

22          MS. BONJEAN:  Okay.  You can take that down.

23   BY MS. BONJEAN:

24   Q.  You testified yesterday that your parents weren't able to

25   work when the tape came out, but your identity wasn't

Jane - cross by Bonjean

937

1    associated with them.  Why weren't they able to work?

2    A.  Because Robert asked them not to work because he didn't

3    want attention being drawn to them which is why we took the

4    vacation as well.

5    Q.  You took a vacation for two weeks.  It wasn't prosecuted

6    for six years later, right?

7    A.  I'm sorry?

8    Q.  You took a vacation for two weeks --

9    A.  Uh-huh.

10   Q.  -- right after the case kind of blew up, and he did that

11   so you could go collect your thoughts and give some

12   consideration, right?

13   A.  Yes.

14   Q.  Okay.  But the case wasn't prosecuted for another six

15   years, right?

16   A.  Right.

17   Q.  And it's your testimony that Robert said don't work for

18   six years?

19   A.  No.  My dad was still a musician during that time, so he

20   was still working.

21   Q.  Right.  So he was working, correct?

22   A.  Yes.

23   Q.  In fact, he was working on some of Robert's albums, but he

24   was also working on other things as well, right?

25   A.  Yes.

Jane - cross by Bonjean

938

1   Q.  And there's nothing about your parents working that would

2   draw attention to this because nobody knew who your parents

3   were in connection with this, right?

4   A.  That's not true.

5   Q.  Okay.  How would your parents working bring attention to

6   this prosecution?

7   A.  Because a lot of people knew that my father was a musician

8   for Mr. Kelly, worked closely with him, that he was my

9   godfather.  We were in a local city.  There were rumors, names

10  released, etcetera.

11  Q.  Okay.  And there was rumors swirling, and it's your

12  position that Robert told your parents don't work because

13  there's rumors out there?

14  A.   Initially when things first started happening, yes.

15  Q.  Okay.  But your parents did work?  Like, you went on

16  vacation and then they came back and you picked up your lives,

17  correct?

18  A.  Eventually, yes.

19  Q.  And that was all before the 2008 prosecution, correct?

20  A.  Yes.

21  Q.  A couple other things.  I want to show you a picture

22  before we -- do you recognize that person?

23  A.  Yes.

24  Q.  Who do you recognize that to be?

25  A.  Robert's wife.

1    Q.   Okay.  Does that fairly and accurately depict Robert's

2    wife at various, I guess, ages?

3    A.   Yes.

4    Q.   You knew her for many, many years.  You lived under her

5    roof, right?

6    A.   Yes.

7         MS. BONJEAN:  Okay.  I would ask that it be admitted

8    and that it be published to the jury.

9         MS. APPENTENG:  No objection.

10   BY MS. BONJEAN:

11   Q.   Oh, yes.  I'm sorry.  This was his ex-wife too, right?

12   A.   Yes.

13   Q.   Okay.  He's not married to her anymore?

14   A.   Correct.

15   Q.   In fact, he got divorced while he was with you, right?

16   A.   Yes.

17   Q.   To be with you, correct?

18   A.   That wasn't my understanding.  It was because their

19   marriage didn't work out.

20   Q.   All right.  And you've testified that when you lived under

21   her roof as an adult that there was sexual interaction between

22   you and her and Mr. Kelly, right?

23   A.   Correct.

24        MS. BONJEAN:  You can take that down.

25   BY MS. BONJEAN:

Jane - cross by Bonjean

940

1    Q.  And I want to show you a picture of -- and do you

2    recognize this woman?

3    A.  Yes.

4    Q.  And who is this woman?

5    A.  My Aunt Stephanie.

6    Q.  Also known as Sparkle?

7    A.  Correct.

8    Q.  Does this fairly represent Sparkle at various ages?

9    A.  Yes.

10           MS. BONJEAN:  Okay.  I'd ask that it be admitted and

11   published.

12           MS. APPENTENG:  No objection.

13           MS. BONJEAN:  Okay.  And this is --

14           THE COURT:  No objection, it's admitted.  You may

15   publish.

16           MS. BONJEAN:  Thank you.

17      (Said exhibit received in evidence.)

18   BY MS. BONJEAN:

19   Q.  This is the Sparkle that you've said that she encouraged

20   you to ask Robert to be your godfather and had you sit on his

21   lap and rub his head and all that, right?

