UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 19 CR 567 |
| v. | Honorable Harry D. Leinenweber |
| ROBERT SYLVESTER KELLY, aka "R. Kelly" | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Robert Kelly is a serial sexual predator who, over the course of many years, specifically targeted young girls and went to great lengths to conceal his abuse of Jane and other minor victims. To this day, and even following the jury verdict against him, Kelly refuses to accept responsibility for his crimes. To the contrary, Kelly brazenly blames his victims and argues that his abuse of 14, 15, and 16 year-old girls was justified because some of his victims as minors "*wanted* to pursue a romantic and sexual connection" with him and others remained in contact with him as adults. At the age of 56 years old, Kelly's lack of remorse and failure to grasp the gravity of his criminal conduct against children demonstrates that he poses a serious danger to society. Kelly goes so far as to insinuate that *he*—and not the young girls he abused— is the victim, because the federal government elected to prosecute him for egregious conduct that occurred throughout the United States for over 20 years.

Standing alone, a sentence of 300 months' imprisonment appropriately accounts for the indescribable harm defendant has caused to Jane, Pauline, and Nia.

Such a sentence is required to protect Kelly's would-be victims and is sufficient but not greater than necessary to meet the goals of sentencing.

## I.     FACTUAL BACKGROUND

Between 1996 and 2001, Kelly repeatedly sexually abused young girls, including Jane, Pauline, and Nia. At trial, each victim testified in detail about the abuse they suffered. The victims' testimony is summarized in the Government's Version of the Offense, and the transcripts of their testimony were attached as exhibits. *See* GVO Ex. A (Jane's Trial Testimony); GVO Ex. M (Pauline's Trial Testimony); GVO Ex. L (Nia's Trial Testimony).

### A.     Jane

*Kelly's Sexual Abuse of Jane*

In 1996 or 1997, when Jane was about 13 years old, she was introduced to Kelly by her aunt. GVO Ex. A (Jane's Trial Testimony), 707-709, 726. At that time Jane was a musician herself, performing in a group with her cousins that toured internationally. *Id.* 702-06, 711. Jane was inspired by music and saw a future career for herself in the music industry. *Id.* Jane's aunt was also a singer and musician, and in addition to being romantically involved with Kelly, Jane's aunt worked with him musically. *Id.* 715. Jane was very close to her aunt, admired her and looked up to her. *Id.* To help foster a closer relationship between Jane and Kelly – who Jane saw as a music mentor – Jane's aunt instructed Jane to sit on Kelly's lap, rub his head, and ask him to be her "godfather." *Id.* 726. Kelly said yes. *Id.* at 727.

Shortly thereafter, Kelly exploited this relationship and began sexually abusing his goddaughter. GVO Ex. A, 725-89. Kelly established an ostensible bond with Jane, and at first would talk to her about things they had in common, such as basketball and music. *Id.* Then, Kelly steered conversations with Jane to become sexual. *Id.* 729-31. He would ask her things like, "What color panties are you wearing," and talk to her about how her breasts were growing. *Id.* Kelly progressed the talks to phone sex, where he would tell Jane that he was masturbating during their phone calls. *Id.* This occurred within weeks of Kelly becoming Jane's godfather—Jane was just 14 years old. *Id.*

Jane testified that at first, she wasn't sure how to respond, but she just went with the flow because he was an adult, an authoritative figure over her at that time. *Id.* 753-56. Kelly's conversations about sex progressed to physical touching and rubbing. *Id.* 731-46. Then, when Jane was still just 14 years old, Kelly induced her to perform oral sex on him. *Id.* And he performed oral sex on her. *Id.* At this time, to facilitate their sexual encounters, Kelly was also giving Jane alcohol and showing her pornography. *Id.* 774-776.

When Jane turned 15, Kelly took her virginity and began having penetrative sexual intercourse with her. *Id.* 731-46; 755. This continued for years, all while Jane remained a minor. Kelly had sexual intercourse with her hundreds of times before she turned 18, at his homes, his studios, tour buses, and hotels. *Id.*

But Kelly's criminal conduct against young girls was not limited to Jane. When Jane was 14 or 15 years old, Kelly asked her to invite friends of her same age to

engage in sexual activity. *Id.* 744-50; 756-58. Responding to Kelly's urging, Jane invited, among others, Pauline and Brittany who were also minors at the time. Kelly engaged Jane in threesomes with Pauline multiple times when Jane was between 15 and 18 years old, and multiple times with Brittany during that same period. *Id.* During these interactions, Kelly would instruct these young girls to kiss each other, grab each other's breasts, grind on each other, and ultimately engage in oral sex and other sexual acts. *Id.*

For Kelly, abusing these minor victims was not enough—Kelly sought to memorialize his sexual exploitation of them. To do so, he recorded his sexual encounters with Jane, using a camcorder. GVO Ex. A, 766-85. Jane was just 14 years old the first time Kelly produced child pornography featuring his abuse of her. *Id.* The recording sessions continued, and eventually included Videos 1, 2, and 3, each of which were viewed by the jury at trial and lead to Kelly's conviction on Counts 1, 2, and 3.

Jane testified that Video 1 depicts a sexual encounter between herself and Kelly in the "log cabin" room of Kelly's home. *Id.* Video 1 is 26 minutes long. At the beginning of the video, Kelly is alone and testing the camera angle to make sure it is properly positioned to have a clear shot of Jane. In the next frame, Kelly hands Jane cash and then instructs her to perform oral sex. Jane complies. *Id.* Jane testified that Kelly handed her the money "[b]ecause if anybody saw the tape or if it was released for some reason, he wanted it to appear as if I was like a prostitute." *Id.* 781. The next line in the transcript shows the government asking the Court for a break, because at

this point Jane was sobbing on the stand reliving these traumatic events as she described them to the jury.

Video 1 then shows Jane dancing in front of a hot tub in the room. She is completely naked. Video 1 then shows Kelly simulating sexual intercourse with Jane while sitting on a bench adjacent to the hot tub. Then, Jane again performs oral sex. Kelly ejaculates and urinates in Jane's mouth and on the rest of her body. Throughout the recording, Jane calls Kelly "Daddy," as he instructed her to.

Jane testified that Video 2 depicts a sexual encounter between herself and Kelly in the living room of Kelly's home. GVO Ex. A, 769-78. Video 2 is 21 minutes long. Jane testified that the sexual encounter took place "on the floor laying on the towel" in the front of a projector screen (Video 2 shows pornography playing on that screen). *Id.* Jane testified that during this recorded encounter Kelly gave her Cristal champagne, performed oral sex on her, and urinated on her vagina. *Id.* Kelly also asked her to refer to her body part as her "14-year-old vagina," which she did. *Id.*

Video 2 depicts Kelly both giving and receiving oral sex with Jane. Kelly also inserts his finger in Jane's anus, and he urinates on her. Both Kelly and Jane are naked throughout the video, several times during which, Kelly gets up and adjusts the video camera to ensure the scenes of his abuse are properly captured. Each time, Kelly zooms closer. During the recording, Kelly instructs Jane on how to position her body and act for the camera. Kelly and Jane repeatedly refer to Jane's age as 14-years old. For example, Kelly instructs Jane to say to him, "lick that 14-year-old pussy." Jane obeys and repeats after Kelly.

