UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 CR 567 |
| -vs- | ) | |
| | ) | Hon. Martha M. Pacold |
| ROBERT SYLVESTER KELLY, | ) | |
| also known as "R.Kelly," | ) | |
| Defendant. | ) | |

## EMERGENCY MOTION FOR TEMPORARY FURLOUGH

COMES NOW Defendant, Robert Sylvester Kelly, by and through counsel, Beau B. Brindley, and hereby moves this Honorable Court for release to home detention on a temporary furlough from his custodial sentence. In support of his motion, Mr. Kelly provides as follows:

## INTRODUCTION

Centuries ago in ancient Rome, the poet Juvenal remarked: "*Quis custodiet ipsos custodes*?" Who will guard the guardians? This searching philosophical inquiry now finds a real-world instantiation in the case before this Court. Robert Kelly is a prisoner. His life depends on the oversight of literal "guards" and jailers who are entrusted with his safety. He has no choice in the matter. He puts his life in these people's hands because that is what the courts have ordered him to do. Yet, explicit evidence has now emerged to show that the very officials charged with protecting incarcerated inmates have solicited Mr. Kelly's murder. All in an effort to prevent the uncovering of injustices perpetrated by Bureau of Prisons and Department of Justice officers, which Mr. Kelly and his attorneys are in the process of exposing. Evidence has been obtained that, prior to his two trials in federal court, U.S. attorneys and Bureau of Prisons officials worked together to steal Mr. Kelly's attorney/client correspondence and his private communications while in custody. They then weaponized the information contained in this purloined correspondence to

1

turn witnesses against Mr. Kelly and gain an unfair advantage against him at trial. In short, the government has used stolen attorney/client correspondence to make a case against Mr. Kelly in violation of the Due Process Clause of the United States Constitution. When that information began to be exposed by Mr. Kelly's attorneys, officials in the Bureau of Prisons solicited another inmate to kill him. The facts underlying this motion are as stunning as is the remedy that must be sought: the release of a convicted inmate whose life is threatened by the very persons charged with protecting it.

And so this Court must now come to grapple with the ancient Roman inquiry. Who will guard the guardians? Who will hold them to account? Because, in this moment, if no one does, a man will lose his life and the injustices that motivate his destruction may never be revealed. Mr. Kelly therefore comes to this Court with a fervent plea: that it intervene to prevent that from happening.

## FACTUAL BACKGROUND

Mr. Kelly is presently in custody serving a thirty-year sentence for convictions in the Eastern District of New York (Case No.: 23-cr-00304) and a twenty-year (largely concurrent) sentence for his convictions in the above-captioned Northern District of Illinois case. Mr. Kelly is presently incarcerated at FCI Butner in North Carolina.

It is uncontroversial to describe Mr. Kelly's cases as high profile. Everything that occurs in this case is heavily scrutinized in the media and on social media. For months, the undersigned's office has been engaged in an investigation into whether various *Brady* and *Giglio* violations took place in both of Mr. Kelly's criminal cases. A great deal of evidence has been uncovered, which indicates that Mr. Kelly's due process rights were indeed violated by the prosecution teams investigating him in both districts. The undersigned's office continues to develop a motion to

2

vacate Mr. Kelly's convictions on the basis of *Brady* and *Giglio* violations that have been uncovered since the trial, and which were hidden from the defense prior to trial. The investigation into these violations is not yet complete. However, recent events compel the undersigned to disclose many of the facts that will underlie Mr. Kelly's upcoming motion.

The only way to begin the narrative necessary to explain the current circumstances is to focus on one witness the government did not have against Mr. Kelly at the time of his arrest on federal charges. The racketeering case against Robert Kelly in the Eastern District of New York hinged on the testimony of one critical witness: Jane NY. She was the central focus of the trial in New York. However, a fact that most people are unaware of is that Jane NY started out by refusing to cooperate with the federal government in any way. She remained committed to Robert Kelly and had nothing negative to say about him. To the contrary, she was adamant that there was nothing improper about her relationship with Mr. Kelly. The way the government influenced and coerced her to change her mind is at the heart of what we believe to be shocking *Brady* and *Giglio* violations.

