UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT SYLVESTER KELLY,<br>also known as "R. Kelly" | Case No. 19 CR 567<br><br>Honorable Martha M. Pacold |

**GOVERNMENT'S JURISDICTIONAL RESPONSE TO DEFENDANT'S
EMERGENCY MOTION FOR TEMPORARY FURLOUGH**

**I.      Introduction**

Robert Kelly is a prolific child molester. He is unapologetic about it. Kelly has never taken responsibility for his years of sexually abusing children, and he probably never will. In fact, in March of this year, Kelly took part in a social media challenge by releasing a new song from prison, in which, when referencing his incarceration he sang, among other things, "Though I'm in this place, I know I don't deserve this, no…."[1] [2] Kelly's current motion is indicative of precisely this sentiment. A jury of Kelly's peers convicted him. The Seventh Circuit Court of Appeals affirmed both his conviction and the sentence that this Court imposed. The Supreme Court of the United States declined to hear any further appeal of his conviction and sentence. Undeterred, Kelly now asks this Court to release him from incarceration indefinitely under the guise of a fanciful conspiracy.

---

[1] https://genius.com/R-kelly-residuals-remix-lyrics (Last visited June 12, 2025).
[2] https://hiphopdx.com/news/r-kelly-residuals-chris-brown-remix-prison (audio available with lyrics on the screen here) (Last visited June 13, 2025).

Kelly's motion makes a mockery of the harm suffered by Kelly's victims and flouts this Court's previous ruling that this Court lacks jurisdiction to entertain Kelly's complaints about the conditions of his confinement. *See* Dkt. 445. And underscoring the deeply unserious and theatrical nature of Kelly's request is that Kelly has not filed his motion for relief or the two supplements on the docket in Kelly's criminal case in the Eastern District of New York, where that court imposed a 30-year sentence of imprisonment upon Kelly. *See* Exhibit 1, Docket Report from 19 CR 286-AMD, E.D.N.Y. Certainly, this Court does not have jurisdiction to relieve Kelly from that judgment. Kelly's motion must be denied.

## II. Background

### A. The Counts of Conviction

On September 14, 2022, after a month-long jury trial, a jury convicted Kelly of Count One, Count Two, Count Three, Count Nine, Count Ten, and Count Twelve of the superseding indictment. Dkt. 93, 334. Counts One through Three charged Kelly with inducement, enticement, or coercion of "Jane" to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct (Video 1, Video 2, and Video 3), between 1998 and 1999, in violation of Title 18 United States Code, Section 2251(a).

With respect to Count One, Kelly coerced Jane, who was 14 years old at the time, to engage in sex acts with Kelly while Kelly filmed the sex acts in the "log cabin room" inside of Kelly's home. Trial Tr. 777-80. As depicted in Video 1, Kelly handed Jane money at the start of Video 1 to make it appear as if she were a prostitute

2

instead of his "goddaughter." Tr. 780-81. As further depicted in Video 1, among other things, Kelly had Jane perform oral sex on Kelly and urinated on Jane. Tr. 778.

With respect to Count Two, Kelly filmed himself engaging in sex acts with 14-year-old Jane on Kelly's living room floor. Tr. 775. As depicted in Video 2, among other things, Kelly provided Jane with Cristal champagne to drink before having Jane perform oral sex on Kelly and urinating on Jane's vagina. Tr. 776. Kelly specifically directed Jane to describe her vagina as being a 14-year-old vagina, and Jane, who was in fact, 14 years old at the time, complied.[3] Tr. 777.

With respect to Count Three, Kelly filmed himself engaging in sex acts with 14-year-old Jane in Kelly's bedroom on Kelly's bed. Tr. 773. As depicted in Video 3, among other things, Kelly had Jane perform oral sex on Kelly and asked Jane to describe her breasts as "14-year-old breasts." Tr. 773-74.

Kelly's sexual abuse of Jane on and off of the camera in different locations and in different states, including New York and Florida, from 1997 through 2001, also served as the basis for Kelly's conviction on Count Nine of the superseding indictment, which charged Kelly with enticing Jane to engage in unlawful sexual conduct (namely, aggravated criminal sexual abuse), in violation of Title 18 United States Code, Section 2422(b). *See* Tr. 739-40. But Kelly wasn't satisfied with only abusing Jane. Kelly also abused Jane's classmate and friend, "Pauline," from 1997 through 2001, and this sexual abuse served as the basis for Kelly's conviction on Count Twelve of the superseding indictment, which similarly charged Kelly with

---

[3] As the jury heard when the video clips were played for the jury, Kelly did not use the word "vagina," and instead used a different, more vulgar, word. *See* Tr. 985-98.

