UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 CR 567 |
| -vs- | ) | |
| | ) | Hon. Martha M. Pacold |
| ROBERT SYLVESTER KELLY, | ) | |
| also known as "R.Kelly," | ) | |
| Defendant. | ) | |

**MOTION FOR A NEW TRIAL AND EMERGENCY MOTION FOR BOND**

COMES NOW Defendant, Robert Sylvester Kelly, by and through counsel, Beau B. Brindley, and hereby moves this Honorable Court for a new trial pursuant to Federal Rule of Criminal Procedure 33 and for bond pending the resolution of his new trial motion. In support of his motion, Mr. Kelly states the following.

### INTRODUCTION

Robert Kelly presently sits in a prison cell with blood clots in his lungs that could kill him at any time. The surgery that doctors at Duke University Hospital believed necessary to remove the clots and save his life—a pulmonary embolectomy—was actively prevented by officers armed with assault-style rifles who removed Mr. Kelly from the hospital and placed him in solitary confinement at FCI Butner. This happened immediately after prison officials administered to him an overdose of his sleeping medication, which could have killed him. Prison officials took two intentional acts that put Mr. Kelly's life in imminent danger within two days after he filed a motion that made public a declaration by Mikeal Glenn Stine, an avowed white supremacist and Commissioner of the Aryan Brotherhood, who swore he was transferred to FCI Butner for the purpose of killing R. Kelly and solicited to do so by a Bureau of Prisons official. This is not coincidence. This is not an R. Kelly production. This is what they are doing to him as these words

are being written.  We understand that these are shocking factual assertions.  Yet, facts they are.  And they can no longer be avoided.

Duke University Hospitals have confirmed Mr. Kelly was a patient at the times he indicated (between June 13 and June 15, 2025).  A signed HIPPA waiver has been obtained. Medical records have already been ordered.  Sources inside the hospital have confirmed that Mr. Kelly's account of his hospitalization is correct.  The medical records will confirm what we have already stated in prior filings.  The truth is becoming undeniable.  Bureau of Prisons officials do not want R. Kelly to survive and are actively trying to kill him.  In recent days, the recurrent question has been: why?  This motion, over which this Court's jurisdiction is *indisputable*, will answer that question and again seek the immediate release of Robert Kelly as the only possible way to ensure that he lives to see his motion litigated to conclusion.

The undersigned has been told that the informal and internal motto of the U.S. Attorney's Office in Chicago is: "Justice is just us."  The conduct that is detailed below illustrates the critical danger of such a mindset.  When prosecutors believe that they define what justice is, then they begin to think that whatever they do to achieve their goals is fully justifiable.  They begin to break the law while purporting to uphold it.  They begin to believe that their decision to make a person the "target" of an investigation renders that person guilty.  And they begin to think that whatever they choose to do to make their case against their so-called target is necessarily righteous regardless of what laws are broken or how many constitutional rights are fractured in the process.  That is what happened with Robert Kelly.

Prosecutors made the decision to use Bureau of Prisons officials and cooperating witnesses to break the law, to commit crimes, and to knowingly and intentionally and repeatedly violate Mr.

Kelly's constitutional rights. All as a means of making a case they should never have brought and getting a conviction they did not deserve.

R. Kelly was the ultimate target. He was acquitted in 2008 after relentless investigation and accusation. He was the very epitome of the one that got away. Armed with the fervor of cancel culture, the strident indignation of the Me Too movement, and the bright lights of a Lifetime television show, the U.S. Attorney's Office decided that they were going to get R. Kelly. By any means necessary.

The case in Chicago began and ended with one critical witness. She went by the pseudonym, Jane, at the trial although her identity has been repeatedly revealed in many publications. The instant case would never have existed without the cooperation and testimony of Jane. She was the key. Without her, the whole case crumbles. Yet, over the last year, we have discovered that the road to that testimony was paved by threats, empty promises, crimes, and constitutional violations. In order to have their "victim" to go after R. Kelly—the public figure they were intent on bringing down—prosecutors are the ones that did the victimizing. They made an unwilling person play the role of victim to serve their desires for the grandeur of bringing down a larger-than-life public figure within the sanctimonious buzz of the Me Too movement. And they did it through crime, threat, and coercion. This is the very essence of illegally weaponizing the Department of Justice to pursue a public figure.

When speaking at the Department of Justice, President Trump recently remarked: "As the chief law enforcement officer in our country, I will insist upon and demand full and complete accountability for the wrongs and abuses that have occurred." The case of U.S. vs. Kelly is one of the wrongs to which these comments plainly apply. This motion will illustrate and set forth the wrongs that were done to Mr. Kelly. And the relief sought—the vacation of his convictions and

his immediate release on bond pending the litigation of this motion—will provide the accountability that the current administration demands.

## FACTUAL BACKGROUND

IN 2008, Jane specifically told a Cook County jury that she was not the person who appeared in the video that is at the heart of the instant case. Trial Tr, Vol. 5 at 913. Without her testimony, Robert Kelly was found not guilty. The only FBI analysis done on the videotape could not identify her as the person in the video. Exhibit A. For approximately 20 years, she never suggested anything to the contrary. However, as the Me Too movement heated up and Surviving R. Kelly began to flicker in the eyes of prosecutors who saw him as the one that got away, something changed. That change did not come from Jane. She did not independently come forward and change her story. She did not participate in any aspect of Surviving R, Kelly. She did not independently assert that she was the person depicted in any videotape. What changed was the tactics that prosecutors were willing to use to get her to change her story.

Over the past year, the undersigned and his office have interviewed witnesses who have come forward and will testify under oath to the followings facts about what happened to Jane. These are witnesses who were not available to the defense at the time of trial, people who actively avoided or refused to be questioned. In one instance, this is a witness who testified for the government at trial and was not willing to share the truth with defense counsel out of fear. There are other witnesses in whom Jane confided the truth after the trial ended. And, of course, there is Jane herself. At a hearing on this matter, the defense will call Jane to the witness stand, along with other witnesses who will be identified for the Court after the issue of recusal of the U.S. Attorney's

Office for the Northern District of Illinois has been litigated.[1]  Those witnesses will finally provide the truth.