22   A.  Yes.

23   Q.  Do you speak with Sparkle today?

24   A.  No.

25           MS. BONJEAN:  You can take that down.

Jane - cross by Bonjean

1   BY MS. BONJEAN:

2   Q.   And finally, do you recognize this woman?

3   A.   No.

4   Q.   Okay.  This is Government Exhibit 106.  Would you agree

5   that it appears to be a woman with a scarf that is in a

6   checkered pattern?

7   A.   Yes.

8   Q.   And you don't have any idea who this woman is, right?

9   A.   No.

10          MS. BONJEAN:  Okay.  You can take that down.  No,

11   take it down.  She doesn't know who it is.

12   BY MS. BONJEAN:

13   Q.   You testified yesterday that sometimes -- sometimes, and I

14   think you said in connection with Video 2, that Robert gave

15   you Cristal to drink; is that right?

16   A.   I can't remember the number of the video, but that did

17   happen, yes.

18   Q.   And you said you watched all of the videos; is that right?

19   A.   I did, yes.

20   Q.   Did you ever see any Cristal in any of those videos?

21   A.   Like the bottle or the glasses?

22   Q.   Yes, anything.

23   A.   Yes.  I was drinking out of glasses in one of the videos,

24   yes.

25   Q.   It was -- it was a tumbler of -- it was like a big plastic

Jane - cross by Bonjean

1   cup, right?

2   A.  It was a glass cup.

3   Q.  It wasn't like a champagne glass, right?

4   A.  No.

5   Q.  Okay.  And it's your testimony that it wasn't juice or

6   water?

7   A.  Correct.

8   Q.  It was just a big cup of Cristal?

9   A.  Correct.

10  Q.  And since you've been cooperating or, you know, agreeing

11  to be cooperative with the government, you've also asked the

12  government for help just even in the last couple of years,

13  right?

14  A.  Yes.

15  Q.  Assistance, they've given you money, correct?

16  A.  When I'm on their behalf, yes.

17  Q.  Yes.  They have provided you with money since you've been

18  cooperating with their investigation, right?

19  A.  No.

20  Q.  No?

21  A.  I mean, if you can be a little bit more specific, I can

22  answer better, but they don't just give -- hand me money.

23  Q.  They've given you benefits, right?

24  A.  Yes.

25  Q.  Okay.  What have they given you since the beginning of

Jane - cross by Bonjean

1    this investigation as a benefit?

2    A.    As a benefit, they've helped me with housing, and they've

3    just, if I have to travel to come for any reason, like just

4    for food or travel expense or parking or something.

5    Q.    Anything else?

6    A.    Not that I can think of, no.

7    Q.    And when you say they helped you with housing, they helped

8    you get Section 8 housing, didn't they?

9    A.    Yes.

10    Q.    And Section 8 housing is a pretty good benefit, isn't it?

11    A.    It is.

12    Q.    And you can have that for a lifetime, right?

13    A.    I'm not aware of that.

14    Q.    You can pass that on to people in your family even, right?

15    A.    I didn't know that.

16    Q.    Section 8 housing isn't easy to get, is it?

17    A.    No.

18    Q.    And they've -- they paid your downpayment for the Section

19    8 housing?

20    A.    Yes.  They helped me with living because I was not working

21    at the time, and I was not able to -- I was afraid for my

22    safety with cooperating with them, so that was a way of them

23    making sure my son and I were secure.

24    Q.    Speaking of your son, you sent pregnancy photos of

25    yourself to the former U.S. Attorney, right?

Jane - cross by Bonjean

944

1    A.  Yes, I did.

2    Q.  That was AUSA Krull?

3    A.  Are you referring to Angel?

4    Q.  Angel, yes.

5    A.  Yes, yes.

6    Q.  You were on that type of level of familiarity that you

7    sent her your -- like, was it a bare belly?

8    A.  I'm not exactly sure what picture I sent her, but they

9    have seen me in a pretty negative light, so I thought it was

10   okay to share something positive with them.

11   Q.  And she said you were glowing, you looked lovely, right?

12   A.  Yes.

13   Q.  And she calls you by your nickname, Boss Baby, right?

14   A.  Yes.  She has referred to me as that before, but that's

15   not what she calls me.

16        MS. BONJEAN:  Give me one second.

17      (Pause.)

18        MS. BONJEAN:  One last area, your Honor.

19        I'm going to have you look at, I guess we're at

20   Defendant's Exhibit 105.  Just show it to the witness, please,

21   first.