Jane testified that Video 3 depicts a sexual encounter between herself and Kelly in the main bedroom of Kelly's home. GVO Ex. A, 769-78. Video 3 is 21 minutes long. She testified that the sex acts included oral sex and simulating sexual intercourse on a bed. *Id.* The video depicts Kelly receiving oral and manual sex from Jane and simulating sexual intercourse with her. As with Videos 1 and 2, Jane is just 14 years old in this video, although it appears to precede the others, a fact which is confirmed by Jane's actions and language in the video as Kelly provides more directions, reinforcing Jane's unfamiliarity with Kelly's sexual commands. For example, Jane said, "You said you gonna stick it in this pussy one day. When it wide open for you, Daddy." Kelly told Jane to talk louder. And she repeated, "When it get wide and open for you Daddy." Jane said, "You said if I keep practicing, Daddy." Several times in Video 3, Kelly adjusts the video camera and gives Jane instruction on how to position her body and act for the camera. One time, for example, Kelly tells Jane to stick her chest out, and he says, "Where the camera can see. Don't move."

Jane testified that she was uncomfortable with the sexual encounters with Kelly, including the phone sex, oral sex and intercourse, the threesomes, and Kelly recording them. GVO Ex. A, 774-75; 753-56. But she didn't know how to say no to her godfather, an authoritative figure in her life. *Id.* She testified that over time and repetition, the sexual contact with Kelly became normal to her. *Id.*

### Kelly Obstructed Justice

A few years after Kelly began abusing Jane, Video 1 was leaked. This happened around late-2001, when Kelly's career was reaching new heights. In 1998, Kelly

performed his hit song "I Believe I Can Fly" at the Grammy Awards. In February 2002, Kelly performed at the closing ceremony of the Winter Olympics. In other words, Kelly had a lot to lose.

According to Jane and her parents, Brandon and Susan, by early 2002 – when Jane was still a minor at age 17 – the public, the media, and law enforcement had become aware of Video 1. GVO Ex. A, 791-92. When questioned, Jane told her parents the truth: Kelly had been engaging her in sex acts. *Id.* 794-802. By this time, Kelly had already directed Jane not to tell anyone, including the police, about his relationship with, and abuse of her. *Id.* 788-93. With Kelly's career on the rise, secrecy became paramount.

In 2002, Jane and her parents received subpoenas to testify before the Cook County grand jury. *Id.* at 817-823. Jane and Brandon told Kelly about the subpoenas. *Id.*; GVO Ex. F (Brandon Testimony), 22-25. According to Brandon, after the subpoenas were issued, he had a meeting with Derrel McDavid, Kelly's long-time business manager. *Id.* McDavid arranged for an attorney to represent Jane, Brandon, and Susan in connection with the state grand jury proceedings. *Id.* During the meeting, McDavid told Brandon that as part of his testimony, Brandon was going to have to watch the video showing Kelly having sex with Jane. *Id.* McDavid knew that that video showed Kelly and Jane having sex, but McDavid instructed Brandon to testify that he did not recognize the people on the video. *Id.* Brandon later told Susan what McDavid instructed them to do. *Id.*

Brandon and Susan were scared to go against Kelly's power, money and influence and felt pressured to go along with Kelly. GVO Ex. F, 18-19, 21-22; GVO Ex. G (Susan Trial Testimony), 1250-53, 1291. And they did. Brandon and Susan lied in the state grand jury and denied recognizing Kelly and Jane in the video. GVO Ex. F, 22-25; GVO Ex. G, 1256-58. According to Brandon, sometime after he testified in the state grand jury, he had a conversation with McDavid, who told Brandon that he (McDavid) understood that everything went well with Brandon's testimony before the grand jury. GVO Ex. F, 22-25. Jane also lied in the grand jury at Kelly's direction. GVO Ex. A, 817-23. Around the time, Kelly blackmailed Jane with threats to release letters he had her write containing disparaging, embarrassing, and false information about her and videos depicting Jane engaging in humiliating acts at Kelly's direction. GVO Ex. H (Jane's Testimony), 46-47. Kelly needed assurances that she loved him and wouldn't turn against him and from time to time would remind her of the materials. *Id.*

Kelly employed both carrot and stick to maintain the secrecy around his relationship with Jane. Kelly provided Jane and Jane's parents with money and gifts in exchange for their silence and for them not to cooperate with law enforcement. Despite these efforts, in 2002, the Cook County State's attorney's office charged Kelly with 21 counts of child pornography and exploitation related to Jane and Video 1.

Between January 2002 and May 2002, Brandon received approximately $50,000 from Kelly, which was for something other than the work that Brandon did for Kelly. GVO Ex. F, 25-27. According to Brandon, at the time Kelly gave Brandon

this money, Brandon did not view it as taking money in exchange for lying in the state grand jury or for keeping quiet about Kelly's relationship with Jane. *Id.* Looking back, Brandon believed that Kelly and McDavid viewed these payments differently than he did in that they gave him the money to make sure that he was on "team Robert," meaning that he would not tell the truth about Kelly, Jane, and the tape to the police. *Id.*

Kelly's state court trial was held between May 20, 2008 and June 13, 2008. Neither Jane nor her parents testified and Kelly was ultimately acquitted. At Kelly's 2022 federal trial, the financial records entered into evidence showed that Kelly's company, Bass Productions, issued numerous checks to Brandon in the months leading up to and after Kelly's 2008 state child pornography trial, well after Brandon had become aware that Kelly had filmed his minor daughter engaged in sexually explicit conduct. Gov. Ex. 411. For example, between February 2007 and May 9, 2008, Kelly paid Brandon $23,300. These payments were made by check and four of them stated that they were "loans" on the memo of the check. Additional payments were made to Brandon after Kelly was acquitted at the 2008 trial on June 13, 2008. On June 20, 2008, Kelly paid Brandon $3,000. On August 25, 2008, McDavid issued on Kelly's behalf a check to Brandon in the amount of $4,792.92 for 2006 property taxes. On August 26, 2008, McDavid issued another check on Kelly's behalf to Brandon in the amount of $10,000. On September 17, 2008, McDavid issued for Kelly a check to Brandon in the amount of $30,000. There is no memo noted for this large lump sum payment.