While Robert Kelly was being held in custody on federal charges in the glaring absence of any evidence from Jane NY, which the US Attorney's Office sought and needed, a series of crimes were committed. These crimes were not committed by Robert Kelly. They were not committed by anyone he associated with prior to his incarceration. They were committed by federal officers. Like all inmates, Mr. Kelly's phone calls and emails were monitored by prison officials. However, in this instance, a Bureau of Prisons officer named Tawana Ingraham was not listening to or monitoring Mr. Kelly's recorded calls and emails. She was, instead, stealing them. Specifically, Ms. Ingraham illegally accessed and stole a series of phone calls and emails regarding Mr. Kelly's relationship with a woman other than Jane NY. Ms. Ingraham was a Special Investigative Services

disciplinary officer who had no business dealing with any of Mr. Kelly's communications. She did not work at the facility at which Mr. Kelly was being housed and was not even supposed to have access to the system containing his emails and calls. Yet, somehow, she was allowed to gain access and allowed to steal Mr. Kelly's private communications (both emails and recorded telephone calls). There is an ongoing civil suit regarding her conduct pending right now before Honorable Judge Bucklo in the Northern District of Illinois.

Armed with illicit access, Ingraham stole emails and calls that were specifically inflammatory to Jane NY, and which would be likely to compel her to turn against Mr. Kelly out of jealousy. These were private conversations to which Jane NY was not privy. She had no way to know the content of these conversations. Hence, they were targeted and stolen for the purpose of turning her against Robert Kelly and thereby helping the government make its case. Only persons with knowledge of the investigation would have known which emails and calls to target and steal for the purpose of influencing Ms. Jane IL. The stolen communications included communications with his attorney at the time, which should have been protected under the attorney-client privilege. On its own, this is a shameful abuse of a position of trust by a federal prison official for the purpose of influencing the case against Mr. Kelly. But it became far more insidious than that.

After Mr. Kelly's communications were stolen without his knowledge, these communications were provided to a cooperating government informant named Larry McGee. The defense continues to develop evidence regarding Mr. McGee. But there is strong reason to believe that federal prosecutors in the Northern District of Illinois and the Eastern District of New York supplied Mr. McGee with access to the stolen communications and enlisted him to meet with Jane

NY, a person with whom he had a connection, and use these stolen communications to influence her and coerce her into cooperation against Mr. Kelly.

In social media videos, Mr. McGee has admitted that he has video of Jane NY at his home. He has admitted spending hours coercing her to turn her against Robert Kelly by showing her Kelly's calls and emails. Immediately following this meeting, Jane NY went to MCC-Chicago where Mr. Kelly was housed. She participated in a social visit with him. And, at this visit, she quoted to him the content of his private emails and conversations to which she should never had access. Mr. Kelly instantly knew she had been given his communications but had no idea how that could be possible. It made no sense at that time. Mr. Kelly believes, and intends to prove, that Larry McGee was supplied with stolen communications. He was sent to meet with Jane NY and influence her with these stolen communications all while acting as an informant for the government and communicating with federal prosecutors in New York and Chicago. Immediately after her visit with Robert Kelly, Jane IL contacted federal agents to turn against Robert Kelly.

As a result of this conduct, Larry McGee was rewarded with a cooperation agreement from the government and an incredibly light sentence of 18 months. His sentencing transcript was redacted so no one would know what he did or how he obtained the material to influence Jane NY. However, what is certain is that the only avenue to the reduced sentence with which he was rewarded was by way of cooperation. McGee was so brazen that he admitted on video in social media posts that he flipped witnesses against Mr. Kelly. He admitted that he got people to lie about Mr. Kelly. He did it. And government agents knew that he did it. They directed him to do it. They then hid their illicit conduct behind a sealed sentencing transcript to which Mr. Kelly and his defense team have been denied access.