3

enticing Pauline to engage in unlawful sexual conduct (namely, aggravated criminal sexual abuse), in violation of Title 18 United States Code, Section 2422(b). *E.g.*, Tr. 2288-89.

Pauline met Kelly through Jane when Pauline was 14 years old. Tr. 2289. Kelly began sexually abusing Pauline when Pauline was still 14, after Pauline happened upon Kelly and Jane while Jane was naked in the log cabin room in Kelly's home. Tr. 2291-95. Kelly directed Pauline and Jane to kiss each other and fondle each other's breasts, after which Kelly groped both Pauline and Jane. Tr. 2294-95. Kelly's abuse of Pauline escalated while Pauline was still 14 years old, with Kelly directing Pauline to perform oral sex on Kelly and Jane, and with Kelly progressing to having sexual intercourse with Pauline "over 80 times." Tr. 2296-98.

Kelly also sexually abused "Nia." Nia met Kelly in 1996 when she was 15 years old. Tr. 2584. Nia asked Kelly for his autograph and Kelly volunteered his phone number. Tr. 2585. After speaking to Kelly on the phone and informing Kelly that Nia was 15 years old, Kelly arranged for Nia to fly from Atlanta to Minneapolis several weeks later to see him. Tr. 2589-93. While in Minneapolis, Kelly visited with Nia inside of a hotel room at which point, among other things, Kelly invited Nia to visit Kelly in Chicago at a later date. Tr. 2598-2602. After Nia agreed to visit Kelly in Chicago, Kelly masturbated while sitting next to Nia on the bed and kissed and touched Nia's breasts. Tr. 2601-03.

Nia arranged to spend the summer of 1996 in Chicago with family after being induced to do so by Kelly inside of the hotel room. Tr. 2604-05. Kelly asked Nia to

4

visit him at his recording studio, and she did. Tr. 2607. Nia arrived with family members, prompting Kelly to state to Nia that Kelly thought that Nia was coming alone. Tr. 2608. Eventually, Kelly separated Nia from the group, kissing Nia and folding her breasts and digitally penetrating Nia's vagina Tr. 2611-13. This conduct served as the basis for Kelly's conviction on Count Ten of the superseding indictment, which charged Kelly with enticing Nia to engage in unlawful sexual conduct (namely, aggravated criminal sexual abuse), in violation of Title 18 United States Code, Section 2422(b).

**B.     Kelly's New York Conviction**

Separate from this matter, on September 27, 2021, Kelly was convicted of racketeering and Mann Act violations in the United States District Court for the Eastern District of New York. No. 19 CR 286-AMD, Dkt. 238. Kelly was sentenced to 30 years' imprisonment. Kelly's conviction was affirmed by the Second Circuit on February 12, 2025. *United States v. Robert Sylvester Kelly*, 128 F.4th 387 (2nd Cir. 2025).

**III.    The Sentence Imposed by This Court and Post-Conviction Procedural History**

On February 23, 2023, this Court sentenced Kelly to 20 years' imprisonment for his crimes, with one year of the sentence on Counts One, Two, and Three to be served consecutively to the sentence imposed in the Eastern District of New York. Dkt. 426, 428. Kelly is currently serving both sentences at FCI Butner in Butner,

5

North Carolina.[4] According to the Bureau of Prison's website, Kelly's projected release date is December 21, 2045.

On July 20, 2023, Kelly and his co-defendant Derrel McDavid filed a joint motion to compel FCI Butner to allow McDavid to visit Kelly in prison. This Court denied Kelly and McDavid's motion. Dkt. 445. As the government argued and the Court agreed, Kelly first needed to exhaust his administrative remedies and he had not, and further, Kelly's motion related to the conditions of his confinement and needed to be brought as a civil action in the Eastern District of North Carolina because this Court lacked jurisdiction to order the warden of the facility to take any action. *See* Dkt. 445. It does not appear from a search of the public federal court docket in the Eastern District of North Carolina that Kelly or McDavid ever sought relief from that court after this Court denied Kelly and McDavid's motion.