AUSA Angel Krull and accompanying federal agents pursued Jane after she indicated she did not wish to speak to them.  They told Jane that, if she did not change her story, her parents would both be charged with engaging in a criminal conspiracy with R. Kelly to obstruct justice. They told her that she had evidence of payments her mother and father received from Mr. Kelly. They told her that Krull would use them to see that her parents were prosecuted and jailed unless Jane would change her story and cooperate with the government as prosecutors pursued their desire to get R. Kelly and obtain his conviction.

In addition to the threat, Krull and others on the prosecution team further told Jane that she would be able to receive a substantial financial award if she gave testimony that led to Mr. Kelly's conviction.  That proved to be an outright lie.  But it was told as truth.  And Jane believed it.

Faced with the threat that her aging parents would be jailed and the promise that she could get a life altering financial award for giving testimony that led to a conviction, Jane agreed to change her story and go to the grand jury for the federal government.  Her grand jury testimony in this case was the direct product of threat, intimidation, and coercion.  Jane experienced it.  She reported it to others.  There will be no doubt.  It happened.  Prosecutors compelled the primary witness in this case to change her prior sworn testimony under oath and claim that she was formerly a perjurer by threatening her family with jail and promising her wealth.

Yet, that was just the start of the injustices that would be created by the effort to prosecute Robert Kelly in federal court in Chicago.  The prosecutorial misconduct in the case got worse, rather than better.  After they got Mr. Kelly charged and held in custody at the Metropolitan

---

[1] That motion will be filed imminently.

Correctional Center in Chicago, the prosecution team enlisted Bureau of Prisons officers and cooperating witnesses to steal his correspondence with his lawyer and his private emails. The legal correspondence was used to gain an unfair and plainly unconstitutional advantage over Mr. Kelly by giving prosecutors insight into his strategy with his lawyers to which the government had no right. The legal correspondence and the stolen private emails were further used to directly influence Jane and the person who would become the primary witness against Robert Kelly in New York (hereinafter Jane—NY).

While Robert Kelly was being held in custody on federal charges, a series of crimes were committed. These crimes were not committed by Robert Kelly. They were not committed by anyone he associated with him prior to his incarceration. They were committed by Bureau of Prisons officers and cooperating witnesses authorized by the government. Like all inmates, Mr. Kelly's phone calls and emails were monitored by prison officials. However, in this instance, a Bureau of Prisons officer named Tawana Ingraham was not listening to or monitoring Mr. Kelly's recorded calls and emails. She was, instead, stealing them. Specifically, Ms. Ingraham illegally accessed and stole a series of phone calls and emails regarding Mr. Kelly's relationship with a woman other than Jane or Jane-NY. Ms. Ingraham was a Special Investigative Services disciplinary officer who had no business dealing with any of Mr. Kelly's communications. She did not work at the facility at which Mr. Kelly was being housed and was not even supposed to have access to the system containing his emails and calls. Yet, somehow, she was allowed to gain access for the purpose of stealing Mr. Kelly's private communications (both emails and recorded telephone calls including privileged communications with his lawyer). There is an ongoing civil suit regarding her conduct pending right now before Honorable Judge Bucklo in the Northern District of Illinois.

Armed with illicit access that was granted to her by someone in the Department of Justice, Ingraham stole emails and calls that were specifically inflammatory to Jane and Jane-NY. These were private conversations to which Jane and Jane-NY were not privy. They had no way to know the content of these conversations. Hence, they were targeted and stolen for the purpose of biasing witnesses against Robert Kelly and thereby helping the government make its case. Only persons with knowledge of the investigation would have known which emails and calls to target and steal for the purpose of influencing Jane and Jane-NY. The stolen communications included communications with his attorney at the time, which were protected under the attorney-client privilege. On its own, this is a shameful abuse of a position of trust by a federal prison official for the purpose of influencing the case against Mr. Kelly. But it became far more insidious than that.

Kishan Modugumudi was Robert Kelly's cellmate both before he was transferred to New York to face trial there *and again* months later when he came back to Metropolitan Correctional Center in Chicago after finishing his trial in New York.

In a declaration attached as Exhibit B, Mr. Modugumudi admits that he met with prosecutors and sought a reduced sentence in exchange for providing cooperation against Mr. Kelly. Modugumudi agreed to steal Mr. Kelly's written correspondence from their cell and provide it to prison officials who would then give it to the United States Attorneys handling the investigation against Mr. Kelly. Modugumudi was debriefed by AUSA Angel Krull and agreed to provide this cooperation. AUSA Krull was also the person to whom the stolen correspondence was ultimately provided. Make no mistake, it is a crime for one inmate to steal the legal correspondence of another. That is theft. It is a separate crime for AUSA Krull and B.O.P. officials who helped her to direct the theft and utilize the stolen privileged legal correspondence. That is obstruction of justice.

Mr. Modugumudi would routinely take Mr. Kelly's mail while Kelly was at a visit or somewhere else in the facility. In particular, he made a point of stealing Mr. Kelly's **legal mail** that was written to his lawyers. These were letters that were marked Legal Mail by Mr. Kelly. This was the intentional theft of attorney-client correspondence, which violated Mr. Kelly's constitutional rights and gave the government unauthorized access to his strategy and to confidential facts to which they were not entitled. That stolen mail was then handed off to Special Investigations Officer Luke Selby at MCC who copied it and gave back the original for Mr. Modugumudi to return to the cell such that Mr. Kelly would never know it was gone. The copy of this stolen correspondence was ultimately provided to AUSA Krull.