22   BY MS. BONJEAN:

23   Q.  I'm going to scroll through this and ask you to look at it

24   and tell me if you recognize these text exchanges.  Okay?

25   A.  I'm done.

Jane - cross by Bonjean

945

1   Q.  Go to the next page.

2   A.  Okay.

3           Okay.

4           Okay.

5           Okay.

6           Okay.

7           Okay.

8           Okay.

9           Okay.

10          Okay.

11          Okay.

12          Okay.

13          Okay.

14          Okay.

15  Q.  Almost finished.

16  A.  Okay.

17          Okay.

18          Okay.

19          Okay.

20  Q.  I think that's the last page.

21  A.  Okay.

22          Okay.

23  Q.  Okay.  Do you recognize these text exchanges with the

24  Assistant State's Attorney Angel Krull?

25  A.  Yes.

Jane - cross by Bonjean

946

```
 1   Q.   Okay.  Do they fairly and accurately represent your

 2   messages with the former State's Attorney -- when I say

 3   "former," I mean she's not on this team right here, right?

 4   A.   Correct.

 5   Q.   And do they fairly and accurately depict those messages?

 6   A.   Yes.

 7           MS. BONJEAN:  Okay.  Your Honor, at this time I'd

 8   like to admit them and publish them.  I just have three

 9   questions I want to ask her about it.

10           THE COURT:  All right.  Any objection?

11           They're admitted.  You may publish.

12       (Defendant Kelly Exhibit 105 received in evidence.)

13   BY MS. BONJEAN:

14   Q.   Okay.  Go to the first page.  The Assistant State's

15   Attorney has -- this has you in her phone as "Boss Baby,"

16   right?

17   A.   Yes.

18   Q.   Is that what she called you?

19   A.   She referred me to that sometimes, yes.

20   Q.   Okay.  And I see that you were using emojis to -- I guess

21   a heart emoji to communicate that you loved her message or

22   something like that?

23   A.   Yes.

24   Q.   And is this how you communicated pretty typically with the

25   U.S. Attorney?
```

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 199 of 212 PageID #:11159
Jane - cross by Bonjean
947

1   A.   Yes.

2   Q.   On one other page, she referred to you as BB, right?

3   A.   Correct.

4   Q.   That's like Boss Baby?

5   A.   Yes.

6   Q.   And then if you go to the last page, you asked her, "Did

7   Amalia share the pictures?"  What pictures were you referring

8   to?

9   A.   My pregnancy photos.

10  Q.   Okay.  And the Assistant U.S. Attorney says, "Just one.

11  The green outfit.  So beautiful.  You are glowing.  I'm very

12  happy and excited for you."  Right?

13  A.   Yes.

14  Q.   Okay.  And were these professionally taken pregnancy

15  photos?

16  A.   Yes.

17  Q.   Okay.  And again, this was the nature of your relationship

18  with the U.S. Attorney when you were -- leading up to this

19  trial, right?  This reflects that, correct?

20  A.   Yes.

21  Q.   You talked on the phone too?

22  A.   Yes.

23  Q.   Okay.  And did you have the conversations about

24  restitution with her on the phone?

25  A.   No, not that I can remember over the phone.

Jane - cross by Bonjean

948

1   Q.  Who did you speak to about the restitution?

2   A.  The restitution was -- I actually can't remember how it

3   started out.  From what I think I remember is that we were in

4   person when that was presented to us.

5   Q.  Okay.  And she presented it to you, right?

6   A.  Yes.

7        MS. BONJEAN:  Okay.  And I have one -- and I'm

8   finished, Judge.

9   BY MS. BONJEAN:

10   Q.  And when you say "us," who are you talking about?

11   A.  I'm sorry.  Can you refresh my memory on when I said that?

12   Q.  You just said "she was talking to us."

13   A.  Well, that was other people who were in the room as -- at

14   the time.

15   Q.  You're talking about your friends, right?

16   A.  No.  What friends?  I'm confused.

17   Q.  Who is the "us"?

18   A.  So there were multiple people in the room with Angel at

19   the time that she and I had the conversation, so I'm referring

20   to everyone who was in the room at the time.

21   Q.  And I'm asking who the "us" is.

22   A.  Well, me and my parents.

23   Q.  Okay.  So your parents also are due for restitution as

24   well, right?