In 2014, Jane asked Kelly to help her with rent payments, which were about $1,100 per month. GVO Ex. H, 54. At first Kelly refused, but Jane reminded him who she was, all that she had given up for him, and what she knew about their sexual history together. *Id.* Kelly ultimately agreed, and Jane started receiving monthly payments from Kelly in 2014 and 2015. *Id.* Jane testified at trial that she received payments from Kelly after she contacted him in 2014. GVO Ex. A, 840. Her testimony was corroborated by documentary evidence showing that, as late as 2014, Kelly sent monthly payments to Jane, in the amounts of $1,100 or $1,150. Gov. Ex. 414. Some of those payments were annotated with the word "settlement," despite the absence of any legal settlement between Kelly and Jane. *Id.*

At trial, Jane testified at length how the tactics, including physical abuse, that Kelly used to control her after his 2008 acquittal created fear and financial dependency. GVO Ex. A, 838-39, 873-74; *see also* GVO Ex. H, 51-52. She consistently described an abusive and controlling relationship between her and Kelly, continuing even after Kelly's 2008 acquittal, and that testimony provided critical context to reasonably infer that Kelly's "rent" payments were, in fact, efforts to continue to buy Jane's silence. *Id.* at 840, 873-74.

In addition, Kelly obstructed justice by concealing and covering up Videos 2 and 3, visual depictions of Kelly's sexual abuse of Jane. Kelly, of course, knew of the existence of these tapes because he created them. And in finding Kelly guilty of Counts 2 and 3, the jury found that Videos 2 and 3 were transported in interstate commerce within the context of Kelly's efforts to reclaim the videos. The jury heard

evidence that included testimony that in or around 2001, Kelly learned that Lisa Van Allen stole the videos from him, individuals working for Kelly hired Charles Freeman to recover a VHS tape, and Freeman travelled to Georgia and recovered a tape containing Videos 2 and 3 that the jury viewed in court during trial.[1]

## B.     Nia

Nia met Kelly in 1996 in Atlanta when she was just 15 years old. GVO Ex. L (Nia's Trial Testimony), 2584-85. She saw him in a mall and asked for his autograph. *Id.* In addition to providing the autograph, Kelly invited her to his concert that evening and gave Nia his phone number. *Id.* Nia did not go to the concert but the two ended up speaking on the phone numerous times in the weeks that followed. *Id.* 2586-91. Early in their conversations, Kelly asked Nia how old she was, and she told him she was 15 years old. *Id.* This did not deter him—after learning her age, Kelly told Nia that he wanted her to travel to see him perform. *Id.*

Ultimately, Kelly enticed Nia to travel to Minnesota to see him perform at a concert. *Id.* 2591-2603. He paid for the flight and put her up at a hotel. *Id.* Nia went

---

[1] The Court may appropriately consider these facts despite the jury's verdict of acquittal on Counts 5 and 6 (conspiracy to obstruct justice and conspiracy to receive child pornography), because those charges require elements beyond Kelly's knowledge of the tapes, and his motivation and efforts to conceal them from law enforcement. Moreover, the Court may consider this additional conduct under 18 U.S.C. § 3553(a) and Guideline § 1B1.4 when imposing a sentence. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. At sentencing, the Due Process Clause of the Fifth Amendment supplants the Federal Rules of Evidence, requiring information used at sentencing to be reliable and accurate. Stated another way, "facts considered at sentencing must be proved by a preponderance of the evidence." *United States v. Lucas*, 670 F.3d 784, 792 (7th Cir. 2012); *see also United States v. Watts*, 519 U.S. 148, 156 (1997) (providing that "application of the preponderance standard at sentencing generally satisfies due process").

to the concert one evening and Kelly showed up at her hotel room the next morning. *Id.* Once inside the room, Kelly kissed Nia and asked her to undress, which she did. *Id.* Kelly asked Nia to walk towards him and turn around. *Id.* He then asked Nia to sit next to him and asked her to visit him in Chicago, to which she said yes. Kelly then fondled and kissed Nia's breasts and masturbated until he ejaculated. *Id.* He then left. *Id.*

Months later, in the summer of 1996, Nia traveled to Chicago. *Id.* 2605-13. She spoke with Kelly on the phone, and he invited her to his recording studio. *Id.* When Nia arrived with her cousins, Kelly seemed upset that she did not arrive alone. *Id.* While at the studio, Kelly kissed Nia, fondled her breasts, and touched her vagina and bottom. *Id.*

### C. Pauline

Pauline was Jane's best friend in middle school. GVO Ex. M (Pauline's Trial Testimony), 2288-90. At Kelly's behest, as described above, Jane introduced Pauline to Kelly when Pauline was 14 years old, the same age as Jane. *Id.* Shortly after she met Kelly, Pauline and Jane spent time with Kelly and his wife hanging out at their George Street home. *Id.* 2291.

One day, Pauline and Jane were at Kelly's home and Pauline could not find Jane. *Id.* 2291-95. Pauline went looking for Jane and found her in Kelly's basement log cabin room (where Video 1 was filmed) with Kelly. *Id.* Jane was naked and kneeling on the floor in front of Kelly. *Id.* Pauline ran out of the room and Jane ran

after her. *Id.* Jane told Pauline that it was okay and that Pauline could re-enter the room, which she did. *Id.*

Once in the room, Kelly told Pauline that he was just looking for bruises on Jane because Jane hurt herself. *Id.* When Pauline pushed back and stated, "that's not how you look for bruises," Kelly told her it was and stated that, "We all have secrets … Like the little boy you've been kissing on" *Id.* 2293. When Pauline admitted that she had kissed a boy, Kelly pressured Pauline, "Your mama don't know about that, do she? … She don't have to know about this. We all cool." *Id.* Pauline acquiesced, and said, "I'm cool." Pauline testified that what Kelly was communicating to her was what he was doing was fine, and that it was "our secret." *Id.* 2293-94.

Directly after this conversation, Kelly directed Jane to kiss Pauline, which she did. *Id.* 2294. Kelly also instructed the two girls to touch each other's breasts, which they did, and Kelly also fondled their breasts. *Id.* Pauline and Jane were 14 years old. *Id.*

After that encounter, Kelly continued to engage Pauline in sexual activity. *Id.* 2295-2306. Kelly taught Pauline how to perform oral sex on him and Jane. *Id.* The three engaged in sex acts numerous times when Pauline was 14 and 15 years old, at Kelly's house and studio. *Id.* Kelly began engaging Pauline in sexual intercourse when she was 15 years old. *Id.* During the time when she was 15 and 16 years old, Kelly had sexual intercourse with Pauline at least over 80 times. *Id.* Sometimes Jane was present for these sexual acts, and Kelly engaged them in threesomes at least 60 times when Pauline and Kelly were between 14 and 16 years old. *Id.* These sex acts

occurred at Kelly's home, at his studios, and on his tour buses, and oftentimes Kelly memorialized his abuse by videorecording. *Id.* At times, Kelly would provide Pauline with alcohol before engaging in sexual conduct. *Id.*

## II.    GUIDELINE CALCULATION

For the reasons stated below, the advisory sentencing guidelines range is 168 to 210 months' imprisonment.