What is even worse is that McGee did not stop with Jane NY. Larry McGee arranged a meeting in California with both Jane NY and Jane IL, the principal witness against Mr. Kelly in his Chicago case. Jane NY too had never before cooperated against Robert Kelly despite significant efforts to get her to do so. But, at the direction of federal agents and prosecutors, McGee brought Ms. Jane MY together with Ms. Jane IL. He facilitated their ability to connect, communicate, and collude after first influencing Jane IL with Kelly's stolen communications. Following that conversation, Ms. Jane IL and Ms. Jane NY were the central witnesses in two federal prosecutions. Additionally, throughout the California trip to meet with McGee and Jane IL, Jane NY was in continual text conversation with a US Attorney in the Northern District of Illinois named Angel Krull.

What is obvious from all of this is that, when government witnesses have been allowed to collude with each other, and have been influenced by cooperating informants and stolen communications, that is, at the very least, *Giglio* material, which should have been disclosed to the defense to be potentially used on cross-examination. But this information about stolen communications and cooperating witness Larry McGee was kept from the defense. The investigation of Larry McGee and the *Giglio* violations that his conduct creates provides the factual backdrop for this motion, but it is only the tip of the iceberg. Mr. Kelly is now aware of what McGee has done. The defense is actively investigating what McGee has done. And the defense knows that at least one former Special Investigations Unit officer was involved in this plot to steal Mr. Kelly's communications and influence his case. The defense is presently developing evidence regarding these events. A copy of McGee's redacted sentencing transcript is attached to this motion. (Exhibit A).

With all of that under investigation by the defense team, defense counsel learned that Mr. Kelly had received cryptic communications from a person who he believed to be his former cellmate at the MCC in Chicago. This man is Kishan Modugumudi. Modugumudi was Mr. Kelly's cellmate both before he was transferred to New York to face trial there *and again* after he came back to MCC to face trial in Chicago months later. Having a consistent cellmate following a lengthy departure from MCC is very unusual. The reason for that has since become apparent. Mr. Modugumudi ultimately requested a visit from attorneys for Mr. Kelly. One of the undersigned's associates, Edward McDavid, met with Kishan Modugumudi at MCC-Chicago to determine precisely what it was that Mr. Modugumudi wanted to communicate.

In the meeting, Mr. Modugumudi admitted that, in exchange for the possibility of a reduced sentence, he agreed to steal Mr. Kelly's written correspondence and provide it to prison officials who would then give it to the United States Attorneys handling the investigation against Mr. Kelly. Modugumudi was debriefed by AUSA Angel Krull and agreed to provide cooperation. This cooperation came in the form of stealing correspondence from Mr. Kelly and providing it to the government. AUSA Krull was also the person to whom the stolen correspondence was ultimately provided.

Mr. Modugumudi would routinely take Mr. Kelly's mail while Kelly was at a visit or somewhere else in the facility. In particular, he made a point of stealing Mr. Kelly's ***legal mail*** that was written to his lawyers. These were letters that were marked Legal Mail by Mr. Kelly. This was the intentional theft of attorney-client correspondence, which violated Mr. Kelly's constitutional rights and gave the government unauthorized access to his strategy and to confidential facts to which they were not entitled. That stolen mail was then handed off to Special Investigations Officer named Luke Selby who copied it and gave back the original for Mr.

Modugumudi to return to the cell such that Mr. Kelly would never know it was gone. The copy of this stolen correspondence was ultimately provided to AUSA Krull who was sharing it with AUSA Elizabeth Geddes, the prosecutor in charge of the New York prosecution.

The stolen correspondence included information about Mr. Kelly's relationship with another woman, which was to be kept secret from Jane NY as it would create a serious jealousy problem in 's relationship with Kelly. No one besides Mr. Kelly and his attorney had access to that information. Following the theft of that particular correspondence, Mr. Modugumudi reports that Ms. Jane IL came to the visiting room to see Mr. Kelly and confronted him with information that was included in the attorney-client correspondence that Modugumudi stole and gave to the government.