On April 26, 2024, the Seventh Circuit affirmed both Kelly's conviction and the sentence imposed by this Court. *United States v. Robert Sylvester Kelly*, 99 F.4th 1018 (7th Cir. 2024). On October 7, 2024, the Supreme Court denied Kelly's petition for a writ of certiorari. 145 S. Ct. 276.

---

[4] Kelly was ordered detained pending trial in both this matter and the criminal case in the Eastern District of New York, on the basis that Kelly posed a serious risk of danger to the community, a risk of flight, and a risk that Kelly would obstruct justice, with respect to the charges before this Court, and a serious risk of flight with respect to the charges in the Eastern District of New York. *See* Dkt. 8, 14, 24; No. 19 CR 286-AMD, Dkt. 18-19, E.D.N.Y. Thus, Kelly has been in the custody of the Bureau of Prisons since his arrest in 2019.

**IV. Kelly's Current Motion Either Relates to the Conditions of His Confinement or Fundamentally Challenges his Confinement Altogether, and Asks this Court for Relief This Court Lacks Jurisdiction to Order.**

On June 11, 2025, Kelly filed an Emergency Motion for Temporary Furlough requesting to be released to home detention "on a temporary furlough from his custodial sentence" for an unspecified period of time.[5] Dkt. 485 at 1, 20. Specifically, according to Kelly, a fellow inmate at FCI Butner, who only has months to live, approached Kelly in April 2025 and informed Kelly that he had been tasked by BOP officials to murder Kelly. Dkt. 485 at 12-13. According to Kelly, this inmate decided not to go through with it, at which point a second inmate was enlisted by BOP officials to murder Kelly, and this second inmate also chose not to harm Kelly. *Id.* at 14-15. Based on these allegations, Kelly asks this Court to release him from prison indefinitely. *Id.* at 15. Kelly supplemented his motion early in the evening on June 12, 2025, alleging, in summary, that since filing his motion, he had been moved to solitary confinement.[6] Dkt. 487 at 2. Among other things, Kelly alleges that he no longer has access to the food items he purchased from commissary as a result of being moved to solitary confinement. *Id.* Kelly further alleges that he refuses to eat the food that is available to other inmates for fear he will be poisoned, and as a result, that Kelly is not eating. *Id.* at 2-3.

---

[5] Two previous versions of Kelly's motion filed on June 10, 2025, (Dkt. 480 and 484) were stricken for the reasons stated in Dkt. 481, 483, and on the record on June 11, 2025. *See* Dkt. 486.

[6] Moving Kelly to protective custody seems to run contrary to Kelly's allegation that BOP officials are trying to murder Kelly.

7

Late in the afternoon on June 13, 2013, Kelly filed a second supplement to his motion, complaining that an attorney call with Kelly had been cancelled and alleging that Kelly's counsel was not receiving sufficient information from FCI Butner about Kelly's condition. *See* Dkt. 489.

On June 10, 2025, the Court directed the parties to appear on June 11, 2025, and "be prepared to discuss whether the court continues to have jurisdiction over this matter." Dkt. 483. On June 11, the Court directed the government to respond to Kelly's motion and limit its response solely to the question of whether this Court has jurisdiction to afford the relief requested in Kelly's motion. *See* Dkt. 486. Neither of Kelly's supplements address or otherwise relate to the jurisdictional issue this Court asked the parties to address. *See* Dkt 487, 489. As noted above, Kelly has not filed a similar motion for relief on the docket in his criminal case in the Eastern District of New York. *See* No. 19 CR 286-AMD, E.D.N.Y; Ex. 1.

The government disputes the fantastic allegations in Kelly's motion. Kelly is in prison because he is a serial child molester whose criminal abuse of children dates back to at least President Clinton's first term in office—decades before Kelly was taken into federal custody. But this Court need not address any of the factual allegations in Kelly's motion in order to dispense with it.

Fundamentally, Kelly is complaining about the conditions of his confinement or challenging his confinement altogether. His first supplement to his motion underscores this point emphatically. Kelly's motion must be denied because this Court lacks jurisdiction to afford Kelly the relief that Kelly seeks, and Kelly is seeking

relief in the wrong forum, via the incorrect procedural vehicle, and having failed to exhaust his administrative remedies in the facility where he is incarcerated. There is no legal basis for Kelly's motion to be before this Court.