The stolen correspondence included information about Mr. Kelly's relationship with another woman, which was to be kept secret from Jane and Jane-NY as it would create a serious jealousy problem in their relationships with Kelly. No one besides Mr. Kelly and his attorney had access to that information. After Mr. Kelly's communications were stolen without his knowledge by a combination of Officer Ingraham, Officer Selby and Mr. Modugumudi, these stolen communications were provided by prosecutors to a cooperating government informant named Larry McGee who was also offering to cooperate in exchange for a reduced sentence.

In social media videos, McGee has admitted spending hours coercing witnesses to turn against Robert Kelly by showing them his calls and emails.[2] He has admitted getting people to lie about Robert Kelly.[3] In November of 2018, with the full knowledge of AUSA Krull, Jane went to Los Angeles for the purpose of meeting with individuals that Krull contended would be helpful in preparing her to testify. In reality, at that time, Jane had no intention of ever going through with

---

[2] https://www.youtube.com/watch?v=KaOL0HWwxbM
[3] https://www.youtube.com/watch?v=oV22UQvjT74

trial testimony against Mr. Kelly, but she was not sharing that with the prosecutors that threatened her parents. She went to Los Angeles anyway as that is what she understood she was supposed to do. When Jane got to California, the person who met her was Larry Mcgee. Mcgee took her to a residence. At that residence, Mcgee introduced Jane to Jane-NY. He then proceeded to talk to them both extensively about why they should testify against Robert Kelly and all the government would do for them if they did. Mcgee showed Jane and Jane-NY stolen emails and letters that were sent from Robert Kelly to his lawyer. Jane saw the letters and remembers them explicitly. Those letters referenced Mr. Kelly's relationship with another woman that was neither Jane nor Jane-NY. These letters and emails engendered anger in both Jane and Jane-NY. They began to talk about how Mr. Kelly had been secretly having relationships with each of them behind the others back. This conversation and the review of the letters between Robert and his lawyer compelled Jane to become extremely angry at Mr. Kelly. Jane has indicated that she would never have testified against Mr. Kelly at trial had she not had this discussion with Jane -NY and had she not seen the letters and messages between Mr. Kelly and his lawyer.

As a result of this conduct, Larry McGee was rewarded with a cooperation agreement from the government and an incredibly light sentence of 18 months despite federal charges. His sentencing transcript was redacted so no one would know what he did or how he obtained the material to influence Jane and Jane-NY. Exhibit C. Jane has confirmed that it was Mcgee who put her and Jane-NY together in Los Angeles. It was Mcgee who showed them letters and emails between Mr. Kelly and his lawyer. Jane knows this because she experienced it. The government thought they could hide their illicit conduct behind a sealed sentencing transcript to which Mr. Kelly and his defense team have been denied access. But Jane's personal experience exposes them anyway.

All of this information about stolen communications being given to cooperating witness, Larry McGee, by prosecutors was kept from the defense. The theft of Mr. Kelly's legal mail by Modugumudi and its provision to prosecutors was kept from the defense. The meeting between the two primary witnesses in the New York and Chicago cases, which was facilitated by a cooperating witness working for the U.S. attorneys from whom he sought a reduced sentence, was kept from the defense.

During Mr. Kelly's trial in New York, prosecutors advised his attorneys that they had just been made aware of an investigation into a theft of some of Mr. Kelly's communications. The prosecutors said the investigation was ongoing and they had no other information to provide. They contended to have no knowledge of who had stolen the communications and what was done with them. When Mr. Kelly asked to have time to investigate to see if this theft could influence the case against him, prosecutors claimed they had no other information to provide. None of that was true.

In reality, at the time federal prosecutors in New York claimed a lack of knowledge about the investigation of stolen communications, the truth was that a search warrant for Tawana Ingraham's home and electronic devices had already been executed. The application for that warrant identified undeniable evidence that she stole Mr. Kelly's communications. The search of her residence confirmed it. All of that information was in the possession of federal prosecutors who denied having it. Also in their possession was the attorney-client mail stolen by Mr. Modugumudi, which was used by McGee to influence witnesses against Mr. Kelly. This too was hidden from Mr. Kelly and his lawyers. Consequently, Mr. Kelly lacked the ability to attack the central witnesses against him based on a bias that was intentionally generated through the use of privileged communications stolen by a federal officer and trafficked to a cooperating informant by federal prosecutors and agents; and legal mail stolen by a cellmate working for the government

10

who trafficked the purloined letters to prison officers who gave it to federal prosecutors, who then provided it to a cooperating witness that would bring Jane and Jane-NY together to collude against Mr. Kelly at his urging.

Mr. Modugumudi provided the information in his declaration in the presence of a certified Teluga interpreter and the undersigned's associate, Edward McDavid. On March 11, 2025, Mr. McDavid and the Teluga interpreter discussed with Mr. Modugumudi the execution of a written statement summarizing some of the information that was provided at their prior meeting. Mr. Modugumudi ultimately signed a statement, which was also executed by the certified interpreter to demonstrate that it was fully and accurately translated for Mr. Modugumudi prior to its execution. A copy of that signed statement is attached to this filing (Exhibit B) along with the resume of the certified interpreter (Exhibit D). In that written statement, Modugumudi again admitted the theft of Mr. Kelly's attorney-client correspondence, the transfer of that stolen correspondence to an SIS officer (Officer Luke Selby) at MCC, and the ultimate provision of that stolen correspondence to AUSA Krull. Mr. Modugumudi also indicated that prosecutors in his case asked him why he was being visited by attorneys from the undersigned's office even before Mr. McDavid obtained his signed statement.

At the point this signed statement was obtained, the undersigned's office had in its possession a signed admission from an insider who confessed his role in a conspiracy to violate the constitutional rights of Mr. Kelly and bias witnesses against him through the use of stolen privileged information. This was a conspiracy to obstruct justice carried out and jailers and the cooperating witnesses they used to do their bidding. This conspiracy involved the Bureau of Prisons and was orchestrated by the U.S. Attorney's Office. By his own admission, they directed Mr. Modugumudi to do the same thing that Tawana Ingraham was given access to do when she

stole private emails and calls made and sent by Mr. Kelly to his lawyer. Special Investigations officers in the Bureau of Prisons were the ones handling the stolen correspondence in both instances. Ingraham's theft has been documented and is undisputed.