25   A.  No.  You're confusing me.  I'm sorry.  I'm thinking you're

1    talking about the immunity letter, not restitution.

2    Q.   Okay.

3    A.   I got confused.  I apologize.

4    Q.   It's all right.

5    A.   Can you repeat that for me so I can --

6    Q.   Sure.

7    A.   -- answer clearly?

8    Q.   Yes.  Who told you about the restitution that you were

9    entitled to?

10   A.   Angel.

11   Q.   Okay.  And when did that conversation take place?

12   A.   That was in person during one of our meetings.  My lawyer

13   was actually involved in that conversation as well.

14   Q.   Okay.  Anyone else?

15   A.   Not that I can remember.  I'm not sure, though.

16   Q.   And how much time was spent talking about restitution?

17   A.   I didn't understand it, so it wasn't much time spent on it

18   at all.  I actually got clarity through my lawyer.

19   Q.   Got you.  Okay.  And finally, just for clarity's sake, you

20   also were provided from the U.S. Attorney's office flights to

21   and from Florida, right, with your cousin, correct?

22   A.   Yes.  She was there with me, yes.

23   Q.   And you got expenditures for hanging out in Florida,

24   right?

25   A.   No.  At the time, I was afraid of my safety, so they let

1   me decide where I would like to go and be away from everything

2   that was getting ready to take place.  That's correct.

3   Q.  Well, when was this?

4   A.  This was during the arrest, I believe.

5   Q.  So -- well, this was in June of 2019, right?

6   A.  That sounds about right.

7   Q.  Mr. Kelly was arrested before June of 2019, right?

8   A.  I'm not sure.

9         MS. APPENTENG:  Objection, your Honor, in terms of

10  what arrest we're talking about.  Two arrests have been talked

11  about this case, in 2002 and in this case.

12         MS. BONJEAN:  Okay.  After --

13         THE COURT:  Clarify it.

14         MS. BONJEAN:  I'm sorry?

15         THE COURT:  Clarify it then.

16  BY MS. BONJEAN:

17  Q.  After Mr. Kelly was arrested in 2' -- the early part of

18  2019, he made bond, right?

19  A.  Yes.

20  Q.  Are you aware of that?

21  A.  Yes.

22  Q.  He didn't make any contact with you, correct?

23  A.  No.

24  Q.  That's correct, right?

25  A.  That is correct.

Jane - cross by Bonjean

1   Q.   Okay.  And so you, because of Mr. Kelly being arrested,

2   you were able to go to Florida on vacation with your cousin to

3   get out of --

4   A.   It wasn't --

5   Q.   -- to get out of Dodge, right?

6   A.   It wasn't just about that.  With the attention, with

7   everything happening with the documentary and people were

8   approaching me and my family and me changing numbers and

9   every -- all of the attention that that brought, that was the

10  reason why I left the state.

11  Q.   Okay.  And then your father got some benefits too, right?

12  A.   My parents were also going through the same thing that I

13  was, so they did leave town as well.

14  Q.   And the government paid for that, correct?

15  A.   I'm -- I believe so, yeah.

16  Q.   And then we talked about ultimately you got assistance

17  with your Section 8 housing, but that's locally, right?

18  A.   Yes.

19          MS. BONJEAN:  All right.  I think that might be it,

20  your Honor.  Give me one second.

21          THE COURT:  Is that it?

22          Redirect?

23          MS. APPENTENG:  Thank you, your Honor.  Your Honor,

24  we'd ask if the defense counsel can pull up the last exhibit

25  they just had on the screen.

Jane - redirect by Appenteng

952

1          MS. COHEN:  The text messages?

2          MS. APPENTENG:  Yes, please.

3          MS. BONJEAN:  The Boss Baby text messages?

4          MS. APPENTENG:  Yes.

5                    REDIRECT EXAMINATION

6   BY MS. APPENTENG:

7   Q.  Jane, can you see that on the screen?

8   A.  Yes.

9   Q.  In those text messages, what are you talking about?

10  A.  I'm just going to reread it.  One second.

11  Q.  Yep.

12          THE COURT:  The whole thing or just this one

13  screenshot?

14          MS. APPENTENG:  This screenshot.

15  BY THE WITNESS:

16  A.  We're talking about scheduling a time where I needed to

17  come in to speak with the AO.

18  BY MS. APPENTENG:

19  Q.  Can you go to the next page, please?

20          Are you talking about scheduling generally here too?

21  A.  Yes.

22  Q.  Can you go to the next one, please?  You can go to the

23  next page.