The Sentencing Guidelines to be considered in this case are those in effect at the time of the offense. *See* U.S.S.G. § 1B.11(b); *Peugh v. United States*, 569 U.S. 530, 549 (2013). Here, there are multiple offenses of conviction, spanning different time frames. Reflecting this, in its version of the offense, the government employed the November 1997 Guidelines Manual; and in its presentence investigation report, U.S. Probation used the November 2000 Guidelines Manual. Defendant Kelly agrees with the government that the 1997 Sentencing Guidelines should apply, but acknowledges that no *Ex Post Facto* issues would result from the employment of either the 1997 or 2000 Guidelines Manual in this case because use of either one results in the same Guidelines calculation. *See* R. 410 at 5.

### A.    Counts One through Three

For each of Counts One through Three, the base offense level is 27, pursuant to Guideline § 2G2.1(a). Pursuant to Guideline § 2G2.1(b)(1), two levels are added to each count because the offense involved a victim who had attained the age of twelve years old but not the age of sixteen years. Accordingly, the offense level for each of Counts One through Three is 29. Kelly does not dispute this calculation. *See* R. 410 at 5.

### B. Counts Nine, Ten, and Twelve

The parties dispute the proper Guidelines calculation for Counts Nine, Ten, and Twelve. Guideline Section 2G1.1 covers "prohibited sexual conduct" and directs that "[i]f the offense involved criminal sexual abuse, attempted criminal sexual abuse, or assault with intent to commit criminal sexual abuse," Section 2A3.1 should apply. U.S.S.G. § 2G1.1(c)(2). In turn, Section 2A3.1 provides for a base offense level of 27 if the statutory provisions of either 18 U.S.C. §§ 2241 (aggravated sexual abuse) or 2242 (sexual abuse) are satisfied. Another two levels are added if, as with Jane, Nia, and Pauline, "the victim had attained the age of twelve years but had not attained the age of sixteen years." U.S.S.G. § 2A3.1(b)(2). Accordingly, the offense level for each of Counts Nine, Ten, and Twelve is also 29. Kelly disagrees, arguing that the offense level for each of these counts should be 15.

The counts of conviction involving Kelly's inducement, enticement, and coercion of Jane, Nia, and Pauline readily satisfy the elements of 18 U.S.C. § 2242, and thus qualify for the cross-reference at Section 2A3.1.[2] Section 2242 prohibits "caus[ing] another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping)." 18 U.S.C. § 2242(1). The Seventh Circuit has explained that, "[i]n the § 2242 context

---

[2] U.S.S.G. § 2A3.1 may also be satisfied in relation to the elements of 18 U.S.C. § 2241, which prohibits, among other things, "knowingly caus[ing] another person to engage in a sexual act by using force against that other person; or by threatening or placing that other person in fear that any person will be subject to death, serious bodily injury, or kidnapping." 18 U.S.C. § 2241(a)(1). However, the government is not proceeding on the basis of that statute.

we define the concept of 'fear' broadly," *United States v. Henzel*, 668 F.3d 972, 977 (7th Cir. 2012), and in a manner which can be "inferred from the circumstances, particularly a disparity in power between defendant and victim." *Id.* (quoting *United States v. Lucas*, 157 F.3d 998, 1002-03 (5th Cir. 1998)). This can include the fear that a defendant "would react badly if she [the victim] did not meet his demands," *id.*, or the fear that may emanate from "a defendant's control over a victim's everyday life." *Lucas*, 157 F.3d at 1003. And, "[w]hen an older person attempts to molest a child, there is always a substantial risk that physical force will be used to ensure the child's compliance," which "implicitly place[s] the victim in fear of some bodily harm," sufficient to fulfill 18 U.S.C. § 2242. *United States v. Castillo*, 140 F.3d 874, 886 (10th Cir. 1998). For example, "[a] jury could infer, simply from the nature of the circumstances, that a male parent attempting to perform sexual acts with his children would place them in fear of bodily harm." *Id.*

Under this definition of fear, the evidence available at sentencing as to each of the victims more than satisfies the statutory elements required to employ the cross-reference at 2A3.1(a). When asked "[w]hy did you participate in those sex acts [with Kelly]," Jane responded: "It was out of intimidation … he was an authoritative figure, so I didn't know how to respond. I didn't know how to say no. I felt uncomfortable, but at the same token, I looked up to him. I did see him as an authoritative figure, so I just kind of went along with things, and then it somewhat became normal." GVO Ex. A, 754. Pauline likewise testified how Kelly induced her into sex acts with him and Jane out of fear that Kelly may disclose certain facts to Pauline's mother about

Pauline's relationship with a boy, and based on Kelly's imposition of secrecy over the illicit contact Pauline had seen Kelly performing on Jane. GVO Ex. M, 2292-93. It was through this coercion that Pauline went from running out of the log cabin room, shocked at what she had just seen, to shortly thereafter finding herself engaged in a sexual encounter with Kelly and Jane. *Id.* And Nia described at trial how Kelly's abuse—and his fame—placed her in a state of apprehension, and how he had wanted her to visit him alone, rather than with the cousins that came along as protection. GVO Ex. L, 2612-13. Nia also told law enforcement that she did what she felt Kelly expected her to do, and not "act like a baby." Exhibit A at 3.[3] She explained this included complying with Kelly's sexual demands, because if Kelly was happy with her, he would want to continue to see her. *Id. See Henzel*, 668 F.3d at 977 (noting that fear under § 2242 can include the fear that defendant "would react badly if she [the victim] did not meet his demands."). Applying the cross-reference to Section 2A3.1, and a two-level increase for the age of each of the victims, the offense level for each of Counts Nine, Ten, and Twelve is 29.[4]

---

[3] "In the sentencing context, the district court is not bound by the rules of evidence and, so long as it is reliable, may consider a wide range of evidence, including hearsay, that may otherwise be inadmissible at trial. Moreover, as the Sixth Amendment's confrontation clause does not apply to a sentencing proceeding, the court may rely on the testimony or other statement of a witness even if that witness has not been subject to cross-examination by the defendant." *United States v. Ghassi*, 729 F.3d 690, 695-96 (7th Cir. 2013); *see also* U.S.S.G. § 6A1.3.