During Mr. Kelly's trial in New York, prosecutors advised his attorneys that they had just been made aware of an investigation into a theft of some of Mr. Kelly's communications. The prosecutors said the investigation was ongoing and they had no other information to provide. They contended to have no knowledge of who had stolen the communications and what was done with them. When Mr. Kelly asked to have time to investigate to see if this theft could influence the case against him, prosecutors claimed they had no other information to provide. None of that was true.

In reality, at the time federal prosecutors in New York claimed a lack of knowledge about the investigation of stolen communications, the truth was that a search warrant for Tawana Ingraham's home and electronic devices had already been executed (Exhibit B). The application for that warrant identified undeniable evidence that she stole Mr. Kelly's communications. The search of her residence confirmed it. Information about the sale of the stolen material and use of that evidence by Larry McGee was well known to the US Attorney's Office. All of that information

was in the possession [1]of federal prosecutors who denied having it. Also in their possession was the attorney-client mail stolen by Mr. Modugumudi, which was used to influence witnesses against Mr. Kelly. This too was hidden from Mr. Kelly and his lawyers. Consequently, Mr. Kelly lacked the ability to attack the central witness against him based on a jealous bias that was intentionally generated through the use of communications stolen by a federal officer and trafficked to a cooperating informant by federal prosecutors and agents; and legal mail stolen by a cellmate and trafficked to prison officers who gave it to federal prosecutors.

After Modugumudi provided this information in the presence of a certified Teluga interpreter, Mr. McDavid then visited Mr. Modugumudi a second time. This occurred on March 11, 2025. At this meeting, Mr. McDavid and the Teluga interpreter discussed with Mr. Modugumudi the execution of a written statement summarizing some of the information that was provided at their prior meeting. Mr. Modugumudi ultimately signed a statement, which was also executed by the certified interpreter to demonstrate that it was fully and accurately translated for Mr. Modugumudi prior to its execution. A copy of that signed statement will be attached to this filing (Exhibit C) along with the resume of the certified interpreter (Exhibit D). In that written statement, Modugumudi again admitted the theft of Mr. Kelly's attorney-client correspondence, the transfer of that stolen correspondence to an SIS officer (Officer Luke Selby) at MCC, and the ultimate provision of that stolen correspondence to AUSA Krull. Mr. Modugumudi also indicated that prosecutors in his case asked him why he was being visited by attorneys from the undersigned's office even before Mr. McDavid obtained his signed statement.

---

[1] Jane NY references the Jane Doe who testified in Kelly 19CR286 (the pseudonyms were numbered in the New York case, but the undersigned has not been able to obtain the number of the witness referenced in previous filings before the filing deadline.)
Jane IL references the Jane Doe who testified in Kelly 19CR567

At the point this signed statement was obtained, the undersigned's office had in its possession a signed admission from an insider who confessed his role in a conspiracy to violate the constitutional rights of Mr. Kelly and bias witnesses against him through the use of stolen privileged information. This conspiracy involved the Bureau of Prisons and was apparently orchestrated by the U.S. Attorney's Office. There is no room left to speculate about some way that the U.S. Attorney's Office did not know about the corrupt conduct of these cooperating persons. By his own admission, they directed Mr. Modugumudi to do the same kind of thing that Tawana Ingraham did when she stole private emails and calls made and sent by Mr. Kelly. Special Investigations officers in the Bureau of Prisons were the ones handling the stolen correspondence in both instances. Ingraham's theft has been documented and is undisputed.

Of course, when a cooperating person is influencing and communicating with potential witnesses with the government's knowledge, and at their direction, it is the absolute duty of the government to disclose the cooperator's conduct to the defense and permit the defense to use this information about government-directed influence of witnesses for cross examination of the witnesses who were biased and influenced. When stolen correspondence is being shown to potential witnesses as a means of biasing them against a defendant, that has to be disclosed so the defense can confront the witness with that information or possibly get the witness's testimony excluded. Yet, what happened here is that both McGee's and Modugumudi's involvement was hidden rather than disclosed. McGee's influence over the witnesses was denied rather than acknowledged. In a letter to his attorney in the Chicago case, the government claimed no knowledge of Larry McGee.