V.     **Argument**

Kelly's motion is lacking of any citation to a statute or a case for the proposition that a district court retains jurisdiction over a criminal matter after it has imposed its judgment in order to resolve disputes relating to the conditions of an inmates' confinement within the Bureau of Prisons or to release an inmate to home confinement without fundamentally amending the judgment. Because this is not the law. "Once a court sentences a criminal defendant, it has jurisdiction to continue hearing related issues only when authorized by statute or rule." *United States v. Goode*, 342 F.3d 741, 743 (7th Cir. 2003). Kelly has not pointed the Court to either. Kelly must first bring his grievances to the warden of the prison where he is incarcerated. And only after he has exhausted his internal remedies may he then bring a civil action in the Eastern District of North Carolina where he is incarcerated.

The cases that Kelly cite in his motion make this point clearly. Kelly did not cite to a single criminal case in his motion in support of his position. *See* Dkt. 485 at 16-18. <u>Every single case Kelly cites to in his motion is a civil Section 1983 action against prison officials</u>, except for the *Nichols v. Longo* case—another civil case—which even further undercuts Kelly's position because the court found in that instance that it did not retain ancillary jurisdiction to adjudicate an attorneys' fee dispute after it had entered its judgment and the case was closed, and the Seventh

9

Circuit affirmed that result. *See* Dkt. Dkt. 485 at 16-18; *Nichols v. Longo*, 22 F.4th 695, 697-701 (7th Cir. 2022).

Kelly's position that this Court has jurisdiction to entertain his grievances has no support in the law. Kelly's motion must be summarily denied.

**A.    This Court lacks jurisdiction to administer the sentence it imposed, and may only modify the sentence under limited circumstances.**

A sentence of imprisonment, once imposed, generally is final for all purposes. 18 U.S.C. § 3582(b). Thus, "'[a] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillion v. United States*, 560 U.S. 817, 824 (2010) (citing 18 U.S.C. § 3582(b)) (alterations in original); *Goode*, 342 F.3d at 743 (courts lack jurisdiction after imposing sentence unless "authorized by statute or rule").

"After a district court sentences a federal offender, the Attorney General, through the BOP, has the responsibility for administering the sentence." *United States v. Wilson*, 503 U.S. 329, 335 (1992). The BOP then has "plenary control" placement of the inmate, subject to statutory limits, and this authority includes the decision whether to house an inmate in a prison or in home confinement. *See* 18 U.S.C. §§ 3624(c)(2), 3621(b); *Tapia v. United States*, 564 U.S. 319, 331 (2011); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021). As the Seventh Circuit has made clear, the Court lacks any authority under § 3582(c)(1) to order that an inmate be transferred to home confinement. *Saunders*, 986 F.3d at 1078 (holding that the

district court did not err in declining to review the merits of a request for home confinement, since it had no power to grant such relief) (citations omitted).

Here, Kelly cites no statute or rule that would provide the Court with jurisdiction to consider his motion, as the Court appropriately flagged in its minute entry on June 10, 2025. *See* Dkt. 483. Kelly's motion should be denied on this basis alone.

**B.  Kelly has not exhausted his administrative remedies.**

Kelly further does not suggest in any way in his motion or the supplements to it that he exhausted the grievance process at FCI Butner in order to attempt to address his concerns, and this failure is also fatal to his motion. The Prison Litigation Reform Act states, among other things, that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532. "This means that 'if a prison has an internal administrative grievance system through which a prisoner can seek to correct a problem, then the prisoner must utilize that administrative system before

filing a claim.'" *Ebmeyer v. Brock*, 11 F.4th 537, 541 (7th Cir. 2021) (quoting *Massey v. Helman*, 196 F.3d 727, 733 (7th Cir. 1999)).

"An inmate's perception that exhaustion would be futile does not excuse him from the exhaustion requirement." *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005) (citing *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001)). Further, an inmate must still comply with the exhaustion requirement even if available administrative remedies do not provide the exact relief the inmate wants, so long as the relief may be of some use to the inmate. *Churner*, 532 U.S. at 738-41.