In this case, McGee's and Modugumudi's involvement was hidden rather than disclosed. McGee's influence over Jane and Jane-NY was denied rather than acknowledged. In a letter to his attorney in the Chicago case, the government claimed no knowledge about any stolen correspondence being shown to a witness. Exhibit E. That was a lie. Jane's recollection of her personal experiences will prove that the government did know. They knew McGee was there. They knew Mcgee would be showing Jane and Jane-NY certain documents. It strains credulity to try to fathom how the prosecutors could claim not to have known. The stolen mail was given by Mogudumudi to B.O.P. officers who participated in the theft to federal prosecutors. They knew exactly what was happening. They were using stolen attorney mail and cooperating witnesses to influence the two witnesses they most needed to testify against Robert Kelly in the two respective cases.

Unfortunately for the government, McGee's disclosures on social media exposed his conduct after the fact. Mr. Modugumudi's recent admissions prove that the government has intentionally violated the rights of Mr. Kelly and illicitly tainted witnesses against him. The government hid this truth beneath pages of blacked out redactions in McGee's sentencing transcript and behind the undisclosed behavior of secret cooperating witness, Kishan Modugumudi. But Jane's memory of the events and Modugumudi's recent declaration betray government counsel and reveal the truth.

Just four days after Mr. McDavid obtained the signed statement from Mr. Modugumudi including these admissions, Mr. Kelly was contacted by a prison official at FCI Butner. The official

12

in question advised Mr. Kelly that he got a call, and that "they" (meaning the government) knew that his lawyers in Chicago had been meeting with a witness in jail and that this witness had provided information to the lawyers. The official then advised Mr. Kelly that he was in danger and that Mr. Kelly needed to be careful. The BOP official intimated that Mr. Kelly was not safe in Bureau of Prisons custody. The BOP official further advised that Mr. Kelly should avoid the mess hall. This official wishes to remain anonymous. His identity is known to the defense and can be provided to the Court in camera if needed after the issue of recusal has been addressed.

In the wake of this troubling dialogue with a prison official, on April 11, 2025, an inmate incarcerated with Mr. Kelly approached him and disclosed that he was sent to FCI Butner by BOP officials who directed him to murder Mr. Kelly. The inmate's name is Mikeal Glenn Stine. He is a member of the Aryan Brotherhood gang. He has been in Bureau of Prisons custody since 1982 (with one brief interruption generated by his escape). While incarcerated, he rose to the position of Commissioner of the Aryan Brotherhood. He has signed a declaration setting forth a long history of assaults and murders that he has ordered and participated in at the direction of Bureau of Prisons official. Exhibit F.

Inmates who posed problems for Bureau of Prisons staff and/or inmates with whom staff members were engaged in illegal business were attacked and/or killed by members of the Aryan Brotherhood (A.B). As Commissioner of the A.B., Mr. Stine directed members of the A.B. to commit these acts. In exchange, he and other A.B. members received special privileges including no cell searches and the ability to traffic narcotics within the prison without interference. Mr. Stine indicated that a prison official, who has overseen multiple B.OP. facilities, solicited his participation in multiple killings and assaults. This official's name is Reshae Childress. Mr. Stine had many interactions with Childress while incarcerated at the A.D.X. Florence Supermax facility.

Childress has ordered murders and beating that have been carried out by Mr. Stine and those to whom he gave directions. Mr. Stine is prepared to testify regarding all of these murders in order to provide a foundational backdrop for what happened when Childress approached him about Mr. Kelly.

On or about February of 2023, Stine was housed in the Special Housing Unit at USP Tucson. Without any warning, he was approached for an unexpected official visit. No Bureau of Prisons guards were present. Instead, Mr. Childress directly approached him. Warden Gutierrez and Associate Warden Stangl were with him. They took him out of his cell and took him to an office area in the Special Housing Unit. Being moved without any guards is unprecedented. But it was done in this instance. Once in the office, Childress did all the talking. He advised Stine that he was aware of his terminal cancer diagnosis. He said that he knew Stine had only a matter of months to live. And he said he had a plan that would allow Stine to live out the last of those months as a free man.

Childress advised Stine that he was being sent to FCI Butner. He further advised that there is an inmate at Butner who poses a threat to the Bureau of Prisons and to the government, a person whose high-priced lawyers were going to expose damaging information that would harm high ranking B.OP. officers and higher up DOJ people. Childress told Stine that he needed him (Stine) to eliminate the problem. Childress asked Stine if he was familiar with the musical artist R. Kelly. Stine only knew of Kelly from the news. Childress told Stine that Kelly is a rapist. He told Stine that Kelly raped little white girls. And he told Stine that Kelly was someone that the A.B. would want gone. Childress told Stine that he would be sent to FCI Butner. He said Stine would go to the medical center first and would be eventually moved to Kelly's unit. There, Childress indicated that Stine should kill R. Kelly. This was a plot to commit murder for the purpose of covering up

the crimes noted above. Who it is that gave directives to Childress is a further question that may be answered through a hearing on this motion.

Childress told Stine he would be charged for the murder, but the evidence would be mishandled. There would be no conviction. He further told Stine that he would be transferred following the killing, and, on the way, Stine would be permitted to escape just as he did when he first escaped from BOP custody (a well-documented event). Childress told Stine that he could live out the last of his days as a free man as long as he did as he was told. Stine agreed to his proposal. Gutierrez and Stangl were present for this conversation. Following the conversation, Stine was taken back to his cell in the S.H.U.