24          And what are you talking about here?  Scheduling

25  again?

Jane - redirect by Appenteng

953

1   A.   Yes.

2   Q.   Can you go to the next?

3          Again, what are you -- what are your messages about

4   here?

5   A.   Scheduling.

6   Q.   Can you go to the next message, please?

7          Again, what are you talking about here?

8   A.   The trial date.

9   Q.   The upcoming trial date that -- the trial we're in right

10  now, is that -- for this case?

11  A.   Correct.

12  Q.   Can you go to the next message, please?

13          Again, what are you talking about there?

14  A.   Trial.

15  Q.   Can you go to the next one, please?  Are you talking about

16  schedule -- what the next court dates and updates in this case

17  are?

18  A.   Yes.

19  Q.   Can you go to the next message, please?

20          Again, are you talking about scheduling in these text

21  messages?

22  A.   Yes.

23  Q.   Can you go to the next message?

24          Again, are you talking about scheduling a time to

25  meet?

Jane - redirect by Appenteng

954

1   A.  Yes.

2   Q.  Can you go to the next message, please?

3           Again, are you talking about scheduling a time to

4   meet?

5   A.  I'm sorry.  Can you repeat that?

6   Q.  You're talking about scheduling a time to meet; is that

7   right?

8   A.  Yes.

9   Q.  Can you go to the next one, please?

10  A.  Yes.

11  Q.  Go to the next message.

12          You can go to the next one.

13          Go to the next message, please.

14          So far, the message that we're looking at is talking

15  about scheduling?

16  A.  Yes.

17  Q.  And Angel getting on the line with Amalia or Melissa so

18  that she can talk with you?

19  A.  Correct.

20  Q.  Can we go to the next message, please, and the next one.

21          It says a name there that says "Amalia."  Who is

22  Amalia?

23  A.  She works with Homeland Security.

24  Q.  And it says, "Chris."  Who is Chris?

25  A.  My attorney.

Jane - redirect by Appenteng

955

1    Q.   And the other message said a Melissa.  Who is that?

2    A.   She works with Homeland Security as well.

3    Q.   And they're agents that were working on this case?

4    A.   Correct.

5    Q.   Can you go to the next message, please?

6              Okay.  Go to the next one, please.

7              And these are the -- what pictures are you talking

8    about here?

9    A.   My pregnancy photos.

10             MS. APPENTENG:  I believe that's the last message,

11   correct?  You can take that down.

12   BY MS. APPENTENG:

13   Q.   And just a few questions for you.  You were asked on

14   direct about having counsel to go into the grand jury, the

15   state grand jury, back in 2002.  Do you remember those

16   questions?

17   A.   Yes.

18   Q.   Who provided that lawyer for you?

19   A.   Robert.

20   Q.   You testified -- you were asked questions in

21   cross-examination about wires and checks that you received

22   money for -- to help you pay your rent.  Is that right?

23   A.   Yes.

24   Q.   And who did you talk to about receiving those rental

25   payments?

Case: 1:19-cr-00567 Document #: 410-2 Filed: 02/10/23 Page 208 of 212 PageID #:11168
Jane - redirect by Appenteng
956

1  A.   Robert.

2  Q.   And who agreed to make those payments to you for your

3  rent?

4  A.   Robert.

5  Q.   You were asked on cross-examination about your contact

6  with Mr. Kelly around the time in 2019.  Do you remember those

7  questions?

8  A.   Yes.

9  Q.   You said that you called Robert because you were afraid

10 about the situation with the tapes that you heard about the

11 new tapes that Cook County had received?

12 A.   Yes.

13 Q.   What were you afraid about?

14 A.   This situation resurfacing and another tape being released

15 of he and I sexually engaging.

16 Q.   And what -- strike that.

17      You were asked on cross-examination that back when

18 you were 14, 15, and 16 years old, you were denying your

19 relationship to the world.  Do you remember being asked those

20 questions?

21 A.   Yes.

22 Q.   And at that time you were 14, 15, 16 years old, who

23 instructed you to deny your relationship with Robert Kelly to

24 the world?

25 A.   Robert.

Jane - redirect by Appenteng

1   Q.  Again, you were asked questions about the DCFS and CPD

2   interviews that happened in 2000.  Do you remember those

3   questions?