[4] Even if the cross-reference to Section 2A3.1 does not apply, another one does, resulting in the same offense level for Counts Nine (Jane) and Twelve (Pauline). Again, starting at Section 2G1.1, subsection (c)(1) directs that "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a person less than eighteen years of age to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1." U.S.S.G. § 2G1.1(c)(1). Proceeding accordingly, Section 2G2.1 provides a base offense level of 27, with an increase by two levels if, as with

## C. Grouping

There are six total groups, one for each count. Group One (Count One) carries the highest offense level of 29 and, pursuant to Guideline § 3D1.4(a), counts as one Unit. Under the approach employing the cross-reference to Section 2A3.1, Groups Two (Count Two), Three (Count Three), Four (Count Nine), Five (Count Ten), and Six (Count Twelve) are equally as serious as Group One, each carrying an offense level of 29. Pursuant to Guideline § 3D1.4(a), each count as one Unit, for a total of five additional Units. Accordingly, pursuant to Guideline § 3D1.4, with six total units, five levels are added to the offense level for Group One, resulting in a combined offense level of 34.[5]

## D. Criminal History Category

On or about September 27, 2022, defendant was convicted of multiple federal felony offenses, including violations of 18 U.S.C. §§ 1962(c), 1963, 2421(a), 2422(a),

---

Jane and Pauline, the victim had "attained the age of twelve years but not attained the age of sixteen years." *Id*. § 2G2.1(b)(1). As to Jane, the jury convicted Kelly on three counts of production of child pornography in violation of 18 U.S.C. 2251(a), the precise statutory conduct covered by Section 2G2.1. As to Pauline, she testified at trial how Kelly videorecorded his sexual abuse of her, and that she knew he did so because "he had tripods and cameras in the room." GVO Ex. M, 2305-06; *see also* GVO, Ex H, 38 (testifying that Kelly videorecorded himself engaging in threesomes with Jane and Pauline). The resulting combined offense level of 33 after application of the grouping rules, nearly matches the offense level of 34 yielded by application of the cross-reference to Section 2A3.1, which further supports the conclusion that an offense level of at least 33 is applicable to defendant's conduct.

[5] Should the cross-reference to Section 2G2.1 apply instead, the combined offense level would be 33. Group One (Count One) would still carry the highest offense level of 29, counting as one Unit under Section 3D1.3(a). Groups Two (Count Two), Three (Count Three), Four (Count Nine), and Six (Count Twelve), would be equally as serious as Group One, each carrying an offense level of 29 due to Kelly's conduct in videorecording Jane and Pauline satisfying the provisions of 18 U.S.C. § 2251(a). Group Five (Count Ten) would carry an offense level of 15 and qualify for zero units. Under Guideline § 3D1.4, the result would be five total units,

2422(b), and 2423(a), in the United States District Court for the Eastern District of New York and sentenced to 30 years' imprisonment. Pursuant to Guideline § 4A1.1(a), defendant receives three criminal history points for this conviction. Accordingly, the defendant's criminal history points equal 3 and the defendant's criminal history category is II. This calculation differs from the criminal history category assigned by the PSR, which is III, because the government disagrees with the Probation Officer's assignment of one point, as discussed in paragraph 94. While it appears that defendant was arrested and charged with simple battery in Lafayette Parish in 1996, the government has been unable to determine the disposition of the case and, therefore, in its view, this point should not be assessed.

### E.    Advisory Sentencing Guidelines Range

Under the approach employing the cross-reference to Section 2A1.3, the total offense level is 34 which, when combined with the criminal history category of II, results in an advisory sentencing guidelines range of 168 to 210 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant is subject to a statutory minimum sentence of ten years' imprisonment.[6]

---

requiring an addition of four levels to the offense level for Group One, and resulting in a combined offense level of 33.

[6] Alternatively, should the Court conclude that the cross-reference to Section 2G2.1 applies, the total combined offense level would be 33, which, when combined with the criminal history category of II, results in an advisory sentencing guidelines range of 151 to 188 months' imprisonment.

### III.   APPLICATION OF THE SENTENCING FACTORS

#### A.   Nature and Circumstances of the Offense

To satisfy his own depraved sexual desires toward young girls, Kelly took advantage of Jane, Pauline, and Nia during a time when they should have been enjoying their high school years. Decades later, the effects of the abuse remain with each of them—they cannot, and will never be able to, escape Kelly's exploitation of them. At trial, each of these women faced Kelly and relived the horrible things he did to them, describing in detail Kelly's sexual abuse to the jury.

For Jane, the trial process included watching the three lengthy child pornography videos that captured Kelly's sexual abuse of her when she was 14 years old, so that the videos could be authenticated and introduced as evidence at trial. Watching the videos was excruciating for Jane. No child should be abused in the manner that she was abused by Kelly. And no one should be required to later watch the videos of the abuse, thereby reliving it all over again.

At trial, the Court saw a series of clips from each of the child pornography videos defendant created. Each of the videos is at least *three times* longer than the subset of clips that were shown at trial. Not only are the clips a small subset of each of these longer videos, but the exploitation sessions depicted in the videos are just a small subset of the instances in which Kelly sexually abused Jane and other young girls. And, as depicted in the clips that were shown at trial, Kelly's abuse of 14-year-old Jane was sadistic. He urinated on Jane's face, vagina, and anus. In the videos, Kelly directed Jane to engage in oral sex and non-penetrative sex with him. As Jane

testified at trial, she had never had sex with anyone before meeting Kelly at the age of 13 years old.

As if a 29-year-old Kelly preying on his 14-year-old goddaughter wasn't bad enough, he used Jane to lure 14-year-old Pauline. Kelly's manipulation of Pauline left her with feelings of distrust and fear which she carried with her into adulthood. For example, after her child was born, for years Pauline could not allow her child to be in someone else's care for fear that the child would suffer sexual abuse.[7]

Kelly's crimes had devastating effects on Jane. The presence of Video 1 on the internet, combined with the heightened interest brought about by Kelly's notoriety, led to Jane's *perpetual* victimization. More generally, Kelly's actions had the effect of promoting and perpetuating the market for child pornography. Kelly argues that it is somehow mitigating that Kelly was not the one who leaked Video 1 to the public. While it may be true that Kelly did not actively disseminate the video, the evidence showed that he contemplated that it would one day be seen by others. Jane testified that Kelly told her at the time he made the video that he handed her cash at the beginning of the video so that, "if anybody saw the tape or if it was released for some reason, he wanted it to appear as if I was like a prostitute." Kelly obviously gave not the slightest thought to the suffering Jane would experience if the video "were released for some reason"—his only concern was satisfying his depraved desires. Jane, Pauline, and Nia have already suffered so much and will bear the trauma and

---

[7] The government will tender victim impact statements to the Court, U.S. Probation, and defense counsel with the forthcoming supplemental restitution materials.

the scars of Kelly's sexual abuse for the rest of their lives. The nature and circumstances of the offense support an above-guidelines sentence of 300 months.