Furthermore, no disclosure regarding the thefts committed at the government's behest by Mr. Modugumudi ever occurred either. Unfortunately for the government, McGee's disclosures

10

on social media exposed his conduct after the fact.[2]  Mr. Modugumudi's recent admissions prove that the government has intentionally violated the rights of Mr. Kelly and illicitly tainted witnesses against him.  Mr. Modugumudi has now admitted that he stole legal communications at the direction of the prosecutors handling Mr. Kelly's cases in exchange for promises of help on his own case.  The government hid all of this truth beneath pages of blacked out redactions in McGee's sentencing transcript and behind the undisclosed behavior of secret cooperating witness Kishan Modugumudi.

Just four days after Mr. McDavid obtained the signed statement from Mr. Modugumudi including these admissions, Mr. Kelly was contacted by a prison official at FCI Butner.  The official in question advised Mr. Kelly that he got a call, and that "they" (meaning the government) knew that his lawyers in Chicago had been meeting with a witness in jail and that this witness had provided information to the lawyers.  The official then advised Mr. Kelly that he was in danger and that Mr. Kelly needed to be careful.  The BOP official intimated that Mr. Kelly was not safe in Bureau of Prisons custody.  The BOP official further advised that Mr. Kelly should avoid the mess hall.  This is a particularly poignant conversation because Mr. Modugumudi's statement implicated a Special Investigations officer presently working in the Bureau of Prisons.  Mr. Kelly is now in very reasonable fear of harm because the people who may wish to keep quiet the information that has just been disclosed are prosecutors and jailers, the very persons who have the ability to influence the inmates with which he is housed and the guards who might choose to look the other way.

What is even more troubling is that Mr. Kelly has been attacked by an inmate before.  While housed at MCC Chicago, a federal inmate approached the MCC counselor and announced a plan

---

[2] Copies of these social media posts will be provided to the Court.

to physically attack Robert Kelly. The counselor did nothing to stop it. Instead, he permitted the man to be released in an area where Mr. Kelly was housed. This man was able to gain access to Mr. Kelly, violently attack him while he was sleeping, strike him in the head, and savagely assault him. In the wake of the assault, this inmate wrote a letter saying he was put up to this attack by federal officials. No investigation followed. No information was provided to the defense.

In the wake of this troubling dialogue with a prison official, on April 11, 2025, an inmate incarcerated with Mr. Kelly approached him and disclosed that he was sent to FCI Butner by BOP officials who directed him to murder Mr. Kelly. The inmate's name is Mikeal Glenn Stine. He is a member of the Aryan Brotherhood gang. He has been in Bureau of Prisons custody since 1982 (with one brief interruption generated by his escape). While incarcerated, he rose to the position of Commissioner of the Aryan Brotherhood. He has signed a declaration setting forth a long history of assaults and murders that he has ordered and participated in at the direction of Bureau of Prisons officials (Exhibit E). Inmates who posed problems for Bureau of Prisons staff and/or inmates with whom staff members were engaged in illegal business were attacked and/or killed by members of the Aryan Brotherhood (A.B.). As Commissioner of the A.B., Mr. Stine directed members of the A.B. to commit these acts. In exchange, he and other A.B. members received special privileges including no cell searches and the ability to traffic narcotics within the prison without interference. Mr. Stine indicated that a prison official, who has overseen multiple B.OP. facilities, solicited his participation in multiple killings and assaults. This official's name is R. Childress. Mr. Stine had many interactions with Childress while incarcerated at the A.D.X. Florence Supermax facility. Childress has ordered murders and beating that have been carried out by Mr. Stine and those to whom he gave directions. Mr. Stine is prepared to testify regarding these

murders in order to provide a foundational backdrop for what happened when Childress approached him about Mr. Kelly.