The grievance process is available to Kelly and Kelly has not shown (1) that he filed a grievance and otherwise exhausted his administrative remedies; or (2) that the grievance process is somehow unavailable to him. Remedies are unavailable when a correctional officer tells the prisoner that he cannot file a grievance when in fact the prisoner can do so, or where the prisoner presents evidence that prison personnel denied him grievance forms, threatened him, and solicited other inmates to attack him in retaliation for filing grievances. *Ebmeyer*, 11 F.4th at 542-43. In this case, according to the face of Kelly's motion, Kelly never filed a grievance with prison officials and no prison official told Kelly that he could not file a grievance. In fact, Kelly's motion alleges that he actually has a sympathetic prison official at FCI Butner—who Kelly refuses to identify by name or title—who is trying to help Kelly and warned Kelly to avoid the food hall. Dkt. 485 at 11; Dkt. 487 at 2. Kelly did not ask this official for a grievance form. Kelly is clearly not afraid of airing his grievances because he brought them to this Court to relay them and this Court has no

12

jurisdiction at all over the prison or the officials in it (more on this below in Section V(C)).

Kelly indicated that he learned some information on June 6, 2025, prompting Kelly to seek relief in this Court on June 10, 2025. *See* Dkt. 485 at 15; Dkt. 480. This timeline alone shows that Kelly did not exhaust or even attempt to pursue administrative remedies. According to Kelly's first supplement to his motion, Kelly was moved into solitary confinement "within hours" of filing his motion. Dkt. 487 at 1-2. This shows that officials at FCI Butner are receptive to Kelly's concerns and interested in keeping Kelly safe, had Kelly brought those concerns to those officials instead of using this Court's docket as a grievance sounding board. But Kelly did not bring his concerns to BOP officials. In fact, according to Kelly's motion, Kelly first learned of this supposed plot over two months ago on April 11, 2025, and did nothing in terms of initiating a grievance. Dkt. 485 at 12. For these reasons, the Court cannot entertain Kelly's motion.

**C. Kelly is ultimately complaining about the conditions of his confinement or fundamentally challenging his confinement, and these issues must be raised in the district where Kelly is confined against the prison officials who are administering Kelly's sentence.**

Even *if* Kelly had exhausted his administrative remedies or had shown that administrative remedies were unavailable to him and this Court were to ignore *Goode* and its progeny, there is still no legal basis for Kelly to be before this Court seeking the relief that he is seeking and certainly not in the criminal case that is now closed. Kelly is either complaining about the conditions of his confinement or challenging his present physical confinement, which must be brought in a civil rights action or a

habeas action. Every case that Kelly cites in support of his position is a civil action brought against prison officials under Section 1983, except, as stated above, the *Nichols* case, which even further undercuts Kelly's position. Kelly's motion must either be brought as a habeas action or as a civil Section 1983 action, but under either path, only in the federal district where Kelly is currently detained.

"A petitioner who seeks a 'quantum change' in the level of confinement must use the writ [of habeas corpus]. A prisoner who seeks anything else must use a civil rights action." *Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) (citing *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991)). In *Graham*, the Seventh Circuit stated:

> If the prisoner is seeking what can fairly be described as a quantum change in the level of custody—whether outright freedom, or freedom subject to the limited reporting and financial constraints of bond or parole or probation, or the run of the prison in contrast to the approximation to solitary confinement that is disciplinary segregation—then habeas corpus is his remedy. But if he is seeking a different program or location or environment, then he is challenging the conditions rather than the fact of his confinement and his remedy is under civil rights law, even if, as will usually be the case, the program or location or environment that he is challenging is more restrictive than the alternative that he seeks.

*Graham*, 922 F.2d at 381. Thus, either way, the relief that Kelly is seeking must either be brought as a habeas action or as a civil rights action, but in no case can Kelly seek relief as to the conditions of his confinement or challenge the level of his confinement in this criminal case.

The federal habeas statute provides that the proper respondent to a habeas petition is the person who has custody over the petitioner (the person with the ability

to produce the prisoner's body before the habeas court), and therefore, district courts are limited to granting habeas relief within their respective jurisdictions, which is to say, "the court issuing the writ [must] have jurisdiction over the custodian." *See Rumsfeld v. Padilla*, 542 U.S. 426, 434-35, 442 (2004) (Rehnquist, C.J.). A detainee's challenge to his present physical confinement is a "core habeas petition," and "for 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement.'" *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005-06 (2025) (per curiam) (quoting *Padilla*, 542 U.S. at 443); *see also Padilla*, 542 U.S. at 443 ("The plain language of the habeas statute thus confirms the general rule that for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."); *Kholyavskiy v. Achim*, 443 F.3d 946, 951 (7th Cir. 2006) ("We interpreted 28 U.S.C. § 2241, which gives district courts the power to grant writs of habeas corpus "within their jurisdictions," to mean that the only proper venue for habeas proceedings is the federal district in which the petitioner is detained.").