Within two weeks of meeting with Childress, Stine was transferred to FCI Butner. As a general matter, BOP transfers almost never happen that quickly. After arriving at Butner, Stine was not on Kelly's unit. He was ultimately taken to the Medical Center just like Childress said. Stine was at the medical center between October 17, 2023, and March of 2025. While at the medical center, Stine was approached by an official in a suit. He does not know his name. This official told Stine that he knew his diagnosis. He knew there was no treatment available. He told Stine: "You need to do what you came here for." Shortly, after that visit, Stine was moved to R. Kelly's unit. He arrived to the unit in March of 2025.

After arriving to the unit, Stine found Mr. Kelly. He followed him. He watched him. He considered how to carry out his murder. He was prepared to carry out the execution. But, in the moment when Stine got near Mr. Kelly, he made a different choice. He told him the truth. Stine told Kelly that he was sent to kill him. He told Mr. Kelly how and by who. He told Mr. Kelly that his life was absolutely in danger. As a dying man with a long history of murder and violence in his past, Stine decided not to carry out his order. Instead, he decided to take this opportunity to expose

15

Childress and the BOP for the decades of murder and violence that they have foisted upon the inmate populace while facing no consequences whatsoever. Mr. Stine is prepared to take a polygraph examination. He is prepared to testify before this Court. He is prepared to provide the names of other witnesses who can corroborate his account of the violence that the A.B. has carried out at the direction of Childress and other BOP. officers. As of the writing of this motion, other A.B. members are now present in Mr. Kelly's unit. Another BOP. officer at F.C.I. Butner named Lieutenant Teague has approached Mr. Stine on multiple occasions to remind him that he must do what he was sent to do.

On June 6, 2025, the defense learned that a second member of the Aryan Brotherhood, who is housed at FCI Butner, had just been approached by Lieutenant Teague and directed to carry out the execution of Mr. Kelly and Mr. Stine. This man's name is David Keith Harris. The possibility of poison being mixed into the food at the chow hall and in the commissary as a means of achieving these executions was discussed with Harris by Lieutenant Teague. This means that at *least* two avowed white supremacists and members of the Aryan Brotherhood have been approached by BOP officers and directed to take Mr. Kelly's life. The one who failed to do so has now had his own life threatened. All of this is being done at the direction of Bureau of Prisons officers whose duty is to keep safe the inmates under their supervision. Both Stine and Harris have agreed to take polygraph examinations and testify to these facts whenever called.[4]

An emergency motion for release from custody based on these threats was filed on June 10, 2025. Within hours of our filing, Mr. Kelly was placed in solitary confinement. He had no access to phones to call his family or his friends. He had no way to call his lawyer. When they

---

[4] The defense has not had the time to formally interview Harris because of the immediacy of the information that he provided.

came to take him to solitary, Mr. Kelly immediately asked to call his lawyer. He was denied that request. He was put in solitary against his will. After no one heard from him on the evening of June 10, 2025, the undersigned's office began making efforts to determine what happened. Prison official refused to tell him whether Mr. Kelly had been placed in solitary confinement. All they would say is that he is still housed in the same facility. After multiple sustained demands, the undersigned finally got a legal call with Mr. Kelly on the morning of June 11. It was only then that the circumstances Mr. Kelly faces were brought to his attention.

In solitary, Mr. Kelly could not eat his own food from his locker, which he purchased from commissary. The prison officials refused to give it to him. Mr. Kelly had spiders crawling over him as he tried to sleep. He did not eat between June10 and June 12 because the only food they would bring him comes from the very chow hall about which both a prison official warned him.

While the allegations made by Mikeal Glenn Stine were shocking, the events that transpired since the filing of Mr. Kelly's motion for temporary furlough are equally stunning, but yet undeniable. When combined with what has already been asserted, the recent events plainly support Mr. Stine's accusation that Bureau of Prisons officers are seeking to kill Robert Kelly to cover up crimes committed by U.S. attorneys and B.O.P. officers involved in the investigation of his case.

Government counsel has called Mr. Kelly's prior motion for release from custody with words like fanciful and theatrical. They can use whatever words they like. The problem for the government is that the allegations in Mr. Kelly's motion are not his. They are the allegations of people who participated in crimes committed by government officials in the effort to make federal cases against R. Kelly, and in a plot to take Mr. Kelly's life as a means of covering up those crimes. For those who doubt the idea that Bureau of Prisons Officers seek to harm Mr. Kelly, the recent

events described below will replace skeptical doubt with stunned recognition of an undeniable reality: Mr. Kelly's life is in danger and the threat comes from Bureau of Prisons officers whose duty is to protect him.

Mr. Kelly was sent to solitary confinement against his will shortly after the filing of his motion for release. A legal call with his attorney was cancelled without explanation. Questions about his physical well-being went unanswered. On June 16, 2025, the reasons became apparent. Finally able to speak to Mr. Kelly by phone, the undersigned learned the following shocking revelations. Mr. Kelly went into solitary confinement with his medications in his possession on June 10, 2025. He takes medication for anxiety and to help him sleep, in addition to other medications. While in solitary confinement, prison staff approached him, and he showed them the medications in his possession. This will appear on camera footage from the institution. Later in the evening, personnel came to Mr. Kelly's cell and provided him with additional medication and instructions to take it. This too will be captured on camera. The way this medication is administered to inmates in solitary confinement is as follows. A Bureau of Prisons official crushes up the pills and puts them in a small, paper cup which is given to the inmate. The inmate has to swallow the power in the presence of the official. So it is not possible for the inmate to discern what pill or quantity of pills he is being given when it is in crushed up form. Mr. Kelly took the medication as directed because he is required to. This was on June 12, 2025, after the undersigned filed a document revealing the solitary confinement conditions experienced by Mr. Kelly.

In the early morning hours of June 13, 2025, Mr. Kelly awoke. He felt faint. He was dizzy. He started to see black spots in his vision. Mr. Kelly tried to get up, but fell to the ground. He crawled to the door of the cell and lost consciousness. He was placed on a gurney. Prison officials wanted him to be taken to the on-site medical facility, but staff there could not assist him.