4   A.  Yes.

5   Q.  And that you were wanting to continue your relationship

6   with Mr. Kelly at the time?

7   A.  Yes.

8   Q.  Do you remember those questions?

9   A.  Yes.

10  Q.  And how old were you in 2000 around that time?

11  A.  About 16, 17.  16.  15 or 16.

12  Q.  You were asked some questions on cross-examination about

13  what you were able to do after the 2008 trial, what Mr. Kelly

14  allowed you to do after the 2008 trial.  Do you remember those

15  questions?

16  A.  Yes.

17  Q.  What did Mr. Kelly allow you to do during the trial?

18  A.  Nothing.

19  Q.  Where did you stay?  Where did you sleep and stay at that

20  time during the trial?

21  A.  I was in the garage in the Olympia Fields house that was

22  turned into a gym, and I was in the office space in the house,

23  back and forth.

24  Q.  Were there other places that you stayed during the trial

25  when the trial was going on?

Jane - redirect by Appenteng

958

1    A.   Hotels.

2    Q.   Where?  Safe to say the suburbs of Chicago?

3    A.   Yes.

4    Q.   And why were you staying in hotels during the trial?

5    A.   Because I was not to be in the house with all of the

6    possibilities of things that were happening legally.

7    Q.   You weren't supposed to be seen, is that what you're

8    saying?

9    A.   Yes.

10        MS. APPENTENG:  This is wrapping up, your Honor.

11   BY MS. APPENTENG:

12   Q.   Now, those text messages that you were shown on

13   cross-examination that were between you and Mr. Kelly, those

14   were text messages in 2018; is that correct?

15   A.   Yes.

16   Q.   And about how old were you in 2018?

17   A.   I was about late 20s, early 30s.

18   Q.   In your 30s?

19   A.   Yes.

20   Q.   What was Mr. Kelly's reaction to you as you saw in those

21   text messages in 2018 where you were suggesting that you two

22   get together?

23        MS. BONJEAN:  I'm going to object to -- I mean, the

24   text messages have been admitted.  I don't -- if she's asking

25   her to characterize, I think that's improper.

Jane - redirect by Appenteng

959

1    MS. APPENTENG:  My question was, what was your --

2    THE COURT:  I don't know.  Overruled.  Go ahead.

3  BY MS. APPENTENG:

4  Q.  My question was:  What was Mr. Kelly's reaction to you in

5  2018 when you suggested getting together in those text

6  messages?  Did he respond?

7  A.  Yes.

8  Q.  Did he respond every single time?

9  A.  No.

10  Q.  When you were 14, 15, and 16 years old, did Mr. Kelly make

11  efforts to see you?

12  A.  Yes.

13  Q.  And how frequently did he make those efforts to see you at

14  that time when you were 14, 15, and 16 years old?

15  A.  Weekly.

16  Q.  I'm sorry?

17  A.  Weekly, daily.

18  Q.  And what happened on those occasions when you all were

19  together, you and Mr. Kelly when you were 14, 15, and 16 years

20  old?

21  A.  Sometimes we would just hang out or I would be in the

22  studio, or sometimes we would have sexual engagement.

23    MS. APPENTENG:  A moment, your Honor.

24    No further questions.

25    THE COURT:  Okay.  You can step down.

Siffermann - direct by Pozolo
960

1      (Witness excused.)

2           THE COURT:  Call your next witness, please.

3           MS. POZOLO:  The United States calls Special Agent

4      Melissa Siffermann.

5           Can the witness be sworn, your Honor?

6           THE COURT:  Oh, excuse me.

7      (Witness sworn.)

8           THE WITNESS:  I do.

9           THE COURT:  Ms. Pozolo, you may question the witness.

10          MS. POZOLO:  Thank you, your Honor.

11          MELISSA SIFFERMANN, GOVERNMENT'S WITNESS, SWORN

12                        DIRECT EXAMINATION

13    BY MS. POZOLO:

14    Q.   Good afternoon.

15    A.   Good afternoon.

16    Q.   Can you please state and spell your name for the record?

17    A.   Melissa Siffermann, S-i-f-f-e-r-m-a-n-n.

18    Q.   Where are you employed?

19    A.   I'm a special agent with Homeland Security Investigations.

20    Q.   Is Homeland Security Investigations commonly referred to

21    as HSI?

22    A.   Yes, it is.

23    Q.   What is your job title?

24    A.   A special agent.

25    Q.   How long have you been a special agent with HSI?