Such a sentence is on par with other defendants who have committed similar crimes. For example, in *United States v. Osborne*, 17 CR 73 (NDIL), the defendant recruited 12 minor girls to have sex with him and take lascivious pictures of themselves, even filming one girl engaged in sex acts, falsely promising them money. The defendant pleaded guilty to sex trafficking of children by force, fraud, or coercion and received a sentence of 264 months' imprisonment, followed by a term of 12 years of supervised release. And in *United States v. DeLeon*, 21 CR 70 (NDIL), the defendant enticed two minor girls online and coerced them to create sexually explicit images and videos on their own (meaning he did not physically engage with them) and send the videos to him. Afterward, the defendant distributed some of the visual depictions. Defendant pleaded guilty to transportation and received the statutory maximum sentence of 20 years (240 months). Kelly has victimized more individuals over a longer period of time than Osborne and DeLeon.

### B. Defendant's History and Characteristics

Kelly is 56 years old and has spent most of his adult life as a famous – and now infamous – music artist. Indeed, Kelly's celebrity status was a tool he used to facilitate the sexual abuse of children and is an aggravating factor in many ways. Kelly's celebrity status magnified the power imbalance between Kelly and Jane, Pauline, and Nia. Their guards were down because he was such a public figure and in the public eye. And his allure was extraordinary. As an example, Kelly's power and

influence over Jane – a girl who had no sexual experience before meeting Kelly – had her within months of meeting Kelly inviting her 14-year-old friends into sex acts with him. And Video 1 – that was made public in 2001 – will forever be sought after and circulated to a significant degree because R. Kelly *is* R. Kelly. Video 1 was sold on the streets of major cities from New York to LA; scenes from the video, in particular Kelly urinating on Jane, were parodied by comedians, on nighttime talk shows, and even in a feature-length cartoon on a major cable network; and even today the video is readily available on the internet. The video has, in a despicable and insidious way, become part of the social record. The very public consumption of Video 1 is something that Jane grew up with and will live with for the rest of her life.

The government recognizes that, before achieving stardom as an adult, Kelly had a difficult upbringing. In particular, the PSR details the sexual abuse that Kelly suffered as a child. PSR ¶¶ 145-151. This abuse is both aggravating and mitigating. Although Kelly's past abuse is a terrible experience that no doubt affected him and his mental health, it is particularly disturbing that, after having been a victim of abuse, he went on later in life to victimize other children. Kelly argues that because of his trauma he lacked insight as to his harmful choices and that his "intellectual disabilities" should "shed light on why he engaged in inappropriate relationships." R. 410 at 22, 26. However, the reality is that he engaged in sexual relationships with underage Jane, Pauline, and Nia with eyes wide open, knowing that it was wrong. He knew it was wrong in 1994 when he had to obtain false documentation to marry 15-year-old Aaliyah to conceal her true age. And that was two years before he even

met Jane. He also knew it was wrong to have sex with children in 2000 when he became aware that the Department of Children and Family Services and the Chicago Police Department were investigating allegations of his sexual misconduct with Jane. GVO Ex A, 787-790. Jane was 15 years old at the time of the investigations and Kelly continued to engage her in sexual acts. *Id.* Kelly knew his choices were wrong, harmful, and illegal. And Kelly thought he was above the law—given the chance to break a harmful cycle that began with his own abuse, he instead chose to perpetuate it. As discussed below, this demonstrates that Kelly poses a substantial risk of recidivism, and that the public needs to be protected from future R. Kelly crimes.

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment, Adequate Deterrence and Protection for the Public

Kelly's conduct in this case and the New York case demonstrates that his desire to sexually abuse children is insatiable. *See* PSR ¶ 96. The evidence in this case alone shows that he sexually abused Jane and Pauline *hundreds* of times before they turned 18 years old. And before abusing Jane, Pauline, and Nia, in 1994, Kelly, thinking that he was beyond the reach of law, bribed a government official so that he could secretly marry 15-year-old Aaliyah who he had been abusing since she was at least 13 or 14 years old. PSR ¶ 96, p. 15.

Kelly has been engaging in this conduct for decades and it warrants a sentence that makes clear to the victims that their lives matter, that they deserve justice, and that victims of sexual abuse should continue to come forward. Kelly's brazen conduct over the last 30 years demonstrates his mindset at the time he committed the instant

offenses, and well after – a complete disregard for the rule of law and for the gravity of the harm he was causing his minor victims. Kelly's legacy of snubbing societal norms and laws to satiate his desires warrants a serious and meaningful custodial sentence here to convey to him and the public the seriousness of his offense.

The sentence here should also provide just punishment, promote respect for the law and deter others as well as defendant. Kelly's refusal to accept responsibility for his actions dates back to 2008, when he pressured Jane and her parents to lie to a grand jury. Escaping justice back then only emboldened him to continue to abuse children, including having sex with a 16-year-old girl just one year following the 2008 trial. PSR ¶ 96, p.17. (While Kelly's abuse of this minor girl was accounted for in the NY trial, conviction, and sentence, the focus here is the obstructive conduct and the purpose behind it – so that he could continue to sexually abuse children.) And on March 8, 2019, after Cook County filed sexual abuse charges, including related to abuse of Jane when she was a minor, and just four months before the indictment in this case, Kelly sat for an interview aired on national television and lied to the world, defiantly responding "No," when asked if he had ever had sex with anyone under the age of 17. Later in the interview, as he does now, Kelly claims that he is the victim being unfairly attacked, and that people are out to get him and his "30-year career." *See* *https://www.cbsnews.com/video/gayle-king-questions-r-kelly-on-abuse-allegations/#x* (last visited February 16, 2023).

Second, the manufacture and possession of child pornography are extraordinarily serious offenses that threaten the safety of our children and

communities. Congress and the courts have repeatedly reinforced this principle. The legislative history of the Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121 (codified at 18 U.S.C. § 2252A) demonstrates that Congress recognized the destructive impact that the production of child pornography has on the victim: "Congress finds that … where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years …" S. Rep. No. 104-358, 1996 WL 506545, § 2(2) (Aug. 27, 1996). Simply put, Jane could not protect herself from Kelly when she was just 14 years old and the memorialization of that exploitation will continue to haunt her for the rest of her life.

As discussed above, the child pornography video that Kelly produced of Jane in the log cabin room (Video 1) is widely available to the public. At trial, the government called a witness from the National Center for Missing & Exploited Children ("NCMEC") to testify about Video 1, which is called the "PaneledRoom" series of child pornography for NCMEC's reporting purposes. The witness from NCMEC explained that, starting in at least 2007, law enforcement agencies in numerous states other than Illinois submitted depictions of child pornography matching Video 1 to NCEMC. Specifically, Video 1 was the subject of 232 reports comprised of 314 individual files submitted to NCMEC by federal and state law enforcement agencies. According to NCMEC's distribution report, depictions of child pornography matching Video 1 were submitted to NCMEC from law enforcement

agencies in at least 42 different states, in addition to Washington, DC and Puerto Rico.