On or about February of 2023, Stine was housed in the Special Housing Unit at USP Tucson. Without any warning, he was approached for an unexpected official visit. No Bureau of Prisons guards were present. Instead, Mr. Childress directly approached him. Warden Gutierrez and Associate Warden Stangl were with him. They took him out of his cell and brought him to an office area in the Special Housing Unit. Being moved without any guards is unprecedented. But it was done in this instance. Once in the office, Childress did all of the talking. He advised Stine that he was aware of his terminal cancer diagnosis. He said that he knew Stine had only a matter of months to live. And he said he had a plan that would allow Stine to live out the last of those months as a free man.

Childress advised Stine that he was being sent to FCI Butner. He further advised that there is an inmate at Butner who poses a threat to the Bureau of Prisons and to the government, a person whose high-priced lawyers were going to expose damaging information that would harm high ranking B.OP. officers and other officials. Childress told Stine that he needed him (Stine) to eliminate the problem. Childress asked Stine if he was familiar with the musical artist R. Kelly. Stine only knew of Kelly from the news. Childress told Stine that Kelly is a rapist. He told Stine that Kelly raped little white girls. He told Stine Kelly was scum. And he told Stine that Kelly was someone that the A.B. would want gone. Childress told Stine that he would be sent to FCI Butner. He said Stine would go to the medical center first and would be eventually moved to Kelly's unit. There, Childress indicated that Stine should kill R. Kelly.

Childress told Stine he would be charged for the murder, but the evidence would be mishandled. There would be no conviction. He further told Stine that he would be transferred

following the killing and, on the way, Stine would be permitted to escape just as he did when he first escaped from BOP custody.  Childress told Stine that he could live out the last of his days as a free man as long as he did as he was told.  Stine agreed to his proposal.  Gutierrez and Stangl were present for this conversation.  Following the conversation, Stine was taken back to his cell in the S.H.U.

Within two weeks of meeting with Childress, Stine was transferred to FCI Butner.  As a general matter, BOP transfers almost never happen that quickly.  After arriving at Butner, Stine was not on Kelly's unit.  He was ultimately taken to the Medical Center just like Childress said. Stine was at the medical center between October 17, 2023, and March of 2025.  While at the medical center, Stine was approached by an official in a suit.  He does not know his name.  This official told Stine that he knew his diagnosis.  He knew there was no treatment available.  He told Stine: "You need to do what you came here for."  Shortly, after that visit, Stine was moved to R. Kelly's unit.  He arrived on the unit in March of 2025.

After arriving on the unit, Stine found Mr. Kelly.  He followed him. He watched him.  He considered how to carry out his murder.  He was prepared to carry out the execution.  But, in the moment when Stine got near Mr. Kelly, he made a different choice.  He told him the truth.  Stine told Kelly that he was sent to kill him.  He told him how and by who.  He told Mr. Kelly that his life was absolutely in danger.  As a dying man with a long history of murder and violence in his past, Stine decided not to carry out his order.  Instead, he decided to take this opportunity to expose Childress and the BOP for the decades of murder and violence that they have foisted upon the inmate populace while facing no consequences whatsoever.  Mr. Stine is prepared to take a polygraph examination.  He is prepared to testify before this Court.  He is prepared to provide the names of other witnesses who can corroborate his account of the violence that the A.B. has carried

14

out at the direction of Childress and other BOP. officers. As of the writing of this motion, other A.B. members are now present in Mr. Kelly's unit. Another BOP. officer at F.C.I. Butner named Lieutenant Teague has approached Mr. Stine on multiple occasions to remind him that he must do what he was sent to do.

On June 6, 2025, the defense learned that a second member of the Aryan Brotherhood, who is housed at FCI Butner, had just been approached by Lieutenant Teague and directed to carry out the execution of Mr. Kelly and Mr. Stine. This man's name is David Keith Harris. The possibility of poison being mixed into the food at the chow hall and in the commissary as a means of achieving these executions was discussed with Harris by Lieutenant Teague. This means that at *least* two avowed white supremacists and members of the Aryan Brotherhood have been approached by BOP officers and directed to take Mr. Kelly's life. The one who failed to do so has now had his own life threatened. All of this is being done at the direction of Bureau of Prisons officers whose duty is to keep safe the inmates under their supervision. Both Stine and Harris have agreed to take polygraph examinations and testify to these facts whenever called.[3] Time is now of the essence. It is with these breathtaking facts in mind that Mr. Kelly asks this Court for an extraordinary legal remedy: his release from Bureau of Prisons custody.