Kelly is detained in the Eastern District of North Carolina. The warden of FCI Butner is the person with the ability to produce Kelly. The Eastern District of North Carolina is the only appropriate venue for Kelly to being his grievances to court, because this Court does not have jurisdiction over the warden at FCI Butner.

Kelly's position becomes even more mystifying if what Kelly is pursuing is a civil rights action under Section 1983 for alleged Eighth Amendment violations, because Section 1983 may only be invoked in a *civil* action naming the individuals who purported to have violated Kelly's constitutional rights as defendants. *See, e.g.,*

15

42 U.S.C. § 1983. The prison officials that are at the core of the relief Kelly seeks are all located in the Eastern District of North Carolina at FCI Butner, and none of them are parties in this case. *See Mortensen v. Arrowood*, 711 F. Supp. 3d 935, 937 (N.D. Ill. 2024) (the proper defendant in a Section 1983 action is the individual or entity that causes the alleged constitutional deprivation). Further, the United States of America, which is the only other active party in this case besides Kelly, is immune from lawsuits and cannot be a party to a Section 1983 action unless it consents to be sued, and it has not here. *See, e.g.*, *Hercules Inc. v. United States*, 516 U.S. 417, 422-23 (1996).

Whether Kelly is seeking a quantum change in the conditions of his confinement (such as going from serving a 31-year prison sentence to home confinement) or challenging the conditions of his confinement, either way, Kelly is seeking relief in the incorrect forum and in a closed criminal case (and in only one of Kelly's closed criminal cases) instead of in a civil action as he should. This Court has no jurisdiction to entertain Kelly's motion, and it should be denied.

**VI.    Conclusion**

Imagine a scenario where any and every incarcerated criminal could go back to the criminal court(s) that imposed a sentence of imprisonment upon them, allege that they fear imminent harm, and demand to be released from custody while the matter was investigated. Every convicted murderer, rapist, and terrorist will have a newfound shot at freedom. This is an impractical, unworkable, and unlawful scenario. District courts only have jurisdiction by statute or rule, and Congress has not

authorized such a scenario. Kelly asks this Court to release him from custody despite his separate 30-year and 20-year sentences of imprisonment imposed by separate district courts. This Court is not authorized to afford Kelly the relief he seeks and cannot, in any event, alter the judgment in the Eastern District of New York. Kelly's daily supplements to his motion—filed only in this Court—do nothing to cure these fundamental flaws with respect to Kelly's current course of action.

Four hours after Kelly filed his motion, this Court flagged as a threshold question whether it continued to have jurisdiction over this matter. Dkt. 483. The following day, at Kelly's request, the Court allowed briefing on that question despite the Court directing the parties to come prepared to discuss that question on June 11, 2025. Dkt. 486. Kelly's two supplements to his motion ignore this threshold question. And Kelly suggests there will be more supplements to his motion, totally unrelated to the threshold question this Court directed the parties to address. *See* Dkt. 489 at 2. The Court should find this instructive on how to resolve Kelly's motion. Kelly refuses to accept responsibility for years of sexually abusing children and is using this Court's docket merely to promote himself despite there being no legal basis to be before this Court.

Unfortunately, no court has the ability to enter an order freeing Kelly's victims from the prison that Kelly put them in. Particularly Jane, whose abuse was trafficked at barbershops and flea markets in the early 2000s and disseminated over the internet as a result of Kelly's perversion. Kelly's motion is repugnant to the sentence

that this Court imposed for deeply disturbing offenses. Kelly's motion should be denied.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:    /s/ *Jason A. Julien*
       JASON A. JULIEN
       Assistant United States Attorney
       219 South Dearborn St., Rm. 500
       Chicago, Illinois 60604
       (312) 353-5300

# **CERTIFICATE OF SERVICE**

I, Jason A. Julien, an attorney, certify that I served a copy of the foregoing Government's Jurisdictional Response to Defendant's Emergency Motion for Temporary Furlough by filing the same using the CM/ECF System, and that a copy will be provided to all parties of record designated to receive notice.

        Respectfully submitted,

        ANDREW S. BOUTROS
        United States Attorney

By:    /s/ *Jason A. Julien*
        JASON A. JULIEN
        Assistant United States Attorney
        219 South Dearborn St., Rm. 500
        Chicago, Illinois 60604
        (312) 353-5300