18

Consequently, Mr. Kelly was taken by ambulance to nearby Duke University Hospital. While in the ambulance, he heard one of the prison officers with him state: "this is going to open a whole new can of worms." At the hospital, Mr. Kelly learned that he had been administered an overdose quantity of his medications that threatened his life. He required hospitalization for two days to treat it. That means that, within two days of the filing of his motion, Bureau of Prisons officials administered an amount of medication that significantly exceeded a safe dose and caused Mr. Kelly to overdose, putting his life in jeopardy. They gave him an amount of medicine that could have killed him.

Unfortunately, administering an overdose quantity of medication to Mr. Kelly just days after his exposure of a Bureau of Prisons plot to kill him is not the end of the B.O.P. actions that put his life in jeopardy. It actually gets much worse. For many months now, Mr. Kelly has been seeking medical attention for an obviously swollen leg. He has a history of blood clots[5] and has been worried about further clots forming. Earlier this year, Mr. Kelly received what was supposed to be a scan for blood clots. He was then told by prison medical staff that they were only authorized to advise him that he would no longer be receiving blood thinners. He was taken off of blood thinners at that time. This was within the past approximately three months.

At Duke University Hospital, Mr. Kelly showed the doctors his leg. He shared his fears and concerns. The hospital immediately did a scan for blood clots. That scan revealed blood clots in his right leg, blood clots in his left leg, and blood clots in his lungs. The hospital indicated he would need to be kept for 7 days and scheduled for a surgery to clear the clots called a pulmonary embolectomy. He was immediately placed back on blood thinners that Butner medical staff

---

[5] Mr. Kelly's blood clots began after the BOP mishandled his recovery from surgery to repair his Achilles tendon and failed to return Mr. Kelly to the operating hospital to remove his leg cast within the timeframe ordered by medical professionals.

discontinued. When advised he required surgery and needed to be kept for a week, officers assigned to Mr. Kelly in the hospital contacted the officials at Butner. Within an hour, officers with assault rifles came into his hospital room and removed Mr. Kelly. He was taken from the hospital against his will and against the directives of the doctors. He was denied the surgery he needs to clear blood clots in his lungs that threaten his life. This happened. It has been confirmed by certain hospital staff. It will be confirmed by hospital records that have been ordered already. It is undeniable. Mr. Kelly's life is in jeopardy right now because the Bureau of Prisons denied him necessary surgery to clear clots from his lungs. He could die from this condition at any time, and they are letting it happen. There is no legitimate explanation for that.

And what did the Bureau of Prisons officials do with an inmate just diagnosed with multiple blood clots at an outside hospital who needs surgical intervention? They took him out of the hospital and returned him to solitary confinement, not even to the Butner medical facility. Since his return to Butner, Mr. Kelly is *still* being denied the blood thinners that were just prescribed to him at the Duke University Hospital. There is no other way to interpret this. They are putting his life in danger intentionally. They intend to let him die.

It is useful to juxtapose the declaration of Mikeal Stine with the conduct of the Bureau of Prisons officials since that declaration became public. He exposed what he indicated was a Bureau of Prisons plot to kill Mr. Kelly in order to cover up crimes committed by D.O.J. and Bureau of Prisons officials during the investigation of his cases. This raised shock and skepticism from some. The Bureau of Prisons officials responded to his allegations by (1) putting Mr. Kelly into solitary confinement against his will; (2) overdosing him on prescription medications administered by prison staff; and (3), removing him from the hospital where they intended to perform surgery to clear blood clots that threaten his life and (4) continuing to deny him blood thinners after they were

explicitly prescribed at the hospital. All of this is verifiable through medical records that have been obtained. So, Mr. Kelly says to the government: how fanciful do Mr. Stine's claims sound now? It was not theatrics that took Mr. Kelly off of the blood thinners that he needed. It was not theatrics that provided him with an overdose of medication. It was not theatrics that denied him necessary surgery on blood clots in his lungs and legs, which threaten his life at his minute. Bureau of Prisons officials did all of that on their own. And they did it within days of Mr. Stine's declaration going public. Those plain facts speak a lot louder than anything government counsel has to say. And they give one message loud and clear: Mr. Kelly's life is in danger, and that danger is coming from Bureau of Prisons officials and their actions.

Should witnesses like Jane, the friends who spoke to her about what prosecutors did, Kishan Modugumudi, Mikeal Glenn Stine, and David Keith Harris ever take the witness stand at a hearing on this motion, they will disclose a sordid and concerted effort by prosecutors and B.O.P. officials to violate Mr. Kelly's rights, to threaten and corruptly influence witnesses, to commit the crimes of theft and obstruction of justice, and to plot the murder of R. Kelly rather than the face the consequences that will follow once their criminal conduct is proven . If this testimony is given, these people can lose their job and their pensions. Under the current Trump Justice Department directives, these people will be prosecuted and go to jail. These people are now high-ranking officials and influential attorneys. They are senior prosecutors and even judges. If Jane, Stine, Modugumudi, and Larry Mcgee get to the witness stand, all of those careers can be upended. All of those important lives can be destroyed.

When Tawana Ingraham was caught stealing Robert Kelly's calls and emails following a search warrant, her guilt was obvious. The U.S. attorney said there was going to be an investigation and prosecution. What happened to Tawana Ingraham? Nothing. She retired quietly with her full

pension. Her crime was swept under the rug. If that is not evidence of corruption inside the U.S. Attorney's Office, then what is? Following a search that established her guilt, a lot of people were necessarily involved in the decision to prevent Tawana Ingraham from facing any of the justice she deserved. Some of the highest-ranking people in the U.S. Attorney's Office had to sign off on that inexplicable decision. All of them are complicit in trying to cover up the corruption that is laid out above. All of them face devastating consequences should the testimony we seek to elicit from these witnesses ever get provided. All of them have every reason to try to prevent Mr. Kelly from ever litigating this motion. If Mr. Kelly is dead, that goal is accomplished.