The trafficking of child pornography affects not only the children involved in the particular pornography, but other children and society in general as well. As Congress recognized in enacting the federal child pornography statute, the trafficking of child pornography "inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials." *Id*. at § 2(10)(B). Further, Congress pointed out that "prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children …" *Id*. at § 2(12).

By manufacturing and possessing child pornography, Kelly perpetuated Jane's abuse and helped to preserve a permanent record of it. Congress has concluded that this conduct warrants a substantial prison term. Many courts have explained why. In *United States v. Goldberg*, the Seventh Circuit reversed the sentence imposed by the district court judge in a child pornography possession case. In so doing, the Seventh Circuit stated,

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded – both consumed himself and disseminated to others. The greater the customer demand for

child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for [manufacturing and] downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

491 F.3d 668, 672 (7th Cir. 2007) (citations omitted).

In short, "the 'victimization' of the children involved does not end when the pornographer's camera is put away." *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). Here, Kelly perpetuated the abuse because pornography creates a "permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Id.* (*quoting New York v. Ferber*, 458 U.S. 747, 759 (1982)); *see Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come."); *United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) ("The possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their interests in avoiding the disclosure of personal matters."). All of these factors are even more significant in this case because of the market for Video 1 resulting from Kelly's celebrity and fame. Because Kelly *is* Kelly, more people have watched child pornography than they otherwise would have. The effects of Kelly's conduct are wide-ranging, incalculable, and irreversible. A substantial period of incarceration is necessary to deter Kelly and others from committing similar crimes in the future, to promote respect for the law, and to protect the public.

Far from being a one-time mistake, Kelly's sexual abuse of minors was intentional and prolific. As set forth above, the danger posed by Kelly regarding the risk that he will abuse or attempt to abuse minors is ongoing. Being sexually attracted to young girls is not something that you can just turn on and turn off like a light switch. That sexual desire and interest in young girls, hasn't gone away. It is what he's been doing for most of his adult life and what makes him a danger today.

Kelly's lack of acceptance of responsibility for his criminal conduct, despite unassailable video evidence of that conduct, demonstrates that he poses a great risk of recidivism. To this day, Kelly refuses to acknowledge the wrongfulness of his conduct. What he refers to as a "relationship" with Jane was, in fact, criminally exploitative child sexual abuse. Kelly continues to believe that he is in control of Jane and has the audacity to purport to speak for her, arguing that "Jane would have been happy to put her experience behind her until the government revived the case and insisted that she cooperate with the prosecution, including by inducing her to participate with promises of restitution riches." R. 410 at 19. He makes this argument after hearing Jane speak for herself at trial. Jane explained that she chose to participate in the case because she was "exhausted" living with his lies. More proof that Kelly has no compassion for Jane or remorse for the harm he caused her and others.

Kelly's unrelenting abuse of girls and women, and his refusal to acknowledge his criminal conduct and the harm it has caused, demonstrates that he cannot be

deterred. As a result, the only way to ensure Kelly does not reoffend is to impose a sentence that will keep him in prison for the rest of his life.

A review of the factors set forth in 18 U.S.C. § 3553(a) makes clear that Kelly's egregious conduct, regardless of how the Court resolves the Guidelines disputes, merits an above-Guidelines sentence of 300 months' imprisonment.

Above and beyond defendant's egregious crimes, Kelly obstructed justice on multiple occasions over several years in order to cover up his abuse of Jane and other minor victims. As described in detail above, this obstruction was most evident in his efforts to intimidate Jane and her family, and to suborn their perjury, in connection with the grand jury investigation into his abuse of Jane. That obstruction was successful – for a time – as Jane and her father both lied before a state grand jury at Kelly's request, and they refused to testify at his 2008 state court trial, which resulted in the erroneous not guilty verdict.

While a 2-level enhancement for obstruction of justice arguably should be applied above to the offense level on Counts One and Nine at the very least, the government's conservative calculation of the Guidelines range using the 1997 Guidelines Manual did not include it, as one could potentially argue that Kelly's blatant obstruction of the Cook County grand jury and criminal court proceedings in the mid-2000s did not obstruct the "instant offense" charged separately in federal court. A later Application Note to Guideline § 3C1.1 plainly sets forth that Kelly's obstructive conduct is exactly the type of conduct that warrants such an enhanced sentence, because it was specifically designed to thwart any law enforcement efforts

to hold him accountable for his abuse of Jane: "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *See* November 1, 2006 Guidelines Manual, § 3C1.1, Application Note 1. Kelly's obstructive conduct supports an upward variance of at least two levels.

The degree of departure recommended by the government is also supported by subsequent amendments to the guidelines. *See United States v. Baker*, 29 Fed. App'x 375, 376 (7th Cir. 2002) (stating that "later amendments to the guidelines can [ ] be considered in assessing the appropriate degree of departure," without running afoul of the Ex Post Facto clause) (citing *United States v. Coe*, 220 F.3d 573, 578 (7th Cir. 2000)); *United States v. Kopshever*, 6 F.3d 1218, 1222-23 (7th Cir. 1993), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012) (approving of the district court "applying pre-amendment Guidelines and then departing upward on the theory that the earlier version did not adequately figure [defendant's] offense"). In 2003, Congress recognized the need to "increase jail sentences in cases where children are victimized by sexual predators," Sen. Rep. No. 108-2 at 19 (2003) when it passed the PROTECT Act of 2003. The PROTECT Act led to the increase of the base offense level in Guideline § 2G2.1 from 27 in 1997 to 32 as of 2004, where it remains today. Likewise, the base offense level for Guideline § 2A3.1 has been revised upward from 27 in 1997 to 30 today. Based on the Sentencing Commission's developed consideration of these issues as reflected in these amendments, conduct similar to

that of Kelly would arguably merit an upward variance of 3 to 5 offense levels. To be clear, the government is not now suggesting that the Court incorporate revised Guidelines provisions into its calculation of Kelly's offense level. However, such developments are useful in determining the degree to which the properly calculated Guidelines range should be increased, in light of the particularly serious nature of Kelly's criminal conduct and the danger he poses to the community.

In sum, taking all of factors into consideration, the government respectfully submits that an upward variance of 5 to 7 offense levels above the calculated offense level of 34 should apply here. That results in an effective Guidelines range of up to 360 months to life imprisonment.