## ARGUMENT

The threat against Mr. Kelly is of a constitutional and existential magnitude, and drastic relief is warranted. Mr. Kelly's continued incarceration while he knows his life is in jeopardy constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Moreover, the fact that he is being targeted for seeking redress for constitutional

---

[3] The defense has not had the time to formally interview Harris because of the immediacy of the information that he provided.

violations committed by the government during the course of his prosecutions contravenes protections under the First and Sixth Amendments to the Constitution. Mr. Kelly faces an extraordinary threat, and extraordinary relief is warranted.

Implicit in every criminal sentence is that it cannot be imposed in an unconstitutional manner. Hence, a sentence that is facially valid requires that the sentence not be imposed in a manner that would constitute cruel and unusual punishment. U.S. Const. amend. VIII. Similarly, a sentence may not be imposed in a way that unconstitutionally deprives an inmate of his First Amendment right to petition the government for the redress of grievances. *See Dobbey v. Illinois Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009). The threat against Mr. Kelly's life contravenes these constitutional guarantees implicit in his sentence.

Continued custody while he knows that he is in heightened danger, and that he will not be adequately protected by BOP officers constitutes cruel and unusual punishment in violation of the Eighth Amendment. "[T]he Eighth Amendment's Cruel and Unusual Punishment Clause[] . . . imposes upon prison officials the duty to 'take reasonable measures to guarantee the safety of the inmates.'" *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)). "In particular, this duty requires prison officials 'to protect prisoners from violence at the hands of other prisoners.'" *Id.* (quoting *Farmer*, 511 U.S. at 833). Certainly, that duty includes protection from violence organized or orchestrated at the behest of government officials.

An Eighth Amendment violation may be established by demonstrating that the prison officials "were aware of a substantial risk of serious injury to the [inmate] but nevertheless failed to take appropriate steps to protect him from a known danger." *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) (quoting *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998)).

16

The prison official who spoke to Mr. Kelly specifically warned him that he was at a heightened risk of danger and that he could not protect him.  Mr. Stine indicated that he was directed by BOP officials to carry out Mr. Kelly's assassination. Mr. Harris has indicated the same thing.

A threat "can rise to the level of cruel and unusual punishment." *Dobbey v. Illinois Dep't of Corr.*, 574 F.3d 443, 445 (7th Cir. 2009); *Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015)). Threats of grave violence can constitute cruel and unusual punishment under the Eighth Amendment.  "Mental torture is not an oxymoron, and has been held or assumed in a number of prisoner cases . . . to be actionable as cruel and unusual punishment." *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir. 1994) (collecting cases) (citations omitted); *Dobbey*, 574 F.3d at 445 (offering the example of "falsely informing a prisoner that he has been sentenced to death").  Although Mr. Kelly is intensely fearful after the conversation with the prison official and subsequent confirmation that his life is in danger, the test is an objective one: "[t]he test for what constitutes 'cruel and unusual punishment' is an objective one." *Dobbey*, 574 F.3d at 445.  "It is not the actual fear of the victim, but what a 'reasonable' victim would fear."  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); and *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006)).  There can be no doubt that fear is the reasonable response to an inmate's learning that he is at a heightened risk of danger and that prison officials tasked with protecting him cannot or will not do so.  Indeed, it would be unreasonable not to be fearful under such circumstances.  This is particularly true when the threat is linked to the inmate's efforts to expose constitutional violations and wrongdoing committed and covered up by the B.OP. and U.S.A.O. More so when another inmate indicates that he was directed by prison officials to kill the inmate. Not being fearful under these circumstances would be patently unreasonable.