In the general public, no one really notices what happens to people in prison. If someone dies in prison, it seems commonplace. If someone is killed in prison, that's just what happens in there. It is a sad reality that few people really care about. With that in mind, it becomes easy to understand how the people who committed this corruption and those that helped cover it up would rather kill a disgraced inmate convicted of sex crimes than face consequences that could ruin their lives and careers should he ever put his witnesses on the stand.

The government does not want this pattern of B.O.P. and D.O.J. collusion to commit crimes, intimidate witnesses, and violate rights to secure convictions to be plainly proven in a high-profile case. It will disgrace the U.S. Attorney's Office and Department of Justice. It will disgrace the Bureau of Prisons. And it will cause a long look to be taken at all of the other cases in which the same thing happens every day when no one is paying attention. People have been killed for a lot less. And right now, Mr. Kelly's life is literally in danger as he sits in B.O.P. custody with life threatening blood clots untreated in his lungs because B.O.P. prevented him from getting the treatment that would save him. It does not get more obvious than that.

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 33 allows a defendant to bring a motion for a new trial based on newly discovered evidence within three years of conviction. Fed. R. Crim. P. 33. "[A] motion for a new trial based on newly discovered evidence that demonstrates constitutional or statutory error may . . . be brought under Rule 33 and should be granted 'if the interest of justice so requires.'" *United States v. O'Malley*, 833 F.3d 810, 815 (7th Cir. 2016) (quoting Fed. R. Crim. P. 33(a)).

**ARGUMENT**

Newly discovered evidence establishes that the government engaged in numerous constitutional violations in its prosecution of Mr. Kelly. The government violated Mr. Kelly's right to counsel by utilizing a jailhouse informant to elicit information from Mr. Kelly about the subject matter of the case. The government committed further violations of Mr. Kelly's right to counsel as well as his right to due process under the Fifth Amendment through the surreptitious collection of Mr. Kellys legal communications. And the government flouted its obligations under *Brady* and *Giglio* by concealing impeachment evidence that would damage its case against Mr. Kelly and demonstrate witness intimidation and obstruction of justice committed by prosecutors and B.O.P. officers. The interest of justice therefore requires a new trial.

## I.     The Government Violated Mr. Kelly's Rights to Counsel and Due Process by Imbedding a Government Informant as His Cellmate and Stealing His Legal Communications.

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.'" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). "The core of this right has historically been, and remains today, 'the opportunity for a defendant to consult with an attorney and to have him investigate the case

and prepare a defense for trial.'" *Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (quoting *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)). The Supreme Court has held "that the right extends to having counsel present at various pretrial 'critical' interactions between the defendant and the [government], *United States v. Wade*, 388 U.S. 218, 224 (1967), including the deliberate elicitation by law enforcement officers (and their agents) of statements pertaining to the charge, *Massiah v. United States*, 377 U.S. 201, 206 (1964))." *Id.* (parallel citations omitted).

Moreover, the Supreme Court has "readily acknowledge[d] the importance of the attorney-client privilege, which 'is one of the oldest recognized privileges for confidential communications.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)); *see also Luis v. United States*, 578 U.S. 5, 11 (2016) (describing the "necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust . . . ."). Accordingly, "there has been widespread agreement that communications by post between an inmate and his attorney are sacrosanct . . . ." *Adams v. Carlson*, 488 F.2d 619, 631 (7th Cir. 1973).[6] "Oral intercourse has been hedged with similar protection." *Id.* As the Third Circuit has explained:

> The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself.

*United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978).

---

[6] While *Adams* involved the right of inmates to communicate with counsel, the protection is no less applicable to pretrial detainees.

The government's intrusion into privileged conversations with one's attorney can thus require the vacation of convictions. For instance, "[i]n *Black v. United States*, 385 U.S. 26 (1966), and *O'Brien v. United States*, 386 U.S. 345 (1967), law enforcement officers improperly overheard pretrial conversations between a defendant and his lawyer," and the Supreme Court reversed the conviction in each case. *United States v. Morrison*, 449 U.S. 361, 364–65 (1981) (parallel citations omitted). The risk is not only that the government might introduce such communications at trial, but also that the government can use privileged communications to build its case against a defendant. *See United States v. Danielson*, 325 F.3d 1054, 1074 (9th Cir. 2003), as amended (May 19, 2003) (requiring the government to "show that all of the evidence it introduced at trial was derived from independent sources, and that all of its pre-trial and trial strategy was based on independent sources.").

Another risk is that the government gains an unfair advantage by learning of the defendant's trial strategy. The Ninth Circuit has described the difficulty in assessing such claims:

> In cases where wrongful intrusion results in the prosecution obtaining the defendant's trial strategy, the question of prejudice is more subtle. In such cases, it will often be unclear whether, and how, the prosecution's improperly obtained information about the defendant's trial strategy may have been used, and whether there was prejudice. More important, in such cases the government and the defendant will have unequal access to knowledge. The prosecution team knows what it did and why. The defendant can only guess.

*Danielson*, 325 F.3d at 1070.

Here, the government exhibited a blatant disregard for Mr. Kelly's right to counsel. It embedded Modugumudi as Robert's cellmate—both before and after his New York trial—to obtain information against Mr. Kelly. Mr. Kelly discussed his case with Modugumudi, and that information was provided to BOP officials and the prosecution team. Acting as an informant alone would constitute a Sixth Amendment violation. But the government went further, and enlisted

Modugumudi to obtain Mr. Kelly's privileged correspondence with his attorneys. Not only that, but the numerous BOP officials accessed Mr. Kelly's emails, including legal correspondence. The government used the information stolen by Modugumudi and BOP officers to influence witnesses in this case and I Mr. Kelly's New York prosecution. Compounding the prejudice, the government was able to access Mr. Kelly's trial strategy from these stolen communications. The breadth of this violation and the use of privileged communications in the prosecutions of Mr. Kelly are repugnant to the constitutional guarantees of the right to counsel and due process. *See United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989). The interest of justice thus requires a new trial.