## IV. THE TERM IMPOSED SHOULD RUN CONSECUTIVELY TO THE SENTENCE KELLY IS CURRENTLY SERVING FOR HIS CONVICTIONS IN THE EASTERN DISTRICT OF NEW YORK

Pursuant to Guideline § 5G1.3(c) of the 1997 Guidelines Manual, Kelly's sentence for the instant offense should run consecutive to his current undischarged term of imprisonment in *United States v. Kelly*, 19 CR 286 (E.D.N.Y.), because the instant offense was not committed while he was serving his New York sentence, § 5G1.3(a), nor did the New York sentence result from the specific offenses that have been fully taken into account in the determination of the offense level for the instant offense, § 5G1.3(b). Moreover, a consecutive sentence is eminently reasonable given the egregiousness of Kelly's conduct.

Under § 5G1.3(c), a court may impose a sentence, "concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to

achieve a reasonable punishment for the instant offense." In making this determination, the Court should consider the factors set forth in § 3553(a) and be cognizant of:

> (a) the type (e.g. determinate, indeterminate/probable) and length of the prior undischarged sentence;
>
> (b) the time served on the undischarged sentence and the time likely to be served before release;
>
> (c) the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and
>
> (d) any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

Application Note 4 to § 5G1.3 (citing 18 U.S.C. § 3584).

For all of the reasons set forth above, the § 3553(a) factors counsel in favor of a consecutive sentence in this case. Kelly committed horrific crimes against children. He not only refuses to accept any responsibility for his conduct, but he repeatedly deflects any blame for his crimes, and instead advocates that *he* is being treated unfairly because, for example, "other artists and musicians" should be prosecuted for these crimes. R. 410 at 30. Plain and simple, Kelly does not comprehend that what he did was wrong. The Court should impose a consecutive sentence in order to protect the community from Kelly, as he has shown no signs of rehabilitation.

Substantial incremental punishment is necessary in this case to account for the fact that this case is different from the New York case in nature and scope. Here, Kelly was convicted of sexually abusing minors who were not a part of the New York case and who did not testify at the New York trial. Accordingly, Kelly's conduct in

this case involves minors not accounted for in his New York sentence and should be addressed in this Court by imposing a consecutive sentence. *See, e.g., United States v. Trammell*, 312 Fed. App'x 816, 818-19 (7th Cir. 2008) (district court did not abuse its discretion in sentencing defendant to 200 months' imprisonment for a bank robbery, to be served consecutive to defendant's undischarged term of 133 months' imprisonment for a bank robbery conviction in a different federal case); *see also United States v. Boyle*, 28 F.4th 798 (7th Cir. 2022). Kelly's argument that a consecutive sentence would be improper because "the offenses charged in this case were covered by EDNY's RICO prosecution," or were tantamount to predicate acts incorporated therein, R. 410 at 17, is completely unfounded and runs contrary to well-established Seventh Circuit precedent which establishes that "[t]he Government can, without running afoul of double jeopardy, prosecute and secure convictions for both racketeering and the predicate illegal acts alleged to be the 'racketeering activity' required under § 1962(c) to secure the RICO conviction." *United States v. Morgan*, 39 F.3d 1358, 1367 (7th Cir. 1994). "Under this rationale," the Seventh Circuit further explained, "it seems nonsensical for Defendants to characterize their consecutive sentences as multiple punishment for the 'same offense' and in violation of the Double Jeopardy Clause. The district court could, without violating double jeopardy, impose consecutive punishment on both the RICO offense and the predicate crimes—and so holds every other court of appeals to consider the question of consecutive sentences for RICO and predicate act convictions." *Id*. at 1367-68 (collecting cases). Accordingly, Kelly's sweeping references to "double jeopardy" and "cumulative punishment" have

no legal support and should be dismissed outright, particularly where the specific crimes against the specific victims charged in this case formed no part of any federal prosecution elsewhere.

The government recognizes the significance of sentencing Kelly to a term of imprisonment consecutive to that received in New York.[8] But Kelly's conduct in this case, on its own, is deserving of a 300-month sentence. There is no reason that the consequences imposed for his heinous crimes here should be discounted due to the sentence imposed for harming different victims at different times in the New York prosecution.

## V.     RESTITUTION

Restitution is mandatory in this case. 18 U.S.C. §§ 2259, 2429, 3663A. "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. 3664(f)(1)(A); *see United States v. Brazier*, 933 F.3d 796, 804 (7th Cir. 2019); *United States v. Sensmeier*, 361 F.3d 982, 988 (7th Cir. 2004) ("The economic circumstances of a defendant *cannot* be considered by the court when fixing the amount of the restitution.") (emphasis in original).

---

[8] Specifically, with good time served, Kelly will complete his New York sentence in or around the year 2045, at the age of 78. If the Court were to impose a consecutive sentence of 300 months, that would extend Kelly's sentence to in or around the year 2066, accounting for good time.

The text of the Mandatory Victims Restitution Act "seeks primarily to ensure that victims of a crime receive full restitution." *Dolan v. United States*, 560 U.S. 605, 612 (2010). Pursuant to 18 U.S.C. § 3664(d)(5), "if the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government . . . shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." The MVRA imposes a deadline "to give victims timely relief; it is not written to give defendants an absolute deadline, after which they are freed from providing restitution to the individuals they have harmed." *United States v. Bour*, 804 F.3d 880, 888 (7th Cir. 2015); *see also Dolan*, 560 U.S. at 613-14; *United States v. Grimes*, 173 F.3d 634, 639 (7th Cir. 1999) (noting that the "intended beneficiaries [of the statute] are the victims, not the victimizers").

On February 10, 2023, the government informed the Court that the victims' losses had not been fully ascertained and, citing § 3664(d)(5), requested the Court to defer the calculation of restitution in this matter until approximately 30 days after sentencing. R. 412. The Court denied the request and ruled that it will consider restitution at the sentencing hearing scheduled for February 23, 2023. R. 417. As such, the government will promptly supplement its prior submission on the issue of restitution with additional information related to the victims' losses so that the information can be considered at the sentencing hearing.

## VI. SUPERVISED RELEASE CONDITIONS

The government agrees with the proposed mandatory, discretionary, and special conditions of supervised release set forth in the PSR, which are appropriate to facilitate the probation officer's supervision of the defendant, support the defendant's rehabilitation and reintegration into the community and ensure he is engaged in lawful pursuits rather than criminal activity, and to help ensure the safety of others.

## VII. CONCLUSION

In this case, an above-Guidelines sentence is sufficient, is necessary to achieve the statutory purposes of sentencing, and is just. Standing alone, a sentence of 300 months will reflect the seriousness of Kelly's crimes, deter him and others from committing child exploitation offenses, and protect the public from Kelly.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Jeannice Appenteng*
JEANNICE APPENTENG
ELIZABETH R. POZOLO
JASON A. JULIEN
BRIAN WILLIAMSON
Assistant U.S. Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300