17

This raises another constitutional issue: the fear of retaliation for exercising activity protected under the First Amendment. The conversation regarding Mr. Kelly's danger was directly linked to his efforts to petition the government for redress of *Brady*, *Giglio*, and Sixth Amendment violations. The BOP official specifically informed Mr. Kelly that "they" knew that his counsel met with "the guy [at the MCC Chicago]" just days after the undersigned's associate obtained a signed statement from Mr. Modugumudi describing aspects of his cooperation against Mr. Kelly. That information was specifically linked to Mr. Kelly's danger and the official's inability to protect him. Thus, the danger to Mr. Kelly was specifically linked to his efforts to petition the government for redress of the constitutional violations, and thus in contravention of the First Amendment.

This is both its own violation and amplifies the fear a reasonable person would experience under the cruel and unusual punishment analysis. How can one ever be safe if he is in danger for efforts to expose the wrongdoing of the governmental institution to which his protection is entrusted? Who can such a person turn to for protection?

Petitioning this Court is the only viable option under such circumstances, and this Court's inherent authority empowers it to provide a remedy. "The Supreme Court has made clear that, in addition to the authority granted by the supplemental jurisdiction statute, 28 U.S.C. § 1367, federal courts retain, by virtue of their inherent authority to protect their judgments, limited authority to address matters related, but tangential, to cases within their jurisdiction." *Nichols v. Longo*, 22 F.4th 695, 697–98 (7th Cir. 2022) (citing *Peacock v. Thomas*, 516 U.S. 349, 354 n.5 (1996)). Stopping cruel and unusual punishment falls within the Court's jurisdiction. So too does ensuring that a defendant is not subject to unconstitutional conditions while serving his sentence. Certainly, preventing the government from converting a defendant's custodial sentence into a death sentence falls within the Court's inherent authority.

Mr. Kelly is not safe in federal custody. Any continued incarceration while Mr. Kelly is under threat would constitute cruel and unusual punishment. Ordinary channels for redressing grievances are inadequate because those in charge of the prison grievance process are the ones who have initiated the threat against Mr. Kelly. Petitioning the Court for a temporary furlough to home detention while the matter is investigated is the only viable option to protect Mr. Kelly. Such an order is "necessary [and] appropriate" given the threat against Mr. Kelly's life. *See* 28 U.S.C. § 1651.

This Court is presented with a daunting task. The relief Mr. Kelly seeks is truly extraordinary. Yet, extraordinary circumstances call for extraordinary remedies. The circumstances set forth above are as extraordinary as they are terrifying. Incarcerated persons have no redress for protection outside of the guards that are hired to keep them safe. When the hierarchy under which those guards work has sanctioned and ordered an inmate's execution, then there is no safety for that inmate. The declaration of Mr. Stine shows that inmate murder at the behest of prison officials is neither new nor uncommon. It happens regularly and without consequence. Hence, the threat to Mr. Kelly's life continues each day that no action is taken. More A.B. members are accumulating at his facility. More than one has already been approached about carrying out his murder. One of them will surely do what Mr. Stine has not, thereby burying the truth about what happened in this case along with Robert Kelly.

Mr. Kelly opened this motion with a question from ancient Rome: who will guard the guardians? He now concludes with a modern and uniquely American answer. In this country, the Court and the Constitution exist for the express purpose of guarding the guardians. The founding fathers put them there for moments just like these, when the powerful threaten the weak by way of corruption. In these moments, it is the role of the Court to make sure that the systemic powers

of the government have limits while the unalienable rights of the individuals do not.  Mr. Kelly's life is threatened by governmental powers that have now sought his literal destruction.  The only chance he has at basic safety lies with this Court, which stands outside and independent of the powers that threaten him.

WHEREFORE Mr. Kelly respectfully requests that this Honorable Court order a temporary furlough to home detention.

Respectfully submitted,

By: /s/ *Beau B. Brindley*
Attorney for the Defendant

LAW OFFICES OF BEAU B. BRINDLEY
53 W. Jackson Blvd.
Suite 1410
Chicago, Illinois 60604
(312) 765-8878 (Phone)