## II. The Government Committed *Brady* and *Giglio* Violations Which Warrant a New Trial.

It was not enough for the government to ignore Mr. Kelly's right to counsel, but it deliberately concealed evidence that it was constitutionally required to produce under *Brady* and *Giglio*. "For a *Brady* violation to exist, entitling a defendant to a new trial, he must establish (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that it is material to an issue at trial." *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007). "Evidence is material if there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Impeachment evidence falls within the *Brady* rule." *Id.* (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

The government's suppression of evidence in this case requires a new trial. The government suppressed the threat of prosecuting Jane's parents if she did not testify. The government also failed to disclose the financial promises it made to Jane. And the government flat out denied that any stolen communications were provided to Jane and that a clandestine meeting

was arranged by McGee. Each of these certainly could have established bias and impacted Jane's credibility with the jury. And one need not speculate about the result if the jury disbelieved her testimony. The acquittal in the 2008 trial is indisputable proof that the case could not stand without her. "Recall that materiality under *Brady* requires only a 'reasonable probability' that the result would be different." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 604 (7th Cir. 2019). "Where, as here, the impeachment evidence is about the government's star witness, it is often material." *Id.*; *see, e.g.*, *Wearry v. Cain*, 577 U.S. 385, 396 (2016) (withholding impeachment evidence against star witness violated *Brady*). There can be no doubt that the interest of justice requires a new trial if Jane's evidence is presented at a hearing.

### III. The Evidence of Constitutional Violations is Newly Discovered.

This information was not obtained until after the trial, and there is no realistic way defense counsel could have obtained it sooner—especially in light of the government's explicit denials. Modugumudi's role as a government informant was not discovered until after the trial. So, too, was the impeachment evidence against Jane. There was no reasonable way to obtain this information without the government's disclosure. "'Because mind-reading is beyond the abilities of even the most diligent attorney,' [courts] are often hesitant to say that 'material contained in a witness's head'" is available to a criminal defendant for *Brady* purposes." *Camm v. Faith*, 937 F.3d 1096, 1109 (7th Cir. 2019) (quoting *Boss v. Pierce*, 263 F.3d 734, 741 (7th Cir. 2001)). And while there was some knowledge of the stolen communications, the breadth of the theft and use of Mr. Kelly's stolen communications to specifically influence Jane and Jane-NY could not have been uncovered by an investigation any more diligent than that undertaken in this case. Discovery and an evidentiary hearing are necessary to assess the full damage of the government's malfeasance

and criminality in its prosecution of Mr. Kelly. However, given the grave constitutional violations in this case, the interest of justice certainly requires a new trial.

### IV.   The Court Should Grant Mr. Kelly Bond Pending the Resolution of his Motion for a New Trial.

Mr. Kelly's life is demonstrably in jeopardy while in custody, and bond pending the resolution this motion is warranted. The jeopardy has gotten worse since the plot to kill him became public. There are no conditions in prison that can protect him. That is been proven every minute he remains with deadly blood clots in his lungs and treatment denied. Courts have "inherent power to order the release of a prisoner bringing a collateral attack . . . ." *Jenkins v. United States*, No. 18-1871, 2018 WL 11303168, at *1 (7th Cir. July 31, 2018) (unpublished) (citing *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985)). Although the case law mostly deals with habeas corpus and § 2255 petitions, the Seventh Circuit has noted that "when made following the outcome of a direct appeal, a Rule 33 motion plainly is 'collateral' in the usual sense of that term." *Kitchen v. United States*, 227 F.3d 1014, 1019 (7th Cir. 2000) (quotation marks and brackets omitted). There is no reason to treat a Rule 33 motion for a new trial differently for purposes of bond.

Here, truly exceptional circumstances warrant Mr. Kelly's bond pending the resolution of this motion. Mr. Kelly's life is in danger while he remains in the physical custody of the BOP. Days after Mr. Kelly filed his emergency motion outlining the corruption in his prosecution and the plot by BOP officials to order his execution, Mr. Kelly was given a potentially lethal overdose of medication while in solitary confinement. At the hospital, he was removed at gunpoint after doctors determined that medical intervention was necessary to treat his blood clots. Mr. Kelly has been warned by BOP officials that things will only get worse for him while his counsel continues to uncover the corruption within the BOP. His release pending the resolution of this motion is

28

necessary for the relief to be effective—a new trial offers no relief if one doesn't live to see it. An immediate bond hearing is requested. The undersigned will seek to call Mikeal Genn Stine at this hearing along with Duke University Hospital doctors that will demonstrate the imminency of the threat that compels bond in this extraordinary circumstance. There is no jurisdictional issue behind which the government can take refuge now that this motion is filed.

## CONCLUSION

The prosecutions of Mr. Kelly brings to mind the warning offered by Justice Brandeis's in his *Olmstead* dissent:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means-to declare that the government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.[7]

"Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of truth," *Kyles v. Whitley*, 514 U.S. 419, 439 (1995), the government must be held to account for its constitutional violations. A new trial is necessary to guard against such descent.

WHEREFORE Mr. Kelly respectfully requests that this Honorable Court order a new trial and Mr. Kelly's release pending the resolution of this motion.

---

[7] *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting), *overruled by Berger v. State of N.Y.*, 388 U.S. 41 (1967), and *overruled by Katz v. United States*, 389 U.S. 347 (1967).

Respectfully submitted,

By: /s/ *Beau B. Brindley*
Attorney for the Defendant

LAW OFFICES OF BEAU B. BRINDLEY
53 W. Jackson Blvd.
Suite 1410
Chicago, Illinois 60604
(312) 765-8878 (